1   GORDON P. ERSPAMER (CA SBN 83364)
    GErspamer@mofo.com
2   STACEY M. SPRENKEL (CA SBN 241689)
    SSprenkel@mofo.com
3   MORRISON & FOERSTER LLP
    101 Ygnacio Valley Road, Suite 450, P.O. Box 8130
4   Walnut Creek, California 94596-8130
    Telephone: 925.295.3300
5   Facsimile: 925.946.9912

6   [see next page for additional counsel for Plaintiffs]

7   Attorneys for Plaintiff(s)
    VETERANS FOR COMMON SENSE, and
8   VETERANS UNITED FOR TRUTH, INC.

FILED

JUL 2 3 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11   VETERANS FOR COMMON SENSE, a District of         C 07 3758 SC
     Columbia Nonprofit Organization; and VETERANS
12   UNITED FOR TRUTH, INC., a California Nonprofit    CASE NO.
     Organization, representing their members and a class
13   of all veterans similarly situated,              **COMPLAINT FOR
                                                       DECLARATORY AND
14                        Plaintiffs,                  INJUNCTIVE RELIEF UNDER
                                                       UNITED STATES CONSTITUTION
15          v.                                         AND REHABILITATION ACT**

16   R. JAMES NICHOLSON, Secretary of Department of   (Class Action)
     Veterans Affairs; UNITED STATES DEPARTMENT
17   OF VETERANS AFFAIRS; JAMES P. TERRY,
     Chairman, Board of Veterans Appeals; DANIEL L.
18   COOPER, Under Secretary, Veterans Benefits
     Administration; BRADLEY G. MAYES, Director,
19   Compensation and Pension Service; DR. MICHAEL J.
     KUSSMAN, Under Secretary, Veterans Health
20   Administration; PRITZ K. NAVARA, Veterans
     Service Center Manager, Oakland Regional Office,
21   Department of Veterans Affairs; UNITED STATES
     OF AMERICA; ALBERTO GONZALES, Attorney
22   General of the United States; and WILLIAM P.
     GREENE, JR., Chief Judge of the United States Court
23   of Appeals for Veterans Claims,

24                        Defendants.

25

26

27

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

1

1    **ADDITIONAL COUNSEL FOR PLAINTIFFS:**

2

3    ARTURO J. GONZALEZ (CA SBN 121490)                    BILL D. JANICKI (CA SBN 215960)
     AGonzalez@mofo.com                                    BJanicki@mofo.com
     HEATHER A. MOSER (CA SBN 212686)                      MORRISON & FOERSTER LLP
4    HMoser@mofo.com                                       400 Capitol Mall, Suite 2600
     MORRISON & FOERSTER LLP                               Sacramento, California 95814
5    425 Market Street                                     Telephone: 916.448.3200
     San Francisco, California 94105-2482                  Facsimile: 916.448.3222
6    Telephone: 415.268.7000
     Facsimile: 415.268.7522
7
     SIDNEY M. WOLINSKY (CA SBN 33716)
8    SWolinsky@dralegal.org
     MELISSA W. KASNITZ (CA SBN 162679)
9    MKasnitz@dralegal.org
     JENNIFER WEISER BEZOZA (CA SBN 247548)
10   JBezoza@dralegal.org
     KATRINA KASEY CORBIT (CA SBN 237931)
11   KCorbit@dralegal.org
     DISABILITY RIGHTS ADVOCATES
12   2001 Center Street, Third Floor
     Berkeley, California 94704-1204
13   Telephone: 510.665.8644
     Facsimile: 510.665.8511

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. _____                                                                    2
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

I.    **INTRODUCTION**

A.    **The Veterans' Plight**

1.    This lawsuit stems from the shameful failures of the United States Department of Veterans Affairs ("VA") and other governmental institutions to meet our nation's legal and moral obligations to honor and care for our wounded veterans who have served our country. Because of those failures, hundreds of thousands of men and women who have suffered grievous injuries fighting in the ongoing wars in Iraq and Afghanistan are being abandoned. Unless systemic and drastic measures are instituted immediately, the costs to these veterans, their families, and our nation will be incalculable, including broken families, a new generation of unemployed and homeless veterans, increases in drug abuse and alcoholism, and crushing burdens on the health care delivery system and other social services in our communities.

2.    The system for deciding VA claims has largely collapsed. The VA claims adjudication system is currently mired in processing a backlog of over 600,000 claims, many of which have been pending for years. The time period for a claim to be fully decided can exceed ten (10) years. By comparison, the private sector health care industry processes thirty (30) billion claims annually in an average of 89.5 days per claim, including the time required to resolve disputed claims. The VA's process for pursuing a claim is not merely arbitrary and ineffective. The delays have become an insurmountable barrier preventing many veterans from obtaining health care and benefits. Many wounded veterans, particularly those with combat-caused mental illness, give up in frustration and despair or die while their claims are pending. In these cases, justice delayed is justice denied.

3.    Even before the U.S. military became involved in Operation Enduring Freedom (the official title for the war in Afghanistan, also known as "OEF") and Operation Iraqi Freedom (the official title of the war in Iraq, also known as "OIF"), Congress identified serious and long-standing problems with the VA's claims adjudication process. These problems compromise the ability of veterans to obtain access to the disability benefits to which they are entitled. Some of the most serious defects of the claims process include the very large and mounting backlog of claims, extremely lengthy processing times for initial claims and appeals, and internal abuses. The VA has also failed to make plans to treat the health problems of the large numbers of returning OEF/OIF

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                3
wc-106298

1    veterans. These failures have led to a virtual meltdown in the VA's ability to provide appropriate

2    health care and benefits for the men and women who have been casualties of these wars.

3        4.    The huge influx of injured troops returning from Iraq and Afghanistan has

4    overwhelmed the VA's outmoded systems for providing medical care and disability benefits. The

5    difficulties in handling the high volume of claims are exacerbated by the fact that the processes are

6    riddled with inconsistent and irrational procedures. In addition, the archaic systems are structurally

7    unsuitable for dealing with Post-Traumatic Stress Disorder ("PTSD"), a signature problem of

8    veterans of OEF/OIF. As a result, the claims processing systems now in place are mere shells, and

9    the due process rights of wounded veterans seeking care and compensation through these systems are

10   routinely and repeatedly violated in multiple ways.

11       5.    Statistics also show a recent sharp increase in the number of denials of claims

12   by the BVA, reflecting a nearly 100% increase in just two years. Soldiers in the Iraq and Afghanistan

13   wars are surviving much more horrific wounds and injuries. As a result, these seriously wounded,

14   injured, and ill veterans file more complex VA disability compensation claims for dozens of

15   significant medical conditions, including traumatic brain injury, amputation, and PTSD.

16       6.    Veterans with PTSD are among those troops who have suffered the worst due

17   to the disintegration of the VA's claims system. The Iraq and Afghanistan wars have produced an

18   unprecedented number of veterans suffering from this mental disorder. PTSD is prevalent in troops

19   returning from the current wars because of multiple rotations into combat, the absence of battle lines,

20   widespread use of improvised explosive devices, the moral ambiguity of killing combatants dressed

21   as civilians, the unprecedented use of National Guard and Reserve troops, and the use of body armor

22   that saves lives but leaves minds and bodies shattered.

23       7.    PTSD is a predictable reaction to being in a life-threatening situation with no

24   means of escape. It can be triggered in an instant by the horror of seeing a mutilated body or

25   witnessing a violent death.

26       8.    Currently, approximately more than 1.6 million men and women have served

27   in Iraq and/or Afghanistan. A recent report issued by the Defense Department's Task Force on

28   Mental Health found that 38% of soldiers and 50% of National Guard members who have served in

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                      4
wc-106298

1   Iraq or Afghanistan report mental health issues ranging from post-combat stress to brain injuries.

2   According to the Department of Veterans Affairs, 686,000 of the service members who were

3   deployed in Iraq and Afghanistan are now veterans and eligible for VA health care. These staggering

4   numbers understate the severity of the problem, and will inevitably swell as the wars drag on and

5   troops continue to be rotated to Iraq and Afghanistan for multiple deployments.

6          9.      For those suffering from PTSD, the results of the extraordinary delays in the

7   VA's claim process and the systemic failures to address the financial and health needs of veterans

8   with PTSD can be catastrophic. Symptoms of PTSD include intense anxiety, persistent nightmares,

9   depression, uncontrollable anger, and difficulties coping with work, family, and social relationships.

10  Delays in treatment of PTSD can lead to alcoholism, crime, drug addiction, homelessness, anti-social

11  behavior, or suicide.

12         10.     Like the claims processing system, the VA's health care system has also

13  collapsed with the drastic increase in demand for services, particularly in the area of mental health,

14  leaving the promise of treatment for wounded soldiers a hollow one. Veterans tell horror stories not

15  only of having to wait weeks and sometimes months for PTSD treatment, but of insufficient and

16  overworked staff, and the absence of any mental health care in rural areas. Although returning troops

17  are statutorily entitled to two years of free care, many never actually receive any care before the two

18  years elapse.

19         11.     Frances Murphy, the Under-Secretary for Health Policy Coordination at the

20  VA, has conceded that many VA facilities do not provide any mental health care or maintain long

21  waiting lists that effectively render the care virtually inaccessible. Of the 1400 VA hospitals and

22  clinics, only twenty-seven have inpatient PTSD programs. A number of veterans have committed

23  suicide shortly after having been turned away from VA medical facilities either because they were

24  told they were ineligible for treatment or because the wait was too long.

25         12.     Veterans with service-connected disabilities, including PTSD, are statutorily

26  entitled to hospital care and medical services. These veterans, as well as their survivors, are also

27  entitled to monetary benefits for service-connected disabilities or deaths. The process for a veteran to

28  establish his or her right to these benefits is set forth in the Veterans Judicial Review Act and related

Case No. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    5
wc-106298

1    statutes (collectively "VJRA"). The legal and constitutional defects with the VA's systems, as set

2    forth herein, are not only inconsistent with established statutes, regulations, and judicial decisions,

3    but are also divorced from the facts of any individual claim.

4         13.    The process for deciding whether a veteran is suffering from a service-

5    connected disability and then assigning a disability rating for a veteran's disability compensation, is

6    unnecessarily complicated and extremely lengthy, containing numerous pitfalls for the unwary.

7    Veterans with mental illness, such as PTSD, face additional hurdles, as their very disability often

8    prevents them from adequately investigating and pursuing valid claims or causes them to abandon

9    their claims unknowingly through inadvertent failures to comply with complex or unanticipated VA

10   procedural requirements.

11        14.    To apply for benefits and ongoing health care, a veteran must submit a twenty-

12   three page claim form to a regional office of the Veterans Benefits Administration ("VBA"), where a

13   claims adjudicator evaluates the material provided and assigns a rating based on the extent of the

14   veteran's disability. The disability rating assigned by the VA in a claim decision can serve as the

15   basis for both monetary benefits and ongoing health care eligibility. A veteran who disagrees with

16   the regional office's decision can file an appeal to the VA's Board of Veterans Appeals ("BVA")

17   which will review the initial decision. If a veteran still disagrees with the result, he or she can further

18   appeal the decision to the U.S. Court of Appeals for Veterans Claims ("CAVC"). Two additional

19   levels of appellate review exist at the Federal Circuit Court of Appeals and the U.S. Supreme Court.

20        15.    The VA's processes for resolving claims and appeals are not linear. For

21   example, instead of actually deciding a case, the BVA can send it back to the regional office for

22   "further development" or evaluation, often on an issue-by-issue basis. Such remands can add up to

23   two years to the time it takes for a veteran to receive a final decision on his or her claim. In 2006, the

24   BVA remanded almost one-third (32%) of all cases, contributing to a chronic pattern of recycling of

25   claims and more delay, which has become known as "the hamster wheel" phenomenon.

26        16.    The CAVC is overwhelmed with an ever-rising number of appeals and a

27   rapidly increasing backlog. With only seven active judges, this Court's per-judge case average is

28   double the average for other courts of appeal, making it impossible for the CAVC to decide the cases

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                              6
wc-106298

1    before it fairly. In fact, the workload is so great that the CAVC has replaced three judge panels with

2    a single judge in most appeals, and is considering adopting the questionable practice of deciding

3    cases without giving any explanation or reason. In addition, the Chief Judge of the Federal Circuit

4    Court of Appeals recently has warned of "ominous signs" of a deluge of appeals that could prove

5    "catastrophic."

6              17.      The VA has not only shortchanged the wounded veterans for whom it is

7    supposed to provide care and benefits, but also has consistently presented misleading statistics to the

8    American public. Thus, it has falsely understated:

9                        a.      The length of time it takes to decide a veteran's claim and to appeal a

10   denial of benefits;

11                       b.      The amount of funds it needs to meet its obligations to veterans;

12                       c.      The number of veterans who need mental health services; and

13                       d.      The true cost of caring for wounded veterans.

14             18.      The VA has also overstated:

15                       a.      The level and type of care it makes available; and

16                       b.      The adequacy of its screening procedures for battle-caused mental

17   disability.

18             19.      The VA has also failed to keep adequate statistics on critical questions

19   essential to the care of wounded veterans, such as suicide information, prevalence of PTSD among

20   OEF/OIF veterans, emergence of PTSD after discharge, and data on the health care needs of National

21   Guard and Reserve troops returning from combat.

22             20.      At a time when troops remain in harm's way in both Iraq and Afghanistan,

23   veterans have also been exposed to a system-wide pattern of abusive and illegal administrative

24   practices. Various impingements on the constitutional rights of veterans, some of which have been

25   institutionalized by federal statutes, have caused or enabled this pattern of illegal, abusive, and extra-

26   judicial actions toward veterans to flourish, without even the semblance of a meaningful remedy

27   under the VJRA or related statutes.

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                        7
wc-106298

21.   The VA's incentive compensation system financially rewards employees for prematurely denying claims without completing the required factual development steps. And, despite a pattern of illegal practices by regional offices extending back decades, the CAVC has no ability to force the regional offices to comply with its decisions, making a mockery of the rule of law. For example, employees who routinely make errors are not held accountable. In addition, top VA political appointees and executives were paid $3.8 million in cash bonuses while the VA health care and claims system became more hindered with increasing delays.

22.   The VA's bureaucracy also has exerted pressure on adjudicators in the VA's regional offices to deny valid claims or deliberately underrate the severity of disabilities in a misguided effort to save money.

23.   In addition, perverse incentives give the VA an unfair financial motivation to delay claims. For example, if a veteran dies while his or her disability claim is pending, survivors in many cases are not entitled to most of the accrued disability benefits.

24.   Perhaps most shamelessly, federal government officials have induced numerous service members suffering from service-connected PTSD to accept "personality disorder" discharges, which preclude affected veterans from obtaining disability benefits or receiving ongoing medical treatment because they are classified as having a "pre-existing condition." More than 22,500 soldiers across the armed forces have been suspiciously diagnosed and discharged with "personality disorder" in the last six years, condemning them to a lifetime of disability without compensation or access to VA medical care.

25.   In addition, serious problems have surfaced regarding the VA's use of a general ratings guide for mental disorders, particularly PTSD. This guide is used by the VA in the claims process to determine a disability rating. However, it focuses on a veteran's employability rather than his or her more general level of impairment. This emphasis on occupational impairment unduly penalizes veterans with PTSD, who may display distressing and disabling impairments in important areas of life but who are often capable of working to some extent. The result is that veterans with PTSD often receive disability ratings that leave them at or below the poverty level and deprive them of needed medical attention.

1    26.    The VA's failure to satisfy its statutory mandates to provide health care and

2    disability benefits to disabled veterans has been exacerbated by a deliberate and chronic pattern of

3    underfunding. While the government continues to pay lip service to assisting wounded veterans, the

4    VA has been chronically understaffed and left without the resources or procedures necessary to fulfill

5    the nation's commitments to veterans.

6    27.    The abandonment by the VA of Iraq and Afghanistan veterans and the failure

7    to promptly and properly treat them is penny-wise and dollar-foolish. If unredressed, these illegal

8    actions and practices will create another generation of indigent and homeless men and women with

9    staggering social costs.

10    28.    In addition, the VA has failed to monitor and project the costs of providing

11    care to Iraq and Afghanistan war veterans, resulting in a multi-billion dollar budget shortfall. For

12    these two wars, even though the raw data is easily available, the VA still does not accurately monitor

13    health care use, disability benefit activity, actual costs, or cost trends of either benefits or care.

14    **B.    Basic Summary of Action**

15    29.    This is a class action for declaratory and injunctive relief challenging the

16    constitutionality of provisions in the Veterans Judicial Review Act of 1988, in conjunction with

17    related, pre-existing statutes and a pattern of illegal policies and practices of the Department of

18    Veterans Affairs. The putative class is comprised of applicants and recipients for service-connected

19    death or disability compensation, including dependency and indemnity compensation (collectively

20    "SCDDC") claims, based upon Post-Traumatic Stress Disorder, and all veterans with PTSD who are

21    eligible for or receive VA Medical Services, as defined below (occasionally collectively referred to as

22    "the Class" or the "Class Members").

23    30.    Specifically, Plaintiffs challenge the constitutionality of the following

24    provisions of the VJRA, both separately and in combination:

25    a.    Restrictions on veterans' procedural rights, including but not limited to

26    the fact that the VA acts as both the trier of fact and adversary at the critical regional office stage

27    where claims are first decided;

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

9

1    b.    The complete absence of neutral judges or trial-like procedures at the

2    critical regional office level;

3    c.    The veterans' inability to obtain discovery to support SCDDC claims;

4    d.    The veterans' inability to compel the attendance of any VA employees

5    or most other witnesses to testify at hearings and support their claims;

6    e.    The complete absence of any procedure through which a veteran can

7    obtain expedited relief in urgent cases such as an imminent suicide threat;

8    f.    The absence of a class action procedure;

9    g.    The limited role of the Court of Appeals for Veterans Claims and its

10   inability to award injunctive or declaratory relief;

11   h.    The absence of any judicial authority or mechanism to enforce judicial

12   decisions or require the agency of original jurisdiction (the regional offices) to obey or comply with

13   the rule of law; and

14   i.    The attorney's fee prohibition, contained in 38 U.S.C. § 5904(c)(l),

15   which provides that "a fee may not be charged, allowed, or paid for services of agents and attorneys

16   with respect to services provided before the date on which a notice of disagreement is filed with

17   respect to the case," and the related provision for criminal penalties, 38 U.S.C. § 5905, which

18   subjects attorneys to criminal penalties, including imprisonment of up to one year for any violation

19   (hereafter collectively the "Fee Prohibition"). The VJRA provisions identified in sub-paragraphs a-i

20   are sometimes collectively referred to below as the "Statutory Defects."

21       31.    Plaintiffs therefore seek injunctive relief to restrain Defendants from

22   continuing certain widespread practices and policies of the VA that are not and cannot be discovered

23   or raised through the existing system of reviewing individual claim decisions leading up to appeals to

24   the Court of Appeals for Veterans Claims. Each of these VA policies and procedures is enabled and

25   encouraged by the Statutory Defects. Amongst these illegal policies and practices are:

26       a.    Very protracted delays in both the adjudication of PTSD claims and the

27   provision of medical care to PTSD claimants and recipients, resulting in irreparable and devastating

28   injury to wounded veterans and thereby violating the requirements of due process;

Case No. ___ ___
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    10
wc-106298

1                 b.      The destruction, alteration or doctoring of records in veterans' claim

2 files by VA employees;

3                 c.      The premature denial of PTSD and other SCDDC claims before

4 required initial claim development has been completed, again for the express purpose of enabling VA

5 employees to manufacture work credits and "earn" additional incentive compensation;

6                 d.      The exertion by VA officials in Washington, DC of extra-judicial

7 pressure and influence, which have nothing to do with the merits of individual cases, upon the

8 adjudication of claims by VA regional offices;

9                 e.      Various other illegal practices and procedures as outlined below.  The

10 practices and procedures described in sub-paragraphs a-d are occasionally referred to collectively

11 below as the "Challenged VA Practices."

12         32.      Neither VA Secretary R. James Nicholson, nor anyone else, has addressed the

13 Challenged VA Practices.  As a result, they persist and continue to evolve into ever more egregious

14 forms, all at the expense of our nation's veterans.

15      **C.**     **Jurisdiction and Venue**

16         33.      The Court has jurisdiction over the subject matter of this action pursuant to

17 28 U.S.C. § 1331, 5 U.S.C. § 7.  The action arises out of the Constitution of the United States and

18 Plaintiffs seek to redress violations of the First and Fifth Amendments to the United States

19 Constitution.  Plaintiffs also attack the appropriateness of the VA's actions under Section 504 of the

20 Rehabilitation Act, the constitutionality of a federal statute — the VJRA — and related provisions in

21 Title 38 of the U.S. Code.  *See Johnson v. Robison*, 415 U.S. 361, 373 (1974) (district courts have

22 jurisdiction to consider constitutional challenges to statutes administered by VA); *Disabled Am.*

23 *Veterans v. United States Dep't of Veterans Affairs*, 962 F.2d 136, 140-41 (2d Cir. 1992) (same);

24 *Broudy v. Mather*, 460 F.3d 106 (D.C. Cir. 2006); *Bowen v. City of New York*, 476 U.S. 467 (1986).

25         34.      Venue is proper under 28 U.S.C. §§ 1402(a) and 1391(e).

26      **D.**     **The Organizational Plaintiffs**

27         35.      Plaintiff VETERANS FOR COMMON SENSE (hereafter "VCS") is a

28 voluntary, non-profit corporation organized and existing under the laws of the District of Columbia.

1   Its approximately 11,500 members consist of many veterans from OEF/OIF, and includes recipients

2   of and potential claimants for SCDDC and Medical Services, as defined below.  The purpose of VCS

3   is to raise the voices of veterans, and to protect and help veterans.  Numerous VCS members have

4   SCDDC claims pending before the VA or the BVA, including claims based upon PTSD.  Some VCS

5   members are existing recipients of SCDDC whose disability ratings have been reduced or who have

6   been threatened with reduction by the VA.  The SCDDC claims of other members have been

7   completely denied by the VA.

8          36.     Plaintiff VETERANS UNITED FOR TRUTH, INC. (hereafter "VUFT") is a

9   voluntary, non-profit corporation organized and existing under the laws of the State of California,

10  whose central office is located in Santa Barbara, California.  Its approximately 500 members include

11  veterans from the wars in Iraq and Afghanistan, and include recipients of and potential claimants for

12  SCDDC and VA health care.  The purpose of VUFT is to serve all veterans of the Armed Forces of

13  the United States, and one of its primary missions is to ensure that upon return from service, veterans

14  and their families receive the benefits and care to which they are entitled.  VUFT's members include

15  veterans who suffer from PTSD.

16         37.     VUFT has been working to support legislation to ensure that veterans receive

17  the benefits they are due under federal programs, including medical and mental health services.

18         38.     VCS and VUFT bring this action as the representatives of their members

19  and/or constituencies and as class representatives.  The nature of the claims alleged herein and of the

20  relief sought does not make the individual participation of each injured member and/or constituent

21  indispensable to proper resolution of the lawsuit.  Hereinafter, VCS and VUFT will occasionally be

22  referred to collectively as the "Organizational Plaintiffs."

23         39.     The facts herein pertaining to the proposed class representatives and the

24  members or the constituencies they serve are included for the specific purposes of establishing their

25  suitability as class representatives and illustrating the Challenged VA Practices, and not for the

26  purpose of obtaining review of decisions by the VA or CAVC.  Nothing herein is intended or should

27  be construed as an attempt to obtain review of any decision relating to benefits sought by any veteran

28  or any Class Member or to question the validity of any benefits decisions made by the Secretary of

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    12
wc-106298

1  the VA. Likewise, nothing herein is intended or should be construed as a request for money

2  damages.

3      **E.**    **The Defendants**

4      40.    The DEPARTMENT OF VETERANS AFFAIRS, established on March 15,

5  1989 (succeeding the Veterans' Administration), is the second largest of the fifteen Cabinet

6  departments in the United States executive branch and operates nationwide programs for health care,

7  financial assistance, and burial benefits for veterans of foreign wars and their families.

8      41.    Defendant R. JAMES NICHOLSON is currently the Secretary of the VA, and

9  is named herein solely in his official capacity. Mr. Nicholson resigned on July 17, 2007, but his

10  resignation is not yet effective and no successor has been appointed.

11      42.    Defendant JAMES P. TERRY is the current Chairman of the Board of

12  Veterans Appeals, and is named solely in his official capacity.

13      43.    Defendant DANIEL L. COOPER is the Under Secretary of the Veterans

14  Benefits Administration, the principal arm of the VA responsible for SCDDC, and is named solely in

15  his official capacity. As Under Secretary, he directs the VBA through regional offices in fifty states,

16  the District of Columbia, Puerto Rico, and the Philippines. He is responsible for the administration of

17  benefits provided by the VA to veterans and dependents, including compensation, pension, education,

18  home loan guaranty, vocational rehabilitation, and life insurance.

19      44.    Defendant BRADLEY G. MAYES is the Director of the Compensation and

20  Pension Service ("C&P Service"), which is part of the VBA, and is named solely in his official

21  capacity. The C&P Service is a sub-part of the VBA, located in Washington, D.C., that administers a

22  variety of benefits and services for veterans, their dependents, and their survivors, including both

23  SCDDC and non-service-connected benefits such as pensions. The C&P Service also oversees the

24  operation of VA regional offices, including the issuance of instructional circulars and directives, and

25  the conduct of audits.

26      45.    Defendant DR. MICHAEL J. KUSSMAN is an Under Secretary for the

27  Veterans Health Administration ("VHA"), the principal arm of the VA responsible for health care,

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

13

1  and is named solely in his official capacity.  As an Under Secretary, he directs the VA's medical
2  programs.

3        46.    Defendant PRITZ K. NAVARA is the Veterans Service Center Manager for
4  the Oakland Regional Office of the VBA.  He is responsible for the management of that office and is
5  named solely in his official capacity.

6        47.    Defendant WILLIAM P. GREENE, JR. is Chief Judge of the United States
7  Court of Appeals for Veterans Claims ("CAVC"), and is not named in his judicial capacity, but rather
8  in his official capacity as the person responsible for the administration and management of CAVC.
9  Judge Greene is also responsible for the Internal Operating Procedures of the CAVC adopted
10  pursuant to 38 U.S.C. § 7264.  In addition, Judge Greene is responsible for the CAVC's Rules of
11  Practice and Procedure.

12        48.    Defendant ALBERTO GONZALES is the Attorney General of the UNITED
13  STATES OF AMERICA, and is named solely in his official capacity.  Attorney General Gonzales is
14  charged with responsibility for enforcing criminal penalties associated with violations of the Fee
15  Prohibition.

16        49.    The inclusion as defendants of each of the administrative officials and judicial
17  officers named herein is necessary in order to afford complete relief, and to avoid a multiplicity of
18  actions and the possibility of inconsistent results.

19  **II.    EXPERIENCE AND PREVALENCE OF PTSD AMONG WAR VETERANS**
       **RETURNING FROM IRAQ AND AFGHANISTAN**
20
21      **A.    Nature of the Current Armed Conflicts Concerning the Global War on
       Terrorism**

22        50.    Approximately 1.6 million U.S. military service personnel have been deployed
23  to the Global War on Terrorism ("GWOT"), the Pentagon's overarching name for OEF/OIF
24  operations.  Of this total, more than 230,000 have already sought medical care from the VA, 83,000
25  of which were for mental health conditions such as PTSD.

26        51.    As of September 30, 2006, more than 3,000 troops had been killed and 50,500
27  troops had been wounded in Iraq and Afghanistan since the onset of OEF/OIF.  (Linda Bilmes,
28  *Soldiers Returning from Iraq and Afghanistan:  The Long-Term Costs of Providing Veterans Medical*

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    14
wc-106298

1  *Care and Disability Benefits*, RWP07-001 (John F. Kennedy School of Government, Harvard
2  University, Faculty Research Working Papers Series, 2007) ("Bilmes Study") at 11-12.)[1]  By early
3  June 2007, the death total had reached 3,810.  The Department of Defense ("DOD") reported that, as
4  of May 2007, 111 of these troops had died of self-inflicted wounds; the DOD does not report suicides
5  among veterans of OEF/OIF.

6  52.  Many troops serving in OEF/OIF are surviving injuries that would have been
7  fatal in past conflicts.  In World War II, about 30% of American service members wounded in
8  combat died.  Because of medical advances, this proportion has dropped to 3% for OEF/OIF service
9  members, but many of them are returning home with severe and often hidden disabilities, including
10  PTSD, making the ratio of casualties to deaths much higher than in past wars.  (U.S. Gov't
11  Accountability Office, VA and DOD Health Care: Efforts to Provide Seamless Transition of Care for
12  OEF and OIF Servicemembers and Veterans, GAO 06-794R. (June 2006) at 5.)

13  53.  The present wars are chaotic ones.  The campaign of fighting insurgents in Iraq
14  and Afghanistan has involved guerrilla style warfare, with the use of suicide bombers and improvised
15  explosive devices from ambiguous sources and threats.  For U.S. service members, this type of
16  combat has resulted in a need for pervasive hyper-vigilance and the sense that there is no safe place
17  in Iraq or Afghanistan.

18  54.  A substantial proportion of service members in the current conflicts have
19  personally experienced severe traumatic events while deployed.  Researchers have found, in a study
20  of troops' mental health before and after deployment, that 95% of respondents reported seeing dead
21  bodies and remains, 95% had been shot at, 89% had been ambushed or attacked, and 69% had injured
22  a woman or child and felt they could not provide assistance.  (C.W. Hoge *et al.*, *Combat Duty in Iraq*
23  *and Afghanistan, Mental Health Problems, and Barriers to Care*, The New England Journal of
24  Medicine (July 1, 2004), at 18.)  According to Deputy Under Secretary for Health Policy
25  Coordination Frances Murphy, 77% of the troops in Iraq reported in Spring of 2006 having shot or

[1] The Appendix contains URLs for all documents referred to in this complaint that are available on the web.

1    directed fire at the enemy and 86% of troops in Iraq reported at the same time knowing someone who

2    was seriously injured or killed. (Frances M. Murphy, Statement Before the Former Members of the

3    President's New Freedom Commission on Mental Health (Mar. 29, 2006) at 3.)

4            55.    In OEF/OIF, troops are serving longer and more frequent tours of duty than in

5    past conflicts. Many troops have been deployed three or four times and have had their tours of duty

6    involuntarily extended in length. A considerable number of troops are conducting combat operations

7    every day of the week, ten to twelve hours per day, for months on end.

8            56.    At no time in U.S. military history have large numbers of troops been required

9    to serve on the front line in any war for a period of six to seven months, let alone a year or more,

10   without a significant break to recover from the physical, psychological, and emotional demands that

11   ensue from combat. During WWII, entire units were withdrawn from the line for months at a time in

12   order to rest and recuperate. Even during Vietnam, week-long combat patrols in the field were

13   typically followed by several days of rest and recuperation at the base camp.

14           57.    Never before has our nation redeployed service members who have already

15   been diagnosed with PTSD to the same combat zone where they were originally traumatized, as is

16   being done now.

17   **B.    Background on Post Traumatic Stress Disorder**

18           58.    PTSD is a psychiatric disorder that can develop in a person who experiences,

19   witnesses, or is confronted with a traumatic event, often an event that is life-threatening. PTSD is the

20   most prevalent mental disorder arising from combat.

21           59.    The psychological effects of war on combatants have been documented at least

22   as far back as the American Revolutionary War. A substantial number of veterans from the World

23   Wars, the Korean Conflict, and the Vietnam Conflict have experienced psychological symptoms that

24   the medical profession originally characterized as "shell shock," "combat fatigue," and "stress

25   reaction." In the mid-1970s, the observation of a large number of combat-related stress disorders in

26   Vietnam veterans prompted increased analysis of psychological problems arising in the wake of

27   traumatic experiences. The resulting research led investigators to postulate that there was a common

28   pattern of psychic reaction to traumatic events, and that a method of categorization was needed.

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                          16
wc-106298

1    60.    The American Psychiatric Association's ("APA") third Diagnostic and

2    Statistical Manual of Mental Disorders ("DSM-III") included, for the first time in 1980, a diagnosis

3    for PTSD. (American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (3d

4    ed. 1980).)  The current diagnostic features for PTSD are contained in the APA's fourth Diagnostic

5    and Statistical Manual of Mental Disorders ("DSM-IV-TR").

6    61.    The essential feature of PTSD is the development of characteristic symptoms

7    after a person experiences, witnesses, or learns of an event(s) that involves actual or threatened death

8    or serious injury, or a threat to the physical integrity of self or others.  The response to the event must

9    involve intense fear, helplessness, or horror.  The symptoms resulting from exposure to the extreme

10   trauma include:  a) re-experiencing of the traumatic event, often through flashbacks or nightmares;

11   b) avoidance of anything associated with the trauma and numbing of emotions; and c) increased

12   arousal, often manifested by difficulty sleeping and concentrating and by irritability.  To support a

13   diagnosis of PTSD, the symptoms must be present for more than one month and must cause

14   significant distress or impairment in important areas of functioning.  (DSM-IV-TR § 309.81, 463-65.)

15   62.    The diagnostic criteria for PTSD speak in terms of response to psychological

16   stressors, and do not require an observable physical injury as a predicate to diagnosis of the disorder.

17   (*Id.*)

18   63.    PTSD can develop at any time after exposure to a traumatic stressor.  When

19   PTSD does not appear until six months or more after the exposure to the traumatic event, it is termed

20   "delayed onset."  For veterans, it often emerges several months after return to civilian life.

21   64.    PTSD can be classified as either acute or chronic, depending on its duration.

22   Acute stress disorder is diagnosed between one to three months after a traumatic exposure and has

23   symptoms that last fewer than three months.  PTSD that is present beyond three months after the

24   traumatic event is termed chronic.  Most studies suggest that PTSD is more likely to manifest in the

25   chronic form with effects that are enduring.  The symptoms of PTSD and the accompanying impaired

26   function may be continuous or sporadic and are often exacerbated by the presence of adversity or

27   new life stressors.

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    17
wc-106298

65.     PTSD is marked by high rates of comorbidity with other mental health conditions, such as depression. Thus, determining comorbidity is an essential component of assessing a patient with PTSD.

66.     Clinicians offer a range of treatments to individuals diagnosed with PTSD, including individual and group therapy and medication to manage symptoms. Although there is no cure for PTSD, early identification and treatment of PTSD symptoms may lessen the severity of the condition and improve the overall quality of life for service members and veterans. If left untreated, severe PTSD can lead to substance abuse, depression, and suicide.

## C.   Statistical Evidence Concerning the Prevalence of PTSD Among OEF/OIF Veterans

67.     Because neither the DOD nor the VA adequately diagnose or effectively track PTSD in veterans, precise statistics on the prevalence of PTSD in OEF/OIF veterans are not available.

68.     The PTSD syndrome appeared, according to studies, in 30% of Vietnam veterans. Where combat operations are especially intense, as they are in Iraq and Afghanistan, troops face an increased risk of developing PTSD and other associated mental health problems. More than any prior war, the current wars in Iraq and Afghanistan are likely to produce the highest percentage of troops suffering from PTSD. The reasons include multiple rotations into combat, the moral ambiguity of killing combatants dressed as civilians, and the unprecedented use of National Guard and Reserve soldiers. (Reserves make up as much as 40% of U.S. forces in Iraq and Afghanistan.) (Linda Rosenberg, Statement Before the House Committee on Veteran's Affairs, PTSD Health Care Symposium, United States House of Representatives (May 16, 2007) at 1.)

69.     There is great variability in the estimates of how many returning OEF/OIF veterans are experiencing PTSD. The studies range from 15% up to 50%.

70.     The Defense Department's Task Force on Mental Health has recently found that approximately 31% of Marines, 38% of Soldiers, and 50% of National Guard members that have served in Iraq or Afghanistan report mental health issues, ranging from post-combat stress to brain injuries. (Dep't of Defense Task Force on Mental Health, *An Achievable Vision: Report of the*

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    18
wc-106298

1   *Department of Defense*, Task Force on Mental Health (June 2007) at ES-2.) So far, the VA has
2   diagnosed possible PTSD in approximately 34,000 Iraq and Afghanistan veterans, about 3800 of
3   whom are women. (Sara Corbett, *The Women's War*, N.Y. Times Mag., Mar. 18, 2007, at 46.)

4       71.     A 2005 investigation by the VA Office of the Inspector General ("OIG") found
5   that the number of veterans receiving SCDDC for PTSD increased significantly during Fiscal Years
6   1999-2004, growing by 79.5%, from 120,265 to 215,971 cases. (Dep't of Veterans Affairs Office of
7   Inspector General, Review of State Variances in VA Disability Compensation Payments, Report No.
8   05-00765-137 (May 19, 2005) at vii.) In FY 2005, PTSD was the fourth most common service-
9   connected disability for veterans who began receiving disability compensation that year. (Veterans
10  Benefits Administration, Annual Benefits Report FY 2005 (Sept. 2005) at 21).) The VA does not
11  publish a record of the total number of veterans currently receiving treatment for PTSD at its medical
12  facilities and Vet Centers (community-based VA facilities that offer trauma and readjustment
13  counseling).

14      72.     Members of the National Guard and Reserves are more likely to be at risk for
15  developing PTSD than other OEF/OIF service members because they have less training and
16  preparation for deployment, less cohesive units, and many never expected to see combat.

17      73.     PTSD is twice as prevalent in female veterans as in males. There are also sex
18  differences in the manifestation of conditions commonly comorbid with PTSD, with females being
19  more likely than males to have major depressive disorder along with PTSD. Female soldiers also
20  experience the trauma associated with sexual assaults, also causing PTSD in some cases.

21      74.     Female veterans are less likely to receive disability benefits for PTSD than
22  male veterans. The difference may be a consequence of the relative difficulty of substantiating
23  exposure to non-combat traumatic stressors — notably, military sexual assault. According to a 2003
24  DOD report, nearly one-third of female veterans reported that they had been sexually assaulted
25  during military service. (Sara Corbett, *The Women's War* at 45.)

26      75.     African-American veterans are more likely than white veterans to experience
27  PTSD. The stress of wartime service can be particularly exacerbated for African-Americans by the
28  isolation of discrimination and racism, contributing to PTSD. (Nathaniel M. Rickles, *et al.*, *Health*

1  *Care Experiences and Health Outcomes of African-American Veterans*, Institute on Urban Health

2  Research (April 2007) at 7.)

3          76.    African American veterans are also less likely than other groups to receive

4  PTSD disability benefits. (Maureen Murdoch, *et al.*, *Mitigating Effect of Department of Veterans*

5  *Affairs Disability Benefits for Post-traumatic Stress Disorder on Low Income,* Military Medicine

6  (Feb. 2005) at 3.) When psychiatrists treat African-Americans for PTSD, they are much less likely to

7  attribute the PTSD to combat than when they treat whites, leading to a denial of services at the VA.

8  (*Id.*). One study found that African-American veterans were deemed to have service-connected

9  PTSD at a rate of 43%, compared with 56% for other respondents. (Maureen Murdoch *et al.*, *Racial*

10  *Disparities in VA Service Connection for Posttraumatic Stress Disorder Disability*, Medical Care

11  (Apr. 2003) at 536-49.)

12          77.    In addition, young adults under age twenty-five are nine times more likely to

13  develop PTSD than veterans over forty. (Jeremy Manier & Judith Graham, *Veterans Fight the War*

14  *Within*, The Chicago Tribune, Mar. 13, 2007 at 2.)

15  **III.    VETERANS' PROPERTY RIGHTS TO RECEIVE SERVICE-CONNECTED**
        **DEATH AND DISABILITY COMPENSATION AND MEDICAL CARE**

16

17      **A.    A Veteran's Statutory Entitlement to Service-Connected Death and**
        **Disability Compensation and Medical Services**

18          78.    About a quarter of the nation's population, approximately seventy million

19  people, are potentially eligible for benefits and services administered by the VA. The VA processes

20  claims and provides services to over twenty-five million veterans, including veterans returning from

21  our ongoing foreign wars in Iraq and Afghanistan.

22          79.    Veterans with "service-connected" disabilities are entitled to monetary benefits

23  as compensation. The term "service-connected" means that the disability is a result of a disease or

24  injury incurred through, or aggravated during, active military service. Service connection will be

25  granted if the disease or injury is diagnosed after discharge provided it was incurred in service.

26  38 C.F.R. § 3.303(d). A veteran is presumed to have been in sound condition when accepted for

27  service except where there is clear and unmistakable evidence that an injury or disease existed prior

28  to service and was not aggravated by such service. 38 C.F.R. § 3.304(b).

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

20

1        80.    Veterans' disability compensation is an entitlement program, like Medicare and

2    Social Security, that creates a property interest protected by the Due Process Clause of the United

3    States Constitution. Once a veteran has been approved to receive disability pay, he or she is entitled

4    to receive annual payments and cost-of-living adjustments. 38 U.S.C. § 1104.

5        81.    Veterans' and other claimants' fundamental right to SCDDC is grounded in

6    express provisions of federal statutes at 38 U.S.C. § 1101 *et seq.* 38 U.S.C. § 1110 ("Basic

7    entitlement") provides for disability compensation, as follows:

8            For disability resulting from personal injury suffered or disease
             contracted in line of duty, or for aggravation of a preexisting injury
9            suffered or disease contracted in line of duty, in the active military,
             naval, or air service, during a period of war, the United States will
10           pay to any veteran thus disabled and who was discharged or
             released under conditions other than dishonorable . . .
11           compensation as provided in this subchapter . . . .

12   Similar provisions are contained in 38 U.S.C. § 1121 ("Basic entitlement" to wartime death

13   compensation), 38 U.S.C. § 1131 ("Basic entitlement" to peacetime disability compensation) and 38

14   U.S.C. § 1141 ("Basic entitlement" to peacetime death compensation).

15       82.    The rates of wartime and peacetime disability compensation correspond to the

16   percentage degree of disability and are specified in 38 U.S.C. §§ 1114-15, 1134. The rates of

17   wartime and peacetime death compensation are specified in 38 U.S.C. §§ 1122, 1142.

18       83.    38 U.S.C. § 1301 *et seq.* provide dependency and indemnity compensation

19   ("DIC") to spouses, children and/or parents of veterans whose deaths were service-connected. 38

20   U.S.C. § 1310(a) provides, in relevant part, as follows:

21           When any veteran dies after December 31, 1956, from a service-
             connected or compensable disability, the Administrator shall pay
22           dependency and indemnity compensation to such veteran's surviving
             spouse, children and parents.
23

24   The purpose of DIC is to provide partial compensation to survivors for the loss of financial support

25   associated with a veteran's death. 38 U.S.C. § 1311 specifies the rates of dependency and indemnity

26   compensation for a surviving spouse, while 38 U.S.C. §§ 1313-15 specify the rates for surviving

27   children and parents, respectively.

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    21
wc-106298

84.     A veteran's fundamental right to hospital care and medical services is codified
at 38 U.S.C § 1710. Congress requires the Secretary of the VA to "furnish hospital care and medical
services" to veterans with service-connected disabilities, including those with PTSD. 38 U.S.C.
§§ 1710(a)(1), (a)(2). The statute defines "disability" as any "disease, injury, or other physical or
mental defect." 38. U.S.C. §1701(1). The mandatory medical services under the statute include
"medical examination, treatment, and rehabilitative services." 38 U.S.C. § 1701(6).

85.     The provisions for VA hospital care and medical services are very broad and
include veterans who have suffered non-service connected disabilities under certain circumstances as
consideration for their prior service to their country. 38 U.S.C. §§ 1710(a)(2)(A)-(G).

86.     A related statutory provision requires that "the Secretary shall ensure that the
Department . . . maintains its capacity to provide for the specialized treatment and rehabilitative
needs of disabled veterans (including veterans with . . . mental illness) within distinct programs or
facilities of the Department that are dedicated to the specialized needs of those veterans in a manner
that (A) *affords those veterans reasonable access to care and services for those specialized needs*,
and (B) ensures that the overall capacity of the Department . . . to provide such services is not
reduced below the capacity of the Department, nationwide, to provide those services as of [the date of
enactment]." 38 U.S.C. § 1706(b)(1).

87.     Congress further ordered that the VA Secretary "shall ensure that the system
will be managed in a manner to ensure that the provision of care to enrollees *is timely and acceptable
in quality*." 38 U.S.C. § 1705(b)(3) (emphasis added).

88.     Chapter 17 of Title 38 of the United States Code contains a specific section
regarding readjustment counseling and related mental health services. *See* 38 U.S.C. § 1712A. This
section requires that "[u]pon the request of any veteran [who has served on active duty in an area at a
time during which hostilities occurred in that area], the Secretary shall furnish counseling to the
veteran to assist the veteran in readjusting to civilian life. Such counseling may include a general
mental and psychological assessment of the veteran to ascertain whether such veteran has mental or
psychological problems associated with readjustment to civilian life." 38 U.S.C. § 1712A(a)(1)(A)
(emphasis added).

22

89.    Congress created a patient enrollment process that separates eligible veterans into eight priority groups and requires the Secretary to enroll the highest priority cases first. 38 U.S.C. § 1710; 38 C.F.R. § 1736(b). Thus, a veterans' priority group determines when his or her claim for medical services will be processed, what services he or she will receive, when he or she will receive those services, and what co-pay, if any, he or she will be required to pay. (*Id.*) For example, 50% of all VA hospital or outpatient medical appointments are reserved for veterans in Priority Group 1. To be placed in Priority Group 1, a veteran must be at least 50% service-connected disabled. 38 C.F.R. § 17.36(b)(1). If a veteran is determined to be only 10%-20% disabled, the highest priority group rating he or she can receive is Priority Group 3. 38 C.F.R. § 17.36(b)(3).

90.    The VA is not currently serving any veterans placed in Priority Group 8 due to its claim of lack of resources. 38 C.F.R. § 17.36(c)(2).

91.    Under a recent law, the VA must provide free medical care to veterans who served in any conflict after November 11, 1998, for two years from the date of separation from military service for any illness, including PTSD, even if the condition is not determined to be attributable to military service. 38 U.S.C. § 1710(e)(1)(D) (hereafter the "Medical Care Statute"). This two-year eligibility includes those Reserve and National Guard members who have left active duty and returned to their units. After two years, these veterans will be subject to the same eligibility rules as other veterans, who generally have to establish eligibility by either proving that a medical problem is connected to his or her military service or by demonstrating relatively low income. The above-described statutory entitlements to medical care and services are collectively referred to as "Medical Services."

92.    Although returning troops are statutorily entitled to two years of free care, many do not get a comprehensive exam for six months to a year after they separate from the military and many are not notified of their treatment needs for another year, giving them little time to access the free health care. (Stacy Bannerman, *Iraq Reservists Face a 'Perfect Storm' of Post-Traumatic Stress*, Foreign Policy in Focus, Mar. 15, 2007 at 1.) In addition, returning troops that have not been diagnosed are placed in Priority Group 6, which means they are likely to wait significant amounts of time for care. 38 C.F.R. § 17.36(b)(6).

93.    The basic rights to SCDDC and Medical Services for PTSD are property interests protected by the Due Process Clause of the Fifth Amendment of the U.S. Constitution. Service-connected injuries frequently interfere with the quality of life and/or preclude employment of a veteran upon return to civilian life, while deaths often deprive a veteran's dependents of their principal or sole means of support. Many PTSD claimants and recipients are frequently incapacitated and many recipients are totally or primarily dependent upon SCDDC for support and upon VA Medical Services for their health care needs.

## B.    The Claims Process at VA Regional Offices

94.    Initial SCDDC claims, including PTSD claims, are made to one of fifty-seven VBA regional offices around the United States and its territories; these regional offices serve as the agency of original jurisdiction. A twenty-three page VA application form requires a veteran to submit evidence of a disability and to indicate how the disability may be connected to the veteran's military service. A VBA service representative is responsible for obtaining the relevant evidence (e.g., military service and medical records) to evaluate the claim.

95.    The development of a factual record at the regional level is the most critical aspect of the claims process, since the VA decision rests on this record, and gaps in the evidence often cannot be cured later.

96.    To obtain information needed to fully develop some PTSD claims, the VBA must obtain records from the U.S. Army and Joint Services Records Research Center ("JSRRC"), whose average response time to VBA regional office requests is about one year. (Daniel Bertoni, "Veterans' Disability Benefits: Processing of Claims Continues to Present Challenges", Testimony Before the Subcommittee on Disability Assistance and Memorial Affairs, Committee on Veterans' Affairs, United States House of Representatives (Mar. 13, 2007) at 6.)

97.    The Fee Prohibition prevents veterans from compensating counsel to represent them in proceedings before the agency and thus prevents veterans from ensuring that the record is fairly and fully developed. The Fee Prohibition has virtually eliminated the ability of Class Members to obtain the services of lawyers and has compromised their ability to prosecute their PTSD claims

1  successfully. Moreover, the Challenged VA Practices occur mainly at the regional office level,

2  where the vast majority of claimants lack attorney representation due to the Fee Prohibition.

3         98.    Once all the relevant evidence has been received by the regional office, a VBA

4  Service Representative or a Rating Veterans Service Representative will typically request that the

5  Veterans Health Administration set up and conduct one or more physical examinations of the

6  claimant, called Compensation and Pension ("C&P") examinations. These examinations are

7  conducted either by staff clinicians or by contracted health professionals, depending on the facility

8  used and the need for specialists. They differ in both scope and purpose from standard clinical

9  exams, as their core function is to provide VBA staff with the evidentiary foundation from which to

10  accept or deny a claim for benefits.

11         99.    For veterans seeking PTSD compensation, the purposes of the C&P

12  examination are to: a) establish the presence or absence of a diagnosis of PTSD; b) determine the

13  severity of PTSD symptoms; and c) establish a logical relationship between exposure to military

14  stressors and current PTSD symptoms. As such, C&P exams for PTSD consist of a review of the

15  veteran's medical history, an assessment of his or her traumatic exposure(s), an evaluation of his or

16  her mental status and of social and occupational function, and a diagnostic exam, which may include

17  psychological testing or a determination of a Global Assessment of Functioning ("GAF") score.

18         100.   The conclusions reached in the medical examination of a PTSD claimant,

19  including analysis of the Clinician Administered PTSD Scale ("CAPS") and the DSM-IV-TR criteria

20  for PTSD, are often pivotal in establishing service connection and the degree of disability.

21         101.   According to a 2006 VA handbook on C&P examinations, VHA has a time

22  standard of thirty-five calendar days after receipt of an examination request to complete the

23  examinations and required tests. (Dep't of Veterans Affairs, *VHA Handbook 1601 E.01:*

24  *Compensation and Pension Examinations* (Veterans Health Administration 2006) at 3.)

25         102.   There are limited circumstances in which a C&P exam is not necessary in

26  order to obtain benefits from the VA. These include situations where a veteran is able to provide

27  sufficient medical and disability documentation and evidence of a service connection to allow VBA

28  to make its determination without the need for further evaluation.

1       103.    The VA's initial decision on a claim for SCDDC (service-connected death or

2   disability compensation) is communicated in a computer-generated notice called a Notice of

3   Decision, which typically contains a brief set of factual findings together with a standardized set of

4   generic findings based upon the type of claim. 38 C.F.R. § 3.103.

5       104.    VA regulations governing the due process rights of claimants and the granting

6   of benefits are expressly conditioned upon "protecting the interests of the Government." 38 C.F.R.

7   § 3.103. At no stage in the claims process does a claimant have the right to compel the attendance of

8   any VA employee or third party witness or obtain any discovery from the VA, other government

9   agencies, or third parties.

10      **C.    Special Rules and Regulations Governing the VA's Adjudication of PTSD
11            Claims**

12      105.    The VA has adopted special rules and regulations to govern its adjudication of

13  PTSD claims, including formal regulations set forth at 38 C.F.R. § 3.304(f) (the "VA PTSD

14  Regulations") and informal rules contained in Section D of Part IV and Part III, Subpart IV, at 4.H, of

15  its desktop M-21-1MR Adjudication Manual (the "PTSD Manual Provisions"). These regulations

16  address procedures for diagnosing and evaluating PTSD claims and other claims based upon mental

17  disorders.

18          106.    The VA PTSD Regulations provide specifically that:

19              Service connection for post-traumatic stress disorder requires medical
                evidence diagnosing the condition in accordance with § 4.125(a) of this
20              chapter; a link, established by medical evidence, between current
                symptoms and an in-service stressor; and credible supporting evidence
21              that the claimed in-service stressor occurred. Although service
                connection may be established based on other in-service stressors, the
22              following provisions apply for specified in-service stressors as set forth
                below:
23
                (1) If the evidence establishes that the veteran engaged in combat with
24              the enemy and the claimed stressor is related to that combat, in the
                absence of clear and convincing evidence to the contrary, and provided
25              that the claimed stressor is consistent with the circumstances,
                conditions, or hardships of the veteran's service, the veteran's lay
26              testimony alone may establish the occurrence of the claimed in-service
                stressor.
27
                (2) If the evidence establishes that the veteran was a prisoner-of-war
28              under the provisions of § 3.1(y) of this part and the claimed stressor is

1

2

3

> related to that prisoner-of-war experience, in the absence of clear and
> convincing evidence to the contrary, and provided that the claimed
> stressor is consistent with the circumstances, conditions, or hardships
> of the veteran's service, the veteran's lay testimony alone may establish
> the occurrence of the claimed in-service stressor.

4

5

6

7

8

> (3) If a post-traumatic stress disorder claim is based on in-service
> personal assault, evidence from sources other than the veterans' service
> records may corroborate the veteran's account of the stressor incident.
> Examples of such evidence include, but are not limited to: records from
> law enforcement authorities, rape crisis centers, mental health
> counseling centers, hospitals, or physicians; pregnancy tests or tests for
> sexually transmitted diseases; and statements from family members,
> roommates, fellow service members, or clergy....

38 C.F.R. § 3.304(f).

9

10

107.     The VA PTSD Regulations also require that, in order to rate a veteran with

PTSD, the decision-maker must be thoroughly familiar with the American Psychiatric Association's

11

Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") and the specific criteria

12

listed in the DSM-IV-TR regarding the evaluation of a person claiming PTSD.  38 C.F.R. § 3.304(f);

13

38 C.F.R. § 4.125(a); 38 C.F.R. § 4.130.

14

108.     The regional office rating personnel are supposed to base their rating decisions

15

on the criteria set forth in the VA Schedule for Rating Disabilities ("VASRD"), 38 CFR Part 4, which

16

includes PTSD among the mental disorders listed.  Mental disorders receive disability ratings of 0,

17

10, 30, 50, 70, or 100%.  Disability payments range from about $115 per month for a 10% disability

18

rating to $2,471 per month for a 100% rating.

19

109.     The PTSD Manual Provisions contain substantive standards beyond what is

20

required by the VA PTSD Regulations regarding proof of a PTSD claim, which include: the

21

minimum proof that must be supplied by a claimant to avoid a denial (e.g., the existence of an in-

22

service stressor, the location of the incident, the approximate date of the incident, and the claimant's

23

military unit); the definition of "engaging in combat"; what constitutes "credible supporting

24

evidence" that a stressor occurred; and the extent to which non-combat-related stressors, such as a

25

plane crash, explosion, rape or assault, can be considered.

26

110.     In addition to the previously described rules and regulations regarding PTSD

27

claims, the C&P Service has developed an elaborate Clinician's Guide, the dual purposes of which

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                              27
wc-106298

1   are to assist clinicians in performing medical examinations and to explain the rating guide in clinical

2   terms.

3              111.    Chapter 13 of the Clinician's Guide addresses the topic of Mental Disorders

4   (C&P Service & Veterans Health Administration, *VA Clinician's Guide* (Lewis R. Coulso, ed.,

5   Matthew Bender & Co. Inc. 2006) at 181-195), while Chapter 14 focuses more particularly on PTSD.

6   (*Id.* at 196-217.)

7              112.    The Clinician's Guide emphasizes that:

8              **NOTE:** Service connection for post-traumatic stress disorder (PTSD)
               requires medical evidence establishing a diagnosis of the condition that
9              conforms to the diagnostic criteria of DSM-IV, credible supporting
               evidence that the claimed in-service stressor actually occurred, and a
10             link, established by medical evidence, between current
               symptomatology and the claimed in-service stressor. It is the
11             responsibility of the examiner to indicate the traumatic stressor leading
               to PTSD, if he or she makes the diagnosis of PTSD. *Crucial in this*
12             *description are specific details of the stressor, with names, dates, and*
               *places linked to the stressor, so that the rating specialist can confirm*
13             *that the cited stressor occurred during active duty.*

14  (*Id.* at 207.) (emphasis in original)

15             113.    The Clinician's Guide provisions regarding PTSD express a far stricter

16  standard of proof than that contained in the VA Regulations, and require data and information that is

17  not available to veterans without discovery. 38 U.S.C. § 7104.

18             114.    Two of the hallmark symptoms of PTSD are "efforts to avoid thoughts,

19  feelings, or conversations associated with the trauma" and an "inability to recall an important aspect

20  of the trauma." (DSM-IV-TR at 468.) As a result of these and other deficits caused by PTSD,

21  veterans suffering from this disorder are often unable to provide sufficient detail about their combat

22  experience for the VA to verify the stressors leading to their PTSD, thereby precluding the veteran

23  from receiving a PTSD diagnosis.

24         **D.    Appeal of the SCDDC Denial Decision to the Board of Veterans Appeals**

25             115.    The BVA was established in 1932. Its function is to processes appeals from

26  decisions made by the VA regional offices. The vast majority of the appeals handled by the BVA

27  (about 96%) involve appeals of SCDDC claim denials. (James P. Terry, Report of the Chairman,

28  Board of Veterans Appeals, for Fiscal Year 2006 (2006) ("Chairman's Report") at 2.)

1    116.   The BVA lacks independence from the VA. In fact, the BVA "shall be bound
2  in its decisions by the regulations of the [VA], instructions of the Secretary, and the precedent
3  opinions of the chief legal officer of the [VA]." 38 U.S.C. § 7104. The VA's instructions to the
4  BVA may be communicated informally, and affect BVA decisions on particular claims or categories
5  of claims and/or issues relating to budget items or the administration of justice. Moreover, the VA
6  resolves conflicts between precedent opinions, VA regulations and instructions of the Secretary, on
7  the one hand, and CAVC judicial precedents, on the other, in favor of the former.

8    117.   If a SCDDC claim is denied in whole or in part, the claimant may contest the
9  determination by initiating a cumbersome, multi-step appeals process that contains numerous pitfalls
10  for the unwary and is particularly difficult for veterans with PTSD to manage because of the stresses
11  and uncertainties involved. (Committee on Veterans' Compensation for Posttraumatic Stress
12  Disorder, National Research Council, *PTSD Compensation and Military Service* (National
13  Academies Press 2007). Veterans with PTSD often experience a "sense of foreshortened future" that
14  can result in inaction because the veteran believes he or she will not be alive long enough to see the
15  resolution of the appeal. (DSM-IV-TR at 468.) This perspective on the future combined with
16  difficulties concentrating can make it nearly impossible for a veteran to comply with the extensive
17  procedural requirements to pursue an appeal.

18    118.   The first step in initiating an appeal is to file a Notice of Disagreement
19  ("NOD") with the regional office. The claimant must file an NOD within one year of the initial
20  decision, and state with specificity the basis for the appeal. 38 C.F.R. § 20.201.

21    119.   If the VA decides to adhere to its initial decision, it prepares a Statement of the
22  Case ("SOC") summarizing its reasons for denying the claim. No deadline applies to the VA's
23  preparation of the SOC, which frequently results in protracted delays.

24    120.   Federal regulations require that a SOC be complete enough to allow the
25  veteran to present written or oral arguments to the BVA, and that a SOC contain a summary of the
26  applicable law and regulation affecting the determination reached on each disputed issue. 38 C.F.R.
27  § 19.29. However, the claimant's only remedy for an insufficient SOC is a remand for preparation of
28  a revised SOC, which can involve delays measured in years.

1    121.    If a claimant takes no action to follow up on the NOD and SOC (which is

2    frequently the case), the file is closed. If the claimant wishes to appeal the claim decision to the

3    BVA, he or she must file a substantive appeal ("SA") within sixty days from the date the VA mailed

4    its SOC, or within one year from the date the VA mailed its initial decision, whichever is later.

5    38 C.F.R. §§ 19.129(b), 19.32, 20.302. Failure to timely comply with the two-step procedure to

6    perfect an appeal to the BVA will result in dismissal. *See* 38 C.F.R. §§ 19.32, 20.200.

7    122.    The SA must "set out specific arguments relating to errors of fact or law."

8    38 C.F.R. § 20.202. Any SA that fails to satisfy these requirements is subject to summary dismissal.

9    38 U.S.C. § 4005(d)(5); 38 C.F.R. § 19.32.

10    123.    When an SA is filed, the original claim file is sent from the regional office that

11    made the initial determination to the BVA in Washington, D.C. for decision. Once the file is

12    transferred, the claimant has ninety days in which to submit additional evidence in support of the

13    claim.

14    124.    A claimant is not automatically entitled to a hearing before the BVA, but rather

15    must specifically request one. Although claimants who exercise the right to a hearing are almost

16    twice as likely to prevail, few veterans actually request hearings at the regional office level. The

17    majority of hearings are held in Washington D.C., and to most VA claimants, such hearings are

18    problematic because of long delays in obtaining a hearing date and the expense of travel. The vast

19    majority of BVA appeals are resolved upon the written record transmitted by the regional office,

20    together with a short, written statement of the veteran's contentions.

21    125.    If a hearing takes place, the BVA will not "issue a subpoena to compel the

22    attendance of DVA adjudicatory personnel" at the hearing. 38 C.F.R. § 20.711. This bar precludes

23    the veteran from presenting testimony regarding VA misconduct or other irregularities in the

24    decision-making process below. Documentary evidence is rarely submitted, expert testimony is

25    infrequently offered, and normally the claimant alone testifies.

26    126.    The BVA grants at least one claimed benefit in approximately one-third of

27    perfected appeals from regional office decisions, and remands an additional 32% for the development

28

of further evidence. (U.S. Gen. Accounting Office, Quality Assurance for Disability Claims and Appeals Processing Can Be Further Improved, GAO-02-806, (Aug. 2002) at 5.)

127. The BVA finds error in the regional office decisions in approximately 52% of appeals. (Chairman's Report at 19.)

**E. Appeals to the United States Court of Appeals for Veterans Claims and Federal Circuit**

128. The CAVC was created under Article I of the Constitution by the Veterans' Judicial Review Act (Pub.L. No. 100-687) on November 18, 1988. Originally named the United States Court of Appeals, its name was changed effective March 1, 1999, by the Veterans' Programs Enhancement Act of 1998 (Pub.L. No. 105-368). The seven judges on the Court are appointed by the President and confirmed by the Senate to serve either thirteen or fifteen-year appointments.

129. To challenge the VA's denial of a claim or rating decision, a claimant must file a Notice of Appeal with the CAVC within 120 days of receipt of the BVA's final decision. 38 U.S.C. § 7266(a). The Secretary for the VA is represented in all proceedings before the CAVC by the VA's General Counsel. 38 U.S.C. § 7263(a). Either party may appeal an adverse decision to the Federal Circuit, *see* 38 U.S.C. § 7292, and ultimately to the Supreme Court by way of a petition for *certiorari*.

130. The CAVC is purely an appellate body and does not hear testimony or evidence. Judicial review of individual agency determinations is limited to the record of proceedings before the agency. 38 U.S.C. § 7252(b). Except for constitutional issues, the CAVC cannot review any "challenge to a factual determination" or any "challenge to a law or regulation as applied to the facts of a particular case." 38 U.S.C. § 7292(d)(2).

131. The Federal Circuit reviews decisions of the CAVC deferentially. Under 38 U.S.C. § 7292(d)(1), the Federal Circuit must affirm a CAVC decision unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or in violation of a statutory right; or (D) without observance of procedure required by law." 38 U.S.C. § 7292(d)(1). The CAVC reverses the BVA outright in approximately 22.5% of

1  appeals, and either remands or provides partial relief in an additional 56% of cases. (*See* Michael P.

2  Allen, *Significant Developments in Veterans Law (2004-2006) and What They Reveal About the U.S.*

3  *Court of Appeals for Veterans Claims and the U.S. Court of Appeals for the Federal Circuit,* 40 U.

4  Mich. J.L. Reform 483 (2007), at 5).)

5        132.    Despite the limitations of its jurisdiction, the Federal Circuit reverses the

6  CAVC in approximately 25% of the cases. (*Id.*)

7        133.    No procedures exist for judicial consideration of claims that depend upon facts

8  or events not reflected in a veteran's claim file, including the Challenged VA Practices or any claims

9  based upon a pattern and practice of unlawful VA behavior. The CAVC's ability to address

10  constitutional issues is limited to those raised by a veteran based upon the facts reflected in that

11  veteran's official SCDDC claim file.

12        134.    Only when a claim reaches the CAVC on appeal from the BVA does it take on

13  some of the attributes of a formal legal proceeding. However, CAVC rules do not permit a veteran to

14  obtain any discovery or to compel the attendance of VA employees or third parties as witnesses at

15  hearings before the CAVC.

16        135.    Most veterans appealing to the CAVC are unrepresented by counsel at filing,

17  although some are able to retain counsel thereafter. The rate of *pro se* appeals in the CAVC is

18  grossly disproportionate to the combined rates for all other United States Courts of Appeal, and is

19  directly attributable to the effects of the Fee Prohibition.

20        136.    Because CAVC proceedings are openly adversarial, a veteran who is

21  unrepresented before the CAVC is at a substantial and unfair disadvantage. The VA General

22  Counsel's Office represents the agency in every case filed at the CAVC, and the General Counsel's

23  Office employs trained legal professionals, whose job it is to persuade the CAVC that the decision of

24  the agency was correct and should be affirmed. Not surprisingly, only a tiny percentage of *pro se*

25  appeals in the CAVC are successful.

26        137.    Beginning on or near the effective date of the Veterans Judicial Review Act,

27  Defendants have been exploiting mistakes made by the large group of unrepresented SCDDC

28  claimants, which later compromise the likelihood of success of any appeals. The success of

32

1    Defendants' strategy is reflected in the body of over 25,000 CAVC decisions and the underlying

2    briefs filed by Defendants at the CAVC and the Federal Circuit, which display a high incidence of

3    technical, procedural, or other arguments raised by the VA that are unrelated to the merits of the

4    claims.

5            138.    The CAVC lacks the power to issue or enforce injunctions against illegal

6    practices or procedures of the VA or to issue any provisional relief.

7            139.    The CAVC further lacks the authority or ability to force the BVA, the VA or

8    its regional offices to conform to the decisions of the CAVC, eroding a fundamental precept of the

9    rule of law and the Due Process Clause.

10           140.    The former Chief Judge of the CAVC, Frank Q. Nebeker, has openly criticized

11   the CAVC's inability to enforce its decisions:

12           Neither this Court, through the Board, the Board, nor the General
             Counsel has direct and meaningful control over the Agencies of
13           Original Jurisdiction [regional offices]. Indeed, it is also clear that the
             VHA — The Veterans Health Administration — ignores specific
14           directives to provide medical opinions as directed. And this is resulting
             in unconscionable delays. . . . Too many of the Court's precedent
15           opinions must focus on law clearly stated in statutes or regulations, but
             ignored below. Indeed, the rate of adjudication error is far too high for
16           a healthy system. Most importantly, though, those opinions should
             serve to guide future adjudications of similar cases. Why permit the
17           initial adjudicators to ignore those decisions simply because their
             operational head ignores them. . . . ?
18

19   (Frank Q. Nebeker, "State of the Court for Presentation to the United States Court of Veterans

20   Appeals, Third Judicial Conference" (Oct. 17-18, 1994) at 3-4.)

21           141.    In another State-of-the-Court address on Sept. 14, 1998, Chief Judge Nebeker

22   reprised the same themes:

23           I want to briefly return to a point that I first made about four years ago
             at the Court's third judicial conference: the serious problem of what I
24           then called a disconnect between the Court, the Board of Veterans'
             Appeals, the VA adjudicators, and VA medical experts. . . . This brings
25           me now to the second part, the lack of command authority between the
             Court, the BVA, the regional offices, and the VHA. In a speech four
26           years ago to this conference, I first publicly commented on this failing.
             I said then and I must say today that I cannot discern within the VA
27           adjudication process a command chain similar, for example, to that in
             the federal court system, where a superior court's decisions are binding
28           on lower courts and in administrative review cases, on all levels of the

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                              33
wc-106298

1
2
3
4
5

> agency . . . The Court of Veterans Appeals or the Board of Veterans'
> Appeals can remand the matter, but other entities in VA do not seem to
> be in the chain of control for claims adjudication . . . . As an anecdote, I
> recently learned from a colleague that a rating specialist at one of the
> ROs [regional offices] told him that the actual Court [of Veterans
> Appeals] decisions still were not being sent to the adjudicators, the
> rating specialists who make the decisions. The particular rating
> specialist my colleague met said that he had never seen a Court
> decision. . . .

6   (Frank Q. Nebeker, "State of the Court for Presentation to the United States Court of Veterans

7   Appeals (Sept. 14, 1998).)

8         142.   The CAVC also lacks the power to authorize class actions because its authority

9   is limited by the VJRA to reviewing individual determinations made by the Board. *Harrison v.*

10  *Derwinski*, 1 Vet. App. 438 (1991) (*per curiam*); *Lefkowitz v. Derwinski*, 1 Vet. App. 439 (1991) (*per*

11  *curiam*). Since the CAVC's jurisdiction extends only to a review of individual claims, there is no

12  potential for relief at the CAVC with respect to unconstitutional VA practices that are not reflected in

13  a specific individual's file or that affect large numbers of veterans.

14        143.   Because of the Statutory Defects described above the CAVC lacks the ability

15  to: (a) enjoin the Challenged VA Practices described *infra*; (b) order the VA to provide medical

16  services to veterans, as required by the Medical Services statutes; (c) provide any relief regarding VA

17  practices that extend beyond an individual claim; (d) enforce any decision at the regional office level;

18  and (e) award declaratory relief. As a result, CAVC decisions affect only the lone claimant in any

19  particular case, and the VA generally refuses to change VA practices or policies in identical

20  situations involving other claimants.

21        144.   In short, the CAVC lacks the ability to make any decisions beyond the

22  framework of an individual claim and has no power to enforce its decisions. In its entire history as a

23  court, the CAVC has never addressed the Challenged VA Practices. The absence of any vehicles in

24  the VJRA to address the Challenged VA Practices inevitably leaves them unaddressed, and leaves

25  PTSD and other SCDDC claimants without any remedy. Each of these limitations reinforces or

26  combines with the others to effectively insulate the VA from responsibility for the Challenged VA

27  Practices.

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

34

## IV. DEFENDANTS' FAILURE TO SATISFY THEIR STATUTORY OBLIGATION TO PROVIDE SCDDC AND ADEQUATE MEDICAL CARE TO OEF/OIF VETERANS WITH PTSD

### A. Unlawful Delays in the Administration of PTSD and Other Claims

145.    For years, the VA claims adjudication process has been the subject of deep concern by Congress and veterans service organizations. (Daniel Bertoni, "Veterans' Disability Benefits: Processing of Claims Continues to Present Challenges" at 1.) In 2000, before the two current wars began, the U.S. General Accounting Office (name changed in 2004 to U.S. Government Accountability Office) (hereinafter collectively "GAO") identified longstanding problems in claims processing, including large backlogs of pending claims, lengthy processing times for initial claims, high error rates in claims processing, and inconsistency across regional offices. (Bilmes Study at 7.) As recently as March 2007, the GAO again expressed concern that the VA continues to experience significant service delivery challenges, including its ongoing need to speed up the process of adjudication and appeal and reduce the backlog of claims. (Daniel Bertoni, "Veterans' Disability Benefits: Processing of Claims Continues to Present Challenges" at 1.)

146.    The VA claims process is presently experiencing unprecedented delays and backlogs at all levels. The VA currently has a backlog of over 600,000 claims. From FY 2000 to FY 2006, the inventory of rating-related claims grew by 39%, from about 579,000 to about 806,000, in part because of the increased filing of claims by veterans of the Iraq and Afghanistan conflicts. (*Id.* at 5.)

147.    The VA's Oakland Regional Office has consistently been at or near the bottom of all VA regional offices in the number of pending claims and the time required to render a decision. (Dep't of Veterans Affairs Office of Inspector General, Combined Assessment Program Review of the VA Regional Office in Oakland, California, No. 01-02124-7 (March 21, 2002) at 3, 16.)

148.    Several perverse incentives characterize the VA's adjudication of SCDDC claims, which combine to give the VA a strong financial motivation to delay the processing of claims.

a.    If a veteran died before Dec. 16, 2003, while a disability claim was pending, his or her survivors and/or estate forfeit all accrued disability benefits for a period in excess of twenty-four months. 38 U.S.C. § 5121(a).

b.    The VA refuses to award any interest on claim awards, regardless of the length of time between a final determination and the effective date or whether the initial claim denial was caused by the VA's own errors. The VA's retroactive awards of SCDDC are based upon historical amounts rather than the higher, current SCDDC amounts. In effect, the VA enjoys the financial benefits of inflation caused by its own delays.

c.    The VA's incentive compensation system for employees encourages the "churning" or recycling of claims, enabling employees to accumulate more work credits and bonuses. The recycling of claims is accomplished by prematurely issuing denials without completing the required development steps, failing to take evidence-gathering steps or arrange for examinations known to be grounds for remands from the BVA or CAVC, and various other manipulative methods or techniques. These incentives are confirmed by the May 2005 VA Office of Inspector General report, "Review of State Variances in VA Disability Compensation Payments" ("2005 VA IG Report"). The 2005 VA IG Report recounts comments by VA ratings staff such as, "there is a lot of pressure to make your production standard. In fact, your performance standard centers around production and a lot of awards are based on it. Those who don't produce could miss out on individual bonuses, etc. . . ." (Dep't of Veterans Affairs Office of Inspector General, Review of State Variances in VA Disability Compensation Payments, Report 05-00765-137 (May 2005) at 61.)

d.    For over a decade, Defendants have failed and refused to devote sufficient resources to the processing of the number of claims filed or expected and to satisfy their statutory obligation to provide Medical Services. Despite a marked increase in SCDDC claims associated with casualties from the Iraq and Afghanistan wars, the VA's 2005 budget reduced by several hundred the number of employees assigned to process SCDDC claims.

149.    As of 2006, the VBA could reasonably have expected an increase in the total number of claims from veterans from the current rate of approximately 105,000 to over 600,000 over

1    the next decade, assuming a moderate scenario (gradual draw-down in troops with no escalation).

2    (Bilmes Study, Table 2 at 10.)

3        150.    Despite the fact that the BVA decided almost 5,000 more claims than in

4    FY 2006, the BVA backlog has swelled from 37,500 to over 40,000 pending cases. (Chairman's

5    Report at 3.) Similarly, the backlog of cases before the CAVC is huge — 6,080 cases as of May 10,

6    2007 — and growing each year. (William P. Greene, Jr., Statement before the House Committee on

7    Veterans' Affairs, Subcommittee on Disability Assistance and Memorial Affairs, U.S. House of

8    Representatives (May 22, 2007) ("Greene Statement") at 5.) To place this backlog of appeals in

9    context, the BVA decided a total of 39,076 cases in 2006, an increase of 4,901 over FY 2005

10   (Chairman's Report at 2-3), while the CAVC decided 2,842 appeals. (Greene Statement at 4-5.)

11   Thus, the BVA backlog represents over one year of cases, while the CAVC backlog represents over

12   two years of cases.

13       151.    The BVA received 41,802 appeals in Fiscal Year 2006, and expects to receive

14   at least that many in Fiscal Year 2007. (Chairman's Report at 2.) The number of cases pending

15   before the Board at the end of Fiscal Year 2006 was 40,265, which is almost a 3,000 case increase

16   over the 37,539 appeals that were pending at the end of Fiscal Year 2005. (*Id.* at 3.)

17       152.    In the first two quarters of FY 2007, the CAVC received the highest numbers

18   of new cases ever (2,542 new cases in two quarters). The rolling wave of new cases received in FY

19   2007 continues the previous year's trend of substantial increases in the court's workload each year.

20   (Greene Statement at 3-4.) New cases continue to arrive at the extraordinary rate of 300 to 400 every

21   month. (*Id*. at 5.)

22       153.    Any proper analysis of delay associated with the adjudication of SCDDC

23   claims must take into account each stage of processing in a full cycle ("Complete Claim Cycle

24   Period"), including the following:

25           a.    **The Initial Decision:** The period of time between the initial filing (or

26   reopened or remanded claim) and the notice of decision on a new, reopened, or remanded claim

27   ("First Stage");

28

1       b.      **Appeal to BVA:** The period of time between a notice of decision and

2   a Notice of Disagreement, between the NOD and the Statement of the Case, between the SOC and a

3   substantive appeal, between the SA and certification to the Board of Veterans Appeals, and between

4   certification to the BVA and a BVA decision ("Second Stage");

5       c.      **CAVC Appeal:** The period of time between a BVA decision and the

6   docketing of an appeal with the CAVC, between docketing and completion of briefing, and between

7   briefing and a decision upon appeal ("Third Stage"); and

8       d.      **Federal Circuit Appeal:** The period of time between a CAVC

9   decision and a decision by the Federal Circuit ("Fourth Stage");

10      e.      **Certiorari Petition:** If applicable, the period of time between the

11  Federal Circuit decision, and Supreme Court action in response to a petition for a writ of *certiorari*

12  ("Fifth Stage").

13      154.    The VA's published productivity statistics overstate the VA's timeliness

14  record. None of the VA's published statistical measures of claim processing encompass the full cycle

15  of the First through the Fifth Stages. The statistics circulated by the VA typically encompass only

16  part of a single stage. The VA's published statistics thus artificially skew the processing times by

17  counting only a discrete part of a claim or appeal, and by ignoring the extra time caused by premature

18  denials and other non-final dispositions, and by various other manipulative assumptions and tactics.

19      155.    For example, the processing of many veterans' claims begins long before

20  discharge under the benefits delivery at discharge program. Yet the VA only includes the period of

21  time after discharge in its calculation of regional office processing times, which materially reduces

22  the average.

23      156.    As an additional example, the VA's published statistics regarding medical

24  appointments misleadingly calculate only the time interval between the date an appointment is

25  requested and the date the appointment is set, ignoring the usually lengthy period of time before the

26  appointment actually occurs.

27      157.    The BVA Chairman's Report shows that the average time between receipt of a

28  NOD from a claimant and issuance of a BVA decision in 2006 is 971 days. (Chairman's Report at

Case No. _____                                                                    38
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

16.) Using this and various public sources, it is possible to compile an estimate of the Complete Claim Cycle Period, as shown in the following chart:

| Stage | Time | Source |
|---|---|---|
| 1.) Initial Decision | 196 days | (Department of Veterans Affairs FY 2006 Performance and Accountability Report (2006) at 213) |
| 2.) BVA Appeal | 971 days | Chairman's Report at 16 |
| 3.) CAVC Appeal | 1286 days: 120 days (notice of appeal) + 254 days (docketing, briefing) + 912 days (judicial consideration) | 38 U.S.C. § 7266; Ct. Vet. App. R. 4(c), 10(a), 10(b), 11(a)(2), 31(a)(1), 31(a)(2), 31(a)(3); Testimony of Robert Chisholm[2] |
| 4.) Federal Circuit | 317 days | Review of Federal circuit docket sheets regarding veterans' appeals from CAVC[3] |
| 5.) US Supreme Court | 386 days | Review of Supreme Court docket sheets for cases heard in 2005 term[4] |
| TOTAL: | 3156 days (8.65 years) | |

158.    As just one illustration of the extensive length of time associated with a Complete Claim Cycle Period, the rating board action in *Collaro v. West*, 136 F.3d 1304 (Fed. Cir. 1998), was effective March 1, 1985, but did not result in a Federal Circuit decision remanding the claim to the CAVC until February 19, 1998, a period of almost thirteen years, which did not include the period between initial filing and rating decision or the additional time required by the CAVC to act after remand.

---

[2] Past-President of National Organization of Veterans Advocates (Robert V. Chisholm, Statement Before the Subcommittee on Disability Assistance and Memorial Affairs of the House Committee on Veterans' Affairs, U.S. House of Representatives (May 22, 2007).)

[3] Derived from hand-review of all veteran appeals in Federal Circuit from October 1, 2005 to September 30, 2006 that resulted in decisions on the merits. (*See also* U.S. Court of Appeals for the Federal Circuit, Statistical Tables G-2, B-8 (2003-2006) (average of 1600 appeals filed and 1632 terminated between 2003 and 2006, implying average of approximately one year from appeal to decision).

[4] Derived from hand-review of all signed Supreme Court decisions issued in the 2005 Term.

1    159.    The VA has repeatedly acknowledged that the complexity of PTSD and certain

2  other types of SCDDC claims requires additional adjudication time and development. (Daniel L.

3  Cooper, Statement Before U.S. House of Representatives Veterans' Affairs Committee (Nov. 3,

4  2005).) The true period of time, from claim filing through resolution of an appeal, required to decide

5  a PTSD claim materially exceeds the averages. The Complete Claim Cycle Period for a PTSD claim

6  is estimated to be twelve to fifteen years.

7    160.    The amount of time it takes the VA to process an SCDDC claim compares

8  unfavorably with the private sector health care/financial services industry, which processes thirty

9  billion claims annually in an average of 89.5 days per claim, including the time required for

10  resolution of disputed claims. (Bilmes Study at 7.)

11    161.    The high frequency of remands from the BVA to the agencies of original

12  jurisdiction means that a claim can be, and often is, recycled through the stages of the adjudication

13  process multiple times, causing additional delays measured in years.

14    162.    The ultimate disposition of approximately one third of appeals to the BVA

15  includes one or more remands resulting in additional delay. (U.S. Gen. Accounting Office, Quality

16  Assurance for Disability Claims and Appeals Processing Can Be Further Improved, GAO-02-806,

17  (Aug. 2002) at 5).) A BVA remand typically adds more than a year to the appellate process.

18  (Chairman's Report at 3.) It is possible for the same claim to be recycled between the BVA and the

19  regional office multiple times, which effectively prevents or delays the veteran from receiving timely

20  appellate review by the CAVC.

21    163.    About 75% of cases that are remanded are subsequently returned to the BVA,

22  which increases the workload of the BVA considerably and further extends timelines. (*Id.* at 3.)

23  Approximately 21,229 remanded claims were pending at VBA's regional offices at the end of FY

24  2006. (*Id.* at 4-5.) If the frequency of remands or reopened claims is considered, the total Complete

25  Claim Cycle Period would be even longer.

26    164.    On May 22, 2007, Defendant William P. Greene, Jr. ("CAVC Chairman

27  Greene") testified before the Subcommittee on Disability Assistance and Memorial Affairs of the

28  U.S. House of Representatives' Committee on Veterans' Affairs that:

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    40
wc-106298

1          a.     The CAVC is one of the busiest federal appellate courts in the United

2    States, with 3,729 new cases in FY 2006, resulting in a per-judge average of 533 cases, which is

3    twice as many cases as the average per judge caseload for the Article III Circuit Courts of Appeal.

4    (William P. Greene, Jr., Statement before the House Committee on Veterans' Affairs, Subcommittee

5    on Disability Assistance and Memorial Affairs, U.S. House of Representatives (May 22, 2007) at 2.)

6          b.     The statistics show a sharp increase in the number of denials by the

7    BVA, jumping from 9,299 in FY 2004 to 13,033 in FY 2005 to 18,107 in FY 2006, reflecting a

8    nearly 100% increase in just two years, which will generate more CAVC appeals in the future. (*Id.* at

9    4.)

10          165.    The workload of the CAVC makes it impossible for the court to fairly analyze

11   and decide the cases before it. In fact, the workload is so great that the court is considering adopting

12   the practice of summarily disposing of cases without giving any explanation or reason.

13          166.    Extensive delays pervade the entire appellate process, including the Federal

14   Circuit Court of Appeals, which is becoming completely overwhelmed by veterans' appeals. In his

15   State of the Court address delivered on June 28, 2007, Chief Judge Paul R. Michel warned of

16   "ominous signs" of a deluge of appeals that could prove "catastrophic":

17              As I mentioned last year, the number of Veterans' cases has been rising
                sharply. While that continues to be true, it did not have a major impact
18              because hundreds of veterans' appeals involving the same few issues
                are stayed pending resolution of a few "test cases." Once we decided
19              the test cases, the stayed appeals were resolved with relatively little
                effort. However, *there are ominous signs that veterans' cases that may*
20              *require individual, case-by-case, adjudication will soon increase, and*
                *probably very sharply. They could in fact swamp our court before*
21              *year's end, just as we once feared immigration cases would have.* The
                Court of Appeals for Veterans' Claims just received more filings than
22              in any other two-quarter period in its history. That court is now
                deciding, on average, 300 appeals a month, though 600 cases alone
23              were decided in April. The Board of Veterans' Appeals has also been
                deciding more cases. Denials of benefits by the Board -- almost 9,300
24              in 2004 -- had almost doubled by 2006 to more than 18,000. About a
                fifth are appealed from the Veterans' Court, which is now deciding
25              cases at the rate of several thousand per quarter. *The impact on our*
                *court will be substantial; it could be catastrophic* . . . .
26

27   (Paul R. Michel, State of the Court of Appeals for the Federal Circuit, Cambridge, MD, June 28,

28   2007.) (emphasis added)

1    167.   As a result of the VA's policies and practices encouraging or permitting
2   administrative delays and the extensive delays veterans experience in appealing adverse decisions,
3   large numbers of veterans, including PTSD applicants and recipients, die while their claims are
4   pending, resulting in the forfeiture of substantial amounts of accrued benefits. More than 10,000
5   veterans died during some stage of the appellate process alone during the last few years. These
6   forfeitures result in large sums of annual savings to the VA.

7    168.   The lengthy delays in processing PTSD and other SCDDC claims are
8   particularly prejudicial to veterans who are senior citizens. The veteran population is aging quickly
9   and the VA has estimated that between 2004 and 2012, veterans aged eight-five and older enrolled in
10   the VA's health care system will increase from 278,000 to 681,000. (Department of Veterans Affairs
11   FY 2006 Performance and Accountability Report (2006) at 13.)

12   **B.    Suicide Risks**

13    169.   Troops who have served in Iraq and Afghanistan are killing themselves at
14   higher percentages than has taken place in any other war where such figures have been tracked.
15   Pentagon statistics reveal that the suicide rate for U.S. troops who have served in Iraq is double what
16   it was in peacetime. (Stacy Bannerman, *Iraq Reservists Face a 'Perfect Storm' of Post-Traumatic*
17   *Stress*, at 1.)

18    170.   In early May 2007, a report was issued suggesting that 1,000 veterans under
19   the care of the VA commit suicide every year. An additional 5,000 veterans who are outside the care
20   of the VA commit suicide each year. The percentage of those veterans who have PTSD is unknown.
21   (Linda Rosenberg, Statement Before the House Committee on Veterans' Affairs, PTSD Health Care
22   Symposium, United States House of Representatives (May 16, 2007) at I.)

23    171.   Since 2004, there have been at least six incidents in which soldiers diagnosed
24   with PTSD have died at a single military base (Fort Carson in Colorado), either from suicide or from
25   accidents involving narcotics or medications. (Dan Frosch, *Fighting the Terror of Battles That Rage*
26   *in Soldiers' Heads*, N.Y. Times, May 13, 2007 at 2.)

27    172.   Many veterans have committed suicide shortly after having been turned away
28   from VA medical facilities either because they were told they were ineligible for treatment or because

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    42
wc-106298

1    the wait was too long. (Stacy Bannerman, *Iraq Reservists Face a 'Perfect Storm' of Post-Traumatic*
2    *Stress*, at 2.)

3              173.    Defendants have failed to conduct effective psychological screening of troops
4    who return from combat zones to identify those military personnel who are at great risk for suicide –
5    those who are vulnerable to PTSD, have been exposed to extreme stressors, or who self-medicate
6    with alcohol or drugs. Nor is there effective screening for troops who begin having psychological
7    trouble months after their separation from the military. In fiscal year 2004, fewer than half of
8    veterans accessing VA health care were even screened for PTSD at all.

9         **C.    Defects in C&P Evaluations and the Ratings System for PTSD Claims**

10             174.    The VASRD is hopelessly outdated. It has not been adequately updated to
11   reflect the current state of science, medicine, technology, or labor market conditions. For example, it
12   contains no classification for traumatic brain injury, which, along with PTSD, are the "two signature
13   injuries" from the war in Iraq. (Dep't of Defense Task Force on Mental Health, An Achievable
14   Vision (June 2007) at EX-1.) The criteria for disability rating decisions are based primarily on
15   estimates made in 1945 about the effect of service-connected impairments on the average individual's
16   ability to perform jobs requiring manual labor. Lonnie R. Bristow, the Chairman of the Institute of
17   Medicine, National Academy of Sciences panel examining the VA's system, concluded in 2007 that
18   "the rating schedule is out of sync with modern medicine and modern concepts of disability."

19             175.    Occupational and Social Impairment (OSI) is the central factor used in the
20   determination of rating levels. However, little guidance is given about how to measure either OSI or
21   its differential impairment across different percentage ratings. Furthermore, the various secondary
22   factors that are used in rating physical disabilities are not applied to mental disorder ratings, thereby
23   giving the primary factor, OSI, a value in determining the ratings that is disproportionately high
24   compared to other symptoms. Because the primary explicit factor in VASRD ratings is the effect on
25   earnings capacity, the presence of a disorder itself — even if it is service-connected — may result in
26   no (0%) or a minimal (10%) disability rating if the veteran is able to obtain employment despite his
27   or her impairment.

28

176.    There is also considerable variability among examiners in how mental health percentage ratings are determined; the same person with the same symptoms applying in different settings can easily receive different amounts of SCDDC. Both the GAO and VA's Inspector General have expressed concerns about the accuracy and consistency of ratings decisions across regional offices. (Daniel Bertoni, "Veterans' Disability Benefits: Long-Standing Claims Processing Challenges Persist", Testimony Before the Committee on Veterans' Affairs, United States Senate, U.S. Gov't Accountability Office, GAO-07-512T (March 7, 2007) at 1-2.)

177.    PTSD is managed by the VA differently from almost all other disabling conditions in that it is subject to the general ratings schedule for mental disorders, which is not focused on the particular symptomology of PTSD. There is one general rating scheme that is applied to all types of mental disorders, which makes it necessary to lump together a heterogeneous set of symptoms and signs from multiple conditions into a single spectrum of problems. Some of the secondary factors that may influence percentage ratings, such as deformity or physical complications, cannot be met for mental disorders. This results in troops with mental disorders being less likely than those with physical disabilities to obtain higher percentage ratings.

178.    The Committee on Veterans Compensation for PTSD found in 2007 that the VA Schedule for Rating Disabilities is a crude and overly general instrument for the assessment of PTSD. The emphasis on occupational impairment in the current criteria unduly penalizes veterans who may be symptomatic in other dimensions but capable of working. The committee recommended that ratings criteria specific to PTSD and based on the DSM-IV-TR be developed. (Committee on Veterans' Compensation for Posttraumatic Stress Disorder, *PTSD Compensation and Military Service* at 5-24.) Psychosocial and occupational aspects of functional impairment should be evaluated separately and a claimant should be rated in the dimension on which he or she is more affected. (*Id.* at S-5.)

179.    The Committee on Veterans Compensation for PTSD also recommended that the VA consider instituting a fixed long-term minimum level of benefits that would be available to any veteran with service-connected PTSD at or above some specified rating level without regard to that person's state of health at particular point in time. (*Id.* at 6-23.) The Committee further

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

44

1  recommended that the VA establish a specific certification program for raters who deal with PTSD

2  claims, with training to support those seeking certification and periodic recertification. (*Id.* at 5-24.)

3          180.    The Committee additionally concluded that the GAF score has limited

4  usefulness in the assessment of the level of disability for PTSD compensation. The score is only

5  marginally applicable to PTSD because of its emphasis on the symptoms of mood disorder and

6  schizophrenia and its limited range of symptom content. The committee recommended that the VA

7  identify and implement an appropriate replacement for the GAF that focus on the symptoms of

8  PTSD. (*Id.* at 4-17.)

9          181.    The VA disability system, which is built around the concept of separate

10 evaluation and compensation for each diagnosed service-connected disorder, is also unsuitable for

11 dealing with the high rate of comorbidity of PTSD and other mental disorders. To address situations

12 where PTSD co-exists with other disorders, the Committee recommended that a standardized training

13 program be developed for clinicians conducting C&P evaluations. This training program should

14 emphasize diagnostic criteria for PTSD and comorbid conditions with overlapping symptoms, as

15 delineated in the DSM-IV-TR. (*Id.* at 4-17.)

16         182.    PTSD claims have an exceptionally high denial rate. (John D. Roche, *The*

17 *Veteran's Survival Guide: How to File and Collect on VA Claims* (2nd ed., Potomac Books, Inc.

18 2006) at 22-23.)

19         183.    The VA's adjudication of PTSD claims results in a disproportionate number of

20 errors compared to other types of claims. A VA Inspector General study of 2100 regional office

21 PTSD rating decisions in 2005 found a 25% overall error rate, with error rates ranging from low of

22 11% in Oregon to a high of 47.7 % in Maine. (Jon A. Wooditch, Statement Before U.S. House of

23 Representatives, Committee on Veterans' Affairs, Subcommittee on Disability Assistance and

24 Memorial Affairs (Oct. 20, 2005) at 5.)

25     **D.      Health Care System Delays and Deficiencies**

26         184.    The VA does not have the capacity or services available to meet the current

27 health needs of OEF/OIF veterans, much less future needs. The demand for medical care and

28 treatment from the VHA has rapidly increased, producing long waiting lists and in some cases, the

Case No. _____                                                                                      45
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298


190. According to a 2006 GAO study, 80% of Iraq veterans who reported symptoms of mental illness in a DOD questionnaire given to discharged service-members were not referred for any treatment. (U.S. Gov't Accountability Office, Report to Congressional Committees, Post-Traumatic Stress Disorder: DOD Needs to Identify the Factors Its Providers Use to Make Mental Health Evaluation Referrals for Servicemembers, GAO-06-397 (May 2006) at 5.)

191. In April 2003, the VA Office of Inspector General ("OIG") issued a report finding that the VA's medical staffing levels were inadequate and that medical staff were unavailable to meet current needs. (Department of Veterans Affairs FY 2006 Performance and Accountability Report (2006) at 229.) Demands for VA health care have grown substantially since this report was issued.

192. A report by the OIG in July 2005 found that the VA's outpatient scheduling procedures need to be improved to ensure accurate reporting of data on veterans' waiting times and facility waiting lists. (*Id.* at 237.)

193. As the American Psychological Association Task Force found in a 2007 report, there are three main categories of barriers facing veterans trying to access mental health services: availability, acceptability, and accessibility. There is a shortage of well-trained psychologists and other mental health specialists who are trained in the nuances of military life and can provide prolonged exposure therapy or other new treatments for PTSD. Appropriate mental health services are often not readily accessible due to a variety of factors that include long waiting lists, limited clinical hours, a poor referral process, and geographic location. An additional barrier to receiving mental health care is concerns among veterans about the stigma that surrounds mental illness in both the military and civilian populations. (American Psychiatric Association, Presidential Task Force on Military Deployment Services for Youth, Families and Service Members, The Psychological Needs of U.S. Military Service Members and Their Families: A Preliminary Report (Feb. 2007) at 40-47.)

194. The GAO has recommended that the VA conduct more thorough screening of the personal and professional backgrounds of health care providers to minimize the chance of patients receiving care from providers who may be incompetent or who may intentionally harm them. (Department of Veterans Affairs FY 2006 Performance and Accountability Report (2006) at 252.)

1           195.    As an OIG report in May 2006 found, some VA medical facilities limit access

2 to certain non-institutional care services to only the highest priority veterans, and VA medical

3 facilities do not have effective controls to ensure that all newly enrolled veterans in need of care

4 receive it within VHA's goal of thirty days of the desired date of care (or within a reasonable time for

5 specialty care).

6           196.    As both the VA OIG and VA Committee on Care of Veterans with Serious

7 Mental Illness have found, there are inaccuracies in the data used in VA's annual capacity report.

8 OIG found inconsistencies in the PTSD program data reported by some VA medical facilities. For

9 example, some medical facilities reported having active PTSD programs although the facilities have

10 no staff assigned to these programs. (U. S. Gov't Accountability Office, Report to the Ranking

11 Democratic Member, Committee on Veterans' Affairs, United States House of Representatives, VA

12 and Defense Health Care: More Information Needed to Determine If VA Can Meet an Increase in

13 Demand for Post-Traumatic Stress Disorder Services, GAO-04-1069 (Sept. 2004) at 14.)

14           197.    Congress highlighted the importance of VA PTSD services more than twenty

15 years ago when it required the establishment of the Special Committee on Post-Traumatic Stress

16 Disorder ("Special Committee") within the VA, primarily to aid Vietnam-era veterans diagnosed with

17 PTSD. The Special Committee issued its first report on ways to improve VA's PTSD services in

18 1985 and its latest report in 2004, which included thirty-seven recommendations (twenty-four of

19 which related to clinical care and education). (U.S. Gov't Accountability Office, Report to the

20 Ranking Democratic Member, Committee on Veterans' Affairs, United States House of

21 Representatives, VA Health Care: VA Should Expedite the Implementation of Recommendations

22 Needed to Improve Post-Traumatic Stress Disorder Services, GAO-05-287 (Feb. 2005) at 2.)

23           198.    As the GAO committee determined in 2005, the VA has not fully met any of

24 the Special Committee's twenty-four recommendations pertaining to clinical care and education. The

25 VA's delay in fully implementing the recommendations raises serious questions about its capacity to

26 identify and treat veterans returning from military combat who may be at risk for developing PTSD,

27 while maintaining PTSD services for veterans currently receiving them. (*Id.* at 6.)

28

199. Without prompt testing and treatment, many veterans with chronic health conditions are not likely to come to the attention of the health care system for years, if at all. Delays in identification and treatment result in significant financial costs, increased pain and illness, personal distress, disability, social disruption, burdens on families, and increased social costs. In the case of PTSD, depression, and other serious mental disorders, the exacerbation of symptoms during a treatment delay may have serious or even life-threatening and catastrophic results. (American Psychiatric Association, The Psychological Needs of U.S. Military Service Members and Their Families: A Preliminary Report, at 46.)

200. In 2000-01, the Compensation and Pension (C&P) Service conducted a review of 143 initial PTSD grants by regional offices, together with informal review of an additional seventy-seven cases ("C&P PTSD Review"). Among the major conclusions of the C&P PTSD Review were the following:

a. Twenty-seven percent of the PTSD decisions incorrectly decided the issue of service connection or improperly evaluated the degree of disability, with the vast majority of the mistakes involving under-evaluation of the degree of disability;

b. The problems in PTSD claims decisions included "failure to analyze evidence and explain the rating decision," and confusion about the criteria in the general rating formula for mental disorders;

c. There was a failure to rate PTSD cases at 100% "even where there were clear indications that the veteran had severe symptoms and had total occupational impairment because of PTSD symptoms," a "failure to provide correct and adequate notification letters," described as a "common problem," a failure to gather evidence, and inadequate medical examinations. (Robert Epley, Training Letter 01-01 (Compensation & Pension Service, Veterans Benefits Administration, Jan. 8, 2001).)

E.   **Procedural Due Process Violations**

201. Despite the vital importance of veterans to our democracy, veterans are being treated as second class citizens who must survive without the procedural protections and civil rights embodied in the U.S. Constitution and enjoyed by their fellow citizens.

202.  The VJRA violates Plaintiffs' due process rights in a multitude of respects, both separately and in combination, including:

a.  the statutory provisions give the VA dual authority to act as both the trier of fact and the adversary at the critical regional office stage where claims are first decided, which for the vast majority of claims represents the final decision; the inherent conflict in the VA's dual role is reflected in the VA's own regulations, which on the one hand require the VA to assist a veteran in gathering information to support a claim, but then qualifies that responsibility by requiring that the decision "*protect[ ] the interests of the government,"* 38 C.F.R. § 3.103(a) (emphasis added);

b.  trial-like procedures and judges/administrative law judges are completely absent;

c.  veterans do not have the right to initiate any discovery to gather evidence of the Challenged VA Practices and to otherwise support their SCDDC claims;

d.  veterans are not allowed to compel the attendance of any VA employees or in most instances, other witnesses to testify at hearings;

e.  veterans are unable to obtain injunctive or declaratory relief or any expedited relief in the most urgent cases, such as an imminent suicide threat;

f.  each veteran must oppose the VA on every issue, even when prior Court of Appeals for Veterans Claims or Federal Circuit decisions have already decided the legal question at issue because the VA does not treat judicial decisions as binding in other cases;

g.  there is no class action procedure;

h.  regulations require BVA and DVA to adhere to agency rulings including VA General Counsel precedent opinions and instructions of VA Secretary, even when such rulings conflict with judicial rulings issued by the CAVC or Federal Circuit precedent; additionally, there are no provisions conferring judicial authority or any other mechanism to enforce judicial decisions or require the agency of original jurisdiction (the regional offices) to obey or comply with the rule of law;

1    i.    there is a complete absence of any procedures, sanctions, or penalty to

2    address VA misfeasance, malfeasance, or intentional disregard of rules, regulations, statutory

3    mandates, or judicial decisions that result in adverse impacts on veterans seeking benefits; and

4    j.    the Fee Prohibition deprives veterans of counsel at the crucial regional

5    office state where the record is developed and where the vast majority of cases are resolved.

6    203.    The procedures for filing a disability benefits claim and appeal are particularly

7    burdensome to veterans with PTSD because the nature of their disorder makes it difficult to provide

8    the information required by the VA and to comply with the VA's many timelines and complex steps.

9    The VA's refusal to reasonably modify their policies, procedures, and practices by removing arbitrary

10   administrative hurdles in its benefits application and appeals processes denies veterans with PTSD

11   meaningful access to SCDDC benefits.

12   **F.    Budget Deficits and Underfunding**

13   204.    The VA has experienced huge budget deficits. Without dramatic budget

14   increases extending over the next decade or longer, it cannot fulfill its statutory responsibilities to

15   provide SCDDC and Medical Services to eligible veterans.

16   205.    The VA has admitted that it lacks the resources to provide Medical Services to

17   OEF/OIF veterans. Members of Congress and other governmental offices repeatedly have questioned

18   the adequacy of resources that the VA is devoting to providing mental health care for veterans

19   returning from Iraq and Afghanistan while also continuing to provide services for veterans who are

20   currently receiving mental health care.

21   206.    The VA announced a $1 billion shortfall in July 2005. The GAO later

22   determined that the budget shortfall was attributable to the use of unsupportable assumptions about

23   cost savings, and the failure to consider additional costs of caring for veterans injured in Iraq or

24   Afghanistan. (U.S. Gov't Accountability Office, VA Health Care: Budget Formulation for Fiscal

25   Years 2005 and 2006,GAO-06-430R (Feb. 2, 2006) at 18-20.) In FY 2006, the VA also ran out of

26   money to provide health care, requiring an emergency supplemental budget request of $677 million.

27   Yet, according to reports from the GAO, the VA did not spend $100 million that had been allocated

28   for PTSD in fiscal years 2005 and 2006.

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                                51
wc-106298

1       207.    Despite these severe budget problems, the VA has awarded ever-increasing

2    bonuses to top officials so that the VA is now amongst the highest paying agencies. In 2006, the VA

3    awarded $3.8 million in bonuses to VA officials. The VA officials responsible for the flawed and

4    misleading 2005 budget, as well those responsible for unconscionable delays in claims processing,

5    were among those who received bonuses of up to $33,000.

6       208.    VA budgetary constraints have exerted improper pressure on the SCDDC

7    claim process and led to the introduction of external influences in favor of denial or underrating of

8    claims. For example, the 2005 VA OIG Report indicates that of VA ratings specialists surveyed:

9               a.    Sixty-five percent reported insufficient staff to ensure timely and

10   quality service, (*id.* at viii);

11              b.    Fifty-seven percent responded that it was difficult to meet production

12   standards if they adequately developed claims and thoroughly reviewed the evidence before issuing

13   rating decisions, (*id.*); and

14              c.    The most frequently discussed issue was "management's perceived

15   emphasis on production at the expense of quality." (Dep't of Veterans Affairs Office of Inspector

16   General, Review of State Variances in VA Disability Compensation Payments, Report 05-00765-137

17   (May 2005) at 61.)

18      209.    The GAO concluded in 2006 that the VA's budget shortfalls were attributable

19   to its use of a model based on 2002 data, before the war in Iraq had begun. (U.S. Gov't

20   Accountability Office, VA Health Care: Budget Formulation for Fiscal Years 2005 and 2006, GAO-

21   06-430R (Feb. 2, 2006) at 18-20.) In addition, an audit of the VA's FY 2004 and 2005 statements

22   revealed the lack of an integrated financial management system, financial operations oversight, and

23   informational technology security controls. (Department of Veterans Affairs FY 2006 Performance

24   and Accountability Report (2006) at 333.)

25      210.    The GAO has identified several shortcomings in the VA's budget process. The

26   VA lacks a methodology for meeting the health care management efficiency savings assumptions

27   reflected in the President's budget requests from 2003 through 2006; the VA's process for creating

28   medical program funding requests for FY 2005 and 2006 was not driven by projected demand; and

1    the VA has used unrealistic assumptions, insufficient data and errors in estimation to formulate a
2    budget. (*Id.* at 261-62.)

3              211.    In FY 2005, VA headquarters allocated \$88 million of the \$100 million above
4    FY 2004 levels that VA officials had promised for mental health strategic plan initiatives. Lack of
5    adequate time for headquarters to allocate funds for plan initiatives to medical centers, late in the year
6    allocations that hampered medical center efforts to bring staff on board during the fiscal year, and a
7    lack of guidance concerning allocations for plan initiatives made through VA's general resource
8    allocation system resulted in spending falling short of what was planned. (U.S. Gov't Accountability
9    Office, Report to Congressional Requesters, VA Health Care: Spending for Mental Health Strategic
10   Plan Initiatives Was Substantially Less Than Planned, GAO-07-66 (Nov. 2006) at I, 25-26.)

11             212.    In FY 2006, VA headquarters allocated \$158 million of the \$200 million above
12   FY 2004 levels promised for mental health strategic plan initiatives. At the end of the fiscal year,
13   about \$46 million that had not been spent on mental health strategic plan initiatives was returned to
14   VA headquarters.

15             213.    In January 2007, Linda Bilmes of the John F. Kennedy School of Government
16   at Harvard University, released a paper entitled, "Soldiers Returning from Iraq and Afghanistan: The
17   Long-Term Costs of Providing Veterans Medical Care and Disability Benefits" ("Bilmes Study").
18   The Bilmes Study documents the VA's failure to plan for and provide medical care for OEF/OIF
19   veterans. Among the major conclusions of the Bilmes Study is that the budgetary costs of providing
20   disability compensation benefits and medical care to the veterans from the Iraq and Afghanistan wars
21   over the course of their lives will be from \$350-\$700 billion, depending on the length of deployment
22   of US soldiers, the speed with which they claim disability benefits, and the growth rate of benefits
23   and health care inflation. (Bilmes Study at 1.)

24             214.    In June 2007, the Department of Defense Task Force in Mental Health issued a
25   report entitled "An Achievable Vision: Report of the Department of Defense Task Force on Mental
26   Health" (the "DOD Mental Health Report"). Among the major conclusions of the DOD Mental
27   Health Report were the following:

28

1                    a.      The system of care for veterans suffering mental health problems is

2  insufficient to meet the needs of today's forces . . . and will not be sufficient to meet their needs in

3  the future." (Dep't of Defense Task Force on Mental Health, *An Achievable Vision* (June 2007) at

4  ES-1.)

5                    b.      "The Military Health System lacks the resources and fully-trained

6  personnel to fulfill its mission to support psychological health in peacetime or fulfill the enhanced

7  requirements imposed during times of conflict." (*Id.* at ES-2.)

8           215.    In its FY 2008 budget, the VA identified a large increase in claims processing

9  staff as essential to reducing the pending claims inventory and improving timeliness. Despite this

10  request, the historical pattern of treatment of VA budget requests suggests that adequate funds to

11  satisfy the need will not be forthcoming.

## V.    ABUSES, MISCONDUCT, AND DESTRUCTION OF CLAIM FILES AND DOCUMENTS IN THE ADMINISTRATION OF SCDDC CLAIMS

### A.    The VA's Unlawful Adoption and Application of Unpublished and Illegal Rules Governing the Disposition of Claims

- **Issuing "Personality Disorder" Discharges to Soldiers Suffering from PTSD, Thereby Depriving Veterans of SCDDC**

17           216.    Officials of the VA and the DOD, together with the Department of the Army

18  and other government entities responsible for our Armed Services, have taken inappropriate and

19  improper measures to reduce budget outlays for SCDDC to Iraq and Afghanistan war veterans. Their

20  actions effectively deprive soldiers suffering from PTSD of the opportunity to later apply for

21  SCDDC.

22           217.    More than 22,500 members of the armed forces have been suspiciously

23  diagnosed and discharged by the Army with "personality disorder" in the last six years. The number

24  of "personality disorder" discharges has increased rapidly as the Afghanistan and Iraq Wars have

25  progressed. In 2001, there were 805 instances. In 2003, there were 980. From January to November

26  2006, there were approximately 1086. (Joshua Kors, *How Specialist Town Lost His Benefits*, The

27  Nation, Apr. 9, 2007 at 2.)

28

1    218.   A separation because of personality disorder, pursuant to Regulation 635-200,

2    Chapter 5-13, makes a veteran ineligible for both disability benefits and medical treatment because it

3    is treated as a "pre-existing condition."

4    219.   Many military doctors encourage troops to accept take a Chapter 5-13

5    discharge, even when it is a questionable diagnosis, by holding out the incentive that the process will

6    get the soldier out of the military in only a few days. Adequate disclosures are not made that the

7    service member will be ineligible for VA benefits after a 5-13 discharge or that it is extremely

8    difficult to reverse a 5-13 discharge. Nor do doctors disclose to the service member that he or she

9    may have to pay back part of his or her re-enlistment bonus.

10   220.   Many of the troops who have been discharged under Chapter 5-13 claim that

11   their military doctor pushed the personality disorder diagnosis upon them, strained to try to show that

12   their problems existed before their service in Iraq or Afghanistan, and refused to acknowledge

13   evidence of PTSD, which would have allowed them to collect SCDDC and receive Medical Services.

14   If these service members really had a severe pre-existing condition, it should have been identified

15   during the psychological screening they received when they joined the military.

16   221.   By discharging troops under Chapter 5-13, as opposed to diagnosing them with

17   PTSD, the military will likely save upwards of $8 billion in estimated disability payments and $4.5

18   billion in medical care over the course of the service members' lifetimes based upon discharges prior

19   to 2006.

20   • **Total Disability Based Upon Individual Unemployability ("TDIU") Abuses**

21   222.   If a claimant obtains a rating for specific disabilities under the rating guide of

22   60% or greater and establishes that he or she is unable to secure substantially gainful employment,

23   the VA is obligated to assign a 100% disability rating. 38 C.F.R. § 4.16. A strong correlation exists

24   between PTSD and Total Disability Based Upon Individual Unemployability ("TDIU") claims.

25   According to a 2005 OIG report, approximately 53,000 of the 216,000 PTSD recipients have

26   individual unemployability status. (Dep't of Veterans Affairs Office of Inspector General, Review of

27   State Variances in VA Disability Compensation Payments, Report 05-00765-137 (May 2005) at vii.)

28

223.    The Department of Veterans Affairs Central Office ("Central Office") has unfairly and improperly interfered with disability determinations by adopting unpublished policies and procedures intended to decrease the number of recipients receiving SCDDC based upon TDIU, including recipients whose claims are based on PTSD, and discouraging new TDIU awards. VA actions include: (1) the institution of "special reviews" of past grants of SCDDC based upon TDIU; (2) adoption of internal rules prohibiting assistance to veterans seeking SCDDC based upon TDIU; (3) requirement of mandatory Central Office review of TDIU grants by regional offices; and (4) implementation of compensation policies that create incentives for aberrant adjudication practices.

224.    Beginning in 1977, the VA initiated a review of its TDIU cases. This review eventually led the VA to issue, but not circulate, Circular 21-80-7, dated September 9, 1980, which required VA personnel to re-evaluate the claims of all TDIU recipients under the age of sixty for purposes of terminating benefits. TDIU grants plummeted. On May 10, 1982, the VA extended its unpublished review to veterans over the age of sixty. The incidence of veterans receiving TDIU continues to be dramatically lower than historical levels.

225.    The VA also issued, but did not publish, rules that prohibited personnel from assisting veterans with the development of their claims, including unpublished instructions that "individual unemployability [claims were] not to be inferred," and that personnel should send a copy of the required form for a TDIU claim to the veteran if "there is a strong likelihood that the veteran may be entitled to this benefit." Unbeknownst to veterans, the unpublished rules imposed a heightened scrutiny on TDIU claims and conveyed the unmistakable message to adjudicators that granting TDIU benefits was discouraged by their superiors. These rules conflicted with the then-existing statutory duty to provide veterans with complete information about all benefits to which they may be entitled, and to assist veterans with the development of all pertinent facts to their claims. *See* 38 U.S.C. § 3003(a) (later changed to § 5103); 38 C.F.R. § 3.155(a).

226.    Beginning in approximately 2005, the VA again began instituting a series of measures designed and calculated to reduce both the number of grants of service connection for PTSD and the assigned ratings for PTSD claims. Among these measures were the following:

1          a.    The VBA issued "Letter 20-05-35" (the "VBA Letter") on or about

2   June 14, 2005 requiring a "concurring second signature from a decision maker of equal or greater

3   authority" for any grant of service connection for PTSD, any grant of a 100% schedule rating, or any

4   grant of a total disability rating based on individual unemployability.

5          b.    The VBA Letter was later amended to include denials of service

6   connection for PTSD, and to limit the second category to 100% grants of service connection for

7   PTSD.

8          c.    In the Fall of 2005, Defendant Nicholson announced a plan to institute

9   a special review of all PTSD recipients' claims for "fraud," a plan that was aborted on November 10,

10  2005.

11         d.    Within days after the cancellation of the global review of PTSD claims,

12  the VA secretly made arrangements with the Institute of Medicine to *inter alia*, review and attempt to

13  narrow the criteria used by the VA to determine the severity levels and compensation rates for PTSD.

14  **B.    The Adverse and Unfair Impacts of the VA's Incentive Compensation
15         Program Upon the Adjudication of Claims**

16         227.   For many decades, the VA has employed a compensation system that ties

17  incentive payments for employees to a system of credits for work performed. Work credits are

18  assigned to a wide variety of tasks such as preparing a rating decision, and the VA financially

19  rewards adjudicators who process tasks more quickly. The statutory basis for the VA's program is

20  5 U.S.C. § 3131, which establishes a Senior Executive Service to "provide for a compensation

21  system, including salaries, benefits, and incentives, and for other conditions of employment, designed

22  to attract and retain highly competent senior executives." 5 U.S.C. § 3131(1).

23         228.   As the VA has known for many years, the VA's compensation system has

24  allowed its employees to commit fraud and "game" the system. VA employees have developed and

25  perfected a number of administrative schemes designed to exploit the system of incentive

26  compensation and artificially enhance their productivity statistics. One of the most common abuses

27  is to prematurely issue a denial decision before the required factual development for a claim is

28  initiated or completed; a second work credit can be garnered if the claim is reopened by the veteran,

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                          57
wc-106298

1    or if an appeal results in a remand for further development. Other abuses include the removal of

2    medical examination reports from claims files, physical alteration of claim files, doctoring of

3    transcripts, and a wide assortment of other improper actions.

4        229.    Premature denial of claims puts the onus on the claimant to perfect a timely

5    appeal. The vast majority of claimants give up after an initial denial. If a claimant succeeds in

6    perfecting an appeal, these appeals are often remanded after a lengthy delay for the necessary

7    development to occur. After remand, the adjudicator reprocessing the claim receives another work

8    credit, contributing to the recycling and churning problem described above.

9        230.    The fraudulent and wrongful use of the VA's work credit system at the

10    expense of veterans has become serious and widespread. It now permeates almost every aspect of the

11    adjudication of SCDDC claims, including the regional office and BVA levels; yet, the VA has done

12    little or nothing to stop it.

13        231.    For example, one BVA attorney pled guilty to removing documents from

14    veteran case files in order to delay or preclude decisions on the merits of benefit applications. *See*

15    *United States v. Gottfried*, 58 F.3d 648, 650-51 (D.C. Cir. 1995) (an investigation by the Inspector

16    General indicated that the advisor, Lawrence Gottfried, destroyed portions of at least thirty-two case

17    files out of thirty-eight files assigned to him over a three-month period. The criminal investigation

18    revealed that this conduct continued over four years, possibly affecting the claims of over 1,000

19    veterans).

20        232.    BVA attorney Jill Rygwalski also pled guilty to similar tampering with veteran

21    case files, potentially affecting 1,100 veterans. Ms. Rygwalski, who processed medical and benefit

22    claims for veterans, was convicted of forging documents and destroying medical records in veteran

23    claim files. Approximately seventy-seven of these veterans died after Ms. Rygwalski returned their

24    cases to local veterans' offices for further action necessitated by her own unlawful conduct, resulting

25    in large forfeitures of accrued benefits. (Toni Locy, *Lawyer Gets 15 Months for Tampering with*

26    *Vets' Files*, The Washington Post, Sept. 9, 1995 at A14.)

27        233.    Notwithstanding these incidents, the destruction, alteration, and forgery of

28    veterans' records and claim files and other illegal practices continue today. The 2005 VA IG Report

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    58
wc-106298

1   lists comments from VA staff such as: "For the past 10 years no examination has been allowed to be

2   returned as inadequate because the regional office *concocted a deal with the hospital to cook the*

3   *books on examination quality. . . . Rating specialists and DRO's* [Decision Review Officers] *have*

4   *been pressured to make rating decisions unwarranted by the evidence to make 'problem cases' go*

5   *away…..*" (Dep't of Veterans Affairs Office of Inspector General, Review of State Variances in VA

6   Disability Compensation Payments, Report 05-00765-137 (May 2005) at 62.) (emphasis added).

7        234.    By their very nature, the destruction, alteration, and forgery of veterans' claim

8   files and other practices described above are difficult or impossible to detect or prove absent

9   discovery, the ability to call VA employees as witnesses, and the ability to subpoena VA documents,

10  highlighting the significance of the Statutory Defects.

11       **C.      The Fee Prohibition and Challenged VA Practices Cause High Rates of
                   Abandonment of SCDDC Claims and Other Adverse Consequences**
12

13       235.    VA rules, regulations, and procedures concerning SCDDC for veterans with

14  PTSD are set forth in multiple sources and are intricate and extensive, comprising many thousands of

15  pages. These sources contain complicated rules and procedures concerning available benefits, claims

16  development, eligibility, ratings, computations, elections, presumptions, severance, fraud, forfeitures,

17  recoupment, appeals, and a host of other subjects.

18       236.    Extensive investigation, documentation, legal analysis, and preparation are

19  necessary to mount convincing SCDDC claims, and the services of attorneys are usually essential to

20  the successful prosecution of complex claims, such as PTSD claims. Most veterans are unacquainted

21  with VA substantive and procedural rules, and are ill-equipped to investigate and prepare their claims,

22  exercise rights to offer documentary evidence, present cases at hearings, exercise appellate rights, and

23  exhaust administrative remedies. Unrepresented veterans encounter great difficulties in prosecuting

24  SCDDC claims, particularly PTSD claims, where the very condition giving rise to the claim

25  adversely affects the veteran's ability to navigate the system.

26       237.    VA attorneys actively participate in every aspect of the adjudication of claims.

27  VA or DOJ staff attorneys decide claims, prepare ratings and SOCs, draft BVA opinions, handle

28  appeals, and perform other functions in the adjudication and appellate process. Yet, very few BVA

1    appellants are represented by attorneys. Lay "service representatives" from non-profit organizations

2    handle the vast majority of perfected appeals under powers of attorney, while many claimants appear

3    *in pro per*. Veterans also frequently represent themselves at the regional office level.

4        238.   Because they are prevented from retaining attorneys, veterans must depend

5    largely upon lay representatives to counsel them concerning their legal rights, prepare and

6    substantiate their claims, and conduct evidentiary hearings at the regional office level. Very few of

7    the service representatives are attorneys, and none receives any formal training from the VA. Nor

8    does the VA attempt to assure their competence as representatives. Moreover, service representatives

9    owe veterans none of the ethical duties and obligations that attorneys owe clients. However well-

10    intentioned, service representatives generally lack the skills, money, training, and resources to

11    represent SCDDC claimants adequately.

12        239.   Claimants represented by attorneys obtain significantly higher success rates on

13    SCDDC claims compared to those who are *pro per* or utilize service representatives to assist them,

14    especially as to complex categories of claims, such as PTSD.

15        240.   The complexity of VA rules, practices, and procedures, the Challenged

16    Practices, the absence of legal representation, and the shortcomings of representatives without legal

17    qualifications combine to discourage veterans from exercising procedural rights and cause many

18    veterans to abandon their SCDDC claims or appeals.

19        241.   Mental illnesses, such as PTSD, also often prevent veterans from investigating

20    and pursuing valid claims or causes them to abandon their claims unknowingly through inadvertent

21    failures to comply with VA procedural requirements. Furthermore, many potential claimants fail to

22    file claims in the first place because they are unable to retain attorneys to represent them.

23        242.   Similarly, the vast majority of unsuccessful claimants do not exercise their

24    right to appeal, despite the fact that the mere filing of a NOD (serves as notice of appeal) prompts

25    regional offices to summarily reverse a substantial percentage of initial denials. Furthermore, a

26    majority of unrepresented veterans drop their appeals after filing the NOD. As described in the

27    August 2002 GAO Report, the appeal abandonment rate between the NOD and SA stages alone is

28

1    approximately fifty percent. (U.S. Gen. Accounting Office, Quality Assurance for Disability Claims

2    and Appeals Processing Can Be Further Improved, GAO-02-806, (Aug. 2002) at 4.)

3          243.    Significantly, the vast majority of "abandoned" appeals involve alleged

4    inaction by a veteran rather than deliberate action. A high percentage of VA claims and appeals are

5    decided on grounds unrelated to the merits, including abandonment, failure to prosecute,

6    untimeliness, and waiver.

7          244.    Contrary to the original purpose of the prior fee restrictions and the Fee

8    Prohibition in the VJRA, the absence of legal representation leaves veterans vulnerable to

9    administrative errors and unfair practices, as actual VA practices often diverge markedly from

10   regulatory requirements.

11         245.    Unrepresented claimants frequently are targets of concerted efforts by VA

12   officials to induce them to surrender important procedural rights, such as their right to a hearing. The

13   regulation that guarantees claimants a right to a hearing "at any time on any issue," 38 C.F.R.

14   § 3.103(c), is not consistently enforced.

15         246.    Since the passage of the VJRA, VA attorneys frequently take advantage of

16   unrepresented claimants by raising technical arguments that have nothing to do with the merits of the

17   claims, including waiver, the doctrine of subsumption, and failure to comply with jurisdictional time

18   deadlines. In most cases, these arguments relate to events that occurred during the critical

19   development of the record at the regional office and the perfection of the appeal.

20         247.    Review of the body of CAVC decisions reveals that they often turn upon a

21   claimant's mishandling of the claim at the regional office level. Two trends emerge. First, the

22   veteran often fails to present issues or arguments to either the regional office or the BVA. *See e.g.*,

23   *Collaro v. West*, 136 F.3d 1304 (Fed. Cir. 1998); *Ledford v. West*, 136 F.3d 776 (Fed. Cir. 1998);

24   *Forshey v. Principi*, 284 F.3d 1335 (Fed. Cir. 2002), *superseded by amended statute*, *Flores v.*

25   *Nicholson*, 476 F.3d 1379 (Fed. Cir. 2007). Second, the veteran commits the prejudicial error of

26   failing to file statutory or administrative rules or regulations. *See e.g.*, *Bailey v. West*, 160 F.3d 1360

27   (Fed. Cir. 1998); *Jaquay v. Principi*, 304 F.3d 1276 (Fed. Cir. 2002); *Beck v. Principi*, 18 Vet. App.

28   560 (2004).

1          248.   The Challenged VA Practices described herein are difficult or impossible to

2 detect, and veterans rarely possess the ability or means to detect VA misconduct without discovery.

3          249.   Neither the VJRA nor related provisions in Title 38 of the U.S. Code provide a

4 procedure or mechanism for a veteran to discover VA misconduct, or whether the adjudication of a

5 particular claim was adversely impacted by one or more of the Challenged VA Practices.

6          250.   As a result of the foregoing problems, erroneous deprivation of SCDDC

7 claims, particularly those for PTSD, is frequent. Judged in the context of the VA's current

8 adjudication rules, procedures, and practices, the Statutory Defects create a high risk of erroneous

9 deprivation and unreasonably deprive the individual Plaintiffs and Class Members of their statutory

10 entitlement to SCDDC and/or medical care without due process of law.

11 **VI.    CLASS ACTION ALLEGATIONS**

12     **A.    Class Definition**

13          251.   The proposed Plaintiff Class for purposes of all claims includes all veterans

14 who have applied for or are receiving SCDDC for PTSD and all veterans who have requested VA

15 medical care based upon PTSD or who are eligible for care under the Medical Services statutes.

16          252.   Plaintiffs reserve the right to amend this Complaint to add additional class

17 representatives, either before or after a Motion to Certify the Class, subject to the provisions of

18 Fed. R. Civ. P. 15.

19     **B.    Presence of Common Issues of Fact or Law**

20          253.   The members of the Proposed Class of PTSD claimants and recipients are so

21 numerous that joinder of all members is impracticable.

22          254.   There are material questions of law and fact common to the proposed class,

23 including but not limited to the following:

24              a.    The constitutionality of the above-described provisions of the VJRA,

25 including the Statutory Defects;

26              b.    The failures of the VA to timely provide VA medical care to PTSD

27 recipients and claimants and to timely resolve SCDDC claims for PTSD;

28              c.    The propriety of the Challenged VA Practices.

1    255.    The claims of the members of the Organizational Plaintiffs and proposed class

2    representatives are typical of the claims of the proposed Class Members, and the proposed class

3    representatives will fairly and adequately protect the interests of the Class.

4    256.    The prosecution of separate actions by various members of the Class would

5    create a risk:

6    a.    Of inconsistent or varying adjudications with respect to Class Members

7    that would establish incompatible standards of conduct for Defendants;

8    b.    That adjudications with respect to individual Class Members would, as

9    a practical matter, be dispositive of the interests of Class Members who are not parties to such

10    adjudications or substantially impair or impede their ability to protect their interests.

11    257.    Defendants have acted and/or refused to act on grounds generally applicable to

12    the Class, thereby making appropriate final injunctive relief and/or declaratory relief with respect to

13    the Class as a whole.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

### FIRST CLAIM FOR RELIEF
### (Declaratory Relief: Denial of Due Process)

3        258.    Plaintiffs reallege and incorporate herein by reference as though fully set forth,

4    each and every allegation contained in Paragraphs 1 through 257 of this Complaint.

5        259.    A present controversy exists between Plaintiffs and Defendants in that

6    Plaintiffs contend and Defendants deny that the VJRA, including the Statutory Defects described

7    above, unconstitutionally infringe upon their property and liberty rights protected by the Due Process

8    Clause of the Fifth Amendment to the United States Constitution, which provides that, "No person

9    shall . . . be deprived of life, liberty, or property, without due process of law."

10        260.    The above-described provisions of the VJRA, the Challenged VA Practices,

11    and the failure to provide medical care and treatment, are unconstitutional because they deprive

12    SCDDC claimants of their property and liberty without affording the due process required by the

13    Fifth Amendment to the United States Constitution.

14

15

### SECOND CLAIM FOR RELIEF
### (Declaratory Relief: Denial of Access to Courts and Right to Petition)

16        261.    Plaintiffs reallege and incorporate herein by reference as though fully set forth,

17    each and every allegation contained in Paragraphs 1 through 257 of this Complaint.

18        262.    The Statutory Defects, both separately and in combination, have completely,

19    unreasonably, and unjustifiably foreclosed the ability of Plaintiffs to pursue their underlying claims

20    and present their grievances, including SCDDC claims, claims for Medical Services, and other claims

21    arising out of the Challenged VA Practices against the responsible officials.

22        263.    As a result, Plaintiffs have been deprived of meaningful access to the courts

23    and their right to petition for a redress of grievances in violation of the First and Fifth Amendments to

24    the United States Constitution.

25

26

### THIRD CLAIM FOR RELIEF
### (Declaratory Relief--Violation of 38 U.S.C. § 1710(e)(1)(D))

27        264.    Plaintiffs reallege and incorporate herein by reference as though fully set forth,

28    each and every allegation contained in Paragraphs 1 through 257 of this Complaint.

1    265.    Defendants have not only violated their duty to provide medical care to

2    returning OEF/OIF veterans for two years from their date of separation from the military, but claim

3    that their statutory obligation is discretionary.

4    266.    The Court should issue a declaration interpreting the provisions of the Medical

5    Care Statute and stating that Defendants' obligation to provide medical care to returning veterans is

6    mandatory.

7
8
**FOURTH CLAIM FOR RELIEF**
**(Declaratory Relief - Violation of Section 504 of the Rehabilitation Act)**

9    267.    Plaintiffs reallege and incorporate herein by reference as though fully set forth,

10   each and every allegation contained in Paragraphs 1 through 257 of this Complaint.

11   268.    Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.

12   § 794, provides that:

13       [N]o otherwise qualified individual with handicaps in the United
         States . . . shall, solely by reason of his or her handicap, be excluded
14       from participation in, be denied the benefits of, or be subjected to
         discrimination under any program or activity receiving Federal
15       financial assistance . . .

16   269.    Plaintiffs are "qualified individuals with handicaps" within the meaning of

17   29 U.S.C. §§ 706(8) and 794.

18   270.    The VA receives federal financial assistance within the meaning of 29 U.S.C.

19   § 794.

20   271.    Solely by reason of their disabilities, Plaintiffs have been, and continue to be,

21   excluded from participation in, denied the benefits of, and subjected to discrimination in their

22   attempts to receive, full and equal access to the programs, services and activities offered by

23   Defendants in violation of the Rehabilitation Act. 29 U.S.C. § 794; 32 C.F.R. § 56.8(a).

24   272.    The VA's benefits application and appeals policies and procedures exclude

25   persons with mental disabilities from proper diagnosis and receipt of SCDDC and discriminate

26   against them solely on account of their disabilities in violation of Section 504 and the regulations

27   promulgated pursuant thereto. Further, the VA systematically fails and refuses to offer reasonable

28   modifications and accommodations for the disabilities of Plaintiffs. The VA's policies, procedures

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                65
wc-106298

1    and practices have resulted in, or threaten to result in, discrimination against Plaintiffs in their

2    unlawful exclusion from participation in, and denial of SCDDC benefits and care under the Medical

3    Services statutes.

## FIFTH CLAIM FOR RELIEF
### (Injunctive Relief)

6        273.   Plaintiffs reallege and incorporate herein by reference as though fully set forth,

7    each and every allegation contained in Paragraphs 1 through 257 of this Complaint.

8        274.   Unless Defendants are restrained, Plaintiffs will suffer irreparable injury,

9    including the following:

10        a.   pain and anguish associated with their untreated PTSD and/or its

11    effects upon their health and safety, including the possibility of suicide;

12        b.   the refusal of medical treatment based upon Defendants' failures to

13    honor the provisions of the Medical Care Statute;

14        c.   additional protracted delays in adjudication of their SCDDC claims,

15    coupled with the possible forfeiture of accrued benefits upon their death;

16        d.   unknowingly having their claims for SCDDC tainted by the Challenged

17    VA Practices;

18        e.   prosecution of their claims without the assistance of counsel, leading to

19    abandonment of claims, procedural errors that are incurable, and a forfeiture of SCDDC; and

20        f.   improper "personality disorder" discharges, resulting in being

21    condemned to a lifetime of disability without compensation or treatment.

22        275.   Plaintiffs will be required to engage in a circuity of actions if injunctive relief

23    is not granted forbidding the VA from continuing to commit the Challenged VA Practices and

24    committing the other wrongful acts alleged above.

25        276.   Plaintiffs lack an adequate remedy at law to remedy the unlawful acts

26    described herein.

27

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                66
wc-106298

277.    Plaintiffs are entitled to a preliminary and permanent injunction enjoining Defendants, and those acting in concert with them, from committing any of the following acts, either directly or indirectly:

a.    Failing or refusing to provide timely medical examinations or treatment to PTSD claimants and recipients;

b.    Failing and refusing to process an initial or reopened PTSD claim and issue an initial decision or complete action on a PTSD appeal within such period of time as meets the minimum requirement of due process;

c.    Destroying, tampering with, forging entries on, removing or otherwise compromising evidence in service records or claim files;

d.    Deciding claims at VA Regional Offices based on instructions or directives from the Veterans Benefits Administration or other government officials in Washington, D.C. instead of based upon the facts and evidence of the record, including, without limitation, directives regarding PTSD claims and total disability based upon individual unemployability claims;

e.    Failing or refusing to honor claimants' requests for a hearing, discouraging claimants from requesting hearings, or failing and refusing to schedule a hearing within a reasonable period of time to claimants who have requested hearings;

f.    Prematurely denying PTSD claims before required factual development has taken place;

g.    Continuing to administer or carry out aspects of the VA's incentive compensation program which encourage VA employees to violate veterans' rights or circumvent VA rules and regulations;

h.    Refusing to decide whether a veteran's consent to a "Personality Disorder" discharge was knowing and voluntary or whether the veteran was in fact suffering from service-connected PTSD at the time of discharge; or from otherwise working with the Department of the Army or any other governmental organization with authority over our armed services in an effort to issue personality disorder discharges to troops suffering from PTSD or who exhibit symptoms of PTSD, thereby eliminating the veterans' ability to receive SCDDC and/or Medical Services;

i.     Continuing to refuse to provide free medical care to all returning veterans for two years, as provided in the Medical Care Statute;

j.     Continuing to violate the Rehabilitation Act; and

k.     Continuing to enforce the provisions of the Fee Prohibition.

278.    Plaintiffs are entitled to preliminary and permanent injunctions forbidding Defendants from continuing to commit the Challenged VA Practices, from failing and refusing timely to provide Medical Services to veterans suffering from PTSD, from enforcing or seeking to enforce the Fee Prohibition, and from committing the other wrongful acts alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    On the First Claim for Declaratory Relief, for declaratory relief as prayed for above.

2.    On the Second Claim for Declaratory Relief, for declaratory relief as prayed for above.

3.    On the Third Claim for Declaratory Relief, for declaratory relief as prayed for above.

4.    On the Fourth Claim for Declaratory Relief, for declaratory relief as prayed for above.

5.    On the Fifth Claim for Injunctive Relief, for a preliminary and permanent injunction as prayed for above.

6.    On all causes of action, for Plaintiffs' reasonable attorneys' fees and costs incurred herein pursuant to 28 U.S.C. § 2412 and any other applicable law.

7.    For such other relief as the Court deems just and proper.

Dated: July 23, 2007

GORDON P. ERSPAMER
ARTURO J. GONZALEZ
HEATHER A. MOSER
BILL D. JANICKI
STACEY M. SPRENKEL
MORRISON & FOERSTER LLP

By: _____
    Gordon P. Erspamer

    Attorneys for Plaintiffs

1    Dated: July 23, 2007

2

3

SIDNEY M. WOLINSKY
MELISSA W. KASNITZ
JENNIFER WEISER BEZOZA
KATRINA KASEY CORBIT
DISABILITY RIGHTS ADVOCATES

By:    _____
       Melissa W. Kasnitz

       Attorneys for Plaintiffs

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
wc-106298

69

1

## APPENDIX OF AUTHORITIES AVAILABLE ON THE INTERNET

2

**Description**                                                                                                                                        **Page(s)**

3   Linda Bilmes, "Soldiers Returning from Iraq and Afghanistan:
       The Long-Term Costs of Providing Veterans Medical Care and Disability
4   Benefits," RWP07-001 (John F. Kennedy School of Government,
       Harvard University, Faculty Research Working Papers Series, 2007)
5   *available at* http://ksgnotes1.harvard.edu/Research/wpaper.nsf/rwp/RWP07-
       001/$File/rwp_07_001_bilmes.pdf ........................................................ 14, 15, 35, 37, 40, 46, 53

6

7   U.S. Gov't Accountability Office, VA and DOD Health care:
       Efforts to Provide Seamless Transition of Care for OEF
       and OIF Servicemembers and Veterans, GAO 06-794R. (June 2006)
8   *available at* http://www.gao.gov/htext/d06794r.html ................................................................ 15

9   C.W. Hoge *et al.*, *Combat Duty in Iraq and Afghanistan,*
       *Mental Health Problems, and Barriers to Care,*
10  The New England Journal of Medicine, July 1, 2004,
       *available at* http://content.nejm.org/cgi/reprint/351/1/13.pdf ...................................................... 15

11

12  Frances M. Murphy, Statement Before the Former Members of the
       President's New Freedom Commission on Mental Health (Mar. 29, 2006),
       *available at* http://www.mhreform.org/pdf/Veterans%20Panel%20Murphy.pdf ................ 16, 46

13

14  Dep't of Defense Task Force on Mental Health, *An Achievable Vision:*
       *Report of the Department of Defense*, Task Force on Mental Health
       (June 2007), *available at*
15  http://www.ha.osd.mil/dhb/mhtf/MHTF-Report-Final.pdf ...................................... 18, 43, 53, 54

16  Sara Corbett, *The Women's War*, N.Y. Times Mag., Mar. 18, 2007,
       *available at* http://www.nytimes.com/2007/03/18/magazine/18cover.html
17  ?ex=1331870400&en=823808201240cefd&ei=5088&partner=rssnyt&emc=rss ................ 19, 46

18  Dep't of Veterans Affairs Office of Inspector General,
       Review of State Variances in VA Disability Compensation
19  Payments, Report No. 05-00765-137 (May 19, 2005),
       *available at* www.va.gov/oig/52/reports/2005/vaoig-05-00765-137.pdf ........... 19, 36, 52, 56, 59

20

21  Veterans Benefits Administration, Annual Benefits Report FY 2005 (Sept. 2005),
       *available at* http://www.vba.va.gov/reports.htm ........................................................................ 19

22  Jeremy Manier & Judith Graham, *Veterans Fight the War Within*,
       The Chicago Tribune, Mar. 13, 2007, *available at*
23  http://www.bcbs.com/news/national/veterans-fight-the-war-within.html ................................... 20

24  Nathaniel M. Rickles, *et al.*, *Health Care Experiences and Health*
       *Outcomes of African-American Veterans*, Institute on Urban
25  Health Research (April 2007), *available at*
       http://www.thebostonchannel.com/download/2007/0524/13385287.pdf ............................ 19, 20

26

27  Maureen Murdoch, *et al.*, *Mitigating Effect of Department of*
       *Veterans Affairs Disability Benefits for Post-traumatic Stress*
       *Disorder on Low Income,* Military Medicine (Feb. 2005), *available at*
28  http://findarticles.com/p/articles/mi_qa3912/is_200502/ai_n10298781/print ............................ 20

1
2   Stacy Bannerman, *Iraq Reservists Face a 'Perfect Storm' of
    Post-Traumatic Stress*, Foreign Policy in Focus, Mar. 15, 2007,
    *available at* http://www.alternet.org/module/printversion/49226 ................................... 23, 42, 43

3   Daniel Bertoni, "Veterans' Disability Benefits: Processing of Claims
    Continues to Present Challenges", Testimony before the
4   Subcommittee on Disability Assistance and Memorial Affairs,
    Committee on Veterans' Affairs, United States House of
5   Representatives (Mar. 13, 2007), *available at*
    http://www.gao.gov/new.items/d07562t.pdf.......................................................................... 24, 35
6
    Dep't of Veterans Affairs, *VHA Handbook 1601 E.01: Compensation
7   and Pension Examinations* (Veterans Health Administration 2006),
    *available at* http://www1.va.gov/vhapublications/ViewPublication.asp?pub_ID=1400
8   ............................................................................................................................................ 25

9   James P. Terry, Report of the Chairman, Board of Veterans
    Appeals, for Fiscal Year 2006 (2006), *available at*
10  http://www.va.gov/Vetapp/ChairRpt/BVA2006AR.pdf................................ 28, 29, 31, 37, 39, 40

11  Committee on Veterans' Compensation for Posttraumatic
    Stress Disorder, National Research Council, *PTSD Compensation
12  and Military Service* (National Academies Press 2007),
    *available at* http://www.nap.edu/catalog/11870.html............................................................ 29, 44
13
    U.S. Gen. Accounting Office, Quality Assurance for Disability Claims
14  and Appeals Processing Can Be Further Improved, GAO-02-806,
    (Aug. 2002), *available at* http://www.gao.gov/new.items/d02806.pdf .......................... 31, 40, 61
15
    Dep't of Veterans Affairs Office of Inspector General, Combined
16  Assessment Program Review of the VA Regional Office in Oakland,
    California, No. 01-02124-7 (March 21, 2002), *available at*
17  http://www.va.gov/oig/CAP/01-02124-71.pdf ............................................................................ 35

18  William P. Greene, Jr., Statement before the House Committee on
    Veterans' Affairs, Subcommittee on Disability Assistance and Memorial
19  Affairs, U.S. House of Representatives (May 22, 2007),
    *available at* http://veterans.house.gov/hearings/schedule110/may07/05-22-07/5-22-
20  07greene.shtml ...................................................................................................................... 37, 41

21  Robert V. Chisholm, Statement Before the Subcommittee on Disability
    Assistance and Memorial Affairs of the House Committee on Veterans' Affairs,
22  U.S. House of Representatives (May 22, 2007), *available at*
    http://veterans.house.gov/hearings/schedule/110/may07/05-22-07/05-22-07chisholm.shtml.... 39
23
    Paul R. Michel, State of the Court of Appeals for the Federal Circuit,
24  Cambridge, MD, June 28, 2007, *available at*
    http://www.fedcir.gov/pdf/State_of_the_Court.pdf............................................................. 41, 42
25
    Department of Veterans Affairs FY 2006 Performance and
26  Accountability Report (2006), *available at* www.va.gov/budget/report ...... 39, 42, 46, 47, 48, 52

27  Dan Frosch, *Fighting the Terror of Battles That Rage in Soldiers'
    Heads*, N.Y. Times, May 13, 2007, *available at*
28  http://www.veteransforamerica.org/ArticleID/9643 .................................................................. 43

Daniel Bertoni, "Veterans' Disability Benefits: Long-Standing Claims
Processing Challenges Persist", Testimony Before the Committee on
Veterans' Affairs, United States Senate, U.S. Gov't Accountability
Office, GAO-07-512T (March 7, 2007), *available at*
http://www.gao.gov/new.items/d07512t.pdf............................................................................... 44

Jon A. Wooditch, Statement Before the U.S. House of Representatives,
Committee on Veterans' Affairs, Subcommittee on Disability
Assistance and Memorial Affairs Hearing on Variances in Disability
Compensation Claims Decisions (Oct. 20, 2005), *available at*
http://veterans.house.gov/hearings/schedule109/oct05/10-20-05/jwooditch.html...................... 45

U.S. Gov't Accountability Office, Report to the Ranking Democratic
Member, Committee on Veterans' Affairs, United States House of
Representatives, VA Health Care: VA Should Expedite the
Implementation of Recommendations Needed to Improve
Post-Traumatic Stress Disorder Services, GAO-05-287 (Feb. 2005),
*available at* http://www.gao.gov/new.items/d05287.html............................................... 46, 47, 48

U.S. Gov't Accountability Office, Report to Congressional Committees,
Post-Traumatic Stress Disorder: DOD Needs to Identify the Factors
Its Providers Use to Make Mental Health Evaluation Referrals for
Servicemembers, GAO-06-397 (May 2006), *available at*
http://www.gao.gov/new.items/d06397high.pdf........................................................................ 47

U. S. Gov't Accountability Office, Report to the Ranking Democratic
Member, Committee on Veterans' Affairs, United States House of
Representatives, VA and Defense Health Care: More Information
Needed to Determine If VA Can Meet an Increase in Demand for
Post-Traumatic Stress Disorder Services, GAO-04-1069 (Sept. 2004),
*available at* http://www.gao.gov/new.items/d041069.pdf.......................................................... 48

Robert Epley, Training Letter 01-01 (Compensation & Pension Service,
Veterans Benefits Administration, Jan. 8, 2001),
*available at* http://www.warms.vba.va.gov/Admin21/LETTER/TL01_01.doc ......................... 49

U.S. Gov't Accountability Office, VA Health Care: Budget
Formulation for Fiscal Years 2005 and 2006, GAO-06-430R (Feb. 2, 2006),
*available at* http://www.gao.gov/new.items/d06430r.pdf .................................................... 51, 52

U.S. Gov't Accountability Office, Report to Congressional Requesters,
VA Health Care: Spending for Mental Health Strategic Plan Initiatives
Was Substantially Less Than Planned, GAO-07-66 (Nov. 2006)
*available at* http://www.gao.gov/new.items/d0766.pdf.............................................................. 53

Joshua Kors, *How Specialist Town Lost His Benefits*,
The Nation, Apr. 9, 2007, *available at*
http://www.thenation.com/doc/20070409/kors........................................................................... 55

1

Toni Locy, *Lawyer Gets 15 Months for Tampering with Vets' Files*,
The Washington Post, Sept. 9, 1995, *available at*
http://pqasb.pqarchiver.com/washingtonpost/access/19405778.html?dids=
19405778:19405778&FMT=ABS&FMTS=ABS:FT&fmac=&date=Sep+
9%2C+1995&author=Toni+Locy&desc=Lawyer+Gets+15+Months+for+
Tampering+With+Vets%27+Files ............................................................................................ 59

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28