PETER D. KEISLER
Assistant Attorney General
SCOTT N. SCHOOLS
Interim United States Attorney
RICHARD LEPLEY
Assistant Branch Director
DANIEL BENSING D.C. Bar No. 334268
STEVEN Y. BRESSLER D.C. Bar No. 482492
KYLE R. FREENY California Bar No. 247857
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 305-0693
Facsimile: (202) 616-8460
Email: Daniel.Bensing@USDOJ.gov

Attorneys for Defendants Hon. Gordon H. Mansfield, the U.S. Department of Veterans Affairs, Hon. James P. Terry, Hon. Daniel L. Cooper, Hon. Bradley G. Mayes, Hon. Michael J. Kussman, Pritz K. Navara, the United States of America, Hon. Michael B. Mukasey, and Hon. William P. Greene, Jr.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| VETERANS FOR COMMON SENSE and VETERANS UNITED FOR TRUTH, <br><br>Plaintiffs, <br><br>v. <br><br>Hon. GORDON H. MANSFIELD, Acting Secretary of Veterans Affairs, *et al.*, <br><br>Defendants. | No. C 07-3758-SC <br><br><br>**DECLARATION OF THOMAS G. BOWMAN** |

I, Thomas G. Bowman, declare:

1. I am employed as the Chief of Staff of the U.S. Department of Veterans Affairs (VA). The information contained in this declaration is based on my personal knowledge and information made available to me in my official capacity.

2. Following my retirement from the Marine Corps as a colonel in October 1999, I

served as senior counsel to the Committee on Government Reform of the U.S. House of Representatives until February 2002, when I joined VA. At VA, I served as Executive Assistant and Acting Assistant Secretary for Public and Intergovernmental Affairs before leaving in June 2003 to serve as State Court Administrator for the Rhode Island Judiciary and Chief of Staff to the Chief Justice of the Rhode Island Supreme Court.

3. I returned to VA in June 2004 to become the Deputy Assistant Secretary for Congressional and Legislative Affairs. In August 2004 I was appointed Deputy Chief of Staff. On October 12, 2005, I was appointed Chief of Staff for VA.

4. In my official capacity I work with the Secretary and Deputy Secretary to manage day-to-day operations of VA, the federal government's second-largest Cabinet department, with more than 247,000 employees at more than 1,300 points of service including Regional Offices, VA medical centers, outpatient clinics, Vet Centers and national cemeteries throughout the country. As Chief of Staff, I am familiar with VA's operations and organizations.

5. I am aware of this litigation and of the defendants' Motion to Dismiss all of the plaintiffs' claims, filed on September 25, 2007, and set for hearing before the Court on December 14, 2007. I am also aware that on October 18 and 19, 2007, the two plaintiff organizations served 129 Requests for Production (RFP) on defendants including VA.

6. I am aware that on October 23, 2007, VA's Department of Justice (DOJ) counsel met with more than 20 VA staff members representing the offices potentially implicated in this lawsuit, including the Chiefs of Staff for both the Veterans Health Administration (VHA) and Veterans Benefits Administration (VBA). The purpose of this meeting was to identify offices within VA likely to have information relevant to the plaintiffs' requests. DOJ counsel requested that the offices identified as potentially having responsive information estimate the cost of responding to plaintiffs' requests in terms of the time required, the monetary expenditure required, and opportunity costs of complying.

7. I have also been advised that, given the ambiguity of some of the plaintiffs' requests, the limited time to respond, the size of the agency and the fact that many different

employees were assigned to the task of developing cost estimates, the assumptions and methodologies used in developing the estimates might vary. Moreover, VA employees attempted to identify the offices most likely to have responsive information but, because of the broad and vague nature of many of the requests, some estimates may not account for all costs associated with the 129 requests. VA staff did not attempt to estimate the costs of responding to certain requests that were patently irrelevant or sought unreleasable information. Nevertheless, based on the good faith estimates provided by VA staff and program offices interpreting the RFPs, I believe that these estimates conservatively capture the rough magnitude of the burden that would be placed on VA if the Department is required to respond to the plaintiffs' broad production requests. We estimate that the cost of complying with 27 of plaintiffs' 129 RFPs is more than $1 million dollars each and that the cost of complying with 21 of these is estimated at more than $2 million dollars each.

    8.    To fulfill plaintiffs' document requests would require many time-consuming electronic and manual searches of computer systems.

    a. For example, plaintiffs seek "All DOCUMENTS CONCERNING any one or more of the [requests for production]." See RFP pg. 8. Plaintiffs have defined "document" to include "e-mail or electronic mail." See RFP, Definition 2. Read literally, plaintiffs' requests will require VA to search all of its e-mail boxes for responsive documents. Moreover, plaintiffs make no effort to identify personnel who may be in possession of these items. Given the size of VA and the ubiquitous nature of e-mail, the information sought by plaintiffs could be located anywhere in VA's more than 320,000 e-mail boxes. I am told by VA information technology staff that in order to conduct a search of the active e-mail system for messages containing particular words or phrases, each mailbox would need to be searched separately. Such searches involve connecting to an individual employee's mailbox, conducting a search, and copying any responsive records; a process estimated to take between five and ten minutes per mailbox, excluding the time required for setup and export of messages. I have been

informed that given the ambiguity in the plaintiffs' multiple, broad requests and VA's size, conducting e-mail searches will place a substantial burden on VA's information technology resources. Additionally, each VA employee would be required to read plaintiffs' 129 paragraph request for production and then manually search his or her work space for responsive materials. It is my opinion as Chief of Staff, that conducting such a broad based search will divert valuable resources necessary to provide benefits and services to veterans and survivors.

      b. Based on the estimates received, complying with requests 16, 17, 31, 32, 38, 103, 104, and 115 will require a search of individual claims files, which are maintained at VA Regional Offices and VA's Records Management Center. Another nineteen requests (request numbers 1-15; 2; 96-98) may require individual searches of files. VA staff estimate that responding to these requests will cost millions of dollars. For example, in response to DOJ's request for cost estimates of complying with RFP 1, the Board of Veterans' Appeals' (BVA) response provides that BVA's electronic database containing the relevant information lacks the capacity to identify the disease or injury on which of the underlying claim for which dependency and indemnity compensation (DIC) (i.e., compensation for service-connected death) is based. In order to satisfy this request, which seeks databases, lists, and printouts showing pending service connected death or disability compensation claims (SCDDC) based on PTSD or other mental disorders, BVA employees would have to manually search each claims file to identify DIC, cause of death claims, or other compensation claims based on PTSD or other mental disorders. BVA estimates it would cost nearly $2.4 million to produce the information requested by RFP 1 alone.

      c. Similarly, many of VA's records are stored at the agency's 57 Regional Offices and the Records Management Center (RMC) in St. Louis, Missouri. Many of plaintiffs' requests would require electronic and/or manual searches of records at those offices. For example, RFP 115 seeks copies of all death certificates for veterans in DIC

claims in which the death certificates show suicide or possible suicide as a cause or contributing cause of death. Although VA does not have existing reports that would provide that information, it is possible that VBA has responsive materials in claims files (*i.e.* death certificates). Therefore, to comply with plaintiffs' request would require VA to write and run a program to attempt to locate an estimated 439,000 claim files at the Regional Offices and the RMC.[1] Identified files would then have to be retrieved from the Regional Office and RMC file banks by GS-4 file clerks. VBA estimates that the files could be pulled at a rate of 100 per hour (4,390 hours). Once retrieved, GS-10s at each of the 57 Regional Offices and RMC would review the files to identify and copy death certificates that have suicide listed as a contributory cause of death. VBA estimates that at a rate of six per hour, it would take 73,167 hours to review the folders and make the copies. Based on the cost estimate provided to me by VBA, responding to plaintiffs' RFP 115 could cost VBA $2.5 million. This figure does not reflect the opportunity costs, *i.e.*, lost productivity in adjudicating claims while employees are diverted to reviewing claims files. It is my opinion as the Chief of Staff that diverting resources from claims adjudication will have a detrimental impact on VA's ability to adjudicate benefits claims from veterans and their survivors.

9.  In addition to the cost and workload burden on VA, plaintiffs' request also raises serious privacy concerns, especially for those requests seeking medical treatment files related to mental health services. Congress has accorded significant protections to such records, see e.g. 38 U.S.C. §§ 5701, 7332, in view of the potential harm that disclosure may have on patients and the physician-patient relationship. For example, plaintiffs' RFP 31 and 120 potentially involve records held by the 209 Vet Centers nationwide. Vet Centers provide readjustment counseling services to combat veterans to assist in the transition from military to civilian life. Services

---

[1] This figure reflects VBA's estimate as to the number of claims files that will contain information on veterans' deaths since January 1, 2000. VBA staff based this estimate upon the number of active Dependency and Indemnity Compensation (DIC) files (329,000) plus an estimate of the conforming records from the 1.1 million inactive records in the system.

provided by the Vet Centers includes, among other things, counseling, group counseling, bereavement counseling, and medical referrals. Vet Center program officials have conservatively estimated that Vet Center paper files contain counseling records for more than 2.5 million veterans. In addition, much of this information is potentially covered by the psychotherapist-patient privilege. Vet Center program administrators have stated that producing documents from the Vet Centers would violate VA's 28-year policy guaranteeing strict confidentiality for services rendered by not releasing records without the veteran's consent. Vet Center program administrators are concerned that such a disclosure would undermine the Vet Center program's hard won trust with the combat veteran population and could cause serious barriers to care for new veterans needing readjustment counseling services. Based on the opinions provided by Vet Center program officials, my understanding of the nature of the Vet Center model, and my experience with the veteran community, I believe that requiring VA to produce information related to treatment records for mental health services could have a negative impact on veterans' willingness to seek mental health care services from VA.

10. Plaintiffs' requests for veterans' records and related correspondence will also require a search of records at VA's nearly 1,300 sites of care including 153 hospitals, 135 nursing homes, 724 Community Based Outpatient Clinics, 209 Vet Centers, and 46 Domiciliary Residential Rehabilitation Treatment Programs. Over 5.5 million individual patients are seen at VA facilities each year. VA conducted nearly 54 million outpatient visits and operated 54,000 inpatient beds in fiscal year (FY) 2006. VHA employs 210,000 individuals throughout the healthcare system, 59 percent (123,900) of whom provide direct patient care. Requiring clinicians to search their files for, e.g., information related to "diagnostic criteria for PTSD applied by VA," RFP 33, "document preservation instructions and measures based upon the filing of this action," RFP 58, or specific information about all potential PTSD patients would significantly burden the VA health system and distract employees, particularly health care providers, from delivering health care services to veterans.

11. Recently, VA's patient population has evolved to include Operation Enduring

Freedom /Operation Iraqi Freedom (OEF/OIF) veterans. Of the 751,273 OEF/OIF veterans separated through October 2007, 263,909 have obtained health care in a VA facility since FY 2002. VA operates the nation's only Polytrauma System of Care in support of the needs of severely injured OEF/OIF veterans. Requiring health care providers in VA's Polytrauma Centers to produce documents related to the request for production would distract VA health care providers from delivering the critical level of care necessary for these OEF/OIF veterans.

12.   Plaintiffs' first Request for Production of documents would divert enormous staff and resources from VA and would prevent VA from timely providing benefits and health care to veterans and their survivors. The Chief of Staff of VHA has advised me that requiring VA to fulfill the request for production in its present form would have an adverse impact on VHA in the context of VHA's four missions: clinical care, research, education and support to the Department of Defense during national emergencies. To the degree that health care professionals (and their support staff) are involved in the retrieval of information related to this request, care provided to veterans will be significantly delayed and the quality of health care for those veterans will be significantly impacted. Our assessment is that health care professionals (and their support staff) will be significantly involved in the retrieval of information related to this request.

13.   Similarly, VA's ability to timely provide veterans benefits through VBA will be significantly and adversely affected by the impact of the labor-intensive reviews and searches that would be required to respond to plaintiffs' request for production. VBA administers programs that provide financial and other forms of assistance to veterans and their survivors including compensation, pension, survivors' benefits, rehabilitation and employment assistance, education assistance, home loan guaranties, and life insurance. Within VBA, the Compensation and Pension Service administers disability compensation and dependency and indemnity compensation benefit programs. This fiscal year, VA will pay compensation and dependency and indemnity compensation benefits totaling nearly $37.3 billion dollars to over 3.2 million veterans and survivors. VA will also pay disability and death pension benefits totaling nearly

$3.8 billion dollars to 513,000 veterans and survivors.

14. The time required to search for the information requested by plaintiffs will detrimentally impact VA's responsibilities to claimants. Disability claims from returning war veterans, as well as from veterans of earlier periods, have increased 45 percent between 2000 and 2007. VBA projects that disability claims in 2008 will increase to an estimated 840,000. The increasing claims volume has significantly increased VBA's inventory of pending claims (now over 400,000) and the length of time veterans must wait for decisions on their claims (averaging 177 days in October 2007).

15. Over the past year, VBA has been aggressively hiring additional staff to address its growing workload, improve the timeliness of decisions, and expedite processing of claims from OIF/OEF veterans. This request for production would divert many of our regional office employees from their primary mission of delivering benefits to veterans and their survivors to searching records and reviewing files. Similarly, new employees, who require more than two years to become proficient, would lose valuable training time if tasked with responding to the RFP. Although the subject of this litigation is service connected death and disability compensation, were VBA employees required to search for the information sought in the RFP, all programs administered by VBA would be adversely affected because VBA employees generally adjudicate all types of benefits claims. Overall, this would have a negative effect on our efforts to increase resources devoted to claims processing and expedite OIF/OEF claims.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 9, 2007.

*[signature]*
THOMAS G. BOWMAN