GORDON P. ERSPAMER (CA SBN 83364)
GErspamer@mofo.com
MORRISON & FOERSTER LLP
101 Ygnacio Valley Road, Suite 450
P.O. Box 8130
Walnut Creek, California 94596-8130
Telephone: 925.295.3300
Facsimile: 925.946.9912

SIDNEY M. WOLINSKY (CA SBN 33716)
SWolinsky@dralegal.org
MELISSA W. KASNITZ (CA SBN 162679)
MKasnitz@dralegal.org
JENNIFER WEISER BEZOZA (CA SBN 247548)
JBezoza@dralegal.org
KATRINA KASEY CORBIT (CA SBN 237931)
KCorbit@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, California 94704-1204
Telephone: 510.665.8644
Facsimile: 510.665.8511

**[see next page for additional counsel for Plaintiffs]**

Attorneys for Plaintiff(s)
VETERANS FOR COMMON SENSE, and
VETERANS UNITED FOR TRUTH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VETERANS FOR COMMON SENSE and VETERANS UNITED FOR TRUTH, INC., <br><br> Plaintiffs, <br><br> v. <br><br> GORDON H. MANSFIELD, Acting Secretary of Veterans Affairs, *et al.*, <br><br> Defendants. | Case No.  C-07-3758-SC <br><br> **CLASS ACTION** <br><br> **DECLARATION OF PAUL SULLIVAN IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE BOWMAN DECLARATION AND OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER** <br><br> **(Civ. L.R. 6-3)** <br><br> Place:   Courtroom 1, 17th Floor <br> Judge:   Hon. Samuel Conti <br><br> Complaint Filed:  July 23, 2007 |

1  **ADDITIONAL COUNSEL FOR PLAINTIFFS:**

2  ARTURO J. GONZALEZ (CA SBN 121490)
   AGonzalez@mofo.com
3  HEATHER A. MOSER (CA SBN 212686)
   HMoser@mofo.com
4  STACEY M. SPRENKEL (CA SBN 241689)
   SSprenkel@mofo.com
5  PAUL J. TAIRA (CA SBN 244427)
   PTaira@mofo.com
6  MORRISON & FOERSTER LLP
   425 Market Street
7  San Francisco, California 94105-2482
   Telephone: 415.268.7000
8  Facsimile: 415.268.7522

9  BILL D. JANICKI (CA SBN 215960)
   WJanicki@mofo.com
10 MORRISON & FOERSTER LLP
   400 Capitol Mall, Suite 2600
11 Sacramento, California 95814
   Telephone: 916.448.3200
12 Facsimile: 916.448.3222

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Paul Sullivan, declare:

2                                    **Introduction**

3       1.      I make this declaration in support of Plaintiffs' Motion to Strike Declaration of

4    Thomas G. Bowman and Opposition to Defendants' Motion for Protective Order to Stay Discovery.

5    I have personal knowledge of the matters set forth herein and could and would competently testify

6    thereto if called as a witness in this matter.

7                              **Summary of Background**

8       2.      I currently serve as the Executive Director of Veterans for Common Sense, a non-profit

9    organization based in Washington, DC, focusing on issues related to national security, civil liberties, and

10   veterans' benefits.  In my current position, I have testified twice in 2007 before the House Veterans'

11   Affairs Committee about the needs and concerns of our veterans of the Iraq War (Operation Iraqi

12   Freedom, OIF) and the Afghanistan War (Operation Enduring Freedom, OEF).  During 1990 and 1991, I

13   served in Saudi Arabia, Kuwait, and Iraq as a Cavalry Scout with the Army's 1st Armored Division

14   during Desert Shield and Desert Storm, commonly called the Gulf War.  From 1995 to 1997, I served on

15   the board of directors of the National Gulf War Resource Center (NGWRC).  From 1997 to 2000, I was

16   employed full-time as the NGWRC executive director, where I testified before Congress about Gulf War

17   veterans' healthcare use, disability benefit activity and proposed legislation.  In 1998, I was with the

18   President of the United States at the White House on Veterans Day when he signed into law an

19   expansion of healthcare and benefits sought by the NGWRC, the "Persian Gulf Veterans Act of 1998."

20      3.      I graduated from the University of West Georgia with a Bachelor of Arts degree in

21   Political Science in 1993, and I received a Master's Certificate in Project Management from George

22   Washington University in 2003.

23      4.      I have had extensive direct experience working on a day-to-day basis with VA data and

24   VA reports regarding Gulf War, OIF and OEF veterans.  From 2000 to 2006, I worked at the Department

25   of Veterans Affairs (VA) as Lead Program Analyst (GS-14), serving as a Level III VA- Certified Project

26   Manager leading a team of program analysts and computer programmers (GS-13s and GS-12s).  Our

27   team at the Veterans Benefits Administration's (VBA) Office of Performance Analysis and Integrity

28   designed, produced, and briefed the quarterly Gulf War Veterans Information System (GWVIS) report

1    that contains summary counts of Gulf War veterans' VA healthcare use, VA Vet Center counseling use,

2    and VA disability compensation and pension claim activity. Our team also designed, produced, and

3    briefed reports about the disability claims activity among Iraq War and Afghanistan War veterans. We

4    also designed and produced dozens of other statistical and analytical reports related to the Gulf War, OIF

5    and OEF for use by VA's Secretary, VA's Under Secretary of Benefits, VA's Office of Public Affairs,

6    VA's Research Advisory Committee on Gulf War Veterans' Illnesses and the VA's Veterans Health

7    Administration (VHA). On several occasions, we prepared specialized data runs on disability benefit

8    activity among veterans with a claim decision (either granted or denied) and/or a claim pending for post-

9    traumatic stress disorder (PTSD). In addition, while at VA, I provided staff support for then-VA

10    Secretary Anthony Principi's "Task Force for Seamless Transition" for OIF and OEF veterans, and I

11    wrote the Task Force's 2004 end of year report. My VA duties and responsibilities included preparing

12    highly specialized business rules for obtaining data on Gulf War veterans with particular conditions,

13    such as amyotrophic lateral sclerosis (ALS), for use by VA researchers. I became familiar with the

14    various databases maintained by VBA that were used by my team to prepare multiple reports each year.

15         5.     I am submitting this Declaration in response to the Declaration of Thomas G. Bowman,

16    submitted by Defendants in support of their Motion for Protective Order to Stay Discovery. I do not

17    know Mr. Bowman personally. I am unaware of the methodology he used to calculate cost estimates, as

18    it is not clear from his declaration. However, based on my personal experiences with the systems and

19    processes at VA, I believe that Mr. Bowman has generally ignored the most cost-effective method to

20    obtain information, and grossly exaggerated the cost burden that VA would incur through compliance

21    with Plaintiffs' discovery requests.

22    **Retrieval of Electronic Documents**

23         6.     Bowman asserts that Defendants would be required to conduct manual searches of

24    "more than 320,000 e-mail boxes" in order to respond to Plaintiffs' discovery requests. Bowman

25    Decl. ¶ 8(a). Presumably, this calculation is based on the total number of both personal and office e-

26    mail boxes across all of VA, and Defendants' faulty assumption that VA must search the e-mail of

27    every single VA employee. However, large segments of the VA, such as the National Cemetery

28    Administration, the Office of Small and Disadvantaged Business Utilization, Center for Faith-Based

1    and Community Initiatives, Center for Minority Veterans, and Center for Women Veterans, have no

2    involvement with the issues raised in this lawsuit, and are not the target of the Plaintiffs' discovery

3    requests.  In addition, even within the VBA, certain departments are extremely unlikely to have

4    documents relevant to Plaintiffs' document requests at this time.  Such departments include the Loan

5    Guaranty, Education, and Vocation Rehabilitation and Employment.  As such, the number of e-mail

6    boxes to be searched at VBA would be dramatically fewer than the number asserted by Mr. Bowman.

7            7.    Mr. Bowman also fails to note that VA has the ability to run key-word searches

8    through other employees' e-mail boxes.  For example, there are employees within VA's Information

9    Technology department and VA's own Information Security Officers with complete access to almost

10   all VA employees'e-mail.  Plaintiffs proposed and provided a detailed list of search terms and titles in

11   discussions with Defendants regarding the negotiations concerning a preservation order, which

12   ultimately were unsuccessful.  Mr. Bowman's Declaration fails to address any means by which

13   computer search capabilities could be utilized to minimize the burden of discovery in this case sought

14   by the plaintiff or to disclose the underlying assumptions for the cost estimates prepared by others.

15           8.    Similarly, the statement that "each VA employee" is required to search his or her

16   entire work space for responsive materials far overstates the burden of compliance.  As with e-mail

17   boxes, large numbers of VA employees would fall within organizations or departments outside of the

18   scope of our request.  Therefore, Defendants' estimate, based on every e-mail box in the entire VA, is

19   a vastly inflated estimate of the true costs that would be incurred.

20                    **Gathering Materials from Individual Claim Files**

21           9.    Defendants' estimates of cost and time for searching claim files are based upon

22   assumptions that ignore common sense and dramatically depart from methods that I utilized

23   conducting similar searches.  For example, while working at VBA, I was asked to perform a search to

24   identify deceased Gulf War veterans either granted or denied service connection for ALS.  After

25   identifying the veterans, I worked with VBA Regional Offices to locate, copy, and transmit copies of

26   their death certificates so that VA researchers could conduct and then publish a peer-reviewed study

27   on the prevalence of ALS among deployed Gulf War veterans compared with those who did not

28   deploy during the same time frame.  I spent approximately one day writing the rules to identify the

veterans who had an ALS diagnostic code in their computerized records. VBA computer programmers then wrote and executed a special computer program to identify the deceased Gulf War veterans where ALS appeared in their computerized records. Researchers and I then contacted each appropriate Regional Office for a copy of the veterans' death certificates. The staff members at each regional facility were highly cooperative and were able to send legible copies of the veterans' death certificates to me within the span of one to two days. Some of the regional offices responded the same day. While electronic records identifying a granted or denied claim for PTSD will be more prevalent than ALS among deceased OIF and OEF war veterans, and this search will require more paper files to be pulled, I find it difficult to understand how the time spent could total anything in magnitude of 80,000 hours. Defendants appear to base their estimates on a manual search process that reviews every Iraq and Afghanistan war veterans' paper claims file (currently reported by VBA as 202,000 as of July 2007), without taking into account the use of simple electronic search methods that would dramatically reduce the scope of the work to only the small sub-set of deceased Iraq and Afghanistan war veterans diagnosed by VHA with PTSD or with a decided VBA claim for PTSD.

      10.    Defendants are either unaware, or fail to acknowledge, that the interactive use of multiple VA databases to identify relevant records would meet a substantial portion of the discovery requests at a small fraction of the costs described. I believe that Defendants would be able to locate the documents responsive to Plaintiffs' discovery requests, in substantial part, by making use of data from VBA's Compensation and Pension Master Record (CPMR), VBA's Beneficiary Identification Records Locator Subsystem (BIRLS), VBA's Pending Issue File (PIF), VHA's Readjustment Counseling Service's Vet Centers Utilization File VHA's Patient Treatment File, VHA's Outpatient Care File, and other VA databases, as described on page 3 of the Department of Veterans Affairs document entitled, "February 2006 Gulf War Veterans Information System Report", a true and correct copy of which is attached hereto as Exhibit A.. The CPMR and BIRLS contain VBA diagnostic codes for PTSD plus other readily identifiable mental conditions. A simple query of this database using specific diagnostic codes could identify veterans who have been diagnosed with such a condition. VHA databases contain diagnostic codes for each medical condition entered by VHA employees. If lists of veterans from these databases were combined and sorted to identify only unique

1   veterans, then VA could quickly provide Plaintiffs with both a summary count of veterans diagnosed

2   with PTSD as well as any other information the court deemed appropriate based on the lawsuit and

3   the veterans' right to privacy.  While this approach requires business rules to be written by one or

4   more program analyst and one or more computer program to be written by a computer programmer at

5   VBA and VHA, this approach would cost nothing remotely approaching the $2.4 million dollars cited

6   by Defendants.  Indeed, nearly all of the work described above (except sorting for unique veterans

7   between VHA and VBA) appears already to have been completed because VBA and VHA already

8   prepare reports on PTSD claims among Iraq and Afghanistan war veterans each quarter in the normal

9   course of business.  For example, VHA has produced for the General Accountability Office (GAO) a

10  report which provides a count of the number of OIF and OEF veterans who have been diagnosed with

11  PTSD at VHA Medical Centers, VHA clinics, and VHA "Vet Centers"   A true and correct copy of

12  this report, entitled, "VA Facility Specific OIF/OEF Veterans Coded with Potential PTSD Through

13  2nd Qt FY 2007," by Han K. Kang, Director, Environmental Epidemiology Service, and dated June

14  2007, is attached hereto as Exhibit B.  The query behind this report could easily be modified to

15  generate a list of veteran names and unique identifiers to protect the privacy of the veterans.  In

16  another example, VBA has produced for internal use, initially designed using my business rules, a

17  report detailing the disability compensation and pension activity among Iraq War and Afghanistan

18  War veterans**.**  A true and correct copy of this report, entitled, "VA Benefits Activity: Veterans

19  Deployed to the Global War on Terrorism," prepared by VBA Office of Performance Analysis &

20  Integrity, and dated June 25, 2007, is attached hereto as Exhibit C.  The simple task of cross-

21  referencing the VBA and VHA databases appears to be the sole step remaining in order to generate

22  the lists requested by the plaintiff of all OIF and OEF veterans diagnosed with, granted service

23  connection, denied service connection, or with a pending claim for PTSD.

24        11.    In paragraph 8(c) of his Declaration, Bowman explains that "it is *possible* that VBA"

25  has death certificates in claim files.  Bowman Decl. ¶ 8(c) (emphasis added).  Based on my

26  experience working with records at VA, it is an indisputable fact that VBA has death certificates in

27  claim files for Dependency and Indemnity Compensation (DIC) or Insurance, as VBA requires proof

28

1    of death to grant the claim, which is almost always in the form of a death certificate that lists the

2    cause of death.

3         12.    In paragraph 8(c), Bowman also contends that the production of veterans' death

4    certificates showing suicide as a cause or contributing cause of death will also be an extraordinary

5    burden.  His estimate is based on a manual search of "an estimated 439,000 claim files at the

6    Regional offices and the RMC" which purportedly would consume over 80,000 hours of staff work.

7    Bowman Decl. ¶ 8(c).  Once again, this estimate is grossly exaggerated.  There is a much easier way

8    to approach this task.  First, Defendants need to define and limit the target population.  Plaintiffs'

9    document requests focus on veterans from the Vietnam War, Gulf War, OIF and OEF.  Defendants

10   can use the following databases to identify veterans based on service in a particular war:  the

11   "Vietnam In-Country File", the "Gulf War Master Record" (that includes data from the following

12   Department of Defense databases: "Active Duty Master File," "Active Duty Loss File," "Reserve

13   Components Common Personnel Data System," "Operation Desert Shield/Storm Files," "Operation

14   Mission/Contingency Files," "Khamisiyah Master File," and the "Al Jubayl Master File," maintained

15   by the Defense Manpower Data Center), and the "Active Duty and Reserve Pay Files, Combat Zone

16   Tax Exclusion, and Imminent Danger Pay Data" file of OIF and OEF veterans.  Taking this data,

17   Defendants could then find out who among the veterans from those four conflicts where the BIRLS

18   computer record contains a "date of death."  Defendants could then take the list of deceased veterans

19   and determine who among them have a DIC which can be either current or terminated.  This would

20   generate a list of record numbers, and only those record numbers would need to be pulled and sorted

21   by regional office.  A low-level clerk could then pull the death certificates from those files.  It would

22   take an analyst approximately one day to find the prior business rules and update them, and then

23   would take a computer programmer approximately two days to edit and execute the computer

24   program to identify the veterans.  The databases described here are already pre-loaded into a VBA

25   data warehouse and are ready for a query to be run.

26        13.    Mr. Bowman contends that a GS-10 would need to review claim files to identify and

27   copy death certificates.  As a preliminary matter, I am not aware that VA employs any GS-10s.

28   Either way, it would be unnecessary for a GS-11 rating specialist to photocopy death certificates, as a

1    lower-level GS-4 clerk would be fully capable of such a task. This faulty assumption alone

2    materially magnifies the cost of compliance.

3           14.    A rough estimate, based on official Department of Defense reports, indicate there are

4    approximately 4,000 deaths of OIF and OEF service members. However, no one knows the number

5    of OIF and OEF veterans who have died after discharge from the military. Based on the

6    approximately 13,500 Gulf War veteran deaths after 15 years (Exhibit A, p. 6), a high estimate of

7    approximately 5,000 OIF and OEF veteran deaths after 6 years of war is reasonable. Spread across

8    the 57 Regional Offices and the Regional Maintenance Center, the 9,000 deaths amounts to

9    approximately 160 such requests at each facility. Even if all 9,000 deaths resulted in a DIC claim,

10   and some do not, and if a clerk can pull at least 20 files per hour using a list created by VA, then this

11   equals approximately one day's work at each facility, with some difference since offices differ in size

12   based on the state's population. Even if one were to adopt Defendants' pedestrian and artificially low

13   estimate for review of such files, six per hour, this is still a total of less than three days work at each

14   facility to review and copy relevant death certificates. A similar analysis could be conducted among

15   Gulf War and Vietnam War veterans to determine a more realistic picture of the cost of fulfilling this

16   document request. Therefore, Mr. Bowman has grotesquely overestimated the burden of conducting

17   such a search.

18          15.    In paragraphs 9 and 10, Bowman once again seriously overestimates the cost of

19   compliance with another of Plaintiffs' discovery requests. We know that there have been 45,330

20   OEF/OIF veterans diagnosed with PTSD at VA Hospitals, and 13,392 at Vet Centers (Exhibit B., p.

21   2. Because there is some overlap between these two populations, VA reports the unique number of

22   OIF and OEF veterans diagnosed with PTSD as 52,375. Furthermore, VBA reports 19,015 OIF and

23   OEF veterans receiving service-connected disability compensation for PTSD (Exhibit C, p. 4). The

24   VA has already identified for other purposes a significant portion of the salient and relevant

25   population for OIF and OEF veterans with PTSD.

26          16.    Finally, Defendants argue that the scope of discovery will detract from their ability to

27   adjudicate claims and provide care for veterans. This is not true, as a GS-4 VA employee does not

28   adjudicate claims, nor do such employees provide direct medical care for veterans. Defendants should

1  not be able to hide behind their broad and systemic failures to assist wounded, injured, and ill Iraq

2  and Afghanistan war veterans as a rationale for avoiding inquiry.  It is VA's mission, based on

3  President Abraham Lincoln's sage advice, "To care for him that shall have borne the battle and for

4  his widow and his orphan."  It is VBA's Leadership Covenant to follow the role model of General

5  Omar Bradley, VA's Administrator after World War II, who said, "We are dealing with veterans, not

6  procedures – with their problems, not ours."  VA's failure to abide by its mission and leadership

7  covenant is not a result of this case.  VA should not be able to hide behind its failures to follow the

8  law for decades as an excuse not to comply with Plaintiffs' document requests and provide justice to

9  our Nation's veterans, especially during war when the needs of veterans is most acute.

10

11      I declare under penalty of perjury that the foregoing is true and correct and that this

12  declaration was executed on November 27, 2007 at Cedar Park, Texas.

13

14                    /s/ Paul Sullivan
                                    Paul Sullivan

15

16      I hereby attest that I have on file all holograph signatures for any signatures indicated by a

17  "conformed" signature (/S/) within this efiled document.

18

19

20

21

22

23

24

25

26

27

28