JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
SCOTT N. SCHOOLS
Interim United States Attorney
RICHARD LEPLEY
Assistant Branch Director
DANIEL BENSING D.C. Bar No. 334268
STEVEN Y. BRESSLER D.C. Bar No. 482492
KYLE R. FREENY California Bar No. 247857
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

  P.O. Box 883
  Washington, D.C. 20044
  Telephone: (202) 305-0693
  Facsimile: (202) 616-8460
  E-mail: Daniel.Bensing@USDOJ.gov

Attorneys for Defendants Hon. Gordon Mansfield, the U.S. Department of Veterans Affairs,
Hon. James P. Terry, Hon. Daniel L. Cooper, Bradley G. Mayes, Hon. Michael J. Kussman,
Ulrike Willimon, the United States of America, Hon. Michael B. Mukasey, and Hon. William P.
Greene, Jr.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| VETERANS FOR COMMON SENSE and VETERANS UNITED FOR TRUTH, )<br><br>Plaintiffs, )<br><br>v. )<br><br>Hon. GORDON H. MANSFIELD, Acting Secretary of Veterans Affairs, *et al.*, )<br><br>Defendants. ) | No. C 07-3758-SC<br><br>**DECLARATION OF MARK BOLOGNA IN SUPPORT OF DEFENDANTS' MOTION FOR PROTECTIVE ORDER**<br><br>Date: December 14, 2007<br>Time: 10:00 a.m.<br>Courtroom: 1 |

1

2     I, Mark A. Bologna, declare:

3

4     1.     I am employed as the Director of the Veterans Benefits Administration's (VBA)

5     Office of Performance Analysis and Integrity (PA&I). The information contained in this

6     declaration is based on my personal knowledge and information made available to me as a senior

7     executive within VBA.

8     2.     I started working for the Department of Veterans Affairs (VA) in March 1993 as a

9     Loan Service Representative at the New Orleans Regional Office. Between 1993 and 2004, I

10     held various positions within the Loan Guaranty Service, and worked at the New Orleans, St.

11     Paul, and Houston Regional Offices. In 2004, I was selected as the Assistant Director of the

12     Nashville Regional Office, and in June 2005 was selected as the Executive Management

13     Officer in VBA's Office of Field Operations. In that role, I worked with the Associate

14     Deputy Under Secretary for Operations to provide support to the 57 Regional Offices in the

15     Veterans Benefits Administration. These offices are comprised of more than 12,000

16     employees, and administer benefit programs that provide over $31 billion in VA benefits

17     annually to veterans and their beneficiaries.

18     3.     In October 2006, I became the Director of the Veterans Benefits Administration's

19     Office of Performance Analysis & Integrity (PA&I). In my official capacity as the Director

20     of PA&I, I work with VBA's Under Secretary for Benefits (USB), Deputy Under Secretary,

21     three Associate Deputy Under Secretaries, and other VA and VBA senior leaders to provide

22     data and analysis related to the delivery of benefits. I serve as the USB's official source of

23     data and information related to VBA's delivery of benefits. As the Director of PA&I, I am

1     familiar with VBA's operations, and the data, measures and indicators available related to the

2     delivery of benefits. I am responsible for VBA's enterprise data warehouse, a database

3     comprised of data from multiple sources which is used to analyze VBA operations, and I

4     oversee the storage of current and historical data related to VBA operations.

5         4.     I am familiar with this litigation, have read the declaration made by Mr. Paul

6     Sullivan, have read the declaration of Mr. Thomas Bowman, and assisted in VA's projection of

7     the costs associated with responding to plaintiffs' 129 Requests for Production (RFP) that served

8     as the basis for the Bowman declaration.

9         5.     Mr. Sullivan's declaration relies on assumptions regarding the scope of the RFPs

10    that are inconsistent with those requests. His description of a search conducted to identify

11    deceased Gulf War veterans either granted or denied service connection for amyotrophic lateral

12    sclerosis (ALS) as an example of a more efficient means through which VA can gather data is

13    not representative of VA's burden of responding to the RFPs. In contrast to PTSD and other

14    mental disorders, ALS is a rare condition identified in VA systems with a single diagnostic code,

15    the population of veterans searched was limited to that of a specific conflict, and he recasts the

16    search in much narrower context unresponsive to the RFPs. See Sullivan Decl. ¶ 9.

17    Furthermore, his description of VBA's electronic search capabilities is incomplete, which, if

18    inadvertent, reflects limitations in his knowledge of VA systems. See Sullivan Decl. ¶ 10.

19        6.     Mr. Sullivan's declaration grossly overestimates the degree to which VA's

20    applications and databases are integrated and readily searchable. Not all of the information

21    requested in the RFP is maintained in VA's data systems, nor is there a single system that

22    contains all the data on SCDDC claims that is maintained. Data is migrated between different

23    applications as a claim proceeds through adjudication. Information that initially serves to

1    identify a claim for benefits is tracked in one application, and depending on whether the benefit

2    sought is awarded or denied, may be transferred to different databases and applications, each

3    with its own unique limitations.  In addition, because VA is in the process of phasing out its

4    older claims processing systems, it presently maintains multiple sets of databases, each with

5    different limitations (for instance on searchability or on the number of diagnostic codes able to

6    be maintained for each claimant) and different dates of coverage.  Applications and databases

7    that VA considered when it assessed the burden of responding to the RFPs include:

8        a.  Beneficiary Identification Records Locator Subsystem (BIRLS):  BIRLS is an

9        application for tracking veteran data for use by VA and VA customers.  Among other

10       things, BIRLS controls the assignment of VA file numbers and stores data on inactive

11       compensation and pension claims.  BIRLS contains over 44 million veteran records.  In

12       some, but not all, cases, BIRLS may contain diagnostic codes identifying some or all of a

13       veteran's disabilities.

14       b.  Compensation and Pension Master Records (CPMR):  CPMR is the record within

15       VBA's Compensation and Pension application that contans data on current awards of

16       disability and death benefits.  CMPR also temporarily houses data on inactive claims until

17       the data is sent to BIRLS.  In some, but not all, cases, CPMR may contains diagnostic

18       codes identifying some or all of a veteran's disabilities.

19       c.  Pending Issue File (PIF):  PIF is a database used to track applications for benefits and

20       other items that must be controlled.  PIF only tracks items until completion such as an

21       award or denial of benefits.  PIF does not contain the individual conditions for which

22       benefits are being sought.  Through the use of an end product code (EPC), PIF can identify

23       applications for compensation, pension, DIC, and other applications for benefits.

4

1    Information is entered into PIF at the beginning of the application process generally within

2    the first 5-7 days after VA receives an application.  Claims for PTSD, if recognizable as

3    such when received, are tracked with a unique EPC and thus can be tracked in PIF.

4    However, certain EPCs take precedence over a PTSD such as the EPC used to track

5    benefits applications from Gulf War veterans. See paragraph 9, infra.

6       d.  Rating Board Automation 2000 (RBA 2000):  RBA 2000 is an application used by VA

7    rating personnel to aid in preparation of rating decisions.  In some, but not all, cases, RBA

8    2000 contains diagnostic codes identifying a veteran's disabilities.   RBA 2000 has been in

9    mandatory use since January 2005, and data entered prior to that time may be incomplete

10   or unreliable for VA purposes.

11      e.  Modern Award Processing- Development (MAP-D):  MAP-D is an application used by

12   VA regional office personnel to aid with development of claims for VA benefits, including

13   matters pertaining to claim status and case management.  In some cases, MAP-D may

14   contain information on a veteran's claimed conditions if entered by VA personnel.

15   However, because this data is not required in MAP-D, it is not a reliable source for locating

16   such data.

17      7.      In a statement that appears to relate to VA's estimate of the burden required to

18   respond to RFP 115, Mr. Sullivan states that "simple electronic search methods would

19   dramatically reduce the scope of the work to only that small sub-set of deceased Iraq and

20   Afghanistan war veterans diagnosed by VHA with PTSD or with a decided VBA claim for

21   PTSD." Sullivan Decl. ¶ 9. Producing documents responsive to plaintiffs' RFP 115, however,

22   requires a significantly broader search than Mr. Sullivan describes. RFP 115 requires that VA

23   produce "[c]opies of all death certificates for veterans, as shown in dependency and indemnity

5

1    compensation [DIC] portion of the CPMR (the Compensation and Pension Service Master

2    Record), including, without limitation, active and terminated records, where such certificates

3    show suicide or possible suicide as a cause or contributing cause of death." Contrary to

4    Mr. Sullivan's assumptions, RFP 115 is not limited to veterans of any particular conflict or to

5    veterans diagnosed with or treated for PTSD. VA's estimate of the burden of responding to RFP

6    115 was based on the RFP as written, rather than the much narrower search suggested in

7    Mr. Sullivan's declaration.

8        8.    To adequately respond to RFP 115 as written would require a much more

9    extensive search than Mr. Sullivan suggests because VBA's electronic records do not include

10    information on the specific cause of death and could not identify cases involving suicide. In

11    order to provide the requested copies of death certificates, VBA would first write and run a

12    program in BIRLS to identify those veterans who have died since January 1, 2000, and the

13    location of their claims folder. By matching the BIRLS results to the CPMR, VBA could further

14    narrow the results to cases where a surviving spouse is or was receiving DIC based on the

15    veterans' death, although such narrowing may limit the broad scope of RFP 115 as written. VBA

16    would then pull and examine the claims folders for each of the deceased veterans to determine

17    the cause of death shown on the death certificate. Currently, there are over 329,000 survivors

18    receiving DIC. The CPMR database contains over 1.1 million terminated master records (this

19    includes the veteran and survivors records). This would require VBA to conduct an electronic

20    search of the database to identify active DIC master records, and terminated DIC master records.

21    VA agrees with Mr. Sullivan that the cost of electronic search itself is relatively small; however,

22    because VBA electronic records do not contain cause of death information, the cost required for

23    the manual review of the estimated 439,000 claim folders of *all* DIC recipients since January 1,

1    2000, to determine whether suicide was the cause of death or a contributing cause of death is

2    significant.

3         9.    The electronic search suggested by Mr. Sullivan would be underinclusive for

4    another reason as well.  Although certain VA databases include diagnostic codes for diseases

5    such as PTSD, they cannot capture all cases in which a deceased veteran had been diagnosed

6    with PTSD.  There are two significant reasons for this.  First, VA databases may not reflect all of

7    a veteran's diagnosed conditions.  VA can electronically search the databases named by

8    Mr. Sullivan (CPMR, BIRLS, PIF) by diagnostic codes, but the fields which provide diagnostic

9    codes are limited in number.  When VA first receives an application for benefits, it tracks the

10   claim through the PIF database and the use of an EPC.  Specific EPCs may be used to track

11   PTSD claims, but in some instances another EPC would take precedence over the PTSD EPC

12   such that the PTSD claim is not identifiable through an electronic search.  If the claim is denied

13   or granted, information on the diagnostic codes in the underlying claims becomes available

14   subject to the limitations of the particular database.  If the claim is granted, the CPMR may be

15   searched to obtain diagnostic code information, but the CPMR only contains information on the

16   first six diagnostic codes entered; any diagnostic code entered after the first six is not retained by

17   the system.  If the veteran's claim is denied, a search of BIRLS will display the first nine

18   diagnostic codes entered into the system.  If the claim is later granted; however, it will be

19   migrated to CPMR for payment, and, as discussed above, those diagnostic codes entered after the

20   first six will not be electronically searchable.  Thus, a veteran's PTSD diagnosis may not be

21   reflected in VA's electronic database even though it is reflected in the paper claims file.

22        10.    Second, diagnostic codes are entered into VA databases for a veteran's clams for

23   disability compensation, but VA databases do not record the underlying disability on which DIC

7

1    is awarded if the veteran had not applied for or been rated for disabilities.  Thus, in the case of a

2    surviving spouse who applies for DIC, if the veteran had not applied for or been rated for

3    disabilities, we would simply have no electronic record of any PTSD diagnosis.  Accordingly,

4    VA could not fully respond to RFP 115 either as written or as recast by Mr. Sullivan without

5    significant manual review of files.

6        11.    Mr. Sullivan's assertions also appear to challenge VA's estimate of the burden of

7    responding to RFP 1.  Without specifying the RFP(s) to which he refers, he states:

8    A simple query of this database [CMPR and BIRLS] using specific diagnostic codes
9    could identify veterans who have been diagnosed with such a condition [PTSD].  VHA
10   databases contain diagnostic codes for each medical condition entered by VHA
11   employees.  If lists of veterans from these databases were combined and sorted to identify
12   only unique veterans, then VA could quickly provide Plaintiffs with both a summary
13   count of veterans diagnosed with PTSD as well as any other information the court
14   deemed appropriate. . .
15
16   Sullivan Decl. ¶ 10.  Mr. Sullivan is correct in that in many cases, VA can readily identify

17   veterans diagnosed with a specific condition such as PTSD based on service in a particular

18   conflict; however, his proposed search is inconsistent with that sought by the RFP.  RFP 1

19   requires VA to identify the "[l]ists, databases, computer systems or printouts showing pending

20   SCDDC claims based on PTSD or mental health disorders, including, without limitation, those

21   containing information regarding the stage of proceeding (e.g., regional office, BVA, CAVC,

22   etc.) and or similar lists maintained, generated, dated, or printed between January 1, 2000 and the

23   present."  RFP 1 is not limited to only those veterans with PTSD.  It seeks information on

24   veterans with PTSD *or other mental disorders*, and as mentioned above, includes DIC claims,

25   two significant distinctions for purposes of searching VA databases.  Although there is a specific

26   diagnostic code for PTSD, there are approximately 152 diagnostic codes for "other mental

27   disorders" mentioned in RFP 1.  Accordingly, the scope of the search and the resulting data in

1    response to RFP 1 as written, would be significantly broader than Mr. Sullivan suggests.  VA can

2    search electronically for the 153 diagnostic codes responsive to the RFP 1 (PTSD + 152 for

3    "other mental disorders"), but a simple electronic search will only locate those diagnostic codes

4    subject to the constraints of the respective application or database.

5        12.    In developing our burden estimates, VA accounted for the limitations inherent in

6    conducting electronic searches of its databases, particularly for searches of claims involving

7    PTSD, other mental disorders, and claims involving suicide.  As explained above, an electronic

8    search could not conclusively identify all pending SCDDC claims based on PTSD or other

9    mental disorders.

10       13.    Mr. Sullivan asserts that VHA and VBA data can be *quickly* matched to respond

11   to plaintiffs RFPs. Sullivan Decl. ¶ 10.  This is incorrect.  If VBA records did reflect a diagnosis

12   of PTSD or other mental disorder, it is theoretically possible to match VBA records to VHA

13   records to determine whether the veteran was ever treated by VHA for such a condition.

14   However, such a search would not be quick or inexpensive.  For example, to identify all persons

15   who have filed claims for compensation or DIC in cases in which the veteran was treated by

16   VHA for PTSD or other mental disorder, VBA would need to do the following.  It would be

17   necessary to manipulate VA's enterprise data warehouse to create a list of veterans (who had a

18   pending claim) from the earliest possible existing data set of this type – which dates back to

19   January 2001.  Data from January 2001 through February 2003 would need to be reloaded and

20   reprocessed.  Data from March 2003 forward was written off to tape for storage.  These tapes

21   would need to be retrieved out of the archives and reloaded to the EDW machine for availability

22   to query.  The total effort would take approximately 8 months to complete.  Labor costs would

23   be approximately $531,180, based on an estimated total of 3,640 hours of government and 3,080

1    contractor personnel (4 government FTE at the GS 13-6 rate and 3.5 contractor FTE at the

2    $120/hr rate).

3        14.    Some of the same hardware resources used for current production would be used

4    to support this effort. However, additional disk space may need to be procured in order to load

5    and process this data. Costs for the additional disk space are estimated at $150,000 per year.

6    This equates to a minimum cost of $31,250 as restoration of the data is estimated at 2.5 months

7    (or 1200 hours) of processing time. Additional monthly costs of $12,500 may be incurred for

8    every month thereafter to maintain this data for further querying. Our usual process would be to

9    leave the data available until the job was complete. Given that scenario, we would incur a total

10   processing cost of approximately $100,000, assuming the job can be completed in 8 months.

11   This overall effort would severely impact both production availability and performance.

12       15.    Finally, Mr. Sullivan asserts that low-level VBA employees could be used to

13   respond to RFP 115 to reduce VA's overall burden costs. Sullivan Decl. ¶ 13. Responding to

14   RFP 115 requires a review of death certificates to determine whether suicide was a cause or

15   contributing cause of death. The duties of GS-4 employees generally include filing and clerical

16   activities, but these employees are not necessarily trained in the processing of clams or in the

17   required maintenance and filing order of data in claims folders and do not routinely *review* data

18   in claims folders. The importance of integrity in the claims folder is such that VA generally does

19   not use these employees to review the folders, locate important information, remove it, copy it

20   and then replace all information in the proper required order. Further, GS-4 employees are

21   critical for movement of claims files throughout a regional office; dedicating these employees to

22   searching for responsive information would adversely impact claims processing.

1          16.    For all the reasons discussed above, based on my personal knowledge the costs

2    described in the Bowman declaration are accurate.

1    I declare under penalty of perjury that the foregoing is true and correct. Executed on

2    December 4, 2007.

3

4

5    Mark Bologna

6