1   GORDON P. ERSPAMER (CA SBN 83364)
    GErspamer@mofo.com
2   MORRISON & FOERSTER LLP
    101 Ygnacio Valley Road, Suite 450
3   P.O. Box 8130
    Walnut Creek, California 94596-8130
4   Telephone: 925.295.3300
    Facsimile: 925.946.9912
5
    SIDNEY M. WOLINSKY (CA SBN 33716)
6   SWolinsky@dralegal.org
    MELISSA W. KASNITZ (CA SBN 162679)
7   MKasnitz@dralegal.org
    JENNIFER WEISER BEZOZA (CA SBN 247548)
8   JBezoza@dralegal.org
    KATRINA KASEY CORBIT (CA SBN 237931)
9   KCorbit@dralegal.org
    DISABILITY RIGHTS ADVOCATES
10  2001 Center Street, Third Floor
    Berkeley, California 94704-1204
11  Telephone: 510.665.8644
    Facsimile: 510.665.8511
12
    **[see next page for additional counsel for Plaintiffs]**
13
    Attorneys for Plaintiff(s)
14  VETERANS FOR COMMON SENSE, and
    VETERANS UNITED FOR TRUTH, INC.
15
                    UNITED STATES DISTRICT COURT
16
                  NORTHERN DISTRICT OF CALIFORNIA
17
                      SAN FRANCISCO DIVISION
18

19  VETERANS FOR COMMON SENSE, and          Case No.       C-07-3758-SC
    VETERANS UNITED FOR TRUTH, INC.,
20                                          **CLASS ACTION**
                 Plaintiffs,
21                                          **EXPERT DECLARATION OF**
         v.                                 **CHAD PETERSON IN SUPPORT OF**
22                                          **PLAINTIFFS' MOTION FOR A**
    GORDON H. MANSFIELD, Acting Secretary of **PRELIMINARY INJUNCTION**
    Veterans Affairs, *et al.*,
23                                          Date:    January 25, 2008
                 Defendants.                Time:    10:00 a.m.
24                                          Ctrm:    1, 17th Floor
25
                                            Complaint Filed July 23, 2007
26

27

28

1    **ADDITIONAL COUNSEL FOR PLAINTIFFS:**

2    ARTURO J. GONZALEZ (CA SBN 121490)
     AGonzalez@mofo.com
3    HEATHER A. MOSER (CA SBN 212686)
     HMoser@mofo.com
4    STACEY M. SPRENKEL (CA SBN 241689)
     SSprenkel@mofo.com
5    PAUL J. TAIRA (CA SBN 244427)
     PTaira@mofo.com
6    MORRISON & FOERSTER LLP
     425 Market Street
7    San Francisco, California 94105-2482
     Telephone: 415.268.7000
8    Facsimile: 415.268.7522

9    BILL D. JANICKI (CA SBN 215960)
     WJanicki@mofo.com
10   MORRISON & FOERSTER LLP
     400 Capitol Mall, Suite 2600
11   Sacramento, California 95814
     Telephone: 916.448.3200
12   Facsimile: 916.448.3222

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXPERT DECLARATION OF CHAD PETERSON, MD/ PH.D.**

I, Chad Peterson, declare:

1.      The facts in this declaration are based on my personal knowledge or else represent my professional opinion, based on my experience and reliance on relevant resources in my field of expertise.

**Introduction and Summary of Opinions**

2.      I am a practicing psychiatrist with experience working with combat veterans with PTSD both at VA medical facilities and through The Coming Home Project.  My credentials and experience are discussed in detail below.

3.      I have worked with numerous veterans who have served in World War II; the Korean Conflict; Viet Nam; Operation Desert Storm; and the current conflicts in Iraq and Afghanistan, and I have developed a strong professional understanding of issues affecting combat veterans, particularly those with Post-Traumatic Stress Disorder ("PTSD").

4.      In my experience working with combat veterans, I have observed general reactions and attitudes held by many such individuals, and these general observations have been useful in understanding their behavior.  Like all generalizations, they are not true for every individual; however, they are broadly applicable and informative in addressing the needs of such veterans.

5.      PTSD as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), the publication that classifies mental disorders and guides diagnosis of all forms of mental illness, has consistently shown a correlation with an increased risk of suicide.[1]  Some of the factors that may be involved in the increased risk of suicide for veterans with PTSD are discussed below.

---

[1] *Physical and Mental Co-Morbidity, Disability, and Suicidal Behavior Associated with Posttraumatic Stress Disorder in a Large Community Sample.*  J Sareen; BJ Cox; MB Stein; TO Afifi; C Fleet; GJG Asmundson.  *Psychosomatic Medicine,* 2007, *69: 242-248.*

6.      In addition to the increased risk of suicide, veterans with PTSD are at risk for numerous personal and social ills such as alienation from friends and family, loss of social support, loss of employment and financial security, homelessness, addiction and antisocial or criminal behavior.  The more these risks are realized, the more complex and costly treatment becomes, and the greater the harms suffered by both the veteran, his or her family, and society as a whole become.

7.      Veterans often have a hard time seeking help for their PTSD because they feel complex emotions regarding their service and their entitlement (or more specifically, lack thereof) to care.  Combat veterans often struggle with feelings of guilt and shame regarding their service, and they do not feel worth of treatment, especially if they are not physically injured.[2]  Their sense of confusion and potentially of betrayal, combined with the actual symptoms of PTSD such as avoidance, lack of trust, and a sense of foreshortened future, make it extremely difficult for them to ask for help; this is compounded by the requirement that they talk about their traumatic experiences as a way to obtain the help they need.

8.      Veterans who succeed in asking for help feel further betrayed and their sense of unworthiness increases if they are denied help following their request.  This can be particularly damaging, as it may increase their sense of hopelessness and make it more difficult for them to either seek or accept care in the future.

9.      Overall, there are substantial obstacles that prevent veterans from receiving the help that they need, despite the fact that they face the risk of grave harm if care is not provided.  It is in the interest of the veterans themselves, as well as VA, which exists for the purpose of supporting veterans, and society as a whole, to provide prompt and appropriate care to veterans.  Such care can improve the overall clinical status of veterans who receive treatment, and it can also reduce the risk

---

[2] *Shame and Posttraumatic Stress Disorder.* J Leskela; M Dieperink; P Thuras: *Journal of Traumatic Stress,* 2002, *15(3): 223-226.*

of additional harms ranging from loss of social support and employment among veterans, to the risks of homelessness and drug addiction, and the risk of suicide. Suicidal veterans in particular need individualized care from a trusted therapist, and any disruption in the availability or continuity of care can cause substantial clinical setbacks and create an increased risk that the veteran will act on a suicidal impulse.

### Professional Qualifications

10.    I am a practicing psychiatrist and I hold both an M.D. and a Ph.D. degree.  My M.D. was granted by Vanderbilt University in 2001, and I subsequently completed my residency in psychiatry at the University of California, San Francisco in 2005.  Prior to that, I received a Ph.D. in organic chemistry at the University of California, Berkeley in 1995.  I received a Bachelors of Science in chemistry from the University of Illinois, Urbana-Champaign in 1989. During my training I received multiple awards, including a teaching award from UCSF and a scholarship as an outstanding student in Psychiatry from Vanderbilt.

11.    Upon completing my training, I worked as an Attending Physician at the San Francisco Veterans' Administration Medical Center and as the Medical Director of the PTSD Clinical Team at that facility. My responsibilities included outreach and program development for treatment of veterans returning from Iraq and Afghanistan and individual, group, and psychopharmacological treatment of veterans from all eras of armed conflict, with a focus on OEF/OIF veterans.  I estimate that I was directly responsible for the evaluation and treatment of over 200 Iraq and Afghanistan veterans.

12.    While I no longer work with VA, I remain actively involved with veterans' issues.  I am currently a member of the Steering Committee of The Coming Home Project, which provides free counseling services for returning Iraq and Afghanistan veterans and their families.  The project also sponsors retreats for returning veterans and their families; I was one of three co-facilitators at one

such retreat from 11/09/07-11/12/07.  I have also conducted several recent training programs

regarding psychiatric care for new veterans.

13.     A true and correct copy of my CV outlining additional information about my

background, experience and credentials is attached hereto as Exhibit A.

### Combat Veterans and Veterans with PTSD

14.     A "combat veteran" is a specific identity that is forged in an individual through both

his or her training and his or her experiences while deployed overseas.  This is an essential aspect of a

veterans' identity which is created deliberately by the military training and then solidified in combat.

15.     Military training has been consciously designed to effectively tear down an

individual's prior identity and then recreate an identity as a soldier.  During the initial training

process, soldiers are encouraged to develop an ideal of "the perfect soldier," which is what they strive

to become. This training involves many aspects of what most mental health professionals would

recognize as torture: sleep deprivation, physical, verbal, and emotional abuse, isolation from prior

support systems, and constant, unpredictably stressful situations. In the context of military training,

this environment creates a remarkably strong but narrowly defined bond between participants, most

of whom are young and relatively impressionable.

16.     Once in combat, where there is no "textbook" firefight, and everything is chaos, troops

almost always feel that they have failed to live up to the ideal of the perfect soldier.  They generally

feel that they did not live up to their training, and feel that they have failed their fellow soldiers,

especially when there are casualties involved.

17.     Military training also involves a process of dehumanization of the enemy, which

allows for troops to be effective in combat, and is believed to have led to a progressive increase in

willingness of troops to fire at the enemy in combat.[3]  However the result is not only dehumanization of Iraqis or Afghans but also a dehumanization of the troops themselves.)At the most extreme, troops thus dehumanize everyone they see, in case they have to kill them. The extent of this dehumanization was brought home clearly to me by many of the Marines I worked with who fought in Iraq. They developed the acronym "FIDO," which stands for "fuck it, drive on." It was used by troops to manage their feelings after they lost a comrade or were involved in some way in atrocities such as the killing of innocent civilians. They believed this extreme denial of feelings of loss, horror, anger, and fear to be necessary to maintain their 'edge' in combat. Unfortunately, they tended to continue to apply a similar paradigm to their lives once they returned to civilian life.

18.    While it is not often discussed, many soldiers find combat to be very exciting, and survival is exhilarating.  In a firefight, a soldier who survives after engaging with the enemy reaches the ideal, for a brief interval, of being a perfect soldier.  However, this fleeting "combat high" does not last, and can lead to substantial conflict later for the soldier. Many former soldiers were able to eventually describe to me their sense of wild supremacy and triumph after killing an enemy combatant during the event; they would invariably then describe their feelings of sorrow, regret, and spiritual crisis at having taken another human life. This dichotomy represents a deep and direct conflict between the externally imposed "perfect soldier" identity and the deeper sense of identity we all have as human beings.

19.    Troops who have returned from service overseas are not given sufficient tools to step away from their identity as a soldier and to begin developing their civilian identities.  This is true to some extent for all members of the military, but even more for National Guard and Reserve troops

---

[3] Lt. Col. Dave Grossman 1995.  *On Killing: the Psychological Cost of Learning to Kill in War and Society.*  New York: Little, Brown, and Company.

1  than for those on active duty.  These individuals have less unity and less support, and are expected to

2  return to civilian life with little opportunity to readjust.

3      20.    Many combat veterans are conflicted about their experience.  They are generally proud

4  that they did their duty, but they can also harbor some degree of guilt and shame about their

5  experiences in combat.  This is particularly true if they killed anyone during their service, if they

6  observed atrocities, or if they participated in atrocities.[45]  If the veteran experienced a "combat high"

7  during his or her service, this can add to the guilt and shame.  Similarly, if the veteran survived his or

8  her tour of duty while friends did not, it will often lead to "survivor's guilt" in addition to the other

9  factors causing guilt and shame.

10

11      21.    Troops who do not agree with the goals of the current deployment, or who do not

12  believe that their service is advancing any goals, are particularly likely to feel guilt and shameabout

13  their participation These troops may also feel betrayed by their perception that the war in which they

14  served did not have any purpose, which can contribute to a more generalized lack of trust in

15  institutions, including those that are in place to help them once they return home.

16

17      22.    The fact that military service is voluntary appears to provide a further barrier for

18  veterans struggling with their experiences to seek help.  They often perceive that they have no one to

19  blame for the difficulties they experienced because they signed up for service on their own.  In

20  conjunction with the military ideals of independence and self-sufficiency and the effects of trauma

21  serving to isolate the individual, combat veterans with PTSD have substantial barriers to obtaining

22

23

24

25  [4] *Atrocities Exposure in Vietnam Combat Veterans with Chronic Posttraumatic Stress Disorder: Relationship to Combat Exposure, Symptom Severity, Guild, and Interpersonal Violence*. J Bekharn; ME Feldman; AC Kirby: *Journal of Traumatic Stress*, 1998, *11(4), 777-785.*

26

27  [5] *Combat Guilt and its Relationship to PTSD Symptoms.*  KR Henning; BC Frueh:  *Journal of Clinical Psychology*, 1997, *53(8): 801-8.*

28

mental health care. As one former Marine under my care jokingly explained, "USMC stands for 'You signed the motherfucking contract.'"

23.    Many veterans also have difficulty seeking help if they are not physically injured, because of their training and the routine assertion within the military that they have to "suck it up" and accept their situation without complaint. Among those who are injured, there appears to be an increase in mental health issues compared to uninjured soldiers.[6]

**PTSD Among Combat Veterans**

24.    For PTSD to arise, one must have personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate. In addition, the individual's emotional reaction to such an event must involve intense fear, helplessness, or horror. The diagnostic criteria for symptoms of PTSD can be divided into three primary categories: (1) re-experiencing criteria such as intrusive, unbidden memories and/or nightmares of the traumatic event that trigger powerful emotional responses (sometimes including dissociative events during which the person acts and/or feels as though he or she were actually back in the traumatic situation); (2) avoidance criteria including avoidance of thoughts, feelings, places, and people who might trigger memories of the event, emotional numbing and isolation, lack of enjoyment in previously pleasurable activities, and sense of foreshortened future; and (3) hyperarousal criteria including anger, irritability, hypervigilance, difficulty concentrating, insomnia, and exaggerated startle response.

---

[6] *Posttraumatic Stress Disorder and Depression in Battle-Injured Soldiers.* TA Grieger; SJ Cozza; RJ Ursano; C Hoge; PE Martinez; CC Engel; HJ Wain: *American Journal of Psychiatry,* 2006, *163:1777-1783.*

25.     That combat fulfills the description of a traumatic event is incontrovertible. The constellation of symptoms that arise for combat veterans who develop PTSD, and the timetable along which they do so varies greatly among individuals. A recent study of veterans returning from the conflicts in Iraq and Afghanistan strongly suggests that there is a "lag time" in development of symptoms of PTSD on the order of 6 months, although some individuals will report experiencing symptoms consistent with PTSD before they have even returned from their deployments.[7]

### Suicide Risks Among Veterans with PTSD

26.     A significant predictor of suicide among people/veterans with PTSD is hopelessness.[8] While this is not a diagnostic criterion for PTSD in the DSM-IV, it is closely related to several of the diagnostic criteria, including the sense of a foreshortened future.

27.     If a veteran is experiencing pain and cannot get help for any number of reasons, his or her sense of hopelessness increases with every disappointment, and therefore the risk of suicide can also increase.

28.     If a veteran asks for help and is specifically denied, the risk is even greater of increasing his or her sense of hopelessness, as well as that of guilt and shame.  Because of psychological issues discussed above, veterans with PTSD often feel that they are unworthy of help. If a request for help is denied, that denial can exacerbate a vet's sense of embarrassment and humiliation, and the idea that he or she is unworthy is reinforced.

---

[7] *Longitudinal Assessment of Mental Health Problems Among Active and Reserve Components Returning from the Iraq War.*  CS Milliken, JL Auchterlonie; CW Hoge: *Journal of the American Medical Association*, 2007, *298(18): 2141-2148.*

[8] *Can We Predict Suicide and Non-Fatal Self-Harm with the Beck Hopelessness Scale? A Meta-Analysis.*  D McMillan; S Gilbody; E Beresford; L Neilly.  *Psychological Medicine, 2007, 37: 769-778.*

29.    Other factors that have been shown to increase the risk of suicide include: divorce or other interpersonal strife; substance abuse; financial trouble or unemployment. Each of these are risks for people with PTSD.

30.    Combat veterans returning from Iraq have also been shown to suffer from neuropsychological deficits that appear to be independent of their emotional issues which may further contribute to heightened risk of impulsive behaviors such as violent and suicidal acts.[8]

31.    Among people who contemplate suicide, there is a common fantasy that they will somehow be able to observe the responses of others to their own death. Much suicidal ideation is focused on the notion that the suicide will "teach others a lesson" and somehow be gratifying to the person who commits suicide. In my experience, individuals who harbor such fantasies frequently also carry significant unexpressed anger and resentment, a state of mind that definitely describes many of the veterans with whom I have worked.

32.    All of the concerns expressed here seem to be reflected in the recent data released detailing an alarming number of suicides of veterans who have returned from recent deployments: these individuals were found to have twice the rate of suicide as the population as a whole during 2005.

**Additional Risks and Harms for Veterans with PTSD Who Do Not Receive Prompt Treatment**

33.    PTSD becomes progressively more difficult to treat, both because of the fact that behavioral responses to PTSD become ingrained as habits and established patterns and thus harder to end, and because of the increasing incidence of co-morbidity and/or self-destructive behaviors that also need to be addressed.

34.    For veterans with PTSD, there is very frequently seen a shrinking of the size of their psychosocial world, leading to isolation and a deepening of the expectation that their efforts to reach out will be ignored or rebuffed. In addition, their approach to others becomes progressively more

cynical, paranoid, and even hostile, increasing the likelihood of negative interpersonal experiences and further confirming their suspicions that they were destined to be loners, to "go it alone," etc.

35.    Combat veterans with PTSD, or more commonly close relations of these individuals, often describe a fundamental change in the identity of the affected individual.  From spouses of combat veterans, it is common to hear that "one person left for Iraq and a completely different person came back."  In fact, in my experience with returning veterans, it is generally the partner or a close family member who is responsible for convincing the veteran to seek help, usually through threat of divorce or ejection from the veteran's living situation.

36.    People with PTSD suffer high rates of co-morbidity, most often involving depression and substance abuse.  Both depression and substance abuse/dependence are linked strongly with higher rates of completed suicide. It is frequently true that these conditions develop subsequent to the emergence of PTSD symptoms, the former due to the demoralizing effects of living with undiagnosed and/or untreated PTSD, and the latter due in many cases to individuals using alcohol and/or marijuana to escape from anxiety and insomnia, or using stimulants such as cocaine or amphetamine in an effort to regain that "combat high" they have not been otherwise able to reproduce in civilian life.

37.    Because of their condition and the maladaptive behaviors that result, veterans with PTSD can experience significant difficulties reintegrating into civilian life, and they are at high risk of losing their social supports.  They may drive away friends and family, including spouses/partners and children.  They are at risk of losing their employment.  They may get into fights or engage in criminal activity.  They may become at risk of homelessness, or in fact lose their homes (recent data have shown over 1000 of America's homeless to be combat veterans who served in Iraq or Afghanistan). Each of these possibilities puts them at risk of a constellation of social difficulties that need to be addressed in addition to treatment for the underlying PTSD.

1

**The Value of Prompt and Appropriate Mental Health Care for Veterans with PTSD**

2

3        38.     In addition to the fact that it is generally less difficult clinically to treat a person with

4    PTSD if help is available promptly, there are numerous personal and societal benefits to providing

5    prompt and appropriate mental health care for veterans with PTSD.  The more effectively veterans

6    receive prompt and effective treatment for their PTSD, the less likely it is that they will be negatively

7    affected by the corresponding problems associated with this condition, such as unemployment,

8    divorce, homelessness, drug abuse, and other societal difficulties.  Veterans are better served if they

9    are protected from these difficulties, and society is well served by caring for people before their

10    problems become more complex and expensive to address. Additionally, studies have shown that

11    combat veterans with PTSD are at higher risk of developing multiple medical problems, including

12    cardiovascular disease, respiratory disease, gastrointestinal illness, and cancer.[9][10]

13

14        39.     Beyond the concrete value of avoiding monetary costs to society, and the more

15    abstract value of minimizing societal ills such as homelessness, we have a broader societal debt

16    specifically to veterans.  Our military is made up of people who have volunteered to put their life on

17    the line in service of the country, for any issue in which the government deems such risks to be

18    necessary.  Unlike in other eras, the percentage of the population who participate in military service

19    is small, and because these volunteers take on this duty, the rest of the population is insulated not

20    only from the actual risks of service in a time of war, but even from the day-to-day necessity of

21    thinking about the meaning of such service.

22

23

24        [9] *Neuropsychological Outcomes of Army Personnel Following Deployment to the Iraq War.*
     JJ Vasterling; SP Proctor; P Amoroso; R Kane; T Heeren; RF White: *Journal of the American*
25    *Medical Association*, 2006, *296:519-529.*

26        [10] *Medical Service Utilization by Veterans Seeking Help for Posttraumatic Stress Disorder.*
     PS Calhoun; HB Bosworth; SC Grambow; TK Dudley; JC Beckham.  *American Journal of*
27    *Psychiatry*, 2002, 159:2081-2086.

28

40.     Civilians can and do ignore the needs of veterans because they don't know how to help or what to do or say. One veteran I worked with at the VA hospital summed up a feeling that many share. He noted that, "Since I got back everyone, even some of my old friends, they all treat me like I have cancer or something. They don't know how to talk to me anymore."  Many people shy away from actually listening to the experiences of veterans, which adds to the veterans' sense of guilt, shame, and isolation.  Veterans feel isolated from civilians on their return, but civilians are often completely isolated from veterans.

### Additional Barriers to Care

41.     For troops who have returned from service overseas but who are not fully separated from the military (primarily National Guard and reserve troops), there are additional hurdles beyond the difficulties based on their condition (as discussed above) and the bureaucratic difficulties inherent in the existing system.  These individuals are in a grey zone between the Department of Defense and the VA.  Their records, including their medical records regarding mental health issues, are completely accessible to the Department of Defense, with no provision whatsoever for confidentiality.  This is not up to the general standard of care for people seeking mental health care in America, and it limits the accessibility of care for affected troops. Several veterans who sought care at the VA hospital decided not to continue working with me once I explained to them that the DoD can access their mental health records, and with good reason: one veteran I worked with, who was a veteran of both the Viet Nam and Iraq wars and who rose to a very high level in the Army, was very clear that seeking mental health care was "career suicide" to an active duty soldier.

42.     The two-year window of free care available to veterans after separation from active duty is proving to be inadequate because of the way the system is actually utilized.  Many veterans show up for treatment late in the two-year window, and then face long delays in receiving service connection for conditions like PTSD that would entitle them to further free care (the most recent data

cite waiting times longer than six months). When, as is often the case, the care runs out before access to benefits is established, a veteran is then obligated to pay out of pocket, which many cannot afford. This can be interpreted as yet another betrayal from the very government he or she has just honorably served, which can aggravate underlying PTSD and other issues.

43.    The process for seeking service connection is also a barrier to veterans with PTSD, who often have difficulty trusting people and who are resistant, as a symptom of their condition, to talk about their traumatic experiences.  Yet, in order to pursue benefits, these veterans are expected to discuss their traumatic combat experiences, about which they feel substantial guilt and shame, with a stranger on a tight schedule, in order to seek benefits for which the veteran often does not feel worthy and views as "blood money."   This type of diagnostic visit (the Compensation and Pension exam, or "C&P") is so charged with emotion and is so painful and intimidating, that it is extremely difficult for veterans to pursue. Many of the patients I worked with during my time at the VA missed multiple appointments for their C&P exams, then admitted to me that when they finally were able to attend the meeting, they downplayed or outright denied symptoms because they felt so uncomfortable and untrusting of the examining clinician.

**Conclusions**

44.    Veterans with PTSD are in need of prompt and appropriate care, and it is in the interests of everyone, the veterans, VA, and society as a whole, to see that they get it.  If veterans who have PTSD do not receive proper care, they become more difficult (as well as more expensive) to treat clinically, and they face increased risk of a constellation of associated harms, including additional co-morbid mental illness and societal difficulties caused by their symptoms.  These include risks of lost social support, lost employment opportunities, homelessness, alcohol or drug abuse, criminal behavior, and suicide.  Each of these difficulties can be complex and expensive to address. Veterans who are denied care or who feel betrayed by the system that is supposed to support them

following their military service are at heightened risk of an elevated sense of hopelessness, which is associated with the risk of suicide. Statistics available to date show that this risk of suicide among returning veterans from Iraq and Afghanistan is substantial and has not been adequately addressed.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on December 7, 2007 at Berkeley, CA.


 /s/  Chad Peterson, M.D., PhD.
Chad Peterson, M.D., Ph.D.

Case No. c07-3758
EXPERT DECL. OF C. PETERSON IN SUPT. OF PLS.' MOTION FOR A PRELIM. INJ.

14