

# Report of the Chairman

## Board of Veterans' Appeals



## Fiscal Year 2006



## DEPARTMENT OF VETERANS AFFAIRS
Chairman, Board of Veterans' Appeals
Washington DC 20420

January 10, 2007

The Honorable R. James Nicholson
Secretary of Veterans Affairs
Department of Veterans Affairs
810 Vermont Avenue, N.W.
Washington, DC 20420

Dear Mr. Secretary:

I am pleased to present the Fiscal Year 2006 Report of the Chairman, Board of Veterans' Appeals (Board or BVA), for inclusion in your submission to Congress. Information on the activities of the Board during Fiscal Year 2006 and the projected activities of the Board for Fiscal Years 2007 and 2008, as required by 38 U.S.C. § 7101(d)(1), are provided in Parts I and II.

Fiscal Year 2006 saw the Board increase productivity, despite limited resources, and conduct a record number of personal hearings. Although veterans benefits law continued to change, the employees of the Board never lost sight of the mission to produce timely, quality decisions for the veterans we serve. Nor did they lose sight of our obligation to treat veterans and their families with care and compassion.

I believe the enclosed report will provide you, the Congress, and the veterans we serve with an accurate and meaningful perspective on the Board's activities of Fiscal Year 2006.

Very respectfully,

James P. Terry
Chairman

Enclosure



# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... **1**

**PART I:** ACTIVITIES OF THE BOARD OF VETERANS' APPEALS FISCAL
YEAR 2006 ............................................................................................................... **2**

*SUCCESSES* ............................................................................................................ **3**

*THE BOARD'S GOALS FOR FISCAL YEARS 2007 AND 2008* ............................... **3**

    *1. Eliminate Avoidable Remands* ............................................................ **3**

    *2. Eliminate the Backlog* ........................................................................ **4**

    *3. Succession Planning* ........................................................................... **6**

*FISCAL YEAR 2006 CONGRESSIONAL HEARINGS AND OTHER BRIEFINGS* ............ **7**

*SIGNIFICANT JUDICIAL PRECEDENT AND ITS EFFECT ON THE BOARD* ............... **8**

*ASSISTANCE TO VBA REGIONAL OFFICES AND VHA* .................................... **10**

*VETERANS SERVICE ORGANIZATION (VSO) FORUMS AND GLOBAL TRAINING* ....... **11**

*VOLUNTEER ACTIVITIES* ...................................................................................... **11**

*PLANNING FOR THE FUTURE* .............................................................................. **11**

BOARD MEMBERS ................................................................................................ **13**

**PART II:** STATISTICAL DATA ............................................................................... **14**

PROJECTIONS FOR FISCAL YEARS 2007 AND 2008 .......................................... **17**

ADDITIONAL INFORMATION ................................................................................. **18**

# INTRODUCTION

The law requires that the Chairman of the Board of Veterans' Appeals (Board or BVA) report the activities of the Board at the conclusion of each fiscal year. This report includes two parts. Part I provides a discussion of BVA activities during Fiscal Year 2006 and projected activities for Fiscal Years 2007 and 2008. Part II provides statistical information related to our activities during Fiscal Year 2006 and projected activities for Fiscal Years 2007 and 2008.

The Board makes final decisions on behalf of the Secretary on appeals from decisions of local Department of Veterans Affairs (VA) offices. The Veterans Law Judges review all appeals for entitlement to veterans' benefits, including claims for service connection, increased disability ratings, total disability ratings, pension, insurance benefits, educational benefits, home loan guaranties, vocational rehabilitation, dependency and indemnity compensation, and health care delivery.

The mission, as set forth in 38 U.S.C. § 7101(a), is "to conduct hearings and consider and dispose of appeals properly before the Board in a timely manner." The goal is to issue quality decisions in compliance with the requirements of the law, including the precedential decisions of the United States Court of Appeals for Veterans Claims and other federal courts.



1

# PART I
# ACTIVITIES OF THE BOARD OF VETERANS' APPEALS
# FISCAL YEAR 2006

The Board was established in 1933 and operates by authority of, and functions pursuant to, Chapter 71 of Title 38, United States Code. The Board consists of a Chairman, Vice Chairman, Senior Deputy Vice Chairman, 56 Veterans Law Judges (VLJs), 8 Senior Counsel, 240 staff counsel, and other administrative and clerical staff. The Board is comprised of four Decision Teams with jurisdiction over appeals arising from the VA Regional Offices (RO) and Medical Centers in one of four geographical regions: Northeast, Southeast, Midwest, and West (including the Philippines). Each Decision Team includes a Deputy Vice Chairman, two Chief VLJs, eleven Line Judges, two Senior Counsel, and sixty staff counsel. Staff counsel review the VA claims folders, research the applicable law, and prepare comprehensive draft decisions or remand orders for the VLJ's review, revision, approval and signature.

The mission is to produce well-reasoned, accurate and fair decisions in a timely manner. In order to do so, the Board determines whether it has jurisdiction, conducts hearings when requested, and evaluates whether development of the evidence is needed. Its decisions, by law, contain findings of fact, conclusions of law, the reasons or bases for the decision, and an order granting or denying relief. Although the Board is primarily an appellate body, it has *de novo* fact-finding authority. It reviews decisions of the Agency of Original Jurisdiction (AOJ) that have been appealed and renders a decision, although it may direct further development of the evidence and readjudication of the claims at issue by the AOJ.

The Board has jurisdiction over a wide variety of issues and matters, but the vast majority of appeals considered (about 96 percent) involve claims for disability compensation or survivor benefits. Examples of other types of claims that are addressed by the Board include fee basis medical care, waiver of recovery of overpayments, reimbursements for emergency medical treatment expenses, education assistance benefits and vocational rehabilitation training, attorney fee matters, and insurance benefits.

In Fiscal Year 2006, the Board conducted 9,158 hearings and issued 39,076 decisions with a cycle time of 148 days. Cycle time measures the time from the date an appeal is physically received at the Board until a decision is dispatched, excluding the time the case is with a service organization representative. The Board physically received 41,802 appeals in Fiscal Year 2006 and expects to receive at least that many appeals in Fiscal Year 2007.

During the fiscal year, the Board hired 56 law clerks and attorneys to fill vacant staff counsel positions and to replace departing staff counsel. In addition, three new VLJs and six Senior Counsel were selected through a competitive process. Senior Counsel serve as Acting Veterans Law Judges, draft decisions, mentor and train other attorneys, and assist in management. Three Senior Counsel were selected to fill positions that were vacant at the beginning of Fiscal Year 2006.

# *Successes*

The Board issued 39,076 decisions in Fiscal Year 2006, an increase of 4,901 over Fiscal Year 2005, when we issued 34,175 decisions. VLJs conducted 9,158 hearings, which is an increase of 582 hearings held over Fiscal year 2005. The majority of the line VLJs exceeded their productivity goals and traveled to at least three ROs to conduct one week of Travel Board hearings at each site. However, the number of cases pending before the Board at the end of Fiscal Year 2006 was 40,265, which is almost a 3,000 case increase over the 37,539 appeals that were pending at the end of Fiscal Year 2005. This increase occurred despite the fact that the Board issued almost 5,000 more decisions in Fiscal Year 2006 than the previous year. If we continue to receive the same high number of appeals and hearing requests each year, the ability to conduct hearings and decide appeals on a timely basis with the current business plan strength of 56 VLJs will present a challenge.

In Fiscal Year 2006, the Board focused on methods to increase decision output and the quality of the decisions rendered. We continued efforts to eliminate avoidable remands and increased decision output through the use of voluntary attorney overtime, production incentives for attorneys, and the issuance of clear, concise, coherent, and correct decisions. The Board will continue to challenge its employees in the upcoming fiscal years to increase decision output even further and to maintain the high level of quality that was achieved in Fiscal Year 2006. The 93% accuracy rate for the fiscal year reflects significant improvement from the 89% accuracy rate for Fiscal Year 2005. The accuracy rate takes into account those substantive deficiencies that would be expected to result in a reversal or a remand by the United States Court of Appeals for Veterans Claims (CAVC or Veterans Court). Deficiencies in quality that are identified during the quality review process are addressed through follow-up training for the VLJs and attorneys.

# *The Board's Goals for Fiscal Years 2007 and 2008*

The most significant challenges for the future are to eliminate avoidable remands and the backlog.

## *1. Eliminate Avoidable Remands*

Veterans want timely and correct decisions on claims for benefits. The record must contain all evidence necessary to decide the claim and show that all necessary due process has been provided. If the record does not meet these requirements, and the benefits sought cannot be granted, a remand for further development is necessary. However, remands from the Board to the AOJ significantly increase the time it takes for a veteran to receive a final decision. A remand typically adds more than a year to the appellate process. Furthermore, about 75% of cases remanded are subsequently returned to the Board, which increases the workload and degrades timeliness. Eliminating avoidable remands is a goal that will provide better service to veterans and their families and, ultimately, help diminish the growing backlog. We made significant progress toward this goal in Fiscal Year 2006 as the remand rate was reduced from 38.6% to 32.0%.

In Fiscal Years 2007 and 2008, the Board will focus on the following:

3

▶ *Concise Explanations of the Reasons for Remanding a Case:*  We will continue to provide a concise explanation of the reasons for remand in individual decisions in order to reduce ambiguity and to improve field processing.  Better understanding of and compliance with remand directives will decrease the risk of a second remand in a particular case and may help avoid future remands because of the same deficiency.

▶ *Prejudicial Error Analyses:*  One reason for the high remand rate of 56.8% in Fiscal Year 2004 was the Veterans Claims Assistance Act (VCAA), which among other things, heightened VA's duty to assist and duty to notify claimants of the type of evidence needed to substantiate their claims.  Following the issuance of *Pelegrini v. Principi,* 18 Vet. App. 112 (2004), in which the Veterans Court held that a VCAA notice letter must be provided to a claimant prior to an initial adverse adjudication, the Board attempted to avoid remands, when possible, by conducting an analysis to determine if any deficiency in the notice provided to the claimant was prejudicial.  If prejudice was not found, most Board judges issued final decisions.  If the deficiency was prejudicial, judges were required to remand the case to the RO to cure the defect.  The Board plans to continue this practice in Fiscal Year 2007.

▶ *Waivers of AOJ Review:*  The 38.6% remand rate in Fiscal Year 2005 trended downward to 32.0%, in Fiscal Year 2006, due, in part, to implementation of a regulatory amendment that allowed the Board to request a waiver of AOJ review of new evidence.  Before February 22, 2002, if the Board accepted any evidence not previously considered by the AOJ it was required to remand the case for review and preparation of a Supplemental Statement of the Case, unless the appellant or representative waived, in writing, initial AOJ consideration of the evidence, or the VLJ could fully grant the benefit(s) sought on appeal.  38 C.F.R. § 20.1304(c) (2001).  Effective February 22, 2002, the Board's Appeals Regulations and Rules of Practice were amended to allow us to consider additional evidence without referring the evidence to the AOJ for initial consideration and without obtaining the appellant's waiver.  However, in *Disabled American Veterans v. Secretary of Veterans Affairs,* 327 F.3d 1339 (Fed. Cir. 2003), the United States Court of Appeals for the Federal Circuit (Federal Circuit) invalidated that portion of the Board's regulations that allowed us to consider additional evidence without remanding the case to the AOJ for initial consideration and without obtaining the appellant's waiver.  Following this decision, the Board amended its regulations to add a substantially similar version of the prior 38 C.F.R. § 20.1304(c).  *See* 69 Fed. Reg. 53,807 (Sep. 3, 2004).  By soliciting waivers in those cases where an appellant or representative submits evidence without a waiver, the Board may avoid unnecessary remands.

As a result of the above efforts, the Board's remand rate decreased from 56.8% in Fiscal Year 2004, to 38.6% for Fiscal Year 2005, and to 32.0% for Fiscal Year 2006.

## *2. Eliminate the Backlog*

The Board will focus on eliminating the backlog, within existing resources, by concentrating on the following:

▶ *Eliminating avoidable remands:*  Fewer remands mean fewer appeals pending before the Board and, thus, a reduced backlog.  At the end of Fiscal Year 2004, there were 31,645

**4**

remands pending at the Veterans Benefits Administration (VBA). By the end of Fiscal Year 2006, that number had decreased to 21,229. Additional efforts to eliminate avoidable remands should reduce the number of Board remands in the field even further.

▶ ***Strengthening BVA's intra-agency partnerships:*** Joint training efforts with VBA, the Office of the General Counsel (OGC), and the Veterans Health Administration (VHA) will improve case development, decision quality and reduce remands. In addition, BVA meets with representatives from VHA, VBA and OGC on a monthly basis to discuss and resolve issues of mutual concern that adversely impact the quality of case output.

▶ ***Training:*** Our full-time training coordinator organizes training evolutions for the Board's attorneys and judges. Training for new attorneys in Fiscal Year 2006 included courses on basic veterans' law and off-site training at the Adjudication Academy in Baltimore. The latter training included overview presentations of the functions of the ROs, OGC, veterans service organizations, the U.S. Army and Joint Services Records Research Center, the Appeals Management Center, and the VA Medical Centers. Throughout the year, the Board's professional staff attended courses on topics such as respiratory disorders, disorders of the knee (this course included a clinical demonstration of a VA examination), post-traumatic stress disorder, military records and awards, tinnitus and hearing loss, and disorders of the eye. Continued training efforts will provide the VLJs and attorneys with the latest information on a variety of legal and medical topics.

▶ ***Writing clear, concise, coherent, and correct decisions:*** The Board stressed to the VLJs and attorneys the value of writing of clear, concise, coherent, and correct decisions in Fiscal Year 2006 and provided them with training to allow them to meet this goal. The benefits of this initiative became apparent as the year progressed and we issued more decisions than anticipated. In the long term, it is expected that this initiative will enable VLJs and attorneys to continue to produce more and better Board decisions.

▶ ***Utilizing employee incentive, mentoring and training programs:*** A number of new programs have been introduced to increase employee motivation and satisfaction as well as to increase productivity and decision quality. Two of the most popular programs are the student loan repayment program and the flexiplace program. Effective November 1, 2005, the Chairman authorized a permanent flexiplace program to permit a limited number of attorneys to prepare draft decisions and other work products at their primary residence. This program enabled the Board to retain attorneys who might otherwise have resigned due to the location of the primary residence, other personal reasons, or because another agency would allow more extensive telecommuting. In connection with this program, we implemented a number of data security safeguards such as encryption software for the Board laptops used by flexiplace program participants and locked cabinets at the primary residence for the laptop and the original claims folders. Each participant agrees to abide by the rules of the program, which include strict safeguards to protect sensitive data. Participants are not permitted to use their own personal computers for drafting decisions and the home work sites are periodically inspected to ensure continued compliance with the Board's rules.

▶ ***Making use of overtime:*** The Board will continue to use overtime within existing resources to enhance output.

► *Increasing our use of paralegals:* The Board established a paralegal unit for non-decisional support activities to free up the legal staff to decide appeals. In the second quarter of Fiscal Year 2006, the Board transferred the responsibility of drafting a certified list of the relevant evidence considered by the VLJ in cases appealed to the CAVC from the staff counsel to the paralegal unit. In Fiscal Year 2005, BVA provided 2,744 certified lists to VA's OGC and 3,127 in Fiscal Year 2006. By transferring this responsibility to paralegals, the attorneys were able to produce additional draft decisions and other work product for the VLJs.

► *Improved on-line legal research tools and analytical frameworks* to aid timely and correct decision production. In Fiscal Year 2006, the Board developed a computerized aid to assist the attorneys and VLJs with initiating draft decisions and an interactive analytical framework for evaluating one of the more complicated subject matter areas, increased rating claims for the knee. The analytical framework takes the decision maker through various scenarios and contains hyperlinks to the applicable laws, regulations, VA General Counsel opinions, and court precedents that are cited. Additional analytical frameworks are in the development stages for service connection for post-traumatic stress disorder, total disability ratings based on individual unemployability, reopening of finally decided claims based on the submission of new and material evidence, increased ratings for spine disabilities, and service connection cases that involve the presumptions of soundness and aggravation. These tools will be maintained and updated to incorporate changes in the law and regulations as they occur, and as new training materials and resources are developed. In addition, handouts and documentation provided at Board-sponsored training seminars are made available to the attorneys and VLJs.

► *VLJs will draft decisions*, in addition to reviewing decisions drafted by staff counsel, as time permits.

These measures will work to reduce the backlog and to shorten the time it takes for a veteran to receive a fair, well-reasoned Board decision.

## *3. Succession Planning*

In Fiscal Year 2006, three new VLJs were appointed to the Board, and six new Senior Counsel were selected through a competitive selection process. The newly appointed VLJs each had 12 or more years of experience as Board attorneys and Senior Counsel prior to their appointment as VLJs. Two of the newly appointed VLJs are veterans of the United States Marine Corps and the Army, respectively.

Our business plan contemplates that Senior Counsel positions function as a training ground for future VLJs. The creation, in Fiscal Year 2003, of two Senior Counsel positions on every team provides the necessary flexibility to maintain productivity despite short-term personnel shortages. Senior Counsel perform as Acting VLJs, Team Leaders, and attorneys drafting decisions. In addition, Senior Counsel mentor and evaluate newly hired attorneys and supervise more experienced attorneys in need of special attention or assistance. The creation of the Senior Counsel positions has allowed the Board's current leaders to train and mentor future leaders, and has provided significant advancement opportunities for Board staff attorneys.

The Board also has a rigorous recruitment program and recruits some of the best and the brightest attorneys and administrative personnel available. During the summer of Fiscal Year 2006, we hired 14 summer law clerks to work with attorneys and VLJs to draft decisions and other work product. In addition to providing them with challenging writing assignments, the summer law clerks also participated in training activities and were mentored by the attorneys with the goal of having them apply for permanent employment with the Board after graduation. We attract high caliber summer law clerks, attorneys, and administrative personnel, because the mission to serve veterans is one that is particularly attractive to those seeking a career in public service.

## *Fiscal Year 2006 Congressional Hearings and Other Briefings*

The Chairman testified before the United States House of Representatives Committee on Veterans' Affairs on December 7, 2005. He addressed the productivity of the Board and its primary challenges—eliminating avoidable remands to VA regional offices and increasing productivity to contain and reduce the backlog.

In January 2006, the Chairman briefed the Veterans Disability Benefits Commission about the activities of the Board. In July 2006, he presented an overview on the VA appellate process, the handling of medical issues in the appeals process and general activities of the Board to the Institute of Medicine Committee on Medical Evaluation of Veterans for Disability Compensation.

In April 2006, our representatives participated in panel discussions and addressed the Board's operations at the CAVC Judicial Conference and the National Organization of Veterans' Advocates Conference. In May 2006, the Chairman addressed the Judicial Conference of the United States Court of Appeals for the Federal Circuit and VBA's Veterans Service Center Managers Conference. The Board also participated in a panel discussion on issues in veterans law in the Federal Circuit's Judicial Conference.

In July 2006, the Chairman testified before the United States Senate Committee on Veterans' Affairs to address the reasons for the increase in the number of appeals to the CAVC. The Board's attempts to meet its goals of eliminating the backlog and avoidable remands had the ancillary effect of increasing the universe of final decisions that could be appealed to the CAVC. To illustrate, in Fiscal Year 2003, the Board issued 31,397 decisions with a remand rate of 42.6%. In Fiscal Year 2004, it issued 38,371 decisions but the remand rate soared to 56.8%. In Fiscal Year 2005, when we began coordinating efforts with VBA to avoid remands, the Board issued 34,175 decisions of which 38.6% were remanded in whole or part. In Fiscal Year 2006, the Board issued 39,076 decisions with a 32.0% remand rate. The impact of reduced remands is a significant increase in the number of final decisions that may be appealed to the Court. This trend is likely to continue, especially as the Board's workload continues to grow.

During the fiscal year, the Chairman or his representative also discussed the Board's successes, challenges, and general activities at The American Legion 83rd Annual Veterans Affairs and Rehabilitation Conference, the Florida Department of Veterans Affairs Conference, the Georgia Department of Veterans Services Conference, the National Association of County Veterans Service

Officers Convention, the Disabled American Veterans 85th Department Convention and the North Carolina Department of Veterans Affairs Training Conference.

# *Significant Judicial Precedent and Its Effect on the Board*

► *Adjudication of Tinnitus Claims:*  In *Smith v. Nicholson*, 19 Vet. App. 63 (2005), the Veterans Court reversed a decision of the Board, which concluded that no more than a single 10-percent disability evaluation could be provided for tinnitus, whether perceived as bilateral or unilateral, under the version of 38 C.F.R. Sec. 4.87, Diagnostic Code 6260, that was in effect prior to June 13, 2003.  The regulation had been amended in 2003 to codify standard VA practice by stating that recurrent tinnitus will be assigned only a single 10-percent evaluation whether it is perceived in one ear, both ears or somewhere in the head.  68 Fed. Reg. 25,822 (May 14, 2003) (codified at 38 C.F.R. Sec. 4.87, Diagnostic Code 6260). The Veterans Court held that, pursuant to the regulation, dual or separate ratings must be assigned for bilateral tinnitus.  While the Veterans Court's decision was on appeal to the Federal Circuit, the Secretary of Veterans Affairs, on April 22, 2005, directed the Board to stay action on all claims in which a claim for tinnitus was filed before June 13, 2003, and a disability rating for tinnitus of greater than 10 percent was sought; and all claims in which a claim for service connection for tinnitus was filed before June 10, 1999, and a compensable rating was denied on the basis that tinnitus was not persistent for purposes of Diagnostic Code 6260.  The stay was issued to avoid burdens on the adjudication system, delays in the adjudication of other claims, and unnecessary expenditure of resources through remand or final adjudication of claims based on court precedent that may ultimately be overturned on appeal.  On June 19, 2006, the Federal Circuit reversed the Veterans Court's decision and affirmed VA's long-standing interpretation of Diagnostic Code 6260 as authorizing only a single 10-percent rating for tinnitus, whether perceived as unilateral or bilateral.  *Smith v. Nicholson*, 451 F.3d 1344 (Fed. Cir. 2006), *petition for cert. filed*, 75 U.S.L.W. 3122 (U.S. Sept. 18, 2006) (No. 06-400).  On July 10, 2006, the Secretary ordered the Board to resume adjudication of the previously stayed claims consistent with VA's long-standing interpretation of the regulation that a single 10-percent disability rating is the maximum rating allowed under Diagnostic Code 6260.  VA did not appeal the portion of the Veterans Court's decision requiring the Board to explain its interpretation of the term "persistent" in the pre-1999 version of Diagnostic Code 6260.  The VLJs immediately began to adjudicate the previously stayed claims, which included more than 4,000 appellants, and had nearly completed those adjudications by the end of Fiscal Year 2006.

► *Deadline for the Submission of Evidence Following a Board Hearing:*  In *Haney v. Nicholson*, 20 Vet. App. 301 (2006), the Court held that a VLJ, who exercised discretion at a Board hearing to leave the record open pursuant to 38 C.F.R. § 20.709 for the veteran to submit medical evidence, failed to comply with the regulation by not setting a deadline as to when the evidence was to be submitted by, and the Board then erred by issuing a final decision without setting a definite deadline, and providing the veteran and his representative with reasonable notice.  In response to *Haney*, we began sending letters in those cases where

a VLJ or AVLJ held a hearing and indicated that the record would be held open for a period of time, but did not specify that time period on the record. This letter provides the appellant with a period of 60 days from the date of the letter to provide the evidence and also solicits a waiver of AOJ review, if the appellant decides to submit additional evidence to the Board.

▶ *Haas v. Nicholson, 20 Vet. App. 207 (2006):* The Veterans Court reversed a Board decision which denied claims for service connection for various disabilities as a result of exposure to herbicides. The Board determined that, although the appellant had served in the waters off the shores of the Republic of Vietnam, such service did not warrant application of the presumption of herbicide exposure because the appellant never set foot on land in that country. The Veterans Court reversed the Board's decision, holding that a VA Adjudication Procedure Manual provision created a presumption of herbicide exposure based on receipt of the Vietnam Service Medal for purposes of service connection for diseases associated with herbicide exposure. The Court also found that neither the statute nor the regulation governing herbicide exposure claims precluded application of the presumption of herbicide exposure to persons who served aboard ship in close proximity to the Republic of Vietnam. For purposes of applying the presumption of exposure to herbicides under 38 C.F.R. § 3.307(a)(6)(iii), the Court held that "service in the Republic of Vietnam" will, in the absence of contradictory evidence, be presumed based upon the veteran's receipt of a Vietnam Service Medal, without any additional proof required that a veteran who served in waters offshore of the Republic of Vietnam actually set foot on land. Since there were potentially a large number of cases on appeal that might be affected by *Haas*, the Secretary of Veterans Affairs issued a memorandum on September 21, 2006, directing the Board to stay action on and refrain from remanding all claims for service connection based on exposure to herbicides in which the only evidence of exposure is the receipt of the Vietnam Service Medal or service on a vessel off the shores of Vietnam. This action would avoid burdens on the adjudication system, delays in the adjudication of other claims, and unnecessary expenditure of resources through remand or final adjudication of claims based on judicial precedent that may ultimately be overturned on appeal. The Department of Justice, on behalf of the Secretary of Veterans Affairs, has filed a notice of appeal with the Federal Circuit challenging the CAVC's decision in *Haas*.

▶ *Veterans Claims Assistance Act (VCAA):*

  • *Mayfield v. Nicholson, 444 F. 3d 1328 (Fed. Cir. 2006):* The Federal Circuit held that a VA claimant must be given the required VCAA notice prior to VA's decision on a claim and in a form that enables the claimant to understand the process, the information that is needed, and who will be responsible for obtaining the information. In cases, such as this one, where notice was not provided prior to the AOJ's initial adjudication, the timing problem can be cured by remanding for the issuance of a VCAA notice followed by readjudication of the claim. While VCAA notice need not always be contained in a single communication, the duty to notify cannot be satisfied by referencing various post-decisional communications, such as the notification of decision, the statement of the case or the supplemental statement of the case from which the claimant might have been able to infer what evidence was lacking. Following *Mayfield*, we now review appeals to determine

if VCAA notice was provided in compliance with this decision. If non-compliant notice was provided, a remand is required for the AOJ to cure the defect, unless the Board finds that any VCAA notice error was non-prejudicial to the claimant.

- *Dingess/Hartman v. Nicholson*, *19 Vet. App. 473 (2006):* The Veterans Court held that the VCAA notice requirements of 38 U.S.C. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service-connection claim: (1) veteran status; (2) existence of a disability; (3) a connection between the veteran's service and the disability; (4) degree of disability; and (5) effective date of the disability. Upon receipt of an application for service connection, VA is required to review the information and the evidence presented with the claim and to provide the claimant with notice of what information and evidence not previously provided, if any, will assist in substantiating or is necessary to substantiate the elements of the claim as reasonably contemplated by the application. This includes notice that a disability rating and an effective date for the award of benefits will be assigned if service connection is awarded. As a result, the Board needs to determine, when reviewing most appeals, whether a supplemental VCAA notice is required with respect to either the disability rating or effective date claim elements. As part of that review, a prejudicial error analysis is undertaken. If we determine that the appellant is prejudiced and the claim cannot otherwise be granted in full, a remand is required for additional notice to the appellant.

- *Kent v. Nicholson*, *20 Vet. App. 1 (2006):* This opinion established significant new requirements with respect to the content of VCAA notice for reopening previously denied claims. The Veterans Court held that when providing the notice required by the VCAA it is necessary, in most cases, for VA to inform claimants seeking to reopen a previously and finally disallowed claim of the unique character of evidence that must be presented. VA must notify a claimant of the evidence and information that is necessary to reopen the claim and of the evidence and information that is necessary to establish entitlement to the underlying claim for the benefit sought by the claimant. Accordingly, VA must look at the bases for the prior denial and provide a notice letter that describes what evidence would be necessary to substantiate the element or elements required to establish service connection that were found insufficient in the previous denial. This notice obligation does not modify the requirement that VA must provide a claimant notice of what is required to substantiate each element of a service-connection claim pursuant to *Dingess/Hartman*. In adjudicating appeals concerning claims to reopen finally disallowed claims, the Board undertakes a prejudicial error analysis. If the Board determines that the appellant was prejudiced and the claim cannot otherwise be granted in full, a remand is required for additional notice to be sent to the appellant.

## *Assistance to VBA Regional Offices and VHA*

The Board continued efforts to help the ROs reduce their backlog of cases on appeal through the Travel Board program. For most Travel Boards, an attorney travels with a VLJ to an RO to assist in preparing for scheduled hearings. An average of more than 40 hearings are scheduled each week. By mid-week, the cases have been briefed, and the attorneys assist the RO for the remainder of the visit.

In Fiscal Year 2006, 124 attorneys provided assistance to 53 ROs. The attorneys drafted 23 memoranda recommending grants, and conducted training for adjudication personnel at 49 of the ROs visited. Additionally, the attorneys, on request, provided non-binding legal advice to adjudicators in 859 cases that were informally reviewed.

At VHA's request, BVA participated in conference calls with the VHA staff across the country that handle appeals to the Board. In addition, BVA provided training on medical center appeals at several locations.

# Veterans Service Organization (VSO) Forums and Global Training

The Chairman invites the VSOs and attorneys who represent appellants before the Board to VSO Forums on a quarterly basis. These meetings address questions that are raised by representatives and also facilitate the exchange of ideas and information. We update the representatives on the Board's activities and address any matters of interest in the open forum. BVA also provides global training to VSO representatives who are co-located with the Board to familiarize them with our processes and procedures and with the various functions of the administrative personnel, attorneys and VLJs. VSOs are also invited to provide training to attorneys and judges and to participate in the in-house training that is provided to BVA staff.

# Volunteer Activities

The Board supports veterans and their families and educates VA employees by changing veterans' educational exhibits on the Vietnam War, Korean Conflict, Operation Iraqi Freedom, female veterans and Prisoners of War (POWs). The Board also facilitates the collection and donation of comfort items for distribution to veterans at the Washington D.C. VA Medical Center and the United States Armed Forces Retirement Home (U.S.A.F.R.H.); distributes United States Department of Defense, VA POW/MIA Day and Veterans Day posters to veterans; collects Toys for Tots for the United States Marine Corps Reserve; and facilitates the collection of calendars and Valentines for Veterans to distribute at the U.S.A.F.R.H. The Board also participates actively in the Combined Federal Campaign.

# Planning for the Future

▶ *Leadership Initiative:* The Leadership Initiative (LI) provides opportunities for all Board employees, as well as employees of other VA organizations, to improve their leadership skills through training, mentoring, and networking. Events during Fiscal Year 2006 included programs where VLJs shared their insights and experiences with regard to career development, a book discussion focusing on team building, networking breakfasts, and a service event to provide comfort items for active duty personnel stationed in Iraq and Afghanistan. The leadership of the LI was recognized by the Leadership VA Alumni Association for its many contributions.

► **Non-BVA Training Initiatives:** The Board sends high-producing, high-quality attorneys, administrative professionals and VLJs to Leadership VA, as well as leadership seminars and programs offered through the United States Office of Personnel Management's Federal Executive Institute and the Management Development Centers. Two employees were competitively selected to attend Leadership VA, which seeks to contribute to the development of leaders within the Department. Through a series of experiences, Leadership VA strives to provide an integrated view of VA to further the goal of achieving One VA, explore the internal and external forces affecting VA, give insight into the current and predicted challenges facing the Department in its delivery of services and benefits to the veterans' community, provide interchange between officials from various levels and organizational elements of VA and increase leadership skills and provide opportunities for refining them through practice in group settings. The Board also selected two employees to attend Leadership for a Democratic Society at the Federal Executive Institute. This four-week course builds the participants' knowledge and skills in personal leadership, transforming public organizations, and the policy framework in which Government leadership occurs. We also sent 12 employees to the Management Development Centers to participate in courses such as the Supervisory Leadership Seminar: Learning to Lead and Mission to the Stars, Leadership for Critical Times. These developmental courses are an integral part of our plan to develop its future leaders.

► **Facility Move:** The Board continued to plan for a facility move that was originally scheduled to take place in Fiscal Year 2007. Our current location, the Lafayette Building at 811 Vermont Avenue, NW, was first scheduled for a complete renovation starting in Fiscal Year 2007, then in Fiscal Year 2008. However, we have now been advised that a building move will not occur during Fiscal Year 2007 or 2008, and the date of a future move, if any, is unknown.

# BOARD MEMBERS

**James P. Terry, Chairman**

**Ron H. Garvin, Vice Chairman**

**Steven L. Keller, Senior Deputy Vice Chairman**

**Charles E. Hogeboom, Deputy Vice Chairman, Decision Team 1**

Steven L. Cohn, Chief Member
Robert E. Sullivan, Chief Member

**Joaquin Aguayo-Pereles, Deputy Vice Chairman, Decision Team 2**

Mark W. Greenstreet, Chief Member
Constance B. Tobias, Chief Member

**Nancy R. Robin, Deputy Vice Chairman, Decision Team 3**

David C. Spickler, Chief Member
Lawrence M. Sullivan, Chief Member

**Mary M. Sabulsky, Deputy Vice Chairman, Decision Team 4**

Wayne M. Braeuer, Chief Member
Holly E. Moehlmann, Chief Member

## VETERANS LAW JUDGES

| | | |
|---|---|---|
| Keith W. Allen | Mary Gallagher | Jacqueline E. Monroe |
| Marjorie A. Auer | Gary L. Gick | Andrew J. Mullen |
| Kathy A. Banfield | George E. Guido, Jr. | John E. Ormond, Jr. |
| Barry F. Bohan | Mark F. Halsey | Kimberly E. Osborne |
| Derek R. Brown | Milo H. Hawley | Alan S. Peevy |
| Anna M. Bryant | Mark D. Hindin | Renee M. Pelletier |
| Vito A. Clementi | Vicky L. Jordan | Ursula R. Powell |
| Barbara B. Copeland | Michelle L. Kane | Harvey P. Roberts |
| John J. Crowley | Susan L. Kennedy | Howard N. Schwartz |
| Thomas J. Dannaher | Michael E. Kilcoyne | George R. Senyk |
| Jonathan E. Day | Michael D. Lyon | Deborah W. Singleton |
| Paula M. DiLorenzo | James L. March | Charles W. Symanski |
| Shane A. Durkin | Jeffrey J. Martin | Stephen L. Wilkins |
| Frank J. Flowers | Cheryl L. Mason | Richard F. Williams |
| Kathleen Gallagher | Joy A. McDonald | |

**13**

# PART II
# STATISTICAL DATA
# Fiscal Year (FY) 2006 Information

The following information is required by 38 U.S.C. § 7101(d)(2):

## 38 U.S.C. § 7101(d)(2)(A)

Number of cases physically received at the Board during FY 2006:  **41,802**
Number of cases added to docket by filing appeal during FY 2006:  **46,076**

## 38 U.S.C. § 7101(d)(2)(B)

Cases pending before the Board at the start of FY 2006:   **37,539***
Cases pending before the Board at the end of FY 2006:   **40,265***

*Includes certified appeals pending in the field awaiting hearings, as well as cases pending at BVA.

## 38 U.S.C. § 7101(d)(2)(C)

Number of cases received at BVA and new appeals filed during each of the 36 months preceding Fiscal Year 2006.

| Month | Cases Received at BVA | | | | New Appeals (VA Form 9) Filed | | | |
|---|---|---|---|---|---|---|---|---|
| | **FY03** | **FY04** | **FY05** | **FY06** | **FY03** | **FY04** | **FY05** | **FY06** |
| October | 4,024 | 1,572 | 2,664 | 3,750 | 3,040 | 3,855 | 3,566 | 3,700 |
| November | 2,726 | 1,152 | 2,171 | 3,610 | 2,720 | 2,932 | 3,708 | 3,631 |
| December | 3,037 | 1,583 | 3,264 | 3,182 | 2,634 | 3,341 | 3,695 | 3,559 |
| January | 4,294 | 2,616 | 3,202 | 4,142 | 3,185 | 3,632 | 3,543 | 3,899 |
| February | 4,008 | 3,519 | 3,562 | 3,886 | 2,906 | 4,380 | 3,786 | 3,871 |
| March | 4,325 | 3,996 | 4,124 | 4,293 | 3,605 | 5,291 | 4,552 | 4,357 |
| April | 3,676 | 2,975 | 3,055 | 2,575 | 3,717 | 4,920 | 3,461 | 3,615 |
| May | 2,175 | 4,856 | 3,104 | 3,093 | 3,675 | 4,397 | 4,331 | 4,115 |
| June | 3,728 | 4,359 | 4,730 | 3,341 | 3,797 | 4,881 | 4,334 | 4,381 |
| July | 2,956 | 5,371 | 4,655 | 2,941 | 3,719 | 4,264 | 3,445 | 3,531 |
| August | 2,103 | 4,637 | 3,890 | 3,313 | 3,661 | 3,909 | 4,378 | 3,920 |
| September | 2,917 | 3,320 | 3,395 | 3,676 | 4,505 | 3,836 | 4,337 | 3,497 |
| FY Total | 39,969 | 39,956 | 41,816 | 41,802 | 41,164 | 49,638 | 47,136 | 46,076 |

**14**



*Cases Received at BVA FY 03- FY 06*



*New Appeals (VA Form 9) Filed FY 03 - FY 06*

**15**

### 38 U.S.C. § 7101(d)(2)(D)

The average length of time a case was before the Board between the time of the filing of an appeal and the disposition during the preceding fiscal year:

| Time Interval | Responsible Party | Average Elapse Processing Time |
|---|---|---|
| Notice of Disagreement Receipt to Statement of the Case | Field Station | 188 days |
| | Field Station | 42 days |
| Substantive Appeal Receipt to Certification of Appeal to BVA | Field Station | 489 days |
| Receipt of Certified Appeal to Issuance of BVA Decision | BVA | 252 days |
| Average Remand Time Factor | Field Station | 193 days |

### 38 U.S.C. § 7101(d)(2)(E)

The number of members of the Board at the end of FY 2006: **56 members**

The number of professional, administrative, clerical, stenographic, and other personnel employed by the Board at the end of FY 2006: **401 employees not including 56 members above.**

### 38 U.S.C. § 7101(d)(2)(F)

Number of acting members of the Board during FY 2006: **66**

Number of cases in which such members participated: **3,976**

### 38 U.S.C. § 7101(c)(2)

Number of acting members of the Board in terms of full-time employee equivalents: **5.3**

16

# PROJECTIONS FOR FISCAL YEARS 2007 AND 2008

The following information is required by 38 U.S.C. § 7101(d)(3):

## 38 U.S.C. § 7101(d)(3)(A)

Estimated number of cases that will be appealed to BVA:

| | | |
|---|---|---|
| Fiscal Year 2007: | Cases received at BVA: | 43,000 |
| | Cases added to BVA Docket: | 48,000 |
| Fiscal Year 2008: | Cases received at BVA: | 43,000 |
| | Cases added to BVA Docket: | 48,000 |

## 38 U.S.C. § 7101(d)(3)(B)

Evaluation of the ability of the Board (based on existing and projected personnel levels) to ensure timely disposition of such appeals as required by 38 U.S.C. § 7101(a):

The indicator used by the BVA to forecast its future timeliness of service delivery is BVA "response time" on appeals. By taking into account the Board's most recent appeals processing rate and the number of appeals that are currently pending before the Board, BVA response time projects the average time that will be required to render decisions on that group of pending appeals. For response time computation, the term "appeals pending before the Board" includes appeals at the Board and those that have been certified for BVA review but are held in the field pending BVA Travel Board or video conference hearings.

The following categories are calculated as follows:

FY 2006 decisions (39,076) (*divided by*)     = 150.29 Decisions per Work Day
260 work days

Cases Pending end of FY 2006 (40,265)     = 83,265 = Total Workload in FY 2007
+ New Cases expected in FY 2007 (43,000)

Total Workload (83,265) (*divided by*)     = 554 Work Days
Decisions per Work Day (150.29)

Work Days (554) (*divided by*)     = 2.1 Years
260 work days

Work years (2.1)  x  12 (months)     = 25 months

# ADDITIONAL INFORMATION

*Potential BVA Workload in VBA*

| Month | FY03 | FY04 | FY05 | FY06 |
|---|---|---|---|---|
| October | 9,936 | 9,774 | 8,949 | 8,967 |
| November | 8,118 | 8,621 | 8,293 | 7,989 |
| December | 7,957 | 6,595 | 8,016 | 7,594 |
| January | 9,670 | 7,717 | 9,048 | 8,715 |
| February | 9,034 | 8,718 | 9,053 | 8,322 |
| March | 10,676 | 11,698 | 10,265 | 9,815 |
| April | 10,419 | 9,978 | 9,208 | 8,122 |
| May | 9,800 | 8,574 | 9,390 | 9,093 |
| June | 9,753 | 9,642 | 9,256 | 8,700 |
| July | 10,084 | 9,005 | 8,428 | 7,630 |
| August | 9,247 | 9,797 | 9,307 | 8,576 |
| September | 9,915 | 8,812 | 7,468 | 7,717 |
| **FY Total** | **114,609** | **108,931** | **106,681** | **101,240** |

Number of New Notices of Disagreement Received in the Field

## Notice of Disagreement Received FY 03-06



**18**



*Potential BVA Workload in VBA*

*BVA Decisions*

| APPEAL PROGRAM | ALLOWED | | REMANDED | | DENIED | | OTHER | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent | No. | Percent | No. | Percent |
| Burial Benefits | 1 | 2.1% | 9 | 18.8% | 36 | 75.0% | 2 | 4.2% | 48 | 0.1% |
| Compensation | 7,297 | 19.6% | 11,926 | 32.0% | 17,198 | 46.1% | 874 | 2.3% | 37,295 | 95.4% |
| Education | 21 | 9.4% | 70 | 31.3% | 128 | 57.1% | 5 | 2.2% | 224 | 0.6% |
| Insurance | 0 | 0.0% | 7 | 41.2% | 10 | 58.8% | 0 | 0.0% | 17 | 0.0% |
| Loan Guaranty | 0 | 0.0% | 1 | 9.1% | 10 | 90.9% | 0 | 0.0% | 11 | 0.0% |
| Medical | 40 | 14.3% | 111 | 39.8% | 119 | 42.7% | 9 | 3.2% | 279 | 0.7% |
| Pension | 53 | 10.5% | 125 | 24.8% | 308 | 61.1% | 18 | 3.6% | 504 | 1.3% |
| VR&C | 1 | 1.7% | 29 | 49.2% | 26 | 44.1% | 3 | 5.1% | 59 | 0.2% |
| Other Program | 3 | 10.3% | 11 | 37.9% | 14 | 48.3% | 1 | 3.4% | 29 | 0.1% |
| BVA Original Jurisdiction | 14 | 16.3% | 1 | 1.2% | 47 | 54.7% | 24 | 27.9% | 86 | 0.2% |
| Multiple Program Areas | 107 | 20.4% | 197 | 37.6% | 211 | 40.3% | 9 | 1.7% | 524 | 1.3% |
| GRAND TOTAL | 7,537 | 19.3% | 12,487 | 32.0% | 18,107 | 46.3% | 945 | 2.4% | 39,076 | 100.0% |

19

| BVA Dispositions by Representation FY 2006 | | | | | | | | | |
| REPRESENTATION | ALLOWED | | REMANDED | | DENIED | | OTHER | | TOTAL | |
| | No. | Percent | No. | Percent | No. | Percent | No. | Percent | No. | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| American Legion | 1,251 | 20.4% | 1,935 | 31.6% | 2,767 | 45.1% | 180 | 2.9% | 6,133 | 15.7% |
| AMVETS | 66 | 25.9% | 73 | 28.6% | 109 | 42.7% | 7 | 2.7% | 255 | 0.7% |
| Disabled American Veterans | 2,780 | 22.9% | 4,260 | 35.1% | 4,844 | 39.9% | 255 | 2.1% | 12,139 | 31.1% |
| Military Order of the Purple Heart | 108 | 22.9% | 168 | 35.7% | 185 | 39.3% | 10 | 2.1% | 471 | 1.2% |
| Paralyzed Veterans of America | 91 | 24.4% | 150 | 40.2% | 103 | 27.6% | 29 | 7.8% | 373 | 1.0% |
| Veterans of Foreign Wars | 627 | 11.1% | 1,155 | 20.5% | 3,770 | 66.8% | 92 | 1.6% | 5,644 | 14.4% |
| Vietnam Veterans of America | 138 | 22.0% | 278 | 44.3% | 188 | 29.9% | 24 | 3.8% | 628 | 1.6% |
| State Service Organizations | 1,229 | 19.7% | 1,935 | 31.0% | 2,927 | 47.0% | 142 | 2.3% | 6,233 | 16.0% |
| Attorneys | 489 | 21.8% | 903 | 40.3% | 777 | 34.7% | 72 | 3.2% | 2,241 | 5.7% |
| Agents | 9 | 21.4% | 15 | 35.7% | 15 | 35.7% | 3 | 7.1% | 42 | 0.1% |
| Other Representation | 163 | 21.4% | 255 | 33.4% | 320 | 41.9% | 25 | 3.3% | 763 | 2.0% |
| No Representation | 586 | 14.1% | 1,360 | 32.7% | 2,102 | 50.6% | 106 | 2.6% | 4,154 | 10.6% |
| GRAND TOTAL | 7,537 | 19.3% | 12,487 | 32.0% | 18,107 | 46.3% | 945 | 2.4% | 39,076 | 100.0% |

NOTE: American Red Cross figures now included with 'Other Representation.'

| BVA DECISIONS | | | | | |
| Fiscal Year | Decisions | Allowed | Remand | Denied | Other |
|---|---|---|---|---|---|
| 2003 | 31,397 | 22.1% | 42.6% | 32.6% | 2.7% |
| 2004 | 38,371 | 17.1% | 56.8%* | 24.2% | 1.9% |
| 2005 | 34,175 | 20.8% | 38.6% | 38.1% | 2.5% |
| 2006 | 39,076 | 19.3% | 32.0% | 46.3% | 2.4% |

* The 56.8% remand rate for FY 2004 includes former Board development cases converted to remands.



## BVA Decisions FY 03 - FY 06

(bar chart)

FY 03: 31,397
FY 04: 38,371
FY 05: 34,175
FY 06: 39,076
FY 07 Estimate: 38,000

| BVA Operating Statistics | | | | |
|---|---|---|---|---|
| | **FY03** | **FY04** | **FY05** | **FY06** |
| **Decisions** | 31,397 | 38,371 | 34,175 | 39,076 |
| **Case Receipts*** | | | | |
| Added to Docket | 41,164 | 49,638 | 47,136 | 46,076 |
| Received at BVA | 39,969 | 39,956 | 41,816 | 41,802 |
| **Cases Pending**** | 27,230 | 28,815 | 37,539 | 40,265 |
| **Hearings - VACO** | 650 | 805 | 738 | 554 |
| **Video** | 1,689 | 2,108 | 2,618 | 2,719 |
| **Field** | 3,707 | 4,346 | 5,220 | 5,885 |
| **Decisions per FTE** | 69.9 | 87.8 | 79.1 | 86.4 |
| **BVA FTE** | 451 | 440 | 433 | 452 |
| **BVA Cycle Time** | 135 | 98 | 104 | 148 |
| **Cost per Case** | $1,493 | $1,302 | $1,453 | $1,381 |

* Case Receipts composed of: (1) new cases added to BVA's docket; and (2) cases received at BVA, which consist of all cases physically received at the Board, including original appeals and cases returned to the Board's docket (i.e., cases returned following remand development, cases remanded by the Court, and cases received for reconsideration or vacate actions).

** Pending figures include certified appeals pending in the field awaiting BVA hearings, as well as cases pending before the Board.

**21**