1  JEFFREY S. BUCHOLTZ
   Acting Assistant Attorney General
2  JOSEPH P. RUSSONIELLO California Bar No. 44332
   United States Attorney
3  RICHARD LEPLEY
   Assistant Branch Director
4  DANIEL BENSING D.C. Bar No. 334268
   STEVEN Y. BRESSLER D.C. Bar No. 482492
5  KYLE R. FREENY California Bar No. 247857
   Attorneys
6  United States Department of Justice
   Civil Division, Federal Programs Branch
7
   P.O. Box 883
8  Washington, D.C. 20044
   Telephone: (202) 514-5108
9  Facsimile: (202) 616-8460
   Email: Kyle.Freeny@USDOJ.gov
10
   Attorneys for Defendants Hon. James B. Peake,[1] the U.S. Department of Veterans Affairs, Hon.
11 James P. Terry, Hon. Daniel L. Cooper, Hon. Bradley G. Mayes, Hon. Michael J. Kussman,
   Ulrike Willimon, the United States of America, Hon. Michael B. Mukasey, and Hon. William P.
12 Greene, Jr.

13                        UNITED STATES DISTRICT COURT

14                       NORTHERN DISTRICT OF CALIFORNIA

15                               SAN FRANCISCO

16

17 VETERANS FOR COMMON SENSE and          )
   VETERANS UNITED FOR TRUTH,             )   No. C 07-3758-SC
18                                        )
              Plaintiffs,                 )   **MEMORANDUM IN OPPOSITION TO**
19                                        )   **PLAINTIFFS' MOTION FOR**
        v.                                )   **PRELIMINARY INJUNCTION**
20                                        )
   Hon. JAMES B. PEAKE, Secretary of      )   Date: February 22, 2008
21 Veterans Affairs, et al.,              )   Time: 10:00 a.m.
                                          )   Courtroom: 1
22            Defendants.                 )
                                          )
23 _____    )

24

25

26

27
   ───────────────
28       [1]Hon. James B. Peake should be substituted for his predecessor, Acting Secretary Gordon
   Mansfield, as defendant in this action pursuant to Fed. R. Civ. P. 25(d)(1).

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.     Statutory and Regulatory Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          A.     The Veterans Health Care Eligibility Reform Act Of 1996. . . . . . . . . . . . 3

          B.     The Veterans Programs Enhancement Act Of 1998. . . . . . . . . . . . . . . . . 3

          C.     The Joshua Omvig Veterans Suicide Prevention Act. . . . . . . . . . . . . . . 4

          D.     The National Defense Authorization Act For Fiscal Year 2008.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    Factual Background: VA's Extensive Activities To Provide Mental Health Care To Veterans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.    Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          A.     Plaintiffs' Statutory Claims Lack Merit. . . . . . . . . . . . . . . . . . . . . . . . . . 7

               1.     Plaintiffs' Section 706(1) Mandamus Claim Should Be Rejected Because The Agency Action In Question Is Committed To The Secretary's Broad Discretion. . . . . . . . . . . . 8

               2.     Plaintiffs' Section 706(1) Mandamus Claim Should Be Rejected Because The "Actions" In Question Are Not Discrete But, Rather, Programmatic In Nature.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          B.     Plaintiffs' Due Process Claim Lacks Merit. . . . . . . . . . . . . . . . . . . . . . . 14

               1.     Plaintiffs Have Not Established That They Have A Constitutional Due Process-Protected Property Interest In Health Care Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

               2.     Even If Plaintiffs Had A Constitutionally Protected Property Interest In Particular Medical Treatment, The Agency Provides Adequate Due Process Protections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    Plaintiffs Have Not Established They Will Suffer Irreparable
        Harm In The Absence Of A Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . 20

IV.     The Public Interest Favors Denial Of Plaintiffs' Motion. . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

Adams Fruit Co. v. Barrett,
     494 U.S. 638 (1990)......................................................................... 9

American Mfrs. Mut. Ins. Co. v. Sullivan,
     526 U.S. 40 (1999)................................................................... 14, 16

Anderson v. White,
     888 F.2d 985 (3d Cir. 1989)............................................................ 19

In re Barr Laboratories, Inc.,
     930 F.2d 72 (D.C. Cir. 1991)........................................................... 12

Board of Regents of State  Colleges v. Roth,
     408 U.S. 564 (1972)................................................................. 14, 15

Board of Trade of City of Chicago v. S.E.C.,
     883 F.2d 525 (7th Cir. 1989)........................................................... 12

Chinnock v. Turnage,
     995 F.2d 889 (9th Cir. 1993)........................................................... 18

Day v. Shalala,
     23 F.3d 1052 (6th Cir. 1994)........................................................... 19

Devine v. Cleland,
     616 F.2d 1080 (9th Cir. 1980)..................................................... 15, 16

Eastern Paralyzed Veterans Ass'n, Inc. v. Secretary of Veterans Affairs,
     257 F.3d at 1352 (Fed. Cir. 2001)........................................ 15, 16, 17

First Nat'l Bank of Albuquerque v. Albright,
     208 U.S. 548 (1908)..................................................................... 22

Gade v. National Solid Wastes Mgmt. Ass'n,
     505 U.S. 88 (1992)........................................................................ 9

Gillette Co. v. Ed Pinaud, Inc.,
     178 F. Supp. 618 (S.D.N.Y. 1959)................................................... 21

Heckler v. Chaney,
    470 U.S. 821 (1984) ....................................................................................... 10

Helgeson v. Bureau of Indian Affairs,
    153 F.3d 1000 (9th Cir. 1998) ..................................................................... 10

Home Loan Bank Bd. v. Mallonee,
    196 F.2d 336 (9th Cir. 1952) ......................................................................... 22

Independence Mining Co. v. Babbitt,
    105 F.3d 502 (9th Cir. 1997) ......................................................................... 7

International Union, United Autoworkers v. Donovan,
    746 F.2d 855 (D.C. Cir. 1984), cert. denied, 474 U.S. 825 (1985) ............... 11

Japan Whaling Ass'n v. American Cetacean Soc.,
    478 U.S. 221 (1986) ....................................................................................... 7

Johnson v. Robison,
    415 U.S. 361 (1974) ....................................................................................... 22

Kansas Health Care Association, Inc. v. Kansas Department of Social Services,
    31 F.3d 1536 (10th Cir. 1994) ....................................................................... 21

Legal Services of Northern California, Inc. v. Arnett,
    114 F. 3d 135 (9th Cir. 1997) ......................................................................... 10

Lincoln v. Vigil,
    508 U.S. 182 (1993) ............................................................................. 10, 11, 15

Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,
    634 F.2d 1197 (9th Cir. 1980) ......................................................................... 6

Luckett  v. Jett,
    966 F.2d 209 (6th Cir. 1992) , cert. denied, 507 U.S. 922 (1993).f ............... 16

Lujan v. National Wildlife Federation,
    497 U.S. 871 (1990) ....................................................................................... 13

Lydo Enterprises, Inc. v. City of Las Vegas,
    745 F.2d 1211 (9th Cir. 1984) ...................................................... 20

Matthews v. Eldridge,
    424 U.S. 319 (1976)................................................................. passim

Morrissey v. Brewer,
    408 U.S. 471 (1972)...................................................................... 16

National Ass'n of Radiation Survivors v. Derwinski,
    994 F.2d 583 (9th Cir. 1993).......................................................... 19

Norton v. Southern Utah Wilderness Alliance ("SUWA"),
    542 U.S. 55 (2004)..................................................................... 7, 13

OPM v. Richmond,
    496 U.S. 414 (1990)....................................................................... 13

Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,
    762 F.2d 1374 (9th Cir. 1985). ....................................................... 21

Oregon Natural Resources Council v. Harrell,
    52 F.3d 1499 (9th Cir. 1995). ....................................................... 7, 13

Parrish v. Brownlee,
    335 F. Supp. 2d 661 (E.D.N.C. 2004)............................................... 22

Preminger v. Principi,
    422 F.3d 815 (9th Cir. 2005). ......................................................... 18

Quince Orchard Valley Citizens Ass'n v. Hodel,
    872 F.2d 75 (4th Cir. 1989). ........................................................... 21

Rank v. Nimmo,
    677 F.2d 692 (9th Cir. 1982). ......................................................... 10

Richardson v. Perales,
    402 U.S. 389 (1971)....................................................................... 17

Rostker  v. Goldberg,
    453 U.S. 64-65 (1981). .................................................................. 22

Southwest Voter Registration Educ. Project v. Shelley,
    344 F.3d 914 (9th Cir. 2003). ........................................................... 6

Steenholdt v. FAA,
    314 F.3d 633 (D.C. Cir. 2003). ...................................................................... 10

Taylor v. Westly,
    488 F.3d 1197 (9th Cir. 2007). ...................................................................... 20

Thongsamouth v. Schweiker,
    711 F.2d 465 (1st Cir. 1983). ........................................................................ 9

Town of Castle Rock v. Gonzales,
    545 U.S. 748 (2005). ...................................................................................... 15

Virginian Ry. Co. v.  Sys. Fed'n No. 40,
    300 U.S. 515 (1937). ...................................................................................... 22

Walters v. National Ass'n of Radiation Survivors,
    473 U.S. 305 (1985). ...................................................................................... 17

## STATUTES, RULES AND REGULATIONS

5 U.S.C. § 701(a)(2). .......................................................................................... 9,13

5 U.S.C. § 706 ...................................................................................... 7, 12, 13

28 U.S.C. § 1361. ................................................................................................ 7

38 U.S.C. § 511(a). ............................................................................................ 14

38 U.S.C. § 1701(a)(2). ....................................................................................... 8

38 U.S.C. § 1705(a). .................................................................................. 3, 17, 19

38 U.S.C. § 1706. ............................................................................................... 19

38 U.S.C. § 1710(a). .................................................................................... passim

38 U.S.C. § 1720F. .............................................................................................. 4

38 C.F.R. § 17.36(b)(6). ..................................................................................... 13

38 C.F.R. § 17.38. ........................................................................................ 17, 19

38 C.F.R. § 19.29. .............................................................................................. 17

38 C.F.R. §19.30. ............................................................................................... 17

38 C.F.R. § 20.101(b). ........................................................................................ 18

38 C.F.R. §20.201. ............................................................................................. 17

38 C.F.R. §20.202. ............................................................................................. 17

Fed. R. Civ. P. 25(d)(1) ......................................................................................... 1

Fed. R. Evid. 201(b). ........................................................................................... 11

## LEGISLATIVE MATERIALS

144 Cong. Rec. 10374, 10390 ............................................................................... 9

144 Cong Rec S12918, S12933. .......................................................................... 9

H. Rep. No. 104-690 (1996). .................................................................... 3, 8, 17

H.R. 4986, Pub. L. No. 110- ---, 122 Stat. ---- (January 28, 2008) ................... 4

H.R. Rep. No. 690, 104th Cong., 2d Sess. (1996). ....................................... 20

Pub. L. 104-262, codified at 38 U.S.C. § 1705 et. seq. .................................... 3

Pub. L. 105-368,
    § 102, 112 Stat. 3315, 3321-22 (November 10, 1998), codified at 38
    U.S.C. § 1710(a)(1)(D). ............................................................................. 3

Joshua Omvig Veterans Suicide Prevention Act, Pub. L. No. 110-110,121 Stat. 1031
    (November 5, 2007). .................................................................. 2, 4, 22, 23

## MISCELLANEOUS

Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise (3d ed. 1994). ...................... 12

# INTRODUCTION

Plaintiffs, two advocacy organizations, ask this Court to insert itself into the management of the U.S. Department of Veterans Affairs ("VA") with an extraordinary preliminary injunction that would encroach on the discretion delegated by Congress to the Secretary of Veterans Affairs in two ways not justified by the law on equity. First, plaintiffs seek to allocate funds that Congress has committed to VA's discretion via lump-sum appropriations. Second, plaintiffs seek to dictate the scope and level of medical care provided by VA although that decision, as well, is committed to the Secretary's discretion by statute. Plaintiffs rest their motion for emergency relief on selective citations and misinterpretations of the law, including their assertion that the Secretary has failed to spend funds earmarked by Congress. In fact, plaintiffs cite not a single appropriations act, let alone one that has been violated. Rather, plaintiffs rely on a Government Accountability Office ("GAO") report that analyzed the Secretary's discretionary spending of money drawn from lump-sum appropriations. Plaintiffs further claim that veterans who dispute VA doctors' expert medical judgments have no meaningful opportunity to be heard when, in fact, they may appeal clinical disputes; upon such appeal, they receive medical review and due process that comports with the Constitution. The Court need not determine the adequacy of the due process procedures provided, however, since plaintiffs do not have a due process-protected property interest in their health care benefits. Plaintiffs' contrary argument is, again, based on selective citations that ignore the statutory text and relevant legislative history.

Against that background, it is not surprising that plaintiffs fail to clear their high hurdle to justify preliminary relief. Plaintiffs are not likely to succeed on the merits of their Administrative Procedure Act ("APA") claim for mandamus because they cannot show VA has failed to take a required, discrete action. Moreover, enforcement of the mandamus plaintiffs seek would improperly enmesh this Court in the facts of thousands of individual medical decisions. Plaintiffs are also not likely to succeed in their claim that veterans who disagree with the medical care they are offered have no due process at all because, again, they are afforded due process in VA's clinical appeals framework and, in any event, constitutional due process protections do not apply.

1    Plaintiffs have also failed to establish that the injunction they seek will protect them from

2  irreparable harm.  Plaintiffs' claim of urgency requiring a preliminary injunction is belied at the

3  outset by their own delay in seeking relief.  Plaintiffs' delay aside, they have adduced no

4  cognizable evidence but, instead, rely on hearsay and anonymous declarations that cannot be

5  verified and, in any event, do not establish that an injunction would prevent otherwise irreparable

6  harm.

7    Moreover, VA is making great progress in addressing the mental health care needs of

8  combat veterans through its own programs as well as implementation statutes enacted as recently

9  as January 28, 2008, when the President signed the National Defense Authorization Act for

10  Fiscal Year 2008 including several programs to help veterans, and November 2007, when the

11  President signed the Joshua Omvig Veterans Suicide Prevention Act.  As detailed below and in

12  the attached declarations, each major allegation by plaintiffs regarding the scope, availability, and

13  type of care is either wrong or based on data from earlier time periods that no longer reflects the

14  current situation.  This Court should not interfere with the political branches' design, oversight,

15  and modification of VA programs.  For that reason, the public interest also militates against entry

16  of a preliminary injunction.

17    For all of these reasons, the Court should deny plaintiffs' Motion for Preliminary

18  Injunction.

19

20

21

22

23

24

25

26

27

28

1

**BACKGROUND**[2]

2    **I.    Statutory and Regulatory Background**

3        **A.    The Veterans Health Care Eligibility Reform Act Of 1996**

4        In section 104(a) of the Veterans Health Care Eligibility Reform Act of 1996

5    ("VHCERA"), Pub. L. 104-262, underlined codified at 38 U.S.C. § 1705 et. seq., Congress directed the VA,

6    among other things, to establish and operate a system of annual patient enrollment in order to

7    manage the provision of hospital care and medical services under 38 U.S.C. § 1710(a).  See 38

8    U.S.C. § 1705(a).  VHCERA also provided that this system of annual patient enrollment was to

9    be managed in accordance with a list of veteran priority groups that was set forth in the Act.  Id.

10    In VHCERA, Congress explicitly provides that VA's duty to furnish health care to qualifying

11    veterans is limited in any fiscal year to the amount provided in advance in appropriations acts for

12    such purposes.  38 U.S.C. § 1710(a).  Thus, § 1710(a) was explicitly not intended to create any

13    entitlement to health care.  See H. Rep. No. 104-690 (1996) (§ 1710(a) "creates no . . .

14    expectation" that veterans are entitled to health care thereunder).

15        **B.    The Veterans Programs Enhancement Act Of 1998**

16        In 1998, Congress amended VHCERA with the section 102 of the Veterans Programs

17    Enhancement Act, Pub. L. 105-368, § 102, 112 Stat. 3315, 3321-22 (November 10, 1998),

18    codified at 38 U.S.C. § 1710(e)(1)(D), to authorize VA to enroll veterans of future armed

19    conflicts for medical services under VHCERA, 38 U.S.C. §§ 1705, 1710(a) & (e), for a period of

20    two years following the veterans' separation from active duty and without regard to the service-

21    connection of the illnesses for which such veterans seek treatment during those two years.  The

22

23        [2]    Plaintiffs' extraordinary motion to hide the identities of and certain other
information attested to by their fact witnesses from the other parties in this action and their staff
24    counsel is being briefed at the same time as plaintiffs' Motion for Preliminary Injunction.  See
Clerk's Notice of January 11, 2008 (Docket Entry No. 94, setting briefing schedule on plaintiffs'
25    Motion for Protective Order, Docket Entry No. 56).  Because the Court has, accordingly, not
ruled on plaintiffs' motion for their witnesses to proceed anonymously, information from
26    plaintiffs' declarations in support of their Motion for Preliminary Injunction has not been
available to defendants to address in this response.  The Court should, accordingly, not rely upon
27    the untested, often hearsay testimony in these declarations which defendants are unable to
investigate and to which they cannot respond.

28

1   legislative history of § 1710(e)(1)(D) indicates Congress intended it to authorize, but not require,

2   provision of particular medical care to veterans and that, like § 1710(a), it creates no new

3   entitlement.  See infra note 4.

4   **C.      The Joshua Omvig Veterans Suicide Prevention Act**

5         In November of last year, Congress addressed suicide rates among veterans with post-

6   traumatic stress disorder (PTSD), when it enacted the Joshua Omvig Veterans Suicide Prevention

7   Act, Pub. L. No. 110-110,121 Stat. 1031 (November 5, 2007), to be codified in part at 38 U.S.C.

8   § 1720F.  The Joshua Omvig Act directs the Secretary to "develop and carry out a comprehensive

9   program designed to reduce the incidence of suicide among veterans" that includes, inter alia,

10  appropriate staff training; mental health assessments and, where appropriate, counseling referrals;

11  24-hour availability of mental health care; outreach to veterans; and suicide prevention research.

12  See id.  The Act also authorizes, but does not require, the Secretary to establish a toll-free hotline

13  staffed by mental health professionals for veterans to call and a peer counseling program.  Id.

14  **D.      The National Defense Authorization Act For Fiscal Year 2008**

15        On January 28, 2008, the President signed into law Pub. L. No. 110- ---, 122 Stat. ----,

16  H.R. 4986, the National Defense Authorization Act for Fiscal Year 2008.  The Act, *inter alia*, (1)

17  extends the period for which returning combat veterans are made eligible for free medical care

18  under 38 U.S.C. §§ 1710(e)(1)(D), (e)(3)(C), to five years, see H.R. 4986 § 1707; (2) requires

19  reports on administrative separations of members of the Armed Forces due to personality

20  disorder, id. § 597; (3) creates, for purposes of health benefits eligibility, a presumption that

21  mental illness is service-connected where a veteran of the Persian Gulf War developed the

22  mental illness within two years of discharge or release from active military service, id. § 1708(a);

23  and (4)  provides for comprehensive planning, research, and a pilot program to assist veterans

24  and others with traumatic brain injury, id. §§ 1702, 1704, 1705.

25  **II.    Factual Background: VA's Extensive Activities To Provide Mental Health Care To**
    **Veterans**

26

27        In 2004, the Veterans Health Administration ("VHA") developed a Comprehensive

28  Mental Health Strategic Plan to expand and improve mental health services.  See Declaration of

1  Antonette Zeiss, filed herewith as Exhibit 1, ¶ 5.  As part of that plan, and not subject to any

2  Congressional direction in an appropriations act, VA allocated money from lump-sum

3  appropriations through the agency's Mental Health Initiative to be spent to improve the quality

4  and capacity of VHA mental health services.  Id.; Declaration of W. Paul Kearns III, filed

5  herewith as Exhibit 2, ¶ 8.

6        VA provides inpatient and/or outpatient mental health services in all 153 of its medical

7  centers across the country.  Zeiss Decl. ¶ 7.  Each medical center's Emergency Department is

8  directed to have mental health staff available at all times, 24 hours a day, to provide urgent care.

9  Id.  VA's mental health staff includes full and part time psychiatrists and psychologists as well as

10 VA social workers, mental health nurses, counselors, rehabilitation specialists, and other

11 clinicians who work to provide a full continuum of mental health services to veterans.  Id. ¶ 8.

12 VA has hired 3,784 new mental health professionals in the last two and a half years, bringing the

13 total number of mental health professionals within VA to just under 17,000    well above the

14 staffing level in fiscal year 2000.  Id.  VA undertook this massive hiring effort with funds

15 allocated internally by VA from its lump-sum appropriations to carry out the Mental Health

16 Strategic Plan.  Id.  This hiring effort continues.  Id.

17       Each VA medical center is staffed with at least one specialist in PTSD, and veterans are

18 routinely screened for PTSD at primary care clinics.  Id. ¶ 9.  VA has also expanded mental

19 health services in its community based outpatient clinics, including by staffing those clinics with

20 more mental health professionals.  Id. ¶ 10.  Although it is not feasible to staff full-time mental

21 health professionals at every clinic since the demand for such services is sometimes too low, VA

22 works to ensure that all veterans have access to needed mental health care by, for example,

23 providing mental health professionals who travel among different clinics to provide care.  Id.

24 VA has also been expanding its use of telemental health: through streaming video, specialized

25 mental health providers offer diagnoses and therapy to veterans in remote locations.  Id.  This

26 reduces the travel burden on veterans in rural areas.  Id.

27       In June 2007, VHA adopted a policy that veterans who request or are referred for mental

28 health services at a medical center or outpatient clinic are to be given a mental health triage

1   evaluation within 24 hours.  Id. ¶ 11 and Exhibit A thereto.  If the veteran is determined to have

2   an urgent need for care, such as a risk for suicide, he is to be treated immediately; otherwise, he

3   is to be given a follow-up appointment within 14 days for a full diagnostic and

4   treatment-planning evaluation, as well as initiation of treatment, if appropriate.  Id. ¶ 11.  Even

5   before VA implemented this 14-day policy, the number of veterans waiting for appointments was

6   on the decline.  Id. ¶ 12.  The number of veterans who are not able to be scheduled for an

7   outpatient mental health appointment within 30 days has steadily declined over the last year, and

8   is now less than 5% among OEF/OIF veterans seeking treatment at VA.  Id.

9       The population of veterans who receive care from VA have more suicide risk factors than

10  the general population, and so suicide prevention is a major priority for VHA.  Id. ¶ 19.  Every

11  VA medical center has on staff a a Suicide Prevention Coordinator to raise awareness of the risk

12  of suicide, coordinate the medical center's response, and train other staff.  Id. ¶ 20.  In 2007, VA

13  held its first annual Suicide Prevention Day to emphasize that suicide risk among veterans is a

14  concern for everyone at the agency, not only its mental health professionals.  Id.

15      In July 2007, VA established a toll-free Suicide Hotline staffed by trained clinicians to

16  provide emergency assistance to veterans urgently in need of mental health intervention and their

17  families.  Id. ¶ 21.  Since July 2007, VA has successfully intervened in a number of crisis

18  situations, sometimes by talking a veteran into coming into a medical center to meet the Suicide

19  Prevention Coordinator, other times by alerting emergency personnel.  Id.  Since July, there have

20  been more than 8,000 calls to the Suicide Hotline from veterans or family members, more than

21  1,500 referrals to Suicide Prevention Coordinators, and more than 380 rescues.  Id.

**ARGUMENT**

22

23  **I.    Standard of Review**

24      The primary purpose of a preliminary injunction is to preserve the status quo pending a

25  trial on the merits.  Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d

26  1197, 1200 (9th Cir. 1980).  In evaluating plaintiff's request for injunctive relief, this Court must

27  determine whether plaintiff has shown either (1) a combination of probable success on the merits

28  and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of

1  hardships tips in its favor.  See Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d

2  914, 917 (9th Cir. 2003) (en banc).  Plaintiffs fail to satisfy these standards under any formulation.

3  **II.    Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims.**

4        **A.    Plaintiffs' Statutory Claims Lack Merit.**

5        Plaintiffs allege that the VA violated the Administrative Procedure Act, 5 U.S.C.

6  § 706(1), which makes actionable an agency's failure to take action required by law.  Their claim

7  that VA is not meeting statutory requirements to provide certain care fails because it relies on

8  selective citations taken out of context to justify a plainly erroneous interpretation of

9  Congressional intent.

10        As an initial matter, plaintiffs cannot seek emergency relief under § 706(1) because they

11  have not sought relief under that provision anywhere in their lengthy Complaint.  See generally

12  Compl.  Even if plaintiffs were to amend their pleading to include a § 706(1) claim, they cannot

13  establish likelihood of success on such a claim as described in their pending motion for

14  preliminary injunction.  Section 706(1) provides for review similar to that of a claim for

15  mandamus relief.  See Independence Mining Co. v. Babbitt, 105 F.3d 502, 506-507 (9th Cir.

16  1997).[3]  Under the Mandamus Act or the APA, mandamus relief may be granted only when (1)

17  the plaintiff's claim is clear and certain; (2) the duty is "ministerial and so plainly prescribed as

18  to be free from doubt;" and (3) no other adequate remedy is available.  See Oregon Natural

19  Resources Council v. Harrell, 52 F.3d 1499, 1508 (9th Cir. 1995) ("ONRC").  Thus, as the

20  Supreme Court has held, "a claim under § 706(1) can proceed only where a plaintiff asserts that

21  an agency failed to take a *discrete* agency action that it is *required* to take."  Norton v. Southern

22  Utah Wilderness Alliance ("SUWA"), 542 U.S. 55, 64 (2004) (emphasis in original).  Plaintiffs

23  cannot clear either hurdle of the SUWA test.

24

25

26  _____

27      [3]    See also Japan Whaling Ass'n v. American Cetacean Soc., 478 U.S. 221, 230 n.4
(1986) (a claim for mandamus under 28 U.S.C. § 1361 is "in essence" a claim for relief under 5
28  U.S.C. § 706).

1          **1.    Plaintiffs' Section 706(1) Mandamus Claim Should Be Rejected**
           **Because The Agency Action In Question Is Committed To The**
2          **Secretary's Broad Discretion.**

3          Plaintiffs claim that "Congress requires the Secretary of the VA to" take certain actions is

4    based on misleadingly incomplete citations that seek to obscure the Secretary's significant

5    discretion in carrying out his responsibilities and the narrow limitations on those responsibilities.

6    Plaintiffs rely on 38 U.S.C. § 1710(a)(1), which states that "[t]he Secretary *(subject to paragraph*

7    *(4))* shall furnish hospital care and medical services *which the Secretary determines to be*

8    *needed*" to certain veterans with service-connected disabilities.  (Emphasis added; italicized

9    portion omitted in plaintiffs' quotation at Pl. Mem. 8:5).  The reference (omitted by plaintiffs) to

10   "paragraph (4)" refers to 38 U.S.C. § 1710(a)(4) in which Congress expressly provided that

11   "[t]he requirement in [§ 1710] paragraphs [a](1) and (2) that the Secretary furnish hospital care

12   and medical services . . . shall be effective in any fiscal year only to the extent and in the amount

13   provided in advance in appropriations Acts for such purposes."  Thus, as the Federal Circuit has

14   explained, the statute relied upon by plaintiffs "specifically and substantially limits VA's

15   obligation to provide care.  The scope of VA's mandate reaches only 'to the extent and in the

16   amount provided in advance in appropriations Acts for these purposes' [and] *creates no such*

17   *expectation [that veterans are entitled to care]*."  See H. REP. NO. 104-690 (1996), quoted in

18   Eastern Paralyzed Veterans Ass'n, Inc. v. Secretary of Veterans Affairs, 257 F.3d 1352, 1362

19   (Fed. Cir. 2001) (bracketing in E. Paralyzed Vets' Ass'n.; emphasis supplied).  As defendants

20   explain below, plaintiffs have not identified a single appropriations act that they allege the

21   Secretary has violated.

22         Plaintiffs also rely on 38 U.S.C. § 1701(a)(2), which includes the same delegation of

23   discretion to the Secretary (although, again, plaintiffs omit the pertinent language).  See Pl. Mem.

24   8:6.  That provision directs the Secretary to furnish care that *he determines* to be needed, *subject*

25   *to* appropriations limitations, to certain other categories of veterans. 38 U.S.C. § 1710(a)(2).  In

26   1998, Congress amended the statute with § 1710(e)(1)(D), identified by plaintiffs as "the two-

27   year statute," to make eligible for care under § 1710(a)(2) veterans who served in combat during

28   a period of hostilities after November 11, 1998.  Such veterans were made eligible for care of any

1   illness under § 1710(a)(2)(F) without regard to the service-connection of the illness, <u>see</u>

2   § 1710(e)(1)(D), for two years beginning on the date of their military discharge, <u>id.</u>

3   § 1710(e)(3)(C) (recently extended to five years, <u>see</u> H.R. 4986, 110th Congress, § 1707, enacted

4   January 28, 2008). Thus, because the two-year statute merely makes certain veterans eligible for

5   care under § 1710(a)(2), the Secretary's wide discretion under that provision governs plaintiffs'

6   claim under § 1710(e)(1)(D), as well. <u>Cf. Gade v. National Solid Wastes Mgmt. Ass'n</u>, 505

7   U.S. 88, 97 (1992) (statutory construction must account for the "structure" of the statute); <u>Adams</u>

8   <u>Fruit Co. v. Barrett</u>, 494 U.S. 638, 645 (1990) (courts must "giv[e] effect to the meaning *and*

9   *placement* of the words chosen by Congress" (emphasis supplied)).[4]

10

_____

11       [4]     For this reason, as discussed further <u>infra</u>, defendants respectfully submit that the

12   Court was mistaken in finding that "§ 1710(a)(4) does in fact create a property interest protected
     by the Due Process Clause" and that there is "no indication" to the contrary. Order Granting in

13   Part and Denying in Part Defendants' Motion to Dismiss at 36, 37. Indeed, the legislative history
     of § 1710(e)(1)(D) establishes legislative intent to authorize, but *not require*, medical care for

14   veterans within two years of separation after serving in an armed conflict. <u>See</u> H. REP. 105-833,
     "Activities of the Committee on Veterans Affairs for the 105th Congress" (December 9, 1998), at

15   26 (explaining that the House bill that led to enactment of § 1710(e)(1)(D), the "two-year
     statute," did not mandate VA provide any particular medical care but "[e]stablishe[d] authority"

16   for VA to provide health care to veterans of future conflicts within two years after their
     separation from service; also explaining, in contrast, that other sections of the bill "[r]equire[d]

17   VA" to take certain actions such as, *e.g.*, establish a public advisory committee). <u>See also</u> 144
     Cong. Rec. 10374, 10390 (Statement of Rep. Evans) ("This bill gives VA the tools to apply these

18   lessons learned by *allowing* VA to treat veterans from a theater of combat for two years
     post-discharge); <u>id.</u> 10390-91 (summary of the bill by Rep. Evans, then-ranking Democratic

19   member of the House Veterans Affairs Committee, stating the pertinent section would

20   "*[e]stablish authority* for VA to provide priority health care to treat illnesses that may be
     attributable to a veteran's service in combat during any period of war after the Persian Gulf War

21   or during any other future period of hostilities . . ."); <u>id.</u> 10394 (statement of Rep. Stearns) ("This
     bill would . . . *authorize* VA, in advance, to treat veterans of future combat situations for

22   illnesses which first manifest themselves within two years after service."); <u>id.</u> 10395 (statement
     of Rep. Jackson-Lee) ("This is a good bill that *allows* for treatment of these individuals for at

23   least a 2-year period . . ."); 144 Cong Rec S12918, S12933 (statement of Sen. Rockefeller)
     (explaining the legislation "extends VA's current *authority* to provide treatment for veterans of

24   future conflicts."). (Emphases added.) <u>Cf. Thongsamouth v. Schweiker</u>, 711 F.2d 465, 466 (1st
     Cir. 1983) (upholding limitation on medical benefits where it was "clear from the language of the

25   Act as well as its legislative history that Congress intended to grant the Secretary discretionary
     authority to administer the various programs under the Act, and that, for budgetary and other

26   reasons, the authority be broad and flexible").

27

28

1     By providing that the VA provide under these statutes only medical care *that the*

2 *Secretary determines is needed,* Congress committed the matter to the agency's discretion by law

3 (and, therefore, foreclosed the judicial review plaintiffs seek under the APA, <u>see</u> 5 U.S.C.

4 § 701(a)(2)). Agency action is committed to the agency's discretion by law when "the statute is

5 drawn so that a court would have no meaningful standard against which to judge the agency's

6 exercise of discretion." <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1984). "If no judicially

7 manageable standard exists by which to judge the agency's action, meaningful judicial review is

8 impossible and the courts are without jurisdiction to review that action." <u>Steenholdt v. FAA</u>, 314

9 F.3d 633, 638 (D.C. Cir. 2003) (internal quotation omitted); <u>see also</u> <u>Helgeson v. Bureau of</u>

10 <u>Indian Affairs</u>, 153 F.3d 1000, 1003 (9th Cir. 1998).

11     There are no meaningful standards by which a court could review the appropriateness of

12 the Secretary's determination, in his discretion, of what care is needed. Accordingly, courts have

13 interpreted language similar to that included in 38 U.S.C. § 1710(a) as granting discretion to

14 agencies sufficient to preclude judicial review under the APA. <u>See</u>, <u>e.g.</u>, <u>Legal Services of</u>

15 <u>Northern California, Inc. v. Arnett</u>, 114 F. 3d 135, 140 (9th Cir. 1997) (noting that the statute's

16 terms that legal services be provided to senior citizens "to the maximum extent feasible" in

17 accord with their need left the court "ill-equipped" to determine how that could be

18 accomplished); <u>Rank v. Nimmo</u>, 677 F.2d 692, 699-700 (9th Cir. 1982) (statute providing the

19 administrator take action "at [his] option" unreviewable because it vested the "widest discretion

20 possible" in the administrator); <u>Steenholdt v. FAA</u>, 314 F.3d 633, 638 (D.C. Cir. 2003)

21 (regulation that authorizes an agency official to take an action for any reason the official

22 "considers appropriate" leaves Court with "no law to apply"). <u>See also</u> <u>Lincoln v. Vigil</u>, 508

23 U.S. 182, 192-94 (1993) (holding that agency's decision to pursue a statutory goal through a

24 particular children's health care program was committed to agency discretion by law).

25     Indeed, the determination of how to best meet the Secretary's critical statutory outreach

26 goals involves precisely the sort of analysis that the Supreme Court and the APA have left

27 committed to agency discretion:

28

a complex balancing of a number of factors which are peculiarly within [the agency's] expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all. . . . [T]he agency is far better equipped than the courts to deal with the many variables involved[.]

Lincoln, 508 U.S. 182, 193 (internal quotations, citations omitted), quoting Chaney, 470 U.S. at 831-32. After this complex policy analysis, the Secretary has determined how to best meet his statutory obligation to provide to veterans health care that he determines is needed.

Nor are there standards by which this Court could judge the level of mental health funding chosen by the Secretary. When, as here, funds are allocated from a lump-sum appropriation, see Kearns Decl. ¶ 8, that allocation is committed to agency discretion. Lincoln, 508 U.S. 182, 192. "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." Id.; see also International Union, United Autoworkers v. Donovan, 746 F.2d 855, 861 (D.C. Cir. 1984) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."), cert. denied, 474 U.S. 825 (1985).

To evade this clear rule of law, plaintiffs make the wholly unsupported claim that "VA is not spending the money that Congress has appropriated *specifically* to address veterans/ mental health care needs." Pl. Mem. 3:18-19; see also, e.g., id. 12-13. Indeed, plaintiffs entire request for emergency relief rests on this misstatement of law: plaintiffs "simply ask the Court to enjoin defendants from refusing to spend money allocated by Congress." Id. 4 n.2. In fact, plaintiffs do not point to a single such "allocation" or appropriations act of Congress alleged to be violated. Rather, plaintiffs rely solely on a Government Accountability Office ("GAO") report. See, e.g., id. 12-13 (citing GAO-07-66, "VA Health Care: Spending for Mental Health Strategic Plan Initiatives Was Substantially Less Than Planned" (November 2006),[5] a document entirely

---

[5]    Defendants do not object to plaintiffs' request that the Court take judicial notice of the GAO report, although the Court should not, of course, accept plaintiffs' inaccurate characterization of the report's contents. By the same token, defendants do not object to judicial notice that certain purported facts have been *reported* in the media (although defendants do not

1  unrelated to the *legislative* appropriations process.  As indicated in its title, the GAO report

2  tracked spending under the VA's own discretionary Mental Health Strategic Plan ("MHSP")

3  initiatives.  The Declaration of W. Paul Kearns III, the Chief Financial Officer of the Veterans

4  Health Administration, establishes that "[t]his money . . . was *not* part of a specific appropriation

5  by Congress to VA for mental health care. . . . This money was and is allocated internally at

6  VA's discretion out of VHA's three lump-sum appropriations for spending on the Mental Health

7  Initiative in support of the MHSP."  Kearns Decl. ¶ 8.  To the extent Congress has directed VA to

8  meet certain mental health spending targets, VA is in compliance.  See id. ¶¶ 10-12.

9      Equally fatal to the request for preliminary relief is the fact that plaintiffs have proffered

10  data that is out-of-date and which cannot justify injunctive relief for the future.  Plaintiffs do not

11  rely on funding levels in the current fiscal year; instead, they rely on a GAO report concerning

12  the VA's discretionary spending on MHSP initiatives more than three years ago, in fiscal years

13  2004 and 2005.  During the last fiscal year, 2007, VA *exceeded* its planned spending on these

14  discretionary initiatives.  Id. ¶ 7.  This deficiency, alone, requires denial of emergency relief.

15      Lacking relevant evidence, plaintiffs spend a great deal of effort to establish that

16  providing mental health care to veterans is a matter of great import, and the Secretary certainly

17  does not disagree.  But the importance of plaintiffs' particular goals, when viewed in a vacuum,

18  is irrelevant.  As the D.C. Circuit held in a case concerning FDA's review of generic drugs:

19      [T]he impact of the FDA's sluggish pace on the public health is effectively irrelevant in
       light of our analysis of . . . the effect of relief on competing agency priorities.  Assuming
20      constant resources for the . . . program, a judicial order putting [plaintiff] at the head of
       the queue simply moves all others back one space and produces no net gain.  Agency
21      officials not working on [plaintiffs'] matters presumably have not just been twiddling
       their thumbs.  Perhaps Congress should earmark more funds specifically to the generic
22      drug program, but that is a problem for the political branches to work out.

23  In re Barr Laboratories, Inc., 930 F.2d 72, 75 (D.C. Cir. 1991) (internal punctuation, citation

24  omitted); see also KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW

25  TREATISE § 12.3, at 225 (3d ed.1994) (cautioning that mandamus in § 706(1) actions may

26  _____

27  concede their relevance or accuracy), but they do object to judicial notice or consideration of the
   unverified opinions and characterization contained therein.  The same caveat applies to the
28  House of Representatives Democratic staff report submitted by plaintiffs.  FED. R. EVID. 201(b).

1  improperly "confer on the private parties who are potential petitioners the discretion to determine

2  the agency's priorities and its allocation of resources . . .").

3      There is, accordingly, no basis for an injunction requiring VA to spend money in the

4  manner contemplated by plaintiffs.  See Board of Trade of City of Chicago v. S.E.C., 883 F.2d

5  525, 531 (7th Cir. 1989) ("Judges could make allocative decisions only by taking over the job of

6  planning the agency's entire agenda, something neither authorized by statute nor part of their

7  constitutional role.").  Indeed, since plaintiffs have identified no actual appropriations acts that

8  even they contend VA is violating, any such injunction would itself violate the Appropriations

9  Clause of the Constitution.  See U.S. CONST. Art. I, § 9, Cl. 7 ("No Money shall be drawn from

10  the Treasury, but in Consequence of Appropriations made by Law. . ."); OPM v. Richmond, 496

11  U.S. 414, 424 (1990) (construing Appropriations Clause).

12      Judicial intervention under § 706(1) is warranted only "'[w]hen agency recalcitrance is in

13  the face of clear statutory duty or is of such a magnitude that it amounts to an abdication of

14  statutory responsibility.'"  ONRC, 150 F.3d at 1137 (citations omitted).  Plaintiff has identified

15  no such clear and unmistakable duty, and so this Court should decline plaintiffs' invitation to

16  invade the Secretary's congressionally-vested discretion by micromanaging either the health care

17  that he determines to be needed by veterans or his allocation of resources.  Cf. 5 U.S.C.

18  § 701(a)(2) (no APA review of actions "committed to agency discretion by law")

19         **2.      Plaintiffs' Section 706(1) Mandamus Claim Should Be Rejected
               Because The "Actions" In Question Are Not Discrete But, Rather,**
20         **Programmatic In Nature.**

21      As the Supreme Court has held, plaintiffs simply "cannot seek *wholesale* improvement of

22  this program by court decree, rather than in the offices of the Department or the halls of

23  Congress, where programmatic improvements are normally made.  Under the terms of the APA,

24  respondent must direct its attack against some particular 'agency action' that causes it harm."

25  SUWA, 542 U.S. at 64, quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 891 (1990)

26  (emphasis in original).  Therefore, as noted supra, any action plaintiffs seek to compel under the

27  APA mandamus provision must be a *discrete* action.  Id. at 62.

28

Plaintiffs have not identified a discrete action they wish to compel. Rather, they ask this Court to issue a broad order enjoining the Secretary from, in their words:

> 1.      Failing or refusing to treat any veteran seeking medical care within two years of discharge from service to the full extent of Congressional appropriations, as required by 38 C.F.R. § 17.36(b)(6) (the "Two-Year Statute" [*sic*]); [and]

> 2.      Failing or refusing to provide immediate screening and mental health care to any veteran who is eligible for medical care under the Two-Year Statute or is otherwise eligible for VA medical care and seeks medical treatment at any VA facility and who self-reports suicidal intentions or where a VA physician or other medical professional concludes that the veteran has a significant risk of suicide.

<u>See</u> Plaintiffs' Proposed Order on Motion for Preliminary Injunction (Docket Entry No. 70) at 2. Referring to "any veteran" does not refer to a *discrete* action; it arguably refers to a collection of dozens, hundreds or thousands of such actions, but plaintiff cannot succeed on the merits of such a cluster of claims in this Court, either. The flaw of plaintiffs' APA mandamus claim is drawn into stark relief upon consideration of how this Court would seek to enforce the order plaintiffs request. As noted <u>supra</u>, just prior to the filing of the Complaint in this action, it became VA policy to provide the immediate mental health screening that plaintiffs seek. To find the agency out of compliance would require this Court to do what Congress has forbidden and, indeed, what this Court has held it cannot and will not do: "this Court will not be forced to comb through the adjudication process of individual claims in search of some constitutional violation that causes delays." <u>See</u> Opinion Granting in Part and Denying in Part Defendants' Motion to Dismiss (Docket Entry No. 93) at 24; <u>cf. id.</u> at 28 (holding plaintiffs cannot bring an as-applied challenge to veterans' benefits legislation in this Court); <u>see also</u> 38 U.S.C. § 511(a); <u>Zuspann v. Brown</u>, 864 F. Supp. 17, 22 (W.D. Tex. 1994) (such claims involve "the very type of case[s] that would enmesh the courts in expensive, time-consuming litigation (involving a battle of experts) that § 511's judicial bar was constructed to avoid."), <u>aff'd</u>, 60 F.3d 1156 (5th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1111 (1996).

## B.    Plaintiffs' Due Process Claim Lacks Merit.

Plaintiffs also appear to rest their motion for preliminary injunction on a claim that the VA is violating unnamed veterans' due process rights because "there are essentially *no* available procedures for veterans to seek relief from denial of medical care." Pl. Mem. 1:22-23. Plaintiffs

1   are unlikely to succeed on the merits of such a claim both because plaintiffs have not identified a

2   property interest that is protected by constitutional due process and because, regardless, the

3   agency's procedures in place would satisfy due process protections if they applied.

4           **1.    Plaintiffs Have Not Established That They Have A Constitutional Due Process-Protected Property Interest In Health Care Benefits.**

5         "The first inquiry in every due process challenge is whether the plaintiff has been

6   deprived of a protected interest in 'property' or 'liberty.'  Only after finding the deprivation of a

7   protected interest do we look to see if the [government]'s procedures comport with due process."

8   American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999) (citations omitted).  "[T]he

9   range of interests protected by procedural due process is not infinite."  Board of Regents of State

10  Colleges v. Roth, 408 U.S. 564, 570 (1972).  To establish a property interest, plaintiffs must

11  demonstrate "a legitimate claim of entitlement," rather than a mere "abstract need or desire," or a

12  "unilateral expectation." Id., 408 U.S. at 577.  A legitimate claim of entitlement to a property

13  interest comes not from the Constitution, but from "existing rules or understandings that stem

14  from an independent source such as state law    rules or understandings that secure certain

15  benefits and that support claims of entitlement to those benefits." Roth, 408 U.S. at 577.  Thus,

16  due process protections are not triggered unless a plaintiff can demonstrate a claim of

17  entitlement.  Plaintiffs cannot do so here.

18        In their attempt to demonstrate entitlement, plaintiffs rely exclusively on a VA medical

19  care statute enacted under the Veterans Health Care Eligibility Reform Act of 1996, 38 U.S.C.

20  § 1710(a), and related provisions of law that make veterans eligible for care under § 1710(a) (see,

21  e.g., § 1710(e)(1)(D)) or that describes the care available under § 1710(a) (see, e.g.,

22  § 1706(b)(1)).  Section 1710(a) plainly and explicitly does not provide for an entitlement to any

23  particular medical care as plaintiffs argue, however, nor was it intended to    it provides for

24  veterans' *eligibility* for medical care, but it does not create an entitlement to any particular

25  medical service.  See E. Paralyzed Veterans, 257 F.3d at 1362.  The Secretary is vested with wide

26  discretion to determine when care is necessary, see 38 U.S.C. § 1710(a), and how best to allocate

27  funds in service of the agency's statutory mandates, see id. § 1710(a)(4); Lincoln, 508 U.S. at

1  192 ("the very point of a lump-sum appropriation is to give an agency the capacity to adapt to

2  changing circumstances and meet its statutory responsibilities in what it sees as the most

3  effective or desirable way.").  Thus, VA provision of particular health benefits "depends on an

4  affirmative act of discretion by the granting official."  See Dorfmont v. Brown, 913 F.2d 1399,

5  1403 (9th Cir. 1990), cert. denied, 499 U.S. 905 (1991).  Accordingly, § 1710 creates no property

6  interest protected by the Due Process Clause.  See Town of Castle Rock v. Gonzales, 545 U.S.

7  748, 756 (2005) ("a benefit is not a protected entitlement if government officials may grant or

8  deny it in their discretion."); Roth, 408 U.S. at 577.  See also supra note 4 (legislative history

9  establishes that Congress did not intend to create any entitlement to particular medical care in

10  § 1710(e)(1)(D)).

11      The Ninth Circuit's holding in Devine v. Cleland, 616 F.2d 1080 (9th Cir. 1980), relied

12  upon by plaintiffs (Pl. Mem. 11:2-3), is not to the contrary.  In Devine, veterans challenged

13  termination of their educational benefits, which were provided under a statutory scheme not at

14  issue here.  The Court of Appeals held that the plaintiffs, "if 'eligible veterans' as defined by [the

15  veterans' educational benefit statute], and if enrolled and taking the prescribed units of approved

16  courses at an educational institution meeting the requirements of [the statute], ha[ve] a statutory

17  entitlement to receipt of an educational assistance allowance."  Id. at 1086.  Thus, the Devine

18  plaintiffs had to meet the statutory requirements before they were vested with a protected

19  property interest.  The plaintiffs' "property interest in this case, however, is fundamentally

20  different."  American Mfrs. Mut. Ins. Co., 526 U.S. at 60.  Under § 1710, eligible veterans are to

21  be provided with only that medical care which the Secretary determines is needed, and only to

22  the extent funds (which the Secretary has discretion to allocate from lump-sum appropriations)

23  are available.  This statute, as Congress intended, thus provides no expectation of or property

24  interest in particular medical care.  See E. Paralyzed Veterans' Ass'n., 257 F.3d at 1362

25  (construing § 1710(a) and quoting H. REP. NO. 104-690).

26      **2.      Even If Plaintiffs Had A Constitutionally Protected Property Interest
           In Particular Medical Treatment, The Agency Provides Adequate Due
27         Process Protections.**

28      Plaintiffs have not placed at issue the agency's formal appeal process for veterans who

1  may challenge their eligibility for care; rather, they argue there are *no* procedures in place for any

2  indisputably-eligible veterans to challenge VA medical professionals' decisions on what care is

3  *appropriate*.  Plaintiffs are mistaken and, indeed, the available procedures provide adequate and

4  appropriate due process.

5  "[D]ue process is flexible and calls for such procedural protections as the particular

6  situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  To determine the

7  procedural safeguards that are required in a particular circumstance, courts consider three factors:

8  First, the private interest that will be affected by the official action; second, the risk of an
   erroneous deprivation of such interest through the procedures used, and the probable
9  value, if any, of additional or substitute procedural safeguards; and finally, the
   Government's interest, including the function involved and the fiscal and administrative
10 burdens that the additional or substitute procedural requirement would entail.

11 Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  Even assuming *arguendo* the Mathews test

12 applies, plaintiffs "bear the burden of making 'the very difficult factual showing necessary' to

13 invalidate administrative procedures on the basis of the [Mathews] three-prong test." See Luckett

14 v. Jett, 966 F.2d 209, 215 (6th Cir. 1992) (quoting Walters v. National Ass'n of Radiation

15 Survivors, 473 U.S. 305, 330 (1985)), cert. denied, 507 U.S. 922 (1993).

16 Turning to the first Mathews prong, the interest of plaintiffs' members that will be

17 affected by the agency's action is their claimed right to receive particular healthcare services

18 from VA above those that the Secretary determines to be needed under the statute, 38 U.S.C.

19 § 1710(a).  For many veterans, eligibility for health care services is not based upon any financial

20 need determination.  38 U.S.C. § 1705.  In addition, the type of care provided by VA is available

21 through other public or private providers.  See Mathews, 424 U.S. at 341 (the "degree of

22 potential deprivation that may be created by a particular decision is a factor to be considered in

23 assessing the validity of any administrative decisionmaking process.").  Moreover, legislative

24 history indicates that Congress did not intend to create any entitlement to these health services

25 and expressly limited the provision of services to the amounts available in appropriations.  38

26 U.S.C. § 1710; H. REP. NO. 104-690, at 4 (1996) (Congress crafted § 1710 to ensure that

27 "medical judgment rather than legal criteria will determine when care will be provided and the

28 level at which care will be furnished."); E. Paralyzed Veterans' Ass'n., 257 F.3d at 1362, quoting

1  H. REP. NO. 104-690 (1996) (§ 1710(a) "specifically and substantially limits VA's obligation to

2  provide care. The scope of VA's mandate reaches only 'to the extent and in the amount provided

3  in advance in appropriations Acts for these purposes' [and] creates no such expectation [that

4  veterans are entitled to care]."); supra note 4. Cf. 38 C.F.R. § 17.38 (regulation providing that

5  care is to be provided to veterans only if medical professionals determine it to be appropriate).

6        Turning to the second Mathews factor, the risk of erroneous deprivation of this interest is

7  low. Mathews, 424 U.S. at 343-44 (recognizing " 'the reliability and probative worth of written

8  medical reports,' " [and] emphasizing that while there may be "professional disagreement with

9  the medical conclusions" the "specter of questionable credibility and veracity is not present' ")

10  (citing Richardson v. Perales, 402 U.S. 389, 405 (1971)). An eligible[6] veteran who disagrees

11  with a clinical decision can pursue the matter, first, by taking the dispute to his treatment team of

12  medical professionals. See Declaration of Tony A. Guagliardo, filed herewith as Exhibit 3,

13  ¶¶ 10-11. If they are unable to resolve the dispute, the VA facility director would make the final

14  decision for the facility, with written notice to the veteran. Id. ¶¶ 11-12.

15        Once a veteran is given written notice of a facility director's decision about a clinical
       dispute, the veteran has the option of appealing the decision to Director of the Veterans
16       Integrated Service Network (VISN) that oversees the facility. The facility director must
       notify the veteran of this option in writing. A uniform clinical appeals process at the
17       VISN level was initiated in 2001 as a means of standardizing the handling of clinical
       disputes throughout VHA. . . . Based on the advice of the Chief Medical Officer of the
18       VISN and on information obtained from the medical facility and the veteran or the patient
       advocate, the VISN director makes the ultimate decision on a clinical appeal. A VISN
19       Director may request an impartial review of a clinical decision by an external professional
       board to assist in this decision. The VISN Director's final decision must be issued to the
20       veteran within 30 days after initial receipt of the clinical appeal, or within 45 days if
       external review is requested. VISN directors can and should expedite this process when
21       there is an urgent medical need.

22  Id. ¶ 12 (citations to VA directives, filed therewith, omitted). Thus, contrary to plaintiffs'

23  argument, veterans who dispute a clinical decision do have recourse and, indeed, an opportunity

24  to heard at a meaningful time and in a meaningful manner. See Mathews, 424 U.S. at 333.

25  Moreover, a veteran's medical dispute is reviewed by medical professionals, and so the risk of

26

27        [6]        Veterans may appeal eligibility determinations to the Board of Veterans Appeals.
28  See, e.g., 38 C.F.R. §§ 19.29, 19.30, 20.201, 20.202.

1  error in the initial decisionmaking process is low and, accordingly, the potential value of a

2  subsequent evidentiary hearing is low as well. Id. at 344-45. And where, as here, the relevant

3  inquiry turns on medical issues that are "sharply focused and easily documented," as opposed to

4  questions of witness credibility and veracity, special procedures are unnecessary. See Mathews,

5  424 U.S. at 343-45 (holding that pre-termination hearing not required where factual issues in

6  disputes involved conflicting medical diagnoses). While veterans cannot appeal clinical

7  decisions to the BVA, that is the result of a VA regulation, 38 C.F.R. § 20.101(b), and therefore

8  subject to exclusive review in the Federal Circuit, not this Court. See Preminger v. Principi, 422

9  F.3d 815, 821 (9th Cir. 2005); Chinnock v. Turnage, 995 F.2d 889, 893 (9th Cir. 1993).

10  Moreover, the Secretary's considered views of the value and costs of additional procedures is due

11  significant deference in determining what process is due. As the Supreme Court explained in

12  Mathews:

> In assessing what process is due in this case, substantial weight must be given to the
> goodfaith judgments of the individuals charged by Congress with the administration of
> social welfare programs that the procedures they have provided assure fair consideration
> of the entitlement claims of individuals.

13

14

15  424 U.S. at 349. Courts following this admonition have recognized that the Due Process Clause

16  does not empower the judiciary "to establish detailed procedural requirements for agencies and

17  officials administering" public benefits programs. See Anderson v. White, 888 F.2d 985, 994-95

18  (3d Cir. 1989); Day v. Shalala, 23 F.3d 1052, 1064-65 (6th Cir. 1994); see also National Ass'n of

19  Radiation Survivors v. Derwinski, 994 F.2d 583, 591 (9th Cir. 1993) (deference to Congress).

20  Turning to the third Mathews prong, the public has a significant interest in favoring the

21  medical judgments of the Secretary and his designees, VA medical professionals. The care

22  available to veterans from VA is intended to meet the VA's statutory requirement to provide

23  healthcare to eligible veterans that "is determined by appropriate healthcare professionals to be

24  needed to promote, preserve, or restore the health of the individual and to be in accord with

25  generally accepted standards of medical practice." Id.; 38 C.F.R. § 17.38; see 38 U.S.C.

26  § 1710(a) (VA is authorized to provide "hospital care and medical services . . . which the

27  Secretary determines to be needed"). And, as required by 38 U.S.C. § 1706, VA fully provides

28

1    for the specialized treatment of veterans with, inter alia, mental illness.  Indeed, by regulation VA

2    has specifically listed a wide-range of treatments which are available to veterans.  For example,

3    the "medical benefits package" includes outpatient and inpatient medical, surgical, and mental

4    health care; prescription drugs; prosthetic and orthotic devices; home health services; respite

5    care; preventive care; and comprehensive rehabilitative services.  38 C.F.R. § 17.38.  The very

6    purpose of the underlying congressional Act would be undermined if veterans were entitled to

7    extensive process on the type of care they receive.  VHCERA was enacted in order to aid VA in

8    managing its provision of hospital and outpatient care and in responding to fiscal shortfalls.  See

9    38 U.S.C. §§ 1705, 1706.  The VA's ability to do so would be severely compromised if its

10   professionals were to be second-guessed at every turn.[7]

11        Furthermore, the fiscal and administrative costs associated with such additional

12   procedures would be unduly burdensome.  The most visible burden would be the incremental

13   cost resulting from the increased number of review procedures at the expense of providing

14   benefits.  See Mathews, 424 U.S. at 347 (recognizing that "constitutionalizing of government

15   procedures suggests that the ultimate additional cost in terms of money and administrative

16   burden would not be insubstantial").

17        For all of these reasons, plaintiffs are not likely to establish that the VA is violating their

18   due process rights under Mathews even assuming arguendo that the Mathews protections apply.

19   **III.    Plaintiffs Have Not Established They Will Suffer Irreparable Harm In The Absence**
     **Of A Preliminary Injunction.**

20        Plaintiffs' claim of irreparable harm rests on a straw man argument.  They argue that

21

22   ──────────────

23        [7]     Legislative history makes it clear that the enrollment system Congress developed
     is similar to systems that were already in place at many VA facilities that did not guarantee the

24   provision of care. The House Report provides:

25        As currently instituted at many VA facilities, an enrollment system does not involve a
          contractual relationship between the VA and the enrollee or otherwise guarantee the

26        enrollee that the VA will necessarily deliver all needed care.  Enrollment, however, would
          help the VA plan more effectively, so that facilities can better calculate and dedicate the

27        resources needed to provide the care its enrollees require.

28   H.R. REP. NO. 690, 104th Cong., 2d Sess. (1996) (1996 WL 413388 Leg. Hist.).

1  death is irreparable harm; defendants certainly do not argue otherwise.  The relevant question,

2  however, is not whether death is irreparable but whether plaintiffs will suffer "irreparable harm

3  *in the absence of the requested preliminary injunction*[.]"  Taylor v. Westly, 488 F.3d 1197, 1202

4  (9th Cir. 2007) (emphasis added).  Plaintiffs have adduced nothing to show that the injunction

5  they seek is needed or that it would prevent irreparable harm to anyone.

6      As an initial matter, while plaintiffs' claims of imminent irreparable harm may suit their

7  litigation strategy, their actions belie the urgency they claim.  Plaintiffs' allegations concerning

8  defendants' allegedly improper spending are based on a 2006 GAO report that, itself, discussed

9  fiscal years 2004 and 2005.  They filed their Complaint in June 2007, but waited until December

10  to seek extraordinary, emergency relief against defendants.  As the Ninth Circuit noted in Lydo

11  Enterprises, Inc. v. City of Las Vegas, "[a] preliminary injunction is sought upon the theory that

12  there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights

13  a plaintiff demonstrates the lack of need for speedy action[.]"  745 F.2d 1211, 1213 (9th Cir.

14  1984) (quoting Gillette Co. v. Ed Pinaud, Inc., 178 F. Supp. 618, 622 (S.D.N.Y. 1959)).  See also

15  Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc., 762 F.2d 1374, 1377 (9th Cir. 1985)

16  ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and

17  irreparable harm."); Kansas Health Care Association, Inc. v. Kansas Department of Social

18  Services, 31 F.3d 1536, 1543-1544 (10th Cir. 1994) ("delay can undermine claim for irreparable

19  harm"); Quince Orchard Valley Citizens Ass'n v. Hodel, 872 F.2d 75, 79- 80 (4th Cir. 1989)

20  (delay "may . . . indicate an absence of the kind of irreparable harm required to support a

21  preliminary injunction").

22      Moreover, plaintiffs have adduced no cognizable evidence in support of their claim that

23  they will suffer irreparable harm absent an injunction.  Rather, plaintiffs rely on declarations that

24  are, effectively, anonymous; due to plaintiffs' pending Motion for Protective Order (Docket

25  Entry No. 56, see supra note 2), defendants do not know the identities of plaintiffs' fact witnesses

26  and, therefore, cannot properly investigate or dispute their claims.  Regardless, while these

27  anonymous witnesses' declarations include compelling allegations of past occurrences (often

28  based solely on hearsay), they are nonetheless irrelevant to the controlling question:  whether this

1    Court would prevent *future* harm by telling the Secretary how to allocate the agency's resources

2    or how to otherwise exercise the agency's broad and expert discretion.

3         In any event, VA is already taking steps to address veterans' health care and mental health

4    care needs, as provided in the recently-enacted Joshua Omvig Veterans Suicide Prevention Act

5    and otherwise.  As described <u>supra</u> and in the Zeiss Declaration filed herewith, the agency has

6    recently and dramatically increased its mental health staff; increased mental health services

7    available to veterans, both through in-person treatment and via technology to provide "telemental

8    health" to veterans who may have difficulty traveling to service locations; slashed the wait times

9    for veterans who seek mental health and other medical appointments; established a Suicide

10    Prevention Hotline that has resulted in more than 8,000 calls from veterans or their family

11    members, more than 1,500 referrals to Suicide Prevention Coordinators, and more than 380

12    rescues.  Moreover, in the last fiscal year the agency significantly exceeded its planned spending

13    on its Mental Health Initiatives.  Kearns Decl. ¶ 7.

14    **IV.    The Public Interest Favors Denial Of Plaintiffs' Motion.**

15         The broad injunction plaintiffs seek would intrude upon the Secretary's exercise of

16    discretion in matters committed to his decision-making authority such as appropriate health care

17    under 38 U.S.C. § 1710(a) and appropriate allocations from lump-sum appropriations.  These are

18    matters of unusual importance.  "'[T]he public has an interest, particularly in light of current

19    events, in seeing that the [Secretary]'s discretionary decision making . . . is effectuated with

20    minimal judicial interference.'"  <u>Parrish v. Brownlee</u>, 335 F. Supp. 2d 661, 675 (E.D.N.C. 2004)

21    (discussing Army personnel decisions) (quoting <u>Irby v. United States</u>, 245 F. Supp. 2d 792, 798

22    (E.D. Va. 2003) (same)).  Indeed, that is why courts consistently defer to the political branches

23    when considering questions that arise under Congress's Article I authority over national defense

24    and military affairs:[8]  "perhaps in no other area has the Court accorded Congress greater

25

26           [8]    See <u>Johnson v. Robison</u>, 415 U.S. 361, 376 (1974) (concluding that legislation to
27    provide benefits to veterans "is plainly within Congress' Art. I., § 8 powers 'to raise and support
     Armies[]'"); <u>Oregon v. United States</u>, 366 U.S. 643, 648-9 (1961) (Congress' "constitutional
28    powers to raise armies and navies and to conduct wars" includes the power "to pay pensions, and

1    deference." Rostker v. Goldberg, 453 U.S. 64-65 (1981).

2        Plaintiffs' evaluation of the public interest and balance of harms rests entirely on their

3    flawed merits argument: the public interest, they say, is in doing what they want because it would

4    be better for veterans. See Pl. Mem. 19-20. But plaintiffs are wrong on the law, and an

5    injunction would rob the Secretary of the flexibility Congress has seen fit to give him,

6    historically under 38 U.S.C. § 1710 and most recently under the Joshua Omvig Act, which he is

7    in the process of implementing. "It is not for a court to stop an officer . . . from performing his

8    statutory duty for fear he should perform it wrongly." First Nat'l Bank of Albuquerque v.

9    Albright, 208 U.S. 548 (1908); see also Home Loan Bank Bd. v. Mallonee, 196 F.2d 336, 357

10   (9th Cir. 1952) (same). The public interest, here, lies in affording the Secretary the discretion

11   granted him by statute and allowing the political branches to address the problems plaintiffs

12   identify without their interference, however well-intentioned it may be.[9] See Virginian Ry. Co.

13   v. Sys. Fed'n No. 40, 300 U.S. 515 (1937) (statutory policy of Congress "is in itself a declaration

14   of the public interest which should be persuasive" to courts).

15

16

17

18

19

20   to build hospitals and homes for veterans").

21        [9]    To the extent plaintiffs seek a non-specific, "obey-the-law" injunction, that would
22   also be inappropriate. See, e.g., SUWA, 542 U.S. at 66 (courts are not "empowered to enter
     general orders compelling compliance with broad statutory mandates"); SEC v. Wash. Inv.
23   Network, 475 F.3d 392, 407 (D.C. Cir. 2007) (an injunction commanding defendants to comply
     with certain statutes but not commanding or restraining specific acts was not sufficiently specific
24   to satisfy FED. R. CIV. P. 65(d)); Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 (11th Cir. 1996)
25   ("appellate courts will not countenance injunctions that merely require someone to 'obey the
     law'"); Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197, 1226 (C.D.
26   Cal. 2007) ("'blanket injunctions to obey the law are disfavored.'") (quoting Mulcahy v. Cheetah
     Learning LLC, 386 F.3d 849, 852 n. 1 (8th Cir. 2004)); cf. United States v. Bocio, 103 F. Supp 2d
27   531 (N.D.N.Y. 2000) ("A Court order for the Government to comply with an obligation that it is
28   already complying with would be inappropriate.").

1

**CONCLUSION**

2     Accordingly, the Court should deny plaintiffs' Motion for Preliminary Injunction.  A

3 proposed order is attached.

4 Dated: January 30, 2008                    Respectfully Submitted,

5                                            JEFFREY S BUCHOLTZ
                                            Acting Assistant Attorney General
6
                                            JOSEPH P. RUSSIONELLO
7                                            United States Attorney

8                                            RICHARD LEPLEY
                                            Assistant Branch Director
9
                                                __/s/ Steven Y. Bressler__
10                                           DANIEL BENSING D.C. Bar #334268
                                            STEVEN Y. BRESSLER D.C. Bar #482492
11                                           KYLE R. FREENY California Bar #247857
                                            Attorneys, U.S. Department of Justice
12                                           Civil Division, Federal Programs Branch
                                            P.O. Box 883
13                                           Washington, D.C. 20044
                                            (202) 514-5108 (telephone)
14                                           (202) 616-8460 (fax)

15                                           *Attorneys for Defendants*

16

17

18

19

20

21

22

23

24

25

26

27

28