GORDON P. ERSPAMER (CA SBN 83364)
GErspamer@mofo.com
MORRISON & FOERSTER LLP
101 Ygnacio Valley Road, Suite 450
P.O. Box 8130
Walnut Creek, California 94596-8130
Telephone: 925.295.3300
Facsimile: 925.946.9912

SIDNEY M. WOLINSKY (CA SBN 33716)
SWolinsky@dralegal.org
JENNIFER WEISER BEZOZA (CA SBN 247548)
JBezoza@dralegal.org
KATRINA KASEY CORBIT (CA SBN 237931)
KCorbit@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, California 94704-1204
Telephone: 510.665.8644
Facsimile: 510.665.8511

**[see next page for additional counsel for Plaintiffs]**

Attorneys for Plaintiff(s)
VETERANS FOR COMMON SENSE, and
VETERANS UNITED FOR TRUTH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

VETERANS FOR COMMON SENSE, and VETERANS UNITED FOR TRUTH, INC.,

Plaintiffs,

v.

JAMES B. PEAKE, M.D., Secretary of Veterans Affairs, *et al.*,

Defendants.

Case No. C-07-3758-SC

**CLASS ACTION**

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**(Fed. R. Civ. P. 65(a); Civil L.R. 65-2)**

Date: March 7, 2008
Time: 10:00 a.m.
Ctrm: 1, 17th Floor

Complaint Filed July 23, 2007

**ADDITIONAL COUNSEL FOR PLAINTIFFS:**

ARTURO J. GONZALEZ (CA SBN 121490)
AGonzalez@mofo.com
HEATHER A. MOSER (CA SBN 212686)
HMoser@mofo.com
STACEY M. SPRENKEL (CA SBN 241689)
SSprenkel@mofo.com
PAUL J. TAIRA (CA SBN 244427)
PTaira@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

BILL D. JANICKI (CA SBN 215960)
WJanicki@mofo.com
MORRISON & FOERSTER LLP
400 Capitol Mall, Suite 2600
Sacramento, California 95814
Telephone: 916.448.3200
Facsimile: 916.448.3222

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTS ........ 3

ARGUMENT ........ 4

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF BOTH THEIR STATUTORY AND THEIR DUE PROCESS CLAIMS ........ 4

- A. This Court Must Enter Injunctive Relief Where, as Here, the Agency Action Is Unlawfully Withheld or Unreasonably Delayed ........ 4
  - 1. This Court has already held that Plaintiffs properly pled a claim under section 706 ........ 4
  - 2. VA improperly conflates section 706 and mandamus relief ........ 5
- B. VA Is Violating Its Statutory Duty to Provide Medical Care to Veterans ........ 6
  - 1. VA does not have discretion to ignore its statutory mandate ........ 6
  - 2. VA's unreasonable delay is also grounds for this Court to compel action under section 706 ........ 6
  - 3. VA's attempt to reargue issues decided by this Court is misplaced ........ 8
- C. Plaintiffs are Likely to Succeed on Their Constitutional Claims ........ 9
  - 1. This Court already found that section 1710 creates a property interest protected by the Due Process Clause ........ 9
  - 2. There is no enforceable process for veterans denied care ........ 10
  - 3. Under Mathews v. Eldridge, Plaintiffs are likely to succeed ........ 11

II. VA DOES NOT DISPUTE THAT VETERANS FACE IRREPARABLE HARM ........ 12

III. VA IGNORES THE PUBLIC INTEREST IN TAKING CARE OF OUR VETERANS ........ 14

IV. THE BALANCE OF EQUITIES TIPS IN FAVOR OF ISSUING THE INJUNCTION ........ 15

CONCLUSION ........ 15

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anderson v. White*,
888 F.2d 985 (3rd Cir. 1989) .......... 12

*Barnes v. Healy*,
980 F.2d 572 (9th Cir. 1992) .......... 14

*Brower v. Evans*,
257 F.3d 1058 (9th Cir. 2001) .......... 5

*Cupolo v. BART*,
5 F. Supp. 2d 1078 (N.D. Cal. 1997) .......... 13

*Day v. Shalala*,
23 F.3d 1052 (6th Cir. 1994) .......... 12

*Dong v. Chertoff*,
513 F. Supp. 2d 1158 (N.D. Cal. 2007) .......... 8

*Dorfman v. Brown*,
913 F.2d 1399 (9th Cir. 1990) .......... 9

*First Nat'l Bank v. Albright*,
208 U.S. 548 (1908) .......... 14

*Gillette Co. v. Ed Pinaud, Inc.*,
178 F. Supp. 618 (S.D.N.Y. 1959) .......... 12

*Home Loan Bank Bd. v. Mallonee*,
196 F.2d 336 (9th Cir. 1952) .......... 14

*Indep. Mining Co., Inc. v. Babbitt*,
105 F.3d 502 (9th Cir. 1997) .......... 5, 6, 7

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*,
746 F.2d 855 .......... 9

*Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Soc. & Rehab. Svcs.*,
31 F.3d 1536 (10th Cir. 1994) .......... 13

*Kraemer v. Heckler*,
737 F.2d 214 (2nd Cir. 1984) .......... 11

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 9

*Lydo Enters., Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) .......... 12

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 11, 12

*Norton v. S. Utah Wilderness Alliance*,
542 U.S. 55 (2004) .......... 6

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*,
762 F.2d 1374 (9th Cir. 1985) .......... 12

*Parrish v. Brownlee*,
335 F. Supp. 2d 661 (E.D.N.C. 2004) .......... 14

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
872 F.2d 75 (4th Cir. 1989) .......... 13

*Rostker v. Goldberg*,
453 U.S. 57 (1981) .......... 14

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005) .......... 9

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953) .......... 13

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
300 U.S. 515 (1937) .......... 15

*Wang v. Chertoff*,
No. C07-4041 PVT, 2007 U.S. Dist. LEXIS 92357 (N.D. Cal. Dec. 17, 2007) .......... 6

*Washington v. Udall*,
417 F.2d 1310 (9th Cir. 1969) .......... 5

**STATUTES**

5 U.S.C.
§ 706(1) .......... 5, 7

28 U.S.C.
§ 1361 .......... 5

38 U.S.C.
§ 1705(b)(1) .......... 7

**INTRODUCTION**

Faced with a broken system that is failing our veterans, this Court has the opportunity to order discrete agency actions that could potentially save the lives of thousands of men and women returning from the ordeals of Iraq and Afghanistan. *See* Declaration of Arthur Blank in Support of Plaintiffs' Motion for Preliminary Injunction Reply ("Blank Decl.") filed herewith, ¶ 46. At a threshold level, VA chronicles a metanarrative of reasons why the Court does not have authority over the Executive Branch and its officers. As with the Court's jurisdiction, VA is wrong about the Court's authority to enter the requested injunctive relief. The Court's power is rooted in the fundamental tenets our Founding Fathers embedded in the Nation's constitutional system of checks and balances to allow one branch of government to step in when another branch of government acts unconstitutionally. The present situation is precisely where that system contemplates such intervention. It is axiomatic that no branch of government is above the Constitution. Extending VA's argument to its logical conclusion, even if VA were to decide not to provide any health care to veterans, and instead were to spend all of Congress's appropriations on vacation pay, this Court would have *no authority to act* simply based on the decision-makers' status as executive officers. That is not how our constitutional system works, and is a gross underestimation of the power of judicial review of agency action conferred on Article III courts.

Putting aside the threshold question, VA's Opposition is more interesting for what is not said than what is said. The Opposition remains virtually silent on the facts and carefully avoids any mention of the human element. VA ignores the numerous and compelling declarations submitted by veterans and their family members, and the third-party statistical analysis of the alarming rate of suicides among veterans. As a result, the Court's task is made substantially easier due to the VA's decision not to contest the material facts, including that:

- Unprecedented and growing numbers of veterans are returning from Iraq and Afghanistan with post-traumatic stress disorder ("PTSD");
- There is a link between PTSD and suicide; left untreated, PTSD can lead to suicide;
- Veterans are being denied medical treatment for PTSD;
- VA's denial of treatment can, and often does, result in suicide and attempted suicide;
- Providing prompt treatment to a suicidal man or woman can save that person's life;

- Suicide, and the other negative effects from denial of mental health care, constitute irreparable harm; and
- Congress has appropriated sufficient funding for veteran mental health care.

The only factual issue discussed by VA is its claim that it is taking steps to address the mounting suicide problem. But that argument ignores the real world. If, as VA implies, veterans are adequately cared for, why are our veterans continuing to commit suicide at a rate of more than 120 per week? The argument that the system is not broken just cannot be reconciled with the undisputed facts documenting the alarming rate of veteran suicide. Further, VA contends that it has procedures for veterans denied medical care. VA confuses procedures to appeal incorrect *enrollment* determinations to the BVA (with its three-year wait) with procedures to address failure to care for veterans *already enrolled*. The fact remains that when a veteran is turned away at a VA medical facility, he or she has nowhere to turn. There are no enforceable procedures, and there is no right to a hearing before a neutral decision-maker, no opportunity to cross-examine adverse witnesses, nor any other recognized features of due process.

Instead of challenging Plaintiffs' factual claims, VA's Opposition concentrates on a series of peripheral legal issues. But even its legal arguments essentially concede two of the three prongs necessary to entry of a preliminary injunction and focus almost exclusively on probability of success on the merits. As to this third factor, VA contents itself with rearguing issues that have already been addressed by this Court, including:

- Whether Plaintiffs properly pled a sovereign immunity waiver under Section 706(1);
- Whether VA has a statutory obligation to provide eligible veterans with two years of free medical care;
- Whether the two-year care obligation (now five-year) creates an entitlement in eligible veterans, which they cannot be deprived of without due process;
- Whether the obligation to provide two years of medical care is subject to the availability of Congressional appropriations;
- Whether denial of medical care constitutes a discrete or final agency action;
- Whether VA has unbridled discretion, and is unreachable by the Article III Courts, or whether the Court has the authority to intervene in the face of a broken VA system.

Despite acknowledging that suicide is a major problem, VA insists that it is within its discretion to deny veterans desperately needed mental health care. To state VA's position is to acknowledge its

sweeping overstatement: VA has paramount discretion to determine that it has higher priorities than the mandatory programs created by Congress, and no mere court could find otherwise. Try as they might to build a moat around the agency's actions to prevent judicial scrutiny inside the walls of the agency fortress, the reality remains that the Article III Courts are authorized to take action when an agency does not accomplish what Congress mandates or violates the Constitution. Irrespective of discretion, no agency or officer is above the law or the Constitution. For all of these reasons, the Court should issue the requested preliminary injunction, to protect the rights of those who have given so much to this country.

**FACTS**

The essential facts remain undisputed:

- Dr. Stephen Rathbun and CBS News conducted an independent analysis of veteran suicides, and found that veterans are killing themselves at a rate of more than 120 per week; Reply Declaration of Stephen L. Rathbun ("Rathbun Decl.") at ¶ 7, Ex. A, p. 2.[1]

- The CBS results are reinforced by the recent report issued by the Department of Health Services in Oregon, which found that suicide was the leading violent cause of death in Oregon, and that veterans represent approximately 28% of all suicides in Oregon (despite the fact that they represent less than 10% of the population). *See* Request for Judicial Notice in Support of Plaintiffs' Motion for Preliminary Injunction Reply ("Reply RJN") Ex. C;

- Congress has been so distressed that it recently conducted hearings on the veteran suicide epidemic, further highlighting the extent of this problem in the U.S.;

- VA's Opposition admits the crisis proportions of the suicide problem. VA's suicide health line has received more than 8,000 calls in only six months. *See* Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp.") at 6:20. This only includes those suicidal veterans or their families who initiated calls to VA for help. VA says that it has made 380 undefined "rescues." According to the CBS study, in this period of time, approximately 3,120 veterans would have taken their lives. Thus, even if everything VA said were true, VA "rescued" a mere twelve percent of the suicidal veterans during that time period.

VA urges this Court to let its bureaucracy take its course, as it is purportedly beginning to address these issues, while it concedes that the lives of returning soldiers are at risk. This is a prototypical situation for a preliminary injunction.

The Court cannot prevent every suicide, and the court's intervention will not be a panacea for all veteran health care problems. But the Court can direct VA that it can no longer fail to abide by the

[1] An independent study was necessary, because VA has adopted a "willful blindness" approach and has refused to conduct a statistical analysis of veteran suicides.

statutory requirement that it provide veterans with two (now five) years of health care upon return from combat. The Court can instruct VA that veterans, too, are entitled to due process on health care and treatment issues. Finally, the Court can tell VA that it can no longer turn away veterans who are at risk of taking their own lives. These will be significant and effective steps.[2]

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF BOTH THEIR STATUTORY AND THEIR DUE PROCESS CLAIMS

Plaintiffs premise their injunctive relief upon two separate causes of action: (1) a violation of 38 U.S.C. section 1710; and (2) a violation of the Due Process Clause of the Constitution. Compl. ¶¶ 258-60, 264-66. VA argues that both claims fail for independent reasons. With respect to the statutory claim, VA conflates mandamus with § 706 in an attempt to apply the discretionary mandamus standard rather than the mandatory APA standard to compel agency action. Based on the conflated standard, VA's statutory argument then proceeds to rehash an argument that was already adversely decided by this Court on the motion to dismiss. With respect to the due process claim, VA premises its entire argument on the proposition that medical care benefits are not property rights for the purpose of the Due Process Clause – an issue also foreclosed by the Court's prior decision.

#### A. This Court Must Enter Injunctive Relief Where, as Here, the Agency Action Is Unlawfully Withheld or Unreasonably Delayed.

##### 1. This Court has already held that Plaintiffs properly pled a claim under section 706.

The Court has already held that "§ 1710(e)(1)(D) provides a mandatory entitlement to health care for veterans for two years upon leaving the service." Order at 37.[3] VA contends "plaintiffs cannot seek

---

[2] Plaintiffs have sought discovery from VA relevant to this motion since October of 2007. VA has stonewalled Plaintiffs. After the Court issued its Order in early January, Plaintiffs urged VA to prioritize production of documents relevant to this motion, specifically identifying a handful of document requests. VA promised to provide some of these documents before the deadline for this Reply brief. From a review of the limited documents VA produced, it became clear that VA produced less than 2,000 pages of what appear to be publicly available documents. Declaration of Heather A. Moser in Support of Plaintiffs' Motion for Preliminary Injunction Reply ("Moser Reply Decl.") filed herewith, at ¶ 15. In light of this, Plaintiffs urge the Court to draw the adverse inference that the withheld evidence would not be favorable to VA.

[3] A waiver of sovereign immunity is not required for the claims against federal officials. *See Washington v. Udall*, 417 F.2d 1310, 1314 (9th Cir. 1969) (citing *Larson v. Domestic & Foreign*

(Footnote continues on next page.)

emergency relief under § 706(1) because they have not sought relief under that provision anywhere in their lengthy Complaint." Opp. at 7:10-11. But their argument is directly contradicted by the Court's ruling that "Plaintiffs in the present case have in fact pleaded a genuine § 706(1) claim" based on a failure to provide health care to veterans returning from Iraq and Afghanistan. *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss ("Order") at 13-14 (finding failure to act "is a properly pleaded § 706(1) claim").

**2. VA improperly conflates section 706 and mandamus relief.**

The Court's power under the Mandamus and Venue Act is distinct from the power conferred by Congress under § 706 of the Administrative Procedure Act. VA cites *Independence Mining Company, Inc. v. Babbitt* ("*IMC*") in support of its argument that Plaintiffs seek mandamus relief without acknowledging the Ninth Circuit's approach to § 706 relief. 105 F.3d 502 (9th Cir. 1997). Although *IMC* recognizes that mandamus and § 706 have been construed as similar "in essence," *id*. at 507, the *IMC* court also notes that the availability of relief under § 706 technically *precludes* mandamus relief by providing an alternative remedy, and that where the petitioner seeks the same relief, regardless of whether it is under mandamus or section 706, the analysis of claims should proceed under the APA, not mandamus. *IMC*, 105 F.3d at 507 n.6.

The standard for § 706 relief differs from the standard for mandamus relief, and that distinction is critical. A district court has discretion to exercise its mandamus power. 28 U.S.C. § 1361. In sharp contrast, under the APA, a district court "***shall*** … ***compel agency action*** unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1) (emphasis added). Once a court determines that agency action was unlawfully withheld or unreasonably delayed, the APA requires the court to compel agency action. *Brower v. Evans*, 257 F.3d 1058, 1068 n.10 (9th Cir. 2001) ("'Shall' means shall.") (citing *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187-88 (10th Cir. 1999) (the use of the word "shall" means courts "must compel agency action unlawfully withheld")). As set forth below, VA has unlawfully withheld *and* unreasonably delayed medical care and medical benefits determinations in contravention of its

(Footnote continued from previous page.)
*Commerce Corp.*, 337 U.S. 682, 689-91 (1949)). For the claims against the remaining defendants, the Court already found that the Section 702 waiver applies. The Court found that plaintiffs' claims fall within the exceptions set forth in both Sections 704 and 706 of the APA. MTD Order, at 13-14, 20.

Congressional mandate to provide veterans with care for two (now five) years.

**B. VA Is Violating Its Statutory Duty to Provide Medical Care to Veterans.**

**1. VA does not have discretion to ignore its statutory mandate.**

In passing § 706, Congress intended to grant courts the power to ensure agencies comply with their legal duties. VA argues that it must be allowed discretion to operate its programs; however, discretion is not limitless, and a court can, and in fact *must*, hold an agency accountable. *See Wang v. Chertoff*, No. CIV 07-077-TUC-GEE, 2007 U.S. Dist. LEXIS 87419, *10 (D. Ariz. Nov. 26, 2007) ("[T]here is a strong presumption in favor of judicial review of administrative action.") (citations omitted).

In *IMC*, the case relied upon by VA, the Ninth Circuit found that discretion is not dispositive of whether it may compel agency action, for "even if the acts were discretionary, the Secretary cannot simply refuse to exercise his discretion." *IMC*, 105 F.3d 502 n 507 n.6 (9th Cir. 1997) (holding a patent validity determination requiring field examinations and a conclusion that the petitioner had made a "valuable discovery" was discretionary).[4] As in *IMC*, VA here has discretion concerning the means of managing its programs, but not to ignore its statutory objective. The object of 38 U.S.C. § 1710 is to ensure that combat veterans have free access to health care upon their return from service. Though the means of achieving that purpose may be at the agency's discretion, that objective – set forth by Congress – is mandatory. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004). Plaintiffs do not request a particular course of treatment or a specific diagnosis; Plaintiffs merely ask the Court to tell VA that it can no longer refuse treatment to veterans who return from combat with mental health conditions, and that it can no longer turn away suicidal veterans.

**2. VA's unreasonable delay is also grounds for this Court to compel action under section 706.**

The APA provides that a district court may compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1). This Court held that Plaintiffs' allegations of "systemic,

[4] *See also Wang v. Chertoff*, 2007 U.S. Dist. LEXIS 87419, *4 (holding that, though Immigration and Naturalization Services has discretion as to *how* to determine an alien's immigration status, it does not have any discretion as to *whether* or *when* to make the decision); *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1161-62 (N.D. Cal. 2007) (same).

unreasonable delays by VA in providing health care . . . bring Plaintiffs' claims within the exception provided for in § 706(1)." Order at 14.[5] VA claims there is no delay issue, because 95% of OEF/OIF veterans receive appointments within 30 days. Opp. at 6:6-8. VA's Office of Inspector General ("VA OIG") audited VHA's methods for calculating veteran waiting periods for a scheduled appointment. While VHA had reported that 96 percent of veterans seeking medical care were seen within 30 days, VA OIG concluded that "the accuracy of the VHA's reported waiting times could not be relied on." Sprenkel Reply Decl. Exh. 1, at page ii. The VA OIG conducted its own analysis, and concluded that 25% of the appointments had waiting times over 30 days. *Id*. The Report also noted that this number was likely understated because the waiting period for new patients was measured from the time that the appointment was scheduled and not necessarily when the appointment was requested. *Id*. at iii.[6]

---

[5] Order at 14. Six factors – none individually dispositive – are considered to assess whether relief for unreasonable delay is appropriate under section 706:

> (1) the time agencies take to make decision must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) **delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake**; (4) the court should consider the effect of expediting delayed action on agency activities of higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*IMC*, 105 F.3d at 507 n.7 (citing *Telecomms. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.D.C. 1984) ("*TRAC*") (emphasis added). Applying the six *TRAC* factors, the health and welfare issues at stake here tip the balance of these factors heavily in favor of a finding of unreasonable delay. The first two factors weigh heavily in favor of an injunction. VA is required to provide healthcare to veterans in a timely manner. 38 U.S.C. § 1705(b)(1). VA cannot credibly argue that a month between a suicidal veteran's call for help and a medical appointment is reasonable. By the time a veteran is able to see a physician, he is highly likely to have already taken his own life. The third and fifth factors permit recognition of the dire situation of these veterans and the grave consequences of ignoring their pleas. Delaying treatment for veterans that are able to request it will result in even more lives lost to suicide. As to fourth factor, Plaintiffs are hard-pressed to think of a priority more immediate than preventing suicide. Finally, the sixth factor makes clear that a court need not find impropriety behind an agency's delay. Plaintiffs' only concern is preserving life.[5] Because all six factors weigh in Plaintiffs' favor, § 706 states that the Court "*shall* compel agency action." 5 U.S.C. § 706(1).

[6] It is irrelevant under 706 whether Defendants claim insufficient resources to comply with the court's order. Once the court properly concludes VA is in violation of 706, the court must compel agency action. *Dong v. Chertoff*, 513 F. Supp. 2d at 1170-71 ("The Court [ ] is not in a position to relieve the defendants of their obligation to comply with their mandatory duties. Under the APA, a court "shall" compel agency action unlawfully withheld or unreasonably delayed." In this instance, it is not the place of the judicial branch to weigh a plaintiff's clear right to administrative action against the agency's burden in complying. … The question of whether there are adequate resources to [abide by the injunction] is a policy decision for the legislative and executive branches.") (citations omitted).

Even if VA were providing all veterans appointments within thirty days, a thirty-day wait period for a scheduled appointment is an unreasonable delay for suicidal veterans. For these veterans, unreasonable delay of treatment amounts to unlawful withholding of agency action, as they are likely to take their own lives before receiving medical care. To take one recent week in January 2008 as an example, at least two veterans whose mental health conditions were left untreated by VA committed suicide. *See* Reply RJN Exs. A, B. These sad stories are only a rare public glimpse into the silent suicide epidemic quietly taking our veterans' lives at a rate of 120 per week. It goes without saying that agency action, had it not been unlawfully withheld, likely would have made the difference between life and death for these two veterans.

**3. VA's attempt to reargue issues decided by this Court is misplaced.**

A substantial portion of VA's Opposition is devoted to reiterating a legal issue already decided by this Court: whether VA's mandatory duty to provide health care is subject to a condition subsequent – a Congressional appropriation of funds. However, VA *does not* argue, let alone prove, that it lacks sufficient funding to provide medical care. In fact, VA admits that it *could* provide the necessary treatment: "While a significant number of veterans of the conflicts in Iraq and Afghanistan have required treatment for mental health conditions on their return home, the number is well within our capabilities for providing treatment." Declaration of Stacey M. Sprenkel in Support of Plaintiffs' Motion for Preliminary Injunction Reply ("Sprenkel Reply Decl."), Ex. I at 2. Rather, VA focuses on a legal argument: what it perceives as its unbridled discretion to decide whether or not veterans should receive medical care. Plaintiffs agree with this Court's interpretation that the obligation to provide care to returning combat troops is not subject to appropriations. However, assuming *arguendo* that VA is correct in its interpretation, the Court does not need to reach the issue because of VA's failure to show that the funds appropriated by Congress were not adequate.

VA claims that, in general, allocation of lump sum appropriations is within its discretion. However, from this general proposition it does not automatically follow that VA's allocation decisions are entirely shielded from judicial review. In fact, in a case relied on by VA, the Supreme Court acknowledges judicial review is appropriate if an agency fails to allocate funds from a lump-sum appropriation in a manner consistent with statutory objectives. *Lincoln v. Vigil*, 508 U.S. 182, 193

(1993). Here, VA failed to allocate its appropriations in a manner consistent with statutory objectives. The cases relied on by VA are therefore inapposite as none of them challenged an agency's complete failure to allocate funds. Rather, each of these cases involved a challenge to how the agency decided to spend a lump-sum appropriation. *See e.g. Lincoln*, 508 U.S. at 195; *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855. Nor do these cases address the situation faced here, where money has not been spent on mandatory programs such as healthcare, while VA continues to waste millions of dollars as a result of poor oversight and sloppy management on less critical programs. See Sprenkel Decl. Ex. A (where VA OIG finds that VA made overpayments on a computer security contract totaling $8.5 million, and spent more than $35 million on equipment that it could not account for.) It cannot be that VA has complete discretion to waste its money, while failing to carry out its statutory mandate.

**C. Plaintiffs are Likely to Succeed on Their Constitutional Claims.**

**1. This Court already found that section 1710 creates a property interest protected by the Due Process Clause.**

In its January Order, the Court held that "§1710(a)(4) does in fact create a property interest protected by the Due Process Clause." Order at 37. The cases VA cites to suggest that § 1710 does not create a property interest actually provide support for Plaintiffs' claims. In *Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir. 1990), the court held that there was no property interest in a security clearance, due to "the extreme sensitivity of security matters" and the "strong presumption against granting a security clearance." *Id.* at 1401. Here, there is no strong presumption against providing medical care; to the contrary: medical care is supposed to be provided for any *potentially* service-connected condition. In *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), the court found no protected property interest in the enforcement of restraining orders, because the right to have a restraining order enforced does not "have some ascertainable monetary value" as implicitly required by *Roth* and its progeny, and because the interest arises "incidentally." *Id.* at 766-67. In stark contrast, veterans' medical care has an ascertainable monetary value, and is not an incidental benefit arising out of the actions of government actors. As former VA Secretary Nicholson made clear, "Veterans should see mental health services as

another benefit they have earned." Sprenkel Reply Decl., Ex. H at p. 2.[7]

**2. There is no enforceable process for veterans denied care.**

VA's attempts to show that some "process" exists by pointing to a provision giving BVA appellate jurisdiction over decisions regarding eligibility to enroll in the VA health care system, and to internal VA "directives" that set up an informal procedure for patients to complain about treatment decisions. As to the former, a three-year appeal procedure is not a meaningful remedy where enrollment in the system is denied (a circumstance the Complaint does not even speak to). In reality, there is no procedure for veterans who are denied care. If a veteran enters a clinic seeking immediate care and is incorrectly informed by the gatekeeper that he does not qualify for treatment, there is no clinical determination from which to appeal. Expert Chad Peterson concludes that the current system provides "no avenue for recourse whatsoever for a veteran seeking urgent treatment" who is turned away. Peterson Reply Decl. at ¶5. VA does not explain how it handles emergency cases in the many facilities not manned by psychiatrists, but being served by 'streaming video' or "telemental health services." Zeiss Decl. ¶ 10. There is simply no grievance procedure for veterans who believe that they need an immediate redetermination. *Id.* at ¶5.

As to the informal procedure respecting treatment decisions, the unbinding directives relating to clinical appeals cannot satisfy due process. *See e.g.* Declaration of Tony A. Guagliardo, Ex. B. There is

[7] VA selectively cites from the legislative history to suggest that Congress did not intend to create an "entitlement" to medical care. However, the legislative history, in fact, shows that Congress intended the two-year statute to guarantee medical care for all combat veterans. The House Committee on Veterans' Affairs report on the bill that led to enactment of the original two-year statute stated that the bill would establish "a special eligibility provision to *ensure* VA care of veterans of future combat deployments . . ." *See* Sprenkel Reply Decl., Ex. B at 8 (emphasis added). Even in enacting the VJRA, Congress noted that while veterans' benefits were once considered "mere gratuities," they are now "<u>more in the nature of a *right* than a privilege for purposes of due process protections</u>." *See id.*. Ex. D at 50 (emphasis added); *see also id*. Ex. C at 4 (two-year statute will "[a]nticipat[e] our future *obligations* and improve[e] our current programs that help the veterans of America heal from war-related illnesses…") (emphasis added). As VA points out, the two-year statute was recently amended to provide free medical care to all combat veterans for five years. *See id.* Ex. E. The legislative history of H.R. 4986 demonstrates that Congress again intended to *guarantee* veterans medical care. Senator Akaka, who introduced the bill that led to enactment of this statute, states that the purpose of the bill is to "*ensure* that returning servicemembers receive the care they need from VA in the five years immediately following separation or deactivation, without having to meet strict eligibility rules." *See id.* Ex. F at 2 (emphasis added). VA's representative himself characterized the five-year statute as "*automatically allowing [veterans] access to care* without copays for anything related to their combat service." *See id.* Ex. F at 54 (emphasis added). Thus, the legislative history supports this Court's holding that the two-year statute created a property interest entitled to constitutional protection.

no evidence that these procedures are either publicized or used. They are simply a series of management advisory communications that include "sample" descriptions of process flows and "sample" considerations for decision-making. *Id.,* Attachment A, B. Moreover, these "directives" do not address the problems set forth in the Complaint: the directives address a veteran's disagreement with a course of treatment, while the Complaint alleges that veterans are being denied treatment altogether. For these veterans, there is no clinical determination from which to appeal. Furthermore, the measures described are wholly inadequate. The directives set forth a cumbersome, four-stage process, which has a time limit only at the fourth, and final, stage. The directives described by Guagliardo do not provide a veteran the right to present his or her evidence in a fair and impartial hearing before a neutral decision-maker. Thus, even if followed, these guidelines would be insufficient to guarantee veterans a meaningful process to contest denials of medical care.

**3. Under *Mathews v. Eldridge*, Plaintiffs are likely to succeed.**

VA correctly sets forth the three prongs of the *Mathews v. Eldridge* test, but applies them in a way that defies logic. Under *Mathews*, the first factor is the private interest that will be affected. Here, the degree of potential deprivation to veterans is overwhelming. Contrary to VA's officious response, hundreds of thousands of veterans are dependent on VA for their medical care upon discharge from service. Moreover, "the astronomical nature of medical costs" requires that the private interest be weighed more heavily. *Kraemer v. Heckler*, 737 F.2d 214, 222 (2nd Cir. 1984). VA cites to cases that provide only that trial-like pre-deprivation hearings are not always required; those cases reiterate the necessity for minimum procedural safeguards, which are absent here.

As to the second *Mathews* factor, the risk of erroneous deprivation, VA again argues that a procedure exists for challenging a denial of care. As explained above, there is no such procedure. While *Mathews* counsels courts to consider the "probable value, if any, of additional or substitute procedural safeguards," (*Mathews*, 424 U.S. 319, 335 (1976)) this case is unique in that there are no procedural safeguards to supplement. Clearly, some procedure is required to allow veterans "the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333. Here, there is no procedure, no real

opportunity to be heard.[8] Absent an official, regularized procedure, the risk of erroneous deprivation is high.

The third *Mathews* prong considers the government's interest. "Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision." *Mathews*, 424 U.S. at 348. While procedures would entail some additional costs, VA ignores the far greater costs that come with failing to treat veterans with PTSD. "[F]ailure to provide early and effective care not only reduces the likeliness of effective treatment, but also increases the likely cost of care and services that will be necessary to serve the needs of the affected veterans." Blank Decl. ¶ 5. An increase in administrative costs cannot justify a complete denial of procedural protections for returning soldiers, especially where the costs of failing to act are so high for veterans, their families, and society.

## II. VA DOES NOT DISPUTE THAT VETERANS FACE IRREPARABLE HARM

VA cannot dispute that suicide is irreparable harm. But suicide and untreated mental illness are not the only harms. The impact on families is devastating. Ask Kim and Mike Bowman, whose son Tim, an Army Specialist, shot himself on Thanksgiving of 2005 as a result of his untreated PTSD. *See* Reply RJN Ex. D. Mike now suffers from the same ailment that took his son—PTSD, the result of finding his son bleeding to death, and watching him die. *Id.* These harms are a direct result of VA's failures. According to a study published in the American Journal of Psychiatry, "ready access to mental health care is associated with a reduced risk of suicide at the individual patient level." *See* Reply RJN Ex. E.

Defendants attempt to dispute the urgency surrounding the epidemic of veteran suicides by claiming that Plaintiffs waited too long to seek a preliminary injunction. However, in the cases cited by the government, the delay was measured in years (rather than months).[9] Moreover, VA

[8] The cases cited by VA support the point that minimum procedural protections are required. In both *Anderson v. White*, 888 F.2d 985 (3rd Cir. 1989), and *Day v. Shalala*, 23 F.3d 1052 (6th Cir. 1994), the courts found that additional procedural protections were required to comport with due process.

[9] *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (involved delay of five years"); *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 621 (S.D.N.Y. 1959) (involved delay of "at least four years"); *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1375 (9th Cir. 1985) (finding delay of "many years"); *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1989) (declining to grant a permanent injunction where litigation had been ongoing for

(Footnote continues on next page.)

incorrectly asserts that the Complaint was filed in June, rather than at the end of July, 2007. (Opp. at 21:9). Further, VA has failed to disclose its own statistics and findings on suicide, information readily within its grasp. Because VA cannot dispute the epidemic of suicide among returning troops, it relies on a traditional bureaucratic defense to a preliminary injunction motion – it asserts that it is now starting to deal with the problem, and that this counters Plaintiffs' arguments of irreparable harm. VA's argument is factually deficient and fails to meet applicable legal standards.

With respect to VA's program descriptions, Arthur S. Blank, M.D. observes, "Both the Opposition and the Zeiss Declaration speak to many generalities about program initiatives, but include no data that demonstrates that these initiatives or the implementation of them are adequate to combat the ongoing suicide crisis. Much of the currently available data now seems to indicate that they are not adequate." Blank Decl. at ¶ 43. Dr. Blank concludes: "VA is not currently providing adequate and timely care for veterans with PTSD. . . . This . . . increases the risk of suicide among veterans." *Id.* at ¶ 4.

Moreover, even if VA has taken steps to address the problems, such actions as a matter of law do not mitigate the necessity for a preliminary injunction to prevent irreparable injury. Indeed, the Supreme Court has held that a court's power to grant injunctive relief survives even when there has been a complete discontinuance of the illegal conduct. *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *Cupolo v. BART*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (although BART instituted measures that might eventually resolve problems, it had not mooted injunctive relief).

The Ninth Circuit holds that voluntary cessation of illegal conduct does not render a challenge to that conduct moot unless "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992). VA fails on both prongs. First, while VA assures the Court that suicidal veterans now are receiving some attention, in the next breath VA argues that the continuation of such services is contingent not only on Congressional appropriations, but

---

(Footnote continued from previous page.)
years). *See also Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Soc. & Rehab. Svcs.*, 31 F.3d 1536, 1544 (10th Cir. 1994) (delay of three months was not fatal).

also on whether VA desires to continue those services. VA essentially admits the possibility that VA's wrongs will be repeated. Second, the unprecedented and undisputed sharp rise in the incidence of veteran suicide forecloses any argument that the problem has been eradicated. As Dr. Blank observes about VA's own admission concerning its new suicide hotline: "The very level of utilization in the short time that the hotline has existed demonstrates the level of unmet need in the veteran community." Blank Decl. at ¶ 44(f).

In short, an injunction is both appropriate and necessary to provide help for suicidal veterans who need the essential care they were promised when they joined the military. As Dr. Blank concludes: "based on all my experience with VA and with veterans with PTSD, I believe that [the proposed preliminary injunction] is a clinically workable step towards providing much-needed immediate and effective care for suicidal veterans with PTSD, and that enacting this proposed order would save the lives of veterans who are at risk of suicide." *Id.* at ¶ 46.[10]

## III. VA IGNORES THE PUBLIC INTEREST IN TAKING CARE OF OUR VETERANS

VA ignores the overwhelming public interest in saving veterans' lives. Instead, VA claims the proposed preliminary injunction is contrary to the public interest because it would infringe on the Secretary's discretion. In short, VA argues that the public's interest is better served by giving the Secretary unfettered discretion than by providing suicidal veterans with statutorily-mandated medical and mental health care. VA is wrong on the law.[11] As VA points out, the statutory policy of Congress "is in itself a declaration of the public interest which should be persuasive" to courts. *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 602 (1937). Congress's clear intent to provide health care to veterans under the two-year (now five-year) statute outweighs whatever vague public interest VA has identified in the

[10] VA claims that a non-specific, "obey-the-law" injunction is improper. Here, the proposed preliminary injunction is specific and focused on forbidding VA to fail to treat suicidal veterans.

[11] VA cites cases that stand for the proposition that courts should not lightly interfere with the Army's decisions to call up reservists during armed conflicts. *Parrish v. Brownlee*, 335 F. Supp. 2d 661, 675 (E.D.N.C. 2004) (quoting *Irby v. United States*, 245 F. Supp. 2d 792, 798 (E.D. Va. 2003). These cases are inapposite. Moreover, while legislation affecting veterans' benefits is enacted under Art. I, § 8, the very case cited by VA holds, "[i]n that area, as any other, Congress remains subject to the limitations of the Due Process Clause . . . ." *Rostker v. Goldberg*, 453 U.S. 57, 67-68 (1981). VA's other cases, *First Nat'l Bank v. Albright*, 208 U.S. 548, 553 (1908), and *Home Loan Bank Bd. v. Mallonee*, 196 F.2d 336, 357 (9th Cir. 1952), provide that an injunction is inappropriate where no violation of the law has been proven. Here, an injunction is required to stop an ongoing constitutional violation.

Secretary's unfettered discretion.

## IV. THE BALANCE OF EQUITIES TIPS IN FAVOR OF ISSUING THE INJUNCTION

VA's Opposition does not even undertake a balancing of the hardships. How could VA argue that the hardships do not tip in favor of issuing the injunction? To do so would be to suggest that the public's interest in exalting VA's discretion is more important than the loss of our veterans by their own hands. The reality is that there will be no harm to Defendants if they are told they must carry out Congress's clear statutory mandate: to provide health care to veterans in dire need. The veteran suicide epidemic is a hardship for all parties, and certainly to the more than six thousand families a year who are losing a loved one as a result of a treatable illness. VA undeniably has the money, and Congress has expressed its intention. There is no legitimate interest to be served by allowing our soldiers to return from war, wounded, and mentally shattered, to be denied critical medical care, often resulting in their demise. The balance of hardships weighs in favor of granting this injunction.

## CONCLUSION

Plaintiffs have submitted a revised order to address some of the legal and other arguments raised by Defendants. Setting aside VA's metanarrative about its limitless discretion to abide by or ignore Congress' mandate, VA essentially concedes that veterans face irreparable harm and that the public's interest and the balance of hardships weigh in favor of issuing this injunction, and is left arguing with the Court's holding on the motion to dismiss. Meanwhile, veterans continue to take their lives. If VA did, in fact, have a procedure or protocol for dealing with suicidal veterans, it certainly would have mentioned that fact in its Opposition. This Court does have the power to issue this injunction, and for the reasons set forth herein, Plaintiffs respectfully request that the Court exercise that power.

Dated: February 11, 2008

GORDON P. ERSPAMER
ARTURO J. GONZALEZ
HEATHER A. MOSER
BILL D. JANICKI
STACEY M. SPRENKEL
PAUL J. TAIRA
MORRISON & FOERSTER LLP

By: /s/ Stacey Sprenkel
Stacey Sprenkel
Attorneys for Plaintiffs