GORDON P. ERSPAMER (CA SBN 83364)
GErspamer@mofo.com
MORRISON & FOERSTER LLP
101 Ygnacio Valley Road, Suite 450
P.O. Box 8130
Walnut Creek, California 94596-8130
Telephone: 925.295.3300
Facsimile: 925.946.9912

SIDNEY M. WOLINSKY (CA SBN 33716)
SWolinsky@dralegal.org
JENNIFER WEISER BEZOZA (CA SBN 247548)
JBezoza@dralegal.org
KATRINA KASEY CORBIT (CA SBN 237931)
KCorbit@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, California 94704-1204
Telephone: 510.665.8644
Facsimile: 510.665.8511

**[see next page for additional counsel for Plaintiffs]**

Attorneys for Plaintiff(s)
VETERANS FOR COMMON SENSE, and
VETERANS UNITED FOR TRUTH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

VETERANS FOR COMMON SENSE, and VETERANS UNITED FOR TRUTH, INC.,

Plaintiffs,

v.

JAMES B. PEAKE, M.D., Secretary of Veterans Affairs, *et al.*,

Defendants.

Case No. C-07-3758-SC

**CLASS ACTION**

**REPLY EXPERT DECLARATION OF ARTHUR BLANK IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Complaint Filed July 23, 2007

**ADDITIONAL COUNSEL FOR PLAINTIFFS:**

ARTURO J. GONZALEZ (CA SBN 121490)
AGonzalez@mofo.com
HEATHER A. MOSER (CA SBN 212686)
HMoser@mofo.com
STACEY M. SPRENKEL (CA SBN 241689)
SSprenkel@mofo.com
PAUL J. TAIRA (CA SBN 244427)
PTaira@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

BILL D. JANICKI (CA SBN 215960)
WJanicki@mofo.com
MORRISON & FOERSTER LLP
400 Capitol Mall, Suite 2600
Sacramento, California 95814
Telephone: 916.448.3200
Facsimile: 916.448.3222

**DECLARATION OF ARTHUR BLANK**

I, Arthur S. Blank, Jr. M.D., declare as follows:

1. The facts in this declaration are based on my personal knowledge or else represent my professional opinion, based on my experience and reliance on relevant resources in my field of expertise.

**Key Conclusions**

2. Veterans who have served in Iraq and/or Afghanistan have high rates of Post Traumatic Stress Disorder. *See*, *e.g.* Tyler C. Smith, *et al.* "New onset and persistent symptoms of post-traumatic stress disorder self reported after deployment and combat exposures: prospective population based US military cohort study," *BMJ* (2008), http://www.bmj.com/cgi/content/full/bmj.39430.638241.AEv1, attached hereto as Exhibit A. The risks of veterans returning with PTSD increases with multiple deployments to combat zones.

3. The rate of suicide among combat veterans is high. There is substantial evidence to indicate a link between PTSD and suicide among combat veterans. This evidence takes the form of studies published in peer-reviewed psychiatric journals, s*ee*, *e.g.* Mark Kaplan, *et al.*, "Suicide among male veterans: a prospective population-based study" 61 *J. Epidemiol. Community Health* 619-624 (2007), attached hereto as Exhibit B. It is also supported by the clinical experience of mental health professionals who work with veterans. Additionally, there is also substantial information in the popular media regarding suicide among veterans, as well as studies that are less formal, but still compelling. *See, e.g. Report on Veterans and Suicide* (CBS television broadcast, Nov. 13, 2007) attached hereto as Exhibit C. VA itself also recognizes the risk *See* Hudenko, National Center for PTSD Fact Sheet "PTSD and Suicide," attached hereto as Exhibit D, and available on the web at httpa;//www.ncptsd.va.gov/ncmain/ncdocs/fact_shts/fs_suicide.html.

4. VA is not currently providing adequate and timely care for veterans with PTSD. *See, e.g.*, U.S. House of Representatives Committee on Veterans' Affairs – Democratic Staff report, "Review of Capacity of Department of Veterans Affairs Readjustment Counseling Service Vet Centers," October 2006, (hereafter "Congressional Report) attached hereto as Exhibit E. This failure

to provide adequate and timely care increases the risk of suicide among veterans. This is because prompt and appropriate intervention for individuals with suicidal ideation is critical to reduce the risk of successful suicide attempts.

5.   Even for veterans who are not suicidal, early intervention to diagnose and treat PTSD is vital. Early and appropriate mental health care is key to effective treatment. In addition, failure to provide early and effective care not only reduces the likelihood of effective treatment, but also increases the likely cost of care and services that will be necessary to serve the needs of the affected veterans.

**Professional Qualifications**

6.   I am a psychiatrist with forty-two years of professional experience. I received my M.D. from Case Western Reserve University, and completed my Psychiatric residency at Yale University. For most of my career, I have specialized in treating veterans, including treatment of Post Traumatic Stress Disorder in veterans through VA and Army medical facilities. I have participated in substantial research on PTSD and served as an advisor to the Department of Veterans' Affairs on multiple occasions. I personally served in the U.S. Army Medical Corps from 1965-1967, during which time I worked as a Psychiatrist at the U.S. Army 93rd Evacuation Hospital, Long Binh and the 3rd Field Hospital, Saigon, in Viet Nam.

7.   In 1993, I was awarded the William C. Porter Award and Lecture for achievement in psychiatry by the Association of Military Surgeons of the United States (AMSUS). This annual award for outstanding achievement was given to me based on my years of service as the National Director of Vet Centers, as described below.

8.   From 1990-1994, I participated on the Subcommittee on Post Traumatic Stress Disorder for the fourth edition of the Diagnostic and Statistical Manual (DSM-IV), the official diagnostic system of the American Psychiatric Association. The DSM-IV is the current definitive statement of what is and what is not PTSD. It would be accurate to say that this subcommittee, consisting of approximately 20 other specialists and myself, wrote the book on PTSD diagnostic criteria. I also served on the same subcommittee in the preparation of the 3rd Revised Edition of the Diagnostic and Statistical Manual.

9. From 1982 when I was appointed by the Secretary of Veterans Affairs to 1994, I served as the National Director of Vet Centers (community-based counseling centers for war veterans) within the Department of Veterans Affairs. When I took the position, there were 87 community-based centers; under my direction, the network expanded to 202 centers, and the staff grew from 300 to approximately 700. The Vet Center project had first been authorized for three years in 1979, then repeatedly extended, and finally made permanent in the late 1980s.

10. As the National Director of Vet Centers, I, together with my deputies, was responsible for all Vet Center operations nationally, through line authority. The Vet Center functions were centralized; as Director, I did not run an umbrella operation for independent entities, but rather maintained direct clinical and administrative supervision of all local centers. During my time in this role, the Vet Centers were highly successful and were more heavily utilized than Congress had predicted.

11. Under my direction, the Vet Centers conducted intensive outreach to veterans, per directions from Congress. Indeed, the original operational name of the Vet Centers was "Operation Outreach." Outreach included radio, television, and print advertisements, media appearances to discuss Vet Centers, and intensive, local, community-based networking.

12. During my tenure, the Vet Centers focused on early and correct diagnosis and treatment of PTSD in a supportive environment for veterans (the Vet Centers maintained a high proportion of staff who were themselves combat veterans. The stated goal of having 50% of staff who were war zone veterans was regularly exceeded).

13. After I stepped down as Director, I continued to serve as the Senior Psychiatrist on the PTSD Team at the VA Medial Center in Minneapolis, MN from 1994 to 1997. This represents the second period in my career when I was involved in hands-on clinical psychiatric work with veterans with PTSD; the prior period of such work took place from 1972-1982 at the West Haven Veterans Affairs Hospital in West Haven, Connecticut.

14. In addition to my other work, including most recently 10 years of private psychiatric and psychoanalytic practice, I have served on the faculty of the Department of Psychiatry at Yale

University, with additional academic appointments at Georgetown University, the Uniformed Services University of Health Sciences, and George Washington University.

15. I have also served in numerous positions with the International Society for Traumatic Stress Studies and as a reviewer and member of the editorial board for numerous psychiatric journals. I have testified before Congress multiple times, including both the Senate and the House of Representatives. I have engaged in substantial research, teaching, and consulting regarding PTSD in veterans, and I have published multiple peer-reviewed articles on the subject, including participating in the section on Post Traumatic Stress Disorder in the DSM-IV, as noted above. I have also led numerous trainings on PTSD, including training other psychiatric professionals and training staff at VA hospitals on appropriate treatment for PTSD.

16. Additional details about my qualifications and experience are set forth in my resume, which is attached hereto as Exhibit F.

**Sources of Information/Literature**

17. I am extremely familiar with the literature concerning the experiences of veterans with chronic, untreated PTSD. Most of the information regarding the occurrence of various problems for this population is found in an accumulation of small, empirical or clinical studies that document experiences of veterans with PTSD in issues including depression, marital problems, alcoholism and drug abuse, criminal involvement, and other disturbances. This literature, consisting of approximately 200 studies, published in journals such as the American Journal of Psychiatry, the Journal of Nervous and Mental Disease, the Journal of Traumatic Stress Studies, and other such peer-reviewed publications, constitutes a rich source of data on the experiences of veterans.

18. Two key studies include Mark S. Kaplan, *et al.*, "Suicide Among Male Veterans: A Prospective Population-Based Study," 61 *J. Epidemiol. Community Health* 619-624 (2007), cited above and attached as Exhibit B, and Jordan B. Bell, Ph.D. and Ella C. Nye, Ph.D., "Specific Symptoms Predict Suicidal Ideation in Vietnam Combat Veterans with Chronic Post-Traumatic Stress Disorder," 172 *Military Medicine* 1144-1147 (2007), attached hereto as Exhibit G. Some influential media reports on the issue include *Report on Veterans and Suicide* (CBS television broadcast, Nov. 13, 2007), referenced above and attached as Exhibit C, OFFICE OF DISEASE

PREVENTION AND EPIDEMIOLOGY, OREGON DEP'T OF HUMAN SERVICES, VIOLENT DEATHS IN OREGON: 2005 (2007), attached as Exhibit H, and, most recently, Dana Priest, *Soldier Suicides at Record Level: Increase Linked to Long wars, Lack of Army Resources,* WASH. POST, January 31, 2008 at A01, attached as Exhibit I.

19. Another key source of data on the experiences of veterans with PTSD and other mental disorders is the National Vietnam Veterans Readjustment Study, which was published by the Research Triangle Institute in 1988.[1] This study compared the experiences of a statistically meaningful number of veterans who served "in theater" during the Viet Nam war era with the experiences of others who served in the military during the same time period but not in the war zone, and the experiences of both of these groups as compared to the general population on numerous issues. Based on its broad scope, its identification of participants, and its comparison of the experiences of different populations, the NVVRS study continues to serve as the most comprehensive evaluation of PTSD and related conditions among veterans. I was the principal VA supervisor of the development and implementation of the NVVRS, which was ordered by Congress with the goals of identifying the prevalence and incidence of PTSD in various populations, along with additional related information. In this role, I participated in numerous reviews of all aspects of veterans PTSD and post-war adjustment.

20. The NVVRS was the first psychiatric survey in the US conducted on a truly national sample and scale, and remains the largest study ever conducted on PTSD. The questionnaires which formed the basis of the study, and the subsequently developed information, are complex, multi-layered, and redundant, leading to very solid date on the incidence and prevalence of various conditions related to suicide; it retains a high level of significance in PTSD research.

**Opinions/Conclusions**

---

[1] A summary of this study was subsequently published and made available to the public on a much broader basis; it is cited as Kulka, R., Schlenger, W.E., Fairbank, J.A., Hough, R.I., Jordan, B.K., and Marmar, C.R. (1990), Trauma and the Vietnam War Generation: Report of Findings from the National Vietnam Veterans Readjustment Study, New York, Brunner/Mazel, and commonly referred to by the abbreviation "NVVRS".

21. The literature is clear that chronic, untreated PTSD increases rates of family disruption, conflict and divorce. It also increases rates of alcoholism and drug abuse; generally these abusive behaviors are a form of self-medication, which follows the onset of PTSD.

22. Delays in treatment for people with PTSD makes such treatment both more difficult and more expensive. This is due in part to the fact that PTSD becomes more difficult clinically to address the longer it has been left untreated. It is also due to the fact that people with PTSD are likely to experience other difficulties, such as the loss of social supports, alienation from friends and family, job loss, and other disruptions that must also be addressed once they take place.

23. Early treatment is key to effectively addressing the difficulties experienced by veterans with PTSD. By "early treatment" I mean individualized treatment following a diagnosis. This is different than a simple debriefing, which is a technique that encourages a person who has suffered a trauma to discuss the incident in detail. This type of early debriefing was once thought to be an effective way to treat PTSD; however, after extensive study, this technique has not been conclusively determined to be effective, and may risk making the condition of the person with PTSD worse.

24. With effective early treatment, veterans with PTSD are more likely to respond clinically, and are less likely to develop problem behavior, and less likely to have disrupted relationships and careers.

25. In order to initiate effective treatment, veterans need to receive a sophisticated interview to allow subsequent focus on the traumatic event or events that are at the root of the veteran's condition. Sometimes people with PTSD cannot bear to talk about the traumatic event that underlies their condition, and can only give minor descriptions. Sometime people are numb, and are unable to remember or provide information about their underlying trauma. These persons need more time for interviews, which must be conducted by trained intake professionals. This is a reasonably specialized skill, which cannot be performed by just any mental health care professional; it requires appropriate training to ensure that people who start the process are successfully identified and drawn into treatment.

26. It is vital that the first few contacts between a veteran with PTSD and mental health professionals go well; it is equally vital that an individual veteran find a person who is well matched to work with him or her to allow for effective treatment.

27. While VA has generally recognized the principles of how to engage and draw in veterans with PTSD, it is not always effective in doing so. Vet Centers have teams that are appropriately trained; however they can become overwhelmed, particularly with the influx of new veterans now returning from Iraq and Afghanistan. The recent Congressional Report described in ¶ 4, above and attached as Exhibit E, shows this to be a substantial problem at Vet Centers, in that the study reveals an intense impact on the overall ability of Vet Centers to provide adequate counseling services to war veterans. Evidently, some veterans are being provided only group therapy when they should have individual therapy; others are not receiving needed family therapy; some staff are working unduly long hours, which interferes with quality of services; waiting lists are being established when none existed previously, etc. (See text of report for other details). Based on my 12 years experience as the national director of Vet Centers, I can state that the findings of the Congressional study raise major questions with regard to quality of clinical care for, and indeed safety of, veterans being seen.

28. Other VA medical centers sometime do not have the specialized teams necessary to provide prompt and appropriate care to veterans with PTSD. The PTSD teams that are in place at such medical centers are generally larger than those at vet centers, but they can be overwhelmed in general. These medical centers can be problematic for providing immediate and appropriate treatment.

29. The relationship between a veteran and the person providing treatment is an extremely important component of care. To provide effective treatment, a clinician must build a level of trust and understanding with the veteran; it is not uncommon for a veteran with PTSD to spend several months establishing such a relationship before being able to effectively begin to address the underlying trauma at the basis of a PTSD diagnosis.[2]

---

[2] This long-term, trust-based relationship necessary for clinical care stands in sharp contrast to veterans' experiences with C&P interviews, which are part of the benefit application process. These C&P exams are conducted

(Footnote continues on next page.)

**The Threat of Suicide Among Veterans with PTSD**

30. Recent material that has been released, including the attached studies indicates that rates of suicide among veterans, particularly veterans of Iraq and Afghanistan, are high. While there is not yet much peer-reviewed literature on the experiences of Iraq and Afghanistan war veterans, I expect this to generate substantial attention in the near term and ongoing. Also, as noted previously, VA recognizes the significance of the issue and addresses it in its fact sheets. *See* Exhibit D.

31. The studies of current veterans with PTSD may be influenced by the fact that PTSD is greatly underdiagnosed. Many veterans tend not to ask for help for a variety of reasons, and this leads them to try to cope with their PTSD without mental health assistance.

32. Some of the reasons that veterans tend not to ask for help are based on the military culture to which they are accustomed. Many veterans have internalized a "tough guy" or "tough gal" image of a person who doesn't need help. In addition, many veterans have internalized a notion that they just have to live with difficult situations.

33. Military culture also puts a substantial stigma on people who receive mental health care. This stigma carries over into civilian life with meaningful consequences; for example, it can be extremely difficult for a person to obtain life insurance if they have a history of mental health care. While there has been discussion initiated by policymakers regarding efforts to reduce the stigma of mental health care in the military, so far action is limited, and it is unclear the extent to which any such effort is likely to succeed, at least in the short term.

34. Finally, veterans with PTSD often simply think or hope that their symptoms will go away. Unfortunately, this often does not happen.

**Additional Suffering by Veterans with PTSD**

35. PTSD is often sorted into lists of diagnostic criteria. Such lists can fail to convey the level of suffering experienced by people who suffer from the various symptoms at issue. Each of the

---

(Footnote continued from previous page.)

under time pressure with a clinician who is essentially a stranger to the veteran, and the interview necessarily addresses traumatic issues in attempting to inventory symptoms. These exams are extremely traumatic for veterans, and have long been viewed by clinical VA mental health professionals (as opposed to the professionals working on benefits issues) to be problematic for their impact on ongoing care.

"diagnostic criteria" creates meaningful and substantial harm to the person experiencing it. The symptoms result in ongoing emotional pain and trauma, and can contribute to a variety of additional mental health and social problems for veterans.

36. The diagnostic criteria for PTSD are grouped sorted into three categories: "re-experiencing" symptoms, "avoidance" symptoms and "arousal" symptoms.

37. Re-experiencing symptoms, as the name indicates, include a set of circumstances in which the person with PTSD persistently revisits the most traumatic experience of his or her life, an experience beyond that of the average person by definition. The trauma, which for combat veterans often involves violent death or dismemberment, as well as fear for the veteran's own life, is re-experienced through "recurrent and intrusive distressing recollections," "recurring distressing dreams," flashbacks or hallucinations, distress upon experiencing reminders or symbols of the trauma. *See DSM-IV 309.81B(1)-(7).* Put simply, the veteran relives, remembers, and dreams repeatedly the most traumatic episode of his or her combat experience. For combat veterans, these experiences include such things as violent death, dismemberment, gruesome imagery, etc. For example, veterans have experienced the sights and sounds of having a bomb blow up the vehicle in which they were riding, killing (perhaps literally blowing apart) the veteran's buddies, with the resulting blood and trauma. This experience is accompanied by the immediate threat of death to the surviving veteran.

38. Avoidance symptoms include general numbing of responsiveness and specific avoidance of stimuli associated with the trauma. These symptoms, which include efforts to avoid "thoughts, feelings or conversations associated with the trauma," as well as "activities, places or people that arouse recollections of the trauma," *see DSM-IV 309.81C(1)-(2)* substantially limit a veteran's ability to participate in the world. This reduced engagement in the world is heightened by diminished interest in activities that were previously significant to the individual, estrangement from other people, reduced emotions and a sense of a foreshortened future. *Id. at (4)-(7).* Put plainly, a person with these symptoms is unable to engage with people, activities, or emotions in the way that people without PTSD can do. For example, this need for avoidance may make it impossible for a veteran to watch television, read the newspaper, hear his or her children talk about a fight at school,

listen to a fairly ordinary argument between friends or neighbors, address standard levels of conflict at a job, or take part in other activities which contain a level of conflict which is part of everyday life. This avoidance not uncommonly leads to marked withdrawal from social interactions, inability to work, and sometimes makes veterans housebound for long periods of time.

39. The final avoidance symptom is an "inability to recall an important aspect of the trauma." *Id. at (3).* Such traumatic amnesia may be disturbing to an individual whose memory is otherwise intact, particularly when the veteran does not understand why he or she is unable to remember periods of time or significant events. Such amnesia can be especially perplexing and painful when, for example, one recalls that a number of comrades were killed in an attack, but cannot recall the precipitating circumstances, one's own activities during the attack, or even its location. It is common for this kind of traumatic amnesia to complicate a veteran's ability to convey his or her experiences at a C&P exam, during which the examiner may which to know and inquire about matters which the veteran cannot remember.

40. The final group of symptoms are the "arousal" symptoms, which include difficulty falling or staying asleep, anger, difficulty concentrating, hypervigilance and an exaggerated startle response. *See DSM-IV 309.81D(1)-(5).* A person experiencing these symptoms may always be on alert, or may be unable to relax in any setting. A classic example of a person experiencing these symptoms is a veteran who must always sit with his or her back to the wall in order to avoid surprise from behind. More examples include losing one's temper to a degree that severely interferes with personal relationships, and gross interference with job performance as a result of irritability or anger with supervisors.

41. These examples begin to illustrate ways in which PTSD symptoms can and often do lead to disruption in family life, including divorce, alienation from children, frequent job losses and failure to thrive in career, alcohol and drug abuse, and sometimes homelessness.

**Professional Opinion Regarding VA's Arguments**

42. I have reviewed the Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (hereafter "Opposition") and the declaration submitted by Antonette Zeiss, Ph.D (hereafter "Zeiss Declaration").

43. Both the Opposition and the Zeiss Declaration speak to many generalities about program initiatives, but include no data that demonstrates that these initiatives or the implementation of them are adequate to combat the ongoing suicide crisis. Much of the currently available data now seems to indicate that they are not adequate. No matter how VA tries to put its best face forward, it seems quite likely, based on my experience working with veterans with PTSD and the material currently available, that the issue of suicide among veterans (and active duty military, who are tomorrow's veterans) is a real and ongoing problem.

44. In my review of the Zeiss Declaration (and the Opposition, which relies on the information provided by Dr. Zeiss with no additional data), I specifically observed:

    a. The Zeiss Declaration contains a number of positive generalizations which point to trends regarding the care of veterans with mental health issues at VA medical facilities in a vague way, but do not provide specifics. For example, in ¶ 7, the declaration states that "[e]ach medical center's Emergency Department is directed to have mental health staff available on a 24/7 basis." However, the declaration fails to indicate whether any of these mental health staff have received specialized training in PTSD, and, if so, when such training took place. Additionally, ¶ 8 says that current staffing levels in VA mental health are "just under 17,000 – well above the staffing level in FY 2000," but fails to specify what is meant by "well above." Further, there is nothing specified concerning the adequacy of staff dispersal, such as the ratio of staff in urban and rural areas. Paragraph 9 states that VA has "increased its efforts" for training on PTSD, but provides no explanation of what this general statement means. In ¶ 11, reference is made to a new directive regarding prompt mental health evaluation and treatment, but there is no information provided regarding VA's compliance with this directive. Paragraph 11 also references an authorization for fee-based and contract care, but fails to provide any information concerning the extent to which these alternatives are available and utilized. Finally, ¶ 13 references instructions to staff regarding follow-up with veterans who miss appointments. Again, nothing is stated regarding compliance with this instruction.

      b. In ¶ 14, Dr. Zeiss appears to dismiss any complaints from veterans about their dissatisfaction with treatment as originating from a lack of understanding or professional knowledge on the part of the veteran patient. This stance appears to undermine the well-known value of consumer feedback concerning mental health treatment.

      c. In ¶ 15, Dr. Zeiss appears to attribute most barriers to care for PTSD to attitudes or stigma within the potential veteran client. While the problem of stigma is indeed influential, the sensitivity and level of expertise of the evaluators and therapists are at least of equal importance in reducing barriers to care.

      d. Paragraph 18 states that the number of Vet Centers is due to increase to 232 in FY 2008, but no indication is given of how many and what type of new staff will be provided for the additional 23 Vet Centers. Mention is made of 100 new outreach personnel, who I understand were hired in FY 2005 and FY 2006. If indeed these staff are being utilized for outreach and not counseling services, that may be contributing to the workload strain documented by the Congressional Report cited above and attached at Exhibit E.

      e. Paragraph 20 states that each VA Medical Center is staffed with suicide prevention coordinators. One of the difficulties with such a designation is that it is often given to a staff member who already has other extensive special responsibilities. Therefore, to state that a center has a suicide prevention coordinator with no information about the amount of professional time such individual would have for this duty leaves unanswered questions.

      f. With respect to ¶ 21, the level of utilization of the newly implemented suicide hotline is impressive. However, this level raises questions of why such a hotline was not implemented much earlier. The very level of utilization in the short time that the hotline has existed demonstrates the level of unmet need in the veteran community. Secondly, no mention is made of what percentages of calls, referrals and rescues involve war-zone veterans with PTSD, as distinguished from non-war-zone veterans

with other mental health problems. It also raises the question of why, if VA's other initiatives to assist suicidal combat veterans with PTSD are as effective as VA claims, so many veterans are calling the hotline.

45. I note that in the Opposition to Plaintiffs' Motion for Preliminary Injunction that VA raises questions regarding the confidentiality maintained by Plaintiffs concerning the identity of veteran patients. This dismissive treatment of the need for confidentiality of veterans with PTSD and other mental health problems is counter to good practice. Protecting the confidentiality of veterans is an extremely vital matter for both humane and professional reasons.

**Professional Opinion Regarding Proposed Order**

46. I have reviewed the Plaintiffs' Revised Proposed Order being submitted with their reply, and, based on my experience with VA and with veterans with PTSD, I think that it is a clinically workable step towards providing much-needed immediate and effective care for suicidal veterans with PTSD, and that enacting this proposed order would save the lives of veterans who are at risk of suicide.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on 4 Feb at Bethesda MD

Arthur S. Blank, Jr., M.D.