

# Department of Veterans Affairs
# Office of Inspector General

# Review of VA Central Incident Response Capability Contract Planning, Award, and Administration

Report No. 04-03100-90

February 26, 2007

VA Office of Inspector General
Washington, DC 20420

**To Report Suspected Wrongdoing in VA Programs and Operations**
**Call the OIG Hotline – (800) 488-8244**

Review of VA Central Incident Response Capability Contract Planning, Award, and Administration

# Contents

                                           **Page**

**Executive Summary** ........................................................................................... i

**Introduction** ....................................................................................................... 1

    Purpose ............................................................................................................. 1

    Background ........................................................................................................ 1

    Scope and Methodology ................................................................................... 2

**Results and Conclusions** ................................................................................. 3

    Issue 1: Failure to adequately plan, award, and administer the requirements for Managed Security Services resulted in significant overpayments and the ultimate demise of the contract ................................................................. 3

    Issue 2: Deficiencies in the evaluation of the offers adversely affected selection of the CIRC contractor .......................................................................... 9

    Issue 3: Deficiencies in contract administration resulted in a cardinal change with the exercise of Option Year One, double-billing, and overpayment for services and equipment ................................................................. 14

    Issue 4: VA did not properly refer allegations of impropriety ....................................... 21

**Appendices**

    A. Deputy Assistant Secretary for Acquisition and Materiel Management Comments ............................................................................................. 24

    B. Assistant Secretary for Information Technology Comments ................................. 27

    C. Acting General Counsel Comments ....................................................................... 28

    D. OIG Comments to Acting General Counsel's Response ....................................... 33

    E. Task Orders Awarded Under the VA-CIRC Contract ........................................... 37

    F. OIG Contact and Staff Acknowledgements ........................................................... 39

    G. Report Distribution ................................................................................................ 40

# Executive Summary

## Introduction

The Office of Inspector General (OIG) initiated this review to evaluate the planning, award, and administration of the Central Incident Response Capability (CIRC) contract. Our objectives were to determine whether the contract was properly planned and awarded; administered effectively; and reasonably priced.

## Background

The purpose of the VA-CIRC contract (contract) was to provide state-of-the-practice incident handling and response capabilities for the entire VA. VA had to expand the existing CIRC to a broader, world-class operational CIRC and Security Operations Center (SOC) environment to assure confidentiality, integrity, availability, and privacy of information and services for Veterans.

The contract also became VA's mandatory source for Managed Security Services (MSS). The Request for Proposal (RFP) described MSS as: acquisition, installation, integration, configuration, and monitoring of VA's enterprise infrastructure; vulnerability assessment and penetration testing; cyber security intelligence gathering and support of network operations; and supporting the Enterprise Cyber Security Infrastructure Project.

The procurement action was a 100 percent small business set-aside contract authorizing and encouraging joint ventures or teaming arrangements. On July 19, 2002, VA awarded a contract to Veterans Affairs Security Team, LLC. (VAST), a limited liability corporation incorporated in the State of Texas. VAST was formed by members of the joint venture that included SecureInfo Corporation, AEM Corporation, ADTECH Systems, DSD Laboratory, SEIDCON Incorporated, and TEAMBI Solutions Incorporated, all of which are small businesses. Compaq, SAIC, and SIGNAL, large businesses, were added to the VAST team, but were not identified as members of the joint venture.

The $102.7 million fixed-price contract included $82.9 million for recurring labor and $19.8 million for equipment and supply cost spread evenly over a term not to exceed 10 years. By March 2005, when the contract was allowed to expire, VA expended approximately $91.8 million (89.4 percent) of the total contract value.

## Results

We identified weaknesses in the planning, award, and administration of the contract that ultimately resulted in the demise of the contract for lack of funding after less than 3 years. We concluded that VA's efforts to provide state-of-the-practice incident handling and response capabilities for VA were derailed by the late addition of MSS requirements that were not directly related to CIRC and not adequately planned.

Documentation showed that the RFP, multiple and inconsistent amendments to the RFP, and VA's inadequate responses to the significant questions submitted by potential offerors caused confusion and led to inflated pricing. We identified deficiencies in both the technical and price evaluation processes which adversely affected the basis for award and price reasonableness determination. The determination that VAST satisfied Small Business requirements was questionable when large businesses were added to provide the depth of resources to address any current or future demand. We believe VAST did not qualify as a small business entity. In addition, VA did not ensure that VAST met the 51 percent small business work requirements of the procurement at the time of award or during the term of the contract.

Because the contract was awarded to VAST, not the joint venture or business entity in the joint venture, the individual companies who comprised the joint venture were protected from liability. Our review of VAST's corporate and bank records revealed that the corporation had no assets, which may have left VA with no grounds to recover overpayments, which we estimate could be as high as $8.5 million.

On October 8, 2002, VA issued Modification 0001, which added clauses that changed Task 8.d., MSS, to firm fixed-price, Indefinite Delivery Indefinite Quantity (IDIQ). The Modification allowed VA to issue task orders to fill requests from field facilities and Office of Cyber Security for MSS at additional cost. The Modification increased the scope of work and increased the potential value of the contract from $102.8 million to $250 million. This prohibited cardinal change to the contract was approved in a written Office of General Counsel (OGC) opinion provided 1 day after it was requested by the Contracting Officer (CO) via a telephone call. This made the contract an open checkbook in that it resulted in the award of 22 non-competitive task orders valued at approximately $48.6 million, with little assurance of price reasonableness and no planned funding. Records and interviews indicate that at least 17 of the 22 task orders issued against Task 8.d. are believed to be out of scope and thus are prohibited cardinal changes to the contract.

The awarded contract included firm fixed-price labor costs for Task 8.d, MSS, with no expected deliverables. All deliverables were defined and paid for separately under the 22 task orders issued against the contract with no apparent off-set against the $3.8 million VA paid as a firm fixed-price labor cost for Task 8.d. When Modification 0001 was issued, no one considered the impact on the awarded firm fixed-price for Task 8.d., which appears to have resulted in VA overpaying approximately $3.8 million for MSS services.

In addition to labor costs, VA spent more than $35 million for equipment and supplies under the contract. Questionable decisions to buy out equipment leases were made and inventories were not maintained. VA does not know what equipment it has or where it may be located.

The exercise of Option Year One resulted in another cardinal change to the contract because VA issued a revised statement of work and requirements and made an award based on a revised proposal from VAST. Changes included the incorporation of uncompleted work for 9 of the 15 existing task orders and the related costs. Although

the costs for the uncompleted task orders were incorporated in Option Year One, VA continued separately to pay invoices submitted by VAST for work under these task orders. As a result, VA may have paid $4.7 million in duplicate payments.

After contract expiration, VAST submitted $4.8 million in invoices for debts related to the contract. Despite pressure from the former General Counsel to pay the invoices, the CO determined VAST had not provided sufficient support and denied the request. VAST was told they could file under the Contract Disputes Act of 1978; however, no claim was filed. The COs should be commended for their decisions.

## Recommendations

We recommend that:

1. The Deputy Assistant Secretary for Acquisition and Materiel Management (A&MM) and the Assistant Secretary for Information Technology (IT) perform an inventory of the approximately $35 million of equipment purchased under the contract.

2. The Deputy Assistant Secretary for A&MM and the Acting General Counsel:

   a) Establish a clear policy regarding the use of appropriate contract types and contract changes to include specific guidance regarding the uses of IDIQ contracts.

   b) Determine whether VA can recover the approximately $4.7 million in apparent duplicate billings during CIRC Option Year One.

   c) Determine whether VA can recover the approximately $3.8 million billed with no deliverables.

3. The Deputy Assistant Secretary for A&MM:

   a) Take appropriate administrative action against the Contracting Officers who failed to adequately administer the contract.

   b) Take appropriate administrative action for the failure to refer allegations of impropriety.

## Comments

The Deputy Assistant Secretary for A&MM and the Assistant Secretary for IT concurred with our recommendations. The Assistant Secretary for IT has initiated an inventory of the approximately $35 million of equipment and the Deputy Assistant Secretary for A&MM will provide support. To prevent similar problems in the future, the Deputy Assistant Secretary for A&MM has initiated the use of Contract Review Boards to ensure effective and efficient contracting operations. He also agreed to work with OGC to determine whether VA can recover the approximately $4.7 million in apparent duplicate billings and the $3.8 million that was billed with no deliverables. The Deputy Assistant Secretary for A&MM also agreed to take appropriate administrative action.

The Acting General Counsel disagreed with our finding that Modification 0001, which changed Task 8.d. to IDIQ, and the task orders that were issued against Task 8.d. constituted prohibited cardinal changes to the contract. The Acting General Counsel also non-concurred with our recommendations that OGC work with OA&MM to establish clear policy regarding the use of appropriate contract types and contract changes, to include specific guidelines on the use of IDIQ contracts, and to determine whether VA can collect the overcharges identified in our review.

With respect to whether the actions were cardinal changes, we reviewed the legal analysis prepared by OGC, including the case law cited therein, and determined that it was not sufficient to cause us to change our findings and conclusions. Although OGC indicated that they reviewed the issue in-depth prior to approving Modification 0001, they did not provide any supporting documentation. In response to our request for records, the Deputy General Counsel told us that "thorough review and analysis are not always reduced to writing." As discussed in greater detail in our comments to OGC's response on page 33, we found that OGC did not have sufficient facts regarding the impact on competition. As one example, our conclusions were based in part on information that we obtained from unsuccessful vendors; OGC did not have this information when they did their review. With respect to the task orders issued against Task 8.d., our conclusion was also based on opinions of the program officials who have the technical expertise. OGC offered nothing to refute the opinion of the VA experts.

OGC's non-concurrence with implementing our recommendations will most likely result in a continuation of contract failures such as this and make it difficult to determine whether VA has a basis to recover overcharges.

*(original signed by Jon A. Wooditch,*

*Deputy Inspector General for:)*

GEORGE J. OPFER
Inspector General

# Introduction

## Purpose

CIRC is the program used in VA to assure the confidentiality, integrity, availability, and privacy of information and services for veterans. The VA-CIRC operates to ensure that computer security incidents are detected, reported, and corrected as quickly as possible and with minimal impact on the availability and integrity of veterans services. The purpose of this review was to evaluate the planning, award, and administration of the VA-CIRC contract.

## Background

Federal agencies are required to establish a CIRC that interfaces with the Federal Computer Incident Response Capability and provides state-of-the-practice incident handling and response capabilities. Prior to award of the contract, VA operated a CIRC, but needed to expand the current capability to achieve a much broader, world-class operational CIRC and SOC environment. The goal was to provide 24X7 (365 days), integrated information assurance across the enterprise's security operations, and to provide managed security services for developing, deploying, and managing VA's security posture.

On November 20, 2001, VA issued a Request for Information (RFI) for potential sources capable of providing cyber security services in support of its CIRC.[1] The announcement specified that the CIRC will provide services that help the VA Chief Information Officer provide assurance that cyber security controls are in place to protect automated information systems from financial fraud, waste, and abuse. The announcement also stated the CIRC will assist in preventing future incidents from occurring by providing the Office of Cyber Security with materials for use in awareness activities and distribution throughout VA. The CIRC will also help VA contain computer incidents by providing the necessary countermeasures and response mechanisms to deal with cyber security incidents.

On April 15, 2002, RFP 101-21-02, was issued with a proposal due date of May 13, 2002. In addition to the services required to support the CIRC, the RFP included requirements to support VA's MSS. Neither the RFI nor the Acquisition Plan discusses MSS and we were unable to find any other documentation to show planning for the requirement. The RFP was amended eight times for clarification, to provide additional information, to change the type of contract to be awarded, and to extend the deadline for proposals. On July 19, 2002, a contract valued at $102.7 million over a possible 10-year time period was awarded to VAST. VAST was a limited liability

---

[1] The acronym CIRC is used throughout VA as Central Incident Response Capability, Computer Incident Response Capability, and Critical Incident Response Capability.

corporation, incorporated in the State of Texas on July 12, 2002, just 7 days before the contract was awarded. The primary corporation behind VAST was SecureInfo, a small business located in Texas.

The CIRC Acquisition Plan identified both Mr. Dennis Maloney and Mr. Thomas Wagner as the CO. The majority of the contract documents show Mr. Wagner as the CO. Other documents refer to Mr. Maloney as either the CO or the Supervisory Contract Specialist. The original Contracting Officer Technical Representative (COTR) was Mr. Robert Pate. On January 6, 2003, Mr. Pedro Cadenas was designated as the COTR. Mr. Cadenas was also the Associate Deputy Assistant Secretary (ADAS) for Cyber and Information Security. On August 12, 2003, Mr. Johnny Davis was designated as Alternate COTR to act in the absence of Mr. Cadenas.

In August 2002, VA issued two task orders against the contract for additional services under Task 8.d. even though there were no provisions in the contract permitting VA to request and pay for additional work. On October 8, 2002, the CO issued Modification 0001 to add IDIQ clauses to the contract retroactive to August 14, 2002. Modification 0001 was approved in writing by the Office of General Counsel within 1 day after receiving a telephone request from the CO. In total, 22 task orders valued at $48.6 million were issued against Task 8.d.

In July 2003, VA exercised Option Year One of the contract. Prior to exercising the Option Year, VA revised the statement of work and requirements and VAST was required to submit and negotiate a new cost proposal. The Modification exercising Option Year One increased the Firm Fixed-Price for the option year more than $5 million above the Firm Fixed-Price that was negotiated and awarded in July 2002. In March 2005, the contract was allowed to expire due to lack of funding.

## Scope and Methodology

To address the objectives of this review, we reviewed contract files maintained by Office of Acquisition & Materiel Management (OA&MM) and task order files maintained by the Program Manager (PM). We obtained contract planning and award information from the OA&MM contracting officials and contract administration information from the PM and the COTR. We also reviewed available documentation related to a protest filed against the award of the contract. We interviewed both current and former VA employees and unsuccessful bidders. We reviewed VAST and SecureInfo business records and financial information that we obtained through an OIG subpoena.

# Results and Conclusions

## Issue 1: Failure to adequately plan, award, and administer the requirements for Managed Security Services resulted in significant overpayments and the ultimate demise of the contract.

## Findings

On April 15, 2002, VA issued the RFP to award a Firm Fixed-Price Performance Based Service Contract. Proposals were to be submitted by May 13, 2002. The RFP indicated that the contract would include a base year and 9 option years. Although records relating to acquisition planning show that the intent was to award a contract to meet VA's requirements for CIRC, the RFP also contained requirements for MSS. We found that deficiencies in the planning, solicitation, evaluation of proposals, award, and administration of the contract for MSS resulted in uncontrolled spending, overpayments, and illegal contracting actions that resulted in the ultimate demise of the contract due to lack of funding. These deficiencies essentially made the contract an open checkbook for IT-related expenditures and continued until VA had no funding available to support the contract. Less than 3 years into the expected 10-year life of the contract, VA had spent about $91.8 million of the awarded contract value of $102.7 million.

### 1. MSS requirements were not well-defined or directly related to CIRC.

On November 20, 2001, VA issued a RFI seeking potential sources capable of providing cyber security services in support of its CIRC. It is unclear from the records provided when the decision was made to include MSS in the procurement; however, it was included in the RFP as Task 8. Because the RFI was limited to VA's CIRC requirements, VA may not have identified the universe of offerors who could provide both CIRC and MSS services.

While there appears to have been adequate planning for the CIRC requirements, we found no evidence of planning for the MSS requirements. For example, the RFI sought potential sources for CIRC; no RFI or other market research was conducted to identify potential sources for MSS. We also could not find any documentation showing that the program office considered whether it would be in VA's interest to award separate contracts for these two separate and distinct functions. We concluded that the failure to adequately plan for these services resulted in significant cost overruns and the ultimate demise of the contract in less than 3 years. The failure of the contract significantly impacted VA's CIRC operations. Had VA awarded separate contracts for the two functions, the cost overruns and other issues relating to MSS may not have impacted the CIRC program.

Task 8.d. in the April 15, 2002, RFP addressed VA's MSS requirements:

> The contractor will provide best of breed managed security technologies and services, based on industry best practice, to include acquisition, installation, integration, configuration, management and monitoring of the VA enterprise cyber security infrastructure (i.e., firewalls, filtering routers and switches, and proxies; network and host based intrusion detection capabilities; remote access and virtual private networking services; demilitarized zone protections and antivirus and content filtering solutions). The contractor will also provide: vulnerability assessment and penetration testing services; cyber security intelligence gathering, analysis, and reporting engineering support for secure network operations (e.g., services, ports, and protocols analysis; strong user and device authentication and public key infrastructure (PKI) implementation). These technologies and services will directly support the VA Enterprise Cyber Security Infrastructure Project (ECSIP) that will initially establish secure external network connections and critical information repository protections at VA's major data centers. Accordingly, the contractor will also be expected to manage and monitor other network devices and services that directly support the cyber security infrastructure. Separate task orders will be developed as individual sites, and associated site-specific cyber security services, are identified.

We found that many of the questions submitted by potential offerors related to clarification of the MSS task. VA's general response was that, "Managed services will be executed as part of the managed services task. Individual task orders will be written against this task for each location as necessary." This statement was confusing to offerors because it suggested additional work would be requested under task orders, but the RFP did not contain IDIQ or requirements clauses. As such, the offerors followed VA's instructions and proposed Firm Fixed-Prices for the services required under Task 8.d. However, we found that all services under Task 8.d. were paid separately under additional task orders issued against the initial contract, which resulted in VA overpaying approximately $3.8 million for MSS.

The following question is representative of many questions VA received relating to Task 8.d., and demonstrates the confusion with respect to MSS requirements:

> SOW and deliverables 8a, 8b, and 8c require that the offeror develop a concept and architecture for managed security services, and complete a cost-benefit analysis. Deliverable 8d is described as 'Managed Security Services'. Request clarification on Deliverable 8d. Is the offeror to price the estimated cost of providing the 'managed security services', or should the deliverable be 'to provide pricing for managed security services', and Government will then issue separate task orders to order required managed services. . .
>
> [i]f Government requires pricing for Deliverable 8d as part of proposal submission, we then request Government to identify specific services to be provided and scope and frequency of each service, in order to prepare proper pricing.

VA's response to this and other similar questions failed to address the concerns:

> [C]ontractor is to provide 8a, 8b, and 8c as part of the proposal solution. 8d is the cost that the bidder is proposing to provide the managed security services. The bidder is expected to provide the services after the Government acceptance of 8a, 8b, and 8c.

Shortly after award, the contract was modified to an IDIQ contract for MSS to be provided under Task 8. This modification resulted in the award of 22 non-competitive task orders within a 2-year period, the majority of which VA officials concluded were outside the scope of the MSS requirements. The change to IDIQ allowing VA to issue additional task orders for MSS resulted in VA overpaying for services provided under Task 8.d. As part of the Firm Fixed-Price award, VA paid $1.8 million in the base year and another $2 million in the First Option Year with no specific or identifiable deliverables. All Task 8.d. deliverables were paid for under the 22 separately priced task orders with no off-set against the $3.8 million VA paid under the awarded Firm Fixed-Price for Task 8.d.

## 2. Contract type was not clearly defined and the award was inconsistent with the amended RFP.

Records show that from the planning phase through award, VA did not clearly define the type of contract to be awarded. We concluded that the addition of MSS requirements to the RFP for the CIRC contract caused confusion within VA and to potential offerors with respect to the type of contract to be awarded. Whereas a Firm Fixed-Price contract was appropriate to meet VA's CIRC requirements, it may not have been the appropriate contract type for the MSS requirements. The scope of VA's MSS requirements was not known at the time of award either because of inadequate acquisition planning or the nature of the services, or both. VA's failure to distinguish in the RFP the type of contract to be awarded for CIRC requirements versus MSS requirements resulted in serious deficiencies in the solicitation, award, and administration of the contract.

The draft RFP, dated March 8, 2002, stated that the solicitation will result in a Firm Fixed-Price Award Term Incentive Contract. A March 20, 2002, Memorandum for Record from Acquisition Operations Analysis Service states that the resulting award will be Performance Based Firm Fixed Labor Rates. The RFP issued on April 15, 2002, stated that the solicitation would result in a Firm Fixed-Price Performance Based Service Contract. Amendment 006 to the RFP, issued May 7, 2002, stated that the award would be "Firm Fixed Labor Rates. Amendment 008, issued May 14, 2002, further stated that all references in the solicitation to Firm Fixed-Price were changed to Firm Fixed Labor Rate and that no costs other than labor hour rates would be considered.

Amendment 008 was internally inconsistent, thus causing additional confusion to potential offerors. It was not clear whether VA was going to award a Firm Fixed-Price contract for labor only or award a contract based on labor hour rates. The proposals and other documents available for our review showed that the offerors submitted a Firm Fixed-Price for the labor costs associated with each task and subtask, including 8.d., MSS, a Firm Fixed-Price for equipment for Tasks 4 and 9, as well as a list of possible labor categories and an hourly rate for each.

Contrary to the provisions of Amendments 006 and 008, VA awarded a Firm Fixed-Price contract with fixed-prices for deliverables for each task identified in the RFP. The awarded prices included a fixed-price for the labor portion and a fixed-price for equipment for Tasks 4 and 9. Although not evaluated during the selection process, proposed labor categories

and rates included in VAST's proposal were in an attachment when the contract was awarded and appear to have been used to determine prices for task orders issued against the contract for additional work under Task 8.d., MSS.

After the RFP was issued, VA received multiple questions from potential offerors seeking to clarify the services that VA required. Prospective offerors questioned the use of a Firm Fixed-Price contract because the required facilities, equipment, and services identified in the RFP were not sufficiently defined to bid fixed-prices for the required work. They added that this approach could result in additional costs to cover pricing risks. Several offerors told us that the lack of clarity regarding the type of contract caused them to inflate prices.

Although offerors submitted labor categories and labor rates for each category with the proposal, we found no evidence that this information was evaluated as part of the selection process. The selection criteria did not include criteria for evaluating labor rates and, as discussed in detail later, the price evaluation was limited to the total price proposed for the base year of the contract.

We were unable to compare the labor rates proposed by VAST and those proposed by other offerors because VA did not identify or define the labor categories required and each offeror proposed different labor categories. Because VA did not evaluate the proposed labor rates, we concluded that VA did not make a price reasonableness determination, as required by FAR, before including the proposed labor categories and rates in the contract award.

It does not appear that the level of MSS services required by VA under Task 8.d. was known at the time of award, either because of poor planning or the nature of the work, or both. However, if it was VA's intent from the outset that the services would be ordered when needed, the RFP should have clearly distinguished Task 8.d. from the other tasks in the RFP and advised offerors that Task 8.d. would be awarded based on labor hour rates and the award for the remaining tasks would be firm fixed-price. This would have resulted in less confusion and better pricing.

3. **Contract Modification 0001 changing Task 8.d., MSS, from Firm Fixed-Price Performance Based Service to a Firm Fixed-Price IDIQ Contract was a prohibited cardinal change resulting in non-competitive award of task orders resulting in significant cost overruns.**

The contract, awarded in July 2002, included a total of $82.9 million in recurring labor costs for the base year, 9 option years, and 1 incentive option year and $19.8 million for equipment and supply cost spread evenly over the anticipated contract term. Shortly after award, VA began issuing task orders for additional work purportedly for services described in Task 8.d. On October 8, 2002, the CO issued Modification 0001, with a retroactive date of August 14, 2002, which changed Task 8.d. from Firm Fixed-Price Performance Based to Firm Fixed-Price IDIQ. The modification increased the maximum contract value about $147 million more than the awarded contract. By the time the contract was allowed to expire in March 2005, VA had issued 22 task orders for additional work under Task 8.d.

valued at approximately $48.6 million. Although the additional work was supposed to be within the scope of the requirement for MSS in Task 8.d. of the contract, records show that VA officials determined that the majority of the work was outside the scope. We concluded

that Modification 0001 was a cardinal change to the contract because it increased the scope of work beyond that which was evaluated and awarded as a firm fixed-price contract. The task orders issued against Task 8.d. were essentially awarded non-competitively and with little or no assurance of price reasonableness. These actions resulted in a contract that was an open checkbook for IT-related expenditures and continued until VA had no funding available to support the contract. The expiration of the contract in less than 3 years left VA without the congressionally mandated CIRC program.

a. Modification 0001 improperly changed the contract type, increased the scope of work required under Task 8.d and increased the value of the contract award.

On August 14, 2002, the CO issued a *Determination and Finding*, which included the following:

> ...appropriate clauses shall be added to the contract that allow an Indefinite Quantity contract type for CLIN 30, Managed Security Services, to coexist with a fixed price contract to provide the means to issue task orders as needed by individual VA Field Facilities and the Issuing Office to maintain DVA IT security efficiently and timely under the same contract vehicle. It should be noted that strict controls shall be placed on Field Facilities to obtain prior approval from the Cyber Security COTR and the Contracting Officer for all task order requests to insure that each task order requirement is appropriate under the contract statement of work.

The *Determination and Finding* further states that this modification adds clauses that were inadvertently left out of the solicitation terms and conditions and that the modification succinctly defines the solicitations original intent of Task 8.d. The following is included under *Reason for Authority Cited*:

> The intent of the solicitation was to provide a mechanism to allow the Department of Veterans Affairs (DVA), Information Technology Service to integrate all the cyber security requirements of all field facilities nationwide under a central jurisdiction utilizing the provisions of one national contract vehicle for cyber security operations. To accomplish this, the Office of Cyber Security requested a performance based service contract that will provide 'best of breed' technologies enabling the VA Cyber Security Operations to transform and evolve as the Information technology Industry evolves.

The CO's rationale for adding the "inadvertently left out" clauses and changing the type of contract is based on the fact that 16 proposals were received and each provided a cost for Task 8.d., MSS, without exception. Since everyone proposed a cost for this mandatory task, it "can be shown that known industry standards of Managed Security Services in the IT community is consistent with the DVA Office of Cyber Security's intention for this contract line item and the services provided under this line item for additional task orders." Although the proposals responded to the RFP and included a line item for MSS, records

and our discussions with unsuccessful offerors show that there was no clear understanding of the scope of work for Task 8.d.

We question the accuracy of the CO's rationale and conclusion. We believe the modification represents a cardinal change to the contract because it increased the scope of work and the type of contract awarded, both of which significantly increased the value of the contract and affected the competition. As noted previously, the uncertainty with respect to Task 8.d. caused offerors to inflate prices. Considering that the total firm-fixed price for base year labor costs was the sole determining factor in selecting VAST, the failure of VA to include an IDIQ clause, with minimum and maximum dollar amounts, in the RFP, affected competition.

We also question the representation that the clause was "inadvertently" left out. We found nothing in the contract file showing that the matter was discussed prior to solicitation and award. The need for clarification of the RFP was raised by the CO early in the process. In a March 14, 2002, email to various Office of Cyber Security (OCS) and OA&MM personnel, the CO discussed the RFP. He directed attention to a couple of areas that need particular attention including language on using task orders for additional work in scope not yet identified. We found no response in the records provided and no indication that the issues raised by the CO were resolved prior to solicitation, evaluation of proposals, and contract award. Lastly, Modification 0001 increased the potential maximum value of the contract to $250 million and we could not find any documentation in the record to support a statement that this was consistent with prior estimates.

Based on our interviews with unsuccessful offerors, we concluded that the ambiguities in the RFP with respect to Task 8.d., as raised in the questions submitted by potential offerors, and VA's responses thereto, did not clarify the requirement of Task 8.d. or the separately priced task orders that would be issued to meet these requirements. Offerors told us that the uncertainties with respect to the work required under Task 8.d. caused them to propose inflated fixed prices.

On October 2, 2002, the CO verbally requested a written opinion from OGC regarding proposed Modification 0001. Within 1 day, on October 3, 2002, OGC provided a written opinion to the CO, which stated that if two suggested comments were followed the office will have no legal objection to the proposed supplemental agreement.[2] The suggested changes were very technical in nature and did not address the significance of the modification in relation to the underlying contract.

We found no evidence that OGC reviewed any documents relating to the solicitation and award of the contract to determine whether the modification would constitute a prohibited cardinal change. The OGC opinion appears to be solely based on a review of the terms of the proposed modification. A legal opinion of this magnitude should have included a detailed review of the solicitation documents, proposal evaluation, the basis for award of the contract, and the impact the modification would have on the scope of the contract.

---

[2] The OGC reference to supplemental agreement is synonymous with Modification 0001.

b. Task Orders may have been outside the scope of Task 8.d.

Prior to issuing Modification 0001, two task orders for additional work under Task 8.d. had been issued. During the first year of the contract, 15 task orders were awarded against Task 8.d., MSS. Ultimately, the CO approved a total of 22 non-competitive task orders from September 17, 2002 to September 15, 2004, valued at approximately $48.6 million. A list of the task orders and associated modifications is provided in Appendix E.

During a February 9, 2005, meeting attended by representatives from OA&MM, OCIS, and OGC; a representative from OCIS stated that additional task orders were issued at the request of other program offices, though that was not known by the program office at the time. However, all task orders were signed by a VACO contracting officer. At a minimum, all requests for task orders should have been approved by the COTR who was located in the responsible program office, OCIS. The contract modification specifically stated that strict controls shall be placed on Field Facilities to obtain prior approval from the Cyber Security COTR and the Contracting Officer for all task order requests to insure that each task order requirement is appropriate under the contract statement of work. Requests for task orders should not have been approved or awarded without the approval and determination of the COTR that they were within the scope of Task 8.d. This shows poor contract administration by the program office and the contracting activity.

In a briefing prepared for VA senior management on or about April 15, 2005, a statement was made that although the Acquisitions Operation Service has issued 22 task orders, the OCS program office (hereinafter referred to as the program office) has confirmed that only 5 were in support of the VA CIRC project as originally described in the Statement of Work.[3] According to this document, only $7.6 million of the $48.6 million (16 percent) expended for task orders related to the CIRC project as originally described. Our discussions with Mr. Pedro Cadenas, former ADAS, Office of Cyber and Information Security, and COTR for the contract, revealed a different perspective. Mr. Cadenas told us that all of the task orders could be considered out of scope. Although Mr. Cadenas indicated in his discussions with us that he was not involved in many of the issues we identified with this contract, records show otherwise. He appears to have been intricately involved in the administration of the contract. Whether there were 17 or 22 out of scope task orders, any task order that was out of scope of Task 8.d. would be a prohibited cardinal change to the contract.

---

[3] The five Task Orders are:
- 0005 for ADV Systems ($223,512
- 0007 for the expansion of call center services ($2,634,123)
- 0010 for cyber security subject matter expert support ($134,000)
- 0012 for Intrusion Detection System support ($3,857,474), and
- 0022 for software license that would enable VAST to deliver the monitoring and reporting capabilities specified on the SOW ($788,810)

## Issue 2: Deficiencies in the evaluation of offers adversely affected selection of CIRC contractor.

## Findings:

Although VA considered the award of the CIRC contract to VAST as based on "best value" to the Government, the price evaluation process only included the total base year firm fixed-price for labor costs. There is no evidence that prices for the 9 option years and equipment prices were evaluated or considered in the selection process. As a result, the CO awarded a multi-year contract for $102.7 million to VAST based only on the base year labor costs of about $6.7 million.

VA treated the procurement as a small business set-aside; however, we concluded that VAST did not meet the requirements for a small business in that the teaming arrangement inappropriately included large businesses as part of the team, not as subcontractors. VA could not discern from the proposal submitted by VAST that small businesses would be performing 51 percent of the work requirements, and did not monitor for compliance during the term of the contract.

VAST was a limited liability corporation that was incorporated in the State of Texas on July 12, 2002, after proposals were submitted and 7 days before the contract was awarded. There is no evidence that the impact of this significant change from a joint venture to a corporation was considered in the evaluation process. Because VAST is a limited liability corporation with no assets, VA has little or no leverage to recover overpayments.

1. **Documentation shows inadequate evaluation of proposed prices.**

The award was based on "best value" to the Government. The factors to be considered were technical proposal, past performance, and lastly, price. Records show that the scores for technical merit and past performance were equal for five responsible/responsive vendors, and VA selected VAST solely on the basis that VAST offered the lowest Firm Fixed-Price for the labor portion of the proposal for the base year of the contract.

Although required under FAR 15.404-1, we found no documentation of a determination of cost realism, what type of cost realism analysis was performed, or what type of Government estimate was used to determine if the offerors' proposed hours and costs were reasonable for the work required.

Records indicate that all of the proposals contained firm fixed-prices for equipment costs, but there is no evidence that this pricing component was evaluated or considered in the selection process. For VAST, these equipment costs constituted approximately 17 percent of the total proposed firm fixed-price.

The RFP required prospective contractors to submit prices for the base year and each of the 9 option years. However, the price evaluation process included only the total base year firm fixed-price for labor costs, which violated FAR 17.206. Although VAST was the low offeror, there was no assurance of price reasonableness for the option years and the subsequent task orders since the CO based the award on the proposed base year labor costs. As a result, the CO awarded a multi-year contract for $102.7 million to VAST based only on the base year labor costs of about $6.7 million.

## 2. VAST did not qualify as a small business.

We considered whether VAST qualified as a small business to be eligible for award of this contract. We also considered whether the VAST proposal met the small business work requirements in the RFP. We concluded that VAST did not qualify as a small business and that the proposal did not contain sufficient information to show that VAST could meet the small business work requirements. We also determined that VA did not establish criteria for reviewing compliance with these requirements.

During the planning process, VA determined that regulations do not allow a joint venture of a Small Business and a Large Business to meet the small business requirement to be considered for the contract. However, two or more small businesses could team together and submit a proposal as a joint venture as long as the small businesses combined complete 51 percent of the work under the contract. This would allow the small businesses to subcontract to one or more large businesses, but for not more than 49 percent of the contract performance. When the proposal was submitted, VAST was a joint venture, not a limited liability corporation. The VAST proposal identified three large businesses as part of the VAST Team, not subcontractors. In the June 26, 2002, revised proposal, the VAST Team is described as "six small businesses comprising the VAST joint venture...teamed with three premier large businesses: SIGNAL, SAIC, and Compaq." Section 1.a.1, Executive Summary of VAST proposal states "Combining the assets of these partners, i.e., more than 180,000 technical professionals, their facilities, and their specific CIRC-related skills and experience, the VAST Team is ideally situated to assist the VA in achieving their CIRC program goals." Based on this information alone, VAST should have been disqualified as non-responsive to the small business requirement because the teaming arrangement between the small businesses and the three large businesses did not meet the regulatory requirements to be considered as a small business. A second determination should have been made when VAST was incorporated prior to award.

VA's July 25, 2002, press release is further evidence that VAST did not qualify as a small business. The press release stated: "VAST, along with business partners including Compaq, Science Applications International Corporation (SAIC) and Signal Corporation will plan, establish and manage the state-of-the-art central incident response capability." The press release also stated that VAST is led by SecureInfo Corporation and "qualified small business partners include Adtech Systems, Applied Engineering Management Corporation, DSD Laboratories, Seidcon and Team BI."

Just prior to award, VAST was incorporated as a limited liability corporation, which changed the offeror from a joint venture consisting of small and large business entities, to a corporation with no status as a small business. Records indicate that VA was aware of the change but did not consider the impact it would have on whether VAST qualified as a small business to be eligible for award.

The RFP encouraged joint ventures of two or more small businesses and directed that the combined small business must complete 51 percent of the contract. The RFP contained FAR clause 52.219-14, Limitations on Subcontracting, which prescribes that for services at "least 50 percent of the cost of the contract performance incurred for personnel shall be expended for employees of the concern." In determining whether teaming arrangements meet the 51 percent requirement, the Small Business Administration (SBA) considers whether the joint venture participants or partners perform the primary or vital portions of the Statement of Work. SBA also considers whether teaming arrangements clearly set forth the relationship between the parties, as well as the individual roles and responsibilities assigned. The RFP contained no defined criteria to measure compliance with Small Business work requirements.[4]

The Acquisition Plan directed the Source Selection Acquisition Team to conduct an in-depth review and evaluation of each proposal against the solicitation requirements. This would include an evaluation of compliance with the small business work requirements. We were unable to identify any criteria or process established to evaluate proposals against this requirement. In addition, there were no criteria for monitoring compliance with this requirement after award.

The only evidence in the records provided showing that the issue of compliance with the small business work requirements was addressed in the source selection process is contained in a letter to an unsuccessful offeror. This offeror, who had an acceptable technical proposal and offered a firm fixed-price that was comparable to the winning bid, was sent a letter stating there was a concern the small business was not performing 51 percent of the work as required given the amount of involvement by their subcontractor" (a large business). The small business failed to demonstrate and illustrate where they were assuming 51 percent of the work (i.e. accounting) and that all of the senior key personnel were from the large business subcontractor. Overall, there appeared to be a strong dependence on the large business subcontractor in the performance of the contract.

The information contained in VAST's proposal should have raised the issue of VAST being ineligible to perform as a small business. For example, we found that VAST identified more key personnel employed by the large businesses providing services under this contract than key personnel employed by the small business in the joint venture. For several key personnel, the proposal stated the individual would be hired but did not say by whom. In addition, information on Past Performance submitted by VAST included the performance of large businesses. Neither the technical evaluation team nor the CO recognized

---

[4] On February 6, 2002, the VA Office of Small & Disadvantaged Business Utilization concurred in a set-aside of a $94 million CIRC acquisition for small business concerns.

inconsistencies in VAST's statement or the impact on determining whether VAST could meet the Small Business work requirements.

We found no evidence that VA verified VAST's proposed small business eligibility before or after incorporation, nor did we find evidence of verification of continuing small business compliance during the life of the contract. In January 2005, the Acting Deputy Assistant Secretary (ADAS) OA&MM told the OIG that he had recently initiated a policy requiring contractors to report bi-weekly on the percentages of work performed by the prime small business contractor and subcontractors. Follow-up efforts were unsuccessful since the ADAS resigned in August 2006.

### 3. The evidence did not support that VAST was a responsible contractor.

Contracts can only be awarded to responsible prospective contractors and award cannot be made unless the CO makes an affirmative determination of responsibility. The general standards a prospective contractor must have to be determined to be responsible are detailed in FAR 9.104 and include:

- Have adequate financial resources to perform the contract, or the ability to obtain them.

- Be able to comply with the required or proposed delivery or performance schedule.

- Have a satisfactory performance record.

- Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them.

- Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them.

- Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

By awarding the contract to VAST, the CO determined that VAST met these requirements and qualified as a responsible contractor. The Pre-Award Business Clearance Memorandum, dated July 18, 2002, stated that the "six small businesses...that make up this joint venture contract have been determined by the contracting officer to be responsible in accordance with FAR Part 9 and not on the List of Parties Excluded from Federal procurement and Nonprocurement Programs." This statement shows that the Contracting Officer failed to either recognize that VAST was a corporation, not a joint venture, or the significance of the incorporation on VAST's status as a joint venture. The responsibility determination should have focused on whether the corporate entity was responsible.

The use of teaming arrangements or joint ventures is clearly allowed by FAR 9.6 stating the "Government will recognize the integrity and validity of contractor team arrangements; provided, the arrangements are identified and company relationships are fully disclosed in

an offer…"  VAST disclosed that it was a limited liability corporation incorporated in the State of Texas and that it was a joint venture and provided information relating to the six small businesses that formed the joint venture.  In addition, VAST identified three large businesses that would perform under the contract as "team" members, but were not parties of the joint venture.  This information would have been sufficient to make a responsibility determination if the individual companies comprising the joint venture were parties to the contract.  However, the contract was awarded to VAST, a limited liability corporation formed solely for the purpose of submitting a proposal under this RFP.

There is no evidence in the records indicating that VA evaluated whether VAST met the requirements of FAR 9.104.  Based on our review of the records obtained in response to our subpoena, we concluded that VAST should have been determined as non-responsible or, at a minimum, should have been assigned a higher risk rating in comparison to the other four offerors who received equal technical evaluations.

There is no indication in the records that anyone involved in the selection process made any inquiries into the financial structure or stability of VAST.  Because the prime contractor was VAST, VA had no contractual arrangement with the members of the joint venture who subsequently became subcontractors to VAST, and could only hold VAST responsible for contract performance, overpayments, etc.  Prime contractor/subcontractor arrangements are often in the Government's best interest since issues generally are resolved with the prime contractor eliminating the need to deal with subcontractors.  Generally the prime contractor wants to protect future business possibilities, so the Government has financial penalties and poor performance ratings as leverage.

However, in this case, our review of corporate records showed that VAST had no assets and the only business that the corporation had was the VA contract.  Funds paid to VAST were used to pay outstanding obligations and remaining funds were transferred to SecureInfo.  In essence, the corporation was nothing more than an empty shell.  The fact that VAST was a new corporation, not just a joint venture, should have raised a red flag during the evaluation of proposals and during negotiations because the corporate structure gave the Government little or no leverage or recourse if there were overpayments or other reasons to recoup funds.

## Issue 3: Deficiencies in contract administration resulted in a cardinal change with the exercise of Option Year One, double-billing, and overpaying for services and equipment.

## Findings

Prior to exercising Option Year One, VA revised the contract requirements and had VAST submit a new pricing proposal.  This changed the scope of work and increased prices without competition and constituted a cardinal change to the contract.  In addition, we found that unpaid balances for task orders issued in the base year were rolled into the new price proposed and awarded for Option Year One; however, VA separately paid the same costs under the individual task orders.  As a result, VA overpaid VAST about $4.7 million, which is most likely uncollectible due to the fact that VAST has no corporate assets.  We also found

that VA did not properly review or monitor costs for equipment, including the buy out of leases; and that invoices were not properly certified by the COTR before payment. We found that the most recent COs acted appropriately when they refused to pay more than $4.8 million that VAST billed VA after the contract expired.

1. **The exercise of Option Year One constituted a cardinal change to the contract.**

On July 17, 2003, the CO issued Modification 0003 to exercise Option Year One. Although the period of performance should have been from July 19, 2003 through July 18, 2004, the Modification was limited to July 19, 2003 through March 18, 2004. The awarded price for the 8-month time period was $8,200,000, which was consistent with the July 19, 2002 award. On September 22, 2003, VAST submitted a new proposal in response to VA's revised statement of work. On October 17, 2003, the CO issued Modification 0004, which accepted VAST's proposal and increased the contract award for Option Year One by an additional $4,526,683 and extended the period of performance for the full Option Year, through July 18, 2004. With Modification 0004, the total amount obligated for Option Year One was $12,726,683. On November 21, 2003, the CO issued Modification 0005 which accepted an October 22, 2003, proposal submitted by VAST to increase the number of Call Center and Tier III personnel. Modification 0005 increased funding by an additional $2,239,776. This increased the total cost for Option Year One to $14,966,469, which exceeded the offered and awarded price for the option year by $6,766,469. The increase was due to the fact that VA revised the tasks that were the basis of the original award and solicited new proposals from VAST. We determined that these Modifications changed the scope of work and, therefore, constituted prohibited cardinal changes to the contract.

FAR 17.207(f) requires the CO to make a written determination for the contract file that the exercise of the option year is in accordance with the terms of the option, the requirements of this section, and Part 6 (competition). To satisfy requirements of Part 6 regarding full and open competition, the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract.

In his written determination, the CO stated:

> The Option Year was part of the negotiated contract price solicited under FAR Part 12, as a full and open small business set-aside. The cost of Option Year One included $6,673,432 for the negotiated labor cost (Part 4) and $1,797,999 for the negotiated supplies/equipment cost (Part 7).

> An understanding that discussions of which specific tasks shall be rolled into the base contract for the Option Year and that a supplemental agreement will finalize the cost and scope of the base contract for the Option Year. The value of this supplement agreement was rounded up to $8,200,000.00.

The CO's assertion was not accurate. Although option years were negotiated under the original contract, the contract requirements were revised, and renegotiated to the extent

that it constituted a new contract. The revisions constituted prohibited cardinal changes to the contract; VA should have issued a new RFP and competed the requirements.

In addition, the original analysis and negotiations were no longer a viable basis to establish fair and reasonable pricing. Examples of the major changes that occurred with the new contract for Option Year One include:

- Ten tasks originally included under Option Year One were reduced to four tasks in the revised SOW.
- Several tasks not included in the original SOW were added.
- Ongoing IDIQ Task Orders issued under Task 8.d. of the original contract were rolled into the Option Year SOW. This represented a significant contract change and increase in cost.
- The Government's revised estimate, based on the July 17, 2003 SOW, projected a 51 percent cost increase.
- VAST's September 22, 2003, proposal included $3,848,166 of additional costs; a 56 percent cost increase associated with SOW changes.
- The negotiated cost (through Modification 0005) resulted in an 83 percent cost increase from the original estimate.
- The growth in cost for Option Year One is shown below:

| | |
|---|---|
| Original negotiated cost | $ 8,200,000 |
| Revised Government estimate | $12,362,046 |
| VAST proposed cost (9/22/03) | $12,726,683 |
| VAST revised proposed cost (10/22/03) | $14,966,459 |
| Award cost (thru Modification 005) | $14,966,459 |

In addition to not complying with the FAR when exercising Option Year One, the execution of Modification 0005, on November 21, 2003, was not in accordance with the FAR. When the modification was executed, the CO stated:

> This supplement Agreement increases the base support in option year one of contract V101(93)P-1898 by augmenting the VA CIRC with additional Call Center and Tier III personnel in order to handle an increase in support requests from the VA field sites, in accordance with contractor's proposal of October 22, 2003.
>
> The additional cost for this supplemental agreement is $2,239,776.00…to a new total of $14,966,459.00.

Because revisions to the terms and conditions of the original contact resulted in significant changes in scope and cost without competition, VA had no assurance that the prices offered by VAST were fair and reasonable. We found no evidence that the CO ascertained whether these changes were within scope or made any effort to determine whether the costs contained in VAST's new proposals were fair and reasonable.

**2. Task Orders included in Option Year One may have been double-billed.**

The CO's Price Negotiation Memorandum (PNM) for the exercise of Option Year One states:

> . . . during the base year of the contract 15 Tasks were ordered under CLIN 30, Managed Security Services, some of which included monitoring services that would continue through ends [sic] of the total contract period...required a restructuring of the initial contract statement of work to include IDIQ Task Orders that were identified as required to secure VA infrastructure during the initial phases of the base period. Task Orders OCS-0001 through OCS-0015 that were not complete were rolled into the base contract and included in the MOD that exercised Option year one for contract period of performance July 19, 2003 through July 18, 2004.

The PNM further stated that it "was determined that it would take time to develop a proposal that rolled all the tasks, including the equipment leases and software renewals that needed to be included in the cost."

We found that services and equipment for 9 of the 15 tasks orders extended into the Option Year One period of performance.[5] Based on the CO's statement, monitoring effort not completed and billed as of July 17, 2003, on these task orders was rolled into the negotiated price for Option Year One. An expected result would be that VAST would not bill and VA would not pay any further costs under these task orders.

Payment records show that not only was the Option Year One contract cost paid, but VAST billed and VA paid additional payments of $4,687,429 on the nine task orders that were rolled into Option Year One. As a result, VA paid VAST twice for at least some of the same services. Unfortunately, because VAST was essentially a shell corporation with no assets, VA may have no recourse against VAST to recover any overpayments.

The table below shows the nine task orders rolled into Option Year One and payments made after the effective date of Option Year One.

### Nine Task Orders and Payment Dates

| Task Order | Award Date | End Date | Task Order Amount | Payment Dates | Payment Amount* |
|---|---|---|---|---|---|
| OCS-0003/101-J27262 | 09/21/02 | 09/20/03 | $ 566,008 | 7/29/03 - 1/9/04 | $ 286,074 |
| OCS-0004/101-J37052 | 12/05/02 | 12/04/03 | 46,600 | 7/21/03 - 2/9/04 | 27,133 |
| OCS-0005/101-J37022 | 12/03/02 | 12/02/03 | 223,512 | 7/21/03 - 2/9/04 | 16,522 |

---

[5] Task Orders 0002, 0003, 0004, 0005, 0006, 0008, 0009, 0012, and 0014.

| OCS-0006/101 J37041 | 12/04/02 | 12/03/03 | 384,000 | 8/20/03 - 2/9/04 | 182,204 |
|---|---|---|---|---|---|
| OCS-0008/101-J37103 | 01/23/03 | 01/22/04 | 754,350 | 8/20/03 - 1/16/04 | 399,174 |
| OCS-0009/101-J37148 | 03/03/03 | 03/02/04 | 2,289,008 | 7/25/03 - 2/9/04 | 1,593,059 |
| OCS-0012/101-J37217 | 05/29/03 | 05/28/04 | 1,350,715 | 8/20/03 - 6/28/04 | 1,350,715 |
| OCS-0014/101J37221 | 05/27/03 | 05/26/04 | 675,819 | 7/21/03 - 6/21/04 | 647,020 |
| OCS-0015/101-J37224 | 05/28/03 | 08/27/03 | 185,528 | 8/20/03 - 2/17/04 | 185,528 |

TOTAL:                              $ 4,687,429

*Does not include payments made during the base year.

### 3. Significant equipment costs were not monitored and controlled.

We found that a significant portion of the costs associated with the contract were related to the purchase and/or lease of equipment. Although the original Firm Fixed-Price award included a recurring cost of $1.7 million for the base and each option year, these costs were associated with equipment needed for Tasks 4 (CIRC) and 9 (SOC). VAST did not propose, and VA did not award as part of the original contract any costs for equipment related to Task 8.d. However, VA paid an additional $31 million for equipment associated with the 22 Task Orders issued against Task 8.d. VA did not conduct any evaluation prior to award to determine whether the equipment was necessary or whether the proposed costs were fair and reasonable. We reached the same conclusion with respect to the equipment costs associated with the task orders.

Between May 10, 2003 and August 17, 2004, VA completed five equipment lease purchase buyout actions that resulted in additional costs totaling about $17.9 million. These buyout actions were completed through modification actions involving five existing task orders that had been awarded to VAST. We reviewed the documentation involving each buyout action and found inadequate supporting justification for buying the equipment. VA did not complete a cost benefit analysis and did not have an accurate inventory of the equipment being purchased and its operating condition.

Some VA employees recall being told to complete an inventory and some stated they actually conducted some type of inventory, but no one was able to produce a record or other evidence of the inventory. The most recent discussion with VA officials regarding the status of the VA-CIRC equipment confirmed that there is great uncertainty regarding the inventory. Apparently there is some equipment in a former VA-CIRC location and it is believed there is equipment throughout the field based on task order activity, but no record exists of what is there or its value.

The lack of accountability of equipment assets on the part of VA was apparent during the closeout of the contract. Contacts between OCIS and contracting officials showed there was little knowledge of what equipment belonged to VA versus contractor property. Equipment VA thought it had purchased was not included on inventory lists provided by VAST. This finding is another example of poor contract administration by the program office and the contracting activity.

### 4. COTR did not provide adequate oversight.

We reviewed 49 VAST invoices for 7 CIRC contract task orders totaling $24.9 million and found that 29 (59.2 percent) were approved for payment by the PM without the required certification and signature of the responsible COTR. The failure to adequately review invoices prior to payment combined with our findings related to weaknesses in the purchase and control of equipment indicates that VA did not have adequate assurance that approximately $85.7 million in contract payments were appropriate and that expected deliverables were provided.

The payment process included a mechanism for COTR certifications. Each month, VAST submitted electronic invoices to the VA Austin Finance Center for payment. Invoices were forwarded electronically to the PM and the COTR for certification and payment. Hard copies of the invoices would be printed and used to document the PM and COTR certifications. A key COTR responsibility is to review contractor's invoices and certify they accurately reflect work completed in accordance with the requirements of the contract and that appropriate deliverables have been received.

The contract involved contractor support at multiple VA sites around the country as well as network support services for all VA sites. Prior to the contract expiration, there was no evidence of verification of actual work completed or the acceptability of the contractor's performance.

Our concern about the lack of oversight and controls over completion of contract deliverables is also supported by the fact that after the contract expired, OCIS program officials and technical staff were aware that VAST had not completed a deliverable associated with Task Order 21 for a VA-Information Technology Integration Center vulnerability database. VAST missed database development deadlines and provided a prototype instead of the fully operational and functional database deliverable required. VA calculated that the uncompleted work represented at least $79,713 in cost that should not have been paid, but no action was taken to recover the amount paid. However, as previously discussed, VAST was a shell corporation without assets; therefore, it may be difficult to recover overpayments.

## 5. We found additional contract administration deficiencies.

a. <u>Prompt Payment Act requirements were not fully satisfied.</u>

Our review found that 36 (10.3 percent) of the 350 payments made to VAST were not completed within the 30-day time frame required by the Prompt Payment Act[6] resulting in $3,331 in interest penalties. We were advised by the PM that other work priorities caused the late payment of VAST invoices.

b. <u>Contractor employees did not have required background investigations.</u>

The CIRC contract was classified as "High Risk" with national security implications. Contractor employees with access to VA's information systems were required to have at least a "Minimum Background Investigation" prior to working on the contract. According to VA's response to a question submitted by a potential offeror, VAST was required to process necessary paperwork to obtain clearances within 30 days. We found that the PM, the COTR, and the CO did not ensure compliance with the requirement.

Our review found that a key VAST official and two other employees who provided services under the contract did not have security clearances. The contract file contained no documentation that the contractor complied with the background investigation requirement or that anyone in VA attempted to confirm their compliance.

c. <u>Contract expiration exposed VA to increased information security risk.</u>

Near the end of the extension of Option Year One, VA attempted to negotiate revised contract terms for Option Year Two with VAST. Negotiations failed and VA chose not to exercise the option year as originally negotiated, letting the CIRC contract expire. This action left VA without a comprehensive VA-wide security incident detection and reporting process when VA lost access to the web portal and the VA-wide automated incident reporting and tracking system that had been available under the contract.

During the week of February 22, 2005, the program office concluded that, based on their review of the entire VA-CIRC situation, discontinuing service with VAST would be in the best interest of VA. It was recognized if the CIRC services were discontinued; the entire VA infrastructure could be compromised.

During a meeting in early March 2005, that was attended by acquisition, program office, and General Counsel staff, the program office was asked how long it would take VA to stand up a CIRC replacement operation if they had to. The program group responded that it would take 90 to 120 days and discussed a possible location in Illinois.

---

[6] The Prompt Payment Act requires executive departments and agencies to pay commercial obligations within certain time periods and to pay interest penalties when they are late. The CIRC contract included FAR clause 52.232-25 "Prompt Payment" that required compliance with the Prompt Payment Act.

On March 17, 2005, the Director, Critical Infrastructure Protection Service (005S3), issued a memorandum to the Associate Deputy Assistant Secretary for Cyber and Information Security (005S) outlining cyber security contingency plans. The memo states, in part:

> The continued protection of VA's enterprise is the highest priority of the Office of Cyber and Information Security (OCIS). Unfortunately, VA has been unable to negotiate a reasonable agreement for the Government with the Veterans Affairs Security Team (VAST) LLC (the vendor supporting the VA Central Incident Response Capability (VA-CIRC). OCIS is therefore in the process of implementing its contingency plan.

The memo informed the VA workforce that effective immediately, VA was at CYBERCON Level 2 - a higher level of risk than previously under and directed that all IT and security personnel perform daily audits of logs pertaining to critical systems. Patching and configuration efforts should be a priority. The memo adds that due to the lack of availability of the Remedy System and the former VA-CIRC web portal, VA staff shall continue to report all security events to the Echelon III Information Security Officers. All other former VA-CIRC services were temporarily directed to their Government system owners.

Expiration of the contract increased VA IT vulnerability and required VA to rely on a less structured process of security incident detection.

### 6. Contracting Officers properly denied payment of invoices submitted after the contract expired.

On July 26, 2005, VAST submitted six invoices to VA totaling $4.8 million for debts VAST claimed were incurred to support CIRC contract work. Although the former General Counsel directed the CO to pay the invoice, the CO refused and the matter was assigned to another CO.

Documentation in the contract file showed the new CO reviewed the invoices and determined that the majority of the amounts claimed in the invoices were not supported based on the terms of the contract. The CO advised VAST representatives on September 26, 2005, that the invoices could not be processed since the contract expired. VAST could submit a claim for payment under the Contract Disputes Act of 1978. VAST was advised that once a claim was submitted, it would be reviewed and analyzed and the CO would make a decision on payment. In response, VAST withdrew the six invoices.

## Issue 4: VA did not properly refer allegations of impropriety

The CO and his Supervisory Contracting Specialist (CS) failed to forward an allegation of possible fraud, waste, and abuse to the OIG. In addition, both individuals failed to follow OGC Ethics Office advice regarding the allegation.

After the April 25, 2002, pre-bid conference, the CO received an allegation regarding an attempt to influence the source selection process. A potential bidder overheard

representatives of a then-current VA contractor claim they knew a key VA official involved in the contract and their strategy was to influence the Source Selection Board.

The potential contractor submitted the following anonymous email to the CO: "One of the large business contractors (EDS) doing work at VA has made claims that they know (individual name) well and has stated their 'team' strategy is to influence the 'source selection board'. As a competitor on the procurement, how do we insure fair and unbiased assessment from the 'source selection board' in their evaluation of all proposals?"

Upon receipt, the CO alerted the CS to the allegation. They contacted the named VA official and the then-current VA contractor officials implicated in the allegation. The VA official and the contractor officials denied any actions to influence the Source Selection Board. The VA official advised that although he was part of the evaluation team, "there are six other members of the 'team' that must be convinced that the winning proposal is the best bid. I don't have the controlling vote."

The CO discussed this matter with an OGC ethics office representative who agreed with the initial course of action, but recommended passing "this allegation of impropriety to the IG to show that we are not covering anything up and if the IG has an ongoing investigation this would be information they might be interested in looking at."

The CO discussed OGC's recommendation with the CS, who summarized his position as follows: "I have some reservations with this recommendation and would advise not doing so simply because it is elevating the issue beyond what is necessary and given the OIG's mission to investigate may initiate an action that is neither warranted nor necessary."

The failure to notify the OIG of an alleged impropriety and the decision to ignore the OGC recommendation is a cause for concern. The allegation should have been referred to the OIG. The decision to not refer the allegation was inappropriate. The decision of whether to investigate allegations of fraud, waste, and abuse should be made by the OIG.

## CONCLUSIONS

Deficiencies in the planning, solicitation, award, and administration of the contract with respect to Task 8.d., MSS, resulted in inflated pricing, cost overruns, and the ultimate demise of the expected 10-year contract in less than 3 years because of lack of funding. The primary cause was the lack of contract planning for MSS and contract Modification 0001, which changed Task 8.d. from a Firm Fixed-Price Performance Based Service to a Firm Fixed-Price IDIQ contract. This resulted in the award of 22 non-competitive task orders valued at more than $48 million, most of which were outside the scope of Task 8.d. This essentially made the contract an open checkbook for IT-related expenditures.

Even though VAST was the lowest price offeror, VA had no assurance of price reasonableness for the 9 option years and subsequent task orders because the award was based solely on base year labor costs of $6.7 million. The CO should have considered whether VAST, a limited liability corporation and not a joint venture, qualified as a small

business or was a responsible contractor. The determination that VAST was low risk was deficient in that the risk factors associated with a newly formed corporation with no performance history were not taken into consideration. Because VAST was a limited liability corporation with no assets, VA has little or no leverage to recover an estimated $8.5 million in overpayments.

During the planning for the CIRC contract, it was acknowledged that although VA was operating a CIRC, it needed to expand the capability to achieve a much broader, world-class operational CIRC and Security Operations Center (SOC) environment. CIRC was described as a key VA element identified to assure the confidentiality, integrity, availability, and privacy of information and services for Veterans." When the contract was allowed to expire, VA was forced back into a high risk situation relying on a less than world-class monitoring system.

## RECOMMENDATIONS

We recommend the following:

1. The Deputy Assistant Secretary for Acquisition and Materiel Management and the Assistant Secretary for IT perform an inventory of the approximately $35 million of equipment purchased under the contract.

2. The Deputy Assistant Secretary for Acquisition and Materiel Management and the Acting General Counsel:

   a) Establish a clear policy regarding the use of appropriate contract types and contract changes to include specific guidance regarding the use of IDIQ contracts.

   b) Determine whether VA can recover the approximately $4.7 million in apparent duplicate billings during CIRC Option Year One.

   c) Determine whether VA can recover the approximately $3.8 million billed with no deliverables.

3. The Deputy Assistant Secretary for Acquisition and Materiel Management:

   a) Take appropriate administrative action against the Contracting Officers who failed to adequately administer the contract.

   b) Take appropriate administrative action for the failure to refer allegations of impropriety.

Appendix A

# Deputy Assistant Secretary for OA&MM Comments

**Date:** February 1, 2007

**From:** Deputy Assistant Secretary for Acquisition and Materiel Management (049)

**Subject:** Review of VA Central Incident Response Capability Contract Planning, Award, and Administration

**To:** Office of the Inspector General

We have reviewed the subject report, and our responses to the recommendations for the Office of Acquisition and Materiel Management are attached.  We estimate completion of actions on both recommendations within 60 days of this response.

*(original signed by:)*

Jan R. Frye

Attachment

Appendix A

# Deputy Assistant Secretary for Acquisition and Materiel Management Comments to Office of Inspector General's Report

The following comments are submitted in response to the recommendations of the Office of Inspector General's Report:

## OIG Recommendations:

**Recommendation 1.  The Deputy Assistant Secretary for Acquisition and Materiel Management and the Assistant Secretary for IT perform an inventory of the approximately $35 million of equipment purchased under the contract.**

## OA&MM Comments:

Concur.  However, the DAS for OA&MM is not the lead staff element in this endeavor. This office will support the Assistant Secretary for IT in their attempt to inventory approximately $35M of equipment purchased under the contract.

**Recommendation 2.  The Deputy Assistant Secretary for Acquisition and Materiel Management and Acting General Council:**

**a.  Establish a clear policy regarding the use of appropriate contract types and contract changes to include specific guidance regarding the use of IDIQ contracts.**

## OA&MM Comments:

Concur with comment.  Clear guidance already exists in the FAR regarding the use of appropriate contract types and contract changes.  Use of inappropriate contract types and improper contract changes have occurred in the past primarily due to inadequate supervision of contracting officers and lack of process controls in Acquisition Operations Services (AOS).  Contracting officers must be supervised in their actions by their respective supervisors in order to ensure effective and efficient contracting operations. Accordingly, effective December 15, 2006, contract review boards (CRBs) are now mandatory for all procurements estimated to exceed $5M.  This requirement is codified by a written policy statement.  CRBs are designed to: 1) minimize vulnerabilities leading to potential protests, disputes, claims, and litigation against the department; 2) ensure compliance with established federal and department acquisition policies and procedures; 3) provide senior-level advice on contracting actions and support to the respective contracting officer; 4) provide consistency of procurements across the department; and 5) improve the knowledge of department acquisition personnel as they embrace and implement good business practices.  Rather than just an exchange of documents, a CRB fosters an interactive exchange of ideas and solutions to complex, high visibility, and high-dollar requirements.  The CRB process infuses a team atmosphere into the review

Appendix A

program by encouraging discussion, give-and-take, and consensus building. CRBs will convene at three critical junctures during the contracting process: before the solicitation is issued, before negotiations commence (if required), and before contract award. Contracting actions will not proceed beyond any of these milestones without the written approval of the CRB Chairperson. Technical and legal personnel are also CRB members. Leaders are now being held accountable, along with their subordinate contracting officers, for proper award of contracts.

**b. Determine whether VA can recover the approximately $4.7 million in apparent duplicate billings during CIRC Option Year One.**

**OA&MM Comments:**

Concur. OA&MM will confer with the VA Office of General Counsel to determine whether legal grounds exist to recover the approximately $4.7 million in apparent duplicate billings.

**c. Determine whether VA can recover the approximately $3.8 million billed with no deliverables.**

**OA&MM COMMENTS:**

Concur. OA&MM will confer with the VA Office of General Counsel to determine whether legal grounds exist to recover the approximately $3.8 million billed with no deliverables.

**Recommendation 3: The Deputy Assistant Secretary for Acquisition and Materiel Management:**

**a. Take appropriate administrative action against the Contracting Officers who failed to adequately administer the contract.**

**OA&MM Comments:**

Concur. The DAS for OA&MM will take appropriate administrative action against contracting officers who failed to adequately administer the contract.

**b. Take appropriate administrative action for the failure to refer allegations of impropriety.**

**OA&MM Comments:**

Concur. The DAS for OA&MM will take appropriate administrative action against personnel responsible for failure to refer allegations of impropriety.

Appendix B

# Assistant Secretary for IT Comments

**Date:** January 31, 2007

**From:** Assistant Secretary for Information and Technology

**Subject:** Review of VA Central Incident Response Capability Contract Planning, Award, and Administration

**To:** Office of the Inspector General

I concur. An inventory of equipment is underway and should be completed within 120 days.

*(original signed by:)*

Robert Howard

Appendix C

# Acting General Counsel Comments

OGC's Comment on OIG Report on Review of VA Central Incident Response Capability (CIRC) Contract Planning, Award, and Administration

In Results and Conclusions, Issue 1, paragraph 3 OIG wrote, in pertinent part, as follows:

> 3.    Contract Modification 0001 changing Task 8.d., MSS [Managed Security Services], from Firm Fixed-Price Performance Based Service to a Firm Fixed-Price IDIQ Contract was a prohibited cardinal change resulting in non-competitive award of task orders resulting in significant cost overruns.

> \*           \*           \*           \*           \*           \*

> On October 2, 2002, the CO verbally requested a written opinion from OGC regarding proposed Modification 0001.  Within 1 day, on October 3, 2002, OGC provided a written opinion to the office, which stated that if two suggested comments were followed the office will have no legal objection to the proposed supplemental agreement.[7]  The suggested changes were very technical in nature and did not address the significance of the modification in relation to the underlying contract.

> We found no evidence that OGC reviewed any documents relating to the solicitation and award of the contract to determine whether the modification would constitute a prohibited cardinal change.  The OGC opinion appears to be solely based on a review of the terms of the proposed modification.  A legal opinion of this magnitude should have included a detailed review of the solicitation documents, proposal evaluation, the basis for award of the contract, and the impact the modification would have on the scope of the contract.

The OIG's conclusion that this amendment constituted a change outside the scope of the contract or a 'cardinal change' is not correct because it does not follow established legal precedent.  OIG contends that the change was outside the scope for the following reasons:

> We believe the modification represents a cardinal change to the contract because it increased the scope of work and the type of contract awarded, both of which significantly increased the value of the contract and affected the competition.  As noted previously, the uncertainty with respect to Task 8.d. caused offerors to inflate prices.  Considering that the total firm-fixed

---

[7] The OGC reference to supplemental agreement is synonymous with Modification 0001.

Appendix C

price for base year labor costs was the sole determining factor in selecting VAST, the failure of VA to include an IDIQ clause, with minimum and maximum dollar amounts, in the RFP, affected competition.

This conclusion is not based upon a correct statement of the law. In determining whether a modification improperly exceeds the scope of the contract, GAO considers whether the contract as modified is materially different from the original contract for which the competition was held. 69 Comp. Gen. 294 (1990). The question of whether there is material difference is resolved by considering factors such as the extent of any changes in the type of work, performance period, the costs between the contract as awarded and as modified, and whether the agency itself had historically procured the services under a separate contract, as well as whether potential offerors reasonably would have anticipated the modification. *Data Transformation Corp.*, B-274629, Dec. 19, 1996, 97-1 CPD ¶ 10 at 6; *Stoehner Sec. Servs., Inc.*, B-248077.3, Oct. 27, 1992, 92-2 CPD ¶ 285 at 4.

Whether an amendment may have "affected competition" is not the legal standard. The question is whether the contract as modified was materially different. Following the standards outlined by GAO in the above citations of authority, we do not find that the change was outside the scope of the original contract. The issue of a scope change is never black and white. There is always a degree of subjectivity associated therewith. In simple English, the question is whether the change is for a different type of service and is so great an additional amount of services that the pool of vendors that initially responded could not have anticipated it and would be different, thus requiring the agency to conduct a new competition. By 'type' of work, GAO means the character of the services to be provided, not the contract vehicle. We found that this change did not constitute a "material difference" for the following reasons.

First, the initial contract requirements were consistent with an IDIQ contract format. The statement of work listed the Government's needs as tasks and deliverables, which are generally consistent with Indefinite Quantity/Indefinite Delivery (IDIQ) contracts. More importantly though, Task 8.d. specifically stated "Separate task orders will be developed as individual sites, and associated site-specific cyber security services, are identified." Task orders are only issued on IDIQ contracts. There are three basic contract types: fixed quantity, requirements, and IDIQ. Task orders are not issued on fixed-quantity contracts. On such contracts, the quantity may be increased or decreased to a certain extent, but, any such changes are styled as amendments and not considered task orders. For requirements contracts, the agency promises its entire requirement for a specific service or supplies to a vendor in line with an estimated quantity and places delivery orders for those. In contrast, IDIQ contracts normally result in the need being fulfilled as developed by the agency in response to separate task order requests and awards. All offerors were put on notice in the original solicitation that VA would be issuing future task orders as needs for specific sites were identified. Therefore, offerors reasonably could have anticipated a modification that added the Federal Acquisition Regulation (FAR) Indefinite Quantity clause and the additional Ordering and Order Limitations clauses that go therewith. Also,

Appendix C

there is no specific prohibition to having a hybrid contract where part is one contract type (fixed quantity) and another part is a separate contract type (IDIQ). Thus, that aspect of the GAO standard that vendors could have expected this type of medication has been met.

With regard to the potential dollar amount of the change, the original awarded amount was $103 million. OIG contends the size of the change made it outside the scope of the original contract. The maximum contract amount added by the Contracting Officer to the amendment after our legal review was $250 million. It should be noted that this larger dollar amount was not a guarantee of any sort but serves as a ceiling on task orders such that once reached for IDIQ contracts, the contract expires. Per GAO case law, a potential increase of that size is not outside the realm of reasonability. Further, VA had considered this amount to be within the scope of this contract and offerors knew or should have known VA was considering a contract of this size. The technical review dated March 27, 2002, stated the estimated cost of the contract was $500 million. Further, a VA press release issued August 9, 2002, announcing the award stated the initial value of $103 million with the expectations by VA and the contractor that additional services could be required bringing the long term commitment to $250 million. Thus, this dollar size was within the contemplation of the parties when soliciting this requirement.

Moreover, GAO has held that it is insufficient to argue that a significantly increased cost establishes that a modification exceeded the scope of the contract where it is clear that the nature and purpose of the contract have not changed. *Atlantic Coast Contracting, Inc.*, B-288969.4, June 21, 2002, 2002 U.S. Comp. Gen. LEXIS 83. A substantial price increase alone does not establish that the modification is beyond the scope of the contract. *Id.* For example, GAO has held that a 120% increase in price is not a change outside the scope of the contract when the nature, purpose, or type of the work has not changed. *Defense Systems Group; Warren Pumps, Inc.; Dresser Industries, Inc.*, B-240295; B-240295.2; B-240295.3, November 6, 1990, 1990 U.S. Comp. Gen. LEXIS 1182. No argument has been made that the type of services that were acquired or were to be acquired was different from detecting, reporting and correcting computer security incidents as the services were originally defined in the statement of work. Our review of the subsequent task orders, awarded in the course of contract performance made after our review, appear essentially consistent with computer security services. Even assuming one or more task orders were awarded for a different type of service, that does not make the amendment OGC reviewed legally improper, but only calls into question those specific task orders, which would be a contract administration matter. Lastly, the contract performance period was not changed by the amendment. Therefore, since the type or nature of work acquired was not changed by this amendment, according to the GAO standard of review, the supplemental agreement our office approved was not a scope change.

Finally, the only feasible alternative to issuing this amendment may have subjected the VA to a breach of contract claim. Had VA determined that this amendment to Task 8.d of the Management Security Services was a scope change, but VA still required these services and the ability to award additional task orders, the only alternative would have been to

issue a partial termination for convenience to remove that task and initiate a separate procurement for the needed services. The original contractor could then have sued VA for breach of contract, making VA subject to claims for costs and anticipated profits, because an agency is generally not allowed to solicit a requirement, award it to one contractor, then terminate it or a part of it, and then solicit and award the same or similar requirement to another contractor without some changed circumstances. See generally, *Torncello v. United States*, 681 F.2d 756 (Ct.Cl. 1982). When our office conducts a legal review, all the circumstances have to be considered, including what potential litigation risks are present. The modification presented less of a litigation risk to the agency than would have a partial termination. We would not classify this amendment action as an ideal situation, but, our office found a legal rationale to support our client's obtaining desired services.

OIG's remaining points (that OGC should have taken more time on the review and included a detailed review of the proposal evaluation and the basis for award of the contract) are not pertinent. Our office took the time necessary and available to complete the work. Further, a review of the proposal evaluations (we assume OIG means the technical evaluations of proposals) and the basis for award (we assume OIG means the source selection decision) are not relevant to review of a solicitation amendment. Further, our legal review comments were not merely technical in nature as every IDIQ contract requires a guaranteed minimum and an overall contract maximum amount in order to be legally sufficient pursuant to FAR 16.504. Also, every supplemental agreement should attempt to secure a release of future claims from the contractor for the change per FAR 43.204.

It should also be noted that our office defended this award against two protest filed at the General Accounting Office (now Government Accountability Office) and VA prevailed in both cases.

With regard to the specific recommendations of the OIG set forth below, including the Office of General Counsel, these are either not required or do not initially require OGC participation. The recommendations, in pertinent part are as follows:

4.    The Deputy Assistant Secretary for Acquisition and Materiel Management and the Acting General Counsel:

d)    Establish a clear policy regarding the use of appropriate contract types and contract changes to include specific guidance regarding the use of IDIQ contracts.

Response: FAR Part 16, Contract Types, and Part 43, Contract Modifications, already provide sufficient policy guidance on selecting applicable contract types and making modifications to contracts. No further guidance or policy is required.

**Appendix C**

e) Determine whether VA can recover the approximately $4.7 million in apparent duplicate billings during CIRC Option Year One.

Response: An issue of duplicate billings is initially purely an audit function. If there were duplicate billings and there is audit proof of that, the OIG should furnish that data to the Contracting Officer to prepare a bill of collection with the supporting data to submit to the Contractor. When that is prepared, OGC can review the reasonableness of VA's position.

f) Determine whether VA can recover the approximately $3.8 million billed with no deliverables.

Response: See answer to b)

Appendix D

# OIG COMMENTS TO ACTING GENERAL COUNSEL'S RESPONSE

The Office of General Counsel (OGC) disputes our finding that Modification 0001, which added Indefinite Delivery/Indefinite Quantity (IDIQ) provisions to the Task Order, and the subsequent task orders issued under the new IDIQ provisions constituted cardinal changes to the Task Order. In addition, OGC non-concurred with the recommendations that OGC work with the Office of Acquisition & Materiel Management (OA&MM) to establish clear policy regarding the use of appropriate contract types and contract changes, to include specific guidelines on the use of IDIQ contracts, and to determine whether VA can collect the overcharges identified in our review.

**OGC Response**:  With respect to the conclusion that Modification 0001 and the subsequent task orders were cardinal changes, OGC states that our legal analysis was flawed and Modification 0001 was not a cardinal change.  OGC implies that prior to approving Modification 0001 they conducted an in-depth legal analysis and considered VA's options.  As support for their position, OGC states that they defended the award against two protests filed at the Government Accountability Office (GAO) and prevailed.  Also, based on their review of task orders issued against Task 8.d., OGC concluded that the task orders were not outside the scope of Task 8.d.

OGC non-concurred with the recommendation that VA establish clear policy regarding the use of appropriate contract types and contract changes to include specific guidance regarding the use of IDIQ contracts.  OGC stated that further guidance is not necessary because sufficient policy on the selection of contract types and making modifications already exists in FAR Parts 16 and 43.  OGC also non-concurred with the recommendations that they work with the OA&MM to determine whether VA can recover about $4.7 million in apparent duplicate billings and approximately $3.8 million billed with no deliverables.

**OIG Comments:**   We reviewed OGC's legal analysis relating to whether Modification 0001 was a cardinal change, including the cited case law, and determined that it was not sufficient to cause us to change our findings or conclusions.  OGC's non-concurrence with the with implementing the three recommendations will most likely result in a continuation of contract failures such as this  and make it difficult to ensure that that VA has a reasonable basis to collect overcharges.

Whether Modification 0001 constituted a cardinal change:  OGC indicates that they conducted a review and analysis, considered whether Modification 0001 constituted a cardinal change, and discussed options before approving the Modification.  There is nothing in the records provided us during our review to indicate that the issue was addressed by OGC or anyone else involved in this procurement.  After receiving their response, we asked OGC to provide any records they had relating to their review and analysis but no documentation were provided.  The Deputy General Counsel told us that OGC's attorneys' "thorough review and analyses are not always reduced to writing."  It is not clear what information OGC reviewed to conduct the analysis.

**Appendix D**

Based on our review of the case law, we determined that a critical piece of evidence was the effect the failure to include the appropriate IDIQ language and clauses in the solicitation had on the competition. Because this information was not contained in the contract file, we contacted unsuccessful bidders who were rated equal to Veterans Affairs Security Team (VAST) after the technical evaluation. We based our conclusions, in part, on their statements that inconsistencies and uncertainties in the Request for Proposals (RFP) relating to Task 8.d. caused them to inflate their proposed prices. We found no evidence that OGC contacted the unsuccessful offerors to determine whether or how the failure to include IDIQ provisions in the RFP impacted the competitive process.

OGC states that they successfully defended the award against two protests filed at GAO. The implication that this has any bearing on the issue of whether Modification 0001 was a cardinal change is misleading because the Modification was not addressed in either protest. One protest was dismissed because the protestor, a subcontractor to an offeror, did not have legal standing to file the protest. The second protest was filed shortly after award and before Modification 0001 was issued and related only to the selection process.

OGC referenced several cases to support for their conclusion that Modification 0001 was not a cardinal change. None of the cases cited involved changing a firm fixed-price contract to an IDIQ contract. In fact, we could not find a case that specifically addressed this issue. We do not disagree with the general principles of law referenced in OGC's response. However, these are only general principles and cannot be used to reach a legal conclusion without applying them to the specific facts of the case. OGC did not provide us with an explanation how these principles were applied to the facts in any of the cases cited or how they would be applied to the facts in this contract.

Contrary to OGC's assertion, we did not base our finding that Modification 0001 was a cardinal change merely on the fact that it represented a substantial increase in the cost of the contract. Using analyses similar to those used by GAO, we evaluated the reasons for the increase in contract costs and the impact on competition. One GAO decision we relied on is *Matter of: Avitron Manufacturing, Inc.*, B-229972, May 16, 1988, and a subsequent decision on motions for reconsideration, *Matter of Defense Technology Corp.; Department of Navy – Requests for Reconsideration*, B-229972.2; B-229972.3, September 21, 1988. In *Avitron Manufacturing, Inc.*, GAO reviewed the effect the proposed modifications had with respect to competition, specifically the impact on the design, price, and delivery schedule of proposals.

Based on the number and substance of the questions proposed by potential offerors, VA's responses, and our discussions with unsuccessful offerors, we concluded that there was confusion with respect to how Task 8.d. would be awarded and that there were numerous factors that contributed to the confusion and uncertainty among potential offerors. For example, offerors were required to offer a firm fixed-price for the task, and the language in the RFP was vague. In addition, there were multiple and inconsistent amendments to the RFP, such as the type of contract to be awarded. VA failed to clarify the issues in the response to questions and the resulting uncertainty caused offerors to inflate the proposed prices. Based on all the evidence, we concluded that that neither the offerors nor VA had a clear understanding that Task 8.d. was going to be awarded IDIQ.

Appendix D

If VA had clarified this at any time during the solicitation or award process, offerors would have submitted a different proposal. All of these facts support our conclusion that VA's failure to include IDIQ provisions in the RFP impacted competition.

Relying on a statement in the RFP that "Separate task orders will be developed as individual sites, and associated site-specific cyber security services, are identified," OGC concludes that all offerors were "on notice that VA would be issuing separate task order requests and awards." At best, the statement in the RFP raised the questions posed by potential offerors about how Task 8.d. was to be awarded and administered. If the language in the RFP was as clear as OGC claims, the absence of the term "indefinite delivery and indefinite quantity" and the required FAR clauses should have been identified by OGC during the legal review conducted prior to issuing the RFP. The documentation of the legal review does not address the issue. This means that the legal review was either deficient or, contrary to OGC's argument, the cited language in the RFP did not clearly put VA reviewers or potential offerors on notice that Task 8.d.was to be awarded as an IDIQ requirement.

OGC claims that their analysis included consideration of other options and that it was determined that the Modification to add IDIQ clauses was the only feasible alternative other than to subject VA to a breach of contract claim. Although there is no documentation to support the claim that such an analysis was performed, even assuming it was, a prohibited modification was not the only alternative. For example, the award included $1.8 million for labor costs, the amount VAST proposed to meet the requirement of Task 8.d. Because VAST did not qualify its proposal in any way, VA could have held VAST accountable for providing all labor hours needed to meet the base year requirements at the awarded price. Another option available to VA was to purchase services needed to meet the requirements of Task 8.d. during the base year at a cost that did not exceed the $1.8 million firm fixed-price and, not exercise the first option year. The problem was identified early enough after award to allow sufficient time to recompete the requirements.

Whether orders issued against Task 8.d. were cardinal changes: OGC opines that task orders issued under Task 8.d. were not out-of-scope and, therefore, did not constitute cardinal changes. OGC's conclusion is based on their review of an unidentified number of task orders issued under Task 8.d. As stated in the report, our findings regarding the task orders were based on the conclusions reached by the program officials who have the technical expertise. OGC offers nothing to refute the opinion of the VA experts.

Non-concurrence with recommendations: OGC non-concurred with all three components of the following recommendation 2:

The Deputy Assistant Secretary for Acquisition and Materiel Management and the Acting General Counsel:

   a) Establish a clear policy regarding the use of appropriate contract types and contract changes to include specific guidelines regarding the use of IDIQ contracts.

**Appendix D**

b) Determine whether VA can recover the approximately $4.7 million in apparent duplicate billings during CIRC Option Year One.

c) Determine whether VA can recover approximately $3.8 million billed with no deliverables.

OGC non-concurred with Recommendation 2 a) on the basis that Federal Acquisition Regulations "already provide sufficient policy guidance on selecting applicable contract types and making modifications to contracts" and "no further guidance or policy is required." Although the FAR provides specific parameters and options for Government contracting, it does not tell Government agencies what type of contract to use to meet a specific requirement, whether a modification is necessary, or whether a contract action is in the agency's best interest.

Over the past several years, we have reported on a number of contract failures in VA that resulted in significant dollar losses and failed projects. Because all the failures involved issues relating to the type of contract used, in particular IDIQ contracts and contract modifications, we recommended actions that would help VA improve its procurement practices to prevent similar failures and losses in the future. To help ensure that contracting decisions made by VA are sound and are able to withstand scrutiny in the event of a protest, claim, or other legal action, we recommended that OGC be involved in the process of developing policy and guidance. Without meaningful communication and coordination between the program offices, contracting offices, and OGC, contracting deficiencies and the resulting losses, such as those identified in this and other OIG reports, will continue.

With respect to Recommendations 2 b) and c), the report identifies a number of issues that need to be addressed before VA makes a decision whether it is in the Government's best interest to pursue any action against VAST to collect overcharges. For example, whether there acts or omissions by VA, or contract terms and conditions that would preclude the success of a collection action. In addition, our findings regarding VAST's financial structure raise issues as to whether VA would be able to recover the overcharges even if they are successful in overcoming other legal impediments. The intent of our recommendation was to encourage communication between the contracting office and OGC to discuss these issues and develop a plan of action before potentially wasting resources to pursue a claim that that may not be collectible.

Review of VA Central Incident Response Capability Contract Planning, Award, and Administration

**Appendix E**

Task Orders Awarded Under the VA-CIRC Contract

| Task Order | Date | Description | Period | Amount Obligated |
|---|---|---|---|---|
| 0001 | 9/18/02 | Integrate, standardize, and install VA's cyber security infrastructure at the Austin Facility | 9/17/02 - 7/18/03 | $1,206,336 |
| 0003 | 9/20/02 | Government Information Security Act (GISRA) Reporting Database | 9/21/02 - 9/20/03 | $290,232 |
| 0002 | 10/28/02 | VISN 22 Intrusion Detection Services | 10/17/02 - 10/16/03 | $39,572 |
| 0004 | 12/6/02 | Privacy Complaint Tracking, negotiated lower cost - eliminated one slot | 12/5/02 - 12/4/03 | $46,600 |
| 0005 | 12/6/02 | Antivirus Defense (ADV) Systems - McAfee, support and maintenance | 12/3/02 - 12/2/03 | $139,896 |
| 0006 | 12/6/02 | Office of Cyber Security Public Key Infrastructure (PKI) Support | 12/4/02 - 12/3/03 | $348,408 |
| 0007 | 12/20/02 | Expansion of Call Center Services | 12/20/02 - 7/18/03 | $2,027,503 |
| 0008 | 1/23/03 | Deployment and Support of Authentication and Authorization Infrastructure Program | 1/23/03 - 1/22/04 | $754,350 |
| 0001-2 | 2/10/03 | Add Engineering Support for ECSIP External Connection Migration, Covers 36 to 48 migrations per year | 2/10/03 - 7/18/03 | $635,904 |
| 0001-1 | 2/11/03 | Exercise proposed option to monitor, manage and maintain ECSIP Switches at 6 sites. | 2/10/03 - 7/18/03 | $252,554 |
| 0009 | 3/5/03 | ECSIP Gateway Support | 3/3/03 - 3/2/04 | $2,289,008 |
| 0010 | 3/10/03 | Cyber Security Subject Matter Expert Support | 3/10/03 - 6/8/03 | $134,000 |
| 0003-1 | 3/17/03 | Federal Information Security Management Act Reporting, quarterly reporting | 3/12/03 - 7/10/03 | $138,208 |
| 0007-1 | 4/7/03 | Support for Virtual Private Network and VA High Speed remote Access Intranet Service | 4/7/03 - 7/18/03 | $606,620 |
| 0011 | 5/2/03 | Network and Security Operation Center Fiber Optic Cable Installation | 5/2/03 - 5/14/03 | $13,525 |
| 0013 | 5/27/03 | File Transfer Protocol at NSOC | 5/27/03 - 7/7/03 | $47,861 |
| 0014 | 5/28/03 | Chief Healthcare Information Security Intrusion Detection System | 5/27/03 - 5/26/04 | $675,819 |
| 0012 | 6/4/03 | IDS Support | 6/4/03 - 6/3/04 | $1,350,715 |
| 0015 | 6/4/03 | Support for VA Topology Scan | 6/4/03 - 9/3/03 | $185,528 |
| 0003-2 | 6/20/03 | FISMA Reporting, enhance the database | Due NLT 6/30/03 | $27,360 |
| 0016 | 6/20/03 | Deploy 11 IDS Sensors | 6/20/03 - 7/20/03 | $155,232 |
| 0017 | 7/11/03 | AAIP Prototype and Engineering Support | 7/11/03 - 4/15/04 | $2,311,640 |
| 0003-3 | 7/24/03 | FISMA Reporting, exercised option | 7/11/03 - 11/10/03 | $110,208 |
| 0009-1 | 8/22/03 | Year 1 (of 3) for Equipment Lease | 1/1/04 - 1/31/04 | $3,398,696 |
| 0005-1 | 9/5/03 | Milestone Briefings | 9/5/03 - 12/2/03 | $83,616 |
| 0018 | 9/9/03 | ECSIP IDS Support | None Identified | $3,067,248 |

Review of VA Central Incident Response Capability Contract Planning, Award, and Administration

**Appendix E**

Task Orders Awarded Under the VA-CIRC Contract

| Task Order | Date | Description | Period | Amount Obligated |
|---|---|---|---|---|
| 0019 | 9/23/03 | FISMA Compliance Support | 9/19/03 - 7/18/04 | $453,637 |
| 0018-1 | 12/19/03 | IDS and Syslod Devices at 190 Sites | None Identified | $3,497,244 |
| 0009-2 | 12/24/03 | Equipment Lease for ECSIP Gateway and Extension of Engineering Services | 1/1/04 - 1/31/04 | $1,547,179 |
| 0009-3 | 1/30/04 | Extension of Engineering Services | 2/1/04 - 2/29/04 | $87,576 |
| 0001-3 | 2/3/04 | Equipment Lease - Year 2 of 3 | 10/18/03 - 10/17/04 | $878,232 |
| 0020 | 2/4/04 | Establish Hines Information Technology Integration Center (ITIC) | 2/4/04 - 9/30/04 | $208,678 |
| 0009-4 | 2/25/04 | Extension of Engineering Services | 3/1/04 - 3/31/04 | $106,013 |
| 0009-5 | 3/26/04 | Extension of Engineering Services | 4/1/04 - 5/31/04 | $155,983 |
| 0018-2 | 4/6/04 | Server Racks and Installation at 24 Sites | None Identified | $80,000 |
| 0014-1 | 5/13/04 | Inventory of Equipment and Buyout of Lease | NLT 6/1/04 | $192,647 |
| 0001-4 | 8/17/04 | Buyout of Equipment Lease | N/A | $1,097,816 |
| 0009-6 | 8/17/04 | Inventory of Equipment and Buyout of Lease | N/A | $7,930,291 |
| 0012-1 | 8/17/04 | Inventory of Equipment and Buyout of Lease | None Identified | $2,506,759 |
| 0018-3 | 8/17/04 | Inventory of Equipment and Buyout of Lease | None Identified | $6,171,241 |
| 0021 | 9/16/04 | Hines ITC Operational Support | 9/16/04 - 9/15/05 | $2,550,845 |
| 0022 | 9/16/04 | HIPS/Enterprise Anti-Virus and Desktop Patching/Scanning | 9/16/04 - 9/15/05 | $788,810 |

# OIG Contact and Staff Acknowledgments

| OIG Contact | Maureen Regan   (202) 565-8623 |
|---|---|
| Acknowledgments | Michael Bravman |
| | Michael Cheman |
| | Carrie Cross |
| | Gerald Grahe |
| | Kathryn Wick |

**Appendix G**

# Report Distribution

## VA Distribution

Office of the Secretary
Veterans Health Administration
Veterans Benefits Administration
National Cemetery Administration
Assistant Secretaries
Office of General Counsel

## Non-VA Distribution

House Committee on Veterans' Affairs
House Appropriations Subcommittee on Military Construction and Veterans Affairs, and Related Agencies
House Committee on Oversight and Government Reform
Senate Committee on Veterans' Affairs
Senate Appropriations Subcommittee on Military Construction and Veterans' Affairs, and Related Agencies
Senate Committee on Homeland Security and Governmental Affairs
National Veterans Service Organizations
Government Accountability Office
Office of Management and Budget


This report will be available in the near future on the OIG's Web site at http://www.va.gov/oig/publications/reports-list. This report will remain on the OIG Web site for at least 2 fiscal years after it is issued.