| 105TH CONGRESS  2d Session | HOUSE OF REPRESENTATIVES | REPORT  105–626 |
|---|---|---|

## PERSIAN GULF WAR VETERANS HEALTH CARE AND RESEARCH ACT OF 1998

JULY 15, 1998.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. STUMP, from the Committee on Veterans' Affairs, submitted the following

## R E P O R T

[To accompany H.R. 3980]

[Including cost estimate of the Congressional Budget Office]

The Committee on Veterans' Affairs, to whom was referred the bill (H.R. 3980) to amend title 38, United States Code, to extend the authority for the Secretary of Veterans Affairs to treat illnesses of Persian Gulf War veterans, to provide authority to treat illnesses of veterans which may be attributable to future combat service, and to revise the process for determining priorities for research relative to the health consequences of service in the Persian Gulf War, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Persian Gulf War Veterans Health Care and Research Act of 1998".

**SEC. 2. HEALTH CARE FOR VETERANS OF WAR.**

(a) AUTHORITY TO PROVIDE PRIORITY CARE.—Section 1710(e) of title 38, United States Code, is amended—

(1) by adding at the end of paragraph (1) the following new subparagraph:

"(D) Subject to paragraphs (2) and (3), a veteran who served on active duty in a theater of combat operations (as determined by the Secretary in consultation with the Secretary of Defense) during a period of war after the Vietnam era, or in combat

6

odology by which VA could determine the efficacy of treatments provided Persian Gulf War veterans for illnesses which may be associated with their Persian Gulf War service; and (b) if scientifically feasible, develop a mechanism to monitor and study the effectiveness of such treatments and health outcomes;
6. Require VA and DoD to enter into an agreement with the National Academy of Sciences to (a) develop a curriculum (to take account of new research findings relating to care of veterans with illnesses that may be associated with Persian Gulf War service) for use in continuing education of VA and DoD physicians; and (b) periodically review and provide recommendations regarding the Departments' research plans relating to Persian Gulf illnesses;
7. Require establishment of a public advisory committee (to include Persian Gulf War veterans and their representatives) to provide advice to the (VA-DOD-HHS) Persian Gulf War Veterans Coordinating Board on proposed research studies, plans, and strategies relating to Gulf War vets illnesses;
8. Require the Persian Gulf War Veterans Coordinating Board to include in its annual report to Congress any new research priorities it has established and those recommendations made by the new public advisory committee which were not adopted (along with the reasons for non-adoption);
9. Require, in the event VA's ongoing survey of Persian Gulf War veterans identifies scientific evidence of a greater relative risk of illness in families of Persian Gulf War veterans than in families of non-deployed vets, the Gulf War Coordinating Board to ensure that appropriate studies are designed to follow up on such findings;
10. Require publication on the World Wide Web (and elsewhere) of the findings of all Persian Gulf War research conducted by or for the Government; and
11. Designate the Aspinwall, PA VA Medical Center as the "H. John Heinz III Department of Veterans Affairs Medical Center" and the Gainesville, FL VA Medical Center as the "Malcom Randall Department of Veterans Affairs Medical Center".

BACKGROUND AND DISCUSSION

The House Veterans' Affairs Committee has conducted ongoing oversight since concerns regarding health problems among Persian Gulf War veterans were first voiced in 1991. The Committee has held sixteen hearings, and initiated the passage of unprecedented legislation, to address health care problems experienced by Persian Gulf veterans and risk factors associated with such service.

TREATING WAR-RELATED ILLNESSES

Although Congress has done much to address these problems, this Committee is concerned that Congress both continue to tackle unresolved questions regarding Persian Gulf veterans' health problems, and that it apply lessons learned from the Persian Gulf expe-

7

rience to assist veterans who may deploy overseas in the future. Earlier this year, for example, the country faced anew the possibility of committing our armed forces to military intervention in Iraq in response to its leader's breach of United Nations' weapons inspection agreements. With the potential for renewed combat operations in the Persian Gulf theater, some questioned what provision would be made for treating such future combatants for possible war-related illnesses. At the same time, chronic health problems still afflict many veterans of Gulf service seven years ago. Awareness of this nagging problem heightens the importance of Congress addressing the "sunset" this December 31st of the special healthcare authority provided these veterans in law.

That law was first enacted in 1993, some two years after the cessation of Persian Gulf hostilities. With that enactment, Congress sought to ensure that Persian Gulf veterans could get access to needed VA health care for health problems which may have had their origin in service. In doing so, it sought to free these veterans of any need, for health care purposes, of having to obtain an adjudication of service-connection or of having to satisfy a financial need test to establish eligibility. Congress enacted a special eligibility provision relatively soon after becoming aware of the scope of the problem affecting these veterans. Subsequent hearings on Persian Gulf veterans' health care, however, have highlighted the importance of early intervention in treating the kind of unexplained health problems experienced by many Persian Gulf War veterans. The lack of even earlier treatment avenues as well as some clinicians' lack of understanding of these often complex illnesses may, in many cases, have played a role in acute health care problems of Persian Gulf War veterans becoming chronic.

Our hearing record provides powerful support for the view that early, effective treatment is important not only in understanding the Persian Gulf War experience, but as a model for intervention for veterans of any future combat operations. Each of our wars has been unique. Yet medical literature suggests that war has had a similar effect on combatants serving more than a century apart. Testifying before the Subcommittee on Health, Dr. Craig Hyams described his peer-reviewed study of the medical literature of our country's wartime experience, where he found that "poorly understood war syndromes have recurred at least since the Civil War . . . . These syndromes have been characterized by similar symptoms (fatigue, shortness of breath, headache, sleep disturbance, forgetfulness, and impaired concentration)." Another recent study on World War II veterans suggests a strong link between participation in combat and both subsequent decline in physical health and early death. In essence, medical literature provides considerable evidence that the combat experience is a significant risk factor in the development of subsequent illness, and that early treatment of war-related illness is important in avoiding chronic illness.

The implications of these findings underscore the importance both of increasing understanding of war-related illnesses generally, and of ensuring that the Department of Veterans Affairs is better prepared to treat veterans of future wars or military combat. To that end, on April 23rd, the Subcommittee on Health heard testi-

8

mony on draft legislation which sought to foster those objectives. The draft bill proposed the establishment of <mark>a special eligibility provision to ensure VA care of veterans of future combat deployments</mark>; creation of a national center on war-related illnesses; extension of VA's special authority for care of Persian Gulf War veterans; and elevation of the priority for care assigned those and other veterans.

### NATIONAL CENTER FOR STUDY OF WAR-RELATED ILLNESSES

Witnesses at that session expressed strong support for the concept of VA's establishing a national center for the study of war-related illnesses. The Director of the Medical Follow-up Agency at the National Academy of Sciences, Dr. Richard Miller, characterized the proposed center as "an excellent and long overdue effort to elucidate the causes of a major portion of veteran illnesses." Miller testified that a "center organized around the phenomenon of war-related illnesses, rather than a single discipline or disease, can bring together the appropriate mix of expertise and foster appropriate collaborations." He expressed the view that such a center should fund studies of the causes of war-related illness, and described as "essential" epidemiologic studies of risk factors for developing war-related illness with the goal of preventing them or at least ameliorating their effects. Attesting to the benefit of such a center, Miller also stated that, "The lack of a ready answer to the cause of these illnesses exhibited by Persian Gulf veterans suggests the need to look at the problem in new ways. He advised that such a center could have major implications for health care generally "since it is clear that medically unexplained illnesses are by no means limited to veteran populations."

Echoing the broad support for establishing such a center, VA's Deputy Under Secretary for Health, Dr. Thomas Garthwaite, cited such a center as one that would "enhance our ability to create a comprehensive program for post-war clinical care, medical education, health risk communication and research . . . . We believe a Center such as the one proposed has the potential to significantly enhance the medical community's ability to address the needs of future wartime veterans."

As several witnesses testified, such a center should be multi-disciplinary, and active partnership and collaboration with the Department of Defense are essential. The Committee recognizes that VA cannot mount such an effort alone. As described by one expert, Dr. Matthew Friedman, Director of the National Center for Post-Traumatic Stress Disorder, "the best chance for prevention, early detection, and rapid treatment of war-related illnesses is while men and women are still in uniform. To defer proactive medical strategies until after completion of military service is to wait much too long." Such a center must, for example, become a repository of deployment health and environmental surveillance data. To achieve the greatest effectiveness, VA and DoD must coordinate closely to ensure timely transfer of such DoD data, which is critical to the conduct of future research.

While requiring that a center employ an interdisciplinary approach to the study of war-related illnesses, the reported bill vests discretion in the VA regarding the structure of such center. There