

# Department of Veterans Affairs
# Office of Inspector General

# Audit of the Veterans Health Administration's Outpatient Waiting Times

Report No.  07-00616-199                    September 10, 2007

VA Office of Inspector General
Washington, DC  20420

**To Report Suspected Wrongdoing in VA Programs and Operations**
**Call the OIG Hotline – (800) 488-8244**

# Contents

**Page**

**Executive Summary** ......................................................................................... i

**Introduction** .................................................................................................... 1

    Purpose .......................................................................................................... 1

    Background ..................................................................................................... 1

    Scope and Methodology ................................................................................ 2

**Results and Conclusions** ............................................................................... 5

    Issue 1:  Differences In Outpatient Waiting Times ....................................... 5

    Issue 2:  Consult Referrals Not Included On Electronic Waiting Lists ........... 9

    Issue 3:  Prior OIG Recommendations Were Not Implemented ................... 13

**Appendixes**

    A.  Under Secretary for Health Comments .................................................... 19

    B.  OIG Contact and Staff Acknowledgments .............................................. 26

    C.  Report Distribution ................................................................................. 27

# Executive Summary

## Introduction

At the request of the U.S. Senate Committee on Veterans' Affairs, the VA Office of Inspector General (OIG) audited the Veterans Health Administration's (VHA) outpatient waiting times. The purpose of this audit was to follow up on our *Audit of the Veterans Health Administration's Outpatient Scheduling Procedures* (Report No. 04-02887, July 8, 2005), which reported that VHA did not follow established procedures when scheduling medical appointments for veterans seeking outpatient care. As a result, reported waiting times and electronic waiting lists were not accurate. The report made eight recommendations for corrective action. VHA agreed with the reported findings and recommendations.

The objectives of this follow-up audit were to determine whether (1) established scheduling procedures were followed and outpatient waiting times reported by VHA were accurate, (2) electronic waiting lists were complete, and (3) prior OIG recommendations were fully implemented.

## Background

VHA policy requires that all veterans with service-connected disability ratings of 50 percent or greater and all other veterans requiring care for service-connected disabilities be scheduled for care within 30 days of desired appointment dates. All other veterans must be scheduled for care within 120 days of the desired dates. VHA policy also requires that requests for appointments be acted on by the medical facility as soon as possible, but no later than 7 calendar days from the date of request.

To determine if schedulers followed established procedures when making medical appointments for veterans and to determine whether reported waiting times were accurate, we reviewed a non-random sample of 700 appointments with VHA reported waiting times of 30 days or less that were scheduled for October 2006 at 10 medical facilities in 4 Veterans Integrated Service Networks (VISN). Our universe included 14 of VHA's 50 high-volume clinics and represented only 1 month of appointments. VHA designates a clinic as a high-volume clinic if the total nation-wide workload (patient visits) of that clinic ranks in the top 50 clinics. Our sample included 70 appointments at each medical facility, with 60 of the appointments being for established patients and 10 appointments for new patients. For measuring waiting times, VHA defines established patients as those who have received care in a specific clinic in the previous 2 years; new patients represent all others. For example, a veteran who has been receiving primary care at a facility within the previous 2 years would be considered an established patient in the primary care clinic. However, if that same veteran was referred to the facility's

Cardiology clinic, that veteran would now be classified as a new patient to the Cardiology clinic.

VHA uses Veterans Health Information Systems and Technology Architecture (VistA) scheduling software to collect all outpatient appointments in 50 high-volume clinics and then calculates the waiting time. For established patients, (representing 90 percent of VHA's total outpatient appointments), waiting times are calculated from the desired date of care, which is the earliest date requested by either the veteran or the medical provider, to the date of the scheduled appointment. For new patients, VHA calculates waiting times from the date that the scheduler creates the appointment. In the *Department of Veteran Affairs Fiscal Year 2006 Performance and Accountability Report*, issued November 15, 2006, VHA reported that 96 percent of all veterans seeking primary medical care and 95 percent of all veterans seeking specialty medical care were seen within 30 days of their desired dates.

VHA implemented the electronic waiting list in December 2002 to provide medical facilities with a standard tool to capture and track information about veterans' waiting for medical appointments. Veterans who receive appointments within the required timeframe are not placed on the electronic waiting list. However, veterans who cannot be scheduled for appointments within the 30- or 120-day requirement should be placed on the electronic waiting list immediately. If cancellations occur and veterans are scheduled for appointments within the required timeframes, the veterans are removed from the electronic waiting list.

## Results

Schedulers were still not following established procedures for making and recording medical appointments. We found unexplained differences between the desired dates as shown in VistA and used by VHA to calculate waiting times and the desired dates shown in the related medical records. As a result, the accuracy of VHA's reported waiting times could not be relied on and the electronic waiting lists at those medical facilities were not complete. Also, VHA has not fully implemented five of the eight recommendations in the July 8, 2005, report.

<u>Differences in Reported Waiting Times</u>

Of the 700 veterans reported by VHA to have been seen within 30 days, 600 were established patients and 100 were new patients. Overall, we found sufficient evidence to support that 524 (75 percent) of the 700 had been seen within 30 days of the desired date. This includes 229 (78 percent) veterans seeking primary care and 295 (73 percent) veterans seeking specialty care. However, 176 (25 percent) of the appointments we reviewed had waiting times over 30 days when we used the desired date of care that was established and documented by the medical providers in the medical records.

For example, on December 20, 2005, a veteran who was 50 percent service-connected was seen in the Eye Clinic. The medical provider wrote in the progress notes that the veteran should return to the clinic in 6 weeks (January 31, 2006). However, over 7 months later, on September 6, 2006, the scheduler created an appointment for the veteran for October 17, 2006. The scheduler entered a desired date of October 2, 2006, which resulted in a reported waiting time of 15 days. Based on the provider requested date of January 31, 2006, the veteran actually waited 259 days, and was never placed on the electronic waiting list. We saw no documentation to explain the delay and medical facility personnel said it "fell through the cracks." Although this particular examination was delayed, the veteran received medical care from other clinics during this time.

In total, 429 (72 percent) of the 600 appointments for established patients had unexplained differences between the desired date of care documented in medical records and the desired date of care the schedulers recorded in VistA. If schedulers had used the desired date of care documented in medical records:

- The waiting time of 148 (25 percent) of the 600 established appointments would have been less than the waiting time actually reported by VHA.

- The waiting time of 281 (47 percent) of the 600 established appointments would have been more than the waiting time actually reported by VHA. Of the 281 appointments, the waiting time would have exceeded 30 days for 176 of the appointments.

VHA's method of calculating the waiting times of new patients understates the actual waiting times. Because of past problems associated with schedulers not entering the correct desired date when creating appointments, VHA uses the appointment creation date as the starting point for measuring the waiting times for new appointments. VHA acknowledges that this method could understate the actual waiting times for new patients by the number of days schedulers take to create the appointment. VHA uses this method for new appointments because VHA assumes the new patient needs to be seen at the next available appointment. This is true for patients that are absolutely new to the system. However, the problem is that VHA's definition of new patients also includes patients that have already seen a provider and have a recommended desired date. In our opinion, while these veterans might be new to a specialty clinic, they are established patients because they have already seen a medical provider who has recommended a desired date.

For VHA to ignore the medical providers desired date for this group of new patients understates actual waiting times. For example, we reviewed 100 new patients that VHA reported had waiting times of less than 30 days. Out of the 100, 86 had already seen a medical provider and were being referred to a new clinic. The other 14 were either new to the VA or had not been to the VA in over 2 years; therefore they had no desired date. The results of reviewing these two categories are listed below:

- Eighty-six were currently receiving care at the facility but were classified as a new patient because they were referred to a specialty clinic in that same facility and had not received care in that clinic within the previous 2 years. For those 86 patients, we calculated the waiting time by identifying the desired date of care as documented in the medical records (date of the consult referral) to the date of the appointment. We found that 68 (79 percent) of the 86 new patients were seen within 30 days. For 15 of the 18 patients not seen within 30 days, schedulers did not create the appointment within the 7-day requirement and the scheduling records contained no explanation of the scheduling delay. The actual waiting time for the 18 patients ranged from 32 to 112 days.

- Fourteen were either new to the VA, new to the facility, or had not received care in the facility within the previous 2 years. For those 14, we reviewed the VistA scheduling package and identified the date the veteran initiated the request for care (telephone or walk-in) and used that as the desired date for calculating the waiting time. Based on available documentation, all 14 veterans were seen within 30 days of the desired date.

VHA needs to either ensure schedulers comply with the policy to create appointments within 7 days or revert back to calculating the waiting time of new patients based on the desired date of care. The results included in this section are limited by the fact that schedulers may not have recorded the veterans' preferences for an appointment date in VistA as discussed below.

We further reviewed the 176 cases where veterans' waiting times were more than 30 days, and identified 64 veterans that were given an appointment past the 30- or 120-day requirement and should have been on the electronic waiting lists. This represented 9 percent of the 700 appointments reviewed. The 64 cases consisted of 36 veterans with service-connected ratings of 50 percent or greater, 12 veterans being treated for service-connected conditions, and 16 veterans with waiting times more than 120 days.

Use of Patient Preferences When Scheduling Appointments

VHA told us that the unexplained differences we found between the desired dates of care shown in the medical record and the desired date of care the schedulers recorded in VistA can generally be attributed to patient preference for specific appointment dates that differ from the date recommended by medical providers. VHA policy requires schedulers to include a comment in VistA if the patient requests an appointment date that is different than the date requested by the provider. We reviewed all comments in VistA and accepted any evidence that supported a patient's request for a different date. VHA personnel told us that schedulers often do not document patient preferences due to high workload. Without documentation in the system or contacting the patients, neither we nor VHA can be sure whether the patient's preference or the scheduler's use of inappropriate scheduling procedures caused the differences we found.

Some VHA clinics use recall or reminder clinics to emphasize patient-driven scheduling. If a veteran is entered in a recall or reminder clinic, the scheduler will notify the veteran either by letter or phone about 30 days before the expected appointment date and ask the veteran to call the clinic to set up their appointment. VHA personnel said that some veterans may not call for their appointment or, in some cases, may wait several months before calling. If the scheduler does not document this situation, then the veterans waiting time may appear to be longer than it actually was. If a patient fails to call in, VHA policy requires the facility to send a follow-up letter and to document failures to contact the veteran.

VHA personnel told us that some providers are not specific when they document the veterans' desired date of care. For example, some providers will request the veteran to return to the clinic in 3 to 6 months. If a provider uses a date range, VHA policy requires schedulers to use the first date of the date range as the desired date of care or obtain clarification from the provider. When we found appointments with date ranges and no clarifying comments from the provider, we followed VHA policy and considered the first date of the range as the desired date.

<u>Appointments for Consult Referrals Not Scheduled Within Required Timeframe</u>

None of the 10 medical facilities we reviewed consistently included veterans with pending and active consults (referrals to see a medical specialist), that were not acted on within the 7-day requirement, on the electronic waiting list. Pending consults are those that have been sent to the specialty clinic, but have not yet been acknowledged by the clinic as being received. Active consults have been acknowledged by the receiving clinic, but an appointment date has either not been scheduled or the appointment was cancelled by the veteran or the clinic.

According to the consult tracking reports, the 10 medical facilities listed 70,144 veterans with consult referrals over 7 days old. In accordance with VHA policy, the medical facilities should have included these veterans on the electronic waiting lists. The 70,144 does not include veterans with referrals for prosthetics or inpatient procedures. VHA personnel told us that the 70,144 includes some referrals for procedures (such as cardiac catheters) and alternative care (such as contracted care) that should not have been identified on the consult tracking reports. VHA personnel also acknowledged to us that VHA policy does not exempt those referrals from the 7-day requirement. At the time of our review, the total number of veterans on the electronic waiting lists for specialty care was only 2,658.

To substantiate the data in the consult tracking reports, we reviewed 300 consults; 20 active consults and 10 pending consults from each of the 10 medical facilities. Based on our review of the 200 active consults we found that 105 (53 percent) were not acted on within 7 days, and these veterans were not on the electronic waiting lists. Of this number, 55 veterans had been waiting over 30 days without action on the consult request.

Of the 100 pending consults, 79 (79 percent) were not acted on within the 7-day requirement and were not placed on the electronic waiting list. Of this number, 50 veterans had been waiting over 30 days without action on the consult request. Also, medical facilities did not establish effective procedures to ensure that veterans received timely care if the veteran did not show up for their initial appointment or the appointment was cancelled. For 116 (39 percent) of the 300 consults we reviewed, subsequent actions such as a patient no-show placed the 116 consults back into active status. We identified 60 of the 116 consult referrals where the facility either did not follow up with the patient in a timely manner or did not follow up with the patient at all when the patient missed their appointment.

Schedulers Lack Necessary Training

We interviewed 113 schedulers at 6 medical facilities and found that 53 (47 percent) had no training on consults within the last year, and that 9 (17 percent) of the 53 had been employed as a scheduler for less than 1 year. We also discovered that 60 (53 percent) of the 113 schedulers had no training on the electronic waiting list within the last year, and that 10 (17 percent) of the 60 had been employed as schedulers for less than 1 year. Schedulers and managers told us that, although training is readily available, they were short of staff and did not have time to take the training. The lack of training is a contributing factor to schedulers not understanding the proper procedures for scheduling appointments, which led to inaccuracies in reported waiting times by VHA.

While waiting time inaccuracies and omissions from electronic waiting lists can be caused by a lack of training and data entry errors, we also found that schedulers at some facilities were interpreting the guidance from their managers to reduce waiting times as instruction to never put patients on the electronic waiting list. This seems to have resulted in some "gaming" of the scheduling process. Medical center directors told us their guidance is intended to get the patients their appointments in a timely manner so that there are no waiting lists.

Prior Recommendations Not Implemented

At the start of this audit, five of the eight recommendations in our July 8, 2005, report remained unimplemented. During the course of this audit, VHA submitted documentation to support closing three additional recommendations. We closed one recommendation; the other two remain open due to insufficient action taken by VHA. Also, as evidenced by the findings of this report, actions taken by VHA with respect to one of the previously closed recommendations proved ineffective in monitoring schedulers' use of correct procedures when making appointments so we are reinstituting that recommendation in this report. Therefore, five of the eight recommendations from our 2005 report remain unimplemented.

## Conclusion

The conditions we identified in our previous report still exist. VHA has established detailed procedures for schedulers to use when creating outpatient appointments but has not implemented effective mechanisms to ensure scheduling procedures are followed. The accuracy of outpatient waiting times is dependent on documenting the correct desired date in the system.

Our audit results are not comparable to VHA's reported waiting times contained in its *Performance and Accountability Report* because we used a different set of clinics and timeframe of appointments. Further, our audit results cannot be extrapolated to project the extent that waiting times exceed 30 days on a national level because the medical facilities and appointments selected for review were based on non-random samples. Nevertheless, the findings of this report do support the fact that the data recorded in VistA and used to calculate veteran outpatient waiting times is not reliable. VHA states that our results overstate waiting times because patients requested a different appointment date. We agree that patient preference could change the desired date of care; however, if schedulers did not document the patient preference our testing would not disclose this fact. We believe that VHA's calculations of waiting times are subject to a greater uncertainty than our numbers because we cannot assume that differences are due to patient preference, especially when our review took into account medical provider desired dates that were also not accurately recorded in VistA. Until VHA establishes procedures to ensure that schedulers comply with policy and document the correct desired dates of care, whether recommended by medical providers or requested by veterans, calculations of waiting time from the current system will remain inaccurate.

We recommended that the Under Secretary for Health take action to:

- Establish procedures to routinely test the accuracy of reported waiting times and completeness of electronic waiting lists, and take corrective action when testing shows questionable differences between the desired dates of care shown in medical records and documented in the VistA scheduling package.

- Take action to ensure schedulers comply with the policy to create appointments within 7 days or revert back to calculating the waiting time of new patients based on the desired date of care.

- Amend VHA Directive 2006-055 to clarify specialty clinic procedures and requirements for receiving and processing pending and active consults to ensure they are acted on in a timely manner and, if not, are placed on the electronic waiting lists.

- Ensure all schedulers receive required annual training.

- Identify and assess alternatives to the current process of scheduling appointments and recording and reporting waiting times, and develop a plan to implement any changes to the current process.

# Under Secretary for Health Comments

The Under Secretary stated that the report correctly identifies areas VHA needs to address to improve outpatient waiting time accuracy but non-concurs with the findings in Issue 1 because of the limitations of the methodology used in the study and Recommendation 2, relating to the calculation of waiting times for new patients. The Under Secretary agreed with Recommendations 1, 3, 4, and 5. See Appendix A for the full text of the Under Secretary's comments.

# OIG Response

In paragraph 2 of the Under Secretary's response, he attempts to discredit the audit findings by comparing the audit results with the results of VA's national patient satisfaction survey. The survey showed that 85 percent of the veterans who completed the survey reported that they had access to primary care appointments when they needed them and that 81 percent of the veterans reported satisfaction with timely access to specialty care. Notwithstanding the Under Secretary's comment that the national patient satisfaction survey is one of the most valid measurements of access efficiency and that the patient satisfaction survey varies significantly with OIG report results, there is no valid basis for a comparison between the results of the patient satisfaction survey and the results of the OIG audit.

The purpose of the audit was to determine whether established scheduling procedures were followed and whether outpatient waiting times reported by VHA were accurate. Based on the evidence available in VistA, patient medical records, and discussions with the schedulers, the audit demonstrated that scheduling procedures were not followed and that the waiting time information reported by VA was not accurate. There is no comparison between overall patient satisfaction and VA's compliance with specific policy requirements, or the accuracy of the waiting time information reported by VHA. We note that waiting time information reported by VHA was obtained from the same data system that the OIG used to conduct the audit, not from the patient satisfaction survey. To support any level of comparison, the patient satisfaction survey would have had to ask veterans whether they were seen within the 30-day requirement. Because this question was not posed in the survey, the survey results cannot be construed as an indicator of compliance with established scheduling procedures or the accuracy of reported waiting times.

Even assuming, for the sake of argument, that the patient satisfaction results could be used as an indicator of VHA's reported waiting times, the results of the patient satisfaction survey do not support the results VHA reported to Congress in November 2006. VHA reported that 96 percent of all veterans seeking primary care and 95 percent seeking specialty care were seen within the 30-day standard. Only 85 percent of the veterans who responded to the survey reported satisfaction with access to primary care

and only 81 percent were satisfied with timely access to specialty care. These percentages are closer to the results of the OIG audit, which were 78 percent and 73 percent respectively. Although we agree with the Under Secretary that the patient satisfaction survey results do vary from the results of our report, there is a more significant variance between the survey results and the information VHA reported. Also, the results reported by the OIG are accurate, well-documented, and based on all available VA information.

In paragraph 3, the Under Secretary disagrees with our conclusions concerning scheduling and the definition of new patients. With respect to scheduling, VHA asserts that this is a hard number to game because the dates are automatically selected by the software program when the scheduler makes the appointment. The problem with this logic is that the system can be gamed if schedulers delay in entering the information in the system to schedule the appointment. For example, if a physician requests an appointment be scheduled within 30 days but the scheduler waits 90 days before trying to schedule the appointment, the system could show that the patient was seen within 30 days of the date the appointment was scheduled but, in reality, the patient would not have been seen within 30 days of the date requested by the physician. Although the OIG did not investigate whether schedulers were intentionally "gaming" the system, the type of conduct described in the above example is exactly what occurred in 18 of the 100 new patient appointments that were audited.

Although the Under Secretary disagreed in general with our definition of new patients, his response did not include any discussion as to the basis of the disagreement other than to state that the software logic determines which appointments are new. While this may be true, the software makes this determination based on the data put into the system by the scheduler. Part of the problem may be in the definition of a "new patient." In our view, a "new patient" is one who was not previously enrolled in the VA health care system. However, VHA considers new patients to also include patients who have been seen by a VA physician and have been referred to a specialty clinic for the first time. These are established patients, not new VA patients. The definition of a "new patient" is important because many patients who have been referred by a VA physician have a medical provider desired date and, therefore, should be considered as established patients, not new VA patients.

In paragraph 4, the Under Secretary expresses concern that the methodology used by the OIG resulted in a flawed conclusion about the magnitude of the inaccuracy in patient waiting times. VHA's assertion that the OIG computed waiting time error rates by using the date that VA providers specified for the patient without considering the possibility that the veteran could have changed the date, unless the patient's preferred date was clearly documented in the scheduling package, is not accurate. The issue is not whether the patient preferences were clearly documented, but whether there was any documentation at all to support the apparent delays in scheduling patients. To assess

VHA's compliance with scheduling procedures, the OIG used procedures contained in VHA Directive 2006-055 that requires schedulers to add a comment into the scheduling package when the patient requests an appointment date that is different than the provider's requested date.  To accept an assumption that the patient requested a desired date different than the documented desired date shown in the medical records would be irresponsible on our part and contrary to VHA's own directives.  During the OIG review, managers at each facility were given the opportunity to provide any evidence available that would indicate a change in veteran preference for a new appointment date.  Absent any documentation, the OIG relied on the data in the scheduling system and the medical provider desired date in the patient's medical record.  Since the Under Secretary provided no evidence to support his position that veterans were changing their appointments, we found his contention that the OIG reported magnitude of the inaccuracy of patient waiting times was somehow flawed to be illogical and unpersuasive.

The Under Secretary also asserts that the OIG used the most conservative desired appointment date whenever the patient's preferred appointment date was not clearly documented, which essentially provided a worse-case scenario analysis.  This assertion is not entirely inaccurate in that we did use the most conservative date.  However, it was not done to provide a worse-case scenario analysis; we used the most conservative date to be consistent with VHA policy.   In cases where the provider's desired date was a range of time, such as 3-6 months, VHA Directive 2006-055 requires schedulers to use the first date of the date range as the desired date of care or obtain clarification from the medical provider.

In paragraph 4.a. and 4.b., the Under Secretary points out that many VHA facilities use the recall/reminder system to allow patients to negotiate their appointment dates based on personal priorities, and to also ensure the patient is seen within the time period specified by the provider.  We agree that the recall/reminder system is beneficial to both the veteran and VA.  In those cases where a recall/reminder system was used, the OIG followed VHA policy in reviewing scheduler's compliance with scheduling procedures and relied on the information recorded in the scheduling system.

In paragraph 4.c., the Under Secretary concedes that the failure of scheduling clerks to adequately document patient preferences in appointment dates contributed to the OIG findings and states that it is unrealistic to expect schedulers to maintain such a high level of documentation.  While the OIG recognizes the workload associated with millions of appointments made every year, documenting changes in veteran desired dates is required by VHA's own policy.  The Under Secretary also comments that this documentation is solely to support audit requirements and does little, if anything, to support the actual scheduling of the appointment.  Contrary to this position, the OIG maintains that full compliance with established scheduling procedures is critical to ensuring patients are seen in a timely manner and no one falls through the cracks.  Compliance is also critical

to ensure data integrity. VA and Congress must have accurate, reliable, and timely information for budgeting and other decision making purposes.

In paragraph 5, the Under Secretary points out that the OIG incorrectly cited VHA for errors where veterans cancelled appointments and VHA did not follow up to reschedule new appointments when it was the patient's responsibility to reschedule the appointment. This is not accurate. The OIG reported error rate did not include any of the follow-up appointments. This was addressed in a separate part of the report. The OIG reported that VHA did not have effective follow up procedures to ensure patients received the desired care when patients missed their appointments. VHA's Directive 2006-055 requires that the responsible facility personnel must ensure that when a clinic cancels an appointment, patients are rescheduled and when a patient no shows, the patient is contacted to determine the reason for the no show and assist the patient in rescheduling a new appointment acceptable to the patient. We identified 60 consult referrals where the facility either did not follow up with the patient in a timely manner or did not follow up with the patient at all when the patient missed their appointment. For 11 of the 60 appointments, the clinic cancelled the patient's appointment but did not follow up with the patient in a timely manner or did not follow up with the patient at all to ensure the patient received the desired care. In some cases, the patient cancelled and requested the appointment be rescheduled. For example, a veteran had an appointment in the neurology clinic on January 25, 2007. Two days before the appointment, a comment was added in VistA stating that the patient cancelled the appointment. Included in the comment was instruction to reschedule and notify the veteran. We found no evidence that the medical facility made any further attempt to reschedule the appointment. The consult was eventually discontinued without any explanation in VistA.

In paragraph 6, the Under Secretary opines that any attempt at accurate reporting using the current scheduling software package is a formidable, if not impossible, task. We disagree that this is an impossible task. VHA needs to dedicate the necessary resources and training to ensure compliance with their own policies and procedures.

In paragraph 7, the Under Secretary states that to obtain "a more objective, professional analysis" of all components of VHA's scheduling process, he plans to obtain the services of a contractor who will thoroughly assess the factors that contribute to the complexity of the scheduling process and offer suggestions on ways that VHA can improve scheduling processes and demonstrate accurate waiting times. We take issue with any implication that the OIG audit was not an objective or professional analysis of the scheduling process. We briefed VHA representatives on our proposed methodology and approach during the entrance conference and made adjustments to incorporate all of their concerns. The audit was conducted in accordance with Government Auditing Standards, which are the professional standards established by the Comptroller General to ensure independence, due professional care, and quality control. Although VHA concurred with all the findings and recommendations in the 2005 report, five of the eight

recommendations from that report remain unimplemented, which accounts, in part, why the problems still exist, as shown by the most recent audit. While we do not disagree with the Under Secretary's plan of action, we believe any long-term fixes or changes to the current system may take years to implement. In the meantime, VHA needs to ensure accuracy in the current system.

In closing, the OIG remains encouraged that VHA is willing to accept responsibility for the problems reported and has concurred with four of the five recommendations made. We will follow up on the planned actions in this report, and those that remain unimplemented from the 2005 report, until they are completed.

*(original signed by:)*

BELINDA J. FINN
Assistant Inspector General
for Auditing

# Introduction

## Purpose

The purpose of this audit was to follow up on our *Audit of the Veterans Health Administration's Outpatient Scheduling Procedures* (Report No. 04-02887, July 8, 2005), which reported that VHA did not follow established procedures when scheduling medical appointments for veterans seeking outpatient care. The objectives of the follow-up audit were to determine whether (1) established scheduling procedures were followed and outpatient waiting times reported by VHA were accurate, (2) electronic waiting lists were complete, and (3) prior OIG recommendations were fully implemented.

## Background

VHA policy requires that all veterans with service-connected ratings of 50 percent or greater and all other veterans requiring care for service-connected disabilities be scheduled for care within 30 days of desired appointment dates.[1] All other veterans must be scheduled for care within 120 days of the desired dates. In the *Department of Veterans Affairs Fiscal Year 2006 Performance and Accountability Report*, issued November 15, 2006, VHA reported that 96 percent of all veterans seeking primary medical care and 95 percent of all veterans seeking specialty medical care were seen within 30 days of their desired dates. VHA uses VistA scheduling software to collect all outpatient appointments in 50 high-volume clinics and uses that data to calculate the percent of appointments scheduled within 30 days. VHA designates a clinic as a high-volume clinic if the total nation-wide workload (patient visits) of that clinic ranks in the top 50 clinics. Examples of two high-volume clinics would be Ophthalmology and Optometry—both are part of the Eye Care Specialty. Additionally, VHA uses patient surveys to determine whether the patient received an appointment for primary care when they wanted one.

VHA prescribes the following two methods to calculate the waiting times for outpatient appointments.

- For established patients (about 90 percent of outpatient appointments), VHA measures the elapsed days from the desired dates of care contained in the VistA scheduling package to the dates of the appointments. Schedulers must enter the correct desired dates of care in the system to ensure the accuracy of this measurement. The desired dates of care are usually established by the providers but can be adjusted based on veterans' requests.

---

[1] VHA Directive 2006-028, "Process For Ensuring Timely Access To Outpatient Clinical Care" (May 8, 2006).

- For new patients, VHA calculates waiting times from the date that the scheduler creates the appointment.  Since schedulers have 7 days to create appointments, VHA acknowledges that the actual waiting time for new patients could be understated by the number of days schedulers take to create the appointment.

For measuring waiting times, VHA defines established patients as those who have received care in a specific clinic in the previous 2 years; new patients represent all others. For example, a veteran who has been receiving primary care at a facility within the previous 2 years would be considered an established patient in the primary care clinic. However, if that same veteran was referred to the facility's Cardiology clinic, that veteran would now be classified as a new patient to the Cardiology clinic.

VHA implemented the electronic waiting list in December 2002 to provide medical facilities with a standard tool to capture and track information about veterans' waiting for medical appointments.   Veterans who receive appointments within the required timeframe are not placed on the electronic waiting list.  However, veterans who cannot be scheduled for appointments within the 30- or 120-day requirement should be placed on the electronic waiting list immediately.  If cancellations occur and veterans are scheduled for appointments within the required timeframes, the veterans are removed from the electronic waiting list.  VHA tracks the number of veterans who are on the electronic waiting list for more than 30 days.

VHA policy also requires that requests for appointments (including consults) be acted on by the medical facility as soon as possible, but no later than 7 calendar days from the date of request.[2]  To act on the consult is to complete or deny the consult, schedule the consult, or place the veteran on the electronic waiting list.  The policy also requires each facility employee involved directly or indirectly in the outpatient scheduling process, and the employee's supervisor to successfully complete VHA's Comprehensive Scheduler's Training Program.  No employee will be granted access to the VistA scheduling package until this training program is completed.

## Scope and Methodology

We reviewed applicable laws, regulations, policies, procedures, and guidelines and interviewed employees at VA Central Office and 10 medical facilities in 4 VISNs.  We also reviewed scheduling and consult records contained in VistA and the Computerized Patient Records System (CPRS).  The 10 medical facilities reviewed were:

- VISN 7—Atlanta VA Medical Center (VAMC), Birmingham VAMC, and the William Jennings Bryan Dorn VAMC (Columbia, SC).

- VISN 10—Chillicothe VAMC and the Cincinnati VAMC.

---

[2] VHA Directive 2006-055, "VHA Outpatient Scheduling Processes And Procedures" (October 11, 2006).

- VISN 11—John D. Dingell VAMC (Detroit, MI) and the Richard L. Roudebush VAMC (Indianapolis, IN).

- VISN 17— VA North Texas Health Care System (HCS) (Dallas, TX), South Texas Veterans HCS (San Antonio, TX); and the Central Texas Veterans HCS (Temple, TX).

Two of VHA's key performance measures are the percent of primary care appointments and the percent of specialty care appointments scheduled within 30 days of the desired dates of care. VHA uses VistA scheduling software to collect all outpatient appointments in 50 high-volume clinics and uses that data to calculate the percent of appointments scheduled within 30 days. Our universe included 14 of VHA's 50 high-volume clinics and represented only 1 month of appointments.

From VHA's data, we determined that the 10 medical facilities we reviewed scheduled 249,981 outpatient appointments for October 2006 in 14 of the 50 clinics representing 8 specialties—Audiology, Cardiology, Eye Care, Gastroenterology, Mental Health, Orthopedics, Primary Care, and Urology. To determine if schedulers followed established procedures when selecting the types of appointments and veterans' desired dates of care, we:

- Reviewed a non-random sample of 700 appointments from 14 high-volume clinics that were scheduled for October 2006—60 appointments for established patients and 10 appointments for new patients at each of the 10 medical facilities. The 60 appointments for established patients consisted of 20 appointments with VHA-reported waiting times of 30 days, 20 with waiting times of 15 days and 20 with waiting times of 0 days. We selected a smaller sample of new patient appointments because VHA eliminated the use of desired dates when calculating the waiting times of new patients. We did not review any appointments with VHA-reported waiting times of more than 30 days.

- Reviewed the desired date of care requested by the provider and documented in medical records or the veteran's desired date of care as recorded in the VistA scheduling and consult packages by the scheduler to determine if the waiting times of established patients were calculated correctly.

- Determined if schedulers created appointments for new patients within the 7-day requirement prescribed by VHA policy to determine if the reported waiting time was accurate.

- Presented the results of our reviews to each of the 10 medical facilities and, where appropriate, made changes to our results based on information the medical facilities provided to us. Subsequently, we provided the detailed results of all 700 appointments to VHA central office personnel for their review and comment.

- Interviewed 113 schedulers to capture their experiences related to training, supervision, and scheduling practices.

At the time of our review, the 10 medical facilities had 70,144 consult referrals (excluding prosthetic and inpatient referrals) with either an active or pending status that were over 7 days old. To determine if medical facilities used effective procedures to ensure all veterans either had appointments or were identified on the electronic waiting list, we reviewed a non-random sample of 300 consult referrals that were requested during May 2006 through March 2007.

To determine whether VHA and medical facilities implemented the recommendations we made in our July 2005 report, we interviewed personnel responsible for monitoring outpatient waiting times and scheduling appointments. We also tested new procedures to determine if the accuracy of outpatient waiting times and electronic waiting lists improved for new patient appointments.

We assessed the reliability of automated data by comparing selected data elements—date appointment was created, desired date of care, date of completed appointment—to the electronic medical records. We concluded that the data used to accomplish the audit objective was sufficiently reliable.

Our assessment of internal controls focused only on those controls related to the accuracy of veterans' waiting times and facility waiting lists. The audit was conducted in accordance with Generally Accepted Government Auditing Standards.

# Results and Conclusions

## Issue 1:   Differences in Outpatient Waiting Times

### Findings

Schedulers were still not following established procedures for making and recording medical appointments.  We found unexplained differences between the desired dates as shown in VistA and used by VHA to calculate waiting times and the desired dates shown in the related medical records.  As a result, the accuracy of VHA's reported waiting times could not be relied on.

Differences in Reported Waiting Times

Of the 700 veterans reported by VHA to have been seen within 30 days, 600 were established patients and 100 were new patients.  Overall, we found sufficient evidence to support that 524 (75 percent) of the 700 had been seen within 30 days of the desired date. As shown in Table 1, this includes 229 (78 percent) veterans seeking primary care and 295 (73 percent) veterans seeking specialty care.  However, 176 (25 percent) of the appointments we reviewed had waiting times over 30 days when we used the desired date of care that was established and documented by the medical providers in the medical records.

**Table 1.  Appointments With Waiting Times of 30 Days or Less**
**(70 Reviewed at Each Facility)**

| Medical Facility Location | Total | | Primary Care | | Specialty Care | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Atlanta, GA | 54 | 77% | 26 | 76% | 28 | 78% |
| Birmingham, AL | 56 | 80% | 18 | 75% | 38 | 83% |
| Columbia, SC | 45 | 64% | 21 | 72% | 24 | 59% |
| Chillicothe, OH | 45 | 64% | 19 | 76% | 26 | 58% |
| Cincinnati, OH | 56 | 80% | 14 | 70% | 42 | 84% |
| Detroit, MI | 59 | 84% | 28 | 93% | 31 | 78% |
| Indianapolis, IN | 51 | 73% | 24 | 73% | 27 | 73% |
| Dallas, TX | 53 | 76% | 29 | 83% | 24 | 69% |
| San Antonio, TX | 47 | 67% | 28 | 76% | 19 | 58% |
| Temple, TX | 58 | 83% | 22 | 79% | 36 | 86% |
| Total Within 30 Days | 524 | 75% | 229 | 78% | 295 | 73% |
| Total Reviewed | 700 | | 295 | | 405 | |

Veterans waited more than 30 days for the remaining 176 appointments as shown below in Table 2.

**Table 2.  Appointments With Waiting times of More Than 30 Days**

| OIG Calculated Waiting Time | Total Appointments | Primary Care Appointments | Specialty Care Appointments |
|---|---:|---:|---:|
| 31 to 50 Days | 79 | 32 | 47 |
| 51 to 100 Days | 63 | 23 | 40 |
| 101 to 150 Days | 21 | 8 | 13 |
| More Than 150 Days | 13 | 3 | 10 |
| Total Over 30 Days | 176 | 66 | 110 |
| Number of Appointments Reviewed | 700 | 295 | 405 |
| Percent Over 30 Days | 25% | 22% | 27% |

Of the 176 appointments, 48 (27 percent) were for veterans with service-connected ratings of 50 percent or greater or veterans requiring care for service-connected disabilities.  For example:

- On December 20, 2005, a veteran who was 50 percent service-connected was seen in the Eye Clinic.  The provider wrote in the progress note that the veteran should return to the clinic in 6 weeks (January 31, 2006).  On September 6, the scheduler created an appointment for the veteran for October 17.  The scheduler entered a desired date of October 2, which resulted in a reported waiting time of 15 days.  However, based on the provider's desired date of January 31, the veteran actually waited 259 days for his appointment.  The scheduling records did not contain any explanation for the delay.  Medical facility personnel told us the reason this appointment took so long to schedule was because it "fell through the cracks."

- On April 18, 2006, a veteran who was 80 percent service-connected, including service connection for hearing impairment, was referred to the Audiology Clinic.  Because this was a consult referral, the veteran should have received the next available appointment.  On September 20 (155 days after the referral), the scheduler created an appointment for the veteran for October 20 and entered a desired date of September 20, which resulted in a reported waiting time of 30 days.  However, based on the provider's desired date of April 18, the veteran actually waited 185 days for his appointment.  The scheduling records did not contain any explanation for the delay.  Medical facility personnel agreed with our recalculated waiting time.

Although these particular examinations were delayed, the veterans received medical care from other clinics during this time.

Of the 700 veterans reported by VHA to have been seen within 30 days, 600 were established patients and 100 were new patients. In total, 429 (72 percent) of the 600 appointments for established patients had unexplained differences between the desired dates of care documented in medical records and the desired dates of care the schedulers recorded in VistA. If schedulers had used the desired dates of care documented in medical records:

- The waiting time of 148 (25 percent) of the 600 established appointments would have been less than the waiting time actually reported by VHA.

- The waiting time of 281 (47 percent) of the 600 established appointments would have been more than the waiting time actually reported by VHA. Of the 281 appointments, the waiting time would have exceeded 30 days for 176 of the appointments.

VHA's method of calculating the waiting times of new patients understates the actual waiting times. Because of past problems associated with schedulers not entering the correct desired date when creating appointments, VHA uses the appointment creation date as the starting point for measuring the waiting times for new appointments. VHA acknowledges that this method could understate the actual waiting times for new patients by the number of days schedulers take to create the appointment. VHA only uses this method for new appointments because VHA assumes the new patient needs to be seen at the next available appointment. This is true for patients that are absolutely new to the system. However, the problem is that VHA's definition of new patients also includes patients that have already seen a provider and have a recommended desired date. In our opinion, while these veterans might be new to a specialty clinic, they are established patients because they have already seen medical providers who have recommended desired dates.

For VHA to ignore the medical providers' desired dates for this group of new patients understates actual waiting times. For example, we reviewed 100 new patients that VHA reported had waiting times of less than 30 days. Out of the 100, 86 had already seen a medical provider and were being referred to a new clinic. The other 14 were either new to the VA or had not been to the VA in over 2 years; therefore they had no desired date. The results of reviewing these two categories are listed below:

- Eighty-six were currently receiving care at the facility but were classified as a new patient because they were referred to a specialty clinic in that same facility and had not received care in that clinic within the previous 2 years. For those 86 patients, we calculated the waiting time by identifying the desired dates of care as documented in the medical records (date of the consult referral) to the dates of the appointment. We found that 68 (79 percent) of the 86 new patients were seen within 30 days. For 15 of the 18 patients not seen within 30 days, schedulers did not create the appointment within the 7-day requirement and the scheduling records contained no explanation of

the scheduling delay. The actual waiting time for the 18 patients ranged from 32 to 112 days.

- Fourteen were either new to the VA, new to the facility, or had not received care in the facility within the previous 2 years. For those 14 we reviewed the VistA scheduling package and identified the date the veteran initiated the request for care (telephone or walk-in) and used that as the desired date for calculating the waiting time. Based on available documentation, all 14 veterans were seen within 30 days of the desired date.

VHA needs to either ensure schedulers comply with the policy to create appointments within 7 days or revert back to calculating the waiting time of new patients based on the desired dates of care. The results included in this section are limited by the fact that schedulers may not have recorded the veterans' preferences for appointment dates in VistA as discussed below.

Impact on the Electronic Waiting List

We further reviewed the 176 cases where veterans' waiting times were more than 30 days, and identified 64 veterans that were given appointments past the 30- or 120-day requirement and should have been on the electronic waiting lists. This represented 9 percent of the 700 appointments reviewed. The 64 cases consisted of 36 veterans with service-connected ratings of 50 percent or greater, 12 veterans being treated for service-connected conditions, and 16 veterans with waiting times more than 120 days.

Use of Patient Preferences When Scheduling Appointments

VHA told us that the unexplained differences we found between the desired dates of care shown in the medical records and the desired date of care the schedulers recorded in VistA can generally be attributed to patient preference for specific appointment dates that differ from the date recommended by medical providers. VHA Directive 2006-055 requires schedulers to include a comment in VistA if the patient requests an appointment date that is different than the date requested by the provider. We reviewed all comments in VistA and accepted any evidence that supported a patient's request for a different date. VHA personnel told us that schedulers often do not document patient preferences due to high workload. Without documentation in the system or contacting the patients, neither we nor VHA can be sure whether the patient's preference or the scheduler's use of inappropriate scheduling procedures caused the differences we found.

Some VHA clinics use recall or reminder clinics to emphasize patient-driven scheduling. If a veteran is entered in a recall or reminder clinic, the scheduler will notify the veteran either by letter or phone about 30 days before the expected appointment date and ask the veteran to call the clinic to set up their appointment. VHA personnel said that some veterans may not call for their appointment or, in some cases, may wait several months

before calling. If the scheduler does not document this situation, then the veterans waiting time may appear to be longer than it actually was. If a patient fails to call in, VHA Directive 2006-055 requires the facility to send a follow-up letter and to document failures to contact the veteran.

VHA personnel told us that some providers need to be more specific when they document the veterans' desired dates of care. For example, some providers will request the veterans to return to the clinic in 3 to 6 months. If a provider uses a date range, VHA Directive 2006-055 requires schedulers to use the first date of the date range as the desired date of care or obtain clarification from the provider. When we found appointments with date ranges and no clarifying comments from the provider, we followed VHA policy and considered the first date of the range as the desired date.

## Conclusion

We found that the conditions we identified in our previous report still exist. VHA has established detailed procedures for schedulers to use when creating outpatient appointments but has not implemented effective mechanisms to ensure scheduling procedures are followed. The accuracy of outpatient waiting times is dependent on documenting the correct desired date in the system.

## Issue 2:   Consult Referrals Not Included On Electronic Waiting Lists

### Findings

Schedulers did not always create appointments for consult referrals within 7 calendar days and as a result, VHA's electronic waiting lists were understated. Electronic waiting lists are a key tool used in determining how well medical facilities are meeting their patient care requirements and are instrumental in making sure no veterans go untreated or are not treated timely. Incomplete electronic waiting lists compromise VHA's ability to assess and manage demand for medical care.

<u>Appointments for Consult Referrals Were Not Scheduled Within Required Timeframe</u>

None of the 10 medical facilities we reviewed consistently included veterans with pending and active consults (referrals to see a medical specialist), that were not acted on within the 7-day requirement, on the electronic waiting list. Pending consults are those that have been sent to the specialty clinic, but have not yet been acknowledged by the clinic as being received. Active consults have been acknowledged by the receiving

clinic, but an appointment date has either not been scheduled or the appointment was cancelled by either the veteran or the clinic. To act on the consult is to complete or deny the consult, schedule an appointment for the veteran to be seen timely, or place the veteran on an electronic waiting list.

According to the VistA Consult Tracking Reports, the 10 medical facilities listed 70,144 veterans with consult referrals over 7 days old. In accordance with VHA policy, the medical facilities should have included these veterans on the electronic waiting lists. The 70,144 does not include veterans with referrals for prosthetics or inpatient procedures. VHA personnel told us that the 70,144 included some referrals for procedures (such as cardiac catheters) and alternative care (such as contracted care) that should not have been identified on the consult tracking reports. VHA personnel also acknowledged to us that VHA policy does not exempt those referrals from the 7-day requirement. At the time of our review, the total number of veterans on the electronic waiting lists for specialty care was only 2,658. Table 3 shows the number of consult referrals over 7 days old where, in accordance with VHA policy, the medical facilities should have included the veterans on the electronic waiting lists and the number of veterans medical facilities reported on their electronic waiting lists.

**Table 3.  Consult Referrals Over 7 Days Old for All Services
According to VistA Consult Tracking Reports**

| Medical Facility Location | Active | Pending | Total | Total Veterans on the Electronic Waiting List For Specialty Services |
|---|---|---|---|---|
| Atlanta, GA | 1,598 | 416 | 2,014 | 323 |
| Birmingham, AL | 169 | 109 | 278 | 0 |
| Columbia, SC | 114 | 433 | 547 | 0 |
| Chillicothe, OH | 1,326 | 3,356 | 4,682 | 188 |
| Cincinnati, OH | 2,850 | 7,393 | 10,243 | 351 |
| Detroit, MI | 4,561 | 28,819 | 33,380 | 5 |
| Indianapolis, IN | 88 | 10,647 | 10,735 | 24 |
| Dallas, TX | 145 | 116 | 261 | 378 |
| San Antonio, TX | 1,991 | 2,954 | 4,945 | 501 |
| Temple, TX | 1,095 | 1,964 | 3,059 | 888 |
| Total | 13,937 | 56,207 | 70,144 | 2,658 |

According to medical facility personnel, the consult tracking report did not always reflect the actual consult status because clinic personnel did not always update the consult after action was taken. To substantiate the data in the tracking report, we selected 300 consults (20 active consults and 10 pending consults from each medical facility) with consult request dates from May 2006 through March 2007. We found that:

- Of the 200 active consults, 105 (53 percent) were not acted on within 7 days and the veterans were not placed on the electronic waiting list. For 55 (28 percent) of the 200 consults, no action had occurred for at least 30 days from the consult request date.

- Of the 100 pending consults, 79 (79 percent) were not acted on within 7 days and the veterans were not placed on the electronic waiting list. For 50 (50 percent) of the 100 consults, no action had occurred for at least 30 days from the consult request date.

We reported this same condition in our July 2005 report and recommended that the Under Secretary for Health monitor consult referrals to ensure that all veterans with referrals either have scheduled appointments within 7 calendar days or be included on electronic waiting lists. In response to our recommendation, VHA published VHA Directive 2006-055 (October 11, 2006) and included detailed instructions to follow when responding to consult referrals. The directive also requires that schedulers be monitored on an ongoing basis regarding their performance in scheduling. During our facility visits, we found that VHA managers had not implemented an effective process to monitor schedulers' performance. We did however, identify clinics within some medical facilities that monitored all pending and active consults over 7 days old in an effort to ensure that veterans were either scheduled for their appointments or included on the electronic waiting lists.

<u>Schedulers Were Not Getting the Necessary Training</u>

Schedulers at the medical facilities we reviewed told us that, although training was readily available, they did not have time to take the training. Their managers agreed, saying that medical facilities were short of staff and training was not a high priority. We interviewed 113 schedulers at 6 medical facilities and found that:

- Fifty-three (47 percent) told us they have had no training on consults within the last year. Nine (17 percent) of the 53 have been employed as schedulers for less than 1 year.

- Sixty (53 percent) told us they have had no training on the electronic waiting list within the last year. Ten (17 percent) of the 60 have been employed as schedulers for less than 1 year.

Medical facilities need to implement mechanisms to ensure that all personnel involved in managing consult referrals understand the requirement to either act on the consult referrals within 7 calendar days from the date of request or to include the veterans on the electronic waiting list.

Facilities Did Not Have Effective Consult Follow-Up Procedures

Medical facilities did not establish effective procedures to ensure that veterans received timely care if the veteran did not show up for their initial appointment or the appointment was cancelled. Facility personnel complied with VHA policy to schedule appointments within 7 days for 116 (39 percent) of the 300 consults we reviewed. However, subsequent actions such as a patient no show placed the 116 consults back in active status. For 26 (22 percent) of the 116 consults, we found no evidence in the medical records that the facilities followed up on the consults to ensure the veterans eventually received the desired care. For example:

- A consult request was initiated on November 28, 2006, for a veteran to receive care in the Endocrinology Clinic. On November 30, the scheduler created the appointment for January 29, 2007. On January 30, a note was added in VistA stating that the veteran did not show up for the previous day's appointment. We reviewed medical records and interviewed facility personnel and found no evidence that clinic personnel made any further attempt to contact the referring physician or veteran to determine whether the consult should be cancelled or rescheduled.

- A consult request was initiated on December 12, 2006, for a veteran to receive care in the Neurology Clinic. On December 18, the scheduler created the appointment for January 25, 2007. Two days before the appointment, the veteran called to cancel. Remarks were added in VistA to reschedule and notify the veteran. We reviewed medical records and interviewed facility personnel and found no evidence that clinic personnel made any further attempt to contact the referring physician or veteran to determine whether the consult should be cancelled or rescheduled.

For 90 of the 116 consults where we found evidence that the medical facilities did follow up with the veteran, the facilities took longer than 7 days to act on the appointment for 34 (38 percent) of the consults and did not place the veterans on the electronic waiting list. For example:

- A consult request was initiated on November 17, 2006, for a veteran to receive care in the Internal Medicine Clinic. On November 22, the scheduler created the appointment for December 28. On the day of the appointment, a note was added in VistA stating that the patient did not show and the appointment needed to be rescheduled. Another note to reschedule the appointment was added on February 8, 2007. Clinic personnel did not create a new appointment until February 12—46 days after the veteran did not show up for the original appointment on December 28. The appointment was rescheduled for March 15.

- A consult request was initiated on January 3, 2007, for a veteran to receive care in the Orthopedic Clinic. On January 4, the scheduler created the appointment for

February 15. On January 29, a note was added in VistA stating that the clinic cancelled the appointment because there was only one resident available and the appointment needed to be rescheduled. Clinic personnel did not create a new appointment until February 20—22 days after the clinic cancelled the veteran's original appointment. The appointment was rescheduled for April 16.

Facility personnel told us the requirement to act on consults within 7 calendar days applied only to the initial appointments. Although VHA Directive 2006-055 does not specifically address the required timeline for following up on consults, VHA personnel confirmed for us that the 7-day requirement also applied when consults were placed back in active status.

## Conclusion

VHA needs to ensure that the electronic waiting lists are complete and accurate. Electronic waiting lists are used to gauge how well medical facilities are meeting their patient care requirements and are also instrumental in making sure no veterans go untreated. Underreported waiting lists compromise VHA's ability to assess and manage demand for medical care.

## Issue 3:   Prior OIG Recommendations Were Not Implemented

### Findings

In July 2005, we reported that outpatient scheduling procedures were not adequate to ensure accurate reporting of veterans' waiting times and facility waiting lists (*Audit of the Veterans Health Administration's Outpatient Scheduling Procedures*, Report No. 04-02887-169, July 8, 2005). The Under Secretary for Health agreed with all eight recommendations to correct the reported conditions; however, at the start of this audit five of the recommendations to improve the accuracy of waiting times and waiting lists remained unimplemented. They were as follows:

- Ensure that medical facility managers require schedulers to create appointments following established procedures (recommendation 1a).

- Monitor consult referrals to ensure that all veterans with referrals either have scheduled appointments within 7 business days or be included on electronic waiting lists (recommendation 2a).

- Establish an automated link from the CPRS consult package to the VistA scheduling module (recommendation 2b).

- Develop a standard training package for medical facilities to train schedulers on the electronic waiting list and VistA scheduling module (recommendation 3a).

- Make sure all schedulers receive annual training on the electronic waiting list and VistA scheduling module (recommendation 3c).

In addition, as evidenced by the results of this review, VHA's actions to monitor the schedulers' use of correct procedures when creating appointments (one of the three implemented recommendations) were not effective (recommendation 1b).

During the course of this audit, VHA submitted documentation to us stating that recommendations 1a, 2a, and 3a were implemented. We agreed that recommendation 3a was implemented. However, recommendations 1a and 2a were only partially implemented by VHA as neither implementation action sufficiently addressed the oversight needed to ensure the schedulers followed the procedures. We did not review VHA's efforts to establish an automated link from the CPRS consult package to the VistA scheduling module (recommendation 2b).

## Conclusion

VHA needs to take timely action to implement recommendations as five of the eight recommendations from our July 2005 report remain unimplemented. Timely action may have precluded the same conditions from occurring again.

Our audit results are not comparable to VHA's reported waiting times contained in its *Performance and Accountability Report* because we used a different set of clinics and timeframe of appointments. Further, our audit results cannot be extrapolated to project the extent that waiting times exceed 30 days on a national level because the medical facilities and appointments selected for review were based on non-random samples. Nevertheless, the findings of this report do support the fact that the data recorded in VistA and used to calculate veteran outpatient waiting times is not reliable. VHA states that our results overstate waiting times because patients requested a different appointment date. We agree that patient preference could change the desired date of care; however, if schedulers did not document the patient preference our testing would not disclose this fact. We believe that VHA's calculations of waiting times are subject to greater uncertainty than our numbers because we cannot assume that all differences are due to patient preference, especially when our review took into account medical provider desired dates that were also not accurately recorded in VistA. Until VHA establishes procedures to ensure that schedulers comply with policy and document the correct desired dates of care, whether recommended by medical providers or requested by veterans, calculations of waiting time from the current system will remain inaccurate.

# Recommendations

1. We recommended that the Under Secretary for Health establish procedures to routinely test the accuracy of reported waiting times and completeness of electronic waiting lists, and take corrective action when testing shows questionable differences between the desired dates of care shown in medical records and documented in the VistA scheduling package.

Management Response

The Under Secretary for Health agreed with the recommendation and stated that the Deputy Under Secretary for Health (DUSH) for Operations and Management will task a Work Group composed of knowledgeable clinical, administrative, and technical staff (including facility/VISN representation) to fully address all issues relating to electronic waiting list management that are addressed in this report. The group will develop comprehensive procedures, perhaps in the form of a checklist, which all facilities will be required to apply systematically in testing the completeness of their electronic waiting lists. As part of their task, the work group will also provide specific recommendations to the DUSH/Operations and Management for oversight monitoring and reporting tools that can be practically utilized to measure facility compliance in implementing the procedures. One action that will be considered by the work group is implementation of a new access performance monitor that will assist in identifying problem areas that need to be addressed. Before the end of this fiscal year, a new software patch will also be released that will automatically place patients on the electronic waiting list if the appointment is being scheduled more than 120 days beyond the desired appointment date. It is anticipated that this software enhancement will significantly improve compliance with existing directives.

VHA is also in the process of negotiating a national contract to analyze the full scope of scheduling processes, including electronic wait lists and waiting times reporting. Final actions approved in response to recommendations made by the work group will be implemented in conjunction with related actions addressed in the scheduling improvement study. The work group will be appointed and convened by the end of August 2007, with formal recommendations submitted to the DUSH/Operations and Management, by November 2007.

OIG Response

While we do not disagree with the Under Secretary's plan of action, we believe any long-term fixes or changes to the current system may take years to implement. In the meantime, VHA needs to ensure accuracy in the current system. We will follow up on the planned actions until they are completed.

2. We recommended that the Under Secretary for Health take action to ensure schedulers comply with the policy to create appointments within 7 days or revert back to calculating the waiting time of new patients based on the desired date of care.

Management Response

The Under Secretary for Health did not agree with the recommendation and especially disagreed with our observation that VHA ignores the medical provider's desired date for new patients, thereby understating actual waiting times. The Under Secretary stated that the OIG inaccurately stated that problems with using incorrect desired dates of care prompted VHA to stop using desired dates when calculating waiting times for new patients. Since 2001, VHA has calculated the waiting times for new patients as the number of days between the date the appointment was created and the appointment date. VHA considered it a number hard to game and more difficult to manipulate because the dates are automatically selected by our software when the scheduler makes the appointment. The Under Secretary stated that VHA must maintain a high level of flexibility in our scheduling practices for new patients, since provider/patient preferences and numerous other factors can obviously impact final appointment decisions.

OIG Response

Unless the desired date of care and the appointment creation date are the same, VHA's decision to measure the waiting time for new patients as the number of days between the date the appointment was created and the appointment date ignores the desired date of care (whether established by the medical provider or the patient). Of the 100 new patient appointments we reviewed, only 41 of the appointments were created on the desired date of care. For the remaining 59 new appointments, the scheduler understated the reported waiting times by taking anywhere from 1 to 97 days past the providers (or patients) desired date of care to create the appointment. Further, VHA's intention to use software to make the new patient scheduling process harder to game and more difficult to manipulate actually reduces the flexibility the Under Secretary says is necessary because the software automatically selects the appointment creation date as the desired date of care. This process does not allow the scheduler to consider any patient preferences. Finally, during our entrance conference, the Under Secretary's key representatives specifically stated that past problems with incorrect desired dates prompted the new process of measuring new patient waiting times by using the appointment creation dates instead of the desired dates.

3. We recommended that the Under Secretary for Health amend VHA Directive 2006-055 to clarify specialty clinic procedures and requirements for receiving and processing pending and active consults to ensure they are acted on in a timely manner and, if not, are placed on the electronic waiting lists.

Management Response

The Under Secretary for Health agreed with the recommendation and stated that the Directive will be amended pending final determinations made by the Under Secretary for Health in response to recommendations made by the referenced work group and by the national scheduling improvement study that is currently under negotiation by VHA.

OIG Response

The improvement plans are acceptable and we will follow up on the planned actions until they are completed.

4. We recommended that the Under Secretary for Health ensure all schedulers receive required annual training.

Management Response

The Under Secretary for Health agreed with the recommendation and stated that annual scheduler training, including certification of completion, is already mandated. All facilities have either completed or have nearly completed comprehensive annual training requirements for all schedulers, and VISNs are in the process of monitoring full completion via review of locally maintained training records. Annual scheduler refresher training will also be developed. Again, future training plans will be designed to reflect recommendations made by the pending work group and scheduling improvement study.

OIG Response

The improvement plans are acceptable and we will follow up on the planned actions until they are completed.

5. We recommended that the Under Secretary for Health identify and assess alternatives to the current process of scheduling appointments and recording and reporting waiting times, and develop a plan to implement any changes to the current process.

Management Response

The Under Secretary for Health agreed with the recommendation and stated that VHA has released a Statement of Work to engage the services of a technical contracting firm to analyze the full scope of our scheduling processes, identify opportunities for improvement, and recommend viable alternative approaches for consideration. Based on submitted recommendations, decisions will be made about pursuing alternative directions in the scheduling design.

<u>OIG Response</u> The improvement plans are acceptable and we will follow up on the planned actions until they are completed.

.

Appendix A

# Under Secretary for Health Comments

**Department of
Veterans Affairs**                          **Memorandum**

**Date:**       August 22, 2007

**From:**       Under Secretary for Health (10)

**Subject:**    **OIG Draft Report:   Audit of the Veterans Health
                Administration's Outpatient Waiting Times (Project
                No. 2007-00616-R5-0068/WebCIMS 381450)**

**To:**         Assistant Inspector General for Auditing (52)

1.  I have carefully reviewed your revised draft report on waiting
times, and I appreciate your willingness to address several key VHA
concerns with the audit methodology, particularly in relation to the
contrasting methods used by VHA and OIG to calculate wait times,
and your acknowledgment that the audit results cannot be
extrapolated to project national trends.  I also believe that the report
correctly identifies areas VHA needs to address to improve
outpatient waiting time accuracy.   Nevertheless, VHA continues to
non-concur with the findings in Issue 1 because of the limitations of
the methodology used in the study.  I also do not concur with
Recommendation 2, relating to the calculation of waiting times for
new patients.   We do, however, concur with Issue 2 and the
remaining recommendations, and include a plan of corrective actions
as part of our response.

2.  As I am sure you will agree, scheduling processes in a system as
massive as VA are often overwhelmingly complex, with so many
variables involved that accurate reporting of national waiting times
by any large organization is a daunting challenge.   To my
knowledge, VHA's efforts appear to be unprecedented, since no
other system in the public or private sector has attempted to measure
waiting times for almost 40 million appointments.   Your report
highlights many of the roadblocks we face.   However, one of the
most valid measurements we have of access efficiency is also the
most vital, since it is generated directly from our veterans.   VA's
national patient satisfaction survey, completed in February and

March 2007, shows that 85 percent of the veterans who personally completed the survey reported that they had access to primary care appointments when they needed them. Eighty-one percent of those same veterans also reported satisfaction with timely access to specialty care. This positive reporting by actual veteran patients varies significantly with your report results. There are several factors which might account for this discrepancy.

3. With respect to Issue 1: "Differences in Outpatient Waiting Times," I am extremely concerned that the methodology OIG used resulted in a flawed conclusion about the magnitude of the inaccuracy in patient waiting times. I especially disagree with your conclusions about both the scheduling and definition of new patients, and the observation that VHA ignores the medical providers' desired date for new patients, thereby understating actual waiting times. You inaccurately state that problems with using incorrect desired dates of care prompted VHA to stop using desired dates when calculating waiting times for new patients. VHA has calculated a new patient wait time since 2001. We have always calculated it as the number of days between the date the appointment was created and the appointment date. We considered it a number hard to game because the dates are automatically selected by our software when the scheduler makes the appointment. Thus, the software logic determines which appointments are new, not the scheduler, so it's very difficult for the field to manipulate. We must maintain a high level of flexibility in our scheduling practices for new patients, since provider/patient preferences and numerous other factors can obviously impact final appointment decisions. It should also be emphasized that new patients who are in high priority categories, including Operation Iraqi Freedom/Operation Enduring Freedom (OIF/OEF) and service-connected veterans, are immediately provided with timely access to needed care either in the VA or in the private sector, if necessary.

4. OIG auditors computed waiting times by using the date that our clinicians specified for a patient to return for a visit, without considering the date the patient wanted to return, unless that patient's preferred date was clearly documented by the clerk in the scheduling package or the medical record. You also estimated the most conservative desired appointment date whenever the patient's preferred appointment date was not clearly documented, essentially providing a worse-case scenario analysis. Strictly adhering to the physician desired date as an absolute nonnegotiable date rather than

as the preferred time frame it is used as in scheduling, and by not factoring in all patient preferences, the report overstates the delay in waiting times.

a. VHA allows patients to negotiate their own appointment dates based on their own personal priorities. To accommodate this, many of our facilities use a "recall/reminder" system. As the time of the appointment scheduling nears, a postcard or other reminder is sent to the patient which reminds the patient to contact the facility to schedule their appointment. Patient involvement in this process decreases the likelihood that appointments will be cancelled if they are scheduled far in advance, and also reduces the possibility that the patient will be a "no show" for his or her appointment.

b. For example, a veteran and his or her clinician agree that a follow-up appointment is needed in six months. Using the "recall/reminder" system, no appointment is made at the time of that agreement. Five months later, the facility sends the veteran a reminder that an appointment is needed, and that the veteran should contact the facility within a month. Many times, veterans take longer than a month to make that contact. In those situations, even if an appointment is made within 30 days of the call, OIG auditors would consider this an overdue appointment, which VHA believes it is not.

c. I concede that scheduling clerks' failures to adequately document patient preferences in appointment dates contributed to the audit findings - but it is unrealistic to expect VHA's schedulers to maintain such a high level of documentation for the 37 million appointments scheduled annually when that documentation is solely to support audit requirements and does little, if anything, to support the actual scheduling of the appointment per se.

5. OIG auditors also cited VHA for errors in cases where veterans cancelled appointments, and VHA did not follow-up to reschedule new appointments. Except in cases involving mental health diagnoses or other high-risk illnesses, our patients have the responsibility to reschedule appointments that they have cancelled. This expectation is the same as that in the private sector. VHA, of course, has the responsibility to follow-up when our staff initiate the cancellation.

6. With respect to Issue 2: "Electronic Wait Lists Were Not Complete," VHA concurs with the report findings and an action plan

to address the associated recommendations is attached.  I would re-emphasize, however, that any attempt at accurate reporting of waiting times, as an unintended byproduct of a scheduling software package, is a formidable, if not impossible, task in a health care system as vast and complex as VA.

7.    To obtain a more objective, professional analysis of all components of VHA's scheduling process, including electronic wait lists and waiting times reporting, I plan to obtain the services of a contractor who will thoroughly assess the factors that contribute to the complexity of the scheduling process and offer suggestions on ways VHA can improve scheduling processes and demonstrate accurate waiting times.    Included in the assessment will be information technology software support; levels of variability in the way departments are organized; scheduling rules and their implementation; demands on scheduling clerks and their organizational alignment; patient no-show rates; overbooking practices, and variability in provider supply and patient demand for specific types of appointments.  VHA, working with the Office of Acquisition and Material Management, finalized a Statement of Work for this project and is now in the solicitation process.

8.  Along with this study, VHA will continue to take important steps towards implementing a proposed new scheduling software package; improving waiting time metrics; developing standardized tools to improve reporting accuracy systemwide; improving our documentation procedures; and addressing training and career development issues for our scheduling clerks.  I am personally committed to making significant improvements in this area, and I look forward to working with you to ensure that these improvements fully benefit veterans and their families.

9. If you require any additional information, please contact Margaret M. Seleski, Director, Management Review Service (10B5), at 565-7638.


    *(original signed by:)*
Michael J. Kussman, MD, MS, MACP

Attachment

## Under Secretary for Health Comments
## to Office of Inspector General's Report

The following comments are submitted in response to the recommendations in the Office of Inspector General's report:

1.  We recommended that the Under Secretary for Health establish procedures to routinely test the accuracy of reported waiting times and completeness of electronic waiting lists, and take corrective action when testing shows questionable differences between the desired dates of care shown in medical records and documented in the VistA scheduling package.

Concur

Target Completion Date:  November 2007 and Ongoing

The Deputy Under Secretary for Health for Operations and Management (DUSH/Operations and Management) will task a Work Group composed of knowledgeable clinical, administrative and technical staff (including facility/VISN representation) to fully address all issues relating to electronic waiting list management that are addressed in this report.  The group will develop comprehensive procedures, perhaps in the form of a checklist that all facilities will be required to apply systematically in testing the completeness of their electronic waiting lists.  As part of their task, the work group will also provide specific recommendations to the DUSH/Operations and Management for oversight monitoring and reporting tools that can be practically utilized to measure facility compliance in implementing the procedures.  One action that will be considered by the work group is implementation of a new access performance monitor that will assist in identifying problem areas that need to be addressed.  Before the end of this fiscal year, a new software patch will also be released that will automatically place patients on the electronic waiting list if the appointment is being scheduled more than 120 days beyond the desired appointment date.  It is anticipated that this software enhancement will significantly improve compliance with existing directives.

As noted in our response memo, VHA is also in the process of negotiating a national contract to analyze the full scope of scheduling processes, including electronic wait lists and waiting times reporting. Final actions approved in response to recommendations made by the work group will be implemented in conjunction with related actions addressed in the scheduling improvement study.

The work group will be appointed and convened by the end of August 2007, with formal recommendations submitted to the DUSH/Operations and Management, by November 2007.

2. We recommended that the Under Secretary for Health take action to ensure schedulers comply with the policy to create appointments within 7 days or revert back to calculating the waiting time of new patients based on the desired date of care.

Non-Concur

Non-Concur based on reasons cited in the response memo. VHA anticipates the contractor will include recommendations related to policy compliance as part of their review.

3. We recommended that the Under Secretary for Health amend VHA Directive 2006-055 to clarify specialty clinic procedures and requirements for receiving and processing pending and active consults to ensure they are acted on in a timely manner and, if not, are placed on the electronic waiting lists.

Concur

Target Completion Date: December 2007 and Ongoing

The Directive will be amended pending final determinations made by the Under Secretary for Health in response to recommendations made by the referenced work group and by the national scheduling improvement study that is currently under negotiation by VHA.

4. We recommended that the Under Secretary for Health ensure all schedulers receive required annual training.

Concur

Target Completion Date: December 2007 and Ongoing

Annual scheduler training, including certification of completion, is already mandated. All facilities have either completed or have nearly completed comprehensive annual training requirements for all schedulers, and VISNs are in the process of monitoring full completion via review of locally maintained training records. Annual scheduler refresher training will also be developed. Again, future training plans will be designed to reflect recommendations made by the pending work group and scheduling improvement study.

5. We recommended that the Under Secretary for Health identify and assess alternatives to the current process of scheduling appointments and recording and reporting waiting times, and develop a plan to implement any changes to the current process.

Concur

Target Completion Date: December 2007 and Ongoing

As already noted, VHA has released a Statement of Work to engage the services of a technical contracting firm to analyze the full scope of our scheduling processes, identify opportunities for improvement and recommend viable alternative approaches for consideration. Based on submitted recommendations, decisions will be made about pursuing alternative directions in the scheduling design.

**Appendix B**

# OIG Contact and Staff Acknowledgments

| | |
|---|---|
| OIG Contact | Larry Reinkemeyer (816) 426-7100 |
| Acknowledgments | Robin Frazier |
| | Joseph Janasz |
| | Brad Lewis |
| | Daniel Morris |
| | Dao Pham |
| | Carla Reid |
| | Jason Schuenemann |
| | Marcia Schumacher |
| | Oscar Williams |

**Appendix C**

# Report Distribution

## VA Distribution

Office of the Secretary
Veterans Health Administration
Veterans Benefits Administration
National Cemetery Administration
Assistant Secretaries
Office of General Counsel

## Non-VA Distribution

House Committee on Veterans' Affairs
House Committee on Appropriations, Subcommittee on Military Construction, Veterans Affairs, and Related Agencies
House Committee on Oversight and Government Reform
Senate Committee on Veterans' Affairs
Senate Committee on Appropriations, Subcommittee on Military Construction, Veterans Affairs, and Related Agencies
Senate Committee on Homeland Security and Governmental Affairs
National Veterans Service Organizations
Government Accountability Office
Office of Management and Budget

This report will be available in the near future on the OIG's Web site at http://www.va.gov/oig/publications/reports-list.asp. This report will remain on the OIG Web site for at least 2 fiscal years after it is issued.