**MORRISON | FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

DENVER, NORTHERN VIRGINIA,
ORANGE COUNTY, SACRAMENTO,
WALNUT CREEK, CENTURY CITY

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

April 10, 2008

Writer's Direct Contact
415.268.7020
AGonzalez@mofo.com

**E-filing and Hand Delivery**

Honorable Samuel Conti
USDC, Northern District
450 Golden Gate Avenue
Courtroom 1, 17th Floor
San Francisco, CA 94102

Re:   *VCS, et al. v. Peake, et al.*, Case No. 07-03758-SC
      Northern District of California

Dear Judge Conti:

We respond to the letter submitted today by Kyle R. Freeny pertaining to suicide records. We agree that the issue of suicide records is critical and worthy of reconsideration or clarification by this Court.

First, with respect to the suicide tracking database that Ms. Freeny refers to, we do not believe that the VA is prohibited by law from producing that data. Nonetheless, we do not believe that it was the Court's intent that this information be produced at this time. An order clarifying this point would seem appropriate.

Second, there was a critical development in this case yesterday. William Feeley is Deputy Undersecretary for Health for Operations and Management, Veterans Health Administration. He manages all of the VHA, including VISNs, hospitals, and CBOCs. Yesterday, Mr. Feeley testified that the Issue Briefs (sometimes referred to as "Incident Briefs") are critical to the VA's analysis of the "root cause" of veteran suicides. He testified that "there is *a lot of learning content* in issue briefs" and that he reviews them for every suicide involving a veteran who is being seen by the VA. (Feeley Dep. 158:6-19.) He also stated: "every suicide results in a *root cause analysis* which is a – a deep dive into what might have led to that particular event." (Feeley Dep. 160:7-22.) (A copy of these Feeley excerpts are attached.)

sf-2497257

MORRISON | FOERSTER

Judge Samuel Conti
April 10, 2008
Page Two

Mr. Feeley's testimony establishes that the Issue Briefs are not only relevant, but critical, to this case:

> Q: So it is your feeling that you by looking at these issue briefs involving suicide one can learn what are the root causes for the suicide among these veterans who are being seen by VA, am I right.
>
> A: *I think you can – you can come up with some recurring themes*.

(Id. at 163:1-7.)

These "recurring themes" are directly at issue in this case. Are the suicides caused by the VA's failure to provide timely care, or some other reason? It is hard to imagine documents more relevant to the key issues in this case.

We have retained an epidemiologist to review these Issue Briefs and the related "root cause analysis" to help Plaintiffs establish the cause of these suicides and to prove (contrary to Defendants' assertion) that the suicide rates for veterans are substantially disproportionate to suicide rates among non-veterans.

If Plaintiffs do not receive the underlying "suicide tracking database" that Defendants are relying upon, they should at least be given access to the Incident or Issue Briefs and the root cause analysis that is prepared in connection with veteran suicides and attempted suicides. That information is relevant to issues that go to the heart of this case.

For these reasons, we request that the Court clarify its April 7, 2008, Order as follows:

"Upon further review and consideration of the discovery issues raised by the parties, the Court Orders as follows: (1) Defendants are not required to produce the "suicide tracking database" at this time; and (2) Defendants shall produce by Wednesday, April 16, 2008, the Incident Reports or Issue Reports and root cause analysis relating to veteran suicides and attempted suicides."

Respectfully submitted,

Arturo J. González

sf-2497257

N O T I C E

This transcript is a ROUGH DRAFT, UNEDITED, UNCERTIFIED TRANSCRIPT ONLY. It contains the raw output from the court reporter's stenotype machine, translated into English by the court reporter's computer, without the benefit of proofreading. It will contain untranslated steno strokes, mistranslations (wrong words), and misspellings. These and any other errors will be corrected in the final transcript. Since this rough draft transcript has not been proofread, the court reporter cannot assume responsibility for any errors.

This rough draft transcript is intended to assist attorneys in their case preparation and is not to be construed as the final transcript. It is not to be read by the witness or quoted in any pleading or for any other purpose and may not be filed with any court.

---

THE VIDEOGRAPHER: On the record with tape number 1 of the video deposition of William Feeley taken by the Plaintiffs in the matter of Veterans for Common Sense and Veterans for United Truth (sic) versus the Honorable James B. Peake, Secretary of Veterans Affairs, et al., in the United States District Court for the Northern District of California, San Francisco Division, Case Number C-07-3758-SC.

This deposition is being held at the offices of Morrison Foerster located at 2000 Pennsylvania Avenue, Northwest, in Washington, D.C. on April 9th, 2008, at approximately 9:04 a.m.

My name is T.J. O'Toole representing the Souza Group located at 4615 First Street, Suite 200, Pleasanton, California. I am the certified legal video specialist. The court reporter is Dana Ryan, also representing the Souza Group.

Will counsel please introduce themselves and indicate which parties they represent?

MR. GOLDMAN: Mel Goldman for plaintiffs.

---

MS. MOSER: Heather Moser for plaintiffs.

MR. SCHWARTZ: James Schwartz with the Department of Justice for defendants.

MR. DAUGHERTY: Michael Daugherty, Department of Veteran Affairs for plaintiffs.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness?

WILLIAM F. FEELEY, having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. GOLDMAN:

Q Could you please state your full name?
A William F. Feeley.
Q Mr. Feeley, have you ever had your deposition taken before?
A I believe I have, yes.
Q On how many occasions?
A Perhaps several.
Q Any within the last five years?
A No.
Q Have you ever testified at a trial?
A No.

---

Q You have testified before Congressional committees?
A Yes.
Q Within the last several years -- let's say the last two years, on how many occasions would you say?
A Four to six.
Q And do you occasionally meet with staff of these committees?
A Yes.
Q In advance of your testimony normally?
A Yes.
Q Have you testified before any Congressional committee on -- on the subject of PTSD?
A No.
Q Or veteran suicides?
A No.
Q Waiting times?
A Yes.
Q When was the last time you testified before a committee on that subject?
A I would say it's been in the -- within the past six months.

1 that are very --
2   Q   Not letters, just satisfaction
3 reports?
4   A   No segment of -- of satisfaction
5 contracted process gives us that. What we have
6 again is correspondence that comes in from
7 people.
8   Q   Now, finally I wanted to ask you --
9 and then I'm going to get to the June 1 memo --
10 what kind of information you -- you review on a
11 regular basis. This is -- I want to see what
12 you look at on a regular -- I'm going to ask
13 questions about it?
14   A   Okay. I'm going to -- I look at
15 waits and delays as a primary.
16   Q   I'm going to ask you some specific
17 questions.
18   A   Okay.
19   Q   Do you on a regular basis receive
20 information on PTSD patients?
21   A   Nod.
22   Q   On suicides by patients?
23   A   Yes.
24   Q   What -- what do you see on a
25 regular basis about suicides?

157

1   A   When suicides occur in the system
2 or even suicide attempts, issue briefs are
3 prepared by the facility, run through the
4 network and into headquarters and I get to read
5 each one of those issue briefs.
6   Q   So for every veteran who is being
7 seen by a VA who commits suicide, you will see a
8 suicide brief?
9   A   Correct.
10   Q   When did you start that practice?
11   A   That -- that was going on when I
12 arrived in headquarters. What I would say is
13 it's been accelerated because of an interest in
14 transporting knowledge across the system to
15 become a major teaching device as I talked about
16 with other strategies with calls with network
17 directors and directors across the system, and
18 there is a lot of learning content in issue
19 briefs.
20   Q   How many issue briefs have you
21 reviewed since you have become the under
22 secretary?
23   A   I would guess that issue briefs --
24 this is a very hot question -- average probably
25 20 to 25 a week.

158

1   Q   So how much time do you spend per
2 week reading suicide issue briefs?
3   A   Suicide issue briefs is a narrower
4 focus.
5   Q   I see.
6   A   Issue briefs are on all topics --
7   Q   Got ya.
8   A   -- general medicines, surgery.
9   Q   Thank you. And I just --
10   A   A --
11   Q   -- want to --
12   A   -- couple --
13   Q   -- focus --
14   A   -- of hours --
15   Q   -- on suicide.
16   A   -- a couple of hours a week, I
17 would say, on issue briefs altogether. Because
18 of my own interest in mental health and
19 commitment to it, I take a particular interest
20 in suicide issue briefs.
21   Q   Now, is there a -- do these briefs
22 roll up from VISNs?
23   A   Yes.
24   Q   But they're not -- they're not
25 summarized? It's the -- it's the VISN -- it's

159

1 the suicide brief that was prepared in the VISN
2 that comes to you?
3   A   They're prepared at the facility
4 where the event occurred. Its rolled up through
5 the VISN and comes to me in headquarters through
6 the staff that work for me.
7   Q   What I'm trying to find out is
8 whether the initial suicide incident report or
9 brief is what you see or whether it gets -- it
10 gets condensed in some form and whether you see
11 it in a condensed form?
12   A   What I see is a heads up message
13 that comes in when an event occurs and there's
14 a, I think, 48 hour time frame to put
15 granularity to that event. So the issue brief
16 is two or three pages in duration. If there are
17 questions myself or Dr. cross or Dr. Kussman
18 have we'll go pack and ask additional content.
19 Every suicide that occurs results in a root
20 cause analysis which is a -- a deep dive into
21 what might have led to that particular event and
22 also we peer review suicides.
23   Q   And -- and is that -- that deep
24 down root cause analysis is what we find in the
25 suicide briefs?

160

**Page 161**

1  A  No. The -- we're seeing and I
2  think is what I would describe as a three-page
3  assessment of the key issues. I want to know
4  that stuff right away, so if I see some trend
5  there that I'm concerned about, I can transport
6  it across the country. To do an RCA takes 45
7  days and we give the system 45 days to do that.
8  Q  All right. So this three-page
9  assessment of the key issues, is that what you
10 call the -- the suicide brief?
11 A  Yes, the issue brief, yeah.
12 Q  The issue brief. Is there
13 something else called a suicide incident report?
14 A  If -- if you were in a medical
15 center, you would be filling out an incident
16 report. That's a one piece -- piece of paper --
17 Q  Like one page?
18 A  One page. And that has really not
19 got a lot of content in it.
20 Q  And do you get that?
21 A  No. That's for local leadership.
22 Q  So this three-page assessment,
23 who -- who works on that? Who are the people
24 that give you the -- who are the people --
25 A  That's --

**Page 162**

1  Q  -- that give you that?
2  A  That's developed again by the
3  leadership team at the facility where the event
4  occurred. It's reviewed by the network and then
5  comes up to us.
6  Q  And that's what you read?
7  A  That's what I read one.
8  Q  Not the one-page suicide group --
9  A  Not the one page.
10 Q  Because the one page doesn't give
11 you the root causes?
12 A  Well, the one page doesn't give you
13 enough contact.
14 Q  In order to learn what happened?
15 A  That's exactly right.
16 Q  I don't think we've seen those, but
17 I don't -- I'm not -- I'm not that knowledgeable
18 about the production, but I don't think I've
19 zone those. So who else reviews those
20 three-page assessments?
21 A  They're reviewed by Dr. cross and
22 Dr. Kussman, myself, Joe Williams, the
23 management team in VHA. If we believe there's a
24 concern about quality, we might send the -- a
25 medical inspector in to look at the case.

**Page 163**

1  Q  So is your feeling is that you by
2  looking at these issue briefs involving suicide
3  one can learn what are the root causes for the
4  suicide among these veterans who are being seen
5  by VA; am I right?
6  A  I think you can -- you can come up
7  with some recurring themes.
8  Q  Have you come up with some
9  recurring themes?
10 A  I think one of the recurring
11 themes --
12 Q  You have come up with them?
13 A  I think one of the recurring themes
14 is we need to watch out for people who have' got
15 guns and we're actually talking a lot and
16 bringing that up with patients so if a patient
17 is at risk and has got guns we're asking those
18 guns to be given up and get a family member to
19 take those guns. That's one of the biggest one
20 that I'm seeing and of course soldiers know how
21 to use guns.
22 Q  They have access to guns?
23 A  Yes.
24 Q  Any other current things you've
25 learned by all your readings of these issue

**Page 164**

1  briefs involving suicide?
2  A  I -- I -- I think the lethal
3  combination of alcohol and any of the major
4  diagnosis we've talked about with depression,
5  PTSD and -- those are risk factors, so that's
6  why we have alcohol screening, depression
7  screening and PTSD screening trying to early
8  detect and discover when someone has got a set
9  of risk factors so we pay more attention to
10 them.
11 Q  All right. Let me ask you about
12 whether there are any other sources of this
13 information and then I want to come back to the
14 recurring themes?
15 A  Okay.
16 Q  There are suicide coordinators,
17 suicide prevention coordinators in medical
18 centers; correct?
19 A  Yes.
20 Q  And there is above them a national
21 suicide prevention coordinator; am I correct?
22 A  I couldn't give you an informed
23 answer.
24 Q  Dr. Kemp or --
25 A  That sounds -- that sounds accurate