1  JEFFREY S. BUCHOLTZ
   Acting Assistant Attorney General
2  JOSEPH P. RUSSONIELLO
   United States Attorney
3  RICHARD G. LEPLEY
   Assistant Branch Director
4  DANIEL BENSING D.C. Bar No. 334268
   KYLE R. FREENY California Bar No. 247857
5  JAMES J. SCHWARTZ D.C. Bar No. 468625
   RONALD J. WILTSIE, D.C. Bar No. 431562
6  Attorneys
7  United States Department of Justice
   Civil Division, Federal Programs Branch
8  P.O. Box 883
   Washington, D.C. 20044
9  Telephone: (202) 514-5108
   Facsimile: (202) 616-8460
10 Email: Kyle.Freeny@usdoj.gov
11
12 Attorneys for Defendants Hon. James B. Peake, the U.S. Department of Veterans Affairs, Hon.
   James P. Terry, Hon. Daniel L. Cooper, Hon. Bradley G. Mayes, Hon. Michael J. Kussman,
13 Ulrike Willimon, the United States of America, Hon. Michael B. Mukasey, and Hon. William P.
   Greene, Jr.

14                      UNITED STATES DISTRICT COURT
15                     NORTHERN DISTRICT OF CALIFORNIA
16                              SAN FRANCISCO

17 VETERANS FOR COMMON SENSE and  )    No. C 07-3758-SC
   VETERANS UNITED FOR TRUTH,     )
18                                )
                                  )    **DEFENDANTS' PRETRIAL**
19          Plaintiffs,           )    **STATEMENT**
                                  )
20    v.                          )
                                  )    Date: April 21, 2008
21                                )    Time: 9:00 a.m.
22 Hon. JAMES B. PEAKE, Secretary of )  Courtroom: 1
   Veterans Affairs, *et al.*,    )
23          Defendants.           )
                                  )
24                                )
25 _____ )
26
27
28 Defendants' Pretrial Statement ( No. C 07-3758-SC)

1    At the initial hearing in this matter, the Court directed that a pretrial statement be

2    submitted on April 14, 2008.  Transcript of April 5 Hearing on Plaintiffs' Motion for Preliminary

3    Injunction at 616:19-617:5.  Defendants address the scope of the cognizable issues presented in

4    this case, a summary of the record so far relating to these issues, and what defendants submit the

5    evidence at the remainder of the evidentiary hearing will show.  A list of expected witnesses and

6    exhibits follows.  Finally, because there have been repeated motions for reconsideration of

7    discovery orders and motions to compel production of certain categories of documents, a

8    summary of the document production process is set forth.

9                                    **ISSUES PRESENTED**

10   **I.  Jurisdictional Doctrines Limiting the Scope of the Case**

11   The issues before the Court are far narrower than plaintiffs' lengthy complaint and

12   expansive discovery requests suggest.  As the Court has recognized, its jurisdiction is

13   circumscribed by a number of constitutional and statutory considerations that preclude this Court

14   both from entertaining many of plaintiffs' claims, and from providing the sweeping remedies

15   they seek.  The record created thus far, and further evidence will show, that the concerns

16   regarding the nature of plaintiffs' claims expressed by the Court in its January 10, 2008 Order

17   denying the motion to dismiss in part are well-founded.  Plaintiffs seek to have this Court rewrite

18   regulations over which it has no jurisdiction, determine the accuracy of individual benefits

19   decisions in violation of Congress's express prohibition, and make the kind of managerial,

20   medical, and policy decisions entrusted by the Constitution to the Political Branches.  In effect,

21   plaintiffs ask this Court to administer the programs of the second largest Cabinet-level agency, a

22   task for which Congress and the Executive Branch are better suited.

23          **A.      The Limited Waiver of Sovereign Immunity**
                      **Does Not Cover Many of Plaintiffs' Claims**
24
        This Court lacks jurisdiction to entertain the kind of "broad programmatic attack" on
25
     VA's operations that plaintiffs have tried to mount.  See Norton v. S. Utah Wilderness Alliance,
26
     542 U.S. 55, 64 (2004).  Instead, this Court has jurisdiction only over final agency actions, see
27

28   Defendants' Pretrial Statement ( No. C 07-3758-SC)                                              2

1  January 10 Order at 10:19-20, which even when specifically requested to do so by the Court,

2  plaintiffs have so far been unable to identify with the requisite specificity.  Id. at 11:4-9 (noting

3  that plaintiffs will face higher standard of proof after pleading stage).  To date, plaintiffs have

4  challenged, among other things: the number of medical professionals VA employs; employees'

5  workloads; the location and hours of operation of particular medical facilities; the training

6  programs VA provides to its employees; the number of work credits an employee can receive for

7  completing particular tasks; and even the decision whether to offer individual or group therapy to

8  patients with PTSD.  These are not the kind of challenges for which Congress has waived

9  sovereign immunity.

10      Plaintiffs' proposed order, which requires VA to make unspecified  "system-wide" policy

11  changes and subjects VA to this Court's contempt power in the event that VA does not or cannot

12  comply as swiftly as plaintiffs would like,[1] (see Plaintiffs' Proposed Order Granting Injunctive

13  and Declaratory Relief, Docket Entry 166), bears out the concerns that animated the Supreme

14  Court's admonition in Norton that courts lack jurisdiction to enter general orders: such authority

15  would improperly "inject[] the judge into day-to-day agency management."  See Norton, 542

16  U.S. at 67.  Congress has permitted courts to compel only "*discrete* agency action[s] that it *is*

17  *required to take.*"  Id. at 64 (emphasis in original); see also ACLU v. Nat'l Security Agency, 493

18  F.3d 644, 679 (6th Cir. 2007) (declining to review "generalized practice").

19      With respect to plaintiffs' challenges to VA's health care system, the only issue for this

20  Court is whether VA fails to provide health care to veterans that Congress insisted be

21  mandatory.[2]  Plaintiffs have identified no other "relevant statute" whose violation "forms the

22  _____

23      [1] Notably, plaintiffs' proposed injunction does not even purport to contain specific
24  reference to all of the allegedly illegal practices that it would enjoin, instead referring to the
    allegations set forth in plaintiffs' 73-page complaint.  Proposed Injunction at A.3 (referring
25  reader to Paragraph 31 of plaintiff's Complaint, which in turn refers to "various other illegal
    practices and procedures. . .").

26      [2] Although defendants discuss the scope of the Court's decision not to dismiss plaintiffs'
27  complaint in its entirety, they continue to maintain that the Court lacks jurisdiction over all of

28

1   legal basis for their complaint." See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990); see

2   also Norton (noting that APA "empowers a court only to compel an agency to perform a

3   ministerial or non-discretionary act") (internal quotations omitted).  With respect to plaintiffs'

4   challenges to VA's benefits adjudication system, plaintiffs have so far failed to identify any final

5   agency actions or discrete actions the agency is required to take aside from individual benefits

6   determinations, which fall outside this Court's jurisdiction.  See 38 U.S.C. § 511.

7        Moreover, plaintiffs cannot "challenge an entire program by simply identifying specific

8   allegedly-improper final agency actions within that program."  Sierra Club v. Peterson, 228 F.3d

9   559, 567 (5th Cir. 2000).[3]  Therefore, even if plaintiffs finally identify some challenged final

10  agency action, such as an agency decision unreasonably delayed, their claims and the

11  accompanying relief must be limited to that action.  Id.  Their attempt to force VA to overhaul its

12  entire benefits systems under penalty of contempt must fail.  See Lujan, 497 U.S. at 891

13  ("wholesale improvements" must be sought "in the offices of the Department or the halls of

14  Congress, where programmatic improvements are normally made").

15

16  plaintiffs' claims.

17       [3]  Contrary to plaintiffs' allegation, the evidence will show that the U.S. Court of Appeals
18  for Veterans Claims can effect system-wide change by issuing precedential opinions in the
    context of individual appeals.  See Part III at 14, infra; see also Collaro v. West, 136 F.3d 1304
19  (Fed. Cir. 1998) (upholding CAVC jurisdiction to consider challenge to constitutionality of
    circular issued by VA Central Office).  On this ground, defendants respectfully request that the
20  Court reconsider its decision that the other requirement for waiver of sovereign immunity – no
    adequate alternate remedy – is met in this case.  See MTD Order at 14-20.  Moreover, the
21  fact that plaintiffs – advocacy organizations that do not themselves assist veterans in the claims
22  adjudication process – cannot bring their own claims before the CAVC does not render the
    CAVC an inadequate forum for veterans' claims.  Plaintiffs' claims are only derivative of their
23  veteran members' claims.  See  Rockford League of Women Voters v. United States Nuclear
24  Regulatory Comm'n, 679 F.2d 1218, 1221 (7th Cir. 1982).  "[T]he question whether [a] litigant
    is a 'proper party to request an adjudication of a particular issue' is one within the power of
25  Congress to determine."  Sierra Club v. Morton, 405 U.S. 727, 732 n.3 (1972).  Congress has
26  done so by permitting the CAVC to review only claims by individual veterans, not by
    organizations.  See 38 U.S.C. § 7252(a).  Deference should be accorded to that legislative choice.
27  Sierra Club, 405 U.S. at 740.

28

1

**B.    Plaintiffs Mount a Collateral Attack on VA**
**Regulations Which the Court Cannot Adjudicate**

2

3       The scope of this Court's jurisdiction is further limited by 38 U.S.C. § 502, which

4   prevents district courts from reviewing challenges to VA's regulations.  See MTD Order at

5   14:14-16.  Plaintiffs' assertion that they do not seek to challenge regulations rings hollow in light

6   of their many allegations that inescapably require review of regulations.  Plaintiffs challenge,

7   among other things:

8           •       that although veterans can seek review of clinical decisions through an informal
                    process conducted by medical professionals, they cannot seek formal adjudication
9                   of medical decisions before the Board of Veterans Appeals.  See 38 C.F.R.
                    § 20.101(b).
10          •       that a veteran must establish credible evidence that an in-service stressor occurred
                    which triggered his PTSD before he is eligible for a determination that his PTSD
11                  is service-connected.  See 38 C.F.R. § 3.304(f).
            •       that a veteran's disability claim is treated as abandoned if the requested evidence
12                  is not submitted within one year.  See 38 C.F.R. § 3.109(a), 3.158.
            •       the "rating schedule" used to assign disability ratings to veterans for calculation of
13                  disability compensation including general principles governing evaluation of
                    impairment, see 38 C.F.R. §§ 4.1–4.31, and principles specifically governing
14                  evaluation of mental disorders, see §§ 4.125–4.130.  See also 38 U.S.C. § 502
                    (specifying that no court may hear challenges to the rating schedule).
15          •       the "extensive procedural requirements to pursue an appeal" (Complaint ¶ 117)
                    See 38 C.F.R. §§ 20.200–20.202.
16          •       The limited availability of subpoenas in VA administrative adjudications
                    (Complaint at ¶¶ 104, 125, 202.d) See 38 C.F.R.  § 20.711(a).
17          •       the sufficiency of BVA hearing procedures (Complaint at ¶ 124) See 38 C.F.R. §§
                    20.700–20.717.
18          •       the alleged complexity of the compensation application form.  See 71 Fed. Reg.
                    64335 (Nov. 1, 2006).
19
            In addition, many of the "delays" cited by plaintiffs in adjudicating a veteran's claim for
20
    disability are attributable to extensive procedural mandates in Parts 3, 4, 19, and 20 of Title 38 of
21
    the Code of Federal Regulations.  For example, the regulations require that, once it becomes
22
    apparent that a veteran's claims file is incomplete, the Regional Office defers additional
23
    assistance until the evidence is received.  See 38 C.F.R. § 3.159(b)(2).  In addition, the
24
    regulations set forth certain mandatory periods of time that a veteran must be given to complete
25
    particular actions before adjudication can continue before the Board of Veterans Appeals.  See,
26
    e.g., 38 C.F.R. § 19.26(c)(1) (giving claimant 60 days to respond to request for clarification of
27

28

1  notice of disagreement); 38 C.F.R. § 3.2600(a) (60 days to elect review by a Decision Review

2  Officer); 38 C.F.R. § 20.302(b) (60 days from agency's filing of statement of the case to file

3  substantive appeal); 38 C.F.R. § 20.302(c) (60 days to respond to supplemental statement of the

4  case); 38 C.F.R. § 19.76 (requiring written notice not less than 30 days prior to date of hearing);

5  38 C.F.R. § 20.903(a) (60 days to respond to additional medical or legal opinion).  Any

6  injunction by this Court setting adjudication times that does not take into account the time

7  required by regulation would rewrite the substance of the regulations – a responsibility Congress

8  conferred exclusively on the Federal Circuit.

9    C.    **Plaintiffs Challenge to the Outcomes of Veterans'**
            **Benefits Decisions Is Not Cognizable in This Court**

10      Also not cognizable in this case are any "questions of law and fact necessary to a decision

11  by the Secretary under a law that affects the provision of benefits by the Secretary. . . ."  See 38

12  U.S.C. § 511.  Although plaintiffs claim not to be challenging individual decisions, in fact their

13  "systematic" challenges are based solely on their dissatisfaction with the results of aggregated

14  individual claims decisions.  The only way plaintiffs could establish that veterans were injured as

15  a result of challenged practices, which is required for plaintiffs to establish standing, is to show

16  that particular veterans' claims would have been decided differently but for the challenged

17  practices.  This second-guessing of benefits determinations is foreclosed by § 511.

18      For example, plaintiffs challenge the "premature denial" of claims.  Although plaintiffs

19  have not explained to what agency practice they refer, it cannot be disputed that determination

20  that a particular claim decision (or class of claims decisions) is or are "premature" would require

21  a finding that the decisions are wrong.  This obviously would require the Court to delve into a

22  review of the propriety of particular benefits decisions, which the Court has already recognized is

23  beyond its jurisdiction.  See MTD Order at 24:23-24 (refusing to "comb through the adjudication

24  process of individual claims").  Certainly, whether a claim is ready to be decided is a "question

25  of law and fact necessary to a decision by the Secretary" that this Court cannot reopen.  See 38

26  U.S.C. § 511.

27

28

1

### D.      Plaintiffs' Constitutional Claim Cannot Succeed

2      Because review of plaintiffs' various challenges to VA's alleged adjudication practices

3 would inevitably require reexamination of individual benefits decisions, the only cognizable

4 issue with respect to the adjudication of disability compensation is whether the entire framework

5 of the Veterans Judicial Review Act (VJRA) is facially unconstitutional.  To succeed in such a

6 claim, plaintiffs would have to show that the system for providing benefits – apart from the

7 procedures set forth in regulations – is unconstitutional "in *all* of its applications."[4]  See Wash.

8 State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1190 (2008) (emphasis added)

9 (reiterating high difficulty of establishing facial invalidity).  For this reason, the fact that veterans

10 seeking appeals of initial denials may experience delays or face other obstacles is insufficient to

11 establish facial invalidity of the VJRA.[5]  Instead, plaintiffs would need to be able to show that the

12 VJRA claims processing system, or some discrete facet of the system, *inevitably* violates due

13 process in every instance.  This they are unable to do as the evidence will show that average wait-

14 times for claims decisions are reasonable, as discussed below.  Cf. Wright v. Califano, 587 F.2d

15 345, 354 (7th Cir. 1978) (finding no due process violation where adjudication delays were not

16 "arbitrary or the result of some other inexcusable circumstance" and where agency was making

17 good faith effort to improve).   The VJRA sets forth non-adversarial procedures for the initial

18 adjudication at the Regional Office level, followed by the opportunity to seek judicial review in

19 an adversarial setting, including review by an Article III court.  The evidence will show that the

20 majority of claims are adjudicated solely in the non-adversarial Regional Office setting.  See Part

21 III at 16, infra.

22 _____

23      [4] This is not a fact-intensive inquiry, id. at 1195, making plaintiffs' complaints about the scope of discovery futile.

24

25      [5] Veterans faced with delays in the adjudication of their appeals can bring *as-applied* due process challenges within the exclusive VJRA system of review.  See 38 U.S.C. § 7261(2)

26 (authorizing CAVC to "compel action of the Secretary unlawfully withheld or unreasonably delayed"); see also Lundy v. Dep't. of Veterans Affairs, 142 F. Supp. 2d 776, 779-80 (D. La.

27 2001) (only CAVC or Federal Circuit can compel VA to adjudicate individual claims).

28

1    The system's well-established procedures – proceedings at the initial Regional Office

2    level, see 38 C.F.R. § 3.103(a) and a requirement the agency assist in the development of

3    evidence in lieu of a cumbersome discovery process, see 38 U.S.C. § 5103A   – have stood the

4    test of time.  See, e.g., Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 309 (1985).

5    Plaintiffs' contention that they violate due process in all cases, if accepted, "would bring down

6    too many procedures designed, and working well, for a governmental structure of great and

7    growing complexity."  Richardson v. Perales, 402 U.S. 389, 410 (rejecting due process challenge

8    to system where adjudicator both gathered and weighed evidence).  Described by the Federal

9    Circuit as "strongly and uniquely pro-claimant," see Disabled Am. Veterans v. Sec'y of Veterans

10   Affairs, 327 F.3d 1339, 1349 (Fed. Cir. 2003), the veteran benefits systems is hardly one that

11   inescapably violates due process for all veterans.  See MTD Order at 32:9-11 ("If the VA claims

12   adjudication system were truly nonadversarial, then Plaintiffs' due process claim would be on

13   shaky ground.").

14         **E.    The Remedies Plaintiffs Seek Are Unavailable**

15         Finally, the specific remedies sought by plaintiffs are not within this Court's authority to

16   grant.  In response to the Court's inquiry, counsel for plaintiffs offered a litany of remedies that

17   could not be granted even were the Court to find the defendants liable.  See, e.g., Transcript of

18   April 6 Hearing on Plaintiffs' Motion for Preliminary Injunction at 679-84 (asking Court to order

19   VA to devise a system, without basis in statute, by which every veteran can challenge medical

20   treatment decisions in an independent hearing, with attorneys, discovery, and subpoena power);

21   id. at 691:3-4 (asking Court to set up new court to adjudicate health care claims); id. at 686:11-12

22   (asking for order to "Stop doing this kind of thing.").

23         The Supreme Court has firmly rejected the judicial imposition of deadlines on agency

24   adjudications, especially where there is evidence that Congress did not intend to impose such a

25   deadline.  See Heckler v. Day, 467 U.S. 104 (1984).  In Heckler, the Supreme Court overturned

26   an injunction that ordered the Secretary of Health and Human Services to complete

27

28

1   reconsideration of social security decisions within a period of 90 days – a deadline found

2   nowhere in the statute. <u>Id.</u> at 119. Here, plaintiffs seek a similar judicially-imposed deadline for

3   the adjudication of disability benefits. <u>See</u> Proposed Injunction ¶ E.1 (requesting Court to fill in

4   blank for maximum allowable days to adjudicate claims), even though the statute provides no

5   deadlines itself. The absence of congressionally mandated deadlines is especially telling because

6   the statute specifies time periods in other instances. <u>See, e.g.</u>, 38 U.S.C. § 7106 (requiring that

7   veterans be given one year to file administrative appeal); <u>see also</u> <u>Sierra Club v. Thomas</u>, 828

8   F.2d 783, 797 n. 99 (D.C. Cir. 1987) ("[T]he presence of deadlines elsewhere in the statute is a

9   factor counseling against judicial intervention"). The fact that Congress gave the CAVC the

10   power to compel agency action unreasonably delayed, <u>see</u> 38 U.S.C. § 7261(2), is a further

11   indication that Congress did not want to impose the kind of fixed, across-the-board deadlines that

12   plaintiffs seek.

13        Moreover, it is far from certain that a judicially-imposed deadline on claims adjudications

14   would serve the interests of veterans. Plaintiffs ask, on the one hand, for more extensive

15   procedural rights, and on the other for quicker processing time, two goals that are in obvious

16   tension. <u>See Heckler</u>, 467 U.S. at 117-18 (reasoning that mandatory deadlines would

17   "subordinat[e] quality to timeliness"). As the Seventh Circuit observed in a similarly broad

18   challenge to delays in adjudication of social security benefits, courts should refrain from drawing

19   their own balance between those competing interests where, as here, Congress and the agency

20   have already committed themselves to finding the most appropriate solution:

21         Neither Congress nor the agency has been unmindful of this complex problem. To
22         impose on the SSA the crash review program sought by plaintiffs could be expected to
         result in a deterioration of the quality of the review, and possibly more injustice to
23         claimants than justice. Speed cannot be an end in itself.

24   <u>Wright</u>, 587 F.2d at 356 (7th Cir. 1978).

25        The larger lesson from <u>Heckler</u> – that courts should be loathe to order an agency to do

26   something Congress has considered and has not provided for – is instructive here as well. 467

27

28   <span style="font-size:smaller">Defendants' Pretrial Statement ( No. C 07-3758-SC)</span>              9

1   U.S. 111-112, 119 (warning against "unwarranted judicial intrusion into [a] pervasively regulated

2   area"). Numerous bills have been introduced in Congress that would change the VA health care

3   or disability benefits programs in ways similar to relief sought by plaintiffs in this case. See, e.g.,

4   Veterans Timely Access to Health Care Act, H.R. 92, 110th Cong. (2007) (prescribing maximum

5   30 day wait times for access to health care); Lane Evans Veterans Health and Benefits

6   Improvement Act of 2007, H.R. 1354, 110th Cong. (2007) (requiring mental health evaluation

7   within 30 days); H.R. 1444, 110th Cong. (2007) (providing stipend if VA does not adjudicate

8   claim within 180 days); Veterans Claims Processing Innovation Act of 2007, H.R. 3047, 110th

9   Cong. (2007) (mandating specific changes to VBA work credit system).  That Congress has

10  considered legislation that would impose deadlines on the process, but has decided not to require

11  them, should give this court pause before granting the broad relief sought by plaintiffs.

12  Congress, not the court system, is the branch "charged with making the inevitable compromises

13  required in the design of [] massive and complex welfare benefits programs" like VA's health

14  care and disability benefits programs.  Schweiker v. Chilicky, 487 U.S. 412, 429 (1988).  This

15  Court simply does not have authority to grant the kind of broad remedial – indeed, legislative –

16  relief sought by plaintiffs.

17  **II.    Veterans Medical Care**

18          During the first phase of this trial, Defendants put on evidence demonstrating the VA's

19  commitment to providing world class health care for veterans needing mental health treatment.

20  The evidence shows this commitment by the funding levels VA has dedicated to mental health

21  treatment, the wide array of treatments and services VA offers to help veterans with mental

22  health problems, such as PTSD, and the innovative measures adopted for suicide prevention.

23          In 2004, the Veterans Health Administration ("VHA") developed a Comprehensive

24  Mental Health Strategic Plan to expand and improve mental health services.  Trial Transcript

25  ("Tr. Trans.") p. 480, ln. 18.  As part of that plan, and not subject to any Congressional direction

26  in an appropriations act, VA allocated money from lump-sum appropriations through the

27

28  Defendants' Pretrial Statement ( No. C 07-3758-SC)                                           10

1   agency's Mental Health Initiative to be spent to improve the quality and capacity of VHA mental

2   health services.  Tr. Trans. pp. 284 ln. 13-17; 548 ln. 11-20; 550 ln. 17-25; 551 ln. 1-3, 17-23.  In

3   FY 2008, VHA expects to spend $3.5 billion in Congressionally directed funds on mental health

4   services, Tr. Trans. p. 558 ln 2-3, and $370 million for the Mental Health Initiative.  Tr. Trans.

5   554 ln. 2-6.

6          VA provides inpatient and/or outpatient mental health services in all 153 of its medical

7   centers across the country.  Tr. Trans. p. 531 ln. 16-20.  The VA is also placing mental health

8   treatment into the primary care setting in its expanding network of community based outpatient

9   centers.  Tr. Trans. p. 521 ln. 4-8.  An initiative begun by the VA in June 2007 provides that each

10  medical center's Emergency Department is directed to have mental health staff available at all

11  times, 24 hours a day, to provide urgent care.  Def.s' Ex. 513.  In addition, VHA's new policy

12  requires that veterans who request or are referred for mental health services at a medical center or

13  outpatient clinic are to be given a mental health triage evaluation within 24 hours.  Id.  If the

14  veteran is determined to have an emergent need for care, such as a risk for suicide, he is to be

15  treated immediately; otherwise, he is to be given a follow-up appointment within 14 days for a

16  full diagnostic and treatment-planning evaluation, as well as initiation of treatment, if

17  appropriate.  Id.

18         Testimony at the initial hearing established that VA's mental health staff includes full and

19  part time psychiatrists and psychologists as well as VA social workers, mental health nurses,

20  counselors, rehabilitation specialists, and other clinicians who work to provide a full continuum

21  of mental health services to veterans.  Tr. Trans. p. 509 ln. 9-25.  VA has hired over 3,700 new

22  mental health professionals in the last two and a half years, bringing the total number of mental

23  health professionals within VA to just under 17,000.  Tr. Trans. pp. 508 16-25; 509 ln 9-25;

24  Def.s' Ex. 509, 510.  VA undertook this massive hiring effort with funds allocated internally by

25  VA from its lump-sum appropriations to carry out the Mental Health Strategic Plan.  Tr. Trans. p.

26  221 ln. 23-25.  This hiring effort continues.  Tr. Trans. p. 419 ln. 12-18.

27

28

1    Each VA medical center is staffed with at least one specialist in PTSD, most are staffed

2    with a PTSD clinical team, and veterans are routinely screened for PTSD at primary care clinics.

3    Tr. Trans. pp. 518 ln 5-21; 586 ln. 21-25; 587 ln. 1-7; 740 ln. 10-18.  VA has also expanded

4    mental health services in its community based outpatient clinics, including by staffing those

5    clinics with more mental health professionals.  Tr. Trans. p. 521 ln. 4-8.  Although it is not

6    feasible to staff full-time mental health professionals at every clinic since the demand for such

7    services is sometimes too low, Tr. Trans. p. 538 ln. 2-6, VA works to ensure that all veterans

8    have access to needed mental health care by, for example, providing mental health professionals

9    who travel among different clinics to provide care, Tr. Trans. p. 538 ln. 7-11, as well as

10   expanding its use of telemental health: through streaming video, specialized mental health

11   providers offer diagnoses and therapy to veterans in remote locations.  Tr. Trans. p. 589 ln. 5-25;

12   590 ln. 1-19.

13   In response to the needs of returning OEF/OIF veterans, VA has launched numerous

14   programs, see Def.s' Ex. 512, including establishing 95 mental health teams that are specifically

15   dedicated to OEF/OIF veterans, including specialized PTSD treatment.  Tr. Trans. pp. 581 ln 19-

16   25; 582 ln. 1-25; 583 ln. 1-6.  These 95 teams are located throughout the country and are

17   concentrated in the places with the most returning veterans.  Tr. Trans. p. 583 ln. 7-17.

18   The testimony also emphasized that suicide prevention is a singular priority for the VHA.

19   Tr. Trans. p. 738 ln. 19-25; 739 ln. 1-5.  Every VA medical center has on staff a Suicide

20   Prevention Coordinator, whose sole role is to raise awareness of the risk of suicide, coordinate

21   the medical center's response, and train other staff.  Tr. Trans. pp. 742 ln. 22-25; 743 ln. 1-25;

22   744 ln. 14-25; 745 ln. 1-25; 746 ln. 1-11.  VA has also established a toll-free Suicide Hotline

23   staffed by trained clinicians to provide emergency assistance to veterans urgently in need of

24   mental health intervention and their families.  Tr. Trans. pp. 746 ln. 12-25; 747 - 748; 749 ln. 1-

25   9.  Another role of the suicide prevention coordinator is to track referrals from the suicide

26   prevention hotline to insure veterans at risk are seen by VA's mental health professionals.  Tr.

27

28   Defendants' Pretrial Statement ( No. C 07-3758-SC)                                        12

1    Trans. p. 745 ln. 5-17.

2    VA's commitment to providing service to its patients was further evidenced by the

3    testimony regarding the patient advocate system and the clinical appeals process available to

4    patients.   An eligible veteran who disagrees with a clinical decision can pursue the matter, first,

5    by taking the dispute to his treatment team of medical professionals.  Tr. Trans. p. 636 - 637.  If

6    they are unable to resolve the dispute, the VA facility director would make the final decision for

7    the facility, with written notice to the veteran.  Tr. Trans. p. 640 ln. 3-7.  Once a veteran is given

8    written notice of a facility director's decision about a clinical dispute, the veteran has the option

9    of appealing the decision to Director of the Veterans Integrated Service Network (VISN) that

10   oversees the facility.  Tr. Trans. pp. 640 ln. 23-25; 641 ln. 1-14; 643 ln. 1-21.  Based on the

11   advice of the Chief Medical Officer of the VISN and on information obtained from the medical

12   facility and the veteran or the patient advocate, the VISN director makes the ultimate decision on

13   a clinical appeal.  Def.s' Ex. 536.  A VISN Director may request an impartial review of a clinical

14   decision by an external professional board to assist in this decision.  Id.  The VISN Director's

15   final decision must be issued to the veteran within 30 days after initial receipt of the clinical

16   appeal, or within 45 days if external review is requested.  Id.; Tr. Trans. pp. 645 ln. 24-25; 646

17   ln. 1-8.  VISN directors can and should expedite this process when there is an urgent medical

18   need.  Tr. Trans. p. 646 ln. 9-15.

19   Thus, review of medical decisions is made by trained clinical professionals, not by

20   lawyers or judges, as plaintiffs advocate. This review process has the flexibility that a formal

21   hearing does not, allowing the reviewing doctors to expedite the process whenever a patient's

22   medical needs warrant.  Tr. Trans. p. 731 ln. 16-25.  The evidence at the trial confirmed what

23   simple common sense indicates: that adding formal procedures like discovery to the process of

24   challenging individual medical decisions would only slow down the process.  Id.

25   **III.    Veterans Benefits Claims Adjudication**

26   The evidence will show that plaintiffs' allegations concerning delays in the Veterans

27

28   Defendants' Pretrial Statement ( No. C 07-3758-SC)                                          13

1   Benefit Administration (VBA) processing claims for disability compensation are largely

2   immaterial and, in key respects, unfounded.  Plaintiffs overstate their case, fail to provide the

3   necessary context, and ignore critical facts.

4        The strategic goal, as published in VA's Strategic Plan for 2006-2011, for the time to

5   process a veterans ratings-related compensation claim is approximately 125 days.  There are

6   external limiting factors affecting the speed with which these claims can be processed, such as

7   the statutory rights accorded veterans by the Veterans Claims Assistance Act, 38 U.S.C. §§ 5103

8   ("VCAA"), procedural due process protections, and judicial precedents, e.g., Vazquez-Flores v.

9   Peake, 22 Vet. App. 37 (2008) (VCAA notice on increased-rating claim must include specific

10  information about the criteria in VA's rating schedule); Dingess v. Nicholson, 19 Vet. App. 473

11  (2006) (VCAA notice in claim for service-connected compensation must include notice as to

12  how VA assigns disability rating and effective date if service connection is granted); Kent v.

13  Nicholson, 20 Vet. App. 1 (2006) (requiring more specific notice on claims to reopen).  Because

14  the VA uses standard letters to notify claimants of their rights under the VCAA, each court

15  decision clarifying the VA's obligations under that statute necessitates reconsideration of not

16  only that case, but all similar claims then pending or on appeal.  See Simmons v. Nicholson, 487

17  F.3d 892 (Fed. Cir. 2007) (any defect in VCAA notice is presumed prejudicial requiring remand

18  to the regional office unless VA can show affirmatively that there was no prejudice).

19       The evidence will show that many factors unique to the VA benefits claims process that

20  explain the difference between the 125 day strategic goal and the current average time to

21  complete a compensation claim, approximately 180 days.  First, adding to the potential delay in

22  adjudicating any given claim is the fact that the record remains open throughout the adjudication,

23  permitting a veteran to supply additional evidence or sources of new evidence at any point from

24  the initial claim to the completion of any appeal.  Newly submitted evidence by a veteran

25  requires the VBA to develop the new evidence and reconsider its decision, thus postponing the

26  final resolution of the claim due to the *veteran's* action.  See 38 C.F.R. §§ 3.156(b) & 20.1304.

27

28                     14

And if the new evidence is presented while the matter is on appeal to the Board of Veterans Appeals (BVA), the Board must remand the matter to the regional office for reconsideration in the first instance, unless the veteran consents to permit the Board to do so. Disabled American Veterans v. Secretary of Veterans Affairs, 327 F.3d 1339 (Fed. Cir. 2003).

Second, unlike private insurance, for which eligibility focuses solely on whether the policy was in effect when the claim was made, and Social Security, which merely focuses on whether the claimant is precluded from employment due to disability, the VA by law must ensure that a nexus exists between the claimed disability and injury or disease incurred in service, and further, quantify the level of impairment. Thus, the VA's rating decision is more complicated, requiring longer claims processing times than those for private insurance plans or other public benefit providers.

Third, in the last few years there has been an unprecedented increase in the number of claims being filed by veterans. For fiscal year 2007, this number exceeded 838,000 claims, compared to slightly less than 675,000 claims in 2001.

Fourth, each "claim" typically contains on average over 3 separate medical "issues" – individual disabilities for which the veteran seeks service connection – with over 20% of the claims containing more than *seven* issues. VBA does not consider a claim as complete until *each* issue has been adjudicated.

Fifth, although plaintiffs focus their complaint on recently discharged veterans, the largest component of these new claims is the aging veteran population of the Vietnam and Cold War eras. As they age, older veterans may lose employment-related health care, prompting them to seek VA benefits for the first time. The complexity of these claims is greater due to the difficulty relating current disability with an in-service event or disease in the absence of documentation showing continuous treatment since discharge. In addition to this increase in original compensation claims, many older veterans who had already been granted compensation are now filing claims to reopen their award to increase their disability ratings due to progressively

1  deteriorating physical conditions.

2      The evidence will also show that the VA has moved aggressively to address the increase

3  in claims.  Just last year, Congress authorized the Veterans Benefit Administration to hire an

4  additional 3,100 employees (to a base of approximately 7,500).  Due to the need to train these

5  new employees by diverting seasoned employees from their claims processing duties, it is

6  anticipated that in the short run, the average time to complete a claim may rise slightly.  That

7  appears to have happened, but the initial signs that this training is paying off are now evident.

8  Previous changes made by VBA in response to the 2001 report by the Claims Processing Task

9  Force, impaneled by then Secretary Anthony Principi – changes such as streamlining the rating

10  process and standardizing it across all 57 regional offices – improved claims processing over

11  what it otherwise would have been.  Thus, while there is not an absolute improvement in

12  processing time between 2002 and 2008, the absorbtion of much higher claims volume without a

13  degradation of service is a significant achievement.  As the substantial new resources devoted to

14  claims processing come on-line, significant reduction of processing times is expected.

15      Similarly, placed in context, the fact that the few compensation decisions by VBA that are

16  appealed take longer cannot constitute a due process violation.  Of the over 800,000 claims being

17  adjudicated each year, only approximately 12% are appealed, and only 4% actually end up going

18  to the Board of Veterans Appeals.  Thus, over two-thirds of the cases where the veteran

19  expresses any dissatisfaction are resolved after further explanation by VBA or otherwise resolved

20  without resort to the VA appellate process.  Of those cases that proceed to the Board, much of the

21  delay occurs because after the initial decision, as explained above, the veteran still has an

22  unlimited right to provide additional evidence to the regional office or to the Board.  This time to

23  consider new evidence submitted by the veteran is counted toward the overal appeals resolution

24  time.

25      The quality of the VA claims decision process is enviable.  Of the 4% of cases appealed

26  to the BVA, approximately 50% (or 2% of all claims) are either granted or remanded.  Of those,

27

28

1    only 25 % are remanded because of an avoidable error.  Thus, of the 800,000 claims adjudicated

2    by VBA per year, less than 1% are remanded for further development because of errors

3    attributable to the regional offices.  In context, therefore, the delays associated with remands

4    during the appeals process do not constitute an unconstitutional deprivation of rights.

5          Finally, the evidence will establish that none of the alleged "illegal practices" exists.

6    There is no evidence of a routine practice throughout VBA of destroying documents in claims

7    files.  Nor are there improper incentives to VA employees to move claims along without properly

8    adjudicating them.  Each VBA compensation employee is audited monthly on the quality of their

9    work by having at least five of their cases reviewed by a superior or co-worker.  And each month,

10   ten cases are randomly selected from each regional office for review by national auditors.  The

11   results of both of these quality assurance inspections factor into the compensation of all

12   employees from the regional office director on down.  Thus, the incentive is to do quality work.

13

14                              **DEFENDANTS' WITNESSES**

15         Defendants intend to call the following witnesses as a part of their affirmative case:

16         **Michael Walcoff**, Deputy Under Secretary for Benefits, Department of Veterans Affairs:

17         Mr. Walcoff will testify concerning the process for adjudicating compensation claims, the

18   current status within the Veterans Benefit Administration of such adjudications, and changes

19   being made to the adjudication process. Mr. Walcoff will also testify as to the incentive

20   compensation system for employees and managers conducting the adjudication process.

21         **Edna McDonald**, Assistant Director for Quality Assurance, Compensation & Pension

22   Service, Department of Veterans Affairs:

23         Ms. McDonald will testify to the methods by which the Veterans Benefit Administration

24   verifies that compensation adjudications are being properly performed.  Ms. McDonald may also

25   testify as to the particulars of the compensation adjudication process.

26         **Steven L. Keller**, Senior Deputy Vice Chairman of the Board of Veterans Appeals:

27

28   Defendants' Pretrial Statement ( No. C 07-3758-SC)                                    17

1    Mr. Keller will testify about the Board's procedures and timelines for adjudicating

2    appeals of disability claims, including its efforts to reduce the overall time it takes to bring a

3    claim to decision.

4    **Patrick McCormack**, Assistant Special Agent in Charge of VA Benefits Desk, Office of

5    Inspector General (OIG):

6    Mr. McCormack will testify that there is no evidence to support plaintiffs' allegation

7    there is a widespread practice of VA employees destroying or tampering with records in veterans'

8    claims files.

9    **Diana Rubens**, Associate Deputy UnderSecretary of Benefits for Field Operations:

10    Ms. Ruebens will testify, if needed, on the compensation system within the Veterans

11    Benefit Administration.

12    **Lily Fetzer**, San Diego VA Regional Office Director:

13    Ms. Fetzer will testify about the VA benefits claims processing system at the regional

14    office level and on appeal.

15

16    In addition, after review of plaintiffs' witness list and proffer of evidence, defendants may

17    call rebuttal witnesses not listed above.  Also, although defendants submit that there are no issues

18    presented in this case for which expert testimony is permissible, should the plaintiffs seek to file

19    an expert report with their pretrial statement and present expert testimony at trial, defendants

20    reserve the right to proffer its witnesses as rebuttal experts in appropriate subjects or call

21    additional expert rebuttal witnesses.

22

23    **DEFENDANTS' EXHIBITS**

24    In addition to the exhibits previously accepted as evidence, defendants identify the

25    following exhibits they expect to introduce at the hearing.  Defendants may also move into

26    evidence any of the exhibits on plaintiffs' exhibit list.

27

28    Defendants' Pretrial Statement ( No. C 07-3758-SC)                                          18

1     540.    Typical Regional Office Organization

2     541.    Disability Claims Timeline

3     542.    Ratings Claims Received 2001 - 2008(projected)

4     543.    Original Claim Receipts - Issues per Claim

5     544.    Growth in Pending Claims Inventory

6     545     Compensation and Pension Service Field Full-Time-Equivalents

7     546.    Regional Director Performance Review Board Template

8     547.    RVSR Performance Standard

9     548.    VSR Performance Standard

10    549.    Appeals Ratio

11    550.    Manual M21-4, Chapter 3, Quality Assurance

12    551.    Benefit Entitlement Accuracy, 2006 and 2007

13    552.    Decision Documentation & Notification Accuracy, 2006 and 2007

14    553     Board of Veterans' Appeals, Report of the Chairman, Fiscal Year 2007

15    554     BVA Budget Authority and Authorized FTE

16    555.    Department of Veteran Affairs National Mental Health Monitoring System:

17            Summary Report of System Change FY 2004 - FY 2007

18    556.    Visits/Veteran Diagnosed with PTSD in VA Specialty Mental Health Programs:

19            1997 - 2007.

20

21                            **DOCUMENT PRODUCTION**

22          The complicated and extensive document production by defendants in this case is set

23    forth below to provide context for the issues to be tried in this proceeding.

24          Plaintiffs initially sought 191 wide-ranging requests for production ("RFPs") covering

25    defendants' health care services and benefits claims processing that encompassed many hundreds

26    of thousands of documents.  (Docket Entry 39, 44).  The Court subsequently entered a stay of

27

28    Defendants' Pretrial Statement ( No. C 07-3758-SC)                                19

1    defendants' obligation to respond to document production pending resolution of defendants'

2    motion to dismiss.  On January 10, 2008, the Court denied the motion to dismiss in part and

3    stated that discovery should commence.  (Docket Entry 93 at 41).   Thirty days after the Court's

4    order defendants filed objections or asserted privilege and notified plaintiffs that they would

5    commence producing responsive, non-privileged documents.  (Docket Entry 139, Exhibit 2).

6        On January 16, 2008, plaintiffs informed defendants by letter of specific categories of

7    documents that they believed would be relevant to the then-pending motion for preliminary

8    injunction.  Defendant responded by producing documents in response to three categories and

9    stating objections to the rest.  The documents defendants produced were the source for most of

10   the 26 volumes of material that plaintiffs relied on during the preliminary injunction hearing.

11       After the Court and parties agreed to consolidate the preliminary injunction hearing with

12   a permanent injunction hearing, on March 6, plaintiffs were asked to submit a list of documents

13   they wanted for trial and file a proposed order.  (Docket Entry 169).  Defendants responded the

14   next day and also filed a proposed order identifying categories of documents that they would try

15   to produce before trial.  (Docket Entry 170).  On March 13, the Court entered an Order

16   Establishing Discovery Obligations In Connection With The April 21, 2008 Hearing.  (Docket

17   Entry 174).

18       On April 2, plaintiffs moved to compel immediate production of certain categories

19   identified in the Court's March 13 Order, and also asked the Court to expand the Order to include

20   additional documents it had earlier sought but the Court had declined to order be produced.

21   (Docket Entry 180-2).  Defendants filed a response on April 4 (Docket Entry 181), and the Court

22   set the matter for hearing on April 7.  At the hearing, the Court asked counsel for plaintiffs to list

23   each category of documents plaintiffs believed necessary for trial.  For each category identified

24   by plaintiffs, the Court either denied the document request as irrelevant and/or unnecessarily

25   burdensome, or ordered defendants to produce the documents by either the next day or the end of

26   the week. (Docket Entry 182, 186).  *Defendants have produced every such document on or*

27

28   Defendants' Pretrial Statement ( No. C 07-3758-SC)                                    20

1    *before the date specified by the Court.*

2        On April 10, plaintiffs filed a second motion to compel on suicide issue briefs and

3    requested a new category of documents called "root cause analyses."  (Docket Entry 185.)

4    Defendants responded the next day noting that the new documents plaintiffs seek are protected

5    by law from disclosure pursuant to 38 U.S.C. § 5705.  (Docket Entry 187.)

6        In addition, defendants continue to review, copy and, where possible, produce to plaintiffs

7    in the Concordance load file format they requested documents in categories responsive to the

8    March 13 Order.  When the universe of responsive documents turned out to be far larger than

9    expected – in excess of 400,000 documents – defendants immediately dedicated *scores* of legal

10   staff (a total of 76 attorneys and paralegals) to reviewing the documents and directed the outside

11   litigation contractor to copy and produce as many documents as possible.   As of April 11,

12   defendants have produced 115,000 pages.  Defendants will continue to work as fast as possible

13   so that plaintiffs will have even more documents by April 17, the last production date specified

14   by the Court.

15       Dated: April 14, 2008

16

17                                   Respectfully Submitted,

18                                   JEFFREY S. BUCHOLTZ
                                     Acting Assistant Attorney General

19                                   JOSEPH P. RUSSONIELLO
20                                   United States Attorney

21                                   RICHARD LEPLEY
                                     Assistant Branch Director

22
                                         /s/ Kyle R. Freeny
23                                   KYLE R. FREENY, California Bar No. 247857
                                     DANIEL BENSING D.C. Bar No. 334268
24                                   RONALD J. WILTSIE, D.C. Bar # 431562
                                     JAMES J. SCHWARTZ D.C. Bar No. 468625
25                                   U.S. Department of Justice
                                     Civil Division, Federal Programs Branch
26                                   P.O. Box 883
                                     Washington, D.C. 20044
27

28
     Defendants' Pretrial Statement ( No. C 07-3758-SC)                              21

1    (202) 514-5108 (telephone)
     (202) 616-8470 (fax)
2    kyle.freeny@usdoj.gov

3    *Attorneys for Defendants*