1   GORDON P. ERSPAMER (CA SBN 83364)
    GErspamer@mofo.com
2   ARTURO J. GONZALEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   HEATHER A. MOSER (CA SBN 212686)
    HMoser@mofo.com
4   RYAN G. HASSANEIN (CA SBN 221146)
    RHassanein@mofo.com
5   STACEY M. SPRENKEL (CA SBN 241689)
    SSprenkel@mofo.com
6   MORRISON & FOERSTER LLP
    425 Market Street
7   San Francisco, California 94105-2482
    Telephone: 415.268.7000
8   Facsimile: 415.268.7522

9

    **[see next page for additional counsel for Plaintiffs]**
10

    Attorneys for Plaintiffs
11  VETERANS FOR COMMON SENSE and
    VETERANS UNITED FOR TRUTH, INC.

12                  UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15

16  VETERANS FOR COMMON SENSE and          Case No.        C-07-3758-SC
    VETERANS UNITED FOR TRUTH, INC.,
                                            **PLAINTIFFS' TRIAL BRIEF**
17            Plaintiffs,

18        v.                                Trial Date: April 21, 2008
                                            Courtroom: 1, 17th Floor
19  JAMES B. PEAKE, M.D., Secretary of Veterans   Before: The Honorable Samuel Conti
    Affairs, *et al.*,
20                                          Complaint Filed July 23, 2007
              Defendants.
21

22

23

24

25

26

27

28

1

**ADDITIONAL COUNSEL FOR PLAINTIFFS:**

2

SIDNEY M. WOLINSKY (CA SBN 33716)
SWolinsky@dralegal.org
JENNIFER WEISER BEZOZA (CA SBN 247548)
JBezoza@dralegal.org
KATRINA KASEY CORBIT (CA SBN 237931)
KCorbit@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, California 94704-1204
Telephone: 510.665.8644
Facsimile: 510.665.8511

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2
Page

3 TABLE OF AUTHORITIES.................................................................................................iv

4 I.        INTRODUCTION .................................................................................................1

5 II.       RELEVANT BACKGROUND.............................................................................1

6          A.    Overview of the Veterans Health Administration's Mental
               Health Care and Suicide Prevention Efforts.........................................1
7
8 III.      OVERVIEW OF VBA Claims Adjudication SYSTEM .....................................3

9 IV.       THE VETERANS HEALTH ADMINISTRATION IS FAILING
            TO PROVIDE MENTAL HEALTH CARE TO VETERANS AS
            REQUIRED UNDER SECTION 1710. ...............................................................4
10
11         A.    Section 1710 Provides an Entitlement to Mental Health
               Care for Combat Veterans for Five Years following
               Discharge.................................................................................................4
12
13              1.    The Secretary Has Determined that Both Mental
                  Health Care for PTSD and Suicide Prevention Are
                  Necessary. ...................................................................................5
14
15         B.    This Court Held That Combat Veterans' Health Care
               Entitlement is Not Constrained by Congressional
               Appropriations, but Even if it Were, the Veterans Health
16             Administration is Admittedly Awash in Appropriated
               Funds. ......................................................................................................6
17
18         C.    Mental Health Care is Unreasonably Delayed on a
               Systemwide Basis....................................................................................7
19
           D.    The Suicide Epidemic Among Veterans Indicates that
20             VHA's Delivery of Mental Health Care is Inadequate for
               Veterans with PTSD and Other Mental Health Diagnoses. ................9
21
22         E.    This Court Has Already Held that APA Section
               706(1) Requires Compulsion of Agency Action Unlawfully
               Withheld or Unreasonably Delayed. ...................................................12
23
           F.    Relief is Appropriate Under Section 706 to Remedy the
24             Systemic Delays in and Denials of Mental Health Care. ...................13

25 V.       THE VHA CLINICAL APPEALS PROCESS AND PATIENT
            ADVOCACY PROGRAMS DEPRIVE VETERANS OF THEIR
            DUE PROCESS RIGHTS ..................................................................................15
26
27 VI.      THE VBA CLAIMS ADJUDICATION SYSTEM violates veterans
            due process rights and va's statutory mandates...............................................17

28

A.  Each Level of the VA Adjudication System is Plagued by Systemic Delays ................................................. 17

B.  The VBA Institutes Extra-Judicial Procedures Which Adversely Affect the Provision of Benefits to Veterans, Without Notice or an Opportunity to be Heard ................................. 20

C.  The VA's Incentive Compensation System and Premature Denials ................................................................. 21

VII.  VBA's adjudication process violates veterans' Due Process Rights ........................... 22

A.  Applicants for, and Recipients of, VA Disability Compensation Have a Constitutionally Protected Property Interest ................................................................. 22

B.  Private Interest at Stake ....................................................... 23

C.  VA's Failure to Provide Timely Benefits Decisions Violates Veterans' Due Process Rights ................................. 24

D.  The VA Claims Adjudication System Contains Various Procedural Defects Which Combine to Create a System that is Depriving Veterans of their Due Process Rights ........................... 25

a.  Risk of Erroneous Deprivation is High ............................ 26

b.  Governmental Interest ...................................................... 28

2.  VA's Failure to Abide by its Own Statutes, Regulations and Procedures Violates Veterans' Due Process Rights ................................................................. 29

VIII.  the court should issue an injunction to correct the constitutional and statutory violations in the delayed adjudication of veterans' benefits. ...................... 30

A.  Plaintiffs' Requested Relief is Appropriate Under Section 706. ....................................................................... 31

1.  The *TRAC* Factors Are Met. ....................................... 31

## I.    INTRODUCTION

The Court has the unprecedented opportunity to be a catalyst for agency improvement that gives returning veterans the rights to which they are lawfully entitled. The Administrative Procedure Act and the Constitution equip this Court with the requisite power to require a federal agency to act pursuant to a statutory duty or in conformity with the Constitution.

Seeking help from the Department of Veterans' Affairs ("VA") involves a two-track system. A veteran will go to the Veterans' Health Administration ("VHA") for diagnosis and medical care; and a veteran goes to the Veterans' Benefits Administration ("VBA") to apply for service-connection and disability compensation. VA is failing these veterans as they move along both of these parallel tracks. They are not receiving the healthcare to which they are entitled (and where they do receive it, it is unreasonably delayed) and they are not able to get timely compensation for their disabilities, which means that they have no safety net. These two problems combine to create a perfect storm for PTSD veterans: they receive no treatment, so their symptoms get worse; and they receive no compensation, so they cannot go elsewhere for treatment. The failings of these two separate but interrelated systems are what this action seeks to address.

Plaintiffs' Motion for Preliminary Injunction was limited to the VHA's failure to provide timely medical care to veterans with PTSD, and the resulting suicide epidemic. That hearing took place from March 3 to March 6, 2008. At the conclusion of witness testimony, the Court decided, pursuant to Federal Rule of Civil Procedure Rule 65, to merge the preliminary injunction with a trial on the merits in the entire action set for April 21, 2008.

## II.    RELEVANT BACKGROUND

### A.    Overview of the Veterans Health Administration's Mental Health Care and Suicide Prevention Efforts.

Faced with a rising tide of veterans suffering from PTSD, VA has failed to take the steps necessary to deliver on their obligation to provide adequate and timely access to mental health services. That failure to provide care is manifesting itself in an epidemic of suicides; up to 120 veterans are committing suicide per week. (Rathbun PI Tr. 310:9-24: 312:21-313-1.) There are 1,000 suicide attempts amongst VHA patients (only 20% of the total veteran population) per month.

1    (Katz PI Hr'g. Tr.760:22-23.)

2    To understand the nature of the systemic problems, a basic understanding of the structure of

3    the VHA is critically instructive.  The VHA consists of 21 integrated networks, referred to as

4    Veterans Integrated Service Networks ("VISNs").  Each VISN covers a specific geographic region

5    and is managed by a VISN or Network Director, who is responsible for the provision of health care,

6    including mental health services, throughout the network.  Within each VISN, VA provides

7    healthcare services primarily in three settings: VA Hospitals or Medical Centers ("VAMCs"),

8    Community Based Outpatient Clinics ("CBOCs") and community based counseling centers known as

9    "Vet Centers."  VAMCs provide both inpatient and outpatient care, but there are only 153 medical

10   centers nationwide, mostly concentrated in urban areas.  (P-357.)  CBOCs provide outpatient services

11   during regular business hours, generally Monday through Friday from 8 a.m. until 4:30 or 5:00 p.m.

12   (Feeley Depo. 132:20-25.)  Vet Centers are staffed by small teams that provide informal readjustment

13   counseling, often by "peer counselors," and outreach services during normal business hours.

14   VA acknowledges that addressing suicidality and PTSD among veterans is a "priority," but

15   asserts the programs in place sufficiently address these concerns.  (Defs.' Pretrial Statement at 10:18-

16   12:26.)  With regard to treatment of PTSD, VA cites "development" of the Mental Health Strategic

17   Plan, placement of PTSD specialists/teams in VAMCs (but not CBOCs or Vet Centers), and

18   screening for PTSD in primary care clinics as sufficient evidence that VA provides timely access to

19   care.  (*Id.* at 10:23-25; 12:2.)  VA also cites an "initiative" in the form of a memo from Mr. William

20   Feeley as evidence that veterans are provided timely care.  (*See id.* at 11:9-17.)  The "Feeley memo"

21   purports to require VAMC Emergency Departments (but not CBOCs or Vet Centers) ensure

22   availability of mental health staff on a 24 hour basis; mental health "triage" evaluations within 24

23   hours for veterans who request or are referred for mental health services; and a follow-up mental

24   health appointments within 14 days at VAMCs or CBOCs (but not Vet Centers).  (*Id.*)  To address

25   the suicide epidemic among veterans, VA points to the creation of "Suicide Prevention Coordinator"

26   positions at VAMCs and establishment of the Suicide Hotline as the solution. (*See id.* at 12:18-26.)

27   The evidence will show that the theoretical existence of these programs, without adequate

28   monitoring of their implementation and operation, is nothing more than an empty promise, on which

1   too many veterans have tragically learned they cannot rely.

2   ### III.   OVERVIEW OF VBA CLAIMS ADJUDICATION SYSTEM

3       The VBA is comprised of a Central Office in Washington D.C. and 57 regional offices

4   ("ROs") across the country.  The vast majority of claims adjudicated at the VBA are for service-

5   connected disability and death compensation ("SCDDC") benefits, handled by the Veteran Service

6   Center within each RO.  There are five common elements to a veteran's application for SCDDC

7   benefits:  status as a veteran, the existence of disability, a connection between the veteran's service

8   and the disability, the degree of the disability, and the effective date of the disability.  The degree of

9   disability is assigned by a VBA rating specialist based on a rating schedule, which is a sliding scale

10  of monthly compensation ranging from $115 per month for a 10% rating to $2,471 per month for a

11  100% rating.  38 U.S.C. 1114.  A veteran assigned a disability rating of 60-90% for a single disability

12  is also eligible for Individual Unemployability ("IU"), essentially an increase to a 100% rating, if the

13  veteran is unable to work due to the service-connected disability.

14      Veterans that do not qualify for free healthcare under 38 U.S.C. § 1710, either because they

15  are not combat veterans or because their five years of free healthcare has expired, must apply for and

16  receive SCDDC at the VBA in order to receive free healthcare from the VHA.  Among veterans who

17  have been granted service-connection for PTSD by the VBA, approximately 60% go to the VHA for

18  medical care, a rate that is higher than that for any other disability.  (Rosenheck Depo. 390:5-391:2.)

19  Dr. Rosenheck, Director of the VA Northeast Program Evaluation Center, acknowledged that

20  establishing service connection is important for veterans with PTSD.  (Rosenheck Depo. 392:21-

21  393:6.)  When a claimant for SCDDC benefits disagrees with an RO's decision, an appeal may be

22  pursued to the Board of Veterans Appeals ("BVA"), which is part of the VA.  The next level of

23  appellate review is provided by the U.S. Court of Appeals for Veterans Claims ("CAVC"), an Article

24  I court.  For persistent claimants, further appellate review is available at the Federal Circuit Court of

25  Appeals and, finally, the U.S. Supreme Court.  The evidence at trial will show that systemic delays,

26  procedural defects, and the VBA's failure to follow its own regulations and procedures is depriving

27  veterans of their due process rights and violating the APA.

28

**IV.    THE VETERANS HEALTH ADMINISTRATION IS FAILING TO PROVIDE MENTAL HEALTH CARE TO VETERANS AS REQUIRED UNDER SECTION 1710.**

**A.    Section 1710 Provides an Entitlement to Mental Health Care for Combat Veterans for Five Years following Discharge.**

Congress has mandated the Department of Veterans Affairs provide veterans with medical care, as codified in the Veterans' Health Care Eligibility Reform Act of 1996, 38 U.S.C. § 1704 *et seq*. Sections 1710 (a)(1) and (a)(2) of the Act require the Secretary to (1) determine what medical services are "needed" and (2) provide those services in accordance with the statutory scheme. In other words, the "shall" in § 1710 modifies both the provision of medical services and the determination of necessity. This reading of the statute gives appropriate weight to Congress' use of the word "shall" and, unlike Defendants' interpretation, is consistent with congressional intent. Use of the word "shall" in § 1710 was not accidental. As the Supreme Court recognized in *United States v. Monsanto*, 491 U.S. 600, 607 (1989), "Congress could not have chosen stronger words to express its intent[.]" *See also Ctr. for Biological Diversity v. Norton,* 254 F.3d 833 (9th Cir. 2001) ("'Shall' means shall.") (quoting *Forest Guardians v. Babbitt*, 174 F3d 1178, 1187-88 (10th Cir. 1999).

The duty to provide health care extends to two groups of veterans: (1) those who have established service-connected disabilities through the adjudication process in the VBA (discussed in Section IV above); and (2) combat veterans within 5 years of their discharge, irrespective of whether "there is insufficient medical evidence to conclude that such condition is attributable to [combat] service." 38 U.S.C. §§ 1710(a)(1), (e)(1)(D). The VA is required to furnish veterans with established or presumed service-connected disabilities (including "mental defect[s]") with "hospital care and medical services," including "medical examination, treatment, and rehabilitative services." 38 U.S.C. §§ 1701(1), (6), 1710(a)(1), (a)(2). The Act further mandates that the VA "ensure that the [health care] system will be managed in a manner to ensure that the provision of care to enrollees *is timely and acceptable in quality*." 38 U.S.C. § 1705(b)(1) (emphasis added).[1] The Secretary is

---

[1] Additionally, upon request of any veteran, the VA must "furnish counseling to the veteran to assist the veteran in readjusting to civilian life. Such counseling may include a general mental and

(Footnote continues on next page.)

1   further required to "ensure that the Department . . . maintains its capacity to provide for the

2   specialized treatment and rehabilitative needs of disabled veterans (including veterans

3   with . . . mental illness) within distinct programs or facilities of the Department that are dedicated to

4   the specialized needs of those veterans in a manner that (a) *affords those veterans reasonable access*

5   *to care and services for those specialized needs*, and (b) ensures that the overall capacity of the

6   Department . . . to provide such services is not reduced below the capacity of the Department,

7   nationwide, to provide those services. . . ." 38 U.S.C. § 1706(b)(1) (emphasis added).

8   **1.    The Secretary Has Determined that Both Mental Health Care for PTSD
            and Suicide Prevention Are Necessary.**

9   
10          This Court correctly held that "§ 1710(e)(1)(D) provides a mandatory entitlement to health

    care for veterans for two [now five] years upon leaving the service." *Veterans for Common Sense v.*
11
    *Nicholson*, No. C-07-3758 SC, 2008 WL 114919, at *18 (N.D. Cal. Jan. 10, 2008). During the
12
    preliminary injunction hearing, top VHA Central Office officials underscored that ruling by testifying
13
    that veterans are "entitled" to health care for the statutory period. (Cross PI Hr'g Tr. 226:20-23;
14
    227:12-21; Katz PI Hr'g Tr. 805:6-13; D-523.) Nevertheless, Defendants continue to argue that the
15
    Secretary has "wide discretion" to determine what care is "needed" under these provisions – thus
16
    precluding judicial review and enforcement under 5 U.S.C. § 706(1). (Defs.' Opp'n. to Mot. for
17
    Prelim. Inj. ("Prelim. Inj. Opp'n") at 8:3-9:6.) Taken to its logical conclusion, VA's interpretation
18
    gives the Secretary unbridled discretion to refuse to provide any medical care under § 1710 by simply
19
    determining it is not "necessary," and shields such a  determination from judicial review. This Court
20
    appropriately rejected VA's interpretation of its statutory duty as contrary to congressional intent.
21
    *Veterans for Common Sense,* 2008 WL 114919, at *18; *see* also *Brower v. Evans*, 257 F.3d 1058,
22
    1065 (9th Cir. 2001) (citing *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 843 n. 9 (1984); *NRDC v.*
23
    *EPA*, 966 F.2d 1292, 1297 (9th Cir. 1992).
24
            VA's argument rests on the assertion that the Secretary *could* theoretically exercise his
25

26   (Footnote continued from previous page.)

27   psychological assessment of the veteran to ascertain whether such veteran has mental or
     psychological problems associated with readjustment to civilian life."  38 U.S.C. § 1712A(a)(1)(A).

28

1    discretion to determine no mental health care is necessary, thereby relieving the VA of its duty to

2    provide medical care to veterans.  Even assuming the Secretary has such unbridled discretion to

3    determine what medical services are "necessary," the Secretary has not exercised his discretion in

4    that manner here.  In fact, Defendants concede that "providing mental health care to veterans is a

5    matter of great import" (Prelim. Inj. Opp'n at 12:15-17) and that "suicide prevention is a singular

6    priority for the VHA."  (Defs.' Pretrial Statement at 12:15-18.)  Thus, having determined that the

7    provision of mental health services is necessary, the Secretary does not now have the discretion to

8    refuse to provide those services.

9    **B.      This Court Held That Combat Veterans' Health Care Entitlement is Not**
          **Constrained by Congressional Appropriations, but Even if it Were, the**
10         **Veterans Health Administration is Admittedly Awash in Appropriated**
          **Funds.**

11   Defendants argue that § 1710(a)(4) ("Paragraph 4") somehow grants the Secretary additional

12   discretion to deem medical care under § 1710 unnecessary because allocation of "lump-sum

13   appropriations" from Congress is within VA's discretion.  (Prelim. Inj. Opp. at 11:7-13:18.)  Again,

14   Defendants continue to litigate an issue that has already been settled by a prior order of this Court,

15   which held that "[n]othing in this language [of section (a)(4)] indicates that the mandatory

16   entitlement to health care . . ., as provided in § 1710(e)(1)(D), is limited by this subsection."

17   *Veterans for Common Sense v. Nicholson*, No. C-07-3758 SC, 2008 WL 114919 (N.D. Cal. Jan. 10,

18   2008), at *18.  Defendants' continued reliance on Paragraph 4 as a source of additional discretion not

19   only ignores this Court's prior ruling, but also defies logic and a plain reading of the statute.

20   Paragraph 4 provides that the obligation to provide medical care "*shall be effective* in any

21   fiscal year only to the extent and in the amount provided in advance in appropriations Acts for such

22   purposes."  (Emphasis added.)  Paragraph 4 is actually a safe harbor – excusing VA's failure to

23   provide medical services as directed by §1710 only when that failure is attributable to a lack of

24   appropriations from Congress.  This provision says nothing about discretion to allocate lump-sum

25   congressional appropriations.  Even if Paragraph 4 applied, Defendants' insistence that internal

26   allocation of lump sum appropriations is within VA's discretion (Prelim. Inj. Opp'n at 11:7-16)

27   misses the point.  Plaintiffs do not challenge those allocations; rather, Plaintiffs challenge VA's

28

1    failure to provide the services mandated by §1710 in a timely manner.

2    　　　Paragraph 4's safe harbor is irrelevant to the analysis here because, as the evidence has

3    already shown, VA has sufficient funding to provide the mandated medical care to our veterans.  (PI

4    Hr'g Tr. 225:12-19 (testimony by Dr. Cross that VA has "enough money and funding to carry out our

5    mission"); *Id.* at 574:13-18 (testimony by Mr. Kearns that VHA is not facing a budget crisis and has

6    "adequate money . . . to meet the mission requirements."); *Id.* at 787:17-20 (testimony by Ira Katz

7    that the current budget is sufficient to "cover a worst-case scenario of returning troops with mental

8    illness[.]")  Indeed, VA admits that from 2004 to present, VHA's medical care budget has included

9    "unspent multi-year appropriations funds carried forward from the previous year," (Decl. of W. Paul

10   Kearns in Support of Defs' Opp'n to Pls.' Mot. for a Prelim. Inj. ("Kearns Decl.") ¶ 5) – money that

11   could have been spent providing medical services as mandated by § 1710.  (Kearns PI Trans. at

12   567:1-568:13.)  The amount of unspent funds carried forward from Fiscal Years 2006 to 2007 and

13   2007 to 2008 was $500,000,000 and $1.3 billion, respectively.  (P-305 at 1..  Thus, any argument by

14   VA that Paragraph 4 excuses its failure to provide timely access to mental health services is

15   disingenuous as VA's own witnesses have testified there is sufficient funding to provide the

16   necessary care.

17   　　　**C.　　　Mental Health Care is Unreasonably Delayed on a Systemwide Basis.**

18   　　　Even though VHA has sufficient funding to provide the necessary care, VHA is failing to

19   provide care on a timely basis.  As noted above, the VHA policy governing mental health care

20   delivery is the Comprehensive Mental Health Strategic Plan.  Last year, the VA's Office of Inspector

21   General ("OIG") criticized the VHA's delivery of health care in two separate reports.  The

22   September 2007 report noted that VHA was "still not following established procedures for making

23   and recording medical appointments" which resulted in an underestimation of at least 25% of patient

24   wait times.  (P-169, at ii.)  As recently as December 2007, the House Committee on Veterans Affairs

25   held a hearing on patient wait times at which the OIG backed up its numbers and rejected VHA's

26   defenses of its misleading figures.  (P-220.)  With respect to the September 2007 report, Deputy

27   Under Secretary for Operations and Management, William Feeley, admitted that "this is a situation

28   where honest people are trying to do the right thing, but that processes are breaking down."  (P-428.)

1    The OIG also criticized the implementation and uniformity of mental health care at VHA.

2 The May 2007 report noted that the suicide-prevention measures set forth in the Comprehensive

3 Mental Health Strategic Plan finalized in 2004 had not yet been implemented by VHA. (P-133.)

4 Senior VHA officials agree that the Plan was not implemented as of May 2007. Mr. Feeley testified

5 that at the time of his June 2007 memo, issued weeks after the OIG Report, the Mental Health

6 Strategic Plan was "overdue" and just "starting to roll out." (Feeley Depo. 198:22-199:22.) The

7 Feeley memo's initiatives include a 24-hour mental health screen for all new patients who request

8 mental health care and a follow-up appointment within 14 days. (Zeiss PI Hr'g Tr. 504:8-19; P-

9 148.) Responsible for enforcement, Feeley testified that "[a]ccountability needs to be high because

10 the end product is so critical." (Feeley Depo. 59:6-7.) However, there is no monitoring taking place

11 with respect to whether the 24-hour screen is implemented systemwide. (Feeley Depo. 247:14-

12 248:7.) Nor is there any monitoring of the emergency procedures or the 24-hour care. (Feeley Depo.

13 246:11-248:20; 254:20-258:1.)

14    In fact, under VHA's "trust and verify" system, the only two "verification" metrics of

15 implementation are the 14 day follow-up appointments and the percentage of mental health staffing

16 vacancies yet to be filled. (Feeley Depo. 208:10-209:9.) Even the meager data that is monitored

17 reveals deficiencies. Very recent data shows that 20% of the mental health patients entitled to a

18 follow up appointment within two weeks are not getting an appointment within that time frame.

19 (Feeley Depo. 208:10-24.) Feeley testified he monitors compliance with his directive by monitoring

20 staffing levels as an indicator of whether VA has the "capacity" to provide the requisite services.

21 (Feeley Depo. 248:16-25.) VHA had the funds necessary to fill the outstanding staff positions, but

22 many are still left unfilled today. (Cross PI Hr'g Tr. 224:2,11-13; 231:9-16; Feeley Depo. 207:5-8.)

23 Despite the non-compliance, there has been no disciplinary or corrective action taken against

24 facilities out of compliance with VHA policy. (Feeley Depo. 413:2-415:17.) As a result, VHA's

25 Mental Health Strategic Plan is nothing more than an empty shell without any force or effect. The

26 lack of monitoring also inevitably leads to great variations throughout the nation in the delivery of

27 care for veterans with PTSD. (Rosenheck Depo.138:17-139:3; P-445, at 23-24.) Senior officials

28 acknowledge that presently there is great "variation in the programs" offered in VHA, and, as a

result, VHA is still in the process of "developing a uniform mental health services plan, to standardize this." (Katz PI Hr'g Tr. 767:11-14.) Despite the best intentions, lengthy plans and the rosy picture painted by top VHA officials in Washington of what is and what will be, the reality is there is no enforceable mental health care plan or policy in place throughout the VHA system.[2]

VA's failure to devise and implement an enforceable, nationwide plan for mental health care is resulting in serious consequences for veterans, particularly those returning from Iraq and Afghanistan. A recent VA study shows that while PTSD diagnoses continuing to climb rapidly, the number of mental health visits per veteran has declined. (P-444.) In fact, for the youngest segment of OEF/OIF veterans (born after 1972), the PTSD diagnoses from 2003 through 2005 shot up 232.2% and continue to climb through 2007. (P-442; P-448.) Dr. Rosenheck, one of the authors of the study, testified that he had to "be honest," the results of his study cause he and others within the VA "concern" that the decrease in visits is a problem. (Rosenheck Depo. 386:13-388:12.) These research findings are confirmed by the experiences of sychiatrists treating veterans at VAMCs (as opposed to bureaucrats in Washington) who report they are seeing a "tsunami of medical need." (Nemuth Depo. 38:21-39:6.) And the evidence will show that VA officials, like former Deputy Under Secretary Frances Murphy, who are brave enough to speak out about these systemic problems in VHA's delivery of mental health care are unceremoniously fired for breaking the VHA code of silence. (Murphy Depo. 24:13-25:25; 35:7-36:15; 68:8-69:17; 117:16-118:17; P-397.)

**D.     The Suicide Epidemic Among Veterans Indicates that VHA's Delivery of Mental Health Care is Inadequate for Veterans with PTSD and Other Mental Health Diagnoses.**

There is no dispute that there is a strong connection between PTSD and suicide and that veterans diagnosed with PTSD have a higher rate of suicide. (Blank PI Hr'g Tr. 69:23-70:2.) The mental health care provided for PTSD is an instrumental component of suicide prevention. Numerous VHA officials testified that "incident briefs" – detailed reports sent to top VHA officials

---

[2] For example, the "secret shopper" program VHA officials testified is a method of monitoring mental health service to veterans was implemented in March 2008 (around the time of the preliminary injunction hearing) and is only in a nascent preliminary phase. (Van Riper Depo. 46:2-17.) The "secret shopper" program is just one more example of Washington VHA officials paying lip service to a program that is not used in practice throughout VHA.

1    regarding the delivery of care in the event of a suicide or attempted suicide – are the definitive

2    teaching tool for systemic problems in the delivery of care.  (Cross PI Hr'g Tr. 232:2-17; Feeley

3    Depo. 171:12-172:15.)  A review of the few hundred incident briefs defendants produced (out of

4    15,000 VA reportedly collected) revealed clear themes, consistent with the problems detailed in

5    Section __, above.  Specifically, the incident briefs link the veteran suicides and suicide attempts to

6    delays and denials of care.  An adverse inference must be drawn that the remainder of the incident

7    briefs would show the same connection reflected in the sampling produced to date.  Otherwise,

8    Plaintiffs will have been severely prejudiced by this denial of discovery.

9        VHA's failure to implement and monitor a national mental health program and suicide

10    prevention program is leading to dire consequences for our Nation's veterans.  The Deputy Under

11    Secretary of VHA testified that the Feeley memo sets forth a general policy of treating any suicidal

12    veteran immediately on an emergency basis.  (Cross PI Hr'g Tr. 130:2-20.)  However, VA's Office of

13    Inspector General found in a recent report that "24-hour mental health care has not achieved full

14    system-wide implementation."  (P-133 at 27.)  Mr. Feeley testified that, even after the OIG Report,

15    VHA "does not have a monitor that indicates, are you doing this," and thus has no idea whether the

16    emergency-treatment policy is being followed throughout the system.  (Feeley Depo. 264:4-21.)

17    Moreover, emergency care is not available 24 hours to veterans throughout VHA.  Emergency rooms

18    exist in most but not all of the VHA's 153 VAMCs, which are concentrated in urban areas.  (Feeley

19    Depo. 129:2-8, 132:20-133:1; 240:7-241:6.)  Suicidal veterans are left with instructions on an

20    answering machines or signs on doors directing them to call 911.  (Feeley Depo. 126:18-129:1.)  The

21    Deputy Under Secretary for Health admits that it is "not enough, and I accept that."  (Cross PI Hr'g

22    Tr.  170:1-8.)

23        The totality of the VHA's specific suicide prevention "program" is three-fold:  (1) suicide

24    prevention coordinators located at VAMCs; (2) an extension of the national suicide hotline to

25    veterans; and (3) an annual suicide awareness day for VHA staff.  The suicide prevention

26    coordinators are responsible for training and monitoring patients at high risk for suicide.  The

27    coordinators are necessary, because the undisputed numbers presented by biostatistics expert

28    Dr. Stephen Rathbun during the preliminary injunction hearing reflect 120 veteran suicides per week

1   as of 2005.[3]  (Rathbun PI Hr'g Tr. 306:23-24; 308:24-309:3, 310:9-311:2.)  Those numbers are twice

2   as high as the suicide rate in the general population and, for the youngest group of veterans ages 20 to

3   24, three to four times that of the same age bracket in the general population.  VHA officials testified

4   that VHA expects 25 suicide attempts for every suicide.  VA's own epidemiologist, Dr. Han Kang,

5   confirmed that the Rathbun suicide figures are "defensible."  The Director of the Office of Mental

6   Health Services, Ira Katz testified that within the confines of the VHA system, which treats only 20%

7   of the total veteran population, even after the purported suicide prevention program was in place, the

8   suicide prevention coordinators are reporting rates of 1,000 suicide attempts per month and

9   identifying over 2,000 veterans at "high risk" for suicide each month.  If extrapolated out to the

10  general veteran population based on the 20% figure, there are 5,000 veteran suicide attempts per

11  month (60,000 per year) and 10,000 veterans are at high risk for suicide (120,000 per year).  These

12  numbers are current, showing the shocking numbers of suicides even after the suicide prevention

13  coordinators were put in place in VHA.  The second prong of the purported suicide prevention

14  program, the national suicide prevention hotline, confirms a widespread problem.  In the first six

15  months of operation of the suicide hotline, July to December 2007, the evidence shows that over

16  8,000 of the 21,000 total calls received in the United States were from suicidal veterans.  (P-345.)

17  The third ranking official in the VHA testified that the suicide hotline "is a busy line."  (Feeley Depo.

18  346:18-347:7.)  The evidence will show that the suicide prevention and mental health programs in

19  place at VHA are insufficient to effectively prevent suicide and that VHA, aware of extraordinarily

20  high suicide rates, has failed to adapt its programs in any meaningful way.

21         The evidence will also show that top VA officials know that the suicide figures are "awful"

22  but actively took steps to cover them up for fear of public scrutiny.  The same top VHA officials who

23  noted internally that the figures were awful and that steps should be taken to shield the information

24  from journalists also stated publicly that there is "no epidemic" of suicide on CBS News and denied it

25  during congressional hearings.  Other VHA officials are in various states of denial.  Despite the

26  _____

27         [3] No national data is available after 2005 due to the data limitations of the National Death
    Index.  Even the VA must use the National Death Index data, because VHA does not record the cause
    of death in its internal system.  (Rosenheck Depo. 100:3-102:12, Apr. 11, 2008)

28

1  overwhelming evidence, a leading researcher for VHA (who also works in connection with Yale

2  Medical School) described suicide as "rare." (Rosenheck Depo. 198:15-199:5.) Another top ranking

3  VHA official expressed a sense of inevitability, stating that "suicides occur like cancer occurs."

4  (Feeley Depo. 42:21-44:20.) Expert testimony has shown and will show, however, that suicides,

5  unlike cancer, can be prevented if there is timely access to adequate mental health care. (Blank PI

6  Hr'g Tr. 74:14-16.)  Suicides are considered inevitable within VHA because the suicide prevention

7  and mental health care programs are not working and VHA is not monitoring the programs to ensure

8  system-wide implementation.  VA's mental health system is broken and its failures have resulted in

9  an epidemic of veteran suicides.

10

11
        **E.**       **This Court Has Already Held that APA Section 706(1) Requires
Compulsion of Agency Action Unlawfully Withheld or Unreasonably
Delayed.**

12
      This Court, in its January 10th Order, and once again during the preliminary injunction

13
hearing, held that "1710(e)(1)(D) provides a mandatory entitlement to health care for veterans for two

14
years [now five years] upon leaving the service." ((*Veterans for Common Sense,* 2008 WL 114919,

15
at *18, PI Hr'g Tr. 5:16-21.) The Court explained that "the APA is relevant to this claim because it

16
waives sovereign immunity and permits actions against the Government agencies under certain

17
circumstances." (PI Hr'g Tr. at 5:22-25.) One such circumstance is where there has been a "genuine

18
failure to act by the relevant agency." (*Id.* 5:24-6:1.)

19
      This Court made clear that, "[u]nder the APA, the District Court 'shall…compel agency

20
action unlawfully withheld or unreasonably delayed.' § 5 USC 706(1). Thus, the APA relief is

21
mandatory if the Court determines that the agency action is being unreasonably delayed or

22
withheld…" (*Id.* at 9:8-12.) The Court explained the standard for assessing whether agency action

23
has been unreasonably delayed or withheld under § 706(1):

24

25
        In assessing whether agency action has been unreasonably delayed or
withheld under 706(1) of the APA, courts look to the so-called TRAC

26
        factors.  And these factors are:  One, that the time agencies take to make
decisions must be governed by a rule of reason; two, when Congress has

27
        provided a timetable or other indication of the speed with which it expects
the agency to proceed in enabling the statute, that statutory scheme may

28
        supply contents for the rule of reason; and three, . . . delays that might be
reasonably in the sphere of economic regulations are less tolerable when

1    health and welfare are at stake. And four, the Court should consider the
     effect of – of expediting delayed action on an agency of activities of a
2    higher or compelling priority; Five, the Court should also take into
     account the nature and extent of the interests prejudiced by the delay; and
3    sixth, the Court may need not find any improperly [sic] lurking behind
     agency latitude [sic]… in order to hold the agency action as unreasonably
4    delayed.

5    (*Id*. at 9:13-10:7 (citing *Independence Mining Co. v. Babbitt*,105 F.3d 502, 507 (9th Cir. 1997).) The

6    Court also analyzed Plaintiffs' health-care claims under these *TRAC* factors:

7        Under the APA framework, the first two TRAC factors favor relief. The
         VA is statutorily required to provide health care to veterans in a timely
8        manner. 38 U.S.C. 1705(b)(1). And although the statute does not define
         what a timely manner entails . . . *if Plaintiffs are able to demonstrate that*
9        *the delay veterans face when seeking health care results in unnecessary*
         *suicide or serious injury, then it seems likely that the health care is not*
10       *being provided in a timely manner.* The third factor clearly supports
         granting relief. The fourth factor would also likely favor relief as it is
11       difficult to imagine how preventing veteran suicides could be trumped by
         a greater priority. . . . The fifth and sixth factors also support relief.
12
     *Id*. at 10:14-11:5 (emphasis added). As set forth in detail in Sections V, C and D above, the delays in
13
     mental health care delivery are resulting in an epidemic of suicides amongst the veteran population.
14
15       **F.    Relief is Appropriate Under Section 706 to Remedy the Systemic Delays in
                 and Denials of Mental Health Care.**

16       Once the Court determines that an agency has acted unlawfully, the APA *requires* the Court

17   to compel the Secretary to take action. (Mar. 3, 2008 Order, PI Hr'g Tr. at 9:8-11 ("Under the APA,

18   the district court 'shall . . . compel agency action unlawfully withheld or unreasonably delayed.' 5

19   USC 706(1).) Thus, the APA relief is mandatory if the Court determines that agency action is being

20   unreasonably delayed or withheld . . ."). As a general matter, "a court may require an agency to act

21   upon a matter, without directing how it shall act." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190

22   (10th Cir. 1999). The injunction Plaintiffs seek comports with that general rule. Plaintiffs' requested

23   injunctive relief does not require the Court to devise a plan for the VHA's delivery of mental health

24   care. On the contrary, Plaintiffs are requesting that the Court order *the VA itself* "develop,

25   implement, and enforce a system-wide uniform policy" "providing for the immediate treatment of

26   veterans eligible for health care under 38 U.S.C. § 1710 presenting with suicidal ideations, a known

27   history of suicide attempts, and/or any other indication of suicide risk factors" and "establish

28   procedures to timely identify and immediately treat individuals with PTSD." That relief simply

1  compels the VHA to do what it is otherwise required to do by § 1710.  Compelling a federal agency

2  to devise a plan to comply with its statutory mandate is the *raison d'etre* of Section 706.

3      Defendants persist in asserting that the Court lacks jurisdiction over "programmatic"

4  challenges to the VA's mental health care delivery.  (Def. Pre-trial Statement, at 2-3.)  The cases

5  upon which Defendants advance are easily distinguishable and contain language that *supports* the

6  idea of a programmatic challenge to agency action.  In *Norton v. S. Utah Wilderness Alliance*,

7  542 U.S. 55, 71 (2004), the Supreme Court upheld the district court's dismissal of an environmental

8  group's complaint against the Bureau of Land Management for lack of subject matter jurisdiction,

9  refusing to apply Section 706's waiver of sovereign immunity on the ground that the Agency had no

10  legal duty to enforce speculative land-use plans.  *Norton* is distinguishable for two reasons.  First, the

11  present case involves a statutory duty to provide veterans with health care.  38 U.S.C. § 1710 ("The

12  Secretary . . . shall furnish hospital care and medical services" to combat veterans and veterans with

13  service-connected injuries.).  In contrast, *Norton* involved a non-binding plan "rather than the statute

14  itself as a source of the [agency] duty in question."  *Our Children's Earth Found. v. EPA*, 506 F.3d

15  781, 795 (9th Cir. 2007).  Moreover, the plan's language used the words "will" versus "shall," which

16  the Supreme Court found to lack the "clear indication of a binding commitment."  *Norton*, 542 U.S.

17  at 69.  The unequivocal statutory duty to provide care found in § 1710 utilizes the term "shall."  As

18  the Ninth Circuit has succinctly noted, "shall means shall."  *Ctr. for Biological Diversity v. Norton,*

19  254 F.3d 833, 837 (9th Cir. 2001); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th

20  Cir. 1999).  That mandatory statutory duty satisfies *Norton*'s requirement that there exist a "discrete

21  agency action that it is required to take."  542 U.S. at 64; *see, e.g., NRDC atterson*, 333 F. Supp.2d

22  906 (E.D. Cal. 2004).

23      Like *Norton*, the Supreme Court in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990),

24  addressed a challenge to the Agency's non-statutory, land-use plans.  Defendants exaggerate the

25  importance of generic language in the opinion and divorce it from its proper context.  Unlike the

26  present case, *Lujan* did not involve Section 706(1), but rather addressed a sovereign immunity waiver

27  under the arbitrary and capricious standard of Section 706(2).  Section 706(2) provides a waiver for

28  review of an agency's pattern of inadequate or insufficient action; in other words, affirmative agency

action – not a failure to act.  The Supreme Court nonetheless noted that courts may "intervene in the administration of the laws [pursuant to the APA] only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect.  Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or *even a whole 'program' to be revised by the agency* in order to avoid the unlawful result that the court discerns." *Id.* at 894 (emphasis added).  The real point of *Norton* and *Lujan* is that a federal court may not inject itself into the daily workings of the Agency by devising a plan to manage the Agency wholesale ("programmatically"), but this does not preclude the court from requiring the agency devise its own plan to comply with its statutory duty.  Because this Court already determined that "the failure by the VA to . . . provide timely medical care to veterans returning from war" constitutes final agency action required by Section 1710, a systemic challenge to the VHA's delivery of health care is appropriate under *Lujan*.  *Veterans for Common Sense,* 2008 WL 114919, at *6.[4]  This Court can and must issue injunctive relief pursuant to Section 706(1) requiring the VHA to provide timely medical care in conformity with Sections 1705 and 1710.

## V.    THE VHA CLINICAL APPEALS PROCESS AND PATIENT ADVOCACY PROGRAMS DEPRIVE VETERANS OF THEIR DUE PROCESS RIGHTS

This Court has already found that Section 1710(a)(4) "does in fact create a property interest protected by the Due Process Clause." *Veterans for Common Sense*, 2008 WL 114919 at *18 (citing 38 U.S.C. § 1710(e)(1)(d) (mandatory entitlement to health care for veterans during specified period upon leaving the service); *see also* § 1710(a)(1), (a)(2) (entitlement to health care for disabled and other specified veterans).  In its earlier decision on Defendants' Motion to Dismiss, this Court set forth the governing principles for due-process analysis:

---

[4] Defendants revisit the Court's decision and insist that Plaintiffs "have so far been unable to identify" the "final agency action" challenged with the "requisite specificity."  (Defs.' Pre-trial Statement, at 2-3.)  Defendants' laundry list of Plaintiffs' purported challenges conspicuously overlooks the VHA's two discrete final agency actions to which they devote two pages and about which VHA witnesses testified to for a week in March, namely the Comprehensive Mental Health Strategic Plan (including suicide prevention efforts encompassed therein) and the June 2007 Feeley memo that purports to "enhance" that Plan.  (*Id.* at 10-12.)  These two documents are the ways in which VHA purports to provide timely mental health care to veterans.  As such, the Plan and the memo constitute discrete "final agency actions" appropriately challenged under Section 706.

1

2

> [T]he identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional substitute procedural requirement would entail.

3

4

5

*Id.* at *15, quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The VHA Clinical Appeals

6

process fails to comport with the requirements set forth in the Due Process Clause of the United

7

States Constitution. For veterans denied care, there is no avenue of relief other than a complaint

8

lodged with a patient advocate. [Murawsky PI Tr. 657:3-10.] For veterans who receive inadequate

9

care or a clinical decision to deny care, VHA's clinical appeals process fails to provide veterans a

10

meaningful opportunity to challenge those decisions and does not provide constitutionally adequate

11

notice. VHA's purported notification to veterans of their right to appeal clinical decisions leaves

12

much to be desired. The clinical appeals process is a complicated procedure with multiple levels of

13

review. There is not even a single reference to that process in the Patient Rights & Responsibilites,

14

the document VHA witnesses claim puts veterans on notice of their rights. [D-535; Cross PI Tr.

15

291:1-10; Murawsky PI Tr. 638:3-6.) The purported notification is not even sent or given out to

16

individual veterans but is merely posted "in high traffic areas." [Murawsky PI Tr. 638:4-10]

17

Moreover, the patient advocacy program in which veterans may lodge complaints about the

18

denials of care provides no opportunity to be heard; it is merely forum for lodging complaints. The

19

VHA clinical appeals policy provides veterans a limited opportunity to be heard on clinical issues.

20

[Murawsky PI Tr. at 655:22-656:9; 726:9-15.] A decision to delay an appointment is only considered

21

"clinical," and thus ripe for appeal, when a nurse or other medical professional has examined the

22

patient prior to scheduling, and has made a scheduling decision based on this examination.

23

[Murawsky PI Tr. at 655:22-656:4.] Thus, veterans who do not have the advantage of a pre-

24

scheduling medical evaluation are left without any recourse. This is particularly troublesome for

25

veterans with PTSD, suicidal ideation, and other mental illness that may not be apparent to clerks and

26

others responsible for administrative tasks such as scheduling appointments. The Clinical Appeals

27

policy is deficient in other ways as well, all of which reflect a power imbalance that diminishes

28

1    veterans' opportunities for meaningful review of clinical decisions. The policy fails to provide a

2    neutral decision maker; a VHA employee reviews the decisions in most cases. Even where external

3    review is sought, VISN Directors make final decisions regarding the outcome of a clinical appeal

4    (including the right to overrule the recommendation of the independent reviewer). (D-536;

5    Murawsky PI Hr'g Tr. 659:17-21; 660:25-661:8; 720:5-12, 732:5-7.) Moreover, the entire clinical

6    appeals process can take up to 45 days, a time frame that is wholly unacceptable, if not perilous, for

7    the many veterans who suffer from severe mental illness. [D-536.]

8    **VI.    THE VBA CLAIMS ADJUDICATION SYSTEM VIOLATES VETERANS DUE
           PROCESS RIGHTS AND VA'S STATUTORY MANDATES**

9

10        VA's Byzantine process for deciding veterans' eligibility for benefits and for delivering those

11   benefits has collapsed. Veterans face lengthy delays in the adjudication of claims, which VA

12   acknowledges will only get worse. And the claims adjudication process is plagued by procedural

13   inadequacies which results in a cumulative error rate of 91.1 percent – systemic evidence of the

14   premature and error-laden denial of claims. During the time veterans await benefits decisions, they

15   often forgo necessary health care and understandably give up in frustration and desperation. They

16   lose their families, their jobs and their homes. Many commit suicide.

17        **A.    Each Level of the VA Adjudication System is Plagued by Systemic Delays**

18        The VA's processes and procedures for deciding claims for service-connected disability and

19   death compensation ("SCDDC") continue to be plagued by unconscionable, systemic delays.[5] The

20   systemic problems in the VBA have been recognized for twenty years. Time has only served to

21   exacerbate these systemic problems to the point where delays are so protracted that many veterans die

22   before a final decision is reached. (Cooper Depo. 49:16-23.) Indeed, the VA's own high-ranking

23   officials have admitted that the delays are unreasonable and that they violate federal statutes.

24        An understanding of the convoluted VA adjudication process is necessary to appreciate the

25   impact of these delays. The veteran, either himself or through a representative, initiates a claim by

26   _____
27        [5] Systemic delays are global delays affecting all claims by veterans and must be distinguished
     from a delay in an individual claim or appeal. Any mandamus relief advancing an individual appeal
     obviously does nothing to cure systemic delays, as the backlog numbers remain the same.

28

1    completing a 21-page form and submitting it to a VA regional office, of which there are 57 across the

2    country.  The VA does not advise the veteran who is deciding his or her claim.  (Pamperin

3    Depo. 114:12-14.)  Although VA regulations guarantee a hearing at "any time on any issue," pre-

4    decisional hearings are rarely held in VA regional offices.  (Mayes Depo. 241:6-18.)  The VA takes,

5    on average 183 days to decide SCDDC claims (Cooper Depo. 46:10-47:12; *see* P- 374 at 2; P- 384 at

6    VA007-2554), although over 100,000 claims have been pending more than 180 days as of March

7    2008 (P- 379 at 1), and some claims are pending for a period of years.  (Mayes Depo. 336:18-

8    336:21.)  In contrast to the average claim, however, it takes much longer to decide complicated

9    claims such as PTSD claims.  (Mayes Depo. 213:21-215:6; Cooper Depo. 79:1-25; P-414 at 28-33.)

10   Stressor verification in a PTSD claim, referring to proof of the traumatic incident in service, alone

11   can take an average of one year.  (*See* P-380 at 2; Pamperin Depo. 102:3-14.)  In addition, the

12   scheduling and completion of medical examinations causes additional delays, as a backlog exists

13   here, too.  Of the 59,838 OIF/OEF veterans diagnosed with PTSD (P-420 at 14), only 34,148 were

14   service-connected for PTSD (P-419 at 4 – Chart No. 8; Pamperin Depo. 65:19-68:14.)

15        The Under-Secretary for the VBA, Admiral Daniel Cooper, who left office earlier in April,

16   admitted that the period of 183 days, on average, to decide an SCDDC claim was unreasonable, and

17   testified that 125 days would be a reasonable time frame for deciding a claim.  (Cooper

18   Depo. 296:23-297:16.)  (P-414)  There currently is a backlog of over 600,000 claims at VA regional

19   offices.  There are currently about 401,000 rating claims pending at VA regional offices, a figure that

20   does not include any remanded claims.  (P-437; Cooper Depo. 22:14-24, 30:9-31:8, 33:11-15.)[6]

21        But the story only starts here, for the appellate delays are far longer, and exhaust all but the

22   most persistent of claimants.  After receiving the veteran's Notice of Disagreement ("NOD"), which

23   serves as a notice of appeal, the VA takes an average of 213 days to complete a short summary of the

24   legal and factual basis for the decision called a "Statement of the Case ("SOC").  (P- 370 at 16.)  At

25

26        [6] The VA's computer systems have the capability to generate reports concerning delays for
     PTSD claims.  (Mayes Depo. 136:2-137:20; Cooper Depo. 78:2-25.)  However, the VA supplied no
27   PTSD delay data for PTSD claims at the RO level or appeals in discovery.  The court should draw an
     adverse inference in light of VA's failure to provide this data.

28

1   that point the veteran has 60 days (or the remainder of a one-year period from the initial filing of the

2   claim), to prepare a Substantive Appeal ("SA"), which must lay out the errors of fact and law made

3   by the VA. 38 C.F.R.§ 20.202. Veterans supply SAs very quickly, as the average time between an

4   SOC and a SA is only 44 days. (P- 370 at 16.) Upon receiving the SA, the regional office asks the

5   veteran to elect whether or not to pursue *de novo* review in the regional office or to complete the

6   appeal to the Board of Veterans Appeals ("BVA"), which is part of the VA. If the veteran elects to

7   continue the appeal, the VA certifies the record for appeal. Incredibly, the regional offices take an

8   average of 531 days to complete this certification process. (P- 370at 16.) A hearing may lengthen

9   this time period considerably, as hearing requests are also backlogged at regional offices. (Mayes

10  Depo. 257:8-16.) The BVA then takes an average of about 273 days to actually decide an appeal.

11  (P- 370at 16.) Thus, the period of time between the NOD and a decision of the appeal, takes an

12  average of 1061 days, a period that is expected to stretch out to an average of about 1161 days (over

13  three years!) in FY 2008. (Pamperin Depo. 265:25-267:9). Moreover, the delays are much longer for

14  PTSD claimants. *See* Defendants' Responses to Interrogatory No. 10.

15      And this is only the beginning, as the BVA remands over a third of all appeals back to the

16  regional office from whence it came (and 57.2% of appeals are either allowed or remanded). (P-370

17  at 3, 19.) As of January 2008, 24,149 remands were pending, almost 20% of which were avoidable,

18  meaning that the cause for the remand was an error by the regional office. (Cooper Depo. 95:10-23;

19  P-369 at 6.) A remand adds yet another year or more to the process, as 75% of all remanded claims

20  are returned to the BVA. (Cooper Depo. 102:12-104:4; P-370 at 3.) At this point, assuming that a

21  PTSD claim was decided within 15 months, the claim would have been pending for over 4 ½ years.

22  There currently is a backlog of over 130,000 appeals at the BVA. (Cooper Depo. 224:7-224:14; P-

23  439 at 266).[7]

24

25

26      _____

27          [7] Despite these long time frames for appeals, the VBA's Under Secretary for benefits"did not
    pay particular attention to [them]," but rather focused on "original claims and resubmitted claims."
    (Cooper Depo. 99:19-100:18.)

28

1

2

**B.     The VBA Institutes Extra-Judicial Procedures Which Adversely Affect the Provision of Benefits to Veterans, Without Notice or an Opportunity to be Heard**

3     The second major adjudication practice challenged by plaintiff is the issuance of directives by

4     the Compensation and Pension Service ("C&P Service") in the VA Central Office which either

5     directs regional offices to apply more stringent standards for deciding SCDDC claims or requires

6     C&P Service approval for each proposed grant.[8]  VA officials have admitted that no statute or

7     regulation gives the C&P Service any authority over the actual process of adjudicating SCDDC

8     claims.  (*See* Mayes Depo. 236:9-25.)  Only the regional offices, the agencies of original jurisdiction,

9     possess that authority.

10    The illegal nature of the VA's interference with regional office decisions is illustrated by one

11    particularly troubling C&P Service Directive. The C&P Service issued an "Extraordinary Awards

12    Letter", which creates an extra step in the adjudication process once a regional office has prepared a

13    decision to grant service connection for a retroactive period of more than 8 years or to award more

14    then $250,000 in benefits.[9]  (P-375 at 1)  Once the grant decision is prepared, and before the award

15    letter is sent to the claimant, the Extraordinary Awards Procedure requires regional offices to send the

16    decision and the claim file to the C&P Service in Washington, D.C. for what is euphemistically called

17    "concurrence."

18    In effect, the C&P Service inserts itself as another decision-making level in the adjudication

19    process without any statutory or regulatory authority.  The C&P Service employee reviewing the file

20    does not have the benefit of the credibility determination made by the adjudicator at the regional

21    office, and the veteran never has the ability to confront the decision-maker.  The veteran is not

22    notified that his or her claim was selected for "extraordinary review."  (Pamperin Depo. 278:21-24,

23    287:9-12.)  The procedure applies only to grants, and not denials.  The "extraordinary reviews" have

24    led to the reversal of approximately 1/3 of the 300-500 regional office grant decisions, all but one of

25    which resulted in a denial of service connection or a reduction in the retroactive award.  (Mayes

26    [8] The sole function of the C&P Service is policy-oriented.  It has no adjudicative powers.

27    [9] As adjudication system delays have become more prolonged, the number of large retroactive awards has increased.

28

1    Depo. 243:6-244:2; Pamperin Depo. 279:21-281:20.)  Again, the veterans are not notified that the

2    C&P Service "review" resulted in a denied claim or a reduced award.

3        The VA attempts to defend the Extraordinary Awards Procedure by characterizing it as a form

4    of "quality review," and labeling the C&P Service determination upon review as simply a non-

5    binding "recommendation."  (Mayes Depo. 139:15.)  However, the quality control rationale does not

6    pass muster because the "review" occurs after the regional office decision is made, but before the

7    grant is communicated to the veteran, and not afterwards.  As to the binding nature of the C&P

8    Service "recommendation," if the regional office disagrees with a reversal (which has happened in a

9    handful of cases) and the C&P Service does not accept it, the regional office must follow the

10   "opinion" of the C&P Service.  (Pamperin Depo. 280:20-281:6, 283:2-4.)

11            **C.    The VA's Incentive Compensation System and Premature Denials.**

12       The very people who are determining claims at VA regional offices (VAROs) and the Board

13   of Veterans Appeals (BVA) have a financial incentive contrary to the rights of veterans.  VAROs,

14   individual VARO employees, and BVA staff counsel receive "credit" for every rating and appellate

15   decision made on a claim.  Productivity is measured by the number of credits they receive, and such

16   productivity is used to determine the award of yearly bonuses.  (Mayes Depo. 200:11-201:5.)

17       Veterans are directly and adversely effected by the reality that bonuses are dependent on the

18   appearance of productivity.  In a recent 2007 survey of raters and veteran service officers, a majority

19   of respondents believed that "speed is more important than accuracy at their VAROs."  (P-414, p.

20   43.)  A 2005 survey by the VA Office of Inspector General found similar results, as "management's

21   perceived emphasis on production at the expense of quality" was "[t]he most frequently discussed

22   issue" when respondents were given the opportunity for an open-ended answer.  (P-392, p. 61.)  The

23   value of speed over accuracy results in avoidable remands from the BVA and premature denials of

24   veterans' benefits claims,[10] a practice uncovered in several regional offices.[11]  (See, P-393, p. 10; P-

25

26           [10] A claim is prematurely denied when it is rated prior to the development and/or review of all
     evidence submitted by the veteran or compiled by the regional office.  Denying a claim before it is
27   ready for review results in inappropriate "credit" to the rater, while the veteran is left with a deficient
     rating decision and a lengthy appellate process.

28

1   1063, p. 5-6).  No matter the VA's ineffective accuracy checks on the claims process, the current

2   system is rife with opportunity for manipulation, and pits even well-intentioned adjudicators against

3   veterans.  As a consequence, veterans are deprived of neutral decision makers.

### VII.    VBA'S ADJUDICATION PROCESS VIOLATES VETERANS' DUE PROCESS RIGHTS

#### A.    Applicants for, and Recipients of, VA Disability Compensation Have a Constitutionally Protected Property Interest

7   As the Court has recognized, veterans with PTSD, including applicants as well as those who

8   already receive benefits, have a protected property interest in receiving ongoing access to medical

9   care and financial support from VA.  VA's statutory obligation to provide ongoing access to health

10  care and disability payments to veterans if they meet specified criteria establishes veterans' claims of

11  entitlement to those benefits, which cannot be denied without due process.  *See Raditch v.United*

12  *States,* 929 F.2d 478, 480 (9th Cir. 1991); *see also Goldberg v. Kelly,* 397 U.S. 254, 264 (1970)

13  (addressing the importance of benefits that allow recipient access to "essential food, clothing,

14  housing, and medical care").

15  Prior court decisions, including those of the United States Supreme Court, have recognized

16  that a variety of veterans' benefits, including service-connected disability, death, and pension

17  payments, are constitutionally protected property interests.  *See Walters v. Nat'l Ass'n of Radiation*

18  *Survivors*, 473 U.S. 305, 333 (1985).  The Ninth Circuit subsequently affirmed that applicants for and

19  recipients of disability benefits related to military service possess a property interest in those benefits

---

(Footnote continued from previous page.)

[11] Any value of accuracy checks on the problem of premature denials is non-existent.  First, in instances where error is actually found, there is no meaningful consequence to the regional office or individual claims processor.  Errors may occasionally result in more training, however credits are never reduced based on finding of inaccuracy.  (Rubens Depo. 126:9-22, 215:5-23.)  Second, the accuracy rating used in regional office performance standards specifically excludes from its count of errors those claims where credits were prematurely taken.  C&P Service conducts reviews (known as STAR reviews) on a monthly basis.  Ten claims that required a rating decision the previous month are randomly selected from each regional office for accuracy review.  (P-368, M21-4, 3-2.)  "Deselected" from that random sample, however, are categories of claims that are in error.  (*Id*. at 3-5.)  One such category is any claim where an end product was prematurely cleared, (i.e., a credit claimed by the regional office before a decision was warranted).  (*Id.*)  Wholesale exclusion of premature denials from the accuracy rating not only fails to track this real problem, but also results in a misleadingly high STAR accuracy rating.

1    that is protected by due process.  *Nat'l Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 588

2    n.7 (9th Cir. 1992); *cf. Devine v. Cleland*, 616 F.2d 1080, 1086 (9th Cir. 1980) (statutory entitlement

3    of eligible veterans to educational assistance benefits constitutes a protected property interest).  A

4    protected property interest does not come into existence only when a benefit is actually secured by a

5    veteran; applicants for benefits also have property interests that are protected by due process.[12]

6        Once the Court has determined that process is due, that veterans have a protectable property

7    interest in their disability benefits, the question then becomes precisely what process is due.  Here,

8    the *Mathews v. Eldridge* factors strongly favor judicial action requiring VA to take steps to ensure

9    that veterans seeking a disability rating have their claims reviewed in a reasonable time, and by fair

10   and adequate procedures.

11                      **B.      Private Interest at Stake**

12       This Court would be hard-pressed to find a more compelling private interest than the need to

13   care for the men and women who were injured while serving our country.  The delays in providing

14   disability ratings to veterans result in extreme hardship to veterans who already are in fragile health

15   and precarious financial situations.  Disability ratings are key to a veteran's access to ongoing health

16   care benefits.[13]  They also are the sole basis for eligibility for disability payments, which provide

17   absolutely essential financial support for disabled veterans.  Veterans with PTSD, which is a severe

18   mental health disability that often strongly impacts a veteran's ability to interact with others, are thus

19   subject to serious financial hardship resulting directly from their disability.  In turn, this hardship

20       [12] *See Raditch*, 929 F.2d at 480 (disability payments for federal employees) (citing
     *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (welfare payments); *Mathews v. Eldridge*, 424 U.S. 319,
21   332 (1976) (social security disability benefits); *Knudson v. Ellensburg*, 832 F.2d 1142, 1144-45 (9th
     Cir. 1987) (municipal disability benefits)).  "Every circuit to address the question . . . has concluded
22   that applicants for benefits, no less than current benefits recipients, may possess a property interest in
     the receipt of public welfare entitlements."  *Kapps v. Wing*, 404 F.3d 105, 115 (2d Cir. 2005)
23   (collecting cases); *see, e.g.*, *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998)
     (discussing various potential benefits constituting property interests).

24       [13] New veterans are entitled to free health care at VA facilities for five years (recently
25   increased from two years) after separation from the military.  After this period is over, the veteran
     must either pay out of pocket for care at VA facilities or obtain care elsewhere unless he or she has
26   received a disability rating.  Because many veterans do not initiate the application process for a
     disability rating until they are nearing the end of their eligibility for care, the slow process leaves
27   them in substantial jeopardy of losing access to care.  Moreover, service connection places veterans
     in a higher priority level for care.

28

1  impacts their ability to find or hold a job and exposes them to other harms such as alienation from

2  family and friends, homelessness and suicide.  Expert Chad Peterson testified that Veterans with

3  PTSD rely on disability compensation.  PI Tr. at 324:20-25.[14]

**C.  VA's Failure to Provide Timely Benefits Decisions Violates Veterans' Due Process Rights**

To obtain a disability rating, veterans must endure a lengthy and frustrating process, and that

these delays are often compounded by excessive remands, which results in what is known as "claims

churning," where claims move back and forth between the Regional Office and the appellate levels

for years without resolution.

Although the point at which delay amounts to a constitutional violation may depend on the

relative interests, it is well established that administrative delay in adjudicating claims for protected

interests can violate due process.  *Rodrigues v. Donovan*, 769 F.2d 1344, 1348 (9th Cir. 1985) (due

process claim based on "considerable delay" in deciding right to disability benefits found not

"insubstantial").[15]  "The acceptable duration of delay is determined by analyzing 'the importance of

the private interest and the harm to this interest occasioned by the delay and its relation to the

underlying government interest; and the likelihood that the interim decision may have been

mistaken." *Finch v. N.Y. State Office of Children & Fam. Servs.*, 499 F. Supp. 2d 521, 535 (S.D.N.Y.

2007).

Here, the delays in the process for determining disability ratings for veterans with PTSD are

---

[14] The *Goldberg* Court notes that the important issues at stake in its review of access to welfare benefits stem from "the Nation's basic commitment . . . to foster the dignity and well-being of all persons within its borders" and finding that such benefits are "a means to 'promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity.'" *Goldberg,* 397 U.S. at 264-65.  Here, the benefits at stake similarly stem from the basic commitment recognized by Congress and VA to care for those who have fought in battle for their country.  An individual's property interest in disability income is substantial and sufficient to require reasonably prompt administrative determinations of the right to benefits to satisfy due process requirements.  *White v. Mathews*, 434 F. Supp. 1252, 1260-62 (D.C. Conn. 1977), *aff'd* 559 F.2d 852 (2d Cir. 1977).

[15] *See also Andujar v. Weinberger*, 69 F.R.D. 690, 694 (S.D.N.Y. 1976) (addressing claims for supplemental security income and finding that "[s]ubstantial precedent exists for finding that allegations of lengthy delays in the delivery of benefits state constitutional claims of denial of property without due process.  Further, delays themselves may result in a deprivation of property."); *Perez v. Lavine*, 378 F. Supp. 1390, 1394-95 (D.C.N.Y. 1974) (mere delay in delivery of benefits by state welfare service providers may amount to a deprivation of property without due process of law).

1   extreme, and the harm to these veterans is severe.  As set forth in detail above, disabled veterans

2   often are unable to hold a job and are likely to be alienated from friends and family.  Without other

3   means of support, they are totally reliant on VA benefits to meet basic needs.  They are at greatly

4   heightened risk of homelessness, deterioration in physical health, broken marriages, substance abuse,

5   and suicide.  Because the situation of disabled veterans is so serious, any delay in providing them

6   with benefits creates extreme suffering.  The existing adjudication system must be evaluated in this

7   context.  Courts have held in numerous contexts that lengthy delays in benefits administration can

8   violate due process.  *See, e.g.*, *Kelly v. R.R. Ret. Bd.*, 625 F.2d 486 (3d Cir. 1980), *White v. Mathews*,

9   434 F. Supp. 1252 (D. Conn. 1976), *aff'd* 559 F.2d 852 (2d Cir. 1977).

10      Courts also consider the effects of delays on the applicants.  In *Cockrum v. Califano*,

11  475 F. Supp. 1222 (D.D.C. 1979) the court enjoined agency action that had been "unreasonably

12  delayed" within the meaning of the Administrative Procedure Act without reaching the issue of

13  whether the delay violated due process.  Its analysis is instructive.  *Cockrum* evaluated delays of 120

14  days for benefits to a class that lived "at or below the margin of poverty and [were] in dire financial

15  condition," and concluded "that deprivation of subsistence support cannot be remedied adequately by

16  larger future payments." *Id.* at 1229.  In reaching this conclusion, the *Cockrum* Court stated:

17
        [T]he Court has the authority and responsibility to insure that statutory
18      rights are not denied through agency delay or inaction[.] . . . [M]any
        members of the class are disabled, aged or infirm and the benefits at issue
        constitute the principal means of subsistence for many.  Delays in
19      determinations of the lengths which are evidenced here *amount to effective
        denial of benefits* and inflict grave and irreparable harm upon
20      plaintiffs. . . . [T]he Court cannot endorse a strained interpretation [of the
        APA] which would insulate from review and remedy systematic failure of
21      the system to resolve disputes about entitlement to payments within a
        reasonable time.
22
23  475 F. Supp. at 1239 (citations omitted, emphasis added).  Here, the delays are so excessive, and the

24  need so great, that the delays in adjudication of service-connected benefits are clearly depriving

    veterans of their due process rights.
25

26      **D.      The VA Claims Adjudication System Contains Various Procedural
                  Defects Which Combine to Create a System that is Depriving Veterans of
27                their Due Process Rights**

28      "[D]ue process is flexible and calls for such procedural protections as the particular situation

1    demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972). The fundamental requirement of due

2    process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 333

3    (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Beyond this basic obligation, the

4    procedural requisites for due process vary depending upon the importance of the interests involved

5    and the nature of the subsequent proceedings. *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975); *see*

6    *also United States v. Alisal Water Corp.*, 431 F.3d 643, 657 (9th Cir. 2005).

7        The VA's entire process to deliver benefits to veterans is based on a false premise: that the

8    claims adjudication system is non-adversarial. The reality is, however, that the VA system is

9    adversarial. This is largely due to the incentive compensation system, which encourages claims

10   adjudicators to emphasize speed over accuracy. The evidence at trial will show that this results in

11   premature denial of claims, as evidenced by what VA calls the "avoidable remand rate." As noted by

12   the Court, "The Federal Circuit, which has exclusive appellate jurisdiction under the VJRA, has

13   recognized this de-facto shift towards an adversarial system." (*Veterans for Common Sense,* 2008

14   WL 114919, at *18, citing *Bailey v. West*, 160 F.3d 1360, 1365.) And as the Court noted, "it is

15   within the Court's power to insist that veterans be granted a level of due process that is

16   commensurate with the adjudication procedures with which they are confronted." *Id*. at 32-33.

17                    **a.    Risk of Erroneous Deprivation is High**

18       The risk of erroneous deprivation is very high for veterans seeking service-connection for

19   PTSD. A number of factors combine to create this high risk of erroneous deprivation. First, the

20   sheer complexity of the determination of PTSD makes the value of an attorney quite high. Although

21   veterans theoretically possess a right to representation by attorneys, regulations prohibit fees for

22   services before the filing of a notice of disagreement. By prohibiting fees for services until a veteran

23   files a notice of disagreement with a regional office decision, Congress and the VA deny veterans the

24   right to assistance of counsel at the initial, crucial stages of the proceedings in the regional offices.

25       In order to pursue their claims effectively, claimants need various procedural devices they

26   may utilize to support their claims and ensure accurate, timely processing at all stages of

27   adjudication. Such procedures include, but are not limited to, a general right to discovery including

28   the right to request subpoenas of witnesses and documents, and the right to examine and cross-

1  examine witnesses.

2         Although the Secretary of the VA has delegated the authority to issue subpoenas to employees

3  at both the regional office level and the appellate level, the VA's regulations contemplate that

4  veterans may request the issuance of subpoenas only in connection with appellate hearings before the

5  BVA.  38 C.F.R. §§ 2.2, 20.711.  Notably absent is any procedure by which a claimant may request

6  issuance of a subpoena to support his or her claim in its initial stage of adjudication by the regional

7  offices.  The VA's regulations also include no provision for claimants to examine and cross-examine

8  witnesses.  Although the claimant is responsible for submitting everything necessary to substantiate

9  his claim, the regional office will exercise its authority to issue subpoenas only if (a) it determines a

10  claim is substantially complete and (b) chooses to do so.  If a claimant requests a hearing, the VA

11  simply expects the claimant's witnesses, who may be a physician or person otherwise essential to

12  prove the claim, to be present.  No provision, however, permits a claimant to request a subpoena from

13  the VA to compel the attendance of such witnesses at hearings in the regional offices.

14         "The opportunity to be heard must be tailored to the capacities and circumstances of those

15  who are to be heard."  *Goldberg v. Kelly*, 397 U.S. at 268-69.  "In almost every setting where

16  important decisions turn on questions of fact, due process requires an opportunity to confront and

17  cross-examine adverse witnesses."  *Id.* at 269 (citations omitted).  In the closely analogous context of

18  social security disability claims, the Ninth Circuit Court of Appeals held that an applicant's right to

19  due process was violated when the ALJ abused his discretion by refusing to issue a subpoena to

20  compel the attendance of a physician the applicant sought to cross-examine.  *Solis v. Schweiker*,

21  719 F.2d 301, 301 (9th Cir. 1983); *see also Pidgeon v. Health & Human Servs.*, 493 F. Supp. 1088,

22  1089 (E.D. Mich. 1980) (right to subpoena physician who authored report upon which ALJ relied);

23  *cf. Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990) (absolute due process right to subpoena and

24  cross-examine a reporting physician).

25         Veterans who must prove they have one or more disabilities connected to their military

26  service, like applicants for social security disability benefits, very often need supporting documents

27  and the testimony of witnesses to establish their eligibility.  Frequently the VA orders medical

28  examinations by VA physicians, who author reports including conclusions that may conflict with

1    those of claimants' treating physician.  Yet the veteran cannot cross-examine the doctor who finds he

2    does not have PTSD, or questions his credibility.  Veterans with PTSD must also verify the

3    occurrence of a "stressor" which caused their PTSD.  Often this verification comes in the form of

4    buddy statements from other servicemembers.  The veteran, however, has no procedure by which he

5    can subpoena the names or contact information of the individuals he served with.  And the veteran

6    cannot compel VA to obtain specific documentation for his claim file.

7         Under these circumstances, a hearing at any stage of the proceedings is meaningless without

8    crucial witnesses and documents, including those upon which the VA relies to deny a claim.  In order

9    to have a meaningful hearing, due process requires that veterans possess the right to request

10   subpoenas for documents and witnesses, and to examine and cross-examine witnesses at hearings, at

11   all stages of the VA's adjudicatory process.

12        The incentive compensation is relevant to the risk of erroneous deprivation because it has

13   resulted in a system that emphasizes speed over accuracy.  Possibly the most striking evidence of the

14   risk of erroneous deprivation under the existing claims adjudication procedure is the inconceivable

15   error rates.  The evidence at trial will show that the cumulative error rate is approximately 91.1

16   percent.  This is a startling number of inaccuracies, and clear evidence that additional procedural

17   safeguards are necessary.

18        The extraordinary awards procedure and other extrajudicial interference by C&P service in

19   the adjudication of claims, as discussed in Section VII, B, supra, also increases the risk of erroneous

20   deprivation.  Because veterans are not provided notice that their claims are selected for this review,

21   they have no opportunity to be heard by individuals who are making critical decisions about their

22   benefits.  Moreover, because veterans cannot subpoena witnesses or documents, they cannot conduct

23   the discovery necessary to prove the existence of the challenged procedures

24        Lastly, the risk of erroneous deprivation is demonstrated by the high abandonment rate.

25   Faced with a complex process and endless delays, veterans give up.

26                        **b.     Governmental Interest**

27        This factor is intended to focus on the array of community interests embodied in the

28   government program.  Society is interested in government costs, but also in fairness to those directly

1  effected by government decisions. Thus, the goal is to maximize social welfare, not solely to reduce

2  costs. *See Goldberg*, 297 U.S. 254*, Jeffries v. Georgia Residential Finance Authority*, 503 F. Supp.

3  610, 620 (N.D. Ga. 1980). Thus, the ideal procedural system would maximize the delivery of

4  government services through the use of fair procedures. For example, the government's interest and

5  public interest would be served by eliminating an incentive compensation system which results in

6  egregious error rates of up to 91.1 percent.

### 2. VA's Failure to Abide by its Own Statutes, Regulations and Procedures Violates Veterans' Due Process Rights

8      A fundamental requirement of due process is that agencies be held to their own published and

9  mandatory standards for adjudicating claims. Claimants must be able to rely on published agency

10  regulations and statutes. When an agency fails to do follow such procedure, it necessarily violates

11  the due process rights of applicants. *See Holmes v. N.Y. City Hous. Auth.*, 398 F.2d 262, 265 (2d Cir.

12  1968) ("The possibility of arbitrary action is not excluded here, however, by the existence of this

13  reasonable regulation. The [regulation at issue will hardly assure the fairness it was devised to

14  promote if, as the plaintiffs allege, some applicants, but not others are secretly rejected by the

15  [agency.]"). It is not only the existence of standards, but the guarantee that an agency will abide by

16  such standards, that guarantees fairness to applicants. It is for this precise reason that an agency may

17  not alter the procedures set forth by statute and regulation by informal "rules" or "policies" without

18  violating applicants' rights to due process. *Vorster v. Bowen*, 709 F. Supp. 934, 942 (C.D. Cal. 1989)

19  (citing *Fox v. Bowen*, 656 F. Supp. 1236 (D. Conn. 1986) for the proposition that agency practice and

20  "rules of thumb" contrary to the applicable statutes and regulations violated the Due Process Clause);

21  *Leduc v. Harris*, 488 F. Supp. 588, 590-91 (D. Mass. 1980) (holding that an internal "policy

22  statement" contrary to the governing Medicare Guidelines was a violation of due process)

23  The VBA consistently and systematically has failed to abide by the mandates set forth in its own

24  statutes and regulations. As a result, veterans are being deprived of their due process rights. The

25  Compensation and Pension Service ("C&P Service") in the VA's Central Office has, without notice

26  to claimants, inserted itself into the adjudication process by issuing mandatory directives to the fifty-

27  seven RO's across the country. These directives, known as Fast Letters, are in violation of the VA's

28

1   own regulations, which require "notice of any decision made by VA affecting the payment of benefits

2   or the granting of relief." 38 C.F.R. § 3.103(b). The extraordinary awards fast letter, discussed

3   supra, is just such an example. The VA does not notify veterans affected by the extraordinary awards

4   procedure. Indeed, the Fast Letter regarding extraordinary awards emphasizes, "[d]o not offer these

5   rating decisions to any veteran's representative for review until the C&P Service makes a final

6   determination regarding the propriety of the decision." (P-375)

7       In *Pressley Ridge Schs., Inc. v. Stottlemyer*, the Court explained :

8       The evidence at trial established Defendants ignored the standards
        contained in the lawfully promulgated agency regulations in favor of
9       unreasonably restrictive standards implemented without the publication,
        public comment or notice required by federal regulations. Without notice,
10      Defendants changed the rules of the game once the game had begun.

11  947 F. Supp. 929, 940-41 (S.D.W.Va. 1996). So too here. Defendants have changed the rules of the

12  game without abiding by the publication, public comment and notice procedures required by law.

13  Instead, VBA issues "fast letters" and "training letters" to the field which substantially alter the

14  procedures for adjudicating service-connected benefits decisions, without providing proper notice to

15  affected veteran-claimants.

16  **VIII.  THE COURT SHOULD ISSUE AN INJUNCTION TO CORRECT THE
        CONSTITUTIONAL AND STATUTORY VIOLATIONS IN THE DELAYED
17      ADJUDICATION OF VETERANS' BENEFITS.**

18      Because the VA is failing to process benefits claims within a reasonable timeframe (taking

19  several years) and the VA's procedures fail adequately to protect the property interests of veterans,

20  this Court must step in to require the federal agency to act. There are two separate sources of the

21  Court's authority to require agency action: (1) Section 706 of the APA; and (2) the Due Process

22  Clause of the Constitution. As set forth below, the relief requested by Plaintiffs falls well within the

23  ambit of the appropriate scope of relief for the two respective doctrines.[16]

24      [16] Defendants' reliance on *Heckler v. Day*, 467 U.S. 104 (1984), is misplaced. In *Heckler*,
    plaintiffs claimed that unreasonable delays in obtaining a hearing before an administrative law judge,
25  in the context of disability claims under the Social Security Act, violated their statutory right to a
    hearing within a "reasonable time." 467 U.S. at 108. The district court agreed and held that all
26  claimants for SSA disability benefits in Vermont are entitled to a hearing within 90-days of
    requesting one. *Id.* The Supreme Court vacated the lower court's decision because Congress had
27  expressly considered and rejected, repeatedly, mandatory time limits at every stage in the
    administrative review of disputed SSA claims. *Id.* at 112-13. The Supreme Court also expressed

                                                        (Footnote continues on next page.)

A.    **Plaintiffs' Requested Relief is Appropriate Under Section 706.**

The unconscionable delays at each stage of the claims adjudication process constitute a failure to act in violation of VA's statutory duty to provide veterans with benefits determinations in accordance with the mandate of 38 U.S.C. § 1110. The APA generally requires agencies to "proceed to conclude a matter presented to it . . . within a reasonable time." 5 U.S.C. 555(b). More specifically, Section 706(1) permits compulsion of agency action "unreasonably delayed."

### 1.    The *TRAC* Factors Are Met.

Although there is no bright-line rule for determining whether delay by an agency rises to the level of unreasonableness, courts look to the *TRAC* factors to guide their analysis. All six *TRAC* factors weigh in favor of granting relief to Plaintiffs. Regarding the first and second *TRAC* factors, statements by VA officials and internal VA documents provide guidance regarding how long is too long and what time limits are reasonable. The current average processing time for SCDDC claims at the regional office level is 183 days. Both Admiral Cooper, former Undersecretary of Benefits for the VBA, and Ronald Aument, former Deputy Undersecretary for Benefits, testified that 125 days, on average, is a reasonable and achievable length of time for an RO to complete a SCDDC claim. (Cooper Depo. at 296:23 – 297:16; Aument Depo. at 85:15-86:6.) The appeals resolution time — from the filing of a Notice of Disagreement to the issuance of a BVA decision — is currently 1,061 days, on average. (P-370 at 16.) Internal VA documents reveal that as recently as April 2005, the

(Footnote continued from previous page.)

concern, given the fact that the time limit was only applicable in Vermont, that "wide variations in judicially imposed deadlines" would "defeat the express congressional goal of uniformity." *Id.* at 116.

Here, in contrast to *Heckler*, Plaintiffs seek nationwide time limits at various stages in the VBA's adjudicative process which Congress has never considered imposing a mandatory time limit. The only congressional bill that Defendants cite that has any relation to time limits in the VBA's adjudication process is a house resolution that would have provided a $500 per month stipend to claimants if their claim was not decided within 180-days of remand from the BVA or CAVC, without exceptions for instances where the claimant caused the delay. H.R. 1444, 110th Cong. (2007). Significantly, remands from the CAVC and BVA are the only two stages of the adjudication process that Congress has expressly required the Secretary, by statute, "to provide for the expeditious treatment" of claims. 38 U.S.C. §§ 5109B & 7112. Moreover, the only mandatory time limits within the statutory scheme governing the VBA's adjudication process apply to claimants, not the VBA. See, e.g., 38 U.S.C. § 7106. Unlike Heckler, where Congress had imposed some mandatory time limits on the SSA, there is a complete absence of time limits in the statutory scheme governing the VBA.

1    VA's internal goal was less than half of today's actual appeals resolution time, or 500 days.  (P-377
2    at 3.)

3         The third and fifth *TRAC* factors — whether human health and welfare are at stake and the
4    nature and extent of the interests prejudiced by delay — also weigh in favor of granting relief.  The
5    evidence at trial will show, for instance, that disability compensation is a critical source of income for
6    many veterans who are unable to maintain gainful employment due to their disabilities.  The VBA
7    has, for example, determined that thirty-one percent of veterans receiving disability compensation for
8    PTSD as their primary diagnosis are unable to work.  (P-386, p.7.)  Further, veterans ineligible for
9    five years of free healthcare under section 1710 must apply for SCDDC from the VBA in order to
10   receive free healthcare from the VHA.  The nexus between the VBA's adjudication system, human
11   health, and welfare thus weighs in favor of granting relief.

12        The fourth *TRAC* factor — effect of expediting delayed action on competing agency activities
13   — also weighs in favor of granting relief.  Although there is no obvious hierarchy among the types of
14   claims adjudicated by the VBA — disability compensation, pension, education, home loan guaranty,
15   insurance, and vocational rehabilitation — one would be hard pressed to argue that disability
16   compensation claims are of less importance than other types of claims.  To the contrary, the nexus
17   between service-connection and the right to receive healthcare from the VHA arguably makes
18   SCDDC claims the VBA's top priority.

19        The sixth *TRAC* factor — the court need not find any impropriety lurking behind agency
20   lassitude – is aggravated in this case and also weighs in favors of relief.  For example, as discussed
21   above, the delay at the BVA level is compounded by the fact that claims are routinely prematurely
22   denied and later remanded due to inadequate claim development at the ROs.  This is so despite the
23   VA's affirmative "duty to assist" veterans with their claim development.  Seventy-five percent of
24   those remands are then returned to the BVA, which is obligated to re-review those claims before
25   more recently filed appeals.  And approximately 27% of remanded claims returned to the BVA are
26   remanded a second time.  This churning of claims within the adjudication system is avoidable, within
27   power of the VA to stop, and adds considerably to the delays at each stage of the process.

28

2.      **The Requested Relief is Within the Ambit of Section 706.**

When the *TRAC* factors weigh in favor of granting relief, unlike discretionary jurisdiction for mandamus, relief under Section 706(1) is mandatory.  March 3, 2008 Tr 9:8-10:7; 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."); *see also Forest Guardians* , 174 F.3d at 1187.  Plaintiffs request that that Court issue an injunction that compels the VA to prescribe the number of days for decision of a service-connected benefits claims at the RO, BVA, and CAVC.

In *Cockrum v. Califano*, 475 F.Supp. 1222, 1239 (D.D.C. 1979), the court held that the determination of "reasonable time" for a hearing could not be wholesale left to the Department of Health, Education, and Welfare because failure to enjoin the agency's delay "would neglect the Court's duty under the APA, 5 U.S.C. 706(1), which provides that on judicial review a court 'shall compel agency action unlawfully withheld or unreasonably delayed.'"  The *Cockrum* court ordered defendants to "submit a plan designated in good faith as an operational (not an advocate's) device to reduce the time for decisionmaking and ultimately to permit all decisions to be made within a reasonable time." *Id*. at 1240.  Acknowledging that the government agency was in the best position to develop this plan, the court held that "[s]uch an approach obviates the immediate need for a court-devised plan and time limitation and is in accord with the long-standing judicial deference to administrative expertise." *Id*. at 1240.

As in *Cockrum*, Defendants "should have the opportunity of first proposing a remedy to the Court which can then determine whether that plan meets [Defendants'] legal responsibilities to plaintiffs." *Id*. at 1240 (noting that the court's deference to the agency was "based upon its presumption that the responsible [agency] officials will act in good faith to carry out the Court's mandate").  Such an order achieves the twin goals of rectifying the gross delay at the VA while ensuring the Court does not assume a managerial role of the agency, and the agency is left to its proper deference.  For these reasons, Plaintiffs propose Defendants offer the Court a plan for reducing the time of adjudications to a reasonable length, a proper request for relief under Section 706.  Alternatively, the Court could order the Secretary to set his own time limits, subject to judicial review. *See, e.g., Williams v. Schweiker*, 541 F. Supp. 1360, 1367 (E.D. Mo. 1982) (rejecting

1   argument that delays are attributable to a heavy caseload and ordering the Secretary of Health and

2   Human Services to "exercise his rule-making power by formulating rules and regulations establishing

3   reasonable time limits for conducting hearings and issuing decisions" in claims for Supplemental

4   Security Income disability benefits).

5           **B.       Plaintiffs' Requested Relief Is Appropriate Under the Due Process Clause.**

6           "Injunctive relief is appropriate in cases involving challenges to government policies that

7   result in a pattern of constitutional violations."  *See Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir.

8   1998).  The form of relief, however, is within a court's discretion.  Courts can and have imposed time

9   limits in the adjudication process for Social Security disability benefits.  For example, the Second

10  Circuit, in *White v. Mathews*, affirmed a district court order imposing mandatory time limits between

11  an applicant's request for a hearing and the final decision by an administrative law judge.  559 F.2d

12  852, 855 (2d Cir. 1977).  The time limits were structured in a fashion that compelled the SSA to

13  reduce the average delay by 30 days every six months for 18 months.  *Id*.  Further, claimants made to

14  wait longer than the prescribed time period received benefits automatically from the expiration of the

15  allotted time period until a decision was rendered, unless the delay was caused by the claimant.  *Id*.

16          **C.       The Court Need Not Micromanage the VA in Order to Grant Meaningful
                       Systemic Relief.**
17
18          The Court has broad power to use whatever mechanism it sees fit to remedy the violations,

    which includes the power to appoint third parties.  *See, e.g., Ex parte Peterson,* 253 U.S. 300, 312
19
20  (1920) (recognizing that trial courts have "inherent power to provide themselves with appropriate

21  instruments required for the performance of their duties.  This power includes authority to appoint

22  persons unconnected with the court to aid judges in the performance of specific judicial duties . . .").

23  In that vein, the Court could appoint an expert, a Rule 53 special master, a monitor, or a magistrate

24  judge to work with the parties to identify specific reforms.  Such an assistant to the Court could also

25  create a timeline for such reforms and monitor their implementation.  Another option would be for

26  the Court to order the parties to negotiate a remedy with or without the assistance of a mediator or

27  magistrate judge.  If the Court wishes to be more involved in fashioning relief, it could hold a hearing

28  on remedy during which each side would present proposed solutions.  None of these alternatives

1  would require the Court to micromanage VA.   Instead, the Court would safeguard important

2  constitutional and statutory rights of veterans by enjoining Defendants from violating those rights.

3  This is historically one of the most traditional and important functions of an Article III court and is

4  not without precedent in other large, public institutions much more complex than VA, such as

5  schools, prison systems, welfare systems, and public housing authorities.  *See, e.g., Morgan v.*

6  *Kerrigan,* 530 F.2d 401 (1st Cir. 1976), *cert. denied,* 426 U.S. 935 (1976) (use of special masters to

7  develop desegregation plans for Boston Public Schools); *Ruiz v. Estelle,* 503 F. Supp. 1265 (S.D.

8  Tex. 1980), *aff'd,* 679 F.2d 1115 (5th Cir. 1982), *cert. denied,* 460 U.S. 1042 (1983) (use of special

9  master to reform Texas Department of Corrections); *Perez v. Boston Hous. Auth.*, 379 Mass. 703

10  (1980) (appointment of a receiver to take over administration of the Boston Housing Authority).

11          Finally, there are particular reasons for the Court to take action in this case.  First, VA has

12  refused to recognize the extent of its problem even in the face of an onslaught of objective criticism

13  by its own Inspector General, the GAO, the media, and Congress.  Second, in spite of its bureaucratic

14  promises and public relations claims, VA has repeatedly failed to take the concrete steps necessary to

15  ensure that the system meets the most urgent needs of veterans and the requirements of due process.

16  VA unconvincingly asserts that it has both the deficiencies in VHA's mental health care delivery (and

17  suicidal veterans) and the VBA's crushing case load "under control".  Those hollow assertions cannot

18  be the basis for avoiding injunctive relief, especially in light of Defendants' argument that the

19  Secretary retains complete discretion to do as he pleases.  *See Eng v. Smith*, 849 F.2d 80, 83 (2d Cir.

20  1988) ("Although defendants claim to have voluntarily implemented substantially all of the ordered

21  relief," in the absence of injunctive relief, "there is nothing to prevent defendants from abandoning

22  procedures which the court determined to be necessary to protect plaintiffs' constitutional rights.").

23  In reality, however, VA's systems for delivering health care and adjudicating benefits claims have

24  completely collapsed on the heads of the veterans VA serves.  Accordingly, VA's self serving

25  trumpeting of its "new initiatives" must be taken with a grain of salt.  Given the recalcitrance of an

26  enormous bureaucracy, there is no reasonable likelihood of meaningful relief without court action

27  and inaction would result in unimaginable harm to thousands of veterans and their families.  These

28

1   life-saving changes to the VA system are both contemplated by the Constitution and the APA and are

2   within the jurisdiction of this Court to order.

3

4   Dated:  April 17, 2008                    GORDON P. ERSPAMER
                                              ARTURO J. GONZALEZ
5                                             HEATHER A. MOSER
                                              RYAN G. HASSANEIN
6                                             STACEY M. SPRENKEL
                                              MORRISON & FOERSTER LLP
7

8                                       By:   /s/ Heather A. Moser
9                                             Heather A. Moser (HMoser@mofo.com)

10                                            Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28