1   GORDON P. ERSPAMER (CA SBN 83364)
    GErspamer@mofo.com
2   ARTURO J. GONZALEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   HEATHER A. MOSER (CA SBN 212686)
    HMoser@mofo.com
4   RYAN G. HASSANEIN (CA SBN 221146)
    RHassanein@mofo.com
5   STACEY M. SPRENKEL (CA SBN 241689)
    SSprenkel@mofo.com
6   MORRISON & FOERSTER LLP
    425 Market Street
7   San Francisco, California 94105-2482
    Telephone: 415.268.7000
8   Facsimile: 415.268.7522

9   **[see next page for additional counsel for Plaintiffs]**

10  Attorneys for Plaintiffs
    VETERANS FOR COMMON SENSE and
11  VETERANS UNITED FOR TRUTH, INC.

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14              SAN FRANCISCO DIVISION

15  VETERANS FOR COMMON SENSE and        Case No.      C-07-3758-SC
    VETERANS UNITED FOR TRUTH, INC.,
16                                        **PLAINTIFFS' RESPONSES TO**
                    Plaintiffs,           **DEFENDANTS' DEPOSITION**
17                                        **DESIGNATION OBJECTIONS AND**
          v.                              **COUNTER-DESIGNATIONS**
18
    JAMES B. PEAKE, M.D., Secretary of Veterans   Complaint Filed July 23, 2007
19  Affairs, et al.,

20                  Defendants.

21

22

23

24

25

26

27

28

1   **ADDITIONAL COUNSEL FOR PLAINTIFFS:**

2   SIDNEY M. WOLINSKY (CA SBN 33716)
    SWolinsky@dralegal.org
3   JENNIFER WEISER BEZOZA (CA SBN 247548)
    JBezoza@dralegal.org
4   KATRINA KASEY CORBIT (CA SBN 237931)
    KCorbit@dralegal.org
5   DISABILITY RIGHTS ADVOCATES
    2001 Center Street, Third Floor
6   Berkeley, California 94704-1204
    Telephone: 510.665.8644
7   Facsimile: 510.665.8511

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Plaintiffs hereby respond to Defendants' objections to Plaintiffs' deposition designations and
2  counter-designations as follows:

3  **PLAINTIFFS' RESPONSES TO DEFENDANTS' DEPOSITION DESIGNATION OBJECTIONS**

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| 1 | William F. Feeley April 9, 2008 | **333:23 – 338:14**<br>**Q:** — in which Ms. Murphy in May of '06 is quoted in substance or in part as saying that the VA clinics do not provide mental health or substance abuse care, or if they do, waiting lists — waiting lists render that care virtually inaccessible. Now, can you remember at any time before now hearing that — of — of any criticism Frances Murphy had made with regard to waiting times?<br>**A:** Frankly, I did not hear of criticism related to wait times, but did hear that she was concerned about the overall health of the mental health service delivery system. Did not see it as focused on wait times.<br>**Q:** What — what aspect was she focused on?<br>**A:** Don't really know.<br>**Q:** Was there discussion at — at the center, at headquarters about what she had said or done?<br>**A:** That — I — I really do not recall being in on any discussions related to Dr. Murphy and her statements. That was when, I think, Dr. Perlin was in the under secretary's job.<br>**Q:** Okay. Let me show you a copy of that article that I'm referring to. It will be Exhibit 370.<br>(Exhibit 370 was marked for identification and attached to the transcript.)<br>THE WITNESS: (Reviews document.)<br>BY MR. GOLDMAN:<br>**Q:** And if you look to the second page of the exhibit, this is where I was, in effect, quoting. She noted | Relevance | Dr. Murphy was Deputy Under Secretary at the VHA and in her capacity as a top VHA official made comments regarding systemic problems with the delivery of health care. Dr. Murphy's criticisms regarding the timeliness of mental health delivery bear directly on the central issues in this case. Moreover, Dr. Murphy was retaliated against for preparing a report that revealed deficiencies in the mental health care provided by VA. |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|--------|---------|-----------|----------------------|---------------------|
| | | that some VA clinics do not provide mental health or substance abuse care, or if they do, waiting lists rendered that care virtually inaccessible. MR. SCHWARTZ: I just want it clear for the record that this exhibit, A, is an article, and, B, it is paraphrasing much of what Dr. Murphy said. It's not a direct quote of – | | |
| | | MR. GOLDMAN: Yes. Let – | | |
| | | MR. SCHWARTZ: — what – | | |
| | | MR. GOLDMAN: — let me – | | |
| | | MR. SCHWARTZ: — she said. MR. GOLDMAN: I — I — I'm glad you said that. | | |
| | | BY MR. GOLDMAN: | | |
| | | **Q:** The quotes are around "waiting lists rendered the — that care virtually inaccessible," end quote. The rest is not quoted. Now, was this article ever brought to your attention? | | |
| | | **A:** No. | | |
| | | **Q:** Was — was she correct, as of — if you look at the first page, this article is May 5, 2006 — was she correct as of May 5, 2006 in what she is quoted as saying, "waiting lists rendered that care virtually inaccessible"? | | |
| | | **A:** I don't believe so. I guess "some VA clinics" would mean, I guess — some — could mean some small CBOCs. Where — | | |
| | | **Q:** That's how I would interpret it. Go ahead. | | |
| | | **A:** Pardon me? | | |
| | | **Q:** I — I would interpret that she's talking about CBOCs, too. | | |
| | | **A:** Yeah. And — and I — if — if — remember we went to the standard that provision of mental health or addiction services would require that there be a cohort of 1,500 veterans. In that sense she's talking about a percentage of clinics that might not have care. However, I think we also — hopefully, I've | | |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC

2

sf-2502600

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|--------|---------|-----------|----------------------|---------------------|
| | | made the point that mental health and substance abuse initial evaluation can be done by primary care providers and, based on the severity of the condition, referred along to an appropriate service delivery.<br><br>**Q:** Since May 2006 when this article was written — quoted in substance and in — in act — in actual quote of Frances Murphy, has she continued to work at the Veterans Administration?<br><br>**A:** My — my read is Dr. Murphy — and — and, again, I don't have an in-depth understanding of what she's been doing; although, I did see her last week at the Winter Sports Clinic in Colorado — is that she's resigned from the VA or retired from the VA and was on sabbatical for a period of time prior to that.<br><br>**Q:** Well, is it — is it correct that since May '06 she's left the VA?<br><br>**A:** I — I don't know of whether the sabbatical occurred within the VA or — or whether she was working at — at some other element in the VA, not in headquarters. I just don't know those details.<br><br>**Q:** Well — well, did she talk to you at any time after May '06 about continuing to work at the VA?<br><br>**A:** I — I believe that Dr. Murphy talked with me about some interest in an opportunity to work as a network director somewhere down the line should that become available, but then she end up — ended up retiring.<br><br>**Q:** What — what did you say about — to her about her prospects at VA?<br><br>**A:** I think she could have — I encouraged her to apply. | | |
| 2 | William F. Feeley<br>April 9, 2008 | **339:3 – 339:7**<br>**Q:** Okay. I want to show you a document we have marked as Exhibit 428. It's an article in the McClatchy Washington — it's | Exhibit is Hearsay | Contains admission by party opponent. The exhibit quotes Mr. Feeley. |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    3

sf-2502600

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | called the McClatchy Washington Bureau; Monday, June 11, 2007. | | |
| 3 | William F. Feeley April 9, 2008 | **339:3 – 343:5** **Q:** Okay. I want to show you a document we have marked as Exhibit 428. It's an article in the McClatchy Washington — it's called the McClatchy Washington Bureau; Monday, June 11, 2007. (Exhibit Number 428 was marked for identification and attached to the transcript.) BY MR. GOLDMAN: **Q:** And I was referring to — on the first page, the third from the bottom paragraph. You're familiar with the McClatchy media chain? **A:** Yes. **Q:** Do you find them generally to be a reliable reporting service? **A:** I would say that they have a point of view; whether it's reliable, I'm not so sure I would see it that way. **Q:** Their headquarters are in Sacramento? **A:** I don't know where their headquarters are. **Q:** It says in the third from bottom paragraph, Waiting times for veterans to see doctors are closely watched by Congress and veterans' advocates. In February, the VA's top official, Michael Kussman, told the Congressional committee that the VA provides 39 million appointments a year, dash, and 95 percent of them are done within 30 days of the patient's request. And you — you recall that that did happen; am I correct? **A:** Correct. And, again, the distinction between the IG auditing function and the approach of patient preference we think is the driver that explains the delta between the 75 percent and 95 percent. **Q:** And then if you turn the page and go up three — four paragraphs, it says, In a May 18th meeting between VA officials and the | Hearsay | Exhibit 428 quotes Mr. Feeley. He confirms this quote is accurate at 342:17-23. His statement is an admission by party opponent. |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | Inspector General's office to discuss the findings, a Deputy Under Secretary for Health – | | |
| | | THE COURT REPORTER: I'm sorry. I didn't hear you. | | |
| | | BY MR. GOLDMAN: | | |
| | | **Q:** — a Deputy Under Secretary for Health, William Feeley, said he was concerned about the Inspector General's conclusion that the VA's, quote, over-stated, close quote, the number of veterans seen within 30 days. Is that an accurate statement? | | |
| | | **A:** I — I think the — I'm much more comfortable that the statement below — | | |
| | | **Q:** I'll go to that one, too. But is this — | | |
| | | **A:** Okay. | | |
| | | **Q:** — one — | | |
| | | **A:** I'm not sure it is. I don't recall what I said 18 months ago. | | |
| | | **Q:** And is it accurate it was May 18th in advance — | | |
| | | **A:** I — | | |
| | | **Q:** — of your — | | |
| | | **A:** I really — | | |
| | | **Q:** — June — | | |
| | | **A:** — don't — | | |
| | | **Q:** — 1 — | | |
| | | **A:** — know. | | |
| | | **Q:** — in advance of your June 1 memo? | | |
| | | **A:** I — I'm — I'm taking your word that that's the case. I just don't recall. | | |
| | | **Q:** They're not my words. I'm pointing you to the — | | |
| | | **A:** The — | | |
| | | **Q:** — McClatchy — | | |
| | | **A:** Okay. | | |
| | | **Q:** You're not taking McClatchy's word? | | |
| | | **A:** I'll talk McClatchy's word, but I — I don't know what the date was. | | |
| | | **Q:** All right. And then it says, | | |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    5

sf-2502600

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|--------|---------|-----------|----------------------|---------------------|
| | | According to an internal report summarizing the May 18th meeting, Feeley said that, quote, Such a statement could easily be misconstrued by readers of the report to imply that the VA was being deliberately deceptive when there was no evidence to that effect — and that you went out to say that — and there's no quotes here. You went out to say, this is a situation where honest people are trying to do the right thing but that processes are breaking down. Now, does that accurately portray what occurred at the meeting? **A:** That sounds like — that last statement I remember making, and — and it goes to the point of deliberate manipulation versus training errors of human beings who are in very busy clinics or patients-centric — patient-preference scheduling where there's a failure to enter into the computer that the patient wanted it at a later time, and that's what I would mean by a process breakdown. | | |
| 4 | Bradley Mayes April 7, 2008 | **62:10 – 63:12** **Q:** And looking at this particular report on the second page, you see that category of per- — under the category — the general category of Performance Measure? I'm referring to the Appeals Resolution Time. **A:** Yeah, I see it. **Q:** And there it shows that the — well — well, with respect to that data element of Appeals Resolution Time, do you — do you also have a — a plan number as — as opposed to the actual number? **A:** Yes. **Q:** Okay. And that — here, for — for example, the plan number is 500; whereas, the actual is 599? **A:** I see that. MR. WILTSIE: Objection. There's been no showing of personal | Defendant renews all objections made on the record. | Defendants fail to identify the specific testimony to which they object. |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | knowledge of this witness of anything in this document. BY MR. ERSPAMER: **Q:** And the — and — and — and — and are you aware of the color coding scheme that's used for whether you satisfy — a particular performance measure had been satisfied? **A:** Not on this report. This is not a report that I — **Q:** Okay. **A:** — I see. | | |
| 5 | Frances Murphy, M.D. April 7, 2008 | N/A | Relevance objections to all after 24:13 – Murphy has no knowledge of the VA after April 2006. | Defendants' objection goes to the weight and not the admissibility. Dr. Murphy was Deputy Under Secretary at the VHA and in her capacity as a top VHA official made comments regarding systemic problems with the delivery of health care. Dr. Murphy's criticisms regarding the timeliness of mental health delivery bear directly on the central issues in this case. Moreover, Dr. Murphy was retaliated against for preparing a report that revealed deficiencies in the mental health care provided by |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC

7

sf-2502600

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | | | VA. |
| 6 | Frances Murphy, M.D. April 7, 2008 | **68:21** **Q:** And what did he say? **A:** He said he'd be happy to give me an early retirement. | Relevance and Hearsay | Statements not offered for the truth, but to show that Dr. Murphy was retaliated against for preparing a report that revealed deficiencies in the mental health care provided by VA. |
| 7 | Frances Murphy, M.D. April 7, 2008 | **69:5** **Q:** Did he tell you — did he say anything else? **A:** No. | Relevance and Hearsay | Statements not offered for the truth, but to show that Dr. Murphy was retaliated against for preparing a report that revealed deficiencies in the mental health care provided by VA. |
| 8 | Frances Murphy, M.D. April 7, 2008 | **110:6** **Q:** — in February that — that it was going to be very difficult for you to close things down, what did they say? **A:** Nothing. | Relevance and Hearsay | Statements not offered for the truth, but to show that Dr. Murphy was retaliated against for preparing a report that revealed deficiencies in the mental health care provided by VA. |
| 9 | Frances Murphy, M.D. April 7, 2008 | **164:10** **Q:** Did anybody stand up and say, that's not right, or anything like that while you were — while you were at that New Freedom Commission? **A:** I believe that at some point I | Relevance and Hearsay | Statements not offered for the truth, but to show the VA's consensus and knowledge of |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | discussed the accuracy of the statement with Art Hamerschlag when he asked about the quote. | | the deficiencies in the mental health care that were revealed by Dr. Murphy. |
| 10 | Frances Murphy, M.D. April 7, 2008 | **165:8** **Q:** So what did he say to you and what did you say to him about the accuracy of that statement? **A:** That the statement was accurate; that I had said it in this statement before the President's commission members — former President commission members and that the data that it was based on was VHA data. | Relevance and Hearsay | Statements not offered for the truth, but to show the VA's consensus and knowledge of the deficiencies in the mental health care that were revealed by Dr. Murphy. |
| 11 | Frances Murphy, M.D. April 7, 2008 | **196:4** **Q:** Okay. And what did he say? **A:** He was — he was a little patronizing, but – | Relevance and Hearsay | Not offered for the truth, but to show that Dr. Feeley was among those who retaliated against Dr. Murphy for preparing a report that revealed deficiencies in the mental health care provided by VA. |
| 12 | Frances Murphy, M.D. April 7, 2008 | **196:7** **Q:** He was a little patronizing, but he — but he said no? **A:** Yeah. | Relevance and Hearsay | Not offered for the truth, but to show that Mr. Feeley was among those who retaliated against Dr. Murphy for preparing a report that revealed deficiencies in the mental health care provided by VA. |
| 13 | Frances Murphy, M.D. April 7, 2008 | **196:10** **Q:** Okay. Understood. Did he tell you why? | Relevance and Hearsay | Not offered for the truth, but to show that Dr. Feeley was |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | **A:** No. He just told me he wasn't considering me for the job. | | among those who retaliated against Dr. Murphy for preparing a report that revealed deficiencies in the mental health care provided by VA. |
| 14 | Diana Rubens April 4, 2008 | **219:21 – 221:4** MS. AMEZCUA  I believe we're at Exhibit 393. (Exhibit 393 was marked for identification and attached to the transcript.) BY MS. AMEZCUA **Q:** Now, Ms. Rubens, before you you have the OIG combined assessment program review of the VA regional office, Albuquerque, New Mexico. Have you seen this before? **A:** Yes. **Q:** How do you know you've seen it before? **A:** As the Western Area director in 2004, any of the Inspector General reports that had to do with the areas — the regional offices in the West would have come to me. **Q:** Will you turn to page 10, please? **A:** Uh-huh. **Q:** The first sentence under the heading Multiple Rating End Products, The VSC manager should ensure that only appropriate end products are cleared. Can you read the sentence saying, Condition needing improvement, please? **A:** VSC personnel inappropriately cleared multiple rating end products for certain claim numbers. **Q:** What does that mean? **A:** That VSC personnel cleared rating end products inappropriately | Relevance due to age of report discussed (2004) | Relevant to extent Ms. Rubens testimony shows VA is aware of inappropriate clearing of end products and the Office of Inspector General has uncovered such a practice occurring in at least one VARO. |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | multiple times for certain claim numbers. | | |
| 15 | Diana Rubens April 4, 2008 | **223:5 – 224:18**<br>**Q:** I think my question was a little different. When you read this report, was this the first time you had heard of VSC personnel doing such a thing?<br>**A:** I'm sure it wasn't the first time that I'd heard of the allegation that somebody might do something like this. Do I — can I tell you that — in 2004 what my thought was after I read it? No, I can't.<br>**Q:** Are you aware of the VBA ever addressing the issue of inappropriately clearing rating end products?<br>**A:** When I went out to the Western Area, one of the things that I did was begin to look at where did it look as though we had duplicate end products being taken within close proximity and began to monitor, demand correction and ensure that we were not doing anything inappropriate.<br>**Q:** And why did you determine that that was the place you should look?<br>**A:** In the Western Area? Because that's where I had responsibility for making sure we were doing what we should be doing.<br>**Q:** Well, you said you came to the Western Area; you determined that one of the places you wanted to look was whether duplicate end products were being taken. Why did you determine that that was a place you should look?<br>**A:** Because when I went to the Western Area, I was looking at everything I could think of to make sure that we were following the appropriate guidance. And, so, it wasn't just were we doing bad things, what are we doing well and how can I go and find out about that and how can I | Relevance due to age of report discussed (2004) | Relevant to extent Ms. Rubens testimony shows VA is aware of inappropriate clearing of end products; the Office of Inspector General has uncovered such a practice occurring in at least one VARO; and VA management's response to inappropriate clearing of end products. |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    11

sf-2502600

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | replicate that and how can I make sure that we are providing the best service to veterans. | | |
| 16 | Diana Rubens April 4, 2008 | **224:4 – 226:7** **Q:** Well, you said you came to the Western Area; you determined that one of the places you wanted to look was whether duplicate end products were being taken. Why did you determine that that was a place you should look? **A:** Because when I went to the Western Area, I was looking at everything I could think of to make sure that we were following the appropriate guidance. And, so, it wasn't just were we doing bad things, but it was, what are we doing well and how can I go and find out about that and how can I replicate that and how can I make sure that we are providing the best service to veterans. **Q:** And has the VBA provided training about clearing rating end products? **A:** I'm not — I guess I'm not — VBA has provided training on processing claims, which includes all aspects of managing end products. **Q:** And does part of that training involve discussion about when and when not to clear a rating end product? **A:** That is part of managing all of the work: When is it appropriate to take any action on any claim. And when feedback is provided, regional offices get that feedback and provide it as training to ensure — if there's been, and in this case — you know, my — my response back here was we have worked with the regional office; the regional office has provided an improvement plan. My goal will be to monitor and ensure that this does not continue. **Q:** When you're talking about your response back here, what are you talking about? | Relevance due to age of report discussed (2004) | Relevant to extent Ms. Rubens testimony shows VA is aware of inappropriate clearing of end products; the Office of Inspector General has uncovered such a practice occurring in at least one VARO; and VA management's response to inappropriate clearing of end products. |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | **A:** My response is on page 13.<br>**Q:** You signed that as the director of the Western Area; is that right?<br>**A:** I did.<br>**Q:** And will you turn to page 11 where it says, The area and regional office directors agreed with the findings and suggestions? Do you see that's the first sentence of the second full paragraph?<br>**A:** (Witness reviews document.) Yes.<br>**Q:** Does that mean, then, at the time you agreed with the finding that some VSC personnel were inappropriately clearing rating end products?<br>**A:** The IG had provided the documentation to show me where they were finding this inappropriate clearing of end products. It's hard to refute fact. | | |
| 17 | Diana Rubens<br>April 4, 2008 | **230:10- 230:24**<br>**Q:** Has the IG found in other regional offices, other than Albuquerque in 2004, that VSC personnel have inappropriately cleared end products?<br>**A:** I would tell you that I don't know. Do I think that it's possible that the IG has a finding that I don't readily pull to the front of my memory, yes, but I — I don't know.<br>**Q:** And why do you think it's possible that the IG has a finding somewhere else about the inappropriate clearing of end products?<br>**A:** Because they found it in Albuquerque, and it's possible that they found it somewhere else. I don't know that to be the case, though. | Relevance and lack of personal knowledge | Objection to lack of personal knowledge waived because not made at deposition.<br><br>Relevant to extent VA is aware that inappropriate clearing of end products may occur in more than one regional office. |
| 18 | Lisa Seibert,<br>April 4, 2008 | N/A | Defendants object to testimony about incidents prior to 2005 as irrelevant | Defendants fail to identify the specific testimony to which they object. |

| Obj. # | Witness | Testimony | Defendants' Objection | Plaintiffs' Response |
|---|---|---|---|---|
| | | | | Further, any testimony regarding incidents of document destruction and tampering of veterans' benefits claims files is relevant to the extent it shows the impact of production expectations on regional office and BVA employees. |
| 19 | Lisa Seibert, April 4, 2008 | **29:16 – 30:1**<br><br>**Q:** Let's start there. Did you ask them when you interviewed them why they did what they did?<br><br>**A:** Okay. I did not interview any of those people. I know for — in Mr. Gottfried's case, he did discuss during his interview why he did it.<br><br>**Q:** And do you know what he said as to why he did it?<br><br>**A:** To paraphrase, I believe he said he felt overwhelmed. | Hearsay | Not offered for truth, but to show VA's knowledge that some employees have reported feeling pressured by production expectations, at the expense of quality. |

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' DEPOSITION COUNTER-DESIGNATIONS**

| Ronald Aument April 3, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **222:18 – 223:5**<br>**A:** Rarely does a Form 9 come in saying send my case to the board. You know, typically there are additional evidence that is submitted along with that that starts the development cycle again, often involving requests for, you | N/A | **222:14-17**<br>**Q:** Okay. We can put that one away.<br>I have to ask, Mr. Aument, why would it take 400 days plus to certify a claim to the BVA after receipt of a Form 9 appeal? |

| Ronald Aument | | |
| April 3, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| --- | --- | --- |
| know, new medical examinations that start that — often — they may request a formal hearing in that process. There's a — there's a host of development actions that, you know, can conceivably take place, and it's very, very rare that a — an appeal upon receipt of the — of — of — of a — of a Form 9 is — is ready for board certification. | | |
| **226:23 – 227:10**<br>**Q:** Do you think the claims processing arena is in need of a revolution?<br>**A:** Me? Again, are you asking for my opinion?<br>**Q:** As opposed to what? I — I don't believe you're here testifying on behalf of the VA, if that's what you're asking me.<br>**A:** I'm here in the — in the — in the capacity that — you probably would not want to be speaking to me as Ron Aument, private citizen, but you're interested in speaking to me as Ron Aument, former Deputy Under Secretary for Benefits. | Relevance, FRE 402. | N/A |

| William F. Feeley | | |
| April 9, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| --- | --- | --- |
| **29:3 – 31:12**<br>**Q:** So these two metrics that you mentioned, the filling of the mental health positions and the waiting time, the 30 days, which you say is down to 14 | N/A | **31:13-15**<br>**A:** They roll up the overall aggregate number, not the number by specific discipline; although, we can get that. |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| —<br>**A:** Correct.<br>**Q:** — these are interrelated metrics —<br>**A:** Yes.<br>**Q:** — would you say?<br>**A:** Yes.<br>**Q:** Because if you don't have the people, there's going to be a longer waiting —<br>**A;** Correct.<br>**Q:** — time?<br>    Now, would you be — when – when  you look at these metrics of — of positions  filled, is — is — is that against a budget of  a — of a certain number of people? How – how  do you — how do you figure out what is the — the number you're after?<br>**A:** I — I think there is two different budgetary dynamics we're talking about here, which is the overall mental health funding package by history, which I think this year was $3.5 billion and the $370 million in '08 supplemental. This is the — a particular dynamic I'm looking at to ensure that new positions are coming on board so a more timely response can occur.<br>**Q:** But then do you have — do you have a — a budget or a projection or a — a listing of what you — what is expected will be the positions in each VISN for each of the medical centers —<br>**A:** The —<br>**Q:** — (inaudible) —<br>**A:** The —<br>**Q:** — (inaudible) — | | |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **A:** I'm sorry.<br>**Q:** — (inaudible) —<br>**A:** I'm sorry.<br>**Q:** — and the other facilities — care<br>facilities in the — in the VISN?<br>**A:** The — the VISN directors in<br>medical center leadership are given considerable autonomy in hiring the type of providers they need; whether it's a psychiatrist, nurse practitioner, social worker, psychologist, RN, we — we want to be — be able to allow them to hire the mental health workforce that they think they need because it's variable based on what parts of the country you're in. The budget is already allocated, so they've got money to hire these positions.<br>**Q:** Well, do you — do they roll up to you the — the number of psychiatrists, the number of psychologists —<br>**A:** Yes.<br>**Q:** — the number of nurses they plan to have in their — in their VISN? | | |
| **46:3-46:24**<br>**Q:** Let me — let me go back to the discipline of directors in VISNs over suicides.<br> You would — you said there would only be discipline if you had found negligence. Is it correct that — that in your view there has never been any negligence by any director arising out of suicides by veterans who are under the care of a particular VISN? | N/A | **46:25 – 47:6**<br>**Q:** And — and has there ever been discipline of anyone within a VISN? It would — it would be up to the director within a — a —<br>**A:** Correct.<br>**Q:** — VISN to — to discipline a person below the director?<br>**A:** Correct. |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **A:** If — if you were to say to me in the last two years —<br>**Q:** Since your watch.<br>**A:** — since I've —<br>**Q:** That's right.<br>**A:** — been in —<br>**Q:** That's right.<br>**A:** — the job —<br>**Q:** That's right.<br>**A:** — I have not seen it.<br>**Q:** And before that?<br>**A:** Well, I wasn't in the job before that, so — on my watch I think was the question. | | |
| **58:25 – 59:2**<br>**A:** constantly traveling to various medical centers, so they may be doing that on their own and I'm unaware. | Lacks foundation. | N/A |
| **59:12 – 60:8**<br>**Q:** If you have a — an initiative or policy that's been issued to be followed by the VISNs and it's not being complied with, does that present a problem to you?<br>**A:** That's going to get dealt with with network directors and facility directors.<br>**Q:** Why — why is that a problem if that's not happening? If your — if your – if  your initiatives and — and directives are not being followed, why is that a problem?<br>**A:** Well, we want standardization; we want, in particular, high levels of accountability for the constituents we're taking care of. Again, my major theme has been managing the variation between networks and facilities to reduce that variation in quality, access and | N/A | **60:9-13**<br>**Q:** Which is not what you found when you arrived; correct?<br>**A:** I — I would say the – the variability was more than I would like, and — and that's what we're — we're looking to fix |

sf-2502600

| William F. Feeley | | |
| April 9, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| satisfaction. **Q:** You're striving towards a national or uniform — **A:** Correct. **Q:** — operation; am I correct? **A:** Correct. | | |
| **68:3 – 68:11** **Q:** So when you were director of — of a VISN before you took over this position, were you aware there was such a plan? **A:** Yes, I — I knew that — I believe it was '04 and '05 that the plan started to be shaped, and — and that — and I may have read an executive summary of the plan as a network director, but I read the plan cover to cover when I came into the position I'm in. | N/A | **68:12 – 69:13** **Q:** Let me take before you came into the position of — of — in February of 2004. As a director, had you read the plan? **A:** Do not believe I had read the plan. Perhaps in a — this is a long way back. I may have read an executive summary, the first 20 pages. **Q:** But you're not sure you did? **A:** I think I read an executive summary. **Q:** Okay. Now, how did you come to get a copy of the plan or the executive summary? **A:** Don't recall. **Q:** Well, was it provided from top down? **A:** Would have been top down, yes. **Q:** Was it provided to you as a director with any instructions as to whether or not you had to follow it? **A:** No. **Q:** Did you think you had to follow it? **A:** I don't think the plan had rolled out. It was in the process of being worked on. **Q:** Well, let's take the years 2004 to 2006 when you were a direct — director of VISN — I forget — |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    19

sf-2502600

| William F. Feeley | | |
| April 9, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| | | **A:** Two. |
| **69:14 – 70:5**<br>**Q:**  — 2 in — in New York. Specifically did you feel you had any obligation to implement within your VISN any of the  recommendations contained in the MHS Plan?<br>**A:**  I — I would answer that this way.  Again, I did not read the plan cover to cover.  I believe I may have read an executive summary.  Network 2 has been one of the highest performing networks in the VA system historically over an eight- to ten-year period of time and has a very, very well developed mental health service delivery system, and is highly re – highly regarded for that, including having mental health professionals in primary care in the mid-'90s, long before it was being discussed in the VA as a standard.  So we were already doing a lot of what was in that plan. | N/A | **70:6-20**<br>**Q:**  My specific question, 2004 to 2006, before you took over your job here in Washington, did you feel bound — that you were bound to follow the recommendations contained in the plan?<br>**A:**  I don't know if the — I just do not know if the plan had been released with recommendations.  I don't know the answer to that.<br>**Q:**  Can you recall feeling bound by it?<br>**A:**  If — if the plan hadn't been released, I don't know how I would have been bound by it.<br>**Q:**  Tell me what you mean by "released." |
| **84:2 – 84:21**<br>**Q:**  Well, apart from sending it out to them to read, did you — was it a subject of discussion at any — with your —<br>**A:**  Yes.<br>**Q:**  — directors at any of —<br>**A:**  Yes.<br>**Q:**  — your two-day — let's say — let's just take the two-day meetings.  Was any time devoted to discussing the plan?<br>**A:**  Yes.  And, in fact, at the National Leadership Board — when we talk about face-to-faces, we have a National Leadership  Board that meets quarterly.  Back in '06 — '6, | N/A | **84:23-85:6**<br>**Q:**  And when — when was it that there was a presentation by Dr. Katz to the National Leadership Board —<br>**A:**  Wouldn't —<br>**Q:**  — regarding —<br>**A:**  Wouldn't be able to give you —<br>**Q:**  — regarding this plan?<br>**A:**  Would — wouldn't be able to give you the dates. |

| William F. Feeley<br>April 9, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| it was meeting ten times a year; that has reduced now a bit, but I think Dr. Katz actually gave a presentation about the Mental Health Strategic Plan and has given resentations about suicide to the National Leadership Board.<br>**Q:**  Does the National Leadership Board include the directors of the VISNs? | | |
| **95:12 – 96:2**<br>**A:**  Other —<br>**Q:**  — A-3.<br>**A:**  Other than to make the qualifying<br>statement that the — the point I think you've articulated related to the implementation time frame and the duration of the implementation  as — I'm not sure when this report was finally approved and signed off on.  I — I think the suicide prevention coordinator effort is a major effort with about 150 FTE.  There are other major efforts going on with high-risk populations like traumatic brain injury and case management services for returning OEF/OIF veterans also aimed at creating a stronger safety net so people don't fall through the cracks. | Non-responsive. | N/A |
| **97:20 – 98:15**<br>**Q:**  — right.  Now, before June 1, 2007 when you put out your — your memorandum, had the MHSHG developed a plan for 24-hour mental health care availability throughout VHA?<br>**A:**  There had always been a plan for 24/7 mental health availability in the system. | Non-responsive. | N/A |

sf-2502600

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| There was — at least that's my understanding.  There was an effort via the June 1 memo to put more clarity in that plan by determining the role of — again of CBOCs, the role of making   sure that our complex, 1A, large hospitals had mental health professionals on site in the emergency room.  That's about 30 institutions; so, for example, a greater Los Angeles or a Cleveland, these are very, very large hospitals.<br>        But even in remote areas in — we<br>have to have the ability to get patients care —<br>**Q:**   All right.<br>**A:**   — 24 —<br>**Q:**   But —<br>**A:**   — 7. | | |
| **102:25 – 103:18**<br>**Q:**   Your memo was telling them they had an obliga- —<br>**A:**   Yes —<br>**Q:**   — -tion?<br>**A:**   — when that went out on June —<br>**Q:**   Be- —<br>**A:**   — 1st.<br>**Q:**   — -fore that, had anyone told any VISN they had an — they had an obligation to see to it that they had 24-hour mental health care availability throughout their VISN?<br>**A:**   My — I — I don't know the answer to that.  I don't know what previous deputy under secretaries may have done.  It's my understanding that we probably have policy — although I'd — I'd have to research that — that indicates | N/A | **103:19-25**<br>**Q:**   Well, name me the policy; identify the —<br>**A:**   I —<br>**Q:**   — policy —<br>**A:**   — don't —<br>**Q:**   — for me.<br>**A:**   I don't know the policy. |

| William F. Feeley April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| we have to provide that emergency care whether it's in mental health or – or general medical or surgery. | | |
| **105:15 – 108:16** **Q:** My question is, until you sent out your June 1, '07 memo, you're not aware of anybody having articulated a — a — a rule or plan that needed to be followed by the VISNs for having a 24-hour mental health — **A:** It's — **Q:** — care — **A:** — my — **Q:** — availability? **A:** — understanding that that's been the policy right along, and that's been the policy, as I understood it as an associate director, as a director, as a network director, that I — long before my arrival in headquarters, that that was my obligation to ensure that if a veteran presented for care that I'm going to get them the care they need either within the VA system or via contract. **Q:** I'm talking about 24-hour mental care. **A:** Correct. Correct. **Q:** Well, if you believe that it was your expectation that all VISNs throughout their VISN had 24-hour mental care availability, why were you sending it out in your initiative of June 1, '07? **A:** I think what we were doing there is, again, underscoring the importance; two, expanding it to include making sure you've got that services available in CBOCs; | Best Evidence, FRE 1002. | N/A |

| William F. Feeley<br>April 9, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| three, to add the clarity that in large urban areas where there's a significant volume of mental health patients, we want mental health professionals right in that emergency room, and that is happening at 30 of our level 1A complexity hospitals.<br>**Q:** If I were a director of VISN before I got your June 1, '07 memo, would I be able to find anywhere that I had been sent an initiative, a plan, a direction, a rule that I had to have a 24-hour mental health care availability throughout my VISN?<br>**A:** Well, my — my answer to that is that I believe it's in policy, but unfortunately I can't point you to the particular —<br>**Q:** Where —<br>**A:** — one.<br>**Q:** — are these policies? Are there — does a manual contain the policies?<br>**A:** Yeah, I — I — yes, would be my answer to that. But I don't know where they —<br>**Q:** What —<br>**A:** — are.<br>**Q:** — do we call the manual?<br>**A:** Don't — don't know the answer to that.<br>**Q:** But the policies of VHA regarding — that — that are — are obligatory for — for directors are contained in the manual?<br>**A:** Yes.<br>**Q:** Do you have the manual in your office?<br>**A:** I — I — I'm sure I can get that, but I don't — it's not | | |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC

sf-2502600

24

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| in my office, but it's in the building.<br>**Q:** When you ask your assistant to get you the manual, what do you call the manual?<br>**A:** My — my guess is it's a — a — the title would be something like the expectations for the care delivery system in the VA.<br>**Q:** Now, is it your guess that the manual contains the policy regarding 24-hour mental care availability or you know it's so?<br>**A:** That's my strong belief that that's what it is. | | |
| **110:11-20**<br>**A:** I would tell you that I may not have linked it initially as coming from the plan, but when the network director in Network 2, we had mental health professionals going to all the post-deployment exchanges where military people, Reserves, Guard would come back together and we would have a — a cadre of human beings that went out, including mental health professionals, to kind of expose them to what the VA had to offer. | Non-responsive. | **110:21-23**<br>**Q:** So you say that —<br>**A:** Did not know the origins of that, but we just kind of did it. |
| **114:6 – 117:17**<br>**Q:** Let's turn to the next page, A-6. Now, the — this one at the top is mental — under Mental Health Strategies, it says, Provide a full continuum of compassionate care to veterans with mental illness. And certainly you're all for that; am I correct?<br>**A:** Yes. | Lacks foundation.<br>Best Evidence, FRE 1002. | **117:18 – 118:12**<br>**Q:** Well, can you identify anything you read so I can go look at it and see if it confirms what your recollection is?<br>**A:** I — I think that that data could be gotten from OQP, and — and they would have the report on that.<br>**Q:** Can you — can you describe the report in any kind of way so that I — |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **Q:** I think you — you said what your duties were; you were — that's — you were articulating that; correct?<br>**A:** (Witness nods head.)<br>**Q:** Am I right —<br>**A:** Yep.<br>**Q:** — Mr. Feeley? It says, Immediate Program Office OQP. What is OQP?<br>**A:** That's the Office of Quality Improvement in the organization.<br>**Q:** Now, let me read what it says. It says, Implement Performance Measure for FY '05: 85 — colon, 85 percent of CBOCs serving more than 1,500 veterans will provide on-site contract and tele-mental health services or — at or above 10 percent of all clinic visits by FY '06. Increase to 15 percent of all clinic visits by FY '07. There's a parenthetical. I'll read that if you like. But has that recommendation ever been implemented?<br>**A:** My understanding is that has been implemented.<br>**Q:** When was that implemented?<br>**A:** I think we — pro — probably during the last two years. It's not recent. It's a while back.<br>**Q:** And how was it implemented?<br>**A:** Once — once the CBOC hurts — hits a certain number of uniques, it's required that a mental health professional be in that community-based clinic.<br>**Q:** What — what form did the direction take? Is it a — a | | **A:** It —<br>**Q:** — could go look at it?<br>**A:** It — it would be a — a spreadsheet related to CBOCs, size of CBOCs and mental health professional presence and — or lack of presence and — and type of presence, I'm assuming. That's kind of what I recall.<br>**Q:** Okay. Let's look at the next —<br>**A:** I —<br>**Q:** — one.<br>**A:** — probably saw an aggregate report. |

| William F. Feeley<br>April 9, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| memorandum; is it a policy statement; where — where will I find this?<br>**A:** Can't — can't recall how that was — and, in fact, that probably occurred prior to me getting to the — in — into the job I'm in, but — and I don't know whether it came out via e-mail, via memo or what, but we actually are able to mon — monitor that electronically.<br>**Q:** So when — you know today, as a matter of fact, today —<br>**A:** Yes.<br>**Q:** — 85 percent of CBOCs serving more than 1,500 veterans provide on-site contract or telemarketing (sic) health services at or above 10 percent of all clinic visits by FY '05 — well, let's leave out the last part, but — but 85 percent of the CBOCs serving more than 1,500 veterans provide on-site contact (sic) or telemarketing (sic) health services?<br>**A:** Yes, OQP could get that information.<br>**Q:** No, I'm asking is that the case today?<br>**A:** That — that would be my understanding.<br>**Q:** That's your understanding. Do you know if that's the case today?<br>**A:** I don't know if that's the case today. That's my understanding that it's the case.<br>**Q:** And how do you come by that understanding?<br>**A:** Having seen reports, but not any recently.<br>**Q:** You've seen reports that | | |

| William F. Feeley April 9, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| verify this to be — **A:** Yes. **Q:** — correct?  What would — **A:** And — **Q:** — identify — **A:** — I haven't seen one in the last six months.  I mean, I — I believe this is really now the standardization having hit in the organization in a good way. | | |
| **127:19 – 128:6** **Q:** — I'm — I'm a suicidal veteran and I — and I call — and I call the — the — the CBOC and I get an answering machine.  And that answering machine will tell me — **A:** Will coach you what to do. **Q:** Which is to call the medical center? **A:** (Witness nods head.) **Q:** The nearest medical center? **A:** Correct. **Q:** It will give me a phone number of the nearest medical — **A:** Right. | N/A | **128:7-10** **Q:** — center? That medical center may be hours away by — by car; correct? **A:** Could be. |
| **135:7 – 136:8** **Q:** All right.  But tele — let's go back to the tele — telemental health.  I could check into — I could go to the CBOC and I could by — by — by a video conferencing talk to a psychiatrist at a medical center? **A:** Correct. **Q:** Instead of doing a face-to-face? **A:** Correct. **Q:** So I want to understand | Lacks foundation. | **136:9-13** **Q:** Well — well, but — Mr. Feeley, you're — you're the manager of all of the CBOCs. You're the — you're the — you're the place where the buck stops — **A:** Right. |

| William F. Feeley April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| how that works.  I'm a — I'm a veteran who's suicidal. I've arrived at the CBOC at 3:30, all right. Who will I — who am I going to meet with?<br>**A:**  You're probably going to meet with an intake nurse, and after there's an assessment of what that situation is, you may see the doctor.<br>**Q:**  I say I'm suicidal.  I —<br>**A:**  Well —<br>**Q:**  I'm —<br>**A:**  — they're going to move you to whatever they think the right level of intervention is clinically.  Again, you're asking me a clinical question, and I'm in a managerial position.  You're getting a layman's understanding of what will occur, but they're going to — they're going to move you along to get you the care that you need. | | |
| **136:21 – 138:3**<br>You're going to need inpatient care.  So I don't know whether the determination of the clinician at any one of these 800 locations would be to access telemedicine or get you in the ambulance and move you to the nearest inpatient —<br>**Q:**  I got —<br>**A:**  — facility.<br>**Q:**  I got your point.  Let — let's suppose that in my hypothetical I have — I don't say I'm suicidal and there's — there's a question whether I am or not, but I want to talk to somebody.  Will we set up a telemental connection —<br>**A:**  If —<br>**Q:**  — with a — | Lacks foundation. | N/A |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC

sf-2502600

29

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **A:** If —<br>**Q:** — veteran with a — with a medical center?<br>**A:** If that's the right thing to do. And as we go to the question of equivalent, which I feel compelled to come back and address, is that you may not need to talk to a psychiatrist. You may need to talk to a trained mental health professional, all of which have to be credentialed to work for us and have the ability to make these assessments who will determine what the next level of care is going to be.<br>**Q:** And they're at the medical center; correct?<br>**A:** No, they're in the CBOCs if there's more than, I think, a thousand or 1,500 veterans. | | |
| **142:1-20**<br>**Q:** So when I — do I have to have a scheduled appointment for this video conferencing?<br>**A:** If — that's a — if you were a walk-in, the answer of course to that would be no. If that was going to be some type of ongoing treatment intervention because that seemed to be the right thing to do, then you'd probably have a scheduled appointment on both ends so that you could use the equipment. You — you might have an allied health professional at the CBOC with you as you're talking to the psychiatrist at the flagship.<br>**Q:** No, my question is do I have to have an appointment set up in advance for this video conference?<br>**A:** The answer would be if you're a walk-in that wouldn't | N/A | **142:21 – 145:16**<br>**Q:** Well, then how are we going to get somebody at the medical center available spontaneously?<br>**A:** If —<br>**Q:** Is someone just waiting there for the —<br>**A:** Well —<br>**Q:** — the video —<br>**A:** — if — if —<br>**Q:** — call?<br>**A:** — if it's an emergency then we'd have to move things around and accommodate.<br>**Q:** Well, how soon can I — can I get this person at the medical center? Won't it depend on who's there at the other end?<br>**A:** Sure it will.<br>**Q:** But if I walk into the medical center, I'm going to see someone right away? I |

| William F. Feeley April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| be the case and — because you would have to be able to do it spontaneously. | | mean — **A:** No, you're going to wait a few minutes until someone's available there, too. **Q:** So your feeling is — is that telemental video conferencing is equivalent to being able to walk into your medical center? **A:** No, I didn't say that. **Q:** Why isn't it equivalent? **A:** Well, I think it's — it's a different modality. It's not necessarily equivalent. **Q:** Now, you've seen suicide reports involving veterans who are being seen at CBOCs; correct? **A:** Yes. I've seen those issue briefs. **Q:** Have you made any association at all of the suicide reports between veterans who are being seen at CBOCs and suicides? **A:** No. **Q:** I'd like you to turn to page A-11. It says in the — in the fourth box, Immediate VISNs — this is immediate for — for VISNs. Each VISN will — will, doesn't say "should"; will. Does "will" when you see that in a — in a — an initiative or plan, does "will" mean the same as "must" to you or do you think it's — it's discretionary? **A:** I don't think it's discretionary. **Q:** Each VISN will develop a planning initiative to address service gaps in outpatient mental health care identified by the MHSP model. Do you see that? |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC     31

sf-2502600

| William F. Feeley |  |  |
| April 9, 2008 |  |  |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
|  |  | **A:** Yeah.<br>**Q:** What is the MHSP model?<br>**A:** I — I really don't know.<br>**Q:** Further down it says, Each —<br>**A:** That would be a — a question for Katz and Zeiss.<br>**Q:** Not for you, though?<br>**A:** Not for me, no.<br>**Q:** Each team or PTSD specialist or a plan to secure these services — okay. I have to back up.    Each VA facility that currently does not have one — and that's one of these plans — I — I'm going — I'll tell you what I'm going to do. I'm going to have you look at this box —<br>**A:** Okay.<br>**Q:** — and — and then ask you — after you've had a chance to read it, I'm going to ask you a couple of questions.<br>**A:** (Witness reviews document.) Okay. |
| **159:11 – 160:12**<br>**Q:** You mentioned going out to sites. We're going to come back to that, but they've gone out to sites and they're going to see more sites.<br>**A:** Right.<br>**Q:** That was part of monitoring; correct?<br>**A:** That would be part of the monitoring so that if — if —<br>**Q:** Well, I'm — I'm — I — that's part of monitoring?<br>**A:** Correct.<br>**Q:** My question is has there been that kind of monitoring to see that the tracking of veterans with — | Non-responsive. | **160:13 – 161:12**<br>**Q:** I understand that.<br>**A:** Yeah.<br>**Q:** And I'm going — I'm going to ask you more about that when I get to your memo, but I'm asking something different. I'm asking about a system for tracking veterans with risk factors for suicide. Not the 24/7. I understand the 24/7 is directed to that problem.<br>**A:** Right.<br>**Q:** I understand that.<br>**A:** Okay.<br>**Q:** But I'm asking for a method of tracking veterans with risk factors for suicide, |

| William F. Feeley<br>April 9, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **A:** I — I would —<br>**Q:** — risk factors of suicide is going on?<br>**A:** I — I would answer that, that in the site reviews at — that we've done about six and have about eight more planned, I don't have the checklist that's being used by Vincent Kane in — so I do not know if he's looking at the CPRS alerts. I think what I was focusing on in particular is insurance that the 24/7 coverage in the large complexity level 1A hospitals is going on the way I intended to have it go on. | | and I wanted to know — and I want to know what monitoring has been done —<br>**A:** I — I'm not sure —<br>**Q:** — to —<br>**A:** I'm —<br>**Q:** — let —<br>**A:** — sorry.<br>**Q:** — to let you know — not — not that you expect people to do it, not that it's your belief that it's being done, but that it is in fact going on within the system?<br>**A:** None that I'm aware of. |
| **164:16 – 165:5**<br>**Q:** One of the things you've been doing and take — take credit for — I mean, you feel good about — is — is — is the satisfaction reports; am I correct?<br>**A:** I — I think the — the three things I'm most pleased about in the job I'm in is the opportunity to impact quality, access and satisfaction. And when I arrived in February of '06, the wait list was way too large, and I believe nearing 200,000 veterans. Via biweekly reporting and increased accountability, that wait list is down to 48,000 veterans as of April 1st, and I expect it will go to 25,000 by September '08, and the goal, of course, is to eliminate it. | N/A | **165:6-22**<br>**Q:** But — but — one of the ways in which you're gauging how good you're doing in delivering medical services is through satisfaction reports?<br>**A:** Correct.<br>**Q:** And what I'm saying is, you — you have focused on that as a means for gauging how well you're doing, just one? I mean, not — one among many, but it's one?<br>**A:** Correct. One among many.<br>**Q:** And you have recently instituted surprise shopper —<br>**A:** Correct.<br>**Q:** — visits; am I correct?<br>**A:** I will tell you that program is rolling out as we speak with the training going on in the second quarter, January of '08 to — |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **166:2-25**<br>Q:  Now, I want to ask you some questions about these satisfaction reports. Does — does every VISN have satisfaction reports; is it a — is it a requirement throughout every VISN —<br>A:  Yes.<br>Q:  — that they have them?<br>A:  Yes.<br>Q:  Is there a particular format that they must follow?<br>A:  Well, let me — let me share with you so we — we don't get things mixed up here. We actually contract for satisfaction reports by network and facility, so I'm able to get a printout of — on basically a quarterly basis, I believe now, on how facilities are doing and how networks are doing compared to each other.<br>Q:  And these satisfaction reports are both for inpatient —<br>A:  Correct.<br>Q:  — and outpatient?<br>A:  Correct.  And then also we'll segment them out by other categories: medicine, surgery and psychiatry. | | **167:1-7**<br>Q:  Will they separate them out by mental health care server?<br>A:  Yes.<br>Q:  Will they have a further breakdown of patients diagnosed with PTSD?<br>A:  Do not believe we've got a breakdown by diagnosis. |
| **168:5 – 169:7**<br>Q:  Have — is there a segmentation from these people who do the satisfaction reports for you of how patients at CBOCs feel about the services they're getting?<br>A:  I — I think we also get satisfaction reports related to CBOCs.  We get timeliness reports related to access.  We get quality reports related to performance measurements, and we get satisfaction scores | Lacks foundation.<br>Hearsay.<br>Best Evidence, FRE 1002. | **169:8-23**<br>Q:  So if I wanted to know whether patients diagnosed with PTSD or other mental health problems are satisfied with the services they receive at CB — at CBOCs, I will find that in these satisfaction reports —<br>A:  Well —<br>Q:  — that —<br>A:  — let —<br>Q:  — you have contracted for? |

| William F. Feeley April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| as well.<br>**Q:** For CBOCs?<br>**A:** For CBOCs, yes.<br>**Q:** And have you read the satisfaction reports —<br>**A:** Yes —<br>**Q:** — for the —<br>**A:** — I —<br>**Q:** — CBOCs?<br>**A:** — I have.<br>**Q:** And the people seem to be satisfied?<br>**A:** Yes, I would — I would say in the big picture. You're never where you want it to be. It — it's a continuous improvement effort, but I think we're better than the private sector in the big picture, but my goal is to exceed each veteran's expectation. So it's a moving target and we're trying to get better every day. | | **A:** Let me — let me answer that this way. In the CBOCs — I — I'm not positive on this, but I do not believe it's broken out by general medical and psychiatry. It would be lumped in an aggregate report. When you go to the medical center, I think it is broken out by medicine, surgery and psychiatry. |
| **177:25 – 179:6**<br>**Q:** Have you come up with some recurring themes?<br>**A:** I think one of the recurring themes —<br>**Q:** You have come up with them?<br>**A:** I — I — I think some recurring themes is we need to watch out for people who've got guns, and we're — we're actually talking a lot and bringing that up with patients, so that if a patient is at risk and has got guns, we're asking those guns to be given up and get a family member to take those guns. That — that's one — one of the biggest ones that — that I'm seeing, and of course soldiers know how to use guns.<br>**Q:** They have access to —<br>**A:** Yes.<br>**Q:** — guns? Any — any other recurring themes you've | Relevance.<br>Hearsay.<br>Best Evidence, FRE 1002. | N/A |

| William F. Feeley April 9, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| learned — <br> **A:** I — <br> **Q:** — by all your reading of these — of these issue briefs involving suicide? <br> **A:** I — I — I think the lethal combination of alcohol and any of the major diagnosis we've talked about with depression, PTSD and — the — those are risk factors, so that's why we have alcohol screening, depression screening and PTSD screening, trying to early detect and discover when — when someone has got a set of risk factors so we pay more attention to them. | | |
| **197:4 – 197:12** <br> **Q:** So a triggering event was not the publicity and the media — <br> **A:** (Witness shakes head.) <br> **Q:** — correct?    It was not the — you're saying no? <br> **A:** No.  I'm sorry. <br> **Q:** And — and it was not the — the passage of a new statute by Congress? <br> **A:** Not that I'm aware of. | Lacks foundation. | N/A |
| **202:9 – 203:22** <br> **Q:** And when you and Dr. Katz discussed this there was not any imminent problem that you were confronting — <br> **A:** To — <br> **Q:** — that — <br> **A:** — the — <br> **Q:** — suggested — <br> **A:** — best — <br> **Q:** — that suggested you ought to get this out and get it out promptly? <br> **A:** To the best of my knowledge, there was no imminent trigger that caused this to occur. <br> **Q:** There was no Inspector | Hearsay. | N/A |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| General report that was about to come out that prompted this?<br>**A:** Not that I can recall.<br>**Q:** Would the answer be no?<br>**A:** Not that I can recall would be the answer.<br>**Q:** Meaning you don't recall if it — it was or was not?<br>**A:** I do not recall if there was an Inspector General's report.<br>**Q:** Or was it the result of appearing before Congress that caused you to — to do — to do this?<br>**A:** There — as I said, you've given a laundry list of what you think the precipitants were.<br>**Q:** No, I don't think that —<br>**A:** Yes —<br>**Q:** — I —<br>**A:** Yes, you have, and — and I feel I need — I've answered the question by pointing out to you that I knew there was no — knew of no precipitant that caused this to occur other than me trying to improve the care delivery system in partnership with Dr. Katz. | | |
| **210:4-21**<br>**A:** It was a big deal. And what I would say to you, the program related to compliance were the two dimensions that I talked about. That — the — the ability to roll up information electronically was key in the decision on how to calibrate what we would measure. So position recruitment is easy to measure, and so is the 14-day standard, and some other things are much more complicated to measure even with an electronic medical record. For example, an assessment | Non-responsive. | N/A |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| can be done in person, can be done on a telephone or via a telemedicine initiative, and we'd end up spending a vast amount of resources for an auditing function because we couldn't roll that up electronically.  The CPRS alert is another matter that in hindsight I would roll up electronically. | | |
| **211:5-25**<br>**Q:**   Is there a place in — in the manual or somewhere which tells me as a director that when I receive an initiative I must comply with it?  You expect them to comply, but —<br>**A:**   Yeah.<br>**Q:**   — what —<br>**A:**   I will —<br>**Q:**   — is it —<br>**A:**   I will —<br>**Q:**   — that tells —<br>**A:**   — tell you, if you said was there anything in writing, as we go to the executive career field contract, there are eight core competencies that are — are very well articulated, and failure to comply would be a — a failure to meet one of those core — a number of those core competencies.<br>**Q:**   And would be negligence on the part of the director?<br>**A:**   That results in disciplinary action. | Best Evidence, FRE 1002. | N/A |
| **215:2 – 216:3**<br>**Q:**   So — so when you writ — when you wrote and sent this out, "by August 1, '07," in your mind you meant that as a — to — to express a sense of urgency, but you didn't think that a director who didn't comply by August 1, '07 | N/A | **216:4-10**<br>**Q:**   Putting to one side extenuating circumstances —<br>**A:**   Right.<br>**Q:**   — absent that, the directors were to have — where it says, "by August 1, '07," you meant by August 1, '07? |

| William F. Feeley April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| would be in dereliction of their duties — **A:** I would answer — **Q:** — am I correct? **A:** I would answer that this way. There are extenuating circumstances that I'd have to look at in that if — in that — if they were having difficulty recruiting positions, for example, that would be an extenuating circumstances. **Q:** Absent — well — well, there's going to be a lot of lead time for recruiting all the people you were going to need — **A:** That's — **Q:** — wasn't there? **A:** — correct. **Q:** You couldn't hire them all in 60 days, could you? **A:** Some of them were being hired long before that. Keep in mind, the initiative related to recruiting positions was something I was monitoring throughout FY '07. This was — June 1st is eight months into FY '07. | | **A:** Correct. |
| **218:7 – 218:20** **Q:** Or how many of the persons I've identified, whether they were treated by the VA or not, committed suicide? **A:** No. **Q:** Do — **A:** One — **Q:** — you — **A:** — of — **Q:** — know — **A:** One of the things that's very difficult to do is we certainly can track suicides or gestures that occur within our system, but keep in mind, not every veteran uses our system so that — | N/A | **218:21-25** **Q:** They have to enroll — **A:** Correct. **Q:** — (inaudible) or receive or use your service? **A:** Correct. |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **226:23 – 227:6**<br>**Q:** Okay. And this — okay.<br>**A:** And let me just also give a qualifier on the vet center. Although it does not apply to the vet centers, vet centers have an intimate connection with local medical centers so that should a veteran present with a suicidal problem in a vet center, and that does happen, that the local VA is going to assist them in getting the care that they need. | Non-responsive. | N/A |
| **227:12-13**<br>**Q:** If a National Guardsman after being deployed in Iraq comes back and is examined and found to have PTSD, all right, is that information passed down to the Department of Defense by the VA?<br>MR. SCHWARTZ: Objection; relevance. | N/A | **227:14-16**<br>THE WITNESS: I — I don't know the answer to that. I believe HIPAA would prevent that, but I do not know the answer to that. |
| **231:18-20**<br>**A:** How would we know that the patient needed help without the patient letting us know it? | N/A | **231:21-25**<br>**Q:** You want me to answer that question?<br>**A:** I — I don't know how.<br>**Q:** I — I will answer that question.<br>**A:** Okay. |
| **232:24 – 233:15**<br>**Q:** Okay. Go ahead. Go ahead.<br>**A:** Because I think — think there has to be a presentation of a human being, so if your point is we have these screening devices, yes, that's correct. And when those screening devices occur, a clinical person makes a decision on the degree of severity based on those findings.<br>**Q:** Got ya. I got ya.<br>**A:** And that's supposed to occur within a 24-hour period | N/A | **233:16 – 234:2**<br>**Q:** So if I'm presenting at a medical center for a brain injury, there would be a screening for PTSD?<br>**A:** There would be -- for a brain injury there would probably be -- the first assessment would be a traumatic brain injury screening more than likely.<br>**Q:** There is -- PTSD is associated often with -- with brain injury; correct?<br>**A:** I -- I -- I think that you're again asking me a -- a -- what I think is a clinical question |

| William F. Feeley | | |
| April 9, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| of time and a referral based on sense of urgency.<br>**Q:** So it would be presentation or referral?<br>**A:** Right.<br>**Q:** Would that be correct?<br>**A:** Right. | | that's out of my realm. |
| **242:3-16**<br>**Q:** And if I present at — at 3:45 on a Tuesday at the CBOC, will I be — regarding men — mental health care, will I be able to get a telementing service within 24 hours?<br>**A:** I — I don't know the answer to that. I would say depending on the sense of urgency based on that evaluation of the primary care provider and the treatment team people in the CBOC, it could be done that soon. That would be a brokered discussion between the treatment team and the patient, because, remember, if you're presenting in that CBOC when it's opened, you're — that's the primary care provider doing that initial look. | Lacks foundation. | N/A |
| **244:19 – 245:8**<br>**Q:** You don't know if — if none of them did or some of them did?<br>**A:** Let me see if I could go back to an answer I think I gave previously. Wherever there's a point of entry into the VA health care system, there's an obligation to provide care to veterans where they present. So if that CBOC is opened, that doctor's office, and somebody presents with a mental health condition and needs assistance, it's that CBOC staff interacting with the host medical center that | N/A | **244:16-18**<br>**Q:** Do you know how many CBOCs had a 24-hour diagnosis in place before your memo?<br>**A:** Do not know that. |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    41

sf-2502600

| William F. Feeley April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| will get that veteran transportation, ambulance ride, whatever is needed to get inpatient care if required or to contract for that care in the location community. | | |
| **257:13-18** **Q:** I'm asking as of today — **A:** I don't — **Q:** — how many have — have implemented it? **A:** I — I think we've had six to eight site visits with six to eight more scheduled. | Lacks foundation. | N/A |
| **259:21 – 261:14** **A:** Which — imminent, yeah, that's — what — I think the message here is considerable sense of urgency to intervene right away, not — not just suicide, but, for example, if somebody is having an anxiety attack, which feels like a heart attack, they're going to need to get taken care of right away and get appropriate relief or they're going to get into trouble. So this is really an effort to make sure that triaging is going on and we can get people's help immediately when it's required. **Q:** It would include people who are suicidal? **A:** Sure would, yeah. **Q:** You had that in mind? **A:** Yep. **Q:** Now, what was — what sort of monitoring has been done by you or — or others at your direction to see to it that this initiative set out in 1 — in 1(b) has been followed? **A:** I — I think as — as I've answered before, there are two | Non-responsive. | N/A |

| William F. Feeley<br>April 9, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| metrics we chose.<br>**Q:** So, have I — I have those two written down.<br>**A:** Right.<br>**Q:** So — so, the 14 —<br>**A:** Those —<br>**Q:** — day —<br>**A:** Those are what we elected to do as our best way of ensuring that access was to occur. Item number (b) is a restatement of what any clinically, well-trained, responsible person would do in — in this situation. If somebody presents with a heart attack, there's — there's a standard protocol you follow in the emergency room. So, again, we're not monitoring on a case-by-case basis with a metric how that's being played out. It's pointing out an expectation that sense of urgency be given to these serious mental health conditions so that the same sense of urgency we see in the medical area is applied to the mental health area. | | |
| **266:25 – 267:4**<br>**A:** That's —<br>**Q:** — let's —<br>**A:** — a standard of care that you would have in any hospital in any community, in any doctor's office. | Lacks foundation.<br>Non-responsive. | N/A |
| **304:1-17**<br>**Q:** Okay.<br>**A:** I would find it bewildering that — because who knows how — who answered the survey? I would find it bewildering that a patient presents with any type — type of psychiatric problem in primary care that is emergent and urgent and can't | N/A | **303:7-20**<br>**Q:** Take —<br>**A:** Whether —<br>**Q:** — your —<br>**A:** — I —<br>**Q:** — time.<br>**A:** — agree or disagree is putting words in my mouth.<br>**Q:** Take your time.<br>**A:** (Witness reviews document.) Now, would you |

43

sf-2502600

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| get immediate care either through the inpatient psychiatry unit, mental health unit or the emergency room at the facility.<br>**Q:** If this were true, this would be<br>  a — really — a big, systemic —<br>**A:** I —<br>**Q:** Hold —<br>**A:** I —<br>**Q:** — on.<br>**A:** I would view that as — | | like to try asking that question again?<br>MR. GOLDMAN: Sure. I'm going to have the reporter read it back to you.<br>THE WITNESS: Okay. |
| **315:13 – 317:4**<br>**Q:** Now, I want to ask you some questions about the — who qualifies for a suicide prevention coordinator. There — there, I believe, is testimony or at least I was told — well, let me ask the question. Did you anticipate when that was put in place, the suicide prevention coordinator — it's a very important post; correct? Is it — I just want to establish, it's an important —<br>**A:** Yes.<br>**Q:** — post? Did you contemplate these would be new positions or they would be filled from within?<br>**A:** We have an open-merit promotion in the system so that we certainly would post a position like that and want to get the best person for the job. I believe — I could be wrong on this — that depending on what the professional discipline of the suicide prevention coordinator was, it could have been a promotion for some people as well. So I had no preconceived notion of whether there — they're new positions, but anyone could apply for them who is eligible | Lacks foundation. | N/A |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| to and met the criteria.<br>**Q:** So, the reason I'm asking is I — I want to ask if this would be so, that a psychologist who is in a medical center could apply and get the job?<br>**A:** I don't know whether when it was announced it was targeted for a particular discipline. I just don't know.<br>**Q:** Well —<br>**A:** But it would seem to me that it would be opened to the mental health professional standard, at least in my view, but I just don't know whether it was targeted for social workers or —<br>**Q:** All right.<br>**A:** — specific disciplines. | | |
| **321:7 – 323:21**<br>**Q:** How did you understand that the schedulers were getting that wrong?<br>**A:** I — I don't know if the schedulers were getting it wrong.<br>**Q:** Well, how did you understand the OIG was saying the schedulers were getting it wrong?<br>**A:** I — I think what the OIG did was use an auditing function to evaluate waits and delays, and our position was there was some confusion on that approach. Clearly there was human error with the scheduling, and we worked hard to try to improve that with a certification program and cutting down the number of people that do scheduling so — and, so — to get more control over it, but the biggest concern we had was patient-preference scheduling. As I described to you in discussing | Hearsay.<br>Best Evidence, FRE 1002. | **323:22 – 324:1**<br>**Q:** Well, if the truth is somewhere in between, then what they've got here is not the truth?<br>**A:** Well, that's correct. I would — I would agree with that**.** |

| William F. Feeley | | |
| April 9, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| some of the IG reports that are in the mental health area, that a patient can be asked to come back within a week and could go out to the clerk and say, I'm going to be in Florida.  I — I — I'd like to come back in five weeks, and there's nothing that rules out, from a — a — a safety perspective, them doing that.  The scheduler is supposed to make an entry into the database, and our experience is that was not happening in busy clinics.  So — so that patient-preference scheduling we felt tipped the — the methodology used in the IG auditing accounting process in a direction that led to less than accurate information.<br>**Q:**  Could this be another place where you feel the OIG got it wrong?<br>**A:**  I — I would say — I — I want to make sure I come through clear.  Their audit, I think, probably gave them the correct results, but I don't believe it actually reflected what the performance was, and that's where the methodology — their position would be, if there wasn't an entry in the field indicating it was a patient preference to change the appointment, it would be viewed as a failure.  Our position was that I — we understood that busy clinics could end up having a clerk not doing that since a — a clerk is a multi-tasker.  There also has been another waits and delays study done in VISN 3 most recently, within I'm saying the past four to six weeks, where the number was | | |

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| found to be 89 percent of patients seen within 30 days that were new patients and 86 percent established patients, and so that's 13 and 11 points higher than the IG finding only six or seven months later. So this — the truth is somewhere in between, and I think there's human error in the process. As we try and triangulate what — what the actual facts are in marrying patient satisfaction scores with our access numbers biweekly and improve train — training and scheduling, hopefully we're just going to get better and better at doing this. But I wouldn't go as far as to say the IG got it all wrong. | | |
| **348:12 – 349:13**<br>**Q:** Well, a peer — a peer to peer is — is important as part of this hotline; correct?<br>**A:** The — the hotline is manned by professionals —<br>**Q:** Okay.<br>**A:** — so it's — it's not a good Samaritan kind of design, which you will see in many communities, but it's actually manned by nurses, doctors and — pardon me, nurses, psychologists and social workers.<br>**Q:** And these rescues, what is meant by a rescue?<br>**A:** I think the — a couple of examples I can think of is a call comes in with a distraught human being is on a bridge threatening to take his or her life. We were able to maintain that person on the cell phone, begin to get them to talk and decompress a bit, help them to reveal where they're at and get the police there and intervene, | Hearsay. | N/A |

| William F. Feeley | | |
| April 9, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| get them into care and admitted to the medical center.<br>**Q:** In other words the high likelihood of saving a life?<br>**A:** Absolutely, and —<br>**Q:** Now, I want to come —<br>**A:** — I think that — that's happened. | | |
| **397:23 – 398:12**<br>**Q:** Did it have any effect on what you did?<br>**A:** I would tell you it goes to the statements I've been making all along today and very clearly; that I've been a mental health advocate for 30 years in my career. Be — it started as a unique opportunity to come into this job and do that starting 2/10 — any time — '06. Any time we have an opportunity to overcome misperceptions, we want to do that, and that's why the memo of 6/1 and the numerous other strategies related to improving access have a goal of not only preventing suicide, but improving the care delivery for the many mental health conditions that veterans suffer from. | N/A | **397:10-22**<br>**Q:** Well, there's a study by a Mr. Rathbun — Mr. Rathbun referred to in the CBS study; are you familiar with that?<br>**A:** No.<br>**Q:** Well, I — I'm — I'm trying to get some clarification of what impact, if any, the CBS report had on how you conducted management of — of — of mental health care facilities.<br>**A:** I don't —<br>**Q:** Did it have —<br>**A:** I —<br>**Q:** — any —<br>**A:** — would — |
| **406:6-18**<br>THE WITNESS: I don't recall that particular feature of the bill. I do recall the young man's name that led to the bill being talked about, and — and, again, wanted to go back and restate that it's my understanding that 24/7 care has been the patent in the VA and the VA's obligation by history, whether it's at a medical center or a CBOC. If you present at the CBOC during open hours, that we have an obligation to provide that care if — if someone | N/A | **405:16 – 406:5**<br>**Q:** Now, we don't have a copy in front of us of the House version, but do you recall being aware by the time you wrote your June 1 memo that there was a bill that had been passed by the House —<br>**A:** I mean —<br>**Q:** — that — that — that dealt with the subject of — of making mental care available to veterans on a 24-hour basis?<br>MR. GOLDMAN: I'm going to ask the reporter to read that back to you and see if you can answer that yes or no, or if you |

sf-2502600

| William F. Feeley<br>April 9, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| needs inpatient or outpatient care, and if we can't do it on one of our sites, to contract for it. | | can't, then tell me.  (The record was read as requested.) |
| **416:4-9**<br>**Q:**  And you also testified that part of a VISN  director's performance evaluation is implementing VA policy?<br>**A:**  Correct.<br>MR. GOLDMAN:  I'm going to object to the question as leading. | Leading. | N/A |

| Bradley Mayes<br>April 7, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **179:17 – 180:12**<br>**A:**  — and I'm talking about on the policy side of the house —<br>**Q:**  Okay.<br>**A:**  — now, operationally, I know they're very focused on this, because it is affecting their average, both locally and nationally.  I mean, usually there's something going on here, though, in these individual cases that precludes it be — from being moved forward to the next case.  And I — I would just say, too, you know, this — the appeal population, generally, we're looking at — you know, out of the 800 and some thousand rating decisions that were made, we're — we're talking about, what, 12 percent where veterans aren't satisfied and they file a Notice of Disagreement.  Maybe 5 | Non-responsive. | **180:13-15**<br>MR. ERSPAMER:  Okay.  I — I — I<br>move to strike the latter part of the — of that answer as nonresponsive. |

| Bradley Mayes<br>April 7, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| percent where they — after they receive the statement of the case, they say, you know, I'm going to move forward here. | | |
| **345:19 – 347:13**<br>MR. WILTSIE:  Page 311.<br>MR. ERSPAMER:  Yeah, I — I see it now.<br>THE WITNESS:  So I would expect that the number of NODs filed might increase commensurately.  But, as a matter of fact, it's — as a relationship to the increase in the number of claims decided, it's actually come down a little bit, which one could conclude veterans are more satisfied with their decisions today than they were three years ago.<br>MR. ERSPAMER:  I — I move to strike the latter part as nonresponsive.<br>BY MR. ERSPAMER:<br>**Q:**   What — what effect has the Appeals Management Center had on the volume of work for the Compensation and Pension Service and the BVA?  I'll start with the Compensation and Pension Service.<br>**A:**   Well, you said yourself, we don't get involved in the deciding of claims or appeals, so for us, the AMC deciding appeals doesn't really have an impact on C&P Service.<br>**Q:**   Does — doesn't the AMC also have a role in remands?<br>**A:**   Well, yes; yes, they do.<br>**Q:**   And doesn't — doesn't the work done by the AMC result in less work for the Regional Offices on a remand?<br>**A:**   Yes, that's the intent of having the Appeal | Non-responsive. | N/A |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    50

sf-2502600

| Bradley Mayes<br>April 7, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| Management Center.<br>**Q:** Okay. And so gradual — gradually the — the — the remand work has been taken over by the Appeals Management Center as opposed to the — the Regional Offices with respect to remands?<br>**A:** Yes, that's the intent, is to keep those remands at the AMC.<br>**Q:** Okay. Are there still appeals teams in Regional Offices?<br>**A:** I'm not sure if we're still doing that or not. Again, that's an operations issue. I — I know we were. When I was a director in Cleveland, we actually were helping the AMC back in 2005. | | |
| **349:1-21**<br>**A:** No, I didn't say that.<br>**Q:** Oh.<br>**A:** You said that. I — I — I didn't say that.<br>**Q:** Oh, I — I — I thought you did, okay.<br>**A:** No.<br>**Q:** Let — let me back up, then. When the — when the — the – the appellant takes no further action with respect to a — a Notice of Disagreement after receiving the statement of case, his time runs eventually, right?<br>**A:** It could be that he understands the rationale for the decision and is satisfied —<br>**Q:** Okay.<br>**A:** — I mean, we're — we're speculating.<br>MR. ERSPAMER: Okay. I — I — I — I move to strike the answer as nonresponsive. | Non-responsive. | N/A |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    51

sf-2502600

| | | |
|---|---|---|
| Frances Murphy, M.D.<br>April 7, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **57:12 – 58:19**<br>**Q:** And can you give me something<br>general, though, I mean, a — a general idea of — of what kinds of — of activities have not been continued or where there has not been any — much activity or improvement, as you sit here today?<br>**A:** No, I — I think — according to my knowledge, and it is limited, and it is all second- and third-hand information based on informal conversations, I think that many or most of the activities that I'm aware of related to the Mental Health Strategic Plan have moved forward in one form or another. The content of those programs and the specific progress that has been made, I couldn't tell you. It's just a general impression.<br>**Q:** General impression, okay. Can you — can you — can you at least identify the areas in which — in which you have a general impression that there's been some movement?<br>**A:** Yes, I think that since that time — since 2006, VHA has continued to increase mental health staffing in com — community-based outpatient clinics. They have made some efforts to improve the access to substance abuse care and PTSD care. They're making efforts to enhance training on PTSD evidence-based treatments and therapies for VA staff through the National Center for PTSD. You know, this is a — a very large document, and I'm — | Hearsay. | N/A |

| Frances Murphy, M.D.<br>April 7, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **110:10-20**<br>**Q:**  Did you ever say to Ham — did Hamerschlag ever tell you why your contract was being — was being — was — was not being renewed and your office was being — was being abolished?<br>**A:**  They didn't feel the office — you know, there were no specific statements.  I think that they felt that — there was a general statement that they felt that the office functions could be handled by other existing VHA offices. | N/A | **110:21 – 111:15**<br>**Q:**  Who said that; Hamerschlag or Perlin or both?<br>**A:**  Dr. Perlin.<br>**Q:**  Did you ask him any questions about your performance or, you know, anything like that?<br>**A:**  You know, there was no need to ask questions about my performance.  I had gotten a performance evaluation in December, six weeks to eight weeks before that, that was outstanding.  I had gotten a bonus.  I had been — I had gotten awards from not only VA organizations but also external organizations.  My performance was outstanding and was recognized not only inside VA but in — outside the VA as well.  I was —<br>**Q:**  So —<br>**A:**  I was a recognized leader in these —<br>**Q:**  So why do —<br>**A:**  — program areas. |
| **110:10-20**<br>**Q:**  Did you ever say to Ham — did Hamerschlag ever tell you why your contract was being — was being — was — was not being renewed and your office was being — was being abolished?<br>**A:**  They didn't feel the office — you know, there were no specific statements.  I think that they felt that — there was a general statement that they felt that the office functions could be handled by other existing VHA offices. | N/A | **112:2 – 115:13**<br>**Q:**  Did you discuss with anyone else   the fact that your contract and your position had been terminated, cancelled?<br>THE WITNESS:  Do I need to answer those questions on my thoughts?<br>BY MR. HOFFINGER:<br>**Q:**  Well, I'm asking if you had any conversations with anybody.<br>**A:**  Yes.<br>**Q:**  Who did you have conversations with?<br>**A:**  With my office staff.<br>**Q:**   And -- and generally what did you say to them and what did they say to you about — |

| Frances Murphy, M.D. April 7, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| | | about — about this — this — this development? **A:** Those conversations were two years ago. Let me try to summarize the main points. That our work was important. **Q:** Uh-huh. **A:** That we were enhancing the health care of veterans. That it was unfair that the office was being closed. That we were concerned that some of the programs would not be carried forward, and that some of the reason was because of our work in mental health. **Q:** Could you explain the last point? — Well, you know, it — it — I think that VHA was very pleased the with Mental Health Strategic Plan. They were never happy about Secretary Principi establishing a Mental Health Task Force, and I think that there was some negative feelings on the part of the under secretary, which he expressed — **Q:** Who? **A:** — not only — Dr. Jonathan Perlin and then Dr. Michael Kussman about some of the activities related to the Mental Health Task Force recommendations and the fact — and Secretary Principi pushing them to implement them. **Q:** Why do you think that they were not happy with -- with Principi and, I assume, the people like you working under him in this mental health project, that area? MR. SCHWARTZ: Objection; calls for speculation. |

| Frances Murphy, M.D.<br>April 7, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| | | THE WITNESS: I worked for Dr. Perlin.<br>BY MR. HOFFINGER:<br>**Q**: Let me do it differently. You say you had this discussion with your -- with your staff. What did you or your staff say about why the under secretary, Dr. Perlin, and his successor, Dr. Kussman, were not happy with the work of — of Dr. Principi in this — or, excuse me, secretary -- Under Secretary Principi in this area?<br>**A**: You know —<br>**Q**: I — I know this is difficult, and I'm — I'm not going to -- I'm not going to dwell on it. I just — we just — it's — it's important to the client in this case. It's important for us to just get, you know, information on the record. I'm not -- this is not directed at you in any way, shape or form, and I'll try to move along, but I -- I need to understand what the thinking was.<br>**A**: And I'm trying to recall a conversation that occurred more than two years ago.<br>**Q**: I understand.<br>**A**: I — I believe that at the time we simply recounted the fact that when I was asked to chair the Mental Health Task Force, I – I had informed Secretary Principi that I believed it would cause some problems with my supervisor, the Under Secretary for Health; that, you know, it was difficult for me to work inside the organization and to produce a report that pointed out some deficiencies. And I think that's as far as the |

Frances Murphy, M.D.
April 7, 2008

| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| --- | --- | --- |
| | | conversation went at the time — in February of 2006 when this occurred. **Q:** And -- and -- and when you said problems with your supervisor, you're talking about Dr. Perlin? **A:** Yes |
| **110:10-20** **Q:** Did you ever say to Ham — did Hamerschlag ever tell you why your contract was being — was being — was — was not being renewed and your office was being — was being abolished? **A:** They didn't feel the office — you know, there were no specific statements. I think that they felt that — there was a general statement that they felt that the office functions could be handled by other existing VHA offices. | N/A | **116:5-18** **Q:** Okay. So — and — and, in fact, you felt at the time that you were — that you were being — your job was being terminated in part because there must have been some displeasure about some of the things — some of the criticisms — or some of — withdrawn — some of the deficiencies that you identified; is that fair? **A:** I think my — you're asking me about my feelings, and my feelings at the time were that the work that we were doing was not appreciated. THE COURT REPORTER: Was not what? THE WITNESS: "Not appreciated." |
| **146:22 – 149:2** Q Did you show this statement to anybody before? **A:** It's — it's routine process to give a copy of the statement to the under secretary's office before you make any public appearances, so this was given to the Chief of Staff. **Q:** Who was the Chief of Staff at the time? **A:** Art Hamerschlag. **Q:** And he was the Chief of Staff for — with Dr. Perlin? **A:** The under secretary for health — | N/A | **149:3 – 150:4** **Q:** Did you discuss this statement with anyone at the VA before you gave it? **A:** Not before I gave it. **Q:** Okay. After you gave it — **A:** Yes. **Q:** — what discussions did you have? **A:** I don't remember the timing. It was several months — several weeks after I appeared before the Campaign for Mental Health Reform. This particular sentence was picked up in a press release by Senator Patty Murray. |

| Frances Murphy, M.D.<br>April 7, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **Q:** Okay. Do you remember — do you remember when you gave it to him?<br>**A:** It was, you know, on the day that I completed the — the drafts and sent it off to the Campaign for Mental Health Reform, so it would have been the week before —<br>**Q:** March 29 —<br>**A:** — March 29.<br>**Q:** — 2006?<br>**A:** Yes, I believe —<br>**Q:** And —<br>**A:** — that's correct.<br>**Q:** — did —<br>**A:** Again, it's been —<br>**Q:** To the best —<br>**A:** — a long —<br>**Q:** — of your recollection?<br>**A:** (Witness nods head.)<br>**Q:** But you're certain that — that one way or the other you gave a copy of at least a draft of the statement to the secretary's office?<br>**A:** The under —<br>**Q:** Excuse me, the under secretary's —<br>**A:** The —<br>**Q:** — office?<br>**A:** — under secretary's office.<br>**Q:** Thank you.<br>    Did — did — after you gave a copy of your statement to the under secretary's office, did either the under secretary or anybody on his staff or anyone else come back to you?<br>**A:** No.<br>**Q:** Did you ever receive any editing — editing suggestions for this report —<br>**A:** No.<br>**Q:** — for this statement? Did anyone ever tell you that |  | **Q:** For — for the record, when you say, "this particular sentence," could you read it to us just for the record (inaudible)?<br>**A:** And I believe it's — it's the one that says, In some communities, VA clinics do not provide mental health or substance abuse care or waiting — care or waiting lists render that care virtually inaccessible.<br>**Q:** If you throw a comma in there, you<br>   and I would not — would not — that was —<br>**A:** I know.<br>**Q:** — stumble over it. That's what counts, though —<br>**A:** It's my bad writing.<br>**Q:** Okay.<br>**A:** I have only myself to blame. |

sf-2502600

| Frances Murphy, M.D. April 7, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| there were certain things in this statement that you couldn't say or that were untrue or anything like that? **A:** No. | | |
| **303:25 – 304:17** **A:** No. The answer to your question is yes, that it was about some communities, and I think if you read the full statement that I made, there are many positive points that I made about the VA medical system. The specific comments about access to care was based on some poor wait time for performance in some communities around the country. **Q:** Do you believe that those statements that you made in that March 29th statement are currently relevant? MR. HOFFINGER: I'm going to — well, I'm going to object. You're asking for an opinion. But go ahead. You can answer. THE WITNESS: I don't have comparable data to base a statement of improvement. The specific information that we had was how many veterans were waiting longer | N/A | **304:18-24** than 90 days or longer than 120 days, and there were still a significant number of veterans that were waiting that long. Some of the charts that you've shown me have shown an improvement in wait times, but they list a 30-day standard and they don't show how many are still waiting longer periods of time. |

| Marcus Nemuth, M.D. March 25, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiff's Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **53:1 – 53:15** **Q:** So when you said that disability claims are 18 months backlogged, you felt comfortable, you had no doubts about the accuracy of | N/A | **53:16 – 54:2** **Q:** And you thought that these particular sources were reliable; yes? **A:** Reliable. But we've known things about breast |

| Marcus Nemuth, M.D. March 25, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiff's Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| the studies that you used to base that statement on? **A:** Well, I had no doubts that they were stated in those studies. Again, I don't do disability claims, I don't — I have almost no interface with them. I do know that in the newspapers people say it was — I'm not getting treated, or it is tough for me to manage my disability claim. But it is not the newspapers that really make a whole lot of difference to me, because it is the, as I said, scientifically generated studies that have been written by very credible individuals. And I think that they are as close as they can get to telling the truth. I think that's the way they operate. | | cancer that now all of a sudden we find are completely wrong and we've changed our approach to treatment of that illness. I think these authors are writing as well as one can write at this time with this level of knowledge that one has. **Q:** Have you in the year since you made that statement found any reason to doubt the reliability of the articles published by these authors? **A:** Well, I have — I have not |
| **64:10 – 64:19** **Q:** And at the registration desk for the emergency department, the person there is a nurse? **A:** There are several people there. One is a nurse, and several are — perform the same function as the new patient registration individual. They log the person in and start their paperwork moving through the ER process. The nurse who is now located in the ER lobby itself is there to determine who needs to be fast-tracked. In other words, somebody who doesn't — and we just need to take them back into the ER now. | N/A | **64:20-23** **Q:** But there is no such nurse at the new patient registration desk outside the ER where Iraq veterans are pointed to? **A:** No |
| **84:15 – 85:5** **Q:** Well, one of the things that you previously testified you said was that you were there in your individual capacity; correct? **A:** You bet I did. | N/A | **80:3 – 82:2** **Q:** Dr. Nemuth, if I could turn your attention to what we marked during the break as Plaintiffs' 1, a CD containing the speech that you gave at the Seattle Rotary Club. And I |

| Marcus Nemuth, M.D. | | |
| March 25, 2008 | | |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiff's Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **Q:** And you said this despite the fact that you had written permission from VA counsel and you had cleared your speech with a PR person at VA? <br> **A:** To be technical regarding the PR person, I wrote her an e-mail regarding the presentation. She was out of town, didn't get the e-mail till she got back. But when she did receive it said, "Thanks very much, and particularly thank you for the article in the PI op-ed." But I had our counsel's permission, and I had spoken to my supervisor, Bob Barnes, and gotten their okay. But that doesn't mean that I'm speaking for the VA. I took annual leave that day. | | ask that he we watch the end of Mr. Endicott's introduction and the beginning of your speech. <br> **A:** I think the person who really gave the introduction was Randy Ravelle. <br> **Q:** Excuse me. <br> **A:** It's all right. <br> **Q:** My mistake? <br> **A:** It's okay. So I have to see how stumbling I was once again. <br> **Q:** Doctor, I should mention we're not going to play you the whole speech, we wanted to authenticate this is, in fact, the speech we were referring to earlier. <br> **A:** My wife said I wasn't there to be a rock star, I was just there to give the information. It made me feel a lot better. (CD Transcription: MR. RAVELLE: Fellow participants and guests, get ready for an emotional roller coaster. I believe his remarks will educate, energize, shock and inspire you. You will also be ashamed of how our government has been treating or neglecting veterans who are crippled physically and mentally, while risking their lives for our country. Dr. Nemuth. Thank you. DR. NEMUTH: Thank you Randy Ravelle, that was beautifully said. Thank you Dave Endicott for helping me get here to speak. It is a real privilege to be talking with you all today. I have become emersed and passionate about our — about our troops in Iraq and our returning Iraq Freedom veterans. This has always been in my     heart, |

| Marcus Nemuth, M.D.<br>March 25, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiff's Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| | | but I'm now seeing —)<br>MS. BRICKMAN:  We can stop the tape here.<br>**Q:**  Dr. Nemuth, the first person we saw speak on that tape, that is Randy Ravelle, the person who introduced you; is it not?<br>**A:**  Yes.<br>**Q:**  And the second person that we saw on the tape is you; correct?<br>**A:**  Correct.<br>**Q:**  And the statements you made in the course of the speech are the statements that we were referring to earlier; correct?<br>**A:**  Yes. |

| Robert Rosenheck, M.D.<br>April 11, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **40:19 – 41:15**<br>**A:**  My understanding of — although I don't know the data — is that many more veterans are getting service connected proportionally, and that, I think, is an asset, can relieve stress.  Vastly more veterans are coming to the VA than ever before, which I — they have an accessibility.  So when I first started studying this in 1987, there was a survey of veterans, I think the statistic was 20 percent of all veterans had ever used the VA in their lifetime.  So this is 1987, 15 years after Vietnam, 30 years, whatever, after World War II, only 20 percent had used the | Lacks foundation.<br>Non-responsive. | N/A |

| Robert Rosenheck, M.D. April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| VA.  We're still in the middle of the war, and my understanding is it's about 20 percent of — or more of OIF veterans have used the VA already.  So it just speaks to a vastly more open system.  Veterans have far more access to services.  They're — they're meeting doctors who know what PTSD is. | | |
| **55:4 – 56:3** **A:**  And if you're confused, all of this is being reorganized.  Because there were – the domiciliary programs were in the extended care part of VA, and other programs were in mental health.  And this has all been consolidated, and I'm — we're involved in creating a new evaluation for this integrated mental health residential rehabilitation treatment program.  So all of these programs are, you know, being put under a common administrative ease — egis with common standards.  And while the PTSD programs primarily — you know, we'll — we'll treat overwhelmingly PTSD, all the programs will be available for, you know, home — homeless veterans with PTSD, if they're veterans with substance abuse and PTSD – so this whole array of residential programs.  And this is just a much more — it's just a much better system from — clinically, total apart from efficiencies.  I don't know if the aggregate — it saves all that much money, because we just have so much more capacity, but I — I haven't done that calculation. | Non-responsive. | N/A |

| Robert Rosenheck, M.D. April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **122:6 – 122:22** **A:** The VA was — you know, as I said, there had been funding, there had been expansions, there's the whole what was called RVOEC program. It is now being called Mental Health SeRV or something like that. So a great deal was doing what was going on. But to be able to see the — the — the — as — as — what — what I really say here is not we've discovered a problem, but it shows the scope of challenge, the magnitude of the challenge. And I think that was what was really useful. I — I — what — they didn't – no one needed me to say we need to expand the PTSD programs. Now that we have evidence that PCT is effective, we need to train people in it. You know, you didn't need me to say that. | Lacks foundation. Non-responsive. | N/A |
| **138:16 – 140:12** **A:** I for — so the national — the — I — as I've heard the story; this is secondhand — the Special Committee has come up with the — had been proposing that there be a national training connectedness issue. So the — part of the is- — issue is — is — so let me just tell you what happened. And Dr. Katz is very enthusiastic about it, chant — charged the National Center for PTSD with organizing it. We had a conference in San Antonio last week which was the kickoff of the whole process. Day one, each VISN has two PTSD mentors who are going to be responsible in some way for keeping track of — of | Non-responsive. Hearsay. | N/A |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC     63

sf-2502600

| Robert Rosenheck, M.D. April 11, 2008 | | |
| --- | --- | --- |
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| speaking up for the treatment of PTSD in their VISNs. And those mentors had a meeting to orient them to their task, and then we had a big meeting of the mentors and some of their mentees — there were 10 from each VISN. It's a very large meeting of 300 people or 400 people — and, basically, was saying, you know, this is an effort to get as good guidance information, advocacy out there for the PTSD programs. It was not completely defined at the outset what anybody would do, because all localities are different. But I was — I don't know if I was the keynote speaker or the – I was the second speaker. They have a first speaker after the leadership, and I basically said — made the exact point you're making. Look, here are these numbers. I don't know if they're bad or good. You know, some places see more veterans who are service connected, some see fewer. Some see more veterans who have been treated before, some see fewer. But these are the kinds of things that — that you will be looking at. And we're going to have the — there's a Web site and we're going to be highlighting these data on the Web site. And, you know, then, the idea is you will meet with your VISN directors and your mental health leadership to draw their attention to things about which you have concern in — in — at least to start with, in our data and in other processes. | | |

| Robert Rosenheck, M.D.<br>April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **162:15 – 163:14**<br>Q: Oh, people can diagnose themselves?<br>A: I would say given the — given the state of the world and what I regard the contribution of the Vietnam veterans to our society, I would bet the vast majority of patients come and say I think I might have PTSD. I — I don't have that as a fact, but everybody — this is part of the American culture. It's like saying I have a headache. People know — it's in the newspapers. People know about it. In the old days — I remember the early years, in the '80s, when you would ask a veteran, has this ever happened? And them say, How did you know that? Does this ever happen? How did you know that? You say, well, this is something we understand now. But the — that — I don't think that era is with us. I mean, the — the soldiers are all getting screen — they're getting screened before they leave the military, they're getting instructions and it's in the culture. If you read the newspaper — if you read the right-hand column of the New York Times, it's got articles about PTSD on a regular basis. | Lacks foundation.<br>Speculation. | N/A |
| **173:18 – 174:8**<br>Q: What's NVVRS data?<br>A: The National Vietnam Veterans Readjustment Study.<br>Q: Okay.<br>A: — and we looked at predictors of suicide. And — of suicidality, suicidal ideation. And I know — I just | Lacks foundation. | N/A |

| Robert Rosenheck, M.D.<br>April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| — I'd have to look at the — it was — it — it was not a robust PTSD is the cause of suicide. It was not a very — you know, there may not have even been a direct relationship.  It was a structural equation model in which you looked at multiple factors.  So I would say that the illness that is most strongly related to suicide is depression, bipolar disorder. | | |
| **210:3 – 211:1**<br>**Q:**  Okay.  I'd like to turn back to Exhibit, I believe it's 446, the time trends and predictors of suicide study.  If we can look at Page 121, right above Discussion, the last sentence there, where you wrote, An adverse effect was found in association with the number of mental health outpatients; that is, at facilities with larger mental health programs as measured in thousands of patients, there was a slightly greater risk for suicide than smaller programs.  Why is that?<br>**A:**  I — I certainly don't know.  The word "effect" is probably too strong inasmuch as it's a statistical effect, but it's not – it could be misled as — as suggesting a causal relationship.  It was an association.  One could imagine that, in larger facilities, a patient feels, you know, less oriented, less — less friendly, but I don't think we found any difference, any associationship between the continuity of care measures and suicide, so that would kind of contradict that. | Lacks foundation. | N/A |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    66

sf-2502600

| Robert Rosenheck, M.D. April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **218:18 – 219:8**<br>**Q:** So nothing's binding unless then Undersecretary adopts it?<br>**A:** You know, that — that's probably a matter of administrative procedure or law that I wouldn't — I wouldn't know.<br>**Q:** But just in your general experience at NEPEC and — and in the VA, your 30 years in the VA, if there's a recommendation, in your experience, it has to be adopted by one of the higher-ups in order to have some enforcement?<br>**A:** I — I guess. Again, it's a recommendation from — certainly a recommendation from the Undersecretary's Special Committee on Serious Mental Illness, those are recommendations to the Undersecretary which he decides to take them or leave them. | Lacks foundation. | N/A |
| **285:18 – 286:17**<br>**Q:** Okay. So let's look at the next page.<br>**A:** It wouldn't change the fact that, for the bulk of the issue, it's — it's — it's not about referrals, it's about service delivery to veterans using advanced technology as, you know, recommended — you know, that whole section we were talking about in the — in this report was about, you know, let's not try to solve last century's problems, let's try to solve this century's problem with this century's technology.<br>MS. MOSER: Move to strike; no question pending.<br>BY MS. MOSER: | Non-responsive. | N/A |

| Robert Rosenheck, M.D.<br>April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **Q:** Okay. Page —<br>MR. SCHWARTZ: Object — I'll object to that, that it was responsive to the question then —<br>MS. MOSER: There was no question pending.<br>MR. SCHWARTZ: — and it was a continuation of the answer.<br>MS. MOSER: He answered my question. | | |
| **336:8 – 337:8**<br>**A:** Actually, my understanding is VA is having a real impact on the market for mental health professionals. We're hiring —<br>**Q:** How is that?<br>**A:** — so many people.<br>**Q:** Are all the positions filled? Do you know?<br>**A:** Oh, vast numbers of them. It's a huge — you know, whether it's 3800 that have been — it's a huge —<br>**Q:** But do you know how many are unfilled?<br>**A:** I don't know offhand, but the —<br>**Q:** You just know how many are filled?<br>**A:** No, no, I don't know — that — I just — I don't want to give you misinformation. That's closely monitored. Dr. Katz could tell you that. You know, they monitor that very closely, and it — it's astonishingly high. But I'm saying VA has been hiring so many mental health professionals because of this that, you know, it's sort — it's sort of palpable in the mental health economy that it's hard for anyone else to hire mental health professionals, and people are leaving other clinics | Lacks foundation | N/A |

sf-2502600

| Robert Rosenheck, M.D. April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| to come to the VA. | | |
| **358:14 – 359:11**<br>**Q:**  You were saying about the — the projection.  What was the conclusion, that the VHA has the capacity to treat all the veterans?<br>**A:**  I don't think that was what — I don't think that's what we were asked, to judge whether we have the capacity.  We were asked to project what the numbers would be.  But by my — since you asked me my understanding, it would be about 2.5 times 1400, which would be about 4200.  So I suppose, on that arithmetic, adding 4200 to 900,000 mental health patients and to — I'd have to look at my figures — 300 — oh, 390,000 PTSD patients at a time when funds are still going out for PTSD, and there will be more in 2009 —<br>**Q:**  So there's plenty of money for PTSD treatment?<br>**A:**  That, I can't say.  I'm just saying given the question you asked me, if I go through the numbers, I end up with a — 4200 new cases. And I can't tell you how much money is flowing, but as you read in my paper, VA put out $100 million last year, so — | Lacks foundation | N/A |
| **362:3 – 365:5**<br>**Q:**  What's the biggest administrative challenge in delivering timely mental health care to veterans for PTSD?<br>**A:**  Okay.  So that's a — I — I just want to underline the radicalness of the change in the question.  That's a little bit like saying, okay, before antibiotics, what's the biggest | Non-responsive. | N/A |

| Robert Rosenheck, M.D. April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| thing you could do for people with tuberculosis. Well, if they went to Arizona, the air was a little better than it was in New York, and maybe that had an effect. But what really made a difference was when you had antibiotics. And so in the absence of a, you know, truly definitive medical technology, you know, the administrative issues are doing our best to assure people are trained in effective psychotherapies or psychotherapies that are more effective than the standard of care. And again, I think a crucial thing is the — you know, that people are – are received by a clinician who's understanding and caring. And one of things that I think is so important about the — the specialized programs and the VA is that there's no other healthcare system where people know that they're there to serve the survivors of war. And there's no other — and the — the — well, I — I was there when we started to talk to people about what happened to them in Vietnam, and it was frightening. I remember when we — we developed a questionnaire and we went — tested it on Vietnam veteran, we asked them, well, did you commit atrocities? Did you kill any children? Did you do this? Did you do that? And then — you know, this was the first time we'd done this. And we said — after he said — he answered all the questions. And afterwards, we said, well, did you find that upsetting to be asked those questions? | | |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC    70

sf-2502600

| Robert Rosenheck, M.D. April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| And he said, no. I — I've been living with this for 20 years, but you seem pretty upset asking them, Doc. And, of course, he was totally right that I was terrified of asking about these things. So the thing about the specialized treatment for PTSD is that the clinicians know about this stuff. They're not at — the first time I had a veteran walk into my office and — who had been involved in killing a number of children, and I said something trying to be supportive about, you know, it was war, you were doing what you were told to do. And he said — I don't think he was trying to give me a hard time. He just naturally looked over at a picture of my kids and said, how old are your kids? And the message was, you know, what if it had been your kids, not some, you know, kids in Vietnam. And so you learn to expect those, you know, the — the — the — there's a wonderful paper called When the Patient Reports Atrocities, and the — the punchline of it is in order to understand someone who is reporting atrocities, you have to recognize that you, yourself, could — could have committed those. So that's — you know, that's the — that is the capacity to treat PTSD that the VA has. It has clinicians — not just the numbers, but the numbers are important, but people who have been there who have decided that they wanted to work with people who have been through these experiences and have | | |

| Robert Rosenheck, M.D. April 11, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| developed ways of absorbing and listening to horrific activities by people who feel terrible about their involvement with it. | | |
| **371:6 – 12** **Q:** And why did that happen? **A:** I can't say for sure. There are two possibilities. One is that due to the funds sent out from Central Office, there were increased numbers of staff, and the other would be that the staff were working harder and seeing people more often. | Lacks foundation | |

| Diana Rubens April 4, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **122:20 – 123:1** **Q:** Does Anchorage get any credit as the receiving station for its work on the claim? **A:** I think my problem is I'm not understanding where you — where you think the credit is going to. Do we — do we keep track of, Anchorage, you rated 50 extra cases? Absolutely. | N/A | **123:2-15** **Q:** Well, who gets credit — what — who — what do you mean when you say credit is going somewhere? Where is the credit going? **A:** When an end product is established by Albuquerque, it is established within the system that Albuquerque has received this claim from this veteran. And, so, for VBA's count, our inventory, it lives in Albuquerque. That end product, when it is completed by the folks up in Anchorage, shows as an Albuquerque completed claim. The brokering is where we are counting Albuquerque sent 50, Anchorage finished 50, so that Anchorage is acknowledged for having worked those 50. |

Pls.' Resp. to Defs.' Depo. Designation Obj. and Counter-Designations — Case No. C-07-3758-SC     72

sf-2502600

| Diana Rubens April 4, 2008 | | |
|---|---|---|
| Defendants' Counter-Designation to Which Plaintiffs Object | Plaintiffs' Objection to Defendants' Counter-Designation | Plaintiffs' Counter-Designation |
| **213:12 – 214:3** **Q:** Does this mean that a list of claims for potential STAR review that has claims on there where a regional office has prematurely taken credit for that claim, those claims will be removed from STAR review; is that right? **A:** This would qualify a case to be deselected from the STAR quality review. The station, if they have prematurely cleared that end product and have now established a no-credit end product to complete that with and actually have completed that work, can send that in for review. We're just trying not to slow down the decision for the veteran, and, so, when that case falls into that category of qualifies to be deselected, it is not necessarily always deselected. | N/A | **214:4-25** **Q:** So if I understand you correctly, what you're saying is, if a case is determined to fall into this category five, the regional office may complete the rating decision there, and then it gets looped back into the STAR review; is that right? **A:** Oh, that this were more simple. Number five is — sort of got two parts to it, so that end product was prematurely cleared. That cleared end product is what put it on to the list for the STAR review staff to potentially select as part of their random selection process in that particular case. When they send that list out, if it is reviewed and it's determined that we recognized we inappropriately, prematurely cleared that end product and we have made the final decision under a no-credit end product, it can still go. If that claim has not been finalized, we will deselect it so that we can finish processing that veteran's claim and provide him a decision. |

1

Dated: April 21, 2008

2

GORDON P. ERSPAMER
ARTURO J. GONZALEZ

3

HEATHER A. MOSER
RYAN G. HASSANEIN
STACEY M. SPRENKEL

4

MORRISON & FOERSTER LLP

5

6

By: /s/ Heather A. Moser

7

Heather A. Moser/HMoser@mofo.com

8

Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28