JUDITH Z. GOLD (State Bar No. 97098)
JEFFREY A. FINUCANE (State Bar No. 244930)
DEREK KNERR (State Bar No. 252746)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268
E-mail: judith.gold@hellerehrman.com

Attorneys for *Amicus Curiae*
Swords to Plowshares and Vietnam Veterans of America, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| VETERANS FOR COMMON SENSE, a District of Columbia Nonprofit Organization; and VETERANS UNITED FOR TRUTH, INC., a California Nonprofit Organization, representing their members and a class of all veterans similarly situated,<br><br>                        Plaintiffs,<br><br>    v.<br><br>JAMES B. PEAKE, M.D.,Secretary of Department of Veterans Affairs; et al.,<br><br>                        Defendants. | Case No.: C 07-3758 SC<br><br>**JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA** |

Heller
Ehrman LLP

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 1

II.    DISCUSSION ................................................................................................. 1

   A.    Three Essentially Undisputed Facts Alone Reveal That Defendants'
         Adjudicatory And Health Care Delivery Systems Are Dysfunctional ..................... 1

   B.    Absent This Court's Intervention, There Is No Reason To Believe That
         The Situation Will Improve .......................................................................... 2

   C.    Defendants' Excuses For The Extraordinary Delays In The
         Adjudicatory Process Do Not Pass Logical Or Legal Muster ............................. 6

   D.    The Human And Societal Costs Of Providing Inadequate Or No Care
         To Veterans With Mental Health Injuries Far Exceed The Cost Of
         Meeting Our Obligations To These Veterans ................................................ 11

         1.    The Human Suffering And Economic Toll Caused By The
               Current Situation Is Unacceptably High ............................................ 11

         2.    The Cost Of Repairing Defendants' Systems Would Be Far
               Less Than The Cost Of Not Doing So ................................................ 14

         3.    Defendants Have Received Billions More than They Have
               Asked For To Address These Issues .................................................. 16

   E.    There Are Feasible Remedies For Ensuring That Defendants Comply
         With Their Constitutional Obligations ........................................................ 16

         1.    Courts Have The Power And Duty To Fashion Remedies For
               Constitutional Violations ................................................................ 17

         2.    The Court Can And Should Enter A Declaratory Judgment ..................... 18

         3.    The Court Can And Should Issue A General Order Requiring
               Defendants To Meet Broadly Defined Goals And Possibly
               Requiring Defendants (Or The Parties Jointly) To Propose A
               Specific Repair Plan ...................................................................... 19

         4.    Many Simple, Specific Remedies Well Within This Court's
               Competence Would Begin The Process Of Repair ................................. 20

         5.    If The Court Wishes To Have Assistance, It Is Readily
               Available; The Court Can Appoint A Master, Monitoring
               Panel, Or Similar Delegate .............................................................. 21

III.   CONCLUSION .............................................................................................. 24

Heller
Ehrman LLP

# TABLE OF AUTHORITIES

## Cases

*Barnett v. Bowen,*
  794 F.2d 17 (2d Cir. 1986)..................................................................................18

*Brown v. Board of Educ.,*
  349 U.S. 294 (1955)..........................................................................................17

*Brown v. Board of Educ.,*
  347 U.S. 483 (1954)..........................................................................................17

*Center for Biological Diversity v. Norton,*
  304 F. Supp. 2d 1174 (D. Ariz., 2003)..............................................................20

*Cupolo v. BART,*
  5 F. Supp. 2d 1078 (N.D. Cal. 1997) .................................................................3

*Demore v. Kim,*
  538 U.S. 510 (2003) ..........................................................................................17

*Gates v. Collier,*
  501 F.2d 1291 (5th Cir. 1974).....................................................................22, 23

*Goldberg v. Kelley,*
  397 U.S. 254 (1970)..........................................................................................19

*Hart v. Community School Board,*
  383 F. Supp. 699 (E.D.N.Y. 1974)..............................................................22, 23

*Henrietta v. Guiliani,*
  No. 95 CV 0641 (SJ) 2001 WL 1602114 (E.D.N.Y. Dec. 11, 2001) ................20

*Hutto v. Finney,*
  437 U.S. 678 (1978)..........................................................................................17

*In re Peterson,*
  253 U.S. 300 (1920)..........................................................................................21

*John B. v. Menke,*
  176 F. Supp. 2d 786 (M.D. Tenn. 2001) ......................................................21, 23

*Johnson v. Robison,*
  415 U.S. 361 (1974)..........................................................................................17

*Joseph A. v. New Mexico Dep't of Human Svcs.,*
  69 F.3d 1081 (10th Cir. 1995).....................................................................22, 23

*Kidneigh v. Unum Provident Ins. Co.,*
  345 F.3d 1182 (10th Cir. 2003) ........................................................................10

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.,*
  726 F. Supp. 1544 (E.D. Ark. 1989) .................................................................23

Heller
Ehrman LLP

JOINT AMICUS BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

*Martin v. Mabus,*
  700 F. Supp. 327 (S.D. Miss. 1998).................................................................22, 23

*Mathews v. Eldridge,*
  424 U.S. 319 (1976)........................................................................................16

*Milliken v. Bradley (II),*
  433 U.S. 267 (1977)....................................................................................17, 23

*Morgan v. Kerrigan,*
  530 F.2d 401 (1st Cir. 1976).............................................................................23

*Nat'l Org. for the Reform of Marijuana Laws (NORML) v. Mullen,*
  112 F.R.D. 120 (N.D. Cal. 1986)........................................................................23

*Perez v. Boston Housing Authority,*
  400 N.E. 2d 1231 (Mass. 1980).....................................................................22, 23

*Puerto Rican Legal Defense & Educ. Fund, Inc. v. Gantt,*
  796 F. Supp. 681 (E.D.N.Y. 1992)......................................................................23

*Richardson v. GAB Business Servs., Inc.,*
  161 Cal. App. 3d 519 (1984)..............................................................................10

*Ruiz v. Estelle,*
  503 F. Supp. 1265 (S.D. Tex. 1980)................................................................22, 23

*Salling v. Bowen,*
  641 F. Supp. 1046 (W.D. Va. 1986)....................................................................17

*Serrano v. Priest,*
  18 Cal. 3d 728 (1976).....................................................................................19

*Serrano v. Priest,*
  20 Cal. 3d 25 (1977).......................................................................................19

*Serrano v. Priest,*
  5 Cal. 3d 584 (1971).......................................................................................19

*Solis v. Schweiker,*
  719 F.2d 301 (9th Cir. 1983).............................................................................19

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
  306 F. Supp. 1299 (W.D.N.C. 1969)....................................................................23

*United States v. Board of Sch. Comm'rs,*
  503 F.2d 68 (7th Cir. 1974)..............................................................................23

*United States v. Suquamish Indian Tribe,*
  901 F.2d 772 (9th Cir. 1990).............................................................................21

*United States v. W.T. Grant Co.,*
  345 U.S. 629 (1953)..........................................................................................3

Heller
Ehrman LLP

*Webster v. Doe,*
    486 U.S. 592 (1988) .......................................................................................................... 17

*White v. Matthews,*
    434 F. Supp. 1252 (D. Conn. 1976) ................................................................................ 18

*Wyatt v. Stickney,*
    344 F. Supp. 373 (M.D. Ala. 1972) ................................................................................ 23

**Federal Statutes**

5 U.S.C.
    § 555(B) ............................................................................................................................ 18
    § 706(1) ............................................................................................................................ 18

28 U.S.C.
    § 1651(a) .......................................................................................................................... 21

38 U.S.C.
    § 7105 ................................................................................................................................ 4
    § 1154 (b) .......................................................................................................................... 7

42 U.S.C.
    § 1997 *et seq* .................................................................................................................. 18

**State Statutes**

Cal. Code Civ. Proc.
    § 583.310 .......................................................................................................................... 10
    § 583.360 .......................................................................................................................... 10
    § 583.420(a)(2)(B) ............................................................................................................ 10

Cal. Ins. Code
    § 790.03 (4) ...................................................................................................................... 10

Cal. Lab. Code
    § 5313 ................................................................................................................................ 10
    § 5402(b) .......................................................................................................................... 10
    § 5402(c) .......................................................................................................................... 10

Cal. Const, Article VI, § 19 ................................................................................................ 10

**Rules**

Fed. R. Civ. P. 53 ............................................................................................................ 2, 21

**Federal Register**

70 Fed. Register 43590 (July 27, 2005) .......................................................................... 11

71 Fed. Register 16424-01 (March 31, 2006) ................................................................ 11

73 Fed. Register 20571-79 (April 16, 2008) .................................................................... 3

JOINT AMICUS BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

# Regulations

38 C.F.R.
§ 3.304(f) ...........................................................................................................7
§ 4.25...................................................................................................................9
§ 20.1304............................................................................................................9
§ 20.1304(c)........................................................................................................9
§ 20.203(b)(2).....................................................................................................3
§ 20.302(a)..........................................................................................................4
§ 20.302(c)..........................................................................................................4

# Other Authorities

Coffin, *The Frontier of Remedies: A Call for Exploration,* 67 Calif. L. Rev. 983 (1979) ...................18

Kirp and Babcock, *Judge and Company: Court-Appointed Masters, School Desegregation, and Institutional Reform,* 32 Ala. L. Rev. 313 (1981)..........................................................................21

Montgomery, *Force and Will: An Exploration of The Use of Special Masters to Implement Judicial Decrees,* 52 U.Colo.L.Rev.105 (1980)...................................................................................21, 22

Nathan, *Use of Masters In Institutional Reform Litigation,* 10 U. Tol. L. Rev. 419 (1979) ...............21

Johnson, *The Role of the Federal Courts in Institutional Litigation*, 32 Ala. L. Rev. 271 (1981) .......18

Heller
Ehrman LLP

JOINT AMICUS BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

## I.     INTRODUCTION

Swords to Plowshares ("Swords"), and Vietnam Veterans of America, Inc. ("VVA"), who file this joint brief as *amicus curiae* because of their vital interest in the outcome of this case, urge the Court to take decisive action to address what has become an emergency.  They urge the Court to reject defendants' attempt to persuade it that no judicial action is necessary, based on the speculation that because defendants hope, in the future, to improve, the situation will, in fact, improve appreciably.  The *evidence*, based on years of experience, and voluminous empirical data and statistics -- a history of failed "initiatives," untested strategic plans, untried task force recommendations, and a brand-new, yet-to-be-implemented "pilot project" -- tells us that the promises, hopes, and goals of the Department of Veterans Affairs ("VA"), regarding veterans with mental illness, have come to naught again and again, with tragic consequences.  Change must be made *now*, pursuant to Court order.

## II.     DISCUSSION

### A.     Three Essentially Undisputed Facts Alone Reveal That Defendants' Adjudicatory And Health Care Delivery Systems Are Dysfunctional

The facts of this case are not extraordinarily complex.  Three simple, shocking, and essentially undisputed facts beg for attention.

First, inexcusably, *hundreds of thousands of veterans with service-connected injuries must wait for unreasonable periods of time, commonly three, five, or even more years for their claims for compensation and other benefits to be resolved.*  Claims are subject to grossly unreasonable delays at every step of the adjudication process.

Second, *a backlog of 650,000 unresolved claims for benefits is choking the VA's adjudicatory system.*  Hundreds of thousands of veterans with Post Traumatic Stress Disorder ("PTSD"), and/or traumatic brain injuries and/or major depression arising from their service, veterans who are disabled, often indigent, and often even homeless, are thus being subjected to further incalculable suffering, now inflicted upon them by the VA, as they wait in limbo for the defendants to act.  It is predictable that over 700,000 more claims will be filed over the next ten years by injured veterans returning from Afghanistan, Iraq, and other combat locations.

Heller
Ehrman LLP

1

1   Third, the defendants' health care delivery system is so dysfunctional that among our five

2   million veterans, *at least 126 veterans per week -- eighteen veterans per day -- commit suicide, and*

3   *about 1000 veterans per month attempt it.*

4   These three essentially undisputed facts alone reveal dysfunction of constitutional magnitude.

5   The thousands of potentially preventable suicides and suicide attempts, tragic in themselves, are also

6   a barometer of the pervasive, although less visible, human suffering that is being caused by the

7   defendants' policies.  This epidemic tells us that hundreds of thousands of men and women, who may

8   never attempt suicide, are nevertheless living with severe pain and suffering connected to their service

9   to our nation, and with critical mental health care needs that are going unmet.  This has already led to

10  further, ever-worsening epidemics of homelessness, family breakdown and a myriad of other societal

11  problems, the costs of which are being borne not just by financially strapped families, but by local

12  and state taxpayers and not-for-profit entities like the *amici*, who cannot possibly meet the

13  overwhelming need.  The actions and inactions leading to this situation are morally unacceptable,

14  fiscally irresponsible, and constitutionally prohibited.

15  **B.    Absent This Court's Intervention, There Is No Reason To Believe That The**
16  **Situation Will Improve**

17  While imposing deadlines on claimants for virtually every step in the claims process, current

18  regulations impose no time limits on the defendants at all.  As a result veterans, trapped in a backlog

19  of over 650,000 unresolved claims, must wait years and years for their claims to be resolved.  For

20  claims denied in their initial stages and appealed, claimants must wait for an average of five to seven

21  years, and often far longer, for their eligibility for benefits to be determined.  This does not honor our

22  nation's veterans -- and it is not due process.

23  Defendants do not argue that such a situation is acceptable.  Their primary "defense"

24  regarding the nearly complete breakdown of their adjudicatory systems is a vow to do better, later,

25  and to do their utmost to shorten claim processing times "if it's at all possible." *See* Testimony of

26  James Terry, Chairman of the Board of Veterans' Appeals, Trial Transcript at 607:2-607:15.  But a

27  vague promise to "try" is merely speculation, not evidence.  The Supreme Court has affirmed that

28  courts have power to grant injunctive relief even when the evidence actually demonstrates a complete

Heller
Ehrman LLP

2

1    *discontinuance* of the illegal conduct. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

2    Thus, even if the Court concluded that defendants here were highly likely imminently to accomplish

3    sweeping systemic changes -- which clearly is not true -- injunctive relief would be appropriate. *See*

4    *also Cupolo v. BART*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (granting injunctive relief despite

5    defendants' showing of actually implemented repair initiatives to comply with Americans with

6    Disabilities Act).  Given their record of failed programs and plans, to avoid judicial intervention at

7    this point defendants must now show, at the minimum, that they have (1) *actually* implemented

8    (2) *specific* changes (3) that have been *monitored and evaluated* based upon verifiable data

9    (4) establishing that the changes are *effective* to obviate the constitutional problem, and (5) that there

10   is an assurance that these changes will stay in place.

11          Defendants, of course, have not shown that any significant repair has been put in place, much

12   less tested by experience.  The one "reform" to which they point that has actually been implemented

13   is their Suicide Prevention Hotline, which is demonstrably ineffective.  Testimony of Ronald Maris,

14   Trial Transcript at 282:18-283:13.  The only other specific repair effort that is purportedly (but not

15   actually) underway is a notice of proposed rulemaking, described by defendants as "so new that we

16   haven't even put it in our trial briefs."  *See* April 21, 2008 Trial Transcript at p. 78:14-15.  This

17   proposed rule, published on April 16, 2008, relates to a *proposed* "pilot project," not to anything that

18   has been tested for its effectiveness.  Even that pilot project, if adopted, will not cover most claimants.

19   It will cover only veterans with representation, and only in four regional offices.  *See* Board of

20   Veterans' Appeals: Expedited Claims Adjudication Initiative – Pilot Program, 73 Fed. Reg. 20571-

21   20579 (April 16, 2008).

22          As to this proposal, defendants represented to the Court that for "certain claimants," the VA

23   had a plan to "expedite" claims if the veteran agreed not to take the full times currently allowed for

24   actions by the claimant.  The published rule, however, does not require the VA to "expedite" claims.

25   It commits the VA to very little.  But it would require the claimant to adhere to new and shorter time

26   limits for *eight* different actions to be taken while the claim is being adjudicated in the Regional

27   Office:  60 days instead of a year from the date of the mailing of the notification to submit additional

28   evidence (38 C.F.R. § 20.203(b)(2)); 60 days instead of a year for filing a Notice of Disagreement

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

1   with the Regional Office decision (38 U.S.C. §7105; 38 C.F.R. §20.302(a)); 30 days instead of 60 (or

2   the remainder of the one-year period for filing a notice of disagreement) for filing a Substantive

3   Appeal (38 C.F.R. §20.302(c)), etc.  In return for all of this, the VA Regional Office would merely

4   certify an appeal, and transfer records to the Board of Veterans Appeals ("BVA"), "within 30 days of

5   the receipt of the Substantive Appeal, or within 30 days of receipt of any additional submissions . . .

6   but no later than 60 days from the receipt of the Substantive Appeal." (Appendix hereto at Tab A.)

7   The proposal would also require the BVA to "screen" cases, and return a case with an inadequate

8   record to the Regional Office immediately (instead of waiting for its docket number to come up, as is

9   done now).  This might slightly speed the resolution of cases returned for an inadequate record, but

10  would not affect a case that did have a sufficient record.  Apart from that, none of the VA's

11  concessions to participants in the pilot project would apply to any BVA (as opposed to Regional

12  Office) actions, or affect the astonishing 1419-day average time now taken by BVA to resolve

13  appeals.

14      Although we applaud any effort by the defendants to improve the situation, it is not obvious

15  why a claimant should give up any of his rights simply to obtain a small concession that the VA will

16  do what it is already legally and morally obligated to do.  Every appeal should be certified, and the

17  record transferred to the BVA, within 30 days.  Moreover, since this pilot project has yet to be

18  implemented, there are no data or other evidence that speeding up the certification of appeals will

19  significantly shorten claimants' average 1419-day waiting time for resolution of their appeals, nor any

20  basis to speculate that this limited "pilot project" would significantly reduce the claims backlog.

21  Defendants have not even explained what part of the current delay is attributable to the two simple

22  acts by the VA that, within the confines of the "pilot project," the VA would "expedite."

23      And we cannot take such matters on faith.  Despite what may be good intentions, the VA's

24  track record for meeting its "goals" and fulfilling its hopes and plans is not encouraging.  For

25  example, James Terry, Chairman of the Board of Veterans' Appeals, testified that when he arrived at

26  the BVA in April 2005, the "goal" for appeals resolution time (from the filing of a substantive appeal

27  to final resolution by the BVA) was 500 days, but the actual average time was reportedly 599 days.

28  Trial Transcript, 562:19-563:3.  The following year, instead of striving to meet that quite lax goal, the

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

1   BVA simply moved the goal post: the new "goal" was 600 days.  Plaintiffs' Trial Exhibit ("Pls. Tr.

2   Ex.") 378.  When that new and even less ambitious goal also was not met (the actual average time in

3   2006 was reportedly 658 days), the VA again adopted a new "goal."  As of now, the goal is 700 days,

4   with the actual average time for appeal resolution, as of February 2008, reported to be 671 days -- less

5   than the new, revised, hardly aspirational "goal," but 171 days *more* (nearly 35% more) than the 2005

6   "goal" of 500.  *See* Pls. Tr. Ex. 413.  And in fact, excluding the claims that never reach the BVA

7   (because the veteran either agrees with an earlier decision or simply gives up), the actual average time

8   that veterans must wait to receive a final decision by the BVA, after filing a Notice of Disagreement

9   with a Regional Office decision, is an astonishing 1419 days.  Pls. Tr. Ex. 1323.

10      The VA's own October 2001 Claims Processing Task Force Report to the Secretary of the VA

11  owns up to this history of false hopes for improvement:

12      Over the last few years, VBA has developed many initiatives in the belief that these
        initiatives would produce a better capacity to adjudicate claims. . . .[T]he Task Force
13      believes that VBA Central Office decisions regarding choices about how to improve the
        processing of claims has exacerbated the claims backlog crisis.  VBA has also created
14      many problems through poor or incomplete planning and uneven execution of claims
        processing improvement projects.  VBA Central Office choices have essentially served to
15      reduce the availability of skilled labor for processing claims, while diverting experienced
        staff to implement unproven process changes that were poorly planned or managed.
16

17  Pls. Tr. Ex. 374.  Despite the Task Force's recommendations (few of which were ever carried out),

18  what it even then called a "backlog crisis" of 533,000 has now grown to over 650,000.  Thus the 2001

19  Task Force Report was yet another ultimately unproductive exercise in self-criticism.  The trial

20  evidence also shows without any doubt that almost none of the recommendations in defendants' May

21  10, 2007 Mental Health Plan for Suicide Prevention were carried out, and that *none* of its stated goals

22  have been met.  *See* Testimony of Dr. Ronald Maris, Trial Transcript at 277:20-22; 280:11-13.  In

23  light of this history, it is predictable that if the Court stayed its hand based on defendants' good

24  intentions, it would have tragic consequences.

25      Furthermore, defendants' promises of unspecified "improvement" simply do not take realistic

26  account of the future.  Without the Court's intervention, the current claims backlog can only increase,

27  as hundreds of thousands of veterans return from Iraq and Afghanistan with disabling injuries, and

28  join the 650,000 veterans who are already waiting for their claims to be resolved.  The most

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

conservative projections contemplate that at least 700,000 additional claims will be filed by veterans

of the combat in Iraq and Afghanistan. At year-end 2007, 751,000 of the 1.6 million soldiers

deployed to Iraq and Afghanistan had returned, and 224,000 (less than one third) had applied for

benefits. Many thousands of veterans who have already returned, and thousands of those still

deployed, will file claims in the future. If claim rates merely equal the rate among Gulf War veterans

(which is 45%), the number of new claims over the next ten years will be more than 700,000, with

about 60,000 to almost 75,000 expected new claims in any one year. And this is a conservative

projection, because actual rates of PTSD are much higher than in the Gulf War. Stiglitz, Joseph E.

and Bilmes, Linda J., *The Three Trillion Dollar War: The True Cost of the Iraq Conflict* at 78-79

(Norton, 2008).

　　　　With nearly 700,000 claims already choking defendants' adjudicatory process, these new

claims cannot possibly be handled under the current system. Even if the pilot project mentioned

above (defendants' only specific proposal) were implemented system-wide, it clearly could not make

a significant impact on the problem. We are facing an emergency, and the Court cannot rely on

defendants' vague promises to "improve."

## C.　Defendants' Excuses For The Extraordinary Delays In The Adjudicatory Process Do Not Pass Logical Or Legal Muster

None of defendants' excuses for this unacceptable situation are persuasive.

　　　　First, in a classic blame-the-victim argument, defendants suggest that the periods allowed for

veterans to take certain steps during the adjudicatory process are substantially responsible for the

problem. Claimants have the right to reasonable periods of time to accomplish the steps they must

take during the claims process (as much as 60 days to seek review of certain actions, and a year to

seek review of the initial decision by the Regional Office). But the average time from Notice of

Disagreement with the Board's initial decision to the final resolution of a claim is 1419 days -- 3.88

years. (This excludes the additional 189 days it takes from the date the claim is filed to the initial

decision by the Regional Office.) In fact, there is no evidence that the average veteran uses all the

time allotted for any step in the adjudicatory process, nor any evidence about how much of the

astonishing 1419 day average appeal resolution time is actually attributable to the average veteran.

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

1  Nor is there any evidence that it has made the slightest difference to the total processing time if a

2  veteran does his or her part quickly.

3         Second, defendants have suggested that the need to determine a connection between a

4  claimant's injury and his or her military service justifies the VA's extraordinary claim processing

5  time.  This is a self-created problem.  Despite medical opinion, and the commonsense understanding,

6  that being in combat might alone constitute sufficient stress to result in long-term PTSD in many

7  individuals, that is not enough for the VA.  The VA requires a claimant to prove a specific service-

8  related "stressor," and it is not enough if a claimant -- an honorably discharged veteran, presenting no

9  reason to doubt his or her word -- describes the "stressor" under penalty of perjury.  The VA also

10  requires corroborating evidence, and now claims that the purported need to gather such evidence

11  causes the years-long delay in resolving the average claim.  These requirements insult and demean the

12  sacrifices that these veterans have made for their country, and they contradict clear statutory law and

13  regulations.  Title 38 U.S.C. §1154 (b) states:

14     In the case of any veteran who engaged in combat with the enemy in active service . . .
       the Secretary shall accept as sufficient proof of service-connection of any disease or
15     injury alleged to have been incurred in or aggravated by such service satisfactory lay or
       other evidence . . . if consistent with the circumstances, conditions, or hardships of such
16     service, *notwithstanding the fact that there is no official record of such incurrence or
       aggravation in such service, and, to that end, shall resolve every reasonable doubt in
17     favor of the veteran.*  (Emphasis added).

18      In addition, 38 C.F.R. § 3.304(f) provides:

19     If the evidence establishes that the veteran engaged in combat with the enemy and the
       claimed stressor is related to that combat, *in the absence of clear and convincing evidence
20     to the contrary*, and provided that the claimed stressor is consistent with the
       circumstances, conditions, or hardships of the veteran's service, the veteran's lay
21     testimony alone may establish the occurrence of the claimed in-service stressor.
       (Emphasis added).

22

23  Absent "clear and convincing evidence to the contrary," the law thus only requires "credible,'

24  satisfactory lay or other evidence" of an in-service stressor that is "consistent with the circumstances .

25  . . of the veteran's service."  Notwithstanding this plain language, for PTSD claims the VA requires

26  (1) medical evidence of the condition; (2) credible supporting evidence that a claimed in-service

27  stressor occurred; and (3) a link, established by medical evidence, between the diagnosis and the in-

28

7

service stressor. VA Office of General Counsel Opinion ("GCO") 12-99 reads in part:

> In order to determine whether the VA is required to accept a particular veteran's 'satisfactory lay or other evidence' as sufficient proof of service connection, an initial determination must be made as to whether the veteran 'engaged in combat with the enemy.' That determination is not governed by the specific evidentiary standards and procedures in section 1154(b). . . . (Appendix, Tab B at §1.)

GCO 12-99 requires veterans to establish by official military records or decorations that they "personally participated in events constituting an actual fight or encounter with a military foe or hostile unit or instrumentality." *Id*. The VA also has promulgated internal instructions requiring

> evidence that specifically documents the veteran's personal participation in the event [or] evidence that indicates the veteran served in the immediate area and at the particular time in which the stressful event is alleged to have occurred, and supports the description of the event. M21-1MR, Part IV, Subpart ii, 1.D.13, at p. 1-D-5. (Appendix, Tab C.)

The VA has effectively read "satisfactory lay or other evidence" out of the law, forcing combat veterans to provide evidence that may not exist, or wait for years for the VA to locate it.

Even if the requirements regarding proof of a specific "stressor" were appropriate and lawful, defendants have produced no evidence explaining why these self-imposed requirements should add any significant claim processing time at all. To document the stressor, the VA contracts with the Joint Service Records Review Center ("JSRRC"). Trial Transcript at 953:9-954:1. According to Michael Walcoff, the VA's Deputy Undersecretary for Benefits, it takes only 20 to 30 days to get the records from the JSRRC once the VA requests them. Mr. Walcoff testified that the oldest unfulfilled request currently at the JSRRC, is from March 28, 2008. *Id*. at 956:4-14. Especially in this era of instantaneous communication by fax, email, and telephone, and electronic databases and other records, there is no apparent reason why that simple step cannot usually be accomplished quickly -- at least once a claim file's number finally comes up and it is taken "off the shelf." (Even in massive commercial litigation involving multi-national corporations, with warehouses full of documents throughout the United States, litigants are generally required to respond to discovery requests in thirty days.) This cannot be the real cause of years of delay. Clearly, the real problem is the logjam choking defendants' adjudicatory system, causing claims to sit in limbo for years before they finally get to the front of the line, and someone at the VA finally sends the email or makes the phone call that is necessary to move the case forward.

Heller
Ehrman LLP

8

Third, defendants argue that the need to determine the degree or percentage of a claimant's disability justifies years of delay. This simply cannot be. Once a service connected disability has been established, the process is very straightforward. The rating activity (formerly known as the rating board) need only evaluate the veteran's medical records and other relevant evidence, and refer to the Schedule for Rating Disabilities contained in 38 C.F.R. Part 4 to determine the rating of disability on a scale of 0 to 100. As with defendants' other excuses, the problem is that claims are terribly backlogged, and as a result it takes months or years for anyone to get to a claim and perform this essentially mechanical process.

Fourth, defendants argue that the fact that claims sometimes involve multiple medical issues justifies the extraordinary delays in its processing of claims. There is no logical basis for this assertion. If, for example, a claimant has both psychiatric and orthopedic injuries, there is no reason why these cannot be evaluated simultaneously, by different doctors if necessary, and no reason why the VA cannot also simultaneously review the reports or other evidence relating to these injuries under its formulaic system described above. A detailed schedule for applying this system to a combination of injuries is provided in the "Combined Rating Table" at 38 C.F.R. §4.25, which provides a formula for determining the aggregate level of disability. Even in a case where it is not possible to get a medical evaluation of both injuries promptly -- although defendants have not explained why that would be so -- it would not be appropriate for defendants to force the veteran to wait for years and years before receiving any help. Instead, the VA should immediately assign a disability percentage to whichever injury it evaluates first, and at least begin to pay partial benefits on that basis. This "multiple issues" excuse is implausible. As with the requirement to verify a "stressor," the problem is the backlog; because of it, a claim sits "on the shelf" for years and years before any meaningful attention is paid to it.

Finally, defendants have argued that the real reason why they take years to decide claims is that if a veteran offers new evidence -- the likelihood of which, of course, is increased if his claim sits indefinitely with BVA -- the case *must* be remanded to the Regional Office and the claimant must start all over again. 38 C.F.R. § 20.1304. In fact, regulations specifically permit this requirement to be waived by the claimant. 38 C.F.R. § 20.1304(c). Defendants have offered no evidence as to how

Heller
Ehrman LLP

9

1  often such a waiver in fact occurs, and thus no evidence that would permit the Court to evaluate the

2  extent to which remands for new evidence are causing the claims resolution logjam.  (If these

3  remands are a substantial cause, defendants could simply adopt a procedure to clearly notify

4  claimants of the right to waive remand, and the likely delays inherent in not doing so.)

5          The salient fact is that veterans with service-connected injuries must wait for five, six, seven,

6  or even more years for resolution of a claim.  No other adjudication process comes to mind that even

7  approaches this time frame.  A California judge may not receive a salary "while any cause before the

8  judge remains pending and undetermined for 90 days . . . ."  Cal. Const., Art. VI, § 19.  Full-fledged

9  personal injury litigation -- including far more complicated disputes about causation  and extent of

10  injuries -- is typically resolved in a year or two.  A California case that is not brought to trial within

11  five years is subject to mandatory dismissal.  Cal. Code Civ. Proc. § 583.310, 583.360;

12  583.420(a)(2)(B).  Because the law assumes that the litigants have been dilatory, dismissal after only

13  three years is discretionary with the court, and not infrequent.  *Id.*

14          Under the California Workers Compensation scheme (and in many other states), if the

15  claims administrator (analogous to the VA's Regional Office) does not decide a claim within 90

16  days, then it is presumptively deemed compensable.  Cal. Lab. Code § 5402(b).  The employer must

17  immediately authorize medical treatment to be provided in the interim until the claim is decided.

18  *Id.*, § 5402(c).  Time limits apply to all participants in the process, even the hearing officer at the

19  Workers Compensation Appeals Board (analogous to the BVA), which "shall" decide an appeal

20  within 30 days after it is submitted. *Id.*, § 5313.  Private disability insurers are also required to act

21  on claims without unreasonable delay; they are at risk of liability for actual and punitive damage in

22  the tens of millions of dollars if they do not do so in an individual case, and to regulatory action if

23  they fail to do so routinely.  *See generally*, Cal. Ins. Code § 790.03 (4); *Richardson v. GAB*

24  *Business Servs., Inc.*, 161 Cal. App. 3d 519 (1984); *Kidneigh v. Unum Provident Ins. Co.*, 345 F.3d

25  1182 (10th Cir. 2003).

26          The disability determination and appeals processes of the Social Security Administration

27  ("SSA"), probably the largest system of administrative adjudication in the world, also deals with

28  disability claims far more quickly than the VA.  It processes about 4.5 million Social Security

Heller
Ehrman LLP

10

Disability Insurance and Supplemental Security Income applications annually.  In 2005, although it had claim resolution times far lower than the VA's, SSA took aggressive steps to speed those times. In the previous year, applicants had waited an average of 95 days for an initial determination of their disability status, and 97 days for local office reconsideration.  Claimants who sought review by an ALJ waited an average of 394 days for a decision; and an Appeals Council decision took an average of 251 more days.  The average disability claim considered at all stages averaged 1,048 days (about three years) to be resolved, compared to about 5.5 years for veterans' claims.  Social Security Administration, Fiscal Year 2004 Performance and Accountability Report, 2005, p. 17. Not satisfied, SSA proposed new rules designed to reduce these numbers. 70 Fed. Register 43590 (July 27, 2005).  These include a "Quick Determination Process," in which claims are screened and acted upon within 20 days, with benefits to be awarded immediately for those clearly disabled, and an immediate transfer back to the local office if a quick determination is not possible.  The new rule also includes time limits not only for the claimant but for the SSA, including a deadline of 90 days for its decision of the final administrative appeal.  On March 31, 2006, the proposed rule was adopted.  71 Fed. Register 16424-01 (March 31, 2006).  Although it is too soon to evaluate its efficacy, this decisive, comprehensive repair effort contrasts sharply with the VA's vague and very limited promises.

Private litigants, insurance companies, and many state and federal institutions involved in administering personal injury and disability claims of all kinds are legally required to resolve each claim within specified, reasonable times; they are held legally accountable if they do not do so.  We should demand no less of defendants in their handling of the comparatively simple, but critically important, claims of veterans who have served our country in combat.  Indeed, we can and must demand far more in the service of those wounded veterans.

**D.      The Human And Societal Costs Of Providing Inadequate Or No Care To Veterans With Mental Health Injuries Far Exceed The Cost Of Meeting Our Obligations To These Veterans**

**1.      The Human Suffering And Economic Toll Caused By The Current Situation Is Unacceptably High**

For veterans with PTSD and similar injuries, the consequences of neglect and delay are

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

catastrophic. 126 veterans per week -- eighteen veterans per day -- commit suicide, and about 1000 veterans per month attempt it. *See* Pls. Tr. Ex. 1247,1249 (February 2008 emails discussing public relations ramifications of these deaths); *see also* Sennot, "Told to Wait, a Marine Dies," *Boston Globe*, Feb. 11, 2007 (Appendix, Tab D). Twenty percent of U.S. suicides are among veterans. The Rand Report (Pls. Tr. Ex. 1253), at pp. 128, 130, notes that "male veterans face roughly twice the risk of dying from suicide as their civilian counterparts" and that depression, PTSD, and TBI have an even greater effect on the suicide risk for female veterans. *See also* "US Veterans' High Suicide Risk," *BBC News*, June 11, 2007 (Appendix, Tab E); Trial Transcript at p. 275:2-8 (Maris testimony that Iraq and Afghanistan veterans are 3.2 times likelier to commit suicides than non-veterans). Possibly because female soldiers face additional pressures when deployed, including the risk of sexual assault (Corbett, "The Women's War," *The New York Times Magazine*, March 18, 2007 (Appendix, Tab F), women veterans commit suicide nearly three times as often as non-veterans. *See* http://www.cbsnews.com/stories/2007/11/13/cbsnews_investigates/main3498625.-shtml. From the fall of 2005 to the summer of 2006, the number of Iraq and Afghanistan veterans reporting PTSD nearly doubled (Shane, "Number of Veterans Seeking Treatment for Stress Has Doubled," *Stars and Stripes*, Mideast Edition, Nov. 2, 2006 (Appendix, Tab G)), and soldiers who have served in Iraq are killing themselves at a higher rate than in any other war where such figures have been tracked. Bannerman, "Iraq Reservists Face 'Perfect Storm' of Traumatic Stress, *AlterNet*, March 15, 2007 (Appendix, Tab H).

This suicide epidemic is both an incalculable tragedy in itself and a symptom of an even larger problem. Hundreds of thousands of veterans, suffering from devastating injuries, have been abandoned to fend for themselves. Because veterans with mental illness are often unable to work or maintain positive relationships with their spouses or children, their families suffer great harm as well. Rand Report (Pls. Tr. Ex. 1253), pp. xxii-xxiii. In San Francisco, at least 1200 to 1500 veterans, nearly all of them suffering from mental illness, are homeless and live on the street or in shelters. Veterans represent approximately 20-25% of our city's total homeless population of well over 6000 (a number that does not count the homeless who are temporarily sleeping in cars, parks, churches, or single room occupancy hotels). Young women recently separated from military service

Heller
Ehrman LLP

represent the fastest growing group of homeless people nationwide, and the VA itself notes that the number of homeless Vietnam era veterans "is greater than the number of service persons who died during that war;" it estimates that there are about 154,000 homeless veterans nationwide (about one fourth of the adult homeless population), on any given night, " and perhaps twice that many experience homelessness at some point during the course of a year." (Appendix, Tab I.)  These numbers will surely rise; it often takes years after leaving service for veterans' accumulating problems to push them into the streets.  And still more tens or hundreds of thousands of veterans with mental health injuries are able to maintain subsistence homes and employment but, because they are not receiving the assistance that we owe them, these men and women also live with unacceptable emotional suffering and economic privation. These numbers are growing inexorably as injured veterans return from combat in the Middle East.

Defendants' mental health care delivery system is overwhelmed.  Although in theory all veterans are eligible for health care, a veteran whose health problem is not service-connected (or who is not yet through the claim process), or who is not indigent, stands in line behind all others, and in reality cannot get care.  VA Bulletin, "Health Care Eligibility and Enrollment for Veterans," announcing that "priority 8" veterans (who include those who are more than five years post-discharge whose claims have yet to be adjudicated) are not eligible for enrollment.  (Appendix, Tab J.)

Even when a claimant is eligible for mental health care, the evidence demonstrates that the VA is very often unable to provide it, because (as just one example) there are only a handful of in-patient PTSD treatment facilities throughout the country.  Dr. Maris testified that, while the VA has created a strategic plan to improve the timely delivery of mental health care to eligible veterans, it has almost entirely failed to implement it.  Trial Transcript at 277:20-279:280:13. *See also* Department of Veterans Affairs Office of Inspector General, "Follow up Health Care Inspection: VA's Role in Ensuring Services for Operation Enduring Freedom/Operation Iraqi Freedom Veterans after Traumatic Brain Injury Rehabilitation," May 1, 2008, at p. 8 ("long-term care is not uniformly provided for TBI patients.  In some cases, significant needs remain unmet").)

Defendants' failings are placing extraordinary burdens on municipal, county, state, and

private institutions that, unlike the VA itself, are in a state of fiscal crisis. For example, in San Francisco, many indigent veterans draw General Assistance, a county-funded subsistence stipend. Lacking any other viable option, indigent mentally ill veterans seek medical attention in the emergency rooms of county-funded hospitals. They crowd homeless shelters and food banks and are often prone to the misdemeanors of homelessness, such as loitering and trespassing and place a burden on local law enforcement. Not-for-profit organizations like Swords, with finite resources, struggle to meet veterans' needs, but the need is overwhelming. Local taxpayers and private donations are in effect funding federal obligations; local public resources are being diverted from other seriously under-funded activities like schools, fire and police services. While recognizing that veterans are entitled to care, local government entities are unequipped to take on the burden of mental health treatment for veterans; and they believe, rightly, that this is the VA's moral and legal obligation. *See* Appendix, Tab K.

The financial costs to society are staggering. The Rand Report estimates that the total cost over a two year period for the societal effects of PTSD and major depression was between $4.0 and $6.2 billion for veterans returning from Iraq and Afghanistan, and the cost attributable to TBI was estimated at an additional $591 to $910 million. Pls. Tr. Ex. 1253, p. xxiii.

### 2.   The Cost Of Repairing Defendants' Systems Would Be Far Less Than The Cost Of Not Doing So

Quite apart from constitutional requirements and the dictates of conscience, to allow the present situation to persist, and inevitably to worsen, is economically foolhardy. We know, based upon the experience of Vietnam veterans, that it will cost the taxpayers billions more in the long run than it would cost to attend to the problem now. With PTSD, early medical intervention is critical, or the disorder becomes intractable. In testimony presented on February 17, 2005, to the VA Veterans Readjustment Committee, Thomas J. Berger, Ph.D, Chair of VVA's PTSD & Substance Abuse Committee, said:

> Evidence overwhelmingly supports the need for early intervention and treatment of PTSD and related mental health disorders not only for active duty troops and veterans but for their families as well. . . . Many of these men and women cannot be expected to reintegrate into their communities without access to appropriate mental health support services. . . .

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

We also know that if we neglect hundreds of thousands of veterans with PTSD and similar disorders, it will lead not only to incalculable suffering for those veterans, but also to epidemics of unemployment and underemployment, homelessness, family breakdown, and other ills that affect the quality of life for all of us. We *know* that neglecting the mental health needs of returning veterans will create an enormous drain on the public purse, costing local, state, and federal taxpayers far more in the long run than it would cost to meet our obligations promptly. The Rand Report (Pls. Tr. Ex. 1253), at p. xxiv, estimates that evidence-based treatment *alone* could reduce societal costs associated with PTSD and major depression by up to $1.7 billion within only two years. Of the 1400 VA hospitals and clinics, however, only twenty-seven have inpatient PTSD programs.

In contrast to the staggering human and economic costs stemming from the paralytic state of defendants' adjudicatory system, which produces perhaps the most obvious due process violations, the cost of speeding up claim processing would be insignificant. The evidence shows that the backlog arises not from lack of funds (which are readily available, *see* Part II.D.3, *infra*), but from disorganization and a lack of any *enforceable* imperative, with clearly-defined, firm goals, to clear it. Defendants have acknowledged this. As stated above, the October 2001 Claims Processing Task Force Report observed that "VBA has . . . also created many problems through poor or incomplete planning and uneven execution . . ." Pls. Tr. Ex. 374 at ii. The Task Force found that poor communication created "confusion, lack of direction, misunderstanding and -- most importantly -- a lack of uniformity in execution." *Id.* at 18-19. It recommended organizational changes to help clear the claims backlog (for example, developing specialized claims processing teams) that would not seem to involve any extra expenditures at all (*id.* at 27, 37), but most of the changes were never made.

The VA simply will have to process all of the backlogged claims at some point. Requiring it to do so now, rather than allowing the VA to push the crisis to a future date, might theoretically require it to spend some of its funds sooner rather than later, but logically should not increase the transaction cost of resolving each claim by a single dollar. Even if that were not the case, the future cost of not implementing changes now will be staggering, in terms of human suffering and in hard dollars.

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

### 3. Defendants Have Received Billions More than They Have Asked For To Address These Issues

Defendants do not contend that there is any lack of funds to meet veterans' mental health care needs. *See* Plaintiffs' Trial Brief ("Pls. Tr. Br.") at pp. 7-8. In 2007, the VA had a budget allocation of $79.6 billion, and spent only $72.8 billion. *See* OMB, Budget of the U.S. Government, Federal Programs by Agency and Account. As for funds designated for veterans' health care, the amounts carried forward in the VHA's budget from the 2006-07 and 2007-08 fiscal years, were $500,000,000 and $1.3 billion, respectively. *See* Pls. Tr. Br. at 7. "In fiscal year 2006 . . . about $42 million of the $200 million that was planned for allocation to mental health strategic plan initiatives was never allocated for them, and thus, never spent for plan initiatives. Also, about $46 million of the $158 million allocated to them was returned by medical centers to headquarters because it had not been spent . . . before the end of the fiscal year." Government Accountability Office, *"VA Health Care, Spending For Mental Health Strategic Plan Initiatives Was Substantially Less Than Planned"* (November 2006), p. 25. (Pls. Tr. Ex. 88.) The VA has used billions of dollars less than it has available to repair its broken systems.

In any event, under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the finding of a constitutional violation necessarily implies that any compliance cost to the government is outweighed by the rights of the affected parties. Even if the VA had a shortage of funds, which it admits is not true, it would be no defense to say that it would cost money to comply with the Constitution.

### E. There Are Feasible Remedies For Ensuring That Defendants Comply With Their Constitutional Obligations

Defendants have continually suggested that even if this Court is convinced that defendants' adjudicatory and delivery-of-service systems for mental health claims are unconstitutionally dysfunctional, and no matter how tragic the consequences, the Court is impotent. The Court, defendants say, "cannot regulate," either because to do so ostensibly would be impermissible, or because it would be inconvenient and not feasible. While the Court might understandably be reluctant to become involved in overseeing the conduct of a large federal agency, there is no doubt that it has the power to do so, and that there is a compelling need for judicial action in this case.

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

1.   **Courts Have The Power And Duty To Fashion Remedies For Constitutional Violations**

Courts have broad equitable power to remedy constitutional violations, and "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Demore v. Kim*, 538 U.S. 510, 516 (2003) (*quoting Webster v. Doe*, 486 U.S. 592, 603 (1988)). This principle applies to the VA's violations at issue here. In *Johnson v. Robison*, 415 U.S. 361, 367 (1974), the Court held that an earlier statutory provision barring review of "decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans" did not bar constitutional challenge to veterans' benefits legislation.

The court's broad power to remedy constitutional violations has long been established. In *Brown v. Board of Education*, 347 U.S. 483, 495 (1954), after finding "separate but equal" constitutionally offensive, a unanimous Court also held that the federal judiciary had inherent power to fashion an appropriate remedy for constitutional violations. *Id.* Courts have invoked *Brown* repeatedly, in crafting remedies for constitutional violations in school systems, public housing bureaucracies, police and firefighting forces, mental hospitals, and prisons. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678 (1978). More than fifty years of jurisprudence following *Brown* have established several factors governing equitable remedies for constitutional violations:

> [First,] the nature of the [equitable] remedy is to be determined by the nature and scope of the constitutional violation. The remedy must therefore be related to the 'condition alleged to offend the Constitution.' Second, the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible to restore the victims of [unconstitutional] conduct to the position they would have occupied in the absence of such conduct....

*Milliken v. Bradley*, 433 U.S. 267, 279-81 (1977) (citations omitted). (The Court also mentioned "the interests of state and local authorities in managing their own affairs," which is not relevant here.) The *Milliken* Court stated: "Once invoked, 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.'" *Id.*, citations omitted. *See also Brown v. Board of Educ.*, 349 U.S. 294, 300 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power"); *Salling v. Bowen*, 641 F. Supp. 1046, 1070 (W.D. Va. 1986) (courts are obligated to

17

Heller
Ehrman LLP

remedy constitutional violations; injunctive relief is often most effective).

When government institutions do not perform their duties, the courts have "no alternative but to take [an] active role in formulating appropriate relief." Johnson, *The Role of the Federal Courts in Institutional Litigation*, 32 Ala. L. Rev. 271, 274 (1981). *See also* Coffin, *The Frontier of Remedies: A Call for Exploration*, 67 Calif. L. Rev. 983, 985 (1979). That is particularly true when, as here, the interests at stake are compelling and the injured parties are vulnerable. Under *Milliken*, an order may be improper if it is aimed at eliminating a perceived wrong that does not violate the Constitution. In addition, a statute that creates a right may limit the remedies available for its violation, and Congress may even be able to limit courts' ability to remedy constitutional violations. It did not do so here. (*Compare* Prison Litigation Reform Act, 42 U.S.C. § 1997 *et seq.*, in which Congress limited courts' ability to enjoin conditions violating the Eighth Amendment.) Congress knows how to limit courts' remedial power when it believes courts should not be involved in supervising a governmental institution. But especially absent any statutory limitation of remedies, when a constitutional right is violated, the federal courts have broad power, also derived from the Constitution, to fashion appropriate relief.

### 2.     The Court Can And Should Enter A Declaratory Judgment

Defendants suggest that, no matter how seriously they are violating veterans' rights, the Court can do nothing but throw up its hands in helpless dismay. But the first step, *and one that has nothing to do with whether the Court believes it has the practical ability to fashion an effective remedy*, is to order, by way of declaratory judgment, that the facts proven at trial constitute a denial of veterans' constitutional right of due process. *See Barnett v. Bowen*, 794 F.2d 17, 21-22 (2d Cir. 1986). Such an order is manifestly appropriate here, based on the essentially undisputed facts. *See White v. Matthews*, 434 F. Supp. 1252, 1261 (D. Conn. 1976) (unreasonable delay is a denial of due process; it deprives claimants of a property interest without a hearing); *see also* 5 U.S.C. § 555(B) (requiring agencies to "conclude a matter . . . . within a reasonable time"). Even if the Court begins by issuing only a declaratory order, other branches of government, including Congress and the administrative agencies involved, might finally respond by taking remedial action on their own.

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

3.    **The Court Can And Should Issue A General Order Requiring Defendants To Meet Broadly Defined Goals And Possibly Requiring Defendants (Or The Parties Jointly) To Propose A Specific Repair Plan**

A next step, and again one well within the Court's authority and practical ability, would be to enter a generally-worded injunction, ordering defendants to meet broadly defined goals, without necessarily specifying in detail how they should do so. *See* 5 U.S.C. § 706(1) ("the reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."). *See Serrano v. Priest*, 5 Cal. 3d 584 (1971) (*Serrano I*); and *Serrano v. Priest*, 18 Cal. 3d 728 (1976) (*Serrano II*). *Serrano* involved general, goal-oriented orders of this type. *Serrano I* ruled that California's public school financing structure violated the equal protection clause because it depended on a district's tax base, resulting in inequalities in per-pupil expenditures. In response, the Legislature enacted SB90, establishing a formula to begin to level school district income based on average attendance. In *Serrano II*, the court ruled that SB90 was a step in the right direction, but "wealth-related disparities" were still impermissible, and gave the state six years to bring the system into compliance. And in 1986, the case was closed after the Superior Court found the defendants had corrected the problem. *See Serrano v. Priest*, 20 Cal. 3d 25 (1977).

Here the Court might order defendants to take immediate steps to reduce the claim backlog "substantially" within a stated period of time. As another example, the Court might direct defendants to provide claimants with minimal procedural safeguards "consistent with" *Goldberg v. Kelley*, 397 U.S. 254, 270-72 (1970) and *Solis v. Schweiker*, 719 F.2d 301 (9th Cir. 1983). *Goldberg* holds that claims for welfare benefits affect "property interests," entitling claimants, under the Due Process Clause, to certain minimal procedural safeguards -- including an evidentiary hearing, the right to make oral arguments and cross-examine witnesses, and the right to retain (and, presumably, to compensate) counsel if the claimant so desires, a right that veterans are denied at the initial stages of their claims. *Goldberg* at 266. Following *Goldberg*, in a case involving Supplemental Security Income benefits, the Ninth Circuit Court of Appeals held that the claimant must be allowed to examine a doctor on whose opinion the administrative law judge had relied. *Solis*, 719 F.2d at 301.

The Court might well decide to start by issuing this kind of general "fix it" order, retaining jurisdiction to enforce it by ordering more targeted remedies later, if necessary. Such an order would

Heller Ehrman LLP

19

not involve the Court in "managing" the defendants, as they suggest. Perhaps somewhat more than declaratory relief alone, an injunction of this type might prompt the parties to negotiate about specific remedial steps and reporting and accounting requirements, or might well motivate other branches of government to take action. The Court could order defendants to propose a detailed remedial plan, or it could order the parties to confer and jointly propose a plan. *See, e.g.*, *Center for Biological Diversity v. Norton*, 304 F. Supp. 2d 1174, 1184 (D. Ariz. 2003) (finding Fish and Wildlife Commission's interpretation of Endangered Species Act "nonsensical" and ordering it to submit new plan for protection of spotted owl by stated deadline, retaining jurisdiction to enforce the order); *Henrietta v. Guiliani*, No. 95 CV 0641 (SJ), 2001 WL 1602114 (E.D.N.Y. Dec. 11, 2001) (involving equal access of persons with disabilities to public assistance benefits).

### 4.    Many Simple, Specific Remedies Well Within This Court's Competence Would Begin The Process Of Repair

Given the VA's long history of failed attempts at self-repair, the Court may believe that only its imposition of specific, detailed rules will be effective. This would not make the Court "a regulator," as defendants suggest. Even (or perhaps especially) when faced with intractable bureaucracies not easily susceptible to change, courts have acted decisively. In cases like this one, involving important constitutional rights, many critically affected people, and dire consequences of inaction, courts *must* follow the basic equitable principle that "for every wrong there is a remedy."

In this case, examples of specific reforms to the adjudication system might include: streamline the 23-page application; set reasonable time limits for adjudication of original claims, remands, and appeals; adopt presumptions that are less burdensome on veterans; implement a fast track claims adjudication process for older claims; and pay subsistence-level benefits to veterans while their claims are pending. Major corrections to the health care system could include: universal psychiatric screening for all veterans; enhanced outreach to veterans regarding the availability of mental health care; partnership with the private sector in the delivery of health care (particularly in rural areas); establishment of meaningful and timely remedies for veterans denied health care; and prioritization of care for suicidal veterans.

These remedies are meant only to illustrate that there are many specific, clear, plain English,

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC

commonsense directives that are well within the Court's capacity to order and implement. We

understand that plaintiffs are submitting a more detailed proposal.

### 5. If The Court Wishes To Have Assistance, It Is Readily Available; The Court Can Appoint A Master, Monitoring Panel, Or Similar Delegate

To the extent that the Court is concerned that crafting complete relief, or monitoring

compliance with any order, would involve specialized knowledge or full-time work, it can appoint a

variety of "agents" to assist it (such as a special master, monitor, ombudsman, or advisory

committee). It is within the Court's inherent authority to rely on such a delegate, even over a party's

objection; the Court may even authorize a master to make findings of fact and law, which it could

treat as presumptively valid, and/or it can use a master simply to enforce any remedial order that it

may issue. *See In re Peterson*, 253 U.S. 300, 306 (1920); All Writs Act, 28 U.S.C. § 1651(a)

(authorizing courts to "issue all writs necessary or appropriate in aid of [our] jurisdiction"); *United

States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990). Federal Rule of Civil Procedure

53 now clearly authorizes the appointment of masters for any or all of these purposes, and others.

The function of a master here would not be to "run the VA" as defendants suggest, but to

create, implement, and monitor a remedy. Masters have been appointed to design the terms of a

decree, to supervise compliance, to negotiate with the persons affected, to advise the defendant and/or

monitor its conduct, and to resolve disputes about the meaning of the decree. *See Nathan, Use of

Masters In Institutional Reform Litigation*, 10 U. Tol. L. Rev. 419 (1979); *see also* Kirp and Babcock,

*Judge and Company: Court-Appointed Masters, School Desegregation, and Institutional Reform*, 32

Ala. L. Rev. 313 (1981); Montgomery, *Force and Will: An Exploration of The Use of Special

Masters to Implement Judicial Decrees*, 52 U. Colo. L. Rev. 105 (1980) ("Montogomery").

The use of special masters is common when large bureaucracies, including federal agencies,

are permeated with systemic constitutional or statutory violations. For example, the United States

District Court for the Middle District of Tennessee appointed a master to develop and implement a

plan to ensure that the state's 640,000 Medicaid-eligible children received Medicaid benefits. *John B.

v. Menke*, 176 F. Supp. 2d 786, 807 (M.D. Tenn. 2001). The plaintiff alleged that the state had failed

to provide checkups, screenings and other required medical benefits. *Id*. at 802. Although the state

Heller
Ehrman LLP

21

had entered into a consent decree, the court concluded that the state had entirely failed to comply, and appointed a special master to create and implement a specific compliance plan. *Id.*

Similarly, the New Mexico District Court used a number of special masters and expert consultants to fix the state's broken foster care system. *Joseph A. v. New Mexico Dep't of Human Svcs.*, 69 F.3d 1081 (10th Cir. 1995) (*reversed on other grounds*). (A case summary can be found at http://www.childrensrights.org/pdfs/Joseph%20A%20Aug%2006.pdf). The plaintiff class of about 2,500 children in foster care sued to remedy, among other things, the amount of time children languished in temporary placements before they were placed in stable homes. The court ultimately used both special masters and consultants to create a strategy for reviewing each case and creating a specific case management plan for it. That strategy was successful; by 2005, nearly three fourths of children in foster care were placed within three years, and over 40% within two years.

Courts have also used special masters to formulate complex school desegregation plans. In *Hart v. Community School Board*, 383 F. Supp. 699, 768 (E.D.N.Y. 1974), the court appointed a master to create a "comprehensive plan dealing not only with the elimination of segregation . . . but also with the housing, non-residential development, community, social welfare, recreational, transportation and protective facilities with the [local] neighborhood necessary to provide a basis for effectively desegregating [the school at issue]." *Id.* at 768. The master supervised investigations, conducted meetings with the school board, parents, local residents, and city officials, and mediated disputes between the parties. *Montgomery*, 52 U. Colo. L. Rev. at 105.

Many cases addressing prison conditions have involved special masters. *See, e.g., Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980) (*reversed on other grounds*), in which the parties entered into a decree requiring sweeping changes, including reducing prison crowding, increasing security and staff, furnishing adequate health care, and bringing living standards into compliance with state requirements. The court appointed a special master to monitor the TDC's compliance, noting that a master is particularly appropriate when the institution has a long history of unconstitutional practices. *Id.* at 1389.

It is simply nonsense to suggest, as the defendants do, that the VA is "too big" or too complex to be changed by a mere court order. Under both consent decrees and disputed orders, masters have

1  helped courts design and enforce complex remedies for unlawful conduct by many institutions that

2  were at least as complex and resistant to change as the VA, in cases involving:

3  - **desegregation of schools** (*Milliken v. Bradley (II)*, 433 U.S. 267 (1977) (upholding broad
   equitable remedies to effectuate desegregation decree); *Swann v. Charlotte-Mecklenburg
4  *Bd. of Educ.*, 306 F. Supp. 1299, 1313 (W.D.N.C. 1969) (appointing "consultant" to aid in
   implementation of desegregation plan); *United States v. Board of Sch. Comm'rs*, 503 F.2d
5  68, 74 n.9 (7th Cir. 1974) (approving adoption of plan prepared by court appointed
   commissioner); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 726 F. Supp.
6  1544, 1546, 1549-1552 (E.D. Ark. 1989) (appointing "metropolitan supervisor" to develop
   student assignment plan after districts defaulted in responsibility); *Morgan v. Kerrigan*, 530
7  F.2d 401 (1st Cir. 1976) (approving use of master to implement busing plan); *Hart, supra*);

8  - **remedying pervasive Eighth Amendment violations in prisons** (*Gates v. Collier*, 501
9  F.2d 1291 (5th Cir. 1974) (appointing a monitor to ensure that the state complied with order
   to reform Mississippi prison facilities); *Ruiz, supra*);

10 - **correction of systemic constitutional and statutory violations in mental institutions**
11 (*Wyatt v. Stickney*, 344 F. Supp. 373 (M.D. Ala. 1972), enforcing 325 F. Supp. 781 (M.D.
   Ala. 1971) (appointing "human rights committee" to ensure residents of mental institution
12 were afforded constitutional and humane treatment));

13 - **monitoring of systemic police misconduct** (*Nat'l Org. for the Reform of Marijuana Laws
   (NORML) v. Mullen*, 112 F.R.D. 120 (N.D. Cal. 1986) (appointing monitor to ensure
14 government's compliance with law enforcement program));

15 - **design and implementation of voter redistricting plans** (*Puerto Rican Legal Defense &
   Educ. Fund, Inc. v. Gantt*, 796 F. Supp. 681, 698 (E.D.N.Y. 1992) (approving
16 reapportionment plan prepared by experts, to be implemented if state plan not in place by
   deadline); *Martin v. Mabus*, 700 F. Supp. 327, 337-43 (S.D. Miss. 1998) (accepting
17 expert's districting plan for judicial elections prepared using criteria provided by judge));

18 - **monitoring and remediation of a myriad of complex, interrelated statutory and
19 constitutional problems in numerous state-wide foster care systems** (*Menke, supra*;
   *Joseph A., supra*);

20 - **remediation of systemic constitutional and statutory problems in a public housing
   system** (*Perez v. Boston Housing Authority*, 400 N.E. 2d 1231 (Mass. 1980)).
21

22  No one believes that the problems addressed in this case can be corrected overnight. It may

23  take years. Currently, however, *no* meaningful corrective action is being taken, an already critical

24  problem is rapidly worsening, and we face an emergency. The Court should reject defendant's

25  attempts to persuade it that, no matter how tragic and constitutionally unacceptable the current

26  situation is, the Court is simply helpless. As a matter of both law and fact, that is not true. Unless the

27  Court acts, there is no reasonable likelihood of meaningful change. At this moment in our history, the

28  Court has an opportunity to be a catalyst for change -- change that even the VA admits is urgently

Heller
Ehrman LLP

23

needed, that society agrees is morally obligatory, that experts concur is a fiscal imperative, and that is constitutionally essential. As shown above, the funding to implement such damages sits now in the VA's accounts. The Court has both the authority and the ability to fashion remedies to deliver to hundreds of thousands of mentally ill veterans the assistance and care that we owe them.

## III.    CONCLUSION

For these reasons, Swords to Plowshares and Vietnam Veterans of America respectfully urge the Court to find in favor of the plaintiffs and award all of the relief sought by the Complaint, and any other relief that the Court deems appropriate.

May 1, 2008

Respectfully submitted,

HELLER EHRMAN LLP

By _____/s/_____
        Judith Z. Gold

Attorneys for *Amici Curiae*: Swords to Plowshares and Vietnam Veterans of America

Heller
Ehrman LLP

JOINT *AMICUS* BRIEF OF SWORDS TO PLOWSHARES AND VIETNAM VETERANS OF AMERICA
CASE NO. C 07-3758 SC