GORDON P. ERSPAMER (CA SBN 83364)
GErspamer@mofo.com
ARTURO J. GONZALEZ (CA SBN 121490)
AGonzalez@mofo.com
HEATHER A. MOSER (CA SBN 212686)
HMoser@mofo.com
RYAN G. HASSANEIN (CA SBN 221146)
RHassanein@mofo.com
STACEY M. SPRENKEL (CA SBN 241689)
SSprenkel@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

[See Next Page for Additional Counsel for Plaintiffs.]

Attorneys for Plaintiffs
VETERANS FOR COMMON SENSE and
VETERANS UNITED FOR TRUTH, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| VETERANS FOR COMMON SENSE, and VETERANS UNITED FOR TRUTH, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JAMES B. PEAKE, M.D., Secretary of Veterans Affairs, *et al.*, <br><br> Defendants. | Case No.    C-07-3758-SC <br><br> **CLASS ACTION** <br><br> **PLAINTIFFS' POST-TRIAL BRIEF, PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Complaint Filed: July 23, 2007 <br> Trial Date:  April 21, 2008 |

1    **ADDITIONAL COUNSEL FOR PLAINTIFFS:**

2    SIDNEY M. WOLINSKY (CA SBN 33716)
     SWolinsky@dralegal.org
3    JENNIFER WEISER BEZOZA (CA SBN 247548)
     JBezoza@dralegal.org
4    KATRINA KASEY CORBIT (CA SBN 237931)
     KCorbit@dralegal.org
5    DISABILITY RIGHTS ADVOCATES
     2001 Center Street, Third Floor
6    Berkeley, California 94704-1204
     Telephone: 510.665.8644
7    Facsimile: 510.665.8511

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

I.    INTRODUCTION ............................................................................................. 1

II.   THE COURT HAS SUBJECT MATTER JURISDICTION TO GRANT
      RELIEF .......................................................................................................... 2

III.  JURISDICTION OVER APA CLAIMS ........................................................... 4

IV.   JURISDICTION OVER CONSTITUTIONAL CLAIMS ................................. 5

V.    REMEDIES ..................................................................................................... 7

      A.    Under APA, the Court Must Compel Agency Action Unlawfully
            Withheld ............................................................................................. 7

      B.    The Court Has Broad Discretion to Remedy Constitutional
            Violations. .......................................................................................... 8

      C.    This Court Has Many Remedial Alternatives. ...................................... 8

FINDINGS OF FACT ..................................................................................................... 10

I.    THE NEED FOR MENTAL HEALTH SERVICES ....................................... 10

II.   VHA FAILURE TO IMPLEMENT MENTAL HEALTH STRATEGIC
      PLAN ............................................................................................................ 13

III.  DELAYS IN THE RECEIPT OF MENTAL HEALTH CARE ........................ 16

IV.   DELAYS IN VBA's SCDDC ADJUDICATION SYSTEM ............................. 20

      A.    Disabled Veterans and Their Survivors Have Both a Need and
            Strong Interest in SCDDC .................................................................. 20

      B.    VBA's Adjudication Process for SCDDC Claims for PTSD ................. 21

      C.    VBA's Inventory of Claims Will Continue Growing ........................... 23

      D.    Extensive Delays for ROs to Adjudicate PTSD Claims........................ 24

      E.    Extensive Delays in the Appellate Adjudication Process ..................... 25

      F.    Delays in Obtaining BVA Hearings .................................................... 26

      G.    BVA Remands Add Further Delay to the Adjudication Process ........... 27

      H.    Delays in the Adjudication Process Produce Dire Consequences.......... 28

      I.    VBA's Alleged "Fixes" Do Not Moot Plaintiffs' Claims ..................... 28

V.    ERROR RATES IN THE ADJUDICATION PROCESS ARE HIGH .............. 29

VI.   PROCEDURAL INADEQUACIES OF VBA'S ADJUDICATION
      PROCESS ...................................................................................................... 30

VII.  EXTRAORDINARY AWARDS PROCEDURE VIOLATES VETERANS'
      RIGHTS ........................................................................................................ 31

CONCLUSIONS OF LAW .............................................................................................. 31

I.    JURISDICTION & STANDING .................................................................... 31

II.   STATUTORY MANDATES GOVERN VA MENTAL HEALTH CARE ........ 32

III.    STATUTORY MANDATES GOVERN SCDDC ADJUDICATION .............................. 32

IV.    ADMINISTRATIVE PROCEDURE ACT ....................................................... 33

V.    VA UNREASONABLY WITHHOLDS AND DELAYS MENTAL
HEALTH CARE DELIVERY ............................................................................... 33

VI.    VA UNREASONABLY WITHHOLDS AND DELAYS
ADJUDICATION OF SCDDC CLAIMS ......................................................... 34

VII.    VA ADJUDICATION SYSTEM DEPRIVES VETERANS OF DUE
PROCESS ............................................................................................................. 35

    A.    Plaintiffs' Members Possess Fifth Amendment Property Interests ...................... 35

    B.    The Adjudication System Deprives Veterans of Due Process .............................. 35

VIII.    DUE PROCESS VIOLATIONS IN OF MENTAL HEALTH CARE
DELIVERY ........................................................................................................... 37

IX.    VA'S CLAIMED RECENT INITIATIVES ...................................................... 38

X.    REMEDIES .......................................................................................................... 38

XI.    RIGHT TO ACCESS ........................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bailey v. West*,
160 F.3d 1360 (Fed. Cir. 1998) ................................................................................ 30, 36

*Barnett v. Bowen*,
794 F.2d 17 (2d Cir. 1986) ............................................................................................ 8

*Beltran v. Meyers*,
677 F.2d 1317 (9th Cir. 1982) .................................................................................. 38, 39

*Boldon v. Humana*,
466 F. Supp. 2d 1199 (D. Ariz. 2006) ........................................................................ 39

*Broudy v. Mather*,
460 F.3d 106 (D.C. Cir. 2006) .................................................................................... 40

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) ...................................................................................................... 8

*Chinnock v. Turnage*,
995 F.2d 889 (9th Cir. 1993) ........................................................................................ 3

*City of New York v. Heckler*,
578 F. Supp. 1109 (E.D.N.Y. 1984) ............................................................................ 3

*Cockrum v. Califano*,
475 F. Supp. 1222 (D.D.C. 1979) ..................................................................... 7, 8, 36, 38

*Consiglio v. Woodford*,
No. CIVS051701GEBGGHP, 2005 WL 2810356 (E.D. Cal. Oct. 26, 2005) ........................ 38

*Ctr. for Biological Diversity v. Norton*,
254 F.3d 833 (9th Cir. 2001) ................................................................................... 4, 32

*Ctr. for Biological Diversity v. Norton*,
304 F. Supp. 2d 1174 (D. Ariz. 2003) .......................................................................... 9

*Cupolo v. BART*,
5 F. Supp. 2d 1078 (N.D. Cal. 1997) ........................................................................... 39

*eBay v. MercExchange*,
547 U.S. 388 (2006) .................................................................................................... 39

*Eng v. Smith*,
849 F.2d 80 (2d Cir. 1988) .......................................................................................... 38

*Ex parte Peterson,*
  253 U.S. 300 (1920) ........................................................................................ 9

*Foss v. Nat'l Marine Fisheries Serv.,*
  161 F.3d 584 (9th Cir. 1998) ......................................................................... 35

*Gallo Cattle Co. v. U.S. Dep't of Agriculture,*
  159 F.3d 1194 (9th Cir. 1998) .................................................................. 5, 33

*Goldberg v. Kelly,*
  397 U.S. 254 (1970) ............................................................................ 9, 35, 37

*Griffith v. Detrick,*
  603 F.2d 118 (9th Cir. 1979) ......................................................................... 35

*Gros Ventre Tribe v. United States,*
  469 F.3d 801 (9th Cir 2006) ............................................................................ 6

*Heckler v. Day,*
  467 U.S. 104 (1984) ......................................................................................... 8

*Henrietta v. Guiliani,*
  No. 95 CV 0641 (SJ), 2001 WL 1602114 (E.D.N.Y. Dec. 11, 2001) ...................... 9

*Holmes v. N.Y. City Hous. Auth.,*
  398 F.2d 262 (2d Cir. 1968) .......................................................................... 37

*Independence Mining Co. v. Babbitt,*
  105 F.3d 502 (9th Cir. 1997) ......................................................................... 33

*Jeffries v. Ga. Residential Fin. Auth.,*
  503 F.Supp. 610 (N.D. Ga. 1980) .................................................................. 37

*John B. v. Menke,*
  176 F. Supp. 2d 786 (M.D. Tenn. 2001) .......................................................... 9

*Joseph A. v. New Mexico Dep't of Human Servs.,*
  69 F.3d 1081 (10th Cir. 1995) ......................................................................... 9

*Kapps v. Wing,*
  404 F.3d 105 (2d Cir. 2005) .......................................................................... 35

*Kelly v. R.R. Ret. Bd.,*
  625 F.2d 486 (3d Cir. 1980) .......................................................................... 36

*Lee v. Oregon,*
  869 F. Supp. 1491 (D. Or. 1994) ................................................................... 38

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ..................................................................................... 4, 6

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ...................................................................................... 35, 36, 37, 38

*Milliken v. Bradley,*
    433 U.S. 267 (1977) ...................................................................................... 8

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs,*
    330 F.3d 1345 (Fed. Cir. 2003) .................................................................... 3

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004) ........................................................................................ 3

*Our Children's Earth Found. v. EPA,*
    506 F.3d 781 (9th Cir. 2007) ........................................................................ 4

*Paralyzed Veterans of Am. v. Acting Sec'y of Veterans Affairs,*
    138 F.3d 1434 (Fed. Cir. 1998) .................................................................... 3

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005) ........................................................................ 3

*Presbyterian Church v. United States,*
    870 F.2d 518 (9th Cir. 1989) ........................................................................ 5

*Ruiz v. Estelle,*
    503 F. Supp. 1265 (S.D. Tex. 1980) ............................................................ 9, 10

*Solis v. Schweiker,*
    719 F.2d 301 (9th Cir. 1983) ........................................................................ 9

*Splane v. Sec'y of Veterans Affairs,*
    216 F.3d 1058 (Fed. Cir. 2000) .................................................................... 3

*Stegall v. West,*
    11 Vet. App. 268 (1998) ............................................................................... 27

*The Coalition for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs,*
    464 F.3d 1306 (Fed. Cir. 2006) .................................................................... 3

*United States v. Monsanto,*
    491 U.S. 600 (1989) ...................................................................................... 32

*United States v. Salerno,*
    481 U.S. 739 (1987) ...................................................................................... 7

*United States v. Suquamish Indian Tribe,*
    901 F.2d 772 (9th Cir. 1990) ........................................................................ 9

*United States v. W. T. Grant Co.,*
    345 U.S. 629 (1953) ...................................................................................... 39

*Veterans for Common Sense v. Nicholson,*
    No. C-07-3758 SC, 2008 WL 114919 (N.D. Cal. Jan. 10, 2008) ....................................*passim*

*Walters v. NARS,*
    472 U.S. 305 (1985) ........................................................................................................... 35

*Walters v. Reno,*
    145 F.3d 1032 (9th Cir. 1998) ............................................................................................ 39

*Wang v. Chertoff,*
    No. CIV 07-077-TUC-GEE, 2007 U.S. Dist. LEXIS 87419 (D. Ariz. Nov. 26, 2007) .......... 33

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................................................................... 31

*White v. Mathews,*
    559 F.2d 852 (2d Cir. 1977) ............................................................................................... 39

*White v. Matthews,*
    434 F. Supp. 1252 (D. Conn. 1976) ............................................................................... 8, 36

*Williams v. Schweiker,*
    541 F. Supp. 1360 (E.D. Mo. 1982) ................................................................................... 39

STATUTES

5 U.S.C.
    § 555(b) .......................................................................................................................... 32, 34
    § 702 .............................................................................................................................. 5, 6, 33
    § 706(1) ................................................................................................................... 4, 5, 6, 7, 33

38 U.S.C.
    § 502 .................................................................................................................................. 2, 3
    § 511 ................................................................................................................................... 31
    § 1110 ..................................................................................................................... 4, 5, 32, 34
    § 1114 ................................................................................................................................. 23
    §§ 1701(1), (6)................................................................................................................... 32
    §§ 1704 *et seq.*................................................................................................................ 32

§ 1705(b)(1) ................................................................................................................. 32, 34
§ 1710 ..................................................................................................................... 4, 5, 32
§§ 1710(a)(1), (a)(2), (e)(1)(D) ................................................................................ 23, 32
§ 1710(a)(4) ...................................................................................................................... 37
§ 5103 ............................................................................................................................... 22
§ 5103A ............................................................................................................................ 22
§ 5103A(a)(1) ................................................................................................................... 33
§ 5103A(b)-(c) .................................................................................................................. 22
§ 5103A(d) ....................................................................................................................... 22
§ 5109B ................................................................................................................ 4, 5, 33, 34
§ 7101 ..................................................................................................................... 4, 5, 34
§ 7101(a) ........................................................................................................................... 32
§ 7105(b)(1) ...................................................................................................................... 23
§ 7105(d)(1) ...................................................................................................................... 23
§ 7105(d)(3) ...................................................................................................................... 23
§ 7252(a) ........................................................................................................................... 39

**OTHER AUTHORITIES**

38 C.F.R.

§ 3.103 ............................................................................................................................. 37
§ 3.109(a) ........................................................................................................................... 2
§ 3.304(f) ............................................................................................................................ 2
§§ 4.1-4.31 ......................................................................................................................... 2
§ 19.29 ............................................................................................................................. 19
§ 19.30 ............................................................................................................................. 19
§ 20.201 ........................................................................................................................... 19
§ 20.202 ........................................................................................................................... 19
§ 19.35 ............................................................................................................................. 23
§ 20.101(b) ......................................................................................................................... 2
§§ 20.200-20.202 ............................................................................................................... 3

## I.    INTRODUCTION

This Court is in an extraordinary position.  Faced with an embattled, recalcitrant agency that has abandoned its obligations to the veterans it serves, this Court must act to preserve and protect our veterans.  There is overwhelming evidence that veterans of the Iraq and Afghanistan wars, together with veterans of earlier conflicts, are in dire need of significant mental health services and assistance.  It is undisputed that if these veterans are not provided the services they need and to which they are entitled on a timely basis, their conditions will deteriorate, and many will take their own lives.

The Department of Veterans' Affairs ("VA") concedes that veterans have an entitlement to care and to service-connected death and disability compensation ("SCDDC").  VA also concedes that it has the money and the capability to remedy the situation.  Through this trial, VA has presented to this Court numerous "plans" to address problems veterans face at VA, the same problems that have been endemic for years.  But VA's own expert witness has told the Court that it is reasonable for the agency to take ten years to implement one of the most important plans.  And VA's own officials responsible for implementing and monitoring these plans have failed to do so, and indeed seem to readily acknowledge their failures.

VA concedes many of the key legal issues in this action:  that veterans need and are entitled to health care and compensation; that the court has jurisdiction over Plaintiffs' challenge to the procedural inadequacies of the SCDDC adjudication process; that Plaintiffs are challenging discrete agency action in mental health care: that Defendant's failed to implement the Mental Health Strategic Plan and the 2007 Feeley Memorandum; that VA has failed to fulfill its duty to assist veterans, as required by statute, and that this failure is resulting in unacceptable levels of avoidable remands; and that the extraordinary delays veterans face in the adjudication of their SCDDC claims are unacceptable.  Faced with these admissions and concessions, the Court has a *clear path* to grant Plaintiffs' requested relief.  The APA provides that the Court *must* compel agency action unlawfully withheld or unreasonably delayed, and the Court has broad equitable discretion to remedy VA's violations of the Constitution.  As set forth herein, this Court has jurisdiction over all of Plaintiffs' claims, and has the power to grant the remedies Plaintiffs seek.

1    But in addition to the jurisdiction to decide and the power to remedy, this Court has the

2    *opportunity* to avert an even more serious looming crisis that is likely to occur when the wars in

3    Iraq and Afghanistan come to an end, and the already overburdened VA system is crushed by the

4    mental health and disability compensation needs of the hundreds of thousands of returning troops.

5    VA has demonstrated for decades that it will not take the necessary steps absent Court

6    intervention; Plaintiffs respectfully request that the Court take this opportunity to save lives.

7    **II.    THE COURT HAS SUBJECT MATTER JURISDICTION TO GRANT RELIEF**

8            As this Court held in the January Order Granting in Part and Denying in Part the Motion

9    to Dismiss, the Court has jurisdiction over this action because Plaintiffs' claims do not "require

10   this Court to review a decision by the Secretary involving an individual claim." *Veterans for*

11   *Common Sense v. Nicholson*, No. C-07-3758 SC, 2008 WL 114919, at *13 (N.D. Cal. Jan. 10,

12   2008) ("*VCS*").  VA suggests that the Court lacks jurisdiction because Plaintiffs are somehow

13   challenging regulations, citing the Federal Circuit's authority under 38 U.S.C. § 502.  Plaintiffs

14   do not challenge regulations, but rather attack systemic aspects of the claims adjudication process

15   under a traditional due process balancing test.  That regulations may play into the due process

16   analysis is irrelevant to the jurisdictional question.  Yet Defendants persist in their attempts to

17   resurrect arguments from their Motion to Dismiss.

18           VA incorrectly suggests that Plaintiffs challenge 38 C.F.R. § 20.101(b), providing that

19   veterans cannot seek formal adjudication of medical decisions before the BVA.  Plaintiffs

20   challenge the absence of any review mechanism for denials of care, and the constitutional

21   adequacy of the clinical appeals process for medical decisions.  VA suggests that Plaintiffs

22   challenge 38 C.F.R. § 3.304(f), requiring credible evidence of an in-service stressor for a

23   determination of service-connection for PTSD.  Plaintiffs do not challenge this regulation, but

24   merely point out that the credibility determination, and need to show in-service stressor are two

25   unique aspects of PTSD claims, which can result in lengthier delays for PTSD claims.  Similarly,

26   Plaintiffs do not challenge 38 C.F.R. § 3.109(a), which provides that a veteran's claim is treated

27   as abandoned if evidence is not submitted within one year, the "ratings schedule" used to assign

28   disability ratings, set forth at 38 C.F.R. §§ 4.1-4.31, or the procedural requirements to pursue an

1    appeal, set forth at 38 C.F.R. §§ 20.200-20.202.  What Plaintiffs challenge are unreasonable

2    delays, the absence of procedural protectors and the clearly adversarial-nature of the system, that

3    combine to create a high risk of erroneous deprivation.  The fact that some regulations are

4    implicated in this analysis does not deprive this Court of jurisdiction over Plaintiffs'

5    constitutional due process claims.

6        Nor does case law support VA.  Under § 502, the Federal Circuit only has exclusive

7    jurisdiction over cases that involve notice and comment before promulgation of a specific rule or

8    consider the constitutionality and interpretation of a particular regulation.[1]  What VA cannot cite

9    to is any case law holding that systemic due process challenges that only tangentially involve

10   regulations belong in the Federal Circuit.  In fact, the Ninth Circuit has held that § 502 does not

11   preclude district court jurisdiction over even direct challenges to VA regulations where the

12   challenge does not involve rule-making or an action by the Secretary requiring notice and

13   publication.  *Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005).  If direct challenges to

14   regulations can proceed in district courts, then clearly an action that does not directly challenge

15   any regulation is not barred from jurisdiction merely because regulations relating to the proof.

16   Moreover, district courts consider actions alleging that agency practices violate regulations.  *City

17   of New York v. Heckler*, 578 F. Supp. 1109, 1124 (E.D.N.Y. 1984).

18       VA urges that *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 71 (2004), bars

19   the relief Plaintiffs seek; but *Norton actually supports* a programmatic challenge to agency action.

20   *Norton*, prescribes two requirements to relief under APA 706: (1) discrete agency action, and (2)

21   that action must be statutorily mandated.  *Norton*, 542 U.S. at 64.  In *Norton*, the Supreme Court

22   upheld the district court's dismissal of a complaint for lack of subject matter jurisdiction, refusing

---

23   [1] *See Paralyzed Veterans of Am. v. Acting Sec'y of Veterans Affairs*, 138 F.3d 1434 (Fed.
     Cir. 1998) (considering whether rule-making procedure incorrectly lacked public notice and
24   comment); *The Coalition for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*,
     464 F.3d 1306 (Fed. Cir. 2006) (same); *Splane v. Sec'y of Veterans Affairs*, 216 F.3d 1058 (Fed.
25   Cir. 2000) (considering whether Department of Veterans Affairs' general counsel opinion
     amounted to rule-making and therefore required public notice and comment); *Nat'l Org. of
26   Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345 (Fed. Cir. 2003) (facial
     challenge to the constitutionality of an amended VA rule); *Chinnock v. Turnage*, 995 F.2d 889
27   (9th Cir. 1993) (holding only Federal Circuit has jurisdiction to interpret a VA regulation).

28

to apply § 706's sovereign immunity waiver because the Agency had no legal duty to enforce the speculative land-use plans at issue. *Norton* is clearly distinguishable from this case. Plaintiffs' claims fulfill the requirements of *Norton* because they involve *discrete* and *mandatory* statutory duties, including the duties to: provide veterans with health care (38 U.S.C. § 1710); provide veterans with compensation (38 U.S.C. § 1110); expeditiously deal with remanded claims (38 U.S.C. § 5109B); and employ sufficient staffing levels at the Board of Veterans Appeals ("BVA") to ensure timely adjudication of appeals (38 U.S.C. § 7101). In stark contrast, *Norton* involved a non-binding plan, not a "statute itself as a source of the [agency] duty in question." *Our Children's Earth Found. v. EPA*, 506 F.3d 781, 795 (9th Cir. 2007). The statutes Plaintiffs challenge set forth unequivocal statutory duties. The Ninth Circuit has made clear that "shall means shall." *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 837 (9th Cir. 2001). Thus *Norton supports* the Court's jurisdiction to grant Plaintiffs' requested relief. The Supreme Court has held that courts may "intervene in the administration of the laws [pursuant to the APA] only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect. Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or *even a whole 'program' to be revised by the agency* in order to avoid the unlawful result that the court discerns." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (emphasis added). Thus, Supreme Court jurisprudence supports the notion that the Court can and must act when faced with agency action unlawfully withheld or unreasonably delayed.

### III.    JURISDICTION OVER APA CLAIMS

Claims brought against an agency pursuant to the APA must satisfy certain agency action requirements. They must challenge final agency action — which under § 706(1) also includes agency actions unlawfully withheld or unreasonably delayed. Under the APA, once this Court determines such action has been unlawfully withheld or unreasonable delayed, the Court must compel the agency to act.

VA concedes that Plaintiffs' medical care claims challenge discrete agency action. VA acknowledges that both the Mental Health Strategic Plan and the Feeley Memorandum of June1, 2007 constitute discrete agency action, which properly can be challenged in this court. (RT 63:8-

21).[2]  Moreover, this Court has already held that there is no alternative adequate remedy.  Order at 20.  Having overcome these threshold issues, jurisdiction is proper over Plaintiffs' § 1710 claims, and sovereign immunity is waived pursuant to § 702 of the APA.

Plaintiffs also challenge agency actions relating to SCDDC adjudication.  VA is required to pay compensation to any veteran with a "disability resulting from personal injury suffered or disease contracted in line of duty."  38 U.S.C. § 1110.  Similarly, 38 U.S.C. § 7101 provides that the BVA "shall consist of . . . such number of members . . . and sufficient personnel . . . to enable the Board to conduct hearings and consider and dispose of appeals properly before the Board in a timely manner."  And 38 U.S.C. § 5109B provides that, "[t]he Secretary shall take such actions as may be necessary to provide for the expeditious treatment . . . of any claim that is remanded to a regional office" by BVA.  VA is violating all of these statutory obligations, and this is agency action unlawfully withheld or unreasonably delayed under § 706(1) of the APA.  Thus, these claims challenge agency action as required under the APA.  Sovereign immunity is properly waived, and this Court has jurisdiction to consider these claims, to compel agency action.

## IV.    JURISDICTION OVER CONSTITUTIONAL CLAIMS

VA relies on one legal argument to address the unconstitutional delays claimants face during the veterans' benefits adjudication process: that Plaintiffs have failed to challenge a "discrete agency action."  This is misplaced for two reasons.  First, this is a constitutional claim, for which it is unnecessary to challenge a discrete agency action.  Second, Plaintiffs do, in fact, challenge discrete agency actions relating to delays.

As this Court noted in its January Order, Plaintiffs must establish a valid waiver of sovereign immunity, this waiver is provided in § 702 of the APA.  The Court cited conflicting authorities in the Ninth Circuit.  In *Gallo Cattle Co. v. U.S. Dep't of Agriculture*, 159 F.3d 1194 (9th Cir. 1998), the Court held that § 702 is constrained by § 704 (necessitating a challenge to "final agency action" in order to rely on the waiver set forth in § 702).  In *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989), the Ninth Circuit held that § 702 is not constrained

[2] RT refers to the "Reporter's Transcript" from the trial held on April 21-30, 2008.

1   by the APA's "agency action" requirements.  The Ninth Circuit recently considered this

2   perceived inconsistency, but declined the opportunity "to make a sua sponte en banc call to

3   resolve this conflict" due to the distinguishing facts in that case.  *Gros Ventre Tribe v. United*

4   *States*, 469 F.3d 801, 809 (9th Cir 2006).  The Ninth Circuit may have been mistaken in

5   suggesting that *Presbyterian Church* and *Gallo Cattle* are not distinguishable.  There is, in fact,

6   one key distinction.  *Presbyterian Church* was a constitutional claim, and relied only on the

7   APA's broad waiver of sovereign immunity.  *Gallo Cattle*, on the other hand, was a case brought

8   solely *under* the APA, based on an agency's failure to comply with a statute.  Thus, for a case

9   brought pursuant to the APA (as opposed to merely relying on the APA's sovereign immunity

10   waiver), the claims must fulfill the agency action requirements set forth in the APA.  In the case

11   at hand, the claims brought pursuant to the APA must challenge some final agency action, failure

12   to act or unreasonable delay (and as set forth above, Plaintiffs do challenge such agency action),

13   but Plaintiffs' constitutional claims are not so constrained in order to rely on the sovereign

14   immunity waiver set forth in § 702.  This squares nicely with this Court's holding in the January

15   Order that the *Presbyterian Church/Gallo Cattle* debate was resolved by the Supreme Court in

16   *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).  *Lujan* was a case brought pursuant to the

17   APA, like *Gallo Cattle*, as opposed to a constitutional claim merely relying on the APA's waiver

18   of sovereign immunity, as in *Presbyterian Church*.  Thus, the Supreme Court's holding in *Lujan*

19   merely stands for the proposition that claims brought pursuant to the APA must satisfy the agency

20   action requirements.

21        However, even if the sovereign immunity waiver were constrained by the agency action

22   requirements of the APA, Plaintiffs' constitutional challenges involve discrete agency actions.

23   As this Court has already held, "Plaintiffs have sufficiently articulated various actions and delays

24   by Defendants that qualify as 'final agency actions.'"  *VCS*, 2008 WL 114919, at *6.  In fact, the

25   Court squarely addressed whether delay constitutes final agency action, and held that Plaintiffs'

26   challenge to "the failure by the VA to make timely decisions on benefits claims and provide

27   timely medical care . . . falls within the definition of 'final agency action.'"  *Id.* at *6 (finding that

28   Plaintiffs plead a genuine § 706(1) claim).  Defendants concede that the Court has jurisdiction to

1  consider Plaintiffs' systemic due process claims. "Now, the trial type procedures that — they say

2  the statute itself is unconstitutional, which we concede that you have jurisdiction to consider, your

3  Honor".[3]  (RT 80:24-81:1.)

4  **V.    REMEDIES**

5      **A.    Under APA, the Court Must Compel Agency Action Unlawfully Withheld**

6          Once a Court determines that an agency acted unlawfully, the APA provides a very

7  specific remedy: it *requires* the Court to compel the agency to take those discrete actions it is

8  required to take by statute.  (Mar. 3, 2008 Order, PIRT 9:8-12.)[4] (APA relief is mandatory where

9  Plaintiffs have proven that "agency action is unreasonably delayed or withheld"). (*Id.*)  Plaintiffs

10  thus request an injunction compelling VA to abide by its statutory mandates.  The relief issued by

11  the Court need not dictate how the agency should operate.  Rather, the Court has the option of

12  requiring VA to "first propos[e] a remedy to the Court which can then determine whether that

13  plan meets [VA's] legal responsibilities to plaintiffs."  *Cockrum v. Califano*, 475 F. Supp. 1222,

14  1240 (D.D.C. 1979) (failure to enjoin the delay "would neglect the Court's duty under the APA, 5

15  U.S.C. § 706(1)").  *Id.* at 1239.  In *Cockrum*, the court ordered defendants to "submit a plan

16      [3] Unable to challenge the Court's jurisdiction over these claims, Defendants claim that the
proper legal standard for Plaintiffs' due process claims is the standard set forth in *United States v.*
17  *Salerno*, 481 U.S. 739 (1987).  Defendants are mistaken.  While the Ninth Circuit may have
applied the *Salerno* standard to facial challenges to statutory language, this is a systemic due
18  process case, and should be analyzed under *Mathews v. Eldridge*, as acknowledged by this Court
in the January Order.  In finding Defendants' argument that an examination of due process claims
19  would involve a review of individual benefits decision was unpersuasive, this Court made clear
that due process analysis does not depend on individual cases:
20
          In applying this [*the Matthew's*, 424 U.S. at 335] test we must keep
21          in mind . . . the fact that the very nature of the due process inquiry
          indicates that the fundamental fairness of a particular procedure
22          does not turn on the result obtained in any individual case; rather,
          procedural due process rules are shaped by the risk of error inherent
23          in the truth-finding process as applied to the generality of cases. . . .

24  *VCS*, 2008 WL 114919, at *16 *citing Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305,
321 (1985) (internal quotes omitted.)  Thus, *Mathews v. Eldridge* provides the governing standard
25  by which this Court should weigh the constitutional adequacy of the VA claims adjudication
system.
26
      [4] PIRT refers to "Preliminary Injunction Reporter's Transcript."  The Preliminary
27  Injunction hearing took place March 3-6, 2008, and was consolidated with the trial.

28

1   designed in good faith as an operational (not an advocate's) device to reduce the time for decision

2   making and ultimately to permit all decisions to be made within a reasonable time." *Id.* at 1240.

3   Such an order in the case at hand would allow the court to remedy the substantial delays in the

4   provision of benefits and health care, without requiring the Court to assume a managerial role in

5   the agency.

6       **B.     The Court Has Broad Discretion to Remedy Constitutional Violations.**

7           The court's broad power to remedy constitutional violations has long been established.  In

8   *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954), a unanimous Court also held that the federal

9   judiciary had inherent power to fashion an appropriate remedy for constitutional violations.  *Id.*

10  More than fifty years of jurisprudence following *Brown* have established several factors

11  governing equitable remedies for constitutional violations:

12              [First,] the nature of the [equitable] remedy is to be determined by
                the nature and scope of the constitutional violation. The remedy
13              must therefore be related to the 'condition alleged to offend the
                Constitution.'  Second, the decree must indeed be remedial in
14              nature, that is, it must be designed as nearly as possible to restore
                the victims of [unconstitutional] conduct to the position they would
15              have occupied in the absence of such conduct . . . .

16  *Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (citations omitted).  This Court should, at a

17  minimum, set time limits or require VA to establish a remedial plan to eliminate the

18  unconstitutional delays for rendering a decision at the RO and BVA level on SCDDC claims.

19  *White*, 434 F. Supp. 1252 (D. Conn. 1976).  *Heckler v. Day*, 467 U.S. 104 (1984), does not bar

20  such a remedy here because Congress has not considered and rejected the idea of imposing

21  mandatory time limits at the various stages of the Veterans Benefits Administration (VBA")

22  adjudication process and has, in fact, never imposed any mandatory time limits on VBA.

23      **C.     This Court Has Many Remedial Alternatives.**

24          This Court has broad discretion to fashion an appropriate remedy.  The Court can declare

25  that the facts proven at trial constitute a denial of veterans' constitutional right to due process.

26  *Barnett v. Bowen*, 794 F.2d 17, 21-22 (2d Cir. 1986).  Such an order is appropriate here, based on

27  the nearly undisputed facts.  *White v. Matthews*, 434 F. Supp. at 1261 (holding unreasonable

28  delay constitutes a denial of due process).  The Court may also direct VA to provide claimants

1    with minimal procedural safeguards "consistent with" *Goldberg v. Kelly*, 397 U.S. 254, 270-72

2    (1970) and *Solis v. Schweiker*, 719 F.2d 301 (9th Cir. 1983).[5]    The Court could also issue a

3    general "fix it" order, retaining jurisdiction to enforce it by ordering more targeted remedies later,

4    if necessary.    Such an order would not involve the Court in "managing" the agency.    The Court

5    may also order VA to propose a detailed remedial plan, or it could order the parties to confer and

6    jointly propose a plan.    *See, e.g.*, *Ctr. for Biological Diversity v. Norton*, 304 F. Supp. 2d 1174,

7    1184 (D. Ariz. 2003) (ordering Fish and Wildlife Commission to submit new plan for protection

8    of spotted owl, and retaining jurisdiction to enforce the order); *Henrietta v. Guiliani*, No. 95 CV

9    0641 (SJ), 2001 WL 1602114 (E.D.N.Y. Dec. 11, 2001).

10        This Court may also appoint a variety of "agents" to assist in oversight and enforcement

11    of the injunction (such as a special master, monitor, ombudsman, or advisory committee).    *See Ex*

12    *parte Peterson*, 253 U.S. 300, 306 (1920); *United States v. Suquamish Indian Tribe*, 901 F.2d

13    772, 775 (9th Cir. 1990).    Federal Rule of Civil Procedure 53 authorizes the appointment of

14    masters.    The use of special masters is common when large bureaucracies, including federal

15    agencies, are permeated with systemic constitutional or statutory violations.    For example, one

16    court appointed a master to develop and implement a plan to ensure that the state's eligible

17    children received Medicaid benefits.    *John B. v. Menke*, 176 F. Supp. 2d 786, 807 (M.D. Tenn.

18    2001).    Similarly, another court used a number of special masters and expert consultants to fix the

19    state's broken foster care system.    *Joseph A. v. New Mexico Dep't of Human Servs.*, 69 F.3d 1081

20    (10th Cir. 1995) (*rev'd on other grounds*).    Cases addressing prison conditions often involve

21    special masters.    *See, e.g.*, *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980) (*rev'd on other*

22    *grounds*), where the parties entered into a decree requiring reducing prison crowding, furnishing

23    adequate health care, and bringing living standards into compliance with state requirements.    The

24    court appointed a special master to monitor compliance, noting that a master is particularly

25    _____

26        [5] *Goldberg* holds that claims for welfare benefits affect "property interests," entitling
    claimants, under the Due Process Clause, to certain minimal procedural safeguards — including
    an evidentiary hearing, the right to make oral arguments and cross-examine witnesses, and the
27    right to retain (and, presumably, to compensate) counsel if the claimant so desires, a right that
    veterans are denied at the initial stages of their claims.    397 U.S. at 266.

28

1    appropriate when the institution has a history of unconstitutional practices. *Id.* at 1389.

2         While there are many forms that this Court's relief can take, one thing is clear:  VA will

3    not remedy this situation absent a Court order.  VA's promises have been made for decades, yet

4    the same problems exist, persist, and are predicted to get worse.  The Court is faced with an

5    extraordinary opportunity to truly affect the lives of the men and women who are suffering from

6    PTSD as a direct consequence of their service to this Country.  The Court should compel agency

7    action that is being unlawfully withheld and unreasonably delayed by VA, as it is required to do

8    pursuant to the APA, and should exercise its equitable discretion to grant relief to remedy the

9    unconstitutional delays and procedural inadequacies claims adjudication process.

10                          **FINDINGS OF FACT**[6]

11   **I.     THE NEED FOR MENTAL HEALTH SERVICES**

12        1.   There is a significant unmet need for mental care services for veterans who are

13   returning from the Iraq and Afghanistan wars.  Dr. Marcus Nemuth, Director of Psychiatry

14   Emergency Services in VA Puget Sound, testified he is seeing a "tsunami of medical need"

15   among returning veterans.  (Ex. 1263 at 38:24-39:1.)

16        2.   The suicide rate among veterans has been estimated by VA researchers to be as high

17   as 7.5 times the national average.  (Ex. 133 at 8; RT 276:3-12.)  The "Katz Suicide Study," dated

18   February 21, 2008, found that suicide rates among veterans are approximately 3.2 times higher

19   than the general population.  (RT 274:15-275:19; Ex. 1183.)

20        3.   An analysis by Dr. Stephen Rathbun, the interim head of the Department of

21   Epidemiology and Biostatistics at the University of Georgia, found that in 2005, the suicide rate

22   among veterans who were 20 to 24 years old was three to four times higher than the non-veteran

23   suicide rate for that age group.  (PIRT 310:9-311:2.)  Internal VA e-mails state that Dr. Rathbun's

24   methodology was "defensible" and "appears to be correct."  (Exs. 1306, 1248.)

25        4.   An internal VA e-mail, dated December 15, 2007, states that "[t]here are about 18

26   _____

27        [6] All findings of fact should also be construed as conclusions of law, and all conclusions
     of law should also be construed as findings of fact

28

1    suicides per day among American's 25 million veterans."  The e-mail adds:  "VA's own data

2    demonstrate 4-5 suicides per day among those who receive care from us."  (Ex. 1247.)  In

3    addition to completed suicides, an internal VA e-mail, dated February 13, 2008, states:  "Shh!

4    Our suicide prevention coordinators are identifying about 1,000 suicide attempts per month

5    among the veterans we see in our medical facilities.  Is this something we should (carefully)

6    address ourselves in some sort of release before someone stumbles on it?"  (Ex. 1249.)  There

7    have been dramatic increases in calls to the suicide hotline over time. (Exs. 1304, 1305).

8         5.  A study released on April 17, 2008, by the RAND Corporation included the following

9    "key" findings:  approximately 18.5% of U.S. service members who have returned from Iraq and

10   Afghanistan currently have PTSD and 19.5% reported experiencing a traumatic brain injury.

11   "Roughly half of those who need treatment for these conditions seek it, but only slightly more

12   than half who receive treatment get minimally adequate care."  (Ex. 1191 at 1.)  The RAND study

13   also estimates that 300,000 American soldiers deployed to Iraq and Afghanistan "currently suffer

14   from PTSD or major depression."  (Ex. 1253 at xxi.)

15        6.  In 2008, Dr. Robert Rosenheck, Director of VA's Northeast Program Evaluation

16   Center ("NEPEC"), issued a report entitled "Recent Trends in VA Treatment of Post-Traumatic

17   Stress Disorder and other Mental Disorders."  (Exs. 442, 444.)  That report found that during

18   2003-2005, for veterans born after 1972, there was a 232% increase in PTSD diagnosis.  (Ex. 442

19   at 1722.)  And although the number of veterans diagnosed with PTSD doubled between 1997 and

20   2005 (*id*.), "the number of clinic contacts per veteran per year declined steadily and relatively

21   uniformly across the years."  (*Id.* at 1723.)  Dr. Rosenheck found that increases in PTSD

22   diagnosis among Iraq and Afghanistan veterans born after 1972 continued to increase

23   "substantially" during 2005-2007.  (Exs. 1265 at 75:15-77:5; 448.)

24        7.  The 2007 Long Journey Home report, which reports on service delivery and

25   performance of VA's PTSD programs, confirms that service intensity (visits per veteran) for

26   specialized PTSD outpatient treatment programs has continued to decline, reflecting a 4.7%

27   decrease in intensity during 2006-2007.  (Ex. 1265 at 132:11-135:3; Ex. 445 at 23-24.)  Many

28   Iraq and Afghanistan veterans also suffer from depression.  (RT 276:13-18.)  Depression and

1    PTSD are two of the leading risk factors for suicide.  (*Id.* at 276:13-19; 274:7-14.)

2        8.   Dr. Arthur Blank is an expert in psychiatry, specializing in treatment of veterans with

3    mental health problems, including PTSD.  He spent 10 years as a teaching and supervising

4    psychiatrist at the Westhaven VA Medical Center and during 1994-1997 was the chief

5    psychiatrist on the PTSD team at the Minneapolis VA.  (PIRT 57:18-23.)  The Court finds that

6    Dr. Blank's testimony was knowledgeable, forthright and credible.  Dr. Blank testified that there

7    is "a strong connection" between PTSD and suicide.  (*Id.* at 69:23-70:6.)  He also testified that

8    depression is one outcome of untreated PTSD (*Id*. at 70:21-25) and that depression increases the

9    risk of suicide.  (*Id.* at 71:1-7.)  If PTSD is not properly treated, it can lead to "terrible" suffering

10   and pain, and disruptions in the person's family and/or career.  (*Id*. at 76:23-77:5.)  PTSD

11   becomes more difficult to treat as symptoms progress.  (*Id*. at 77:6-9.)

12       9.   Dr. Chad Peterson is a Board Certified Psychiatrist.  From July 2005 to July 2007, Dr.

13   Peterson was the medical director of the PTSD clinical team at the San Francisco VA hospital.

14   (PIRT 319:4-23.)  The Court finds that Dr. Peterson's testimony was persuasive and convincing.

15   Dr. Peterson explained that a number of studies demonstrate "a strong link" between PTSD and

16   suicide.  (*Id*. at 332:25-333:17.)  Dr. Peterson also testified regarding the importance of prompt

17   treatment for PTSD.  He opined that failing to see a doctor promptly can lead to suicide.  (*Id*. at

18   355:20-25.)  In addition, that if the wait time for a mental health appointment was more than a

19   week, "the attendance rate was very low."  (Ex. 40; PIRT 354:11-355:18.)

20       10. Dr. Gerald Cross is Principal Deputy Under Secretary for Health at the VHA.  Dr.

21   Cross agreed that the longer a person suffering from PTSD waits to receive medical attention, the

22   greater the risk that that person will develop a psychosocial problem.  (PIRT 137:9-16.)  Dr.

23   Cross also agreed that the longer a veteran with PTSD has to wait for medical attention, the

24   greater the risk that a mild form of the disorder will develop into even more severe forms of

25   pathology.  (*Id*. at 137:17-23.)  Dr. Cross agreed with the National Center for Post Traumatic

26   Stress Disorder (an agency within VA) that 35% of service members from Iraq were seen in VA

27   for a mental health visit within a year of their return.  (Ex. 182 at 2; PIRT 219:3-220:17.)  Dr.

28   Cross testified that the high rates of PTSD among Iraq veterans are a result of a number of

factors, including multiple deployments, an inability to identify the enemy, the lack of a real "safe zone," and the inadvertent killing of innocent civilians.  (PIRT 216:23-218:2.)

11. There is a direct relationship between increased spending on mental health care and decreased suicide rates.  The study entitled "Time Trends and Predictors of Suicide Among Mental Health Outpatients in the Department of Veterans Affairs," authored by Dr. Rosenheck and published in 2008, found that every $100 increase in per capita outpatient mental health spending was associated with a 6% decrease in the rate of suicide.  (Ex. 446 at 118.)

12. Veterans are entitled to five years of care from VA (PIRT 226:20-23) and to free medical care if they develop PTSD or become suicidal in the future, even 10 years from now.  (*Id.* at 230:5-11.)  VA's obligation to provide this care is "a sacred mission."  (*Id.* at 227:12-21.)

13. Mr. Kearns, VHA's CFO, testified that VHA is not currently facing a budget crisis and has adequate money to "meet the mission requirements."  (PIRT 574:13-18.)  Dr. Cross agreed that VA has enough funding from Congress to "carry out [the] mission" to provide the medical care needed, and is in fact currently "running under budget."  (*Id.* at 225:12-19; 239:4-10.) VHA's current budget provides enough funding to cover even a "worst-case scenario of returning troops with mental illness."  (*Id.* at 787:17-20.)  From 2004 to present, VHA's medical care budget included "unspent multi-year appropriations funds carried forward from the previous year" — money that could have been spent providing mental health care to veterans.  (Kearns Decl. ¶ 5; PIRT 559:23-561:2; 567:19-568:13.)  At the end of FY2007, $1.3 billion was carried over to the FY2008 budget.  (Ex. 305 at 1; Kearns Decl. ¶ 5.)  At least $500 million was carried over from the FY2006 VHA budget to the FY2007 budget.  (Ex. 305 at 1; PIRT 572:4-9.)  There are currently approximately 3,800 unfilled mental health positions at the VA.  (PIRT 419:10-14.) As of October 31, 2007, there were 2,403 unfilled nursing positions and 1,394 unfilled doctor positions.  The VA, however, has enough money to fill these positions and "enough money and funding to carry out our mission" with respect to providing medical care to veterans.  (*Id.* at 222:22-225:23; 230:23-231:24; Ex. 316 at 20; Ex. 319 at 19.)

## II.    VHA FAILURE TO IMPLEMENT MENTAL HEALTH STRATEGIC PLAN

14. VA adopted the Comprehensive Mental Health Strategic Plan ("MHSP") in July 2004.

1   (Ex. 398.) One of the initiatives in the MHSP was to "[r]educe suicides among veterans." (*Id.* at

2   A-2.) A key component of the MHSP was to "[d]evelop methods for tracking veterans with risk

3   factors for suicide and systems for appropriate referral of such patients to specialty mental health

4   care." (*Id.* at A-29.) Another vital component of the MHSP was expanding access to mental

5   health services in Community Based Outpatient Clinics ("CBOCs"). (*Id.* at A-6.) The MHSP

6   also requires screening returning veterans for mental health issues is also required by the MHSP.

7   (*Id.* at A-5, A-27.)

8       15. William Feeley, as Deputy Under Secretary for Health Operations and Management, is

9   responsible for the implementation of policy and procedure in the 21 Veterans Integrated Service

10  Networks ("VISNs"). According to Mr. Feeley, when it comes to compliance, "the buck stops

11  with [him]." (Ex. 1259 at 20:20-21:5; 50:7-22; 54:23-55:13.) On June 1, 2007, Mr. Feeley

12  issued a memorandum to all VISN Directors regarding "Mental Health Initiatives" ("the Feeley

13  Memo"). These "initiatives" purportedly served to "reinforce the priorities established by the

14  VHA Comprehensive Mental Health Strategic Plan," adopted in July 2004. (Ex. 148.) However,

15  Mr. Feeley admitted he was not aware of any steps taken to implement the MHSP prior to the

16  release of his Memo, and did not know whether prior to that time, VISN directors had or were

17  supposed to implement the MHSP in their VISNs. (Ex. 1259 at 78:22-79:8; 79:19-80:5; 88:10-

18  14; 154:19-155:9.) The asserted driving force behind the Feeley Memo was "the importance of

19  getting the specific implementations of the mental health plan starting to roll out," which he

20  believed was "overdue." Mr. Feeley acknowledges, however, that his memo was not intended to

21  implement all of the MHSP initiatives. (Ex. 1259 at 198:25-199:22; 220:20-24.)

22      16. VA admits it is not monitoring compliance with the MHSP's requirement that VA

23  track all veterans with risk factors for suicide. When asked why not, Mr. Feeley responded: "I

24  have no answer other than we haven't done it, and that's a good suggestion." (Ex. 1259 at 158:5-

25  159:10; 163:9-14.) Mr. Feeley also admitted that he does not know whether a national program

26  for suicide prevention was developed as directed by the MHSP. (*Id.* at 93:8-15.)

27      17. The only metrics used to track implementation of the Feeley Memo are (1) the number

28  of vacant mental health staff positions and (2) the number of veterans waiting for mental health

1    appointments beyond the 30-day standard. (Ex. 1259 at 27:20-28:16; 267:5-16.) VA is not

2    tracking whether veterans seeking or referred for mental health care receive an initial evaluation

3    within 24 hours, as required by the Feeley Memo. As of April 9, 2008, Mr. Feely did not know

4    how many VA Medical Centers ("VAMCs") or CBOCs had actually implemented the 24-hour

5    provision. (Ex. 1259 at 247:25-248:15; 257:19-258:1.)

6         18. VA's reliance on site visits to ensure implementation of the provisions of the Feeley

7    Memo is inadequate. Between August 1, 2007 and March, 2008, only two site visits had

8    occurred. (Ex. 1259 at 254:20-255:13; 257:1-12.) Dr. Antonette Zeiss is the Deputy Chief

9    Consultant for the Office of Mental Health Services in the VA Central Office. (PIRT 395:9-12.)

10   According to her, the first site visit occurred three weeks before the preliminary injunction

11   hearing, in March 2008. (PIRT 457:9-13) That visit to Los Angeles revealed areas where 100%

12   implementation had not yet been achieved. (*Id.* at 456:4-14.) Dr. Zeiss further testified "[w]e

13   don't have a specific plan" for monitoring VA facilities for compliance with the Feeley Memo

14   and therefore "can't say" when that will happen. (*Id.* 458:6-14.) No one at VA audits facilities

15   that contract with VA to ensure that they are complying with the Feeley Memo. (*Id.* 459:2-19.)

16        19. On May 10, 2007, VA Office of Inspector General ("OIG") issued a report, entitled

17   "Implementing VHA's Mental Health Strategic Plan Initiatives for Suicide Prevention" ("May

18   2007 OIG Report"). (Ex. 133.) That report concluded that many components of the Plan had not

19   been implemented. For example, screening, assessment of veterans at risk, emerging best

20   practices, suicide prevention database, and education programs were all only in the "Pilot Stage."

21   (*Id.* at 53.) Four other programs were implemented only at certain VISNs. (*Id.*) Only one

22   program (research) had been implemented systemwide. (*Id.*)

23        20. The May 2007 OIG Report also found 61.8% of VA facilities had not implemented a

24   suicide prevention strategy to target veterans returning from Iraq and Afghanistan. (Ex. 133 at

25   37.) In addition, 42.7% of VA facilities had not implemented a program to educate first contact

26   non-clinical personnel about how to respond to crisis situations involving veterans at risk for

27   suicide. (*Id.* at 46.) Of those facilities who had implemented such programs, 30.3% were not

28   mandatory. (*Id.*) Seventy percent of VA facilities had not implemented a tracking system for

1  veterans with risk factors for suicide.  (Ex. 133 at 33.)  In addition, 16.4% of VA facilities had not

2  implemented a system to facilitate referral of veterans with risk factors for suicide.  (*Id.* at 25, 30.)

3      21. CBOCs only provide outpatient services during regular business hours, generally

4  Monday through Friday from 8 a.m. until 4:30 or 5:00 p.m.  (PIRT 169:19-25.)  VA's failure to

5  provide 24-hour access to mental health services is a critical defect in VA's provision of care and

6  further evidence of its failure to implement the MHSP.  (RT 312:24-313:2.)

7      22. In fiscal year 2005, $12 million of $100 million allocated for spending on the MHSP

8  was not spent and in FY06, $88 million of the $200 million allocation was left unspent.  (Kearns

9  Decl. ¶ 8; PIRT 563:9-564:7.)

10 **III.    DELAYS IN THE RECEIPT OF MENTAL HEALTH CARE**

11     23. The May 2007 OIG Report found delays in obtaining referrals for depression and

12 PTSD.  Where a primary care provider refers a patient with symptoms of moderate severity for

13 depression, 24.5% of VA facilities reported a wait time of 2-4 weeks and 4.5% reported a wait

14 time of 4-8 weeks.  (Ex. 133 at 31.)  The wait times for PTSD referrals were even longer, with

15 26.4% reporting 2-4 week waiting periods and 5.5% reporting waits as long as 4-8 weeks.  (*Id.* at

16 32.)

17     24. On September 10, 2007, VA's OIG issued a report entitled, "Audit of the Veterans

18 Health Administration's Outpatient Waiting Times" ("Sept. 2007 OIG Report").  (Ex. 169.)  That

19 report was prepared at the request of the U.S. Senate Committee on Veterans' Affairs.  (*Id.* at i.)

20 Its purpose was to follow up on a July 2005 audit, reporting that "VHA did not follow established

21 procedures when scheduling medical appointments for veterans seeking outpatient care."  (*Id.*)

22 That July 2005 report made eight recommendations for corrective action, five of which the Sept.

23 2007 OIG Report found had not been implemented.  (*Id.* at vi.)

24     25. The Sept. 2007 OIG Report found that "(25 percent) of the appointments we reviewed

25 had waiting times over 30 days when we used the desired date of care that was established and

26 documented by the medical providers in the medical records."  (Ex. 169 at ii, 5.)  The report

27 found that "(72 percent) of the 600 appointments for established patients had unexplained

28 differences between the desired date of care documented in medical records and the desired date

1  of care the schedulers recorded in VistA [the electronic waiting list]." (*Id.* at iii, 7.)  The report

2  also found that "[o]f the 100 pending consults, 79 (79 percent) were not acted on within the 7-day

3  requirement and were not placed on the electronic waiting list.  Of this number, 50 veterans had

4  been waiting over 30 days without action on the consult request." (*Id.* at vi.)

5       26. The Sept. 2007 OIG Report also found that schedulers were not adequately trained.

6  Of 113 schedulers interviewed, 47% had no training on consults within the last year, and 53% had

7  no training on the electronic waiting list in the last year.  (Ex. 169 at vi.)  The report states:

8  "While waiting time inaccuracies and omissions from electronic waiting lists can be caused by a

9  lack of training and data entry errors, we also found that schedulers at some facilities were

10  interpreting the guidance from their managers to reduce waiting times as instruction never to put

11  patients on the electronic waiting list.  This seems to have resulted in some 'gaming' of the

12  scheduling process." (*Id.*)  The Sept. 2007 OIG Report also found that VA "has not implemented

13  effective mechanisms to ensure scheduling procedures are followed." (*Id.* at 9.)  The Sept. 2007

14  OIG Report concluded that, "VHA's method of calculating the waiting times of new patients

15  understates the actual waiting times." (*Id.* at iii, 7.)

16       27. As of April 2008, according to VHA's data, there are approximately 85,450 veterans

17  on VHA waiting lists for mental health services.  (Ex. 1244.)  Patients who wait up to 30 days for

18  an appointment are not included in the electronic waiting lists.  (PIRT 635:10-16.)  A report from

19  the South Dakota VA facility found that for the first quarter of 2008, "access/timeliness" was one

20  of the top three patient complaints.  (Ex. 1296.)

21       28. The Special Committee on  PTSD issued its first report on ways to improve VA's

22  PTSD services in 1985, and its latest report in 2004.  (Ex. 37 at 2.)  In a 2005 report: "VA Should

23  Expedite the Implementation of Recommendations Needed to Improve Post-Traumatic Stress

24  Disorder Services" ("PTSD Report"), the U.S. Government Accountability Office ("GAO")

25  found that none of the 24 recommendations made by the Special Committee on clinical care were

26  fully implemented, including 10 recommendations that dated back to the 1985 report.  (*Id.* at 5.)

27       29. In the PTSD Report, GAO found VA had only partially met the recommendation to

28  "[p]rovide increased access to PTSD services." (*Id.* at 26.)  Although VA was treating more

1   veterans for PTSD, it had not developed referral mechanisms in CBOCs that do not offer mental

2   health services.  (*Id.* at 26-27.)  GAO also found VA had not met 10 of the 24 Special Committee

3   recommendations related to PTSD clinical care and education, including (1) extending efforts to

4   monitor productivity and quality of specialized services across the PTSD continuum of care; (2)

5   expanding PTSD treatment to include family assessment and treatment services; (3) designating a

6   PTSD coordinator in each VISN; (4) developing a national PTSD education plan for VA; and (5)

7   developing credentialing standards for VA clinicians specializing in PTSD.  (*Id.* at 30-31.)

8   GAO's PTSD Report concluded that "VA's delay in fully implementing the recommendations

9   raises questions about VA's capacity to identify and treat veterans returning from military combat

10  who may be at risk for developing PTSD, while maintaining PTSD services for veterans currently

11  receiving them." (*Id.* at 3.)  Despite GAO's findings, schedulers currently "are not given specific

12  training about PTSD."  (PIRT 166:21-24.)

13          30. Dr. Frances M. Murphy was Deputy Under Secretary for Health for Health Policy

14  Coordination.  She was VA's representative to the President's New Freedom Commission on

15  Mental Health ("Commission"), created to improve mental health care.  (Ex. 1262 at 124:2-14.)

16  Dr. Murphy helped draft the MHSP.  (*Id.* at 37:1-15.)  On March 29, 2006, she stated:  "In some

17  communities, VA clinics do not provide mental health or substance abuse care or waiting lists

18  render that care virtually inaccessible."  (Ex. 397 at 7.)

19          31. In the fall of 2005, Dr. Murphy informed then Secretary Nicholson that there were

20  "still significant gaps in delivery of substance abuse care, and that in certain areas of the country

21  mental health access was still not meeting VHA standards."  (Ex. 1262 at 32:14-33:13; 35:7-

22  36:15.)  In February, 2006, VA eliminated Dr. Murphy's position, telling her they were closing

23  her office as of April, 2006, and refusing to give her an explanation.  (Ex. 1262 at 24:13-23;

24  103:16-25; 107:16-17.)  Mr. Kussman offered her an "early retirement".  (*Id.* at 68:8-69:4.)  Dr.

25  Murphy stood by her criticism of VA's delivery of care testifying "the statement was accurate"

26  and "the data that it was based on was VHA data."  (*Id.* at 165:8-15.)

27          32. Suicide Prevention Coordinator positions exist only at VA Medical Centers, of which

28  there are 153 nationwide.  (RT 1318:10-1319:3; Ex. 357.)  The more than 800 CBOCs, where

1    most veterans receive care, do not have suicide prevention coordinators.  (*Id.*)

2         33. Eligibility determinations are the only medical care-related decisions that may be

3    appealed to the BVA.  *See*, *e.g.*, 38 C.F.R. §§ 19.29, 19.30, 20.201, 20.202.  Plaintiffs do not

4    challenge the process by which eligibility determinations are made by VA.

5         34. The clinical appeals process does not apply to denials or delays in access to care that

6    do not involve clinical decisions.  (PIRT 656:5-9.)  For example, if a scheduler or clerk tells a

7    veteran that there are no available appointments within the time frame requested by the patient,

8    the clinical appeals process does not provide a resolution because the scheduler's "decision" is

9    not clinical.  (*Id.* at 705:6-20.)  All disputes regarding the course of treatment are handled through

10   an informal clinical appeals process outlined in VHA Directive 2006-057.  (Ex. 536.)  The

11   clinical appeals process is unnecessarily complex and, in practice, fails to resolve patients'

12   concerns about the course of their treatment.  (Ex. 536 at A-1; *see*, *e.g.*, Decl. of Sister 1 at 3:17-

13   19; 4:20-21; 4:23-28; Decl. of Brother 1 at 2:16-21; 4:3-6; Decl. of Girlfriend 1 at 2:1-4.)

14        35. The clinical appeals process does not provide a decision by a neutral party; rather, the

15   VISN director is responsible for the decision, including whether to seek an "external appeal" and

16   whether to disregard the recommendation resulting from the appeal.  (Ex. 536; PIRT 660:25-

17   661:8.)  The veteran has no right to initiate this external appeal, nor does the veteran have a right

18   to know that an external appeal has been initiated or what the resulting recommendation was.

19   (PIRT 715:17-718:14.)  According to Dr. Murawsky, Director of VISN 12, if a veteran wants to

20   know the outcome of the external appeal, the veteran can file an FOIA request.  (*Id.* at 718:15-

21   719:13.)  Because veterans are not adequately notified regarding the clinical appeals process, and

22   because of the complex nature of the process, few patient complaints make it to the formal appeal

23   stage.  (PIRT 643:22-644:2.)  For example, Dr. Murawsky testified he only sees, on average, six

24   formal appeals in his VISN per year.  (*Id.* at 643:22-23.)

25        36. The patient advocacy program does not provide an adequate remedy for veterans

26   denied timely access to care.  VA explains "[t]he Patient Advocate Program is a system that VHA

27   has in place to provide patients with a surrogate or an individual to help them grieve any issues

28   they have or walk through any problems they have with VHA."  (PIRT 638:16-19.)

37. Dr. Ronald Maris is an expert in suicidology and a distinguished professor emeritus at the University of South Carolina. Dr. Maris has published approximately 100 books, articles, and chapters on the topic of suicide and suicide prevention. (RT 264:18-266:8.) The Court finds that Dr. Maris was more credible, and evidenced a greater understanding of the issues, than Defendants' expert, Dr. Berman, who only consulted on the case for four days and a total of approximately 25-30 hours. (RT 1303:14-1304:1.)

38. Dr. Maris testified that the approximately 170 veteran suicide reports he read exposed significant and dangerous departures from standards of care by VA. (Ex. 1331; RT 294:18-296:22.) Dr. Maris determined that VA delayed treatment of suicidal veterans, neglected to evaluate patients for suicide risks, failed to commit veterans requiring inpatient psychiatric care, and ignored its own policies on suicide assessment and appointment scheduling. (*Id.*)

39. VA's failure to implement the MHSP is further evidenced by its failure to develop a proper suicide screening mechanism. (Ex. 398 at A-5, A-27.) The suicide screen currently used by VA is inadequate (RT 287:18-289-24; 291:17-293:13) and, incomplete because it does not require additional screening considered clinically necessary when a patient reports feeling depressed and hopeless. (RT 1325:19-1328:12.) If veterans were receiving proper and timely care for their mental ailments, the suicide rate should be lower. (RT 310:18-311:5.)

## IV.   DELAYS IN VBA'S SCDDC ADJUDICATION SYSTEM

### A.   Disabled Veterans and Their Survivors Have Both a Need and Strong Interest in SCDDC

40. Defendants' Answer admits that "[s]ervice-connected injuries frequently interfere with the quality of life and/or preclude employment of a veteran upon return to civilian life, while deaths often deprive a veteran's dependents of their principal or sole means of support." (Pls.' Pretrial Stmt., Att. C, Pleading Desig. From Defs.' Answer, 10:25-26.) Defendants' Answer to also admits that "[m]any PTSD claimants and recipients are frequently incapacitated, and many recipients are totally or primarily dependent upon SCDDC for support and upon VA Medical Services for their health care needs." (*Id.*) Approximately 82% of Army personnel and 89% of Marines have only a high school education or less. (RT 358:1-14.) There are approximately

1    154,000 homeless veterans on any given night.  (RT 503:17-22.)

2         41. In 2004, Congress created the Veterans' Disability Benefits Commission, which

3    conducted an in-depth analysis of the benefits and services available to veterans for the effects of

4    disabilities attributable to military service.  (Ex. 386 at 1.)  The Commission issued, in October

5    2007, its final report entitled, "Honoring the Call to Duty:  Veterans' Disability Benefits in the

6    21st Century."  (*Id.*)  The report found that disabled veterans have the lowest average earned

7    income, with a significant gap between them and a non-disabled comparison group.  (*Id.* at 218.)

8    The report also found that without VA compensation, service-connected veterans have on average

9    earned income significantly less than non-service-connected veterans, who already have

10   significantly lower incomes than the general population.  (*Id.* at 220.)

11        42. The Commission's report also found that "[f]or every age group and rating percentage

12   group, the average earned income of service-connected veterans with mental primary disabilities

13   is less — substantially less at higher rating percentages — than the average earned income of

14   service-connected veterans with physical primary disabilities."  (*Id.* at 225.)  Average earned

15   income of veterans with mental primary disability is significantly less than that of veterans with

16   physical primary disability, no matter what the rating of disability.  (*Id.*)

17        **B.     VBA's Adjudication Process for SCDDC Claims for PTSD**

18        43. The VBA includes the Compensation and Pension service that administers SCDDC,

19   which VBA views as its "core mission."  (RT 883:9-15; 885:8-22; 893:5-9.)  The Veterans

20   Service Center within each of VBA's 57 Regional Offices ("ROs") is responsible for adjudicating

21   veterans' and their survivors' claims for SCDDC.  (RT 887:22-888:8.)

22        44. To establish a claim for SCDDC, there must be evidence of a disability, service in the

23   military, and a nexus between the disability and one's service.  (RT 887:6-11.)  Approximately

24   88% of veterans are granted SCDDC for at least one claimed disability.  (RT 1042:10-24.)

25   Admiral Daniel Cooper, the Undersecretary for Benefits at VA until April 2008, testified that

26   veterans' disability benefits are "entitlements."  (Ex. 1258 at 14:11-22; 55:23-56:5.)

27        45. Veterans pursuing a SCDDC claim for PTSD have the additional burden of proving a

28   "stressor" event in his or her service.  (RT 952:22-953:8.)  This additional requirement makes

1    SCDDC claims for PTSD unique from all other claims.  (*Id.*)  SCDDC claims for PTSD are one

2    of the most complex types of claims that VBA adjudicates, in part due to the subjectivity involved

3    in adjudicating PTSD claims.  (Ex. 1257 at 142:25-143:9; RT 406:1-14.)

4         46. A claim for SCDDC begins with the filing of a 23-page application on VA Form 21-

5    526.  (RT 408:12-20; Ex. 1069.)  Veterans often make mistakes when completing the application

6    for SCDDC benefits, and veterans suffering from PTSD have special difficulty completing the

7    application.  (RT 348:9-25; 398:9-13.)  Veterans seeking SCDDC for PTSD based on a stressor

8    experienced during combat also complete a VA Form 21-0781, entitled "Statement in Support of

9    Claim for Service Connection for Post-Traumatic Stress Disorder."  (RT 409:23-410:3;

10   Ex. 1321.)  Veterans get frustrated completing this form when they do not remember the details

11   of the stressor that caused their PTSD.  (RT 410:12-412:10.)

12        47. Upon receiving a substantially complete application for benefits from a veteran, VBA

13   has a duty to notify the veteran, under the Veterans Claims Assistance Act ("VCAA"), of any

14   information that is necessary to substantiate the claim.  (RT 940:10-941:18; 38 U.S.C. § 5103.)

15   The notice provided in the "VCAA letter" must indicate which information is to be provided by

16   the veteran and which information VBA will attempt to obtain on behalf of the veteran.  (*Id.*)

17        48. VBA also has a duty to assist veterans under the VCAA.  (RT 923:8-11; 38 U.S.C.

18   § 5103A.)  VBA's duty to assist veterans includes providing a medical examination or obtaining a

19   medical opinion.  38 U.S.C. § 5103A(d).  The medical examination is known as a Compensation

20   and Pension Examination ("C&P Exam").  (RT 946:22-947:6; 951:18-21.)

21        49. The VCAA also imposes on VBA a duty to assist veterans in obtaining private and

22   federal records needed to substantiate their claims.  38 U.S.C. § 5103A(b)-(c).  The records

23   needed to substantiate a claim for disability compensation include medical records from the

24   veteran's service, private medical professionals, and VHA healthcare facilities.  *Id.*

25        50. Once all evidence is gathered, a Rating Veterans Service Representative (or "rating

26   specialist") within an RO decides whether the disability is service connected and assigns a rating

27   to the claim.  (RT 895:16-20; 956:19-957:9.)  The rating assigned to a claim is based on a rating

28   schedule, which is a sliding scale of monthly compensation ranging from $115 per month for a

1    10% rating to $2471 per month for a 100% rating.  38 U.S.C. § 1114.

2         51. Veterans dissatisfied with an RO's decision have one year to file an NOD.  38 U.S.C.

3    § 7105(b)(1).  Upon receiving a Notice of Disagreement ("NOD"), the RO sends the veteran an

4    election letter to choose between a *de novo* review with a Decision Review Officer ("DRO") or

5    just asking the RO to issue a Statement of the Case ("SOC"), explaining the reasons for its initial

6    decision.  (RT 1009:2-19; 38 U.S.C. § 7105(d)(1).)  To continue the appeal, a veteran has 60 days

7    to file a substantive appeal on a VA Form 9 after receiving the SOC.  (RT 1010:3-15; 38 U.S.C.

8    § 7105(d)(3).)  When an RO receives a veteran's Form 9 substantive appeal, the RO must then

9    certify the appeal to BVA.  38 C.F.R. § 19.35.  There are currently no statutory or regulatory time

10    limits imposed on VA during any step of the adjudication process for SCDDC.  (RT: 578:22 -

11    579:8; Ex. P-1258 at 13-14.)  There are time limits imposed on veterans, however, at various

12    stages of the adjudication process.  (RT: 579:7-14.)  A veterans' failure to meet certain time limits

13    within the appellate process, results in a jurisdictional dismissal of the appeal.  (RT 1024:17-20.)

14        **C.    VBA's Inventory of Claims Will Continue Growing**

15         52. On May 22, 2001, the Secretary signed a charter establishing the Claims Processing

16    Task Force ("Task Force").  (Ex. 374 at 1.)  The goal of the Task Force was to recommend

17    specific actions that the Secretary could initiate to relieve the claims backlog and make claims

18    processing more efficient.  (*Id*.)  The Chairman of the Task Force, Admiral Daniel Cooper, issued

19    a report to the Secretary in October 2001.  (*Id*. at i.)  The report found two categories of claims to

20    be troubling.  (*Id*. at 13.)  First, it found that the number of claims in process for a period in

21    excess of one year were of "real concern and, except under very unusual circumstances, hard to

22    justify."  (*Id*. at 13.)  Second, the Task Force found "the time delays to handle appeals and then

23    the time to correct remanded decisions are both unreasonable and unfair to veterans awaiting

24    decisions."  (*Id*. at 14.)  Admiral Cooper testified during his deposition that these two

25    observations are still applicable today.  (Ex. 1258 at 113:22-114:5; 119:6-20.)

26         53. VBA's inventory of pending rating-related claims has increased from 337,742 claims

27    as of January 1, 2005, to 400,450 claims as of April 12, 2008.  (Ex. 1322; *see also* Ex. D-544.)

28    The inventory of "appeals requiring adjudicative action" has also increased from 132,421 appeals

1    as of January 1, 2005, to 150,132 appeals as of April 12, 2008.  (*Id*.)

2         54. Since October 2001, approximately 1.64 million U.S. troops have been deployed to

3    the conflicts in Iraq and Afghanistan.  (Ex. 1253 at iii.)  Thus far, 799,791 have left active duty.

4    (Ex. 420 at 5.)  VBA has not prepared estimates of the number of PTSD, TBI, and depression

5    claims that are expected to be filed by veterans returning from the Global War on Terror.

6    (RT 1153:15-23.)  VBA does not have a contingency plan in place to address an increase in the

7    number of veterans upon the ending of the war in Iraq.  (Ex. 1258 at 86:23-87:5.)

8         **D.      Extensive Delays for ROs to Adjudicate PTSD Claims**

9         55. SCDDC claims for PTSD take longer to adjudicate than the average SCDDC claim.

10   (RT 120:24-121:2; 406:21-407:16; Ex. 1264 at 160:17-22.)  Unlike other claims for SCDDC,

11   VBA must frequently request records from the Joint Services Records Research Center

12   ("JSRRC") to verify alleged "stressors" because JSRRC is the Department of Defense's

13   authoritative source for information regarding such events.  (Ex. 1257 at 110:11-111:13.)  VA

14   does not track the average number of days of pending JSRRC requests.  (Ex. 1243 at 12-13.)

15   According to a GAO report, however, it takes approximately one year, on average, for the VA to

16   receive records from JSRRC.  (Ex. 380 at 2.)  Given the additional requirement of proving a

17   "stressor" event during service and the additional evidence gathering needed to verify "stressors,"

18   PTSD claims take longer to adjudicate than the average claim.  Despite the fact that several VBA

19   witnesses testified that VBA's computer systems were capable of calculating RO processing

20   times for PTSD claims (RT 1005:2-1006:11; Ex. 1260-A.), VA claimed in its interrogatory

21   answers that such information was "not available."  (Ex. 1243 at 12.)

22        56. It takes, on average, 182.3 days from the date of claim for an RO to issue an initial

23   decision on claim types that comprise the "rating bundle."  (RT 936:8-15.)  As of April 12, 2008,

24   there were 101,019 rating-related claims pending more than 180 days.  (Ex. 1322.)  VBA's

25   strategic goal is to process all claims in 125 days.  (RT 936:16-19.)  The 182.3-day average

26   processing time is artificially reduced by a number of factors.  First, the 182.3-day average

27   processing time includes claims that are processed through the Benefits Delivery at Discharge

28   ("BDD") program.  (RT 1089:16-1090:17.)  The clock for claims processed through the BDD

1   program, however, does not start ticking until the moment of discharge, and VBA's goal is to

2   process BDD claims within 60 days of discharge.  (*Id.*; Ex. 1257 at 95:6-17.)  Second, the

3   182.3-day average processing time includes all claims that comprise the "rating bundle."  (RT

4   1154:12-19.)  Some of the claim types, unrelated to SCDDC, which comprise the "rating bundle"

5   take less time to process than SCDDC claims.  (RT 1158:21-1159:13.)  Third, the 182.3-day

6   average processing time does not take into account claims that are prematurely denied and then

7   reopened, sometimes multiple times, resulting in a single claim to generate multiple average

8   processing times well below the 182.3-day average.  (RT 132:23-134:24.)  Accordingly, the

9   average processing time for SCDDC claims is actually significantly higher than 182.3 days.

### E.   Extensive Delays in the Appellate Adjudication Process

11       57. For veterans who pursue an appeal to completion, it takes 1,419 days, on average, to

12   receive a BVA decision after filing an NOD, ranging from 990 to 1,965 days depending on the

13   RO.  (Ex. 1323 at VA322-00002551-2; RT 221:22-25.)  It takes approximately 4.4 years —

14   182 days for an initial RO decision plus 1,419 days to receive a BVA decision — for a veteran to

15   adjudicate a claim all the way to a BVA decision.  (RT 259:22-261:2.)  This 4.4-year period

16   excludes the time between an RO's initial decision and a veteran's NOD filing.  (RT 261:3-6.)

17       58. The metric "Appeals Resolution Time" measures the average number of days,

18   nationwide, that it takes to resolve appeals from the date an NOD is filed.  (RT 568:20-24.)  The

19   total "Appeals Resolution Time" includes appeals that are resolved before they reach BVA, such

20   as appellant deaths which are treated as a form of resolution.  (RT 568:25-569:3; 1174:2-10.)  The

21   total "Appeals Resolution Time" increased from 599 days in April 2005, to 671 days at the end of

22   February 2008.  (RT 563:14-16; 567:17-19.)  During that same period of time, VBA's internal

23   goal also increased from 500 to 700 days.  (RT 563:14-18; 567:13-16.)  The "Appeals Resolution

24   Time" is expected to increase by another 100 days in fiscal year 2008.  (Ex. 1264 at 265:25-

25   266:14.)  Admiral Cooper testified that the 657-day Appeals Resolution Time in fiscal year 2006

26   was "certainly long" and longer than he would like.  (Ex. 1258 at 276:11-278:3.)

27       59. It, on average, takes 261 days for an RO to mail an SOC to a veteran after receiving an

28   NOD.  (Ex. 1320 at VA322-00002598.)  It takes, on average, 43 days for a veteran to file a Form

9 substantive appeal after receiving an SOC.  (Ex. 1310 at VA322-00002505-06; RT 215:7-216:20.)  It takes, on average, 573 days for an RO to certify an appeal to BVA after receiving a Form 9 substantive appeal.  (Ex. 1310 at VA322-00002505-06; RT 215:7-217:2.)  Some SOCs and certifications of appeals to BVA have been pending for more than 1,000 days.  (Ex. 1260 at 177:13-25; 179:4-15.)  VBA has not studied reasons why appeals have aged this long.  (*Id.*)

60. Inordinate delays on appeals are, in part, attributable to VBA's decision to focus on original compensation claims.  (Ex. 1258 at 99:25-101:14; RT 1129:15-1130:10; 1171:25-1172:18.)  Michael Walcoff explained, regarding the "500-some days" period between Form 9 filings and certification to the BVA, that "we have put a priority on working the actual claims, and I think that the fact that we haven't put as much a priority on [appellate claims] as maybe we could have, I think in some way contributes to the 500-some days."  (RT 1019:15-20.)

61. It takes 336 days, on average, for BVA to render a decision on an original appeal (as opposed to a remand returned to the BVA) after a claim is certified to the BVA by an RO.  (Ex. 1310 at VA322-00002505-06)  BVA does not currently intend to add any new-full time employees in fiscal year 2009, though it is hoping to get authorization to hire 10 more employees.  (Ex. 555; RT 645:16-646:18.)

62. Veterans have a right to submit new evidence during the appellate adjudication process, but that right alone does not account for the delays in the process.  (RT 207:25-208:3; 249:9-250:12; 364:9-23; 1019:15-20; 1129:15-1130:10; 1171:25-1172:18.)  When a veteran submits new evidence to an RO after receiving an SOC, the RO sends the veteran a Supplemental Statement of the Case (an "SSOC").  (RT 1015:24-1016:20.)  Form 9 substantive appeals without an SSOC have been pending for 320 days, on average, compared to Form 9s with an SSOC, which have been pending for almost twice as long or 623 days, on average.  (Ex. 1320 at VA322-00002598 & 2600; RT 237:24-238:9.)  More veterans would file an appeal if the delays in the appellate adjudication process were shorter.  (RT 262:8-21; 419:24-420:7.)

### F.    Delays in Obtaining BVA Hearings

63. Veterans have the right to a hearing before BVA.  (RT 528:23-25.)  BVA offers: (1) Travel Board hearings, (2) in-person hearings in Washington D.C. at the expense of the veteran,

1    and (3) videoconference hearings.  (RT 529:1-4.)  Requests for hearings before BVA have been

2    pending, on average, for 455 days.  (Ex. 1324 at VA322-00002653-54; RT 231:12-18.)  Requests

3    for videoconference hearings before BVA have been pending, on average, for 458 days.  (*Id.*)

4        64. Veterans who receive a BVA hearing are more likely to prevail.  (Ex. 1243 at 5.)

5    Claimants who receive a Travel Board, videoconference, or in-person hearing from the BVA in

6    Washington D.C. have at least one issue from the RO's decision overturned 25.3% of the time.

7    (*Id.*)  For veterans who do not receive such a BVA hearing, only 18.4% have at least one issue

8    from the RO's decision overturned.  (*Id.*)  Veterans who receive a hearing are also 10% less likely

9    to have their appeal denied than those who do not receive a hearing — 34% versus 44.7%.  (*Id.*)

10       65. More veterans would request BVA hearings if it took less time to get a hearing.

11       **G.    BVA Remands Add Further Delay to the Adjudication Process**

12       66. When the BVA remands a claim, it is sent to either the Appeals Management Center

13   ("AMC") or returned to an RO.  (RT 210:10-14.)  The BVA's remand rate for claims received

14   from ROs is 41%.  (Ex. 1309 at VA322-00002491-92; RT 223:21-224:3.)  VBA admits that a

15   processing time of more than one year for remanded claims is not "expeditious."  (Ex. 1258 at

16   188:21-189:8.)  It takes, on average, 499.1 days for SCDDC claims to be granted, withdrawn, or

17   returned to the BVA for a second time.  (Ex. 1243 at 13.)  It takes on average, 563.9 days for

18   PTSD claims to be granted, withdrawn, or returned to the BVA for a second time.  (*Id.*)

19       67. After an initial remand, approximately 75% of remanded claims are subsequently

20   returned to BVA for a second time.  (RT 544:15-24; Ex. 370 at 3.)  It then takes BVA 149 days to

21   render a second decision on a remanded claim returned to it.  (Ex. 1310 at VA322-00002505-06;

22   RT 215:7-217:19.)  Of the remanded claims returned to BVA by AMC, 27% are remanded by

23   BVA a second time.  (Ex. 1309 at VA322-00002491-92; RT 223:21-224:10; 551:3-6.)  BVA

24   Chairman Terry explained that claims that are remanded a second time are known as "Stegall

25   violations."  (RT 544:25-545:11.)  A "Stegall violation" occurs when BVA's remand instructions

26   are not followed.  (RT 544:25-545:11; *Stegall v. West*, 11 Vet. App. 268, 271 (1998).)

27       68. The Task Force's report describes how remands get introduced back into the workflow

28   more than once over a period of time and "churn" in the system at each RO.  (Ex. 374 at 13.)

1    BVA Chairman Terry admitted that "the entire system is hurt by remands." (RT 543:20-25.)

2    **H.    Delays in the Adjudication Process Produce Dire Consequences**

3    69. If an award of benefits is granted, it is generally retroactive to the date of the claim,

4    but the veteran is not entitled to interest. (RT 551:7-14; Ex. 1258 at 194:2-13.) The delay in the

5    adjudication process hinders disabled veterans' ability to make payments on their home and other

6    necessities. (RT 517:25-518:9; PIRT 324:13-325:5.) At least 1,467 appellants died, between

7    October 1, 2007 and March 31, 2008, during the appellate adjudication process. (Ex. 1316 at

8    VA322-00002613-24; RT 254:6-255:2.) When an appellant dies, the appeal is extinguished. (RT

9    1173:24-1174:1.) Michael Walcoff agreed that one appellant death is one too many, and the issue

10   is something that the VBA must do something about. (RT 1173:7-23.)

11   **I.    VBA's Alleged "Fixes" Do Not Moot Plaintiffs' Claims**

12   70. The BDD program enables servicemen and servicewomen to apply for disability

13   compensation up to 180 days before discharge from service. (RT 1091:14-21.) Defendants'

14   Answer to Plaintiffs' Complaint admits that "PTSD can develop at any time after exposure to a

15   traumatic stressor. When PTSD does not appear until six months or more after the exposure to

16   the traumatic event, it is termed 'delayed onset.' For veterans, it often emerges several months

17   after return to civilian life." (Pls.' Pretrial Stmt., Att. C, Pleading Desig. From Defs.' Answer

18   at 8:8.) The BDD program is thus of limited benefit to veterans who suffer from PTSD.

19   71. On April 16, 2008, VBA proposed a new pilot program for expedited claims

20   adjudication (Ex. 557.) The two-year program would be limited to four ROs. (*Id.*) The program

21   would ask veterans to sign a waiver upon filing a claim, shortening time limits imposed on them

22   during the process. (*Id.*) Veterans have always been able to waive these time limits. (RT

23   1169:14-17.) The program imposes are unenforceable time limit on VBA during of the appellate

24   process — from a veteran's Form 9 filing to an RO's certification to BVA. (RT 1167:10-1168:9.)

25   There are "no consequences" if VBA exceeds the time limit. (RT 1024:11-16; 1168:10-14.)

26   72. Michael Walcoff announced at trial that VBA would pursue two new efforts to reduce

27   the delays in the appellate process at ROs. (RT 1020:6-1021:9.) First, VBA will establish

28   resource centers dedicated to appellate work. (*Id.*) Mr. Walcoff, however, testified that he has

1    not even seen the plan to create these resource centers. (RT 1162:7-8.) Second, VBA will

2    emphasize appellate performance measures in evaluations. (RT 1020:6-1021:9.) ROs have not

3    yet reassigned more people to work on appeals. (RT 1163:4-13.)

4       73. No evidence was presented concerning the effectiveness of these proposed measures

5    in reducing the lengthy delays in the adjudication process

6    **V.    ERROR RATES IN THE ADJUDICATION PROCESS ARE HIGH**

7       74. Of the approximately 100,000 NODs filed in fiscal year 2006, 33,000 (or 33%) were

8    resolved between the filing of the NOD and certification to BVA. (Ex. 386 at 318-320.)

9       75. BVA issued 40,401 decisions in fiscal year 2007. (Ex. 370 at 19.) Ninety-five percent

10   of BVA's decisions were claims for SCDDC. (*Id.*) 21.6% of those compensation decisions

11   reversed at least one issue decided by the RO. (*Id.*) A veteran dissatisfied with a BVA decision

12   can appeal to the U.S. Court of Appeals for Veterans Claims ("CAVC"). (RT 588:14-16.) Of the

13   CAVC's 3,211 decisions on the merits in 2007, the CAVC either remanded or reversed the BVA,

14   in whole or in part, 64% of the time. (Ex. 1097; RT 591:12-17.)

15      76. An "avoidable remand" is a remand that is identifiable before an RO certifies the

16   appeal to BVA. (RT 553:5-8.) Between January 1 and March 31, 2008, approximately 44% of

17   the 16,633 reasons for BVA remands were identifiable before certification to the BVA if the ROs

18   had fulfilled their duty to assist, their duty to notify, and due process requirements. (Ex. 1312 at

19   VA322-00002521-22; RT 234:23-236:3, 559:9-560:10.) The vast majority of avoidable remand

20   reasons were attributable to violations of the duty to assist. (RT 556:16-24.) VA admits that

21   violating the duty to assist is one of the most common errors made by ROs. (RT 1166:17-20.)

22      77. VA has the ability to reduce avoidable remands. (Ex. 1257 at 119:19-21.) Asked if

23   PTSD claims have a higher avoidable remand rate than average, Chairman Terry testified that

24   PTSD claims have a "higher number than we would like." (RT 561:16-562:3.)

25      78. A survey of VBA rating specialists found that 70% of the rating specialists surveyed

26   believed that speed was emphasized over accuracy. (Ex. 414 at VA007-00000258.) 84% of the

27   rating specialists also believed that too much emphasis was placed on speed. (*Id.*)

28      79. During the first six months of fiscal year 2006, approximately 28% of RO decisions on

1   PTSD claims, in which the veteran sought an increased rating on appeal from the BVA, were

2   overturned.  (Ex. 1230 at 67, 83; RT 599:25-601:20.)  In contrast, on average, only 15% of RO

3   decisions on claims for an increased rating were overturned by the BVA.  (*Id.*)  A VA Office of

4   Inspector General report, dated May 19, 2005, found that there were variances in average

5   disability compensation among the 50 states, and attributed 34.1% of the variance to the

6   distribution of veterans who were assigned a 100% rating for PTSD.  (Ex. 392 at 43-45.)

7       80. The adjudication process at the initial RO level has become adversarial.  (RT 348:12-

8   349:12; *see also Bailey v. West*, 160 F.3d 1360, 1365 (Fed. Cir. 1998).)

9   **VI.    PROCEDURAL INADEQUACIES OF VBA'S ADJUDICATION PROCESS**

10      81. A veteran never finds out which rating specialist rated his or her claim, and rating

11  specialists never attend hearings.  (RT 202:16-203:5; 1046:24-25; Ex. 1261 at 159:22-160:5.)

12      82. Approximately 64% of veterans receiving disability compensation from VA have in

13  place a Power of Attorney designating a representative to act on their behalf.  (Ex. 392 at 24.)

14  VA does not provide training to veterans' service officers regarding how to do their jobs.  (RT

15  934:4-13.)  All of the VSOs combined cannot meet the need of veterans.  (RT 514:19-515:1.)

16      83. Paid attorneys are permitted at every stage of the adjudication process except the

17  initial stage at the RO level.  (*Id.*)  Paid attorneys at the initial RO level of the adjudication

18  process would reduce the overall delays in the process by submitting complete applications for

19  SCDDC.  (RT 348:9-349:12; 514:19-516:6.)

20      84. The evidence shows that hearings are rarely, if ever, held prior to an initial decision by

21  an RO.  (Ex. 1258 at 294:14-295:17; Ex. 1264 at 189:8-190:3; 191:3-6.)  The evidence also

22  shows that having a hearing increases a veteran's likelihood of success (Ex. 1243 at 5), and that

23  the RO stage is the most critical part of the adjudication process because it is where the record is

24  built (RT 359:5-360:6.)  The Court finds that the absence of pre-decisional hearings is linked to

25  the prohibition against paid counsel at the RO level and also points to the value of paid counsel,

26  for it is likely that any counsel armed with evidence about the higher success rates for claims with

27  hearings would likely ask for a hearing.

28

1   **VII.    EXTRAORDINARY AWARDS PROCEDURE VIOLATES VETERANS' RIGHTS**

2           85. The Compensation & Pension Service ("C&P Service") is an organization within the

3   VA's central office in Washington D.C.  (RT 903:13-17; 904:22-24.)  The C&P Service is

4   responsible for setting the policies governing the adjudication of SCDDC claims (RT 903:13-

5   904:7); it is not empowered to decide veteran claims (Ex. 1260 at 237:9-16).

6           86. The C&P Service conveys policies and procedures to the ROs by publishing manuals.

7   (RT 905:22-25.)  The C&P Service issues "Fast Letters" to RO directors when there are changes

8   to a procedure within a manual.  (RT 913:4-15.)  ROs are expected to abide by the terms of a Fast

9   Letter.  (RT 913:13-15.)  In Fast Letter 07-19, dated August 27, 2007, the C&P Service outlined

10  an "extraordinary awards" procedure for ROs to follow in claims that would result in a retroactive

11  payment of at least eight years or greater than $250,000.  (Ex. 375-A at 1-2; RT 1043:2-12.)  This

12  procedure has no basis in statute or regulation.  (Ex. 1260 at 236:9-25.)  The procedure directs

13  ROs to send the claims folder for all cases meeting the criteria to C&P Service for a concurring

14  decision before the award is promulgated to the veteran.  (*Id.*)  In the selection process, VBA only

15  looks at grants, not denials.  (RT 1044:18-20.)  Veterans are never notified that their claims are

16  reviewed pursuant to this procedure.  (RT 1045:17-19; Ex. 164 at 287:9-12; 288:9-14.)

17          87. C&P Service has reviewed approximately 800 rating decisions pursuant to the

18  extraordinary awards procedure.  (RT 1043:20-22.)  The vast majority of those reviews resulted

19  in a reduction to the proposed benefit.  (Ex. 1264 at 286:5-12.)  The C&P Service has only

20  recommended that one proposed award be increased.  (Ex. 1264 at 280:8-12.)

21                              **CONCLUSIONS OF LAW**

22  **I.    JURISDICTION & STANDING**

23          1.  Plaintiffs do not challenge the decision of the Secretary on any individual SCDDC

24  determinations or directly challenge any VA regulation; therefore this Court has jurisdiction to

25  decide Plaintiffs' claims.  38 U.S.C. § 511.

26          2.  Both plaintiff organizations have standing to bring this lawsuit and to obtain systemic

27  relief regarding both VA mental health care and SCDDC adjudications.  *Warth v. Seldin*, 422

28  U.S. 490, 515 (1975); (RT 666:3-10; 671:10-16; 813:17-19; 813:24-814:9.)

## II.    STATUTORY MANDATES GOVERN VA MENTAL HEALTH CARE

3.   VA is required to provide veterans with medical care, as codified in the Veterans' Health Care Eligibility Reform Act of 1996, 38 U.S.C. §§ 1704 *et seq.*  The statute mandates health care for two separate groups of veterans:  (1) veterans who have established service-connected disabilities through the adjudication process; and (2) combat veterans within five years of their discharge, irrespective of whether "there is insufficient medical evidence to conclude that such condition is attributable to [combat] service."  38 U.S.C. §§ 1710(a)(1), (e)(1)(D).

4.   "Shall" in § 1710 modifies both (a)(1) and (a)(2); the Secretary is required to (1) determine what medical services are "needed" and (2) provide those services in accordance with the statutory scheme.  *United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent[.]"); *see also Ctr. for Biological Diversity v. Norton*, 254 F.3d 833 (9th Cir. 2001).  The Secretary has determined that mental health care and suicide prevention are "needed" for veterans (Prelim. Inj. Opp'n at 12:15-17), and now must provide those services in accordance with the statutory scheme.  VA's obligation to provide care under § 1710(a) is not subject to the language in section (e)(1)(D) limiting certain obligations to the extent of congressional appropriations.  *VCS*, 2008 WL 114919, at *18.

5.   VA is required to furnish veterans with established or presumed service-connected disabilities (including "mental defect[s]") with "hospital care and medical services," including "medical examination, treatment, and rehabilitative services."  38 U.S.C. §§ 1701(1), (6), 1710(a)(1), (a)(2).  VA must also "ensure that the [health care] system will be managed in a manner to ensure that the provision of care to enrollees is timely and acceptable in quality." 38 U.S.C. § 1705(b)(1).

## III.    STATUTORY MANDATES GOVERN SCDDC ADJUDICATION

6.   38 U.S.C. § 1110 creates a "basic entitlement" for veterans and a statutory duty for VA to provide veterans with SCDDC , including for PTSD.  VA must adjudicate those claims "within a reasonable time."  5 U.S.C. § 555(b).

7.   38 U.S.C. § 7101(a)  requires the Board of Veterans' Appeals to maintain as many members "as may be found necessary in order to conduct hearings and dispose of appeals

1   properly before the Board in a timely manner."  38 U.S.C. § 5109B requires the Secretary to take

2   such actions as may be necessary for an RO to expeditiously resolve a claim remanded from the

3   BVA.  38 U.S.C. §5103A(a)(1) requires VA to assist veterans in developing their claims.

4   **IV.    ADMINISTRATIVE PROCEDURE ACT**

5       8.   "[T]here is a strong presumption in favor of judicial review of administrative action."

6   *Wang v. Chertoff*, No. CIV 07-077-TUC-GEE, 2007 U.S. Dist. LEXIS 87419, *10 (D. Ariz. Nov.

7   26, 2007).  Section 702 of the APA provides a valid "waiver of sovereign immunity in suits

8   seeking judicial review of a federal agency action under [28 U.S.C.] § 1331."  *Gallo Cattle Co. v.*

9   *Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998); 5 U.S.C. § 702.

10      9.   Under the APA, the District Court "shall . . . compel agency action unlawfully

11  withheld or unreasonably delayed."  5 U.S.C. § 706(1).  APA injunctive relief is mandatory if the

12  Court determines that the agency action is being unreasonably delayed or withheld.

13      10. As this Court has already held, delay in mental health care or adjudication of SCDDC

14  claims is discrete and final agency action.  *VCS*, 2008 WL 114919, at *6.

15      11. An assessment of whether final agency action has been unreasonably delayed under

16  § 706(1) is governed by the *TRAC* factors.  *Independence Mining Co. v. Babbitt*, 105 F.3d 502,

17  507 (9th Cir. 1997).  The *TRAC* factors are:  "(1) the time agencies take to make decision must be

18  governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication

19  of the speed with which it expects the agency to proceed in the enabling statute, that statutory

20  scheme may supply content for this rule of reason; (3) delays that might be reasonable in the

21  sphere of economic regulation are less tolerable when human health and welfare are at stake; (4)

22  the court should consider the effect of expediting delayed action on agency activities of higher or

23  competing priority; (5) the court should also take into account the nature and extent of the

24  interests prejudiced by the delay; and (6) the court need not "find any impropriety lurking behind

25  agency lassitude in order to hold that agency action is unreasonably delayed.'"  *Id.* at 507 n.7.

26  **V.    VA UNREASONABLY WITHHOLDS AND DELAYS MENTAL HEALTH CARE**
        **DELIVERY**

27

28      12. All 6 *TRAC* factors favor relief for VA's failure to provide timely health care.  Factors

1    one and two are met, as VA is statutorily required to provide health care to veterans in a timely

2    manner, 38 U.S.C. § 1705(b)(1); yet VA has failed to provide such care within a reasonable time

3    period. (*See* Exs. 133, 169, 1244, and 1296.) Further, despite its knowledge of the "tsunami of

4    medical need" among veterans (Ex. 1263 at 38; 24-39:1), VA has also failed to implement and

5    monitor the efficacy of its Mental Health Strategic Plan in a timely manner. (Ex. 1259 at 78:22-

6    79:8, 158:5-159:10.) Factors 3 and 4 are also satisfied, as this Court has recognized, "it is

7    difficult to imagine how preventing veteran suicides could be trumped by a greater priority,"

8    (PIRT 10:14-11:5), and VA itself has stated that there is no agency priority higher than the

9    prevention of veteran suicides (Defs.' Pretrial Stmt at 12:15-18).

10    13. *TRAC* factor 5 also favors relief because there can be no greater prejudice to veterans

11    than the worsening of their mental condition or — ultimately — the loss of their own life, as may

12    result from delay. (PIRT 69:23-70:6; 332:25-333:17; 137:17-23.) Finally, factor 6 supports

13    relief: despite VA's awareness of the prevalence of PTSD and suicide among veterans,

14    Defendants have attempted to obscure the extent of the problem. (Ex. 1249.)

15    **VI.    VA UNREASONABLY WITHHOLDS AND DELAYS ADJUDICATION OF**
          **SCDDC CLAIMS**
16

17    14. *TRAC* factors are also met by the unconscionable delays at each stage of the claims

18    adjudication process. The first *TRAC* factor requires time periods for agency determinations to be

19    governed by a "rule of reason" however, the processing times — for an initial decision, resolution

20    of an appeal by an RO and the BVA, remand to an RO and the return of an appeal to the BVA —

21    do not even meet Defendants' internal standards of reasonableness. (Ex. 1258 at 188:21-189:8

22    and 276:11-278:3; RT 1129:15-1130:10; RT 1171:25-1172:18.) The second factor is also met, as

23    VA has a statutory duty to provide veterans with SCDDC determinations, 38 U.S.C. § 1110, a

24    statutory duty to hire sufficient personnel to process appeals at the BVA in a timely manner, 38

25    U.S.C. § 7101; a statutory duty to undertake all actions necessary to resolve remands in an

26    expeditious manner, 38 U.S.C. § 5109B, and § 555(b) of the APA requires agencies to "proceed

27    to conclude a matter presented to it … within a reasonable time."

28    15. The third and fifth factors also weigh in favor of relief. Given the particular

1    vulnerability of SCDDC claimants, the effects of delay can be devastating. (Ex. 386 at 218, 220.)

2    The fourth *TRAC* factor also weighs in favor of Plaintiffs' relief. As presented above, VA admits

3    that RO decisions have been the priority, to the detriment of appeals. If, as VA claims, it plans to

4    emphasize both initial decisions and appeals, then VA acknowledges that expediting both RO and

5    appeal resolutions has little, if any, effect on competing VBA activities.

6        16. The sixth *TRAC* factor also weighs in favor of granting relief. Despite VA's duty to

7    assist, failure to meet that duty is one of the most common reasons for avoidable remands (RT

8    1166:17-20); this further protracts the time a veteran must wait for a final determination of his

9    claim. Though VA has the ability to reduce avoidable remands, it fails to do so.

10   **VII.  VA ADJUDICATION SYSTEM DEPRIVES VETERANS OF DUE PROCESS**

11       17. Procedural Due Process imposes constraints on actions of the federal government that

12   deprive individuals of "liberty" or "property" interests within the meaning of the Due Process

13   Clause of the Fifth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

14       **A.    Plaintiffs' Members Possess Fifth Amendment Property Interests**

15       18. Recipients of statutorily-entitled compensation have a property interest under the Due

16   Process Clause in the continued receipt of such compensation. *See Mathews*, 424 U.S. at 332,

17   *Goldberg v. Kelly*, 397 U.S. 254, 261-62 (1970), *Walters v. NARS*, 472 U.S. 305, 320 n.8 (1985).

18   Applicants for nondiscretionary benefits have a proprietary interest protected by Due Process.

19   *Kapps v. Wing*, 404 F.3d 105, 115 (2d Cir. 2005); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d

20   584, 588 (9th Cir. 1998); *Griffith v. Detrick*, 603 F.2d 118, 122 (9th Cir. 1979).

21       19. Claimants who satisfy the statutory criteria for eligibility are entitled as a matter of

22   law to SCDDC. Based on the statutory framework, certain members of VUFT and VCS have a

23   protected property interest as recipients of and applicants for SCDDC.

24       **B.    The Adjudication System Deprives Veterans of Due Process**

25       20. In determining what process is required in a particular situation, the Supreme Court

26   has traditionally considered three factors: (1) the private interest that will be affected by the

27   official action; (2) the risk of an erroneous deprivation of such interest through the procedures

28   used, and the probable value of additional procedural safeguards; and (3) the government's

1  interest, including the fiscal and administrative burden that the additional or substitute procedures

2  would entail.  *Mathews*, 424 U.S. at 335.  Under the *Mathews* factors, the current system for

3  adjudicating veterans' SCDDC claims is unconstitutional.

4          21. Plaintiffs' members and their families have a compelling need for SCDDC, such that

5  the private interest affected by official action is vital.  Defendants themselves have admitted

6  "many PTSD claimants and recipients are frequently incapacitated and many recipients are totally

7  or primarily dependent upon SCDDC for support" (Pls.' Pretrial Stmt., Att. C, Pleading Desig.

8  From Defs.' Answer, 10:25-26.)  Given the nature of the vulnerabilities of these claimants, the

9  consequences of lengthy delays and erroneous deprivation can be devastating.

10          22. The lengthy delays in the adjudication of SCDDC claims at the RO and BVA, as set

11  forth above in Section IV (D&E)  *supra*,  independently violate due process.  *See, e.g., Cockrum*,

12  475 F. Supp. At 1239-40 (D.D.C. 1979); *Kelly v. R.R. Ret. Bd*., 625 F.2d 486 (3d Cir. 1980),

13  *White v. Mathews*, 434 F. Supp. 1252 (D. Conn. 1976), *aff'd* 559 F.2d 852 (2d Cir. 1977).

14          23. The claims adjudication system is adversarial.  *See, e.g., Bailey v. West*, 160 F.3d

15  1360, 1365 (Fed. Cir. 1998) (en banc) ("[I]t appears the system has changed from a

16  nonadversarial, *ex parte*, paternalistic system for adjudicating veterans' claims, to one in which

17  veterans . . . must satisfy formal legal requirements, often without the benefit of legal counsel,

18  before they are entitled to administrative and judicial review.")

19          24. In light of the adversarial nature of VBA adjudications, and due to the following

20  procedural failures, the risk of erroneous deprivation is high: veterans are not notified that the

21  C&P Service has reviewed their claims pursuant to the extraordinary awards procedure; hearings

22  are rarely, if ever, held prior to an initial decision by a RO, despite the fact that a hearing

23  increases a veteran's likelihood of success; VA's production quotas and link to incentive

24  compensation for adjudicators deprive veterans of a right to a fair and impartial hearing by pitting

25  the self-interest of adjudicators against veterans, prohibition of fees for attorney representation

26  before an RO deny a veteran the right to assistance of counsel at the most crucial stage of the

27  adjudication proceedings, lack of general right to discovery, including the right to subpoena

28  witnesses and documents and the right to examine and cross-examine witnesses.

25. The informal adoption of the extraordinary awards procedure (Ex. P-375-A) has no foundation in law or regulation. Therefore, it deprives claimants and recipients — those with retroactive awards of over $250,000 or a retroactive award extending over a period in excess of eight years — of their property interest in the receipt of SCDDC without due process of law.

26. VA's failure to follow its own statutes and regulations independently violates the due process rights of veterans seeking benefits. *See Holmes v. N.Y. City Hous. Auth.*, 398 F.2d 262, 265 (2d Cir. 1968). For example, the extraordinary awards procedure violates the notice requirement set forth in 38 C.F.R. § 3.103, which provides that veterans are entitled to notice of "any decision made by VA affecting the payment of benefits or the granting of relief."

27. Increased procedural protections, including legal representation and time limits, will not damage any legitimate government interest whatsoever. With regard to time limits, setting time limits will decrease the average claim handling time, thus increasing efficiencies and eliminating backlogs. With regard to increased procedural options and attorneys, these options and the ability to pay an attorney would only be available to those claimants who wished to utilize them. Paid representation at the RO stage would serve the government interest in reducing the backlog because it would result in better claims development at the initial stage, reducing the number of appeals, the number of remands, and the number of pending claims overall. The government has an interest in maximizing the welfare of society, which is benefited by ensuring fair and timely adjudications of veterans' SCDDC claims. *Goldberg*, 397 U.S. 254 at 265; *Jeffries v. Ga. Residential Fin. Auth.*, 503 F.Supp. 610, 620-21 (N.D. Ga. 1980).

28. Applying the balancing test set forth in *Mathews*, 424 U.S. 319, the Court finds that the interest of claimants and recipients in the receipt of SCDDC is compelling; that the government has no legitimate interest in delaying decisions on SCDDC claims or appeals, enforcing illegal policies such as the Extraordinary Awards Procedure or refusing to provide SCDDC to veterans; and that both the risk of error as a result of the procedural inadequacies and the value of additional procedural safeguards are high.

## VIII.   DUE PROCESS VIOLATIONS IN OF MENTAL HEALTH CARE DELIVERY

29. 38 U.S.C. § 1710(a)(4) creates a property interest in health care for eligible veterans

1 protected by the Due Process Clause of the Constitution. *VCS*, 2008 WL 114919, at *18.

2      30. VA's process for resolving clinical disputes denies veterans their statutory entitlement

3 without due process because it does not apply to refusals to provide care, and where the appeals

4 process does apply, there is no opportunity for any hearing by a neutral decision-maker, the

5 process is unduly convoluted and complex, and there is no provision for any expedited process.

6 (PIRT 656:5-9; Ex. 535; PIRT 638:3-10.)

7      31. Defendants' delay and denial of mental health care causes irreparable injury to the

8 highest private interest — veterans' lives. *Consiglio v. Woodford*, No. CIVS051701GEBGGHP,

9 2005 WL 2810356 at *12 (E.D. Cal. Oct. 26, 2005); *Lee v. Oregon*, 869 F. Supp. 1491, 1501 (D.

10 Or. 1994); *Beltran v. Meyers*, 677 F.2d 1317, 1322 (9th Cir. 1982).

11      32. Without an appeals process that addresses the denial, or delay in access to healthcare,

12 there is great risk of erroneous deprivation, with significant consequences. *Mathews,* 424 U.S. at

13 335. There is considerable value to be gained with additional procedural safeguards, especially if,

14 as VA suggests, VA already has a clinical appeals process for other disputes.

15 **IX.     VA'S CLAIMED RECENT INITIATIVES**

16      33. The initiatives VA claims to have recently adopted are insufficient as a matter of law,

17 as they fail to show implementation or efficacy, VA retains discretion to withdraw those measures

18 at any time, and Defendants fail to show how such measures permanently mitigate harm to

19 Plaintiffs. *See Eng v. Smith*, 849 F.2d 80, 83 (2d Cir. 1988) ("Although defendants claim to have

20 voluntarily implemented substantially all of the ordered relief, [in the absence of injunctive

21 relief,] there is nothing to prevent defendants from abandoning procedures which the court

22 determined to be necessary to protect plaintiffs' constitutional rights").

23 **X.     REMEDIES**

24      34. Remedies are available to Plaintiffs under 706 of the APA and the Due Process

25 Clause. As the *TRAC* factors are satisfied both by the delay in delivering mental health care and

26 adjudicating SCDDC claims, this Court must compel agency action. The Court has several forms

27 of relief available, including ordering VA to submit a plan for reducing wait times, *Cockrum v.*

28 *Califano*, 475 F. Supp. 1222, 1239-40 (D.D.C. 1979), and ordering VA to set time limits subject

1     to judicial review, *Williams v. Schweiker*, 541 F. Supp. 1360, 1367 (E.D. Mo. 1982).

2          35. To obtain a permanent injunction for violation of due process, Plaintiffs must show:

3     (1) they suffered an irreparable injury; (2) remedies available at law are inadequate to compensate

4     for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a

5     remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent

6     injunction.  *eBay v. MercExchange*, 547 U.S. 388, 391 (2006).

7          36. Veterans relegated to undue delays in mental health care and SCDDC adjudications

8     are irreparably harmed.  There is no dispute among the courts that death constitutes irreparable

9     harm, and veterans have died — many by their own hand — while awaiting mental health

10    treatment.  Veterans are irreparably harmed when their SCDDC claims are adjudicated in an

11    adversarial system lacking constitutional due process safeguards.  Without appropriate

12    safeguards, veterans and their families are at a high risk for erroneously losing much-needed

13    compensation, and medical and death benefits.  *Beltran v. Meyers*, 677 F.2d 1317, 1322 (9th Cir.

14    1982); *Boldon v. Humana*, 466 F. Supp. 2d 1199, 1207 (D. Ariz. 2006).

15         37. There is no alternative remedy available to Plaintiffs for redress of their statutory or

16    constitutional violations because the CAVC only has jurisdiction over individual SCDDC claims,

17    38 U.S.C. § 7252(a), while Plaintiffs bring their claims on behalf of their organizations.

18         38. The irreparable harm that continues to befall veterans — namely, worsening mental

19    health, death and inability to support one's self and his family, cannot be outweighed by any

20    government interest, especially when VA has ample resources.  (PIRT 574:13-18.)  Ordering

21    Plaintiffs' requested relief serves the public interest when veterans with PTSD are an ever-

22    growing and particularly vulnerable population.  *United States v. W. T. Grant Co.,* 345 U.S. 629,

23    633 (1953); and *Cupolo v. BART*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997).

24         39. Plaintiffs have shown the factors for injunctive relief are met and the *Mathews v.*

25    *Eldridge* analysis weighs in their favor; therefore injunctive relief is appropriate, *see Walters v.*

26    *Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998), and may include the imposition of time limits,

27    *White v. Mathews*, 559 F.2d 852, 855 (2d Cir. 1977).

28

1    **XI.    RIGHT TO ACCESS**

2         40. The Supreme Court has long recognized that citizens have a right of access to the

3    courts, and has grounded that right in the First and Fifth Amendments of the Constitution.

4    *Broudy v. Mather*, 460 F.3d 106, 117 (D.C. Cir. 2006) (*citing Christopher v. Harbury*, 536 US.

5    403, 413 (2002)).  Plaintiffs present a forward-looking right of access claim, as veterans are

6    presently denied an opportunity to meaningfully litigate their claims as a result of systemic due

7    process failures of VA SCDDC adjudications.  There are two necessary elements to a forward-

8    looking claim and Plaintiffs meet both:  (1) an arguable underlying claim, and (2) present

9    foreclosure of a meaningful opportunity to pursue that claim.  *Broudy*, at 120-21.

10        41. As previously recognized by this Court, Plaintiffs have alleged an "arguable

11   underlying [due process] claim."  *VCS*, 2008 WL 114919, at *17.  The lack of appropriate due

12   process safeguards for the adjudication of SCDDC claims denies veterans an opportunity to

13   meaningfully pursue their claims.  Claim development at the RO is the most critical part of a

14   veteran's claim adjudication, as it establishes the record upon which the CAVC and Federal

15   Circuit rely on appeal.  (RT 359:5-360:6.)  The cumulative effect of foreclosing the opportunity to

16   subpoena witnesses and records, disallowing payment of counsel, and requiring the veteran to

17   rely on a non-neutral VBA service representative, denies veterans any meaningful opportunity to

18   litigate their appeals at the CAVC and Federal Circuit.

19   Dated: May 9, 2008                    GORDON P. ERSPAMER
                                           ARTURO J. GONZALEZ
20                                         HEATHER A. MOSER
                                           RYAN G. HASSANEIN
21                                         STACEY M. SPRENKEL
                                           MORRISON & FOERSTER LLP
22

23

24                                    By:   /s/ Gordon P. Erspamer
                                           Gordon P. Erspamer
25                                         GErspamer@mofo.com

26                                         Attorneys for Plaintiffs

27

28