1   GREGORY G. KATSAS
    Acting Assistant Attorney General
2   JOSEPH P. RUSSONIELLO
    United States Attorney
3   RICHARD LEPLEY
    Assistant Branch Director
4   DANIEL BENSING D.C. Bar No. 334268
    KYLE R. FREENY California Bar No. 247857
5   JAMES J. SCHWARTZ D.C. Bar No. 468625
    RONALD J. WILTSIE, D.C. Bar No. 431562
6   Attorneys
    United States Department of Justice
7   Civil Division, Federal Programs Branch

8    P.O. Box 883
     Washington, D.C.  20044
9    Telephone:  (202) 305-0693
     Facsimile:  (202) 616-8460
10   Email: Daniel.Bensing@USDOJ.gov

11  Attorneys for Defendants Hon. James B. Peake, the U.S. Department of Veterans Affairs, Hon.
    James P. Terry, Hon. Bradley G. Mayes, Hon. Patrick W. Dunne,[1] Hon. Michael J. Kussman,
12  Ulrike Willimon, the United States of America

13                 UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                        SAN FRANCISCO

16
    VETERANS FOR COMMON SENSE and      )
17  VETERANS UNITED FOR TRUTH,         )    No. C 07-3758-SC
                                       )
18            Plaintiffs,              )
                                       )
19       v.                            )    **DEFENDANTS' PROPOSED FINDINGS**
                                       )    **OF FACT AND CONCLUSIONS OF**
20  Hon. JAMES B. PEAKE, Secretary of  )    **LAW**
    Veterans Affairs, *et al.*,        )
21                                     )
              Defendants.              )
22                                     )
                                       )
23  ─────────────────────────────────  )

24

25

26  ─────────────────────────

27       [1]The Honorable Patrick W. Dunne, Acting Under Secretary for Benefits, should be
    substituted for his predecessor, the Honorable Daniel L. Cooper, as defendant in this action,
28  pursuant to Fed. R. Civil P. 25(d).

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................ 1

LEGAL MEMORANDUM ON JURISDICTIONAL LIMITATIONS ....................... 1

I.    Plaintiffs Lack Standing ........................................................................ 1

II.   Limitations on the APA's Waiver of Sovereign Immunity ....................... 5

III.  Jurisdictional Limitations in the VJRA .................................................. 8

IV.   Other Jurisdictional Limitations ........................................................... 11

FINDINGS OF FACT – VETERANS HEALTH ADMINISTRATION ................. 14
    The Mental Health Strategic Plan .............................................................. 14
    June 1, 2007 Initiative ............................................................................ 16
    OEF/OIF & PTSD Mental Health Care ....................................................... 17
    Wait Times ........................................................................................... 18
    VA's Suicide Prevention Program .............................................................. 19
    Evaluation of VA's Mental Health Programs and Policies ............................. 21
    VA's Clinical Appeals Process ................................................................... 21

FINDINGS OF FACT – VETERANS BENEFITS ADMINISTRATION ................ 22
    Rating Claims ........................................................................................ 23
    PTSD Claims ......................................................................................... 24
    The Claims Adjudication Process for Rating Claims is Non-Adversarial ........ 24
    The Appellate Process Within The VA Is Also Non-Adversarial ................... 26
    The VBA Is Aggressively Trying To Improve The Timeliness Of Adjudications .......... 28
    The VBA Emphasizes Both Quality And Productivity in Adjudications .......... 29

CONCLUSIONS OF LAW – VETERANS HEALTH ADMINISTRATION ........... 30

    A.    Delay or Denial of Health Care ....................................................... 30
        Jurisdictional Bars ......................................................................... 30
        TRAC/Due Process Analysis of Delay ............................................... 31

    B.    Clinical Appeals Process ................................................................ 32

    C.    Mental Health Strategic Plan Conclusions of Law ............................ 33

CONCLUSIONS OF LAW – VETERANS BENEFITS ADMINISTRATION .......... 34

    A.    Lack of Trial-Type Proceedings as an Alleged Denial of Due Process ............. 34
        Jurisdictional Bars ......................................................................... 34
        Due Process Analysis ..................................................................... 34

    B.    Unreasonable Delay In Adjudicating Benefits Claims ........................ 36
        Jurisdictional Bars ......................................................................... 36
        TRAC Analysis ............................................................................. 37
        Due Process Analysis ..................................................................... 38

    C.    Extraordinary Awards Fast Letters .................................................. 39

-i-

1

2

# TABLE OF AUTHORITIES

3

**CASES**                                                                          Page(s)

4

Bailey v. West,
        160 F.3d 1360 (Fed. Cir. 1998) .................................................................. 35

5

Bates v. Nicholson,
        398 F.3d 1355 (Fed. Cir. 2005) .................................................................. 10

6

7

Bennett v. Spear,
        520 U.S. 154 (1997) ..................................................................................... 5

8

California Save our Streams Council v. Yeutter,
        887 F.2d 908 (9th Cir. 1989) ...................................................................... 10

9

10

Chinnock v. Turnage,
        995 F.2d 889 (9th Cir. 1993) ...................................................................... 10

11

City of Los Angeles v. Lyons,
        461 U.S. 95 (1983) ........................................................................................ 2

12

13

Coe v. Thurman,
        922 F.2d 528 (9th Cir. 1990) ...................................................................... 32

14

Conservation Law Found. v. Reilly,
        950 F.2d 38 (1st Cir. 1991) ....................................................................... 2, 3

15

16

Crosby v. Soc. Sec. Admin.,
        796 F.2d 576 (1st Cir. 1986) ...................................................................... 36

17

Cummins v. Barnhart,
        460 F.Supp.2d 1112 (D. Ariz. 2006) ......................................................... 32

18

19

Devine v. Cleland,
        616 F.2d 1080 (9th Cir. 1980) .................................................................... 12

20

Dorfmont v. Brown,
        913 F.2d 1399 (9th Cir. 1990) .................................................................... 12

21

22

Ecology Center, Inc. V. U.S. Forest Service.,
        192 F.3d 922 (9th Cir. 1999) ................................................... 7, 30, 31, 34

23

Forshey v. Principi,
        284 F.3d 1335 (Fed. Cir. 2002) .................................................................. 35

24

25

Gutierrez De Martinez v. Mamagno,
        515 U.S. 417 (1995) ..................................................................................... 12

26

Heckler v. Chaney,
        470 U.S. 821 (1984) ..................................................................................... 12

27

28

*Heckler v. Day,*
   467 U.S. 104 (1984) ............................................................. 13, 14, 32, 37

*Hickey v. Morris,*
   772 F. 2d 543 (9th Cir. 1984) ................................................ 32, 33

*Holloman v. Watt,*
   708 F.2d 1399 (9th Cir. 1983) ............................................... 5

*Lane v. West,*
   11 Vet. App. 412 (1998) ....................................................... 37

*Larrabee v. Derwinski,*
   968 F.2d 1497 (9th Cir. 1992) ............................................... 9, 30

*Lee v. Oregon,*
   107 F.3d 1382 (9th Cir. 1997) ............................................... 2

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................. 3

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ............................................................. 13

*Long Term Care Pharmacy Alliance v. Leavitt,*
   530 F. Supp 2d 173 (D.D.C. 2008) ......................................... 5

*Lowry v. Barnhart,*
   329 F.3d 1019 (9th Cir. 2003) ............................................... 34

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ............................................................. 2

*Lujan v. National Wild Federation,*
   497 U.S. 871 (1990) ............................................................. 7

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ............................................................. 32, 33, 35, 36

*McNary v. Haitian Refugee Center,*
   498 U.S. 479 (1991) ............................................................. 10

*Military Order of the Purple Heart v. Secretary of Veterans Affairs,*
   Dkt. No. 2008-7076 (Fed. Cir.) ............................................. 40

*National Wrestling Coaches Assoc. v. Dep't of Educ.,*
   366 F.3d 930 (D.C. Cir. 2004) ............................................... 8

*Norton v. Southern Utah Wilderness Alliance,*
   542 U.S. 55 (2004) .............................................................. passim

*Nunez v. City of Los Angeles,*
   147 F.3d 867 (9th Cir. 1998) ............................................... 12

Parham v. J.R.,
    442 U.S. 584 (1979) ................................................................. 33

Pediatric Specialty Care v. Arkansas Dept of Human Services,
    444 F.3d 991 (8th Cir. 2006) ................................................... 10

Preminger v. Principi,
    422 F.3d 815 (9th Cir. 2005) ................................................... 10

Rattlesnake Coalition v. United States EPA,
    509 F.3d 1095 (9th Cir. 2007) ................................................. 7

Schaffer v. Clinton,
    240 F.3d 878 (9th Cir. 2001) ................................................... 2

Schweiker v. Chilicky,
    487 U.S. 412 (1988) ................................................................ 13

Shalala v. Illinois Council on Long Term Care,
    529 U.S. 1 (2000) ..................................................................... 8

Sierra Club v. Morton,
    405 U.S. 727 (1972) ................................................................ 2

Steel Co v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ................................................................... 4

Steenholdt v. FAA,
    314 F.3d 633 (D.C. Cir. 2003) ................................................ 12

Telecommunications Research & Action Center v. F.C.C.,
    750 F.2d 70 (D.C. Cir. 1984) ............................................ 31, 32

Town of Castle Rock v. Gonzales,
    545 U.S. 748 (2005) ................................................................ 12

Traynor v. Turnage,
    485 U.S. 535 (1988) ................................................................. 9

United States v. Solerno,
    481 U.S. 739 (1987) ................................................................ 35

Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,
    454 U.S. 464 (1982) ................................................................. 3

Walters v. National Association of Radiation Survivors,
    473 U.S. 305 (1985) ................................................................ 35

Warth v. Seldin,
    422 U.S. 490 (1975) ................................................................. 3

Webster v. Doe,
    486 U.S. 592 (1988) ...................................................... 12, 13, 31

-iv-

Women's Equity Action League v. Cavazos,
    906 F.2d 742 (D.C. Cir. 1990) ................................................................ 8

Wright v. Califano,
    587 F.2d 345 (7th Cir. 1978) ........................................................... 32, 39

**STATUTES**

5 U.S.C. § 551(13) ................................................................................. 5, 6, 7

5 U.S.C. § 555(b) ...................................................................................... 31

5 U.S.C. § 701(a)(2) ................................................................................. 12

5 U.S.C. § 702 ......................................................................................... 5, 7

5 U.S.C. § 704 ......................................................................................... 7, 8

38 U.S.C. § 211 ...................................................................................... 9, 10

38 U.S.C. § 303 ......................................................................................... 39

38 U.S.C. § 501(a)(4) ................................................................................ 39

38 U.S.C. § 502 ................................................................................. 9, 10, 40

38 U.S.C. § 511 ................................................................................... passim

38 U.S.C. § 512(a) .................................................................................... 39

38 U.S.C. § 1705(b) .................................................................................. 12

38 U.S.C. § 1710 .................................................................................. passim

38 U.S.C. §§ 5101-5109A ............................................................................ 9

38 U.S.C. § 5103 ....................................................................................... 24

38 U.S.C. § 5904 .................................................................................. 26, 27

38 U.S.C. §§ 7252 & 7292 ......................................................................... 26

38 U.S.C. § 7261 ....................................................................... 8, 34, 35, 37

43 U.S.C. § 1782(c) .................................................................................... 6

Pub. L. No. 100-687, 102 Stat. 4105 (1988) .................................................. 8

Pub. L. No. 103-446, 108 Stat. 4658 (1994) ................................................ 13

**RULE AND REGULATION**

38 C. F. R. § 3.100 .................................................................................... 39

-v-

38 C.F.R. § 3.103(a) .................................................................................. 24, 35, 37

38 C.F.R. § 3.159(b)(1) ............................................................................ 11, 24, 37

38 C.F.R. § 3.304 ........................................................................................... 23, 24

38 C.F.R. § 3.2600 ............................................................................................... 27

38 C.F.R. § 19.29 ................................................................................................ 27

38 C.F.R. § 19.31 ......................................................................................... 27, 37

38 C.F.R. §19.37(a) ........................................................................................... 27

38 C.F.R. § 20.302(a) ........................................................................................ 37

38 C.F.R. § 20.700 ...................................................................................... 27, 28

38 C.F.R. § 20.1304(c) ............................................................................... 28, 29

38 C.F.R. §159(c)(1) ................................................................................ 24, 25, 26

**LEGISLATIVE MATERIAL**

H.R. 141, 102nd Cong. (1991) ......................................................................... 13

H.R. 2357 108th Cong. (2003) ......................................................................... 14

H.R. 2735, 109th Cong .................................................................................... 14

H.R. 3094 108th Cong. (200) ........................................................................... 14

H.R. 5793, 101st Cong.(1990) ......................................................................... 13

H.R. Rep. No. 100-963, at 21 (1988), reprinted in 1988 U.S.C.C.A.N. 5782, 5803 ................... 9

1                                **INTRODUCTION**

2         Plaintiffs have failed to support their extreme allegations of systemic denial of mental

3 health care and the alleged collapse of the benefits processing system at the Department of

4 Veterans Affairs. Nor, ultimately, have plaintiffs submitted evidence establishing a jurisdictional

5 foundation required to sustain these claims. The evidence demonstrates that the Veterans Health

6 Administration (VHA) operates an outstanding medical system that is been a leader worldwide in

7 treating PTSD, and the Veterans Benefits Administration (VBA) has also performed

8 exceptionally given the substantial increase in the number and complexity of disability claims

9 and the legal constraints on processing those claims.

10         Ultimately, the Court need not make findings on these questions, since there are

11 numerous jurisdictional limitations, which taken together bar all of plaintiffs' claims. These

12 include standing, lack of an applicable waiver of sovereign immunity, and specific veterans'

13 statutes which deprive district courts of jurisdiction. All of these principles lead to the same

14 conclusion: Congress did not authorize federal courts to exercise the kind of supervisory

15 authority over the operations of the Department of Veterans Affairs – or indeed any federal

16 agency – that plaintiffs manifestly seek in this lawsuit. Instead, Congress and the Executive

17 monitor the administration of federal agencies, and are responsible for recommending and

18 legislating programmatic improvements for agency operations when necessary. The substantial

19 budgetary increases provided to both VHA and VBA over the past several fiscal years by the

20 Political Branches have provided the resources needed to care for American's veterans. For all

21 of these reasons, the Court should enter judgment for defendants on all of plaintiffs' claims.

22       **LEGAL MEMORANDUM ON JURISDICTIONAL LIMITATIONS**

23 **I.**      **Plaintiffs Lack Standing**

24         Plaintiffs' failure to establish that they have standing to bring this suit by itself deprives

25 this Court of jurisdiction to entertain the merits of their claims. Plaintiffs' litany of vague but

26 extreme allegations may have been sufficient to survive at the motion to dismiss stage where the

27 Court assumed that plaintiffs' general allegations would be supported by evidence necessary to

28 sustain their claims, see Order on Motion to Dismiss ("MTD") at 5:4-5, 11:7-9, but it does not

1  discharge plaintiffs' burden at to establish standing at trial.  See Lujan v. Defenders of Wildlife,

2  504 U.S. 555, 561 (1992) (standing must be supported "with the manner and degree of evidence

3  required at [each] successive stage[] of the litigation").  The Article III case and controversy

4  requirement prohibits parties from seeking sweeping judicial relief unmoored to individual

5  controversies.  See Sierra Club v. Morton, 405 U.S. 727, 740 (1972); see also  Conservation Law

6  Found. v. Reilly, 950 F.2d 38, 43 (1st Cir. 1991) ("[A]djudication of [] non-individualized,

7  abstract issues raises serious separation of powers concerns").

8      Plaintiffs, who have brought this action on behalf of their members,[1] see Compl. ¶ 38,

9  must establish, among other things, that their members have suffered a "concrete and

10  particularized" injury that is fairly traceable to each of the agency practices they seek to challenge

11   Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Moreover, because plaintiffs seek

12  prospective injunctive relief, they must establish not merely that their members were injured in

13  the past or that some veteran in the future may be harmed, but rather that the organizations'

14  members *themselves* are "realistically threatened by a repetition of [the alleged violations]." City

15  of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983); see also Lee v. Oregon, 107 F.3d 1382, 1389

16  (9th Cir. 1997) (fact that claim was *pled* as class action does not change requirement).

17      Plaintiffs have assiduously avoided discussion of any individualized facts – including

18  individual injuries – so as to be able to maintain the fiction that their claims are not barred by 38

19  U.S.C. § 511, which prohibits district court review of issues of fact necessary to VA benefits

20  decisions.  That making an individualized showing of harm would cause plaintiffs to run aground

21  of § 511(a) and thereby deprive this Court of jurisdiction does not excuse plaintiffs from the

22  requirement.  For, Article III power "does not wax and wane in harmony with a litigant's desire

23  for a hospitable forum. . . ." Valley Forge Christian Coll. v. Ams. United for Separation of

24  ─────────────────────

25  [1]Plaintiffs, advocacy organizations that do not directly assist veterans in obtaining VA
   benefits, see Trial Transcript ("TTr.") 663:18-21, 818:5-12, do not have standing to bring suit in
26  their own right.  An organization cannot establish such standing by showing that it advocates a
   particular position that would be advanced by the lawsuit, see Sierra Club v. Morton, 405 U.S.
27  727, 740 (1992), or that success in the lawsuit would spare the organization the necessity of
   pressing the same position before the political branches, see Schaffer v. Clinton, 240 F.3d 878,
28  884 (9th Cir. 2001).

1   Church and State, Inc., 454 U.S. 464, 476 n.13 (1982) (quotations omitted).  Plaintiffs'

2   generalized grievances fail to create the kind of "concrete factual context conducive to a realistic

3   appreciation of the consequences of judicial action,"[2] Valley Forge, 454 U.S. at 472, as is

4   evident from the ever-shifting nature of their claims, the contours of which have never been

5   brought into full relief.  Despite plaintiffs' dramatic suggestions to the contrary, federal courts

6   "were simply not constituted as ombudsmen of the general welfare." Valley Forge, 454 U.S. at

7   487.[3]

8        Finally, plaintiffs have failed to demonstrate "that prospective relief will remove the

9   harm" alleged.  Warth v. Seldin, 422 U.S. 490, 505 (1975).  Plaintiffs' claims are somewhat

10  unusual, because they do not challenge any discrete agency action that they contend is harming

11  their members, but instead, complain about an "overburdened . . . system . . . crushed by the

12  mental health and disability compensation needs of the . . . returning troops." Pl. Brief at 2:3-4,

13  without articulating how this Court could redress such harms.  Indeed, after two false starts,

14  plaintiffs' final proposed injunction does not identify any new procedure or policy that they

15  contend will alleviate their injuries but instead asks that the Court direct defendants to submit a

16  proposed remedial plan that will, in some manner not specified by plaintiffs, dramatically shorten

17

18        [2] Even if plaintiffs had established a concrete injury suffered by some of their members
    for which they could seek redress in this Court, they would still not have standing to pursue the
19  kind of *systemwide* relief they seek.  See Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996) ("the
    right to complain of *one* administrative deficiency" does not confer the "right to complain of *all*
20  administrative deficiencies"); Conservation Law, 950 F.3d at 43.

21        [3]Meaningful discussion of standing is noticeably lacking from plaintiffs' post-trial brief,
22  ("Pl. Brief") relegated to a single proposed conclusion of law with no accompanying findings of
    fact. Plaintiffs' citation to testimony by the heads of the two plaintiff organizations in support of
23  this conclusion illustrates the inadequacy of their showing on the issue.  Plaintiffs merely
    adduced generic testimony – in some cases not even offered for the truth of the matter asserted,
24  see TTr. 671:6-7, and based on unsubstantiated hearsay, see TTr. 674:15-21 – that members
    suffer from PTSD (not an injury traceable to VA conduct), that they receive medical care from
25  VA (hardly proof of imminent future harm), and that they experience delays of untold cause or
26  magnitude (which may have been reasonable and lawful under the circumstances).  Plaintiffs
    notably failed to introduce any evidence in support of numerous allegations in their complaint,
27  including that members have had their disability ratings reduced or have been threatened with
    reduction by VA, Compl. ¶ 35, or have been turned away or had to wait years for medical care,
28  Compl. ¶ 10, 92, 172.

1   the wait times for mental health appointments and processing times for claims. "Relief that does

2   not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very

3   essence of the Redressability requirement." Steel Co v. Citizens for a Better Env't, 523 U.S. 83,

4   107 (1998).

5     The evidence presented at trial demonstrated that the complaints about delay are the

6   function of several factors, none of which are subject to remediation by this Court. The number

7   and complexity of benefits claims and the demands for mental health services by veterans with

8   PTSD (all of which have increased significantly in recent years) are caused by factors entirely

9   outside the control of this Court, and, largely outside the control of any branch of the federal

10  government. The procedural protections and rights of veterans who seek benefits are extensive,

11  unmatched in all other federal programs, and give veterans every possible opportunity to present

12  evidence in support of their claims. See Findings ¶¶ 37 – 47, infra. Not surprisingly, however,

13  the testimony at trial established that these extensive procedural protections come at the cost of a

14  substantial increase in the time it takes to process claims. Short of abrogating these procedural

15  rights in an effort to expedite claims processing, (a remedy that plaintiffs have not sought), there

16  is nothing that this Court can do to reduce the impact of this factor. Finally, for obvious

17  separation of powers reasons, this Court has no role in determining VA's annual appropriation.

18    The only order that might hypothetically provide relief (albeit one not supported on the

19  current record), would be an order directing VA to completely change it claims adjudication and

20  health care procedures in some unspecified way to benefit all veterans. But such an order would

21  exceed the Court's authority. "If courts were empowered to enter general orders compelling

22  compliance with broad statutory mandates, they would necessarily be empowered, as well, to

23  determine whether compliance was achieved--which would mean that it would ultimately

24  become the task of the supervising court, rather than the agency, to work out compliance with the

25  broad statutory mandate, injecting the judge into day-to-day agency management." Norton v. S.

26  Utah Wilderness Alliance, 542 U.S. 55, 67 (2004).[4]

27

28    [4] See also Long Term Care Pharmacy Alliance v. Leavitt, 530 F. Supp. 2d 173, 185
    (D.D.C. 2008) (suits challenging overall programs agencies establish to carry out legal

-4-

1    II.    **Limitations on the APA's Waiver of Sovereign Immunity**

2    As with standing, it has become clear since this Court's ruling on defendants' Motion to

3    Dismiss that plaintiffs have failed to move beyond bare allegations in their complaint to establish

4    the unequivocal waiver of sovereign immunity that is prerequisite to this Court's exercise of

5    jurisdiction. See Holloman v. Watt, 708 F.2d 1399, 1401 (9th Cir. 1983). To fall within the

6    APA's waiver of sovereign immunity in 5 U.S.C. § 702, the only possible waiver in this case,

7    plaintiffs must establish that they (1) challenge final agency action (2) for which there is no

8    alternate adequate remedy. See MTD Order at 10.

9    Final Agency Action. As plaintiffs have developed and presented their case, it has

10   become evident that, apart from their impermissible attack on agency regulations, see Part III

11   infra, they do not challenge final agency actions. See 5 U.S.C. § 551(13) (defining "agency

12   action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent

13   or denial thereof, or failure to act. . . ."). An agency action is final only when it "mark[s] the

14   consummation of the agency's decisionmaking process" and is an action *"by which rights or*

15   *obligations have been determined,* or from which *legal consequences will flow."* Bennett v.

16   Spear, 520 U.S. 154, 178 (1997) (emphasis added). Because plaintiffs have never specified

17   which particular agency policies they believe unlawfully cause the delays or "neglect" they

18   allege, see T.Tr. 1366:17, they have similarly never established, that they challenge final agency

19   action.[5]

20   As evidenced by their newest proposed order, D.E. 229(2), which seeks the

21   _____

22   obligations are "rarely if ever appropriate for federal court litigation" for redressability reasons).

23   [5] It is not altogether surprising that plaintiffs have failed to satisfy the final agency action

24   requirement, since they have deliberately styled their case as a challenge to the entire VA system
     rather than individual decisions. Agency policies for administering statutorily-mandated

25   programs are "ordinarily not considered the type of agency action 'ripe' for judicial review" until
     there has been "some concrete action *applying [the policy] to the claimant's situation . . . .*"

26   Lujan v. National Wildlife Federation, 497 U.S. 871, 891 (1990) (emphasis added). Thus, the
     only relevant "final agency actions" in this case would be the individual benefits decisions which

27   "consummat[e] . . .the agency's decisionmaking process" and determine claimants' rights. See

28   Bennett, 520 U.S. at 178; see also 5 U.S.C. §§ 551(11), (13), which are not properly before this
     Court.

-5-

1    comprehensive restructuring of VA's health and disability benefits programs, plaintiffs seek the

2    kind of "wholesale improvement of [these] programs" that is beyond this Court's power to grant.

3    See Lujan, at 497 U.S. at 891. In Lujan, the Supreme Court concluded that the final agency

4    action requirement constrains the authority of federal courts to interfere with the day-to-day

5    management of agencies, and that "the flaws in [an] entire 'program'"cannot be "laid before the

6    courts for wholesale correction . . . ." Id. at 893. Plaintiffs' present challenge to "systemic

7    aspects" of VA's benefits programs, see Pl. Brief at 2:14, is no more directed at final agency

8    action than was the Lujan petitioners' "generic challenge to all aspects" of the Bureau of Land

9    Management's land withdrawal review program. Id. at 890 n.2. Indeed, there is a familiar ring

10   to the litany of challenged "practices" in Lujan which were not reviewable as final agency

11   actions. Compare, e.g., id. at 891 ("failure to provide adequate environmental impact

12   statements") with Pro. Order at ¶ 5, D.E. 229(2) ("failure to provide timely and effective mental

13   health care"); 497 U.S. at 891 ("failure to revise land use plans in proper fashion") with Pre-Trial

14   Brief at 9:5 ("failure to devise and implement an enforceable, nationwide plan for mental health

15   care").

16       Plaintiffs' attempt to couch their claim in terms of a "failure to act" fairs no better. As

17   the Supreme Court held in Norton v. S. Utah Wilderness Alliance,[6] supra, a genuine failure to act

18   may be reviewable as a final agency action under § 706(1) only where the

19   agency has "failed to take a *discrete* agency action that it is *required to take*."[7] 1542 U.S. 64

20   (emphasis in original). Plaintiffs have pointed to no single, *discrete* agency action that VA has

21

22   ─────────────────

23   [6] Plaintiffs' attempt to distinguish Norton on the ground that it allegedly did not involve a
     statutory directive is belied by a quick review of that case. Norton involved a statute directing

24   that the agency "*shall* continue to manage [] lands . . . in a manner so as not to impair the
     suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c) (emphasis added).

25   The Supreme Court concluded that while the statute – much like those at issue in this case – was
     "mandatory as to the object to be achieved, [] it leaves [the agency] a great deal of discretion in

26   deciding how to achieve it," and thus did not provide a basis for a § 706(1) suit. Norton, 542

27   U.S. at 66.

28       [7] The typical § 706(1) case involves a "specific statutory command requiring an agency to
     promulgate regulations by a certain date." Norton, 542 U.S. at 56.

1    failed to take in spite of a Congressional mandate to do so. Even their proposed order does not

2    specify what actions they would have this Court compel. Accordingly, they have failed to meet

3    their burden to establish a right of review under § 706(1).[8]

4        Nor does this Court have jurisdiction to entertain plaintiffs' allegations of "general

5    deficiencies in [VA's] compliance" with statutory obligations. Norton, 542 U.S. at 66. Rather,

6    this Court may compel required agency action only where there is a *genuine failure to act.*"

7    Ecology Center, Inc. v. U.S. Forest Service, 192 F.3d 922, 926 (9th Cir. 1999) (emphasis added).

8    Although this Court held that plaintiffs' 72-page complaint contained allegations of a genuine

9    failure to act sufficient to survive a motion to dismiss, MTD Order at 13, plaintiffs did not come

10   close to proving those allegations at trial. The Court heard testimony from numerous high-

11   ranking officials that VA is not only committed to improving services for veterans, but is taking

12   steps to manage the agency most effectively and to correct whatever deficiencies might be

13   identified. Plaintiffs cannot evade this clear jurisdictional bar "with complaints about the

14   *sufficiency* [of those steps] ' dressed up as an agency's failures to act.'" Ecology Ctr., 192 F.3d at

15   926 (emphasis added). "The prospect of pervasive oversight by federal courts over the manner

16   and pace of agency compliance with [broad] congressional

17   directives is not contemplated by the APA."[9] Norton, 542 U.S. at 67.

---

19   [8] In a transparent attempt to salvage claims that do not hinge on discrete agency actions, plaintiffs contend that "it is unnecessary to challenge a discrete agency action" when raising a
20   constitutional, as opposed to statutory, challenge. This Court has already determined, consistent with a recent Ninth Circuit case, Rattlesnake Coalition v. United States EPA, 509 F.3d 1095,
21   1104 (9th Cir. 2007), that the requirement of a *final* agency action in § 704 constrains the waiver of sovereign immunity in § 702. See MTD Order at 10:19-20. Even had this Court not so held,
22   it is clear that § 702 independently requires a challenge to an *agency action* – as that term is
23   defined in §551(13) – before a waiver of sovereign immunity can be established. See Norton,
24   542 U.S. at 62 ("Sections 702, 704, and 706(1) *all* insist upon an 'agency action'") (emphasis added); see also Ecology Ctr., 192 F.3d at 924 n. 5.

25   [9] The few cases cited by plaintiffs in support of their attempt to seek programmatic relief
26   or to require VA to devise a Court-approved remedial plan predate Lujan and Norton and therefore are not persuasive authority. Plaintiffs' suggestion that this Court could avoid the
27   unwarranted interference caused by such programmatic relief simply by entering a "general 'fix it' order," see Pl. Brief at 9:3, is also plainly erroneous. See Norton, 542 U.S. at 66 (rejecting
28   argument that "federal court could simply enter a general order compelling compliance with [a]

1    <u>Adequate Alternate Remedy</u>.  Review in this Court under the APA is only available if

2    "there is no other adequate remedy in a court."  5 U.S.C. § 704.  However, the Veterans' Judicial

3    Review Act ("VJRA"), Pub. L. No. 100-687, 102 Stat. 4105 (1988), provides veterans with the

4    right to challenge a wide range of VA decisions in the Court of Appeals of Veterans Claims

5    (CAVC), including all decisions denying, in whole or in part, applications for benefits as well as

6    any broader statutory or constitutional issues that arise in those claims.  <u>See</u> 38 U.S.C. § 7261.

7    The testimony at trial demonstrated that decisions of the CAVC have powerful precedential

8    effect, frequently requiring VA to revise it policies and readjudicate entire classes of claims.

9    Hence, this right to judicial review in a specialized, Article I court constitutes an adequate

10   alternative remedy, foreclosing the right to bring the same claims in district court.

11         It is irrelevant that the alternate remedy prescribed by Congress might be less desirable

12   than an action in district court.  For example, in <u>Women's Equity Action League v. Cavazos</u>, 906

13   F.2d 742 (D.C. Cir. 1990), the D.C. Circuit held that Section 704 precludes APA review of

14   enforcement and oversight activity by the Department of Education, because direct suits were

15   available against alleged discriminators, despite the fact that such suits were "more arduous, and

16   less effective in providing systemic relief."  <u>Id.</u> at 751; <u>see also</u>  <u>National Wrestling Coaches</u>

17   <u>Assoc. v. Dep't of Educ.</u>, 366 F.3d 930 (D.C. Cir. 2004).[10]

18   **III.  <u>Jurisdictional Limitations in the VJRA</u>**

19         <u>Section 511</u>.  The preclusion of review provisions of the VJRA, 38 U.S.C. §§ 502 and

20   511, constrain this Court's jurisdiction to entertain nearly all of plaintiffs' challenges.  The VJRA

21   was the product of Congressional dissatisfaction with judicial decisions, culminating in <u>Traynor</u>

23   mandate, without suggesting any particular manner of compliance.").

24         [10] Finally, the fact that plaintiffs, as organizations representing veterans, cannot seek
25   review in the CAVC of decisions by the VA on benefits claims by their members, is totally
     irrelevant to the question of whether the VJRA provides veterans with an adequate alternative
26   remedy.  The Supreme Court has explicitly recognized that, where a special review procedure is
     available to the members of an organization, it is irrelevant that the organization itself may not be
27   able to utilize that procedure to vindicate its members rights, since "the statutes that create the
     special review channel adequately protect those rights."  <u>Shalala v. Illinois Council on Long</u>
28   <u>Term Care</u>, 529 U.S. 1, 24 (2000).

1  v. Turnage, 485 U.S. 535 (1988), that found ways to avoid the preclusion of judicial review

2  contained in the predecessor statute, 38 U.S.C. § 211.  In the House report accompanying the

3  VJRA, Congress explicitly noted that "the Court's opinion in Traynor would inevitably lead to

4  increased involvement of the judiciary in technical VA decision-making," H.R. Rep. No. 100-

5  963, at 21 (1988), reprinted in 1988 U.S.C.C.A.N. 5782, 5803, involvement which Congress

6  strongly opposed.  Consequently, Congress tightened section 211's preclusion of review

7  language, noting that "[t]he effect of this change is to broaden the scope of section 211," id. at

8  27, to prevent federal district courts from entertaining precisely the sort of challenge that

9  plaintiffs bring in this action.[11]  See also Larrabee v. Derwinski, 968 F.2d 1497, 1501 (9th Cir.

10  1992).

11        The Court should not adopt a narrow interpretation of section 511(a)'s preclusion of

12  review language by construing it to apply only to decisions by the Secretary made in an

13  individual benefit determination.  Instead, the Court should give effect to the plain language of

14  the statute, which precludes this Court from reviewing any "questions of law and fact necessary

15  to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to

16  veterans . . ." Id. (emphasis added).  So, for example, decisions by the Secretary on how to

17  organize and assign staff to implement the VA claims administration statutes, 38 U.S.C. §§

18  5101-5109A, or decisions on how and when to provide hospital care to veterans under 38 U.S.C.

19  § 1710, are squarely within section 511's preclusion of review, since both statutes undeniably

20  "affects the provision of benefits to veterans." Cf. Bates v. Nicholson, 398 F.3d 1355 (Fed. Cir.

21  2005).[12]

22

_____

23     [11] "The committee believes that it is strongly desirable to avoid the possible disruption of

24  VA benefit administration which could arise from conflicting opinions on the same subject due
    to the availability of review in the 12 Federal Circuits and the 94 Federal Districts.  The

25  committee also believes that the subject of veterans benefits rules and policies is one that is well
    suited to a court which has been vested with other types of specialized jurisdiction." Id. at 28

26  (emphasis added).

27     [12] The Supreme Court provided crucial guidance on the scope of section 511 in an

28  immigration case, where the Court had occasion to compare a differently-worded jurisdictional
    limitation in the Immigration and Naturalization Act (INA) to the predecessor of section 511.

1      <u>Section 502</u>.  In section 502 of Title 38, the VJRA provides that challenges to VA rules

2  "may be sought only in the United States Court of Appeals for the Federal Circuit. . . ."  38

3  U.S.C. § 502, thereby divesting district courts of jurisdiction to entertain challenges to VA

4  rules.<u>see, e.g., Preminger v. Principi</u>, 422 F.3d 815, 821 (9th Cir. 2005)[13]; <u>Chinnock v. Turnage</u>,

5  995 F.2d 889, 893 (9th Cir. 1993).  Thus, to the extent plaintiffs challenge VA regulations, or

6  seek relief directly inconsistent with regulations, section 502 deprives this Court of jurisdiction to

7  entertain such claims, which must be brought exclusively in the Federal Circuit.

8      It is of no moment that plaintiffs contend that they do not "directly" challenge VA

9  regulations.  In any circumstance in which the injunctive relief requested by plaintiffs will have

10  the practical effect of invalidating a VA rule, in whole or in part, section 502 applies to prohibit

11  such an effect.  <u>See</u> <u>California Save our Streams Council v. Yeutter</u>, 887 F.2d 908 (9th Cir. 1989);

12  <u>Pediatric Specialty Care v. Arkansas Dept of Human Services</u>, 444 F.3d 991 (8th Cir. 2006).

13  Plaintiffs challenge the legality of the claims adjudication process pointing to what they consider

14  undue delay and the absence of trial-type procedures at the initial claim level.  But much of the

15  delay can be attributed to notices that VA must provide claimants and associated response times,

16  <u>see, e.g.</u>, 38 C.F.R. § 3.159(b)(1) (claimant allowed 30 days to respond to VA request for more

17  evidence).  And the regulation which imposes a duty on the VA to obtain evidence supporting the

18

19  ─────────────────

20  <u>McNary v. Haitian Refugee Center</u>, 498 U.S. 479 (1991).  As is the case here, plaintiffs in that
   action sought be bring a systemic challenge to INS practices and procedures, and the government

21  argued that a preclusion of review statute, § 210(e)(1) of the INA, barred the claim.  The Court
   ultimately sided with the plaintiffs as a matter of statutory interpretation.  But the Court tellingly

22  noted that if Congress had wished to preclude challenges to systemwide policies, and not just
   individual decisions, that Congress "could have modeled § 210(e) on 38 U.S.C. § 211(a), which

23  governs review of veterans' benefits claims, by referring to review 'on all questions of law and

24  fact' under the [agency] legalization program."  <u>Id</u>.

25      [13]<u>Preminger</u> most certainly did not hold, as plaintiffs contend, <u>see</u> Pl. Brief at 3:10-12,
   that district courts can entertain direct challenges to VA regulations notwithstanding § 502.  422

26  F.3d at 821 ("[A]ny direct challenge to [the validity of a rule] must be brought in the Federal
   Circuit.").  <u>Preminger</u> – a case that did not involve veterans benefits law – did hold that district

27  courts could entertain challenges to the manner in which a regulation is *applied* "to a particular

28  party or individual," <u>id.</u> at 821, but such challenges would be foreclosed here by § 511.  <u>See</u>
   MTD Order at 28.

1   claim, see 38 C.F.R. § 3.159(c), is inconsistent with plaintiffs' proposed relief under which the

2   claimant could obtain such information himself through discovery.  Because the injunction

3   plaintiffs seek would have the effect of invalidating these rules and others, at least in part, section

4   502 bars such relief.

### IV.    Other Jurisdictional Limitations

6       38 U.S.C. § 1710 Is Not Enforceable in Court.  While defendants acknowledge VA's

7   broad obligation – and indeed its moral imperative – to provide medical care to the men and

8   women who have served our country, they submit that §§ 1710(a)(1) and § 1710(a)(2), which

9   provide that the Secretary "shall furnish hospital and medical services . . . which [he] determines

10  to be needed," do not create any judicially enforceable right to particular types or levels of care.

11  Congress carefully oversees VA, regularly adjusts VA's health care obligations, and appropriates

12  funds as necessary.  Accordingly, plaintiffs' members do not have a "property interest," and

13  plaintiffs are not entitled to review of their medical care claims, even if other jurisdictional

14  defects were ignored.

15      In enacting § 1710, Congress intended to "create[] no such expectation" that "veterans

16  could seek and expect to receive services," H.R. Rep. No. 104-690 (1996), at *16, and expressly

17  provided that the "requirement in [§1710(a)(1) and § 1710(a)(2)] that the Secretary furnish

18  hospital care and medical services . . . shall be effective in any fiscal year only to the extent and

19  in the amount provided in advance in appropriations Acts for such purposes."[14] 38 U.S.C. §

20  1710(a)(4).  The fact that health care is dependent year to year on available funds is alone

21  sufficient to take it outside the realm of a protected property right.  See Nunez v. City of Los

22  Angeles, 147 F.3d 867, 872 (9th Cir. 1998).  That the provision of particular medical services

---

[14]The Court heard unrefuted testimony that – unlike VA's budget for monetary benefits, which is obligated as necessary – VA's health care budget is dependent year to year on what Congress appropriates to VHA.  See PI Tr. 578:10-17, 577:14-18.  This is consistent with the legislative history of the Veterans Health Care Eligibility Reform Act of 1996, which noted that the addition of § 1710(a)(4) was "intended to clarify that [medical] services would continue to depend upon discretionary appropriations.".  H.R. Rep. No. 104-690 at *5.  This distinction also explains why Devine v. Cleland, 616 F.2d 1080 (9th Cir. 1980), the case on which this Court based its initial due process analysis, does not control the present situation, as pension benefits are administered under a mandatory rather than discretionary budget.

1   depends on an "affirmative act of discretion" by the Secretary in determining that the care is

2   "needed," likewise removes that care from the sphere of entitlements. See Dorfmont v. Brown,

3   913 F.2d 1399, 1403 (9th Cir. 1990).[15]

4         Nor is jurisdiction available to enforce § 1710 under the APA, which provides that

5   judicial review may not be had where actions are "committed to agency discretion by law." 5

6   U.S.C. § 701(a)(2). An action is committed to agency discretion where there are "no meaningful

7   standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470

8   U.S. 821, 830 (1985). As such, there is simply "no law to apply" and the Court lacks

9   jurisdiction. Steenholdt v. FAA, 314 F.3d 633, 638 (D.C. Cir. 2003). Section 1710, which

10   directs the Secretary to provide medical services only when *he determines* them to be needed

11   "exudes deference" to the Secretary, and therefore provides no basis for review.[16]  See Webster

12   v. Doe, 486 U.S. 592, 600 (1988) (statute permitting employee termination whenever official

13   "shall *deem* such termination necessary" leaves no law to apply).

14         The Court May Not Impose Judicial Time Limits on VA.  Plaintiffs' request that the

---

[15]Plaintiffs load far more import onto the term "shall" in § 1710 than the language will bear. "Courts in virtually every English-speaking jurisdiction have held – by necessity – that *shall* means *may* in some contexts." See Gutierrez De Martinez v. Mamagno, 515 U.S. 417, 432 n.9 (1995) quoting B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995); see also Town of Castle Rock v. Gonzales, 545 U.S. 748, 760-62 (2005). Section 1710 on its face gives the Secretary discretion in determining which medical services need to be provided, undermining any argument that it creates an enforceable right.

[16] Contrary to plaintiffs' suggestion, § 1705(b) does not provide a meaningful standard against which this Court could judge the Secretary's exercise of his discretion under § 1710. That section deals not with the management of the *health care system*, as plaintiffs indicate, but rather the *enrollment system* – that is, the manner in which the Secretary determines, through rulemaking, which veterans are eligible for health care. Compare 38 U.S.C. § 1705(b) with Pl. Brief at 32:20 (substituting word "health care system" for "enrollment system"). It would therefore be a mistake to read § 1705 as imposing judicially manageable standard for assessing the Secretary's management of medical services. Moreover, in enacting § 1705 and § 1710, Congress indicated that "*medical judgment* rather than *legal criteria* will determine when care will be provided and the level at which that care will be furnished." H.R. Rep. No. 104-690 at *4 (emphasis added). Determining the level and type of care to provide requires the kind of "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," foreclosing review. See Lincoln v. Vigil, 508 U.S. 182, 193 (1993).

1    Court enter an injunction that would have the practical effect of establishing deadlines for VA

2    action on claims for medical care or benefits,[17] is barred by Supreme Court precedent.  In Heckler

3    v. Day, 467 U.S. 104 (1984), the Supreme Court held that where Congress was aware of the

4    problem of delays in adjudicating benefits claims, but expressed "concern that mandatory

5    deadlines would subordinate quality to timeliness . . . it hardly could have contemplated that

6    courts should have authority to impose the very deadlines it repeatedly has rejected."  Id. at 117-

7    18.  "Whether or not we believe that its response was the best response, Congress is the body

8    charged with making the inevitable compromises required in the design of a massive and

9    complex welfare benefits program."  Schweiker v. Chilicky, 487 U.S. 412, 429 (1988).

10           Congress has long been aware of the issue of delay in the provision of VA benefits and

11   has considered, but repeatedly rejected mandatory time limits.  In the benefits area, legislation

12   was introduced during the 101st and 102nd Congresses that would have required the VA to pay

13   interim benefits if disability and dependency claims were not decided within 180 days.[18]  The

14   Veterans' Benefits Improvements Act of 1994 required the VA to provide "expedited treatment"

15   of those cases that had been remanded by the CAVC or the Board.  Pub. L. No. 103-446, Title

16   III, § 302, Nov. 2, 1994, 108 Stat. 4658, but failed to specify a specific time limit for such action

17   on a remand.  Similarly, on the health side, Congress has considered, but rejected proposals that

18   would have required that VA ensure that veterans seeking primary health care be given an

19   appointment within 30 days of contacting the VA.[19]  Clearly, as was the case in Day, "the

20   concern that mandatory deadlines would jeopardize the quality and uniformity of agency

21   decisions has prevailed over considerations of timeless."  467 U.S. at 114.

---

22

23    [17] See Plaintiffs' [Proposed] Order of March 10, 2008 (D.E. 166) at ¶ E.1.  Plaintiffs most
      recent proposed order clearly envisions that defendants' remedial plan will result in mandatory

24    time limits for VA actions.  See Pl. Brief at 8:16-17.

25    [18] Veterans' Claims Administrative Equity Act of 1990, H.R. 5793, 101st Cong. (1990);
      Veterans' Claims Administrative Equity Act of 1991, H.R. 141, 102nd Cong. (1991); Veterans'

26    Claims Administrative Equity Act of 1991, S. 1158, 102nd Cong. (1991); Veterans' Claims
      Administrative Equity Act of 1991, S. 1107, 102nd Cong. (1991).

27

28    [19] H.R. 2357 108th Cong. (2003); Veterans' Timely Access to Health Care Act, H.R. 3094
      108th Cong. (2003); Veterans' Health Care Full Funding Act, H.R. 2735, 109th Cong.

1 **FINDINGS OF FACT – VETERANS HEALTH ADMINISTRATION**

2 <u>**The Mental Health Strategic Plan**</u>

3    1. The Mental Health Strategic Plan ("MHSP"), an agency initiative not required by

4 statute, consists of 265 recommendations to improve mental health care provided by the VA.

5 TTr., p. 777:22-24; Ex. 398. It was developed as a 5 year plan, and it is currently in its fourth

6 year of implementation. PITr. 477:24 - 478:1.

7    2. The Office of Mental Health Services within the Veterans Health Administration is

8 responsible for oversight and directing mental health services at the VA. PITr. 736:21-737:11.

9 This Office sets the direction and creates national programs in mental health, performs the

10 strategic planning for program development and implementation, and develops and implements

11 models for training. <u>Id.</u> This is accomplished by, amongst other things, working on policy

12 development within VA with those offices both above and below in the organizational structure

13 and consulting with the field about appropriate implementation of programs. PITr. 396:2-6. The

14 implementation of the MHSP is of particular emphasis for the Office of Mental Health - it is

15 required to develop the programs that implement the recommendations of the MHSP. <u>Id.</u>; PITr.

16 738:3-6.[20]

17    3. The MHSP is a road map for improved mental health treatment by the VA and, as

18 testified to by Dr. Alan Berman, an expert in suicide involved with the National Strategy for

19 Suicide Prevention through the Surgeon General's Office, it is a plan that could not possibly be

20 fully implemented in only three or four years. TTr., 1274: 21-25; 1310:20-23.

21

22    ───────────────

[20] Despite efforts of Plaintiffs to make it appear otherwise, these are not the roles of Mr.
23 William Feeley, Deputy Undersecretary for Operations and Management. He is an administrator
not primarily responsible for policy formation. TTr. p. 315:22 - 316:8. He is not responsible for
24 creating the policies that implement the MHSP nor is he responsible for monitoring its
implementation in the field - that responsibility falls to the Office of Mental Health Services,
25 headed by Drs. Ira Katz and Antonette Zeiss. Transcript of Preliminary Injunction Hearing
26 ("PITr.") 396:2-6, PITr. 440:16 - 441:17, PITr. 738:3-6; TTr. 436:19 - 437:2, 437:16-20. The
Office of Mental Health works in collaboration with the Office of Operations and Management
27 to make sure policies are implemented and to solve any problems that might be occurring in the
28 field. PITr. 437:13-19.

4. The following chart summarizes the increase in VHA mental health funding over last several fiscal years:

| Fiscal Year | Spending on Mental Health Care | Spending on Mental Health Initiative |
|---|---|---|
| Fiscal Year 2006 | approximately $2.4 billion (PITr. 555:17-20) | approximately $118 million out of a targeted $200 million (PITr. 553:1-4) |
| Fiscal Year 2007 | approximately $3.2 billion (PITr. 557:8-10) | approximately $325 million out of a targeted $306 million (PITr. 553:5-9) |
| Fiscal Year 2008 | on target to spend approximately $3.5 billion (PITr. 558:2-3) | on target to spend $370 million (PITr. at 554:2-6) |
| Fiscal Year 2009 | approximately $ 3.9 billion (TTr. 774:25 - 775:3) | N/A |

5. Over the past few years, VA has hired over 3800 new mental health staff. PITr., 739:12-13, PITr., 221:21-222:3. VA has approximately 500 - 600 positions that remain to be filled.[21] PITr. 419:10-22. VA has 2,403 unfilled nursing positions out of a total of over 40,000 nursing positions. PITr. 224:2-7. VA has 1,394 unfilled positions for physicians out of a total of well over 21,000 physician positions. PITr. 231:9-13.

6. At an initial primary care visit, all veterans are screened for PTSD, depression, traumatic brain injury, military sexual trauma and problem drinking. PITr. 518:5-21. If the screen is determined to be accurate, the veteran will either receive mental health care right in the primary care facility or will receive a referral to specialty mental health care. Id. Newly returning veterans receive this screening from VA annually for the first five years after they return. PITr. 518:22 - 519:1.

---

[21] Plaintiffs assert as a finding of fact that VA has approximately 3,800 unfilled mental health positions at VA. Pl. Brief, p. 13 (D.E. 229). This assertion is utterly disingenuous and borders on a fraudulent misrepresentation to the Court. To make this assertion, plaintiffs take the testimony of Dr. Antonette Zeiss completely out of context. It is clear from Dr. Zeiss' testimony that VA has *hired* over 3,800 mental health staff and that the number of vacancies is between 500 and 600. PITr. 419:10-22. This was obviously equally clear to plaintiffs' counsel, whose next question to Dr. Zeiss was, "[s]o what percentage of vacant positions does that 500 or 600 represent of mental health professionals." Id.

1    7. As part of the implementation of the MHSP, VA started the Primary Care Mental

2 Health Integration Program which moves mental health treatment into the primary care setting,

3 not just in the specialty mental health setting, PITr. 519:5-14, to reduce the stigma associated

4 with mental illness as well as increase access to mental health treatment for veterans. PITr. 519:

5 15 - 520:10.

6    8. To facilitate treatment of mental health in primary care for a veteran who has been

7 prescribed anti-depressants, VA funds extensive follow up with the veteran in consultation with

8 psychiatrists and the primary care provider. PITr. 520:11-521:13. VA also places a co-located

9 collaborative mental health provider, usually a psychologist, into the primary care team so that a

10 mental health professional is immediately available. Id. Further, VA places mental health

11 providers in the Community Based Outpatient Clinics ("CBOC"). Id. In fact, VA has

12 established a new requirement that, to be approved as a CBOC, the CBOC must have a plan for a

13 mental health provider.[22] PITr. 535:21-23. VA also places a mental health provider, usually a

14 psychologist, in every home based primary care team. PITr. 520:11-521:13.

15    9. The MHSP has been 80% implemented. Tr. April 24, p. 777: 22-24. The office of

16 Patient Care Services maintains a matrix which reports whether items of the MHSP are

17 completed or not completed. Tr. April 24, p. 790:9-20.

18 **June 1, 2007 Initiative**

19    10. It is the responsibility of the Office of Mental Health to monitor whether medical

20 facilities are following the June 2007 Initiative. PITr. 440:16 - 442:16. The Office has monitors

21 in place and has additional ones under development. Id. One monitor that is being tracked is

22 whether medical facilities are complying with the 14 day follow up requirement. Ex. 1259 at

23 28:9-16; TTr. 443:1-23, 446:11-17; 453:10-13; 454:10-17. VA's data show that, despite the

24 initiative being less that a year old, VA medical facilities are already meeting this requirement

25 80% of the time, with an expectation that the medical facilities will met this requirement 90% of

26

27    [22] VA has already met and retired performance measures requiring 10% of veteran visits
in CBOCs that serve over 1500 unique veterans to be for mental health treatment, PITr. 526:8-

28 19, and requiring 85% of CBOCs who serve at least 1,500 unique veterans provide mental health
services either on site or by contract. TTr. 703:7-22.

-16-

1   the time by September 2008. Tr. Apr 22 443: 1-10.

2       11. In addition, to ensure implementation of the June 2007 initiative, VA tracks the

3   number of mental health providers hired at medical facilities within a VISN to ensure adequate

4   personnel and patient access to meet the initiatives requirements, including the 24 hour

5   evaluation. TTr.  449: 1-14; 450:24 - 451:3.

6       12. Dr. Jeffrey Murawsky, Chief Medical Officer of VISN 12, testified his VISN has

7   made significant efforts to ensure compliance with June 2007 initiative, including an analysis of

8   whether there is documentation in the medical record of patients that the 24 hour mental health

9   triage occurred, where required. PITr. 633:7- 634:1.

10      13. Plaintiffs failed to produce any evidence that the June 1, 2007 Initiative has not been

11  implemented system wide throughout the VA.  Plaintiffs' reliance on reports of the Office of

12  Inspector General (OIG) and Government Accountability Office (GAO) is not helpful as they

13  predate the implementation of the policy.  Dr. Antonette Zeiss denied that aspects of the June

14  2007 Initiative have not been implemented system wide, PITr. 456:20-23, and testified she is not

15  aware of instances of violation of the 24 hour assessment policy. PITr. 439:23 - 440:3. Dr. Zeiss

16  further denied that many Veteran Integrated Service Networks ("VISN") have yet to devise an

17  implementation plan with respect to the 24 hour assessment and the 14 day follow up. PITr.

18  505:1-4. In addition to performance monitors, verification of implementation of the June 2007

19  Initiative is occurring through site visits, which, while early in implementation, are planned for

20  every VISN. PITr. 442:8-10, 456:24 - 458:5. It is not possible for VA to directly track the 24

21  hour evaluation policy because it would be forced to hire too many auditing personnel that would

22  ultimately detract from direct patient care. TTr. 446: 18-21.  However, if it is discovered that a

23  medical center or CBOC within a VISN is not complying with the 24 hour evaluation

24  requirement, or the other aspects of the June 1, 2007 Initiative, the director of that VISN would

25  be subject to disciplinary action, up to and including suspension or removal. TTr. 460:22 -

26  463:15

27  **OEF/OIF & PTSD Mental Health Care**

28      14. OEF/OIF post deployment health assessment screenings are conducted 90 to 180

1  days after return from overseas Guard and Reserve duty to assist with transition to VA care and,

2  in particular, to identify people who might benefit from mental health care; staff from VA Vet

3  Centers attend each screening.  PITr. 581:19 - 582:3.  VA has also established 95 mental health

4  teams that are specifically dedicated to OEF/OIF veterans, including specialized PTSD treatment.

5  PITr. 581:19 - 583:6.  Teams are seeing veterans and providing the care that was intended.  PITr.

6  584:10-18.

7       15.  VA has numerous specialized PTSD & OEF/OIF services throughout the country.

8  See . Ex. 512.  These include 156 PTSD Clinical Teams or Specialists (in every medical center),

9  evaluation and treatment units, residential rehabilitation programs, women's trauma recovery

10  programs, women's stress disorder treatment track, combined substance use disorders and PTSD

11  track, and PTSD day treatment.  Id.[23]

12  **Wait Times**

13       16.  VA has reduced its national electronic wait list of patients waiting greater than 30

14  days after their desired appointment date from 182,141 in February 2007 to only 37,902 patients

15  in February 2008.  See Ex. 528.  This is to be distinguished from situations where a veteran

16  presents with an emergency situation, as those veterans will receive immediate treatment.  TTr.

17  158:12-16, 130:11-15.

18       17.  Deputy Under Secretary Gerald Cross testified at length why the September 2007

19  OIG report on VHA wait times is suspect, indicating the manner in which the OIG collected data

20  on wait times inappropriately skewed the results to longer wait times by not taking into account

21  patient preference.  For example, when a patient has a previously scheduled vacation and prefers

22  to have an appointment outside the 30 day period, that fact is not always recorded in the veteran's

23  medical record .  TTr. 149:15 - 153:2.

24       18.  As of January 2008, 98.64% of veterans seeking mental health appointments were

25  seen within 0-30 days.  PITr. 594:15 - 595:16, Ex. 514.  In fiscal year 2008, for established

26

27      [23]  VA also has a new program called the PTSD Mentoring Program.  TTr. 830:1 - 832:6.
This program places two PTSD mentors in each VISN who are responsible for keeping track of

28  PTSD treatment in their VISN in order to focus attention on PTSD treatment and its availability
system wide.  Id.

1   mental health patients, the average patient wait time was one day longer that the desired date and

2   the median wait time was zero days. PlTr. 597:17-20, Ex. 515. VA also tracks the waiting time

3   that new mental health patients actually experience from the request/referral to the appointment,

4   which indicates that for FY 2008 the average patient wait time is 12 days and the median wait

5   time is 8 days. PlTr. 598:11-23, Ex. 516.

6   **VA's Suicide Prevention Program**

7        19.  VA, as the leader in suicide prevention, has a suicide prevention program unlike any

8   other in the country. TTr. 1294:7-12. VA has programs, like the Suicide Prevention

9   Coordinators ("SPC"), that do not exist in any other health care system in the United States and

10  far exceed what any other system is doing. PlTr. 743:18-24; TTr. 1290:24 - 1291:5. Defendants'

11  suicide prevention expert, Dr. Alan Berman, testified that no other medical system or any other

12  single hospital doing what VA is doing with regard to best practices for treating suicidal patients.

13  TTr. 1279:21 - 1280:2.

14       20.  The employs suicide prevention coordinators at each VA medical center. Suicide

15  prevention programs and training at CBOCs are monitored by the SPC at the CBOC's parent

16  medical center. Tr. Mar 4 234:23-24. The SPCs coordinate training at the affiliated CBOCs.

17  PlTr. 745:21-25. There is a SPC at every parent facility in VISN 12, and they track the number

18  of suicides and share that information with the VISN monthly. PlTr. 649:19-24. The VA

19  Suicide Prevention Hotline, was activated in July 2007. PlTr. 746:12 - 749:9.

20       21.  VA doctors are instructed to identify suicide risk through clinical judgment by

21  interacting with the patient. PlTr. 752:2-5, 752:14-16. In order to assist doctors in identifying

22  suicide risk, VA provides to all its employees (doctors, clerks, nurses, etc.) a Suicide Risk Pocket

23  Card which presents information on acute risk factors and warning signs and outlines key

24  questions to be asked by the primary provider or others. PlTr. 752:6 - 16, TTr. p. 1282:12-24,

25  Ex. 517.[24]

26

27  _____

      [24] Ex. 365, a type of suicide screen used in primary care settings, is a Puget Sound Health

28  Care template. TTr., p. 1257:3-5. Contrary to plaintiffs' position, it cannot be used to draw any
    conclusions about VA practices nation-wide as it is a tool used by only one of VA's Health Care

22. The May 10 2007 OIG Report entitled "Implementing VHA's Mental Health Strategic Plan Initiatives for Suicide Prevention," heavily relied upon by plaintiffs, based its findings on surveys it performed on VA medical centers between December 2006 and February 2007. Ex 133 at iii. These surveys were completed two months before VA began to implement its SPC positions in April 2007, PITr. 742:13-16; PITr. 746:8-11, and five months before the VA's Suicide Prevention Telephone Hotline was activated. PITr. 745:14.

23. Consequently, the few inadequacies noted in the May 2007 OIG report that were highlighted by plaintiffs are now functions that are performed by the SPCs who are placed in every VA Medical Center. PITr. 743:4-5, 745:5 - 746:11. It is the job of the SPC, a licensed mental health professional, to identify and maintain a list of those veterans who are at high risk for suicide and ensure their care and monitoring is intensified. PITr. 743:14-17; PITr. 745:5-17. This allows the VA to focus its preventative efforts on high risk patients. PITr. 745:18-20. SPCs are also responsible for receiving referrals from VA's Suicide Prevention Hotline, PITr. 745:11-14, where, if necessary, the SPC will meet a veteran referred from the hotline at the doors of the medical center. PITr. 748:14-25. The SPCs are further responsible for coordinating referrals within their facility as well as from the community at large. PITr. 745:15-17. It is also the role of the SPC to provide training on suicide prevention to medical providers about recognition and response to suicide risk, and to other staff members within VA Medical Centers and clinics, including clerks and telephone operators, about recognizing the warning signs of suicide. PITr. 745:21-746:2.

24. The Court finds Dr. Alan Berman[25] more credible and evidenced a greater

---

systems. While the Puget Sound Health Care template, Ex. 365, is a valid tool and within the standard of care for assisting primary care doctors in evaluating the suicide risk of patients, TTr. p. 1291: 18 - 1292:11, there does not exist a universal validated scale for assessment of suicide risk that is available and useful. PITr. 752:2-5.

[25] Dr. Alan Berman is an expert in suicide and suicidology and is an experienced clinician who has treated and continues to treat patients with mental health issues. TTr. p. 1268:4-17. Dr. Berman has an extensive background working with the VA and its suicide prevention program and is knowledgeable about the Mental Health Strategic Plan. Id. at 1272:24-1274:17; 1276:16-1278:14.

1   understanding of the facts at issue in this case than Plaintiffs' expert, Dr. Ronald Maris. The

2   Court finds Dr. Maris, as an academic sociologist, was not qualified to express opinions

3   regarding clinical standard of care or clinical treatment of patients in VA's suicide prevention

4   program. TTr. 1299:17-1301:6.

5   **Evaluation of VA's Mental Health Programs and Policies**

6       25. In January 2008, Dr. Robert Rosenheck, Director of VA's Northeast Program

7   Evaluation Center published a study that used all available data to assess the performance of the

8   delivery of VA mental health services. TTr. 835:1-20. Ex. 553. The study had approximately

9   100 different measures. Id. The report concluded that for the time period of FY 2004 - FY 2007,

10  the time period in which the MHSP was begun, "overall improvement in mental health care was

11  thus substantial and sustained." Ex. 553 at 2, TTr. 836:18-837:5.

12      26. In another study performed by Dr. Rosenheck regarding the number of visits per

13  veteran diagnosed with PTSD in VA's specialty mental health programs, Dr. Rosenheck found

14  that for Gulf War Veterans (which includes OEF/OIF veterans), visits per veteran increased from

15  2005 to 2006 and increased substantially more from 2006 to 2007. TTr. 837:16 - 838:6. This

16  means that Gulf War veterans who were seen by the VA were seen with increasing intensity,

17  which means they had more visits with the mental health specialist. Id.[26]

18  **VA's Clinical Appeals Process**

19      27. The quickest way to get a decision that meets the medical needs of a patient when

20  that patient who disagrees with a clinical decision, is through prompt discussion with the patient

21  in a clinical setting. PITr. 731:16-22. Adding an external review to the process, with discovery

22  and subpoenas, would delay the clinical appeals process. PITr. 731:16-25.

23      28. In the context of a veteran seeking a medical appointment, the clinical appeals

24  process is meant to address the clinical opinion that a patient is sufficiently medically stable to

25  _____

26      [26] Dr. Rosenheck has also performed a study of VA's PTSD Clinical teams which

27  determined that there was no difference in patient outcomes for patients treated by high intensity
    (higher visits per veteran) PTSD Clinical Teams versus low intensity PTSD Clinical Teams.

28  TTr. 838:13 - 839:15.

1   have an appointment on a certain date. Id. If a veteran expresses a need for treatment, in any

2   manner, they will be seen by a nurse for a triage assessment. PITr. 654:16-656:9. A veteran will

3   not be told by a clerk that no appointments are available or that he cannot be seen on a desired

4   date if that veteran expresses a need for treatment because clerks are not qualified to make that

5   triage decision. Id.

6   **FINDINGS OF FACT – VETERANS BENEFITS ADMINISTRATION**

7   **Rating Claims**

8        29. The Veterans Benefits Administration ("VBA") administers benefit programs for

9   veterans. Veterans may file a claim for compensation and pension benefits at any of the 57 VA

10  Regional Offices (ROs) throughout the country. TTr. 883:9-885:6; 887:21-888:8.

11       30. The majority of rating claims seek compensation for an injury allegedly incurred in

12  service. TTr. 930:16-931:9. Rating claims require three elements: (1) eligible service, (2) a

13  diagnosed disability, and (3) a nexus between the service and the disability ("service

14  connection"). Id. 887: 6-11. Need is not a factor. See id.

15       31. A rating claim may seek compensation for more than one injury. Each separate

16  injury is considered an "issue" in the claim. TTr. 930:4-15. A claim remains open until all

17  issues have been resolved. Id. 934:22-935:15.

18       32. In FY 2007, the VBA received 838,141 ratings claims. Ex. 542; TTr. 28 972:16-22.

19  Of these, 225,173 were "original" claims – first time requests for benefits by veterans. Ex. 543.

20  The remaining 612,968 claims were "reopened" claims, claims from veterans who had previously

21  sought benefits from the VA. Exs. 542, 543. Of the original claims that year, 58,532 had 8 or

22  more issues and 166,641 had 7 or fewer issues. Ex. 543. Since FY 2005, the number of claims

23  with 8 or more issues has risen 34%, while the number with 7 or fewer has remained essentially

24  steady. Id.; TTr. 983: 16-984:13.

25       33. Average Days to Complete ("ADC") measures the time to adjudicate all rating claims

26  completed over a finite period of time. TTr. 900:12-902:8. ADC is computed by taking all

27  rating claims adjudicated during a period (a year, a month, or fiscal year to date), adding the

28  number of days it took to complete each one, and dividing by the total number of claims that

-22-

1  were adjudicated. Id. 900:12-18. As of trial, the ADC for FY 2008 to date was approximately

2  183 days. Ex. 541; TTr. 936:8-12. Since FY 2000, the number of issues contained in these

3  claims has increased 69%, from approximately 1,656,466 to 2,797,563. Ex. 559. The ADC for

4  FY 2000 was 173 days and for FY 2007, 183 days – an increase of only 6% %. Id.

5      34. The reasons for the increase in claims – and issues – per year include the current

6  conflicts, outreach to veterans by the VA, presumptive service connections of certain diseases for

7  Vietnam era veterans, and the aging of the veteran population as a whole (as veterans age, certain

8  disabilities manifest for the first time, or previously service connected disabilities worsen), and

9  new or increased benefits awarded veterans by Congress. TTr. 975:13-980:9.

10     **PTSD Claims**

11     35. PTSD claims differ from other ratings claims in one significant manner. A claim for

12  PTSD requires a "stressor" – a traumatic event – that is the cause of the subsequent disorder.

13  TTr. 28 907:14-18. In order to be compensable, this stressor must be connected to the veteran's

14  prior service. Id. 953:2-8. VA regulations require that, in most cases, the stressor itself must be

15  verified as having occurred. 38 C.F.R. § 3.304.[27] At the start of trial, plaintiffs contended that

16  PTSD claims take on average 544 days to adjudicate. Ex. 1277. Plaintiffs adduced no evidence

17  to support this claim.

18     36. The VBA has made tremendous progress in the time needed to verify combat-related

19  stressors. The VBA often has to request old military unit records from the United States Army's

20  Joint Record Research Center (JSRRC) to verify that a veteran actually served in combat at the

21  time the claimed stressor occurred. TTr. 953:9-25. As of early 2007, the JSRRC was

22  backlogged with over 5,412 such requests. Id. at 954:6-21. In early 2007, the VBA assigned 4 to

23  5 employees to review all the requests then pending at the JSRRC. Id. at 954:22-955:14. By the

24  fall of 2007, these employees had cleared this backlog. Id. at 955:15-21. As a result, as of April

25  26, 2008, the longest pending request for stressor verification at the JSRRC was 29 days. Id.

26  956:4-14. Thus, a 2006 GAO report alleging that the JSRRC was taking over 1 year to verify

27

28     [27]If a veteran was engaged in combat, his testimony alone will suffice to establish an in-service stressor. 38 C.F.R. § 3.304(f).

1    stressors is no longer accurate. Id. 956:15-18.

2    **The Claims Adjudication Process for Rating Claims is Non-Adversarial**

3        37.  Pursuant to the Veterans Claims Assistance Act (VCAA), 38 U.S.C. § 5103, the VA

4    is required to assist a veteran develop all evidence supporting the issues in a claim.  No advocate

5    for the VA opposes a claim.  38 C.F.R. 3.103(a)

6        38.  Under the VCAA duty to notify, a VBA employee known as a Veterans Service

7    Representative ("VSR") sends a letter to the veteran informing the veteran of what evidence the

8    VBA will need to adjudicate the claim, what evidence the veteran must supply, and what

9    evidence the VBA will seek on his behalf under the VCAA duty to assist.  38 C.F.R. §

10   3.159(b)(1); TTr. 940:10-941:9.

11       39.  Under the VCAA duty to assist, the VBA must seek all federal government records

12   that may pertain to the claim.  TTr. 940:23-941:4.  Typically, these will include service personnel

13   and medical records, but may also include VA medical treatment records, social security records,

14   or other records.  Id. 942:6-944:8.  By regulation, the VA must continue to seek these records

15   until the responsible agency attests that they are no longer available.  38 C.F.R.§ 3.159(c)(2);

16   TTr. 940:23-941:4.

17       40.  The duty to assist also requires the VBA to undertake reasonable efforts to acquire

18   non-federal records identified by the veteran, typically private medical records.  38 C.F.R. §

19   159(c)(1); TTr. 941:5-9; 944:9-21.  The VBA cannot initiate the search for these records without

20   a release executed by the veteran.  38 C.F.R. § 159(c)(1)&(c)(2); TTr. 941:5-9; 944:9-21.  The

21   VBA duty to notify letter includes the necessary releases for the veteran to execute.  Id. 941:16-

22   24.  In the alternative, the veteran may personally acquire the private records and present them to

23   the VBA himself.  The duty to notify letter provides veterans with a 60-day deadline to respond

24   with any releases and with any evidence in their possession.  TTr. 941:16-24.  Once the releases

25   are received, the VBA requests the private records from their custodian.  Id. 944:22-945:2.  The

26   request asks the provider to return the records within 60 days.  Id. 945:3-4.  If the provider fails

27   to do so, the VBA sends out another request seeking a reply within 30 days.  Id. 945:6-13.

28       41.  The VBA may order a medical examination, known as a Compensation & Pension

1    Examination. TTr. 946:22-24. The purpose of this examination is to confirm that a disability

2    exists and to assess the medical implications of that disability in order to assist the claim

3    adjudicator in determining the percentage the veteran will be considered disabled pursuant to the

4    rating schedule. 38 C.F.R. § 159(c)(4); TTr. 946:25-947:6. Thus, even veterans who have been

5    treated for a disability at a VA medical facility may be required to undergo a C&P Exam, as

6    medical treatment records often do not provide the type of information needed to determine the

7    percentage a veteran is disabled. The VBA arranges for and pays for this examination. See id.

8    951:18-952:20. Currently, the time between a request and the examination is approximately 30-

9    35 days. Id. 951:14-17.

10        42. The evidentiary record remains open throughout the claims adjudication process.

11    TTr. 948:18-949:8. At any point, the veteran may supply new evidence. Id. The VCAA duty to

12    assist applies to this new evidence, thereby possibly requiring the VBA to issue new requests for

13    private records and to wait up to 90 days for a response. Id. 945:3-13. Additionally, at any time

14    the veteran may introduce a new issue into the claim. Id. 949:9-950:1. For new issues, the entire

15    claim development process will have to be initiated again to develop the evidence in support of

16    this new disability. Id. Approximately 10-20% of all claims have a new issue presented during

17    the pendency of the claim. Id.

18        43. Once all the evidence has been gathered, a Rating Veteran Service Representative

19    ("RVSR") will rate the claim (or, if all issues are not yet ready to rate, those issues that are).

20    TTr. 895:16-896:5; 951:2-13. The RVSR determines whether the disability should be service

21    connected and, if so, assigns the percent disability according to the statutory rating schedule and

22    the effective date. Id. 956:22-959:7. A VSR then processes and promulgates the rating decision

23    and, if appropriate, an award letter to the veteran. Id. 961:21-962:7. Approximately 88% of all

24    rating claims are at least partially granted. Id. 1041:10-24.

25        44. When an RVSR rates a claim, the veteran receives the benefit of several burden of

26    proof rules. For example, by statute, if the total evidence for and against granting a claim is in

27    equipoise, the RVSR must grant the claim. TTr. 958:5-13. Additionally, the VA is required to

28    develop and adjudicate not just those disabilities that the veteran requested, but also any

1  "inferred" issues that the medical records may reveal. Id. 961:5-20. These rules and the attitude

2  that they express has lead several ROs to hang banners stating "Grant If You Can, Deny If You

3  Must." Id. 958:11-12.

4      45. A veteran may be represented throughout the RO claim adjudication process.

5  Veterans Service Organizations ("VSO") provide free representation to veterans who ask for it.

6  The VA provides these VSOs with space within the RO, computer systems and access to VA

7  databases. TTr. 932:14-934:21. A veteran may also be represented by a lawyer at this stage, but

8  by statute the lawyer may not be compensated. 38 U.S.C. § 5904.

9  **The Appellate Process Within The VA Is Also Non-Adversarial**

10      46. Upon receipt of a rating decision, a veteran may appeal the decision first within the

11  VBA, and then to the Board of Veterans Appeals ("the Board").[28] The veteran initiates an appeal

12  by filing a Notice of Disagreement, an informal paper stating that he disagrees with some part of

13  the rating decision and wishes to appeal. TTr. 1008:15-24.

14      47. A veteran may appeal any part of any issue in the rating decision: the denial of an

15  issue, the percentage disability assigned, or the effective date. TTr. 1008:7-14. An appeal may

16  be limited to one issue, or may include several issues. Id. 1008:1-5. Additionally, the record

17  remains open throughout the appeals process, permitting the veteran to submit additional

18  evidence. TTr. 176 :12-178:16; 1111:10-20. The VCAA duties to notify and to assist apply to

19  any new evidence submitted at this stage. Id. Thus, the VBA may be required to seek additional

20  private records and readjudicate the claim at this stage. Id. VA also must inform the claimant of

21  its assessment of each new evidentiary item and provide the claimant a further opportunity to

22  respond. See 38 C.F.R. §§ 19.31; 20.302(c).

23      48. There are two non-exclusive paths an appeal may take. TTr. 1009: 2-19. Under the

24  "traditional" path, the RO will prepare a Statement of the Case after receipt of the NOD. TTr.

25  1013:21-1014:4. A SOC is a more detailed explanation of the rationale underlying the rating

26  _____

27     [28] After that, further appeals lie to the Court of Appeals for Veterans Claims (CAVC) and
to the United States Court of Appeals for the Federal Circuit. 38 U.S.C. §§ 7252 & 7292.

28  Lastly, certiorari may be sought to the United States Supreme Court. Until the appeal proceeds
to the CAVC, no advocate appears on behalf of the VA against the veteran. 38 U.S.C. § 5904.

1    decision. Id.; see also 38 C.F.R. § 19.29. Once the SOC is issued, the veteran has the longer of

2    (1) one year from the date of the rating decision or (2) 60 days from the date of the SOC to file a

3    formal appeal on a VA Form 9. Id. at 1014:5-10. Here again, the record remains open and the

4    veteran may submit additional evidence at any time. 38 C.F.R. §19.37(a); TTr. 176 :12-178:16;

5    1111:10-20. Once the formal appeal has been received, the RO certifies the appeal to the Board.

6    Id. 1017:2-12.

7        49. The alternative path by which an appeal may proceed is the Decision Review Officer

8    ("DRO") path. See 38 C.F.R. § 3.2600. A DRO is a senior RVSR who has the power to review

9    a rating decision de novo upon the request of the claimant.   TTr. 896:6-12. A DRO will review

10    the file, perform any additional development, meet with the veteran and his representative if

11    requested, and may reverse a denial decision. Id. 1011:1-1012:6. As with the traditional path, a

12    veteran may submit new evidence at any time. Id. 1011: 10-20. If the DRO resolves some but

13    not all of the appeal, an SOC will be prepared, and the traditional appellate path is followed. Id.

14    1010:3-14; 1012:12. Because DRO review occurs post-NOD, a veteran may retain paid counsel

15    for these proceedings.

16        50. As part of an appeal to the Board, every claimant is offered a hearing before a Board

17    judge. 38 C.F.R. § 20.700. At the veteran's option, this hearing may be held in Washington,

18    D.C., at the veteran's local regional office, or by video conference. Id.; TTr. 1017:16-1018:2.

19    Board hearings are held once or twice a year at each regional office. Id. 1018:3-16.

20        51. Of the over 830,000 ratings claims filed each year, approximately 11% result in a

21    NOD being filed, and only approximately 4% proceed to a decision by the Board. TTr. 1006:12-

22    24.

23        52. Annually, the Board affirms the VBA in approximately 40% of the cases it decides.

24    TTr. 1007:10-11.

25        53. The Board annually remands approximately 40% of the cases it decides. TTr.

26    1007:16-20. A remand does not necessarily mean that the VBA made any error. Changes in the

27    law and new court precedent may provide the reason for some remands, as will cases where the

28    veteran presents new evidence. Id. 187: 23-188: 12; 1026:7-20. An avoidable remand is defined

-27-

1  as an appeal in which an error occurred prior to the VBA certifying the case to the Board. Id.

2  1026:21-1027:4. A given appeal may have more than one avoidable remand reason in it. Id.

3  1030:6-21. The current avoidable remand rate is 19% of cases certified to the Board. Id.

4  1027:15-16. Additionally, the evidentiary record remains open for at least part of the Board

5  appellate process, thus partially explaining why many cases may have to been remanded. See id.

6  187:23-188:1; 38 C.F.R. § 20.1304(c).

7      54. The Board reverses only approximately 20% of the cases that it hears. TTr. 1007:12-

8  15. Given that only 4% of all claims are ultimately appealed to the Board, the 20% reversal rate

9  means that only approximately 1% of all claims filed are appealed and reversed. Like a remand,

10  a reversal does not necessarily mean that the VBA made an error adjudicating the claim. Id.

11  1034:3-10. Changes in the law and new court precedent may account for some reversals, as may

12  new evidence. Id.

13      55. Of those cases that are remanded, the vast majority are returned to the Board.

14  Ultimately these are reflected in the 20% reversal or the 40% affirmance rates.

15      56. Just as a claim remains open until all issues in it are resolved, so an appeal remains

16  open until all the appellate issues therein have been resolved. See TTtr. 1012:7-20.

17  **The VBA Is Aggressively Trying To Improve The Timeliness Of Adjudications**

18      57. The VBA's long-term strategic goal for Average Days to Complete all issues in a

19  rating claim is 125 days. TTr. 936:16-19. The current ADC is 183 days. Id. 936:11-12.

20      58. In Spring of 2007, Congress authorized VBA to hire an additional 3,100 employees

21  and provided the necessary additional appropriations. TTr. 918:4-21; 999:1-19. 2,700 of these

22  new employees will be hired into the Compensation and Pension line of business. Id. At the

23  time of trial, 2,100 of the 2,600 had already been hired. Id. These 2,700 employees will be in

24  addition to the approximately 8,000 already employed working ratings claims. Id. 1072:19-

25  1073:17.

26      59. Based primarily on these new hires, VBA projects that ADC for ratings claims will

27  reach 169 days by the end of FY 2008, and 145 days by the end of FY 2009. TTr. 1000:6-15.

28      60. In 2001, the VBA instituted the Claims Process Improvement Model, whereby the

1  processing of rating claims was standardized across all ROs. Ex. 540; TTr. 906:15-907:2;

2  997:20-998:2. Additionally, starting in 2002, the VBA created nine Resource Centers dedicated

3  to rating claims that ROs had fully developed but were not yet ready to rate. Id. 888:21-890:3.

4  Currently, over 100,000 rating claims per year are brokered from ROs to these centers or to other

5  ROs that have additional capacity to rate cases. Id. 890:15-17. These two improvements are

6  primarily responsible for limiting the rise of Average Days to Complete between 2000 and 2007

7  to 6% while the number of issues adjudicated rose over 69%.

8     61.  Based on the success of the Resource Centers, the VBA has established four

9  Development Centers to handle the evidentiary development of ratings claims for those ROs who

10  have a surplus of claims awaiting development. TTr. 890:18-891:17. In 2003, the VA

11  consolidated most of the work on cases remanded by the Board at the Appeals Management

12  Center in Washington, D.C. to expedite processing of remands. Id. 1021:10-1022:3.

13     62.  Other initiatives to improve timeliness include increased overtime, rehiring retired

14  annuitants, and operational consolidations such as assigning all pension work to three ROs and

15  creating national call centers to handle the million calls per year previously handled by ROs. TTr.

16  891:18-899:9; 1000:21-1004:18.

17  **The VBA Emphasizes Both Quality And Productivity in Adjudications**

18     63.  In addition to production goals, RVSRs and VSRs are expected to meet an 85%

19  accuracy goal. Exs. 547; 561; TTr. 1047:23-1044:6. This quality goal is measured by a

20  supervisor randomly selecting five cases worked on by the employee each month and evaluating

21  their accuracy. TTr. 1047:25-1048:5; 1054:6-15. The results of these quality assurance checks

22  are used in the employee's annual performance evaluation. Exs. 547; 561.

23     64.  Similarly, RO Directors are evaluated each year on a number of criteria. Of these,

24  rating claim timeliness and quality are the most heavily weighted and are equal in emphasis.

25  TTr. 1061:5-1064:8.

26     65.  Quality factors heavily into VBA's three tiered incentive compensation system. In

27  order to qualify for bonus funds granted to high-performing ROs, the RO must meet four

28  mandatory criteria, one of which is its annual quality goal. TTr. 1054:16-1061:4.

-29-

CONCLUSIONS OF LAW – VETERANS HEALTH ADMINISTRATION

A. **Delay or Denial of Health Care**

1. <u>Jurisdictional Bars</u>. This Court lacks jurisdiction over plaintiffs' claim that VA "unreasonably withholds and delays mental health care delivery." Pl. Brief at 33:26-27. "Mental health care delivery," like the "land withdrawal review program" at the center of petitioners' challenge in <u>Lujan</u>, is not "an identifiable action or event." 497 U.S. at 899. Instead, it is the "name by which [plaintiffs] have occasionally referred to the continuing (and thus constantly changing) operations" of an entire agency program, which cannot be reviewed by this Court. Nor can this Court compel VA to provide health care, since no particular instance of care is clearly *required*, but instead rests on a decision by the Secretary as to whether the care is "needed."[29] Moreover, even if the general provision of care is mandatory, it is not a discrete action, but rather an untold number of decisions about VHA's day-to-day management. These are not the types of "ministerial or non-discretionary act[s]" that this Court can compel, <u>see</u> <u>Norton</u>, 542 U.S. at 64.

2. Delay is not itself a <u>final</u> agency action, as delay "does not 'consummate' any agency process." <u>See</u> <u>Ecology Ctr.</u>, 192 F.3d at 925. Delay is also not a <u>discrete</u> agency action but rather the *effect* of countless different actions of both the agency and third parties. This Court's jurisdiction over the question of delay must be analyzed under § 706(1), meaning that a delayed action can only be compelled where it is a discrete agency action that is required by law. <u>See</u> <u>Norton</u>, 542 U.S. at 63 n.1. Because "mental health care delivery" is not a discrete agency action that can be compelled, <u>see</u> <u>supra</u>, delay in that delivery similarly cannot not be remedied by § 706(1).

3. Nor can the Court review the "effectiveness" or quality of the care provided by VA. <u>See</u> Pro. Order ¶ 5, D.E. 229(2). This Court may exercise authority under § 706(1) only with respect to a genuine failure to act, not "general deficiencies" in an agency's performance. <u>Norton</u>, 542 U.S. at 66; <u>see also</u> <u>Ecology Ctr.</u>, 192 F.3d at 926. In denying defendants' motion to dismiss, this Court distinguished <u>Ecology Ctr.</u> by noting that plaintiffs had alleged a *genuine*

---

[29] Even if it were inclined to do so, this Court is prohibited by § 511 from determining which instances of a care are *required* (and therefore capable of being compelled and § 706(1)). <u>See</u> <u>Larrabee v. Derwinski</u>, 968 F.2d 1497, 1500 (2d Cir. 1992).

1  *failure to act* in the delivery of health care.  Since then, plaintiffs have adduced no evidence of a

2  failure to act, nor have they supported their allegation that VA routinely turns away veterans.

3  Since 2004 VA has made concerted efforts to expand and improve the mental health care

4  provided to veterans.  Review of the efficacy of those steps is beyond this Court's jurisdiction, as

5  plaintiffs cannot "evade the finality requirement with complaints about the sufficiency of an

6  agency action dressed up as an agency's failure to act."  Ecology Ctr., 192 F.3d at 926 (internal

7  quotations omitted).

8      4.  Even if sovereign immunity did not bar plaintiffs' challenge to the timeliness and

9  adequacy of VA care, 38 U.S.C. § 1710 commits decisions about the provision of medical care to

10  the Secretary's discretion and provides no meaningful standard for this Court's review.  Webster

11  v. Doe, 486 U.S. 592, 600 (1988).  Section 1710 similarly does not give plaintiffs a property right

12  for due process purposes.

13      5.  TRAC/Due Process Analysis of Delay.  Under the APA, agencies are to conclude

14  matters presented to them within a "reasonable" time, 5 U.S.C. § 555(b), but Congress has failed

15  to define that term.  In Telecommunications Research & Action Center v. F.C.C., 750 F.2d 70

16  (D.C. Cir. 1984) ("TRAC"), the court set out a series of factors to assess an agency's timeliness

17  under section 555(b), once other jurisdictional hurdles have been cleared.[30]

18      6.  The Due Process inquiry in cases asserting inordinate delay in agency action is

19  whether "due process is no longer due process because past due."  Wright v. Califano, 587 F.2d

20  345, 354 (7th Cir. 1978).  "[T]here is no talismanic number of years or months after which due

21  process is automatically violated."  Coe v. Thurman, 922 F.2d 528, 531 (9th Cir. 1990).  "The

22  mere passage of time, without more, does not constitute a due process violation."  Cummins v.

---

24  [30]Those factors are (1) the time agencies take to make decisions must be governed by a
25  "rule of reason" (2) where Congress has provided a timetable or other indication of the speed
   with which it expects the agency to proceed in the enabling statute, that statutory scheme may
26  supply content for this rule of reason (3) delays that might be reasonable in the sphere of
   economic regulation are less tolerable when human health and welfare are at stake; (4) the court
27  should consider the effect of expediting delayed action on agency activities of a higher or
   competing priority (5) the court should also take into account the nature and extent of the
28  interests prejudiced by the delay and (6) the court need not "find any impropriety lurking behind
   agency lassitude in order to hold that agency action is unreasonably delayed."  Id. at 80.

1  Barnhart, 460 F.Supp.2d 1112, 1121 (D. Ariz. 2006). Put another way, "[d]elay is a factor but

2  not the only factor" in assessing agency timeliness. Wright, 587 F.2d at 354. Speed cannot be an

3  end in itself, lest accuracy (or quality) suffer. Wright, 587 F.2d at 356. Courts are in a uniquely

4  unsuitable position to properly balance these competing facets of the administrative process. Id.

5  at 353-354.

6      7. Plaintiffs have failed to establish that medical care is unreasonably delayed under the

7  TRAC factors. Plaintiffs have failed to establish that VA has engaged in a genuine failure to act

8  to treat veterans with mental health disorders. Neither did plaintiffs put forth any relevant,

9  credible evidence that VA engages in unreasonable delay in treating mental illnesses. The

10  evidence established that VA engages in immediate treatment for veterans in emergency

11  situations. Ex. 513, TTr. 158:12-16, 130:11-15. VA provides medical services according to

12  clinical need, a rule of reason that is both appropriate and one that this Court is not well-situated

13  to second-guess. This Court cannot say that wait times for veterans are unreasonable, especially

14  since a determination of reasonableness depends on the facts of each case. See Ex. 528; PITr.

15  594:15 - 595:16, Ex. 514; PITr. 597:17-20, Ex. 515; PITr. 598:11-23, Ex. 516. And because

16  Congress has considered but rejected time limits on the scheduling of routine appointments, this

17  Court is foreclosed from imposing them. Heckler v. Day, supra. For similar reasons, veteran

18  wait times do not violate due process.

19      **B. Clinical Appeals Process**

20      8. Due Process is a flexible standard, calling for "such procedural protections as the

21  particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976). Further, due

22  process does not always require an adversarial hearing. Hickey v. Morris, 722 F. 2d 543, 549 (9th

23  Cir. 1984). In evaluating whether a procedure satisfies Due Process, courts balance (1) the

24  private interest, (2) the risk of erroneous deprivation and the concomitant value, if any, of extra

25  safeguards, and (3) the Government's interest, especially the burden any additional safeguard

26  would impose. Matthews, 424 U.S. at 332.

27      9. VA has established a process that addresses the needs of veterans through consultation

28  with the treating physicians, access to patient advocates and an efficient and timely process for a

1   veteran to appeal a medical decision to both the facility level and the VISN level. 636:14-

2   646:20; Ex. 536. Veterans who dispute a clinical decision have recourse and an opportunity to

3   be heard at a meaningful time and in a meaningful manner. See Mathews, 424 U.S. at 333.

4   Moreover, a veteran's medical dispute is reviewed by medical professionals, and so the risk of

5   error in the initial decision making process is low and, accordingly, the potential value of a

6   subsequent evidentiary hearing is low as well. Id. at 344-45. And where, as here, the relevant

7   inquiry turns on medical issues that are "sharply focused and easily documented," special

8   procedures are unnecessary. See id. at 343-45 (holding that pre-termination hearing not required

9   where factual issues in disputes involved conflicting medical diagnoses); see also Parham v. J.R.,

10  442 U.S. 584, 607-08 (1979) ( "[t]he mode and procedure of medical diagnostic procedures is not

11  the business of judges."). Nor does the appeals process require that an "independent decision

12  maker come from outside the hospital administration." Hickey v. Morris, supra, 772 F. 2d at

13  549.

14      10. Finally, the fiscal and administrative costs associated with such additional procedures

15  suggested by plaintiff would be unduly burdensome and cause unacceptable delay in the

16  administration of a veterans' medical treatment. PITr., 731:16-25; see also Parham, 442 U.S. at

17  605 (government has "interest in allocating priority to the diagnosis and treatment of patients . . .

18  rather than to time-consuming procedural minuets").

19      **C. Mental Health Strategic Plan Conclusions of Law**

20      11. This Court lacks jurisdiction to consider plaintiffs' claim that "VA has failed to

21  implement and monitor the efficacy of the Mental Health Strategic Plan in a timely manner." Pl.

22  Brief at ¶ 34. Plaintiffs have adduced no evidence that any of their members have suffered a

23  concrete, particularized injury that is fairly traceable to the pace at which the Plan has been

24  implemented, let alone the manner in which its implementation has been monitored. Sovereign

25  immunity further bars the Court's consideration of this claim. "[A]gency recommendations" like

26  the MHSP "are not reviewable as final agency action," Ecology Ctr., 192 F.3d at 925, and an

27  agency's "monitoring is several steps removed from final agency action." Id.

28      12. This Court also lacks jurisdiction to order VA to implement the Mental Health

1   Strategic Plan, see Pro. Order ¶ 12, D.E. 229(2), because the 265-prong Plan is not a *discrete*

2   action that VA was *required* to take.[31] See Norton, 542 U.S. at 64, 71 (agency statements "about

3   what it plans to do" in the future "cannot be . . . made the basis for a suit under § 706(1)); see

4   also Lowry v. Barnhart, 329 F.3d 1019, 1022 (9th Cir. 2003) (internal agency guidance not

5   enforceable). Nor have plaintiffs established that premature implementation of the 5-year plan

6   would redress any of their alleged grievances.

7          **CONCLUSIONS OF LAW – VETERANS BENEFIT ADMINISTRATION**

8          A. **Lack of Trial-Type Proceedings as an Alleged Denial of Due Process**

9          13. Jurisdictional Bars. Plaintiffs contend that the process for adjudicating veterans

10  benefit claims violates veterans' rights under the Due Process Clause since it does not provide

11  sufficiently elaborate trial-type procedures at the initial level – including a right to paid counsel

12  and to subpoena all witnesses. Plaintiffs' claims here can be construed as either a facial

13  challenge to the constitutionality of the VJRA (due to its failure to require such trial-type

14  procedures in connection with the initial submission of claims), see Findings ¶ 37 – 45, infra, or

15  a challenge to the decisions of the Secretary to administer his authority to adjudicate claims in a

16  more streamlined and less adversarial manner than plaintiffs favor. If the later, veterans could

17  certainly challenge the constitutionality of the Secretary's decisions as to how to administer the

18  adjudication process in the context of a particular claim for benefits at the CAVC. See 38 U.S.C.

19  § 7261(a)(3)(B). However this Court lacks jurisdiction to consider a challenge to the process for

20  adjudicating benefits since: (1) the process is not final agency action and § 7261(a)(3)(B)

21  provides an adequate alternate remedy; (2) the process is embodied in rules, made unreviewable

22  here by section 502; and (3) the process reflects decisions made by the Secretary under laws

23  affecting the provision of benefits, and so is unreviewable under § 511.

24         14. Due Process Analysis[32] Any challenge to the facial constitutionality of the VJRA

---

25  [31] Even if the Plan were a discrete agency action that VA was required to take, plaintiffs'
26  challenge would still not fall within § 706(1), as they do not allege a genuine failure to undertake
    a plan at all, but rather "general deficiencies in compliance" with the Plan which cannot give rise
27  to jurisdiction. Norton, 542 U.S. at 66.
    [32]Defendants incorporate by reference the Due Process analysis contained in Conclusion ¶
28  6, supra.

1  itself must meet the demanding standard set forth in <u>United States v. Solerno</u>, 481 U.S. 739

2  (1987), that "no set of circumstances exists under which the Act would be valid." <u>Id.</u> at 745.

3  First, the issue of whether a veterans' inability to compensate a lawyer for representation before a

4  RO violates Due Process has been conclusively settled by the Supreme Court.  In <u>Walters v.</u>

5  <u>National Association of Radiation Survivors</u>, 473 U.S. 305 (1985), the Supreme Court rejected

6  this identical argument.  The Supreme Court noted that, while a lawyer may be useful in

7  amassing a record, "[u]nder our adversary system the role of counsel is not to make sure the truth

8  is ascertained but to advance his client's cause by any ethical means . . . [which may include]

9  causing delay and sowing confusion." <u>Id.</u> at 325-26, <u>quoting</u> Friendly, <u>Some Kind of Hearing</u>,

10 123 U. Pa. L. Rev. 1267, 1287 (1975).[33]

11      15.  The remaining procedural deficiencies alleged by plaintiffs may be easily disposed

12 of.  All veterans are entitled to a hearing before a RO, and if desired he will be granted one.  38

13 C.F.R. § 3.103(c).  That these types of hearings rarely occur is due to veteran preference; the

14 record is wholly devoid of any evidence that the VBA discourages or denies hearings if

15 requested.  Similarly, <u>Mathews</u> is simply inapplicable to plaintiffs' allegation that production

16 goals linked to incentive compensation create a conflict between adjudicators and veterans.  This

17 contention was not supported by persuasive evidence that such conflicts had ever occurred and

18 was squarely rebutted by the evidence of record that adjudicators and RO directors are evaluated

19 based on meeting both production goals and quality standards; failure results is substantially

20 reduced or no incentive compensation.

21      16.  The additional trial-type procedures plaintiffs seek are not required by <u>Mathews</u>.

22 _____

23 [33]To be sure, the Supreme Court grounded its holding in its view that the process before
the VA was non-adversarial, but that process, at least before the RO is essentially unchanged

24 today.  Anecdotal evidence – such as offered by plaintiffs' witnesses here – that the process is
now adversarial was specifically rejected by the Supreme Court, <u>id.</u> at 324 n.11, and is similarly

25 of little value here.  Such allegations are also inconsistent with the evidence of the assistance that
the VBA gives veterans in developing their claims, the lack of a advocate appearing against the

26 veteran until any appeal to the Court of Appeals for Veterans Claims, and the fact that 88% of all
claimants receive at least a partial grant of a claim.  The Federal Circuit's dicta in <u>Bailey v. West</u>,

27 160 F.3d 1360 (Fed. Cir. 1998), relied on by plaintiffs, refers not to the proceedings before the
RO, but rather to the appeal to CAVC.  <u>See</u> <u>Forshey v. Principi</u>, 284 F.3d 1335, 1355 (Fed. Cir.

28 2002)(en banc).

1    First, the interest veterans have in receiving disability compensation is not based on need. <u>See</u>

2    <u>Mathews v. Eldridge</u>, 424 U.S. 319, 341 (1976) (non-need based benefits less significant for due

3    process analysis). Second, the value of these additional safeguards was not established at trial.

4    The fact that the avoidable remand rate is less than 19% of the 4% of cases that are appealed to

5    the Board is insufficient to justify such costly and cumbersome additional procedures. Third,

6    plaintiffs submitted no studies showing how these additional protections might reduce any errors

7    being made. And fourth, the burden of essentially conducting a trial before an adjudicator is too

8    large. The addition of discovery, subpoenas (and the concomitant motions to compel/motions for

9    protective orders) and full witness examinations will inevitably slow the process.

10        **B.  <u>Unreasonable Delay In Adjudicating Benefits Claims</u>**

11        17. <u>Jurisdictional Bars</u>. Plaintiffs contend that the waiting times for the adjudication of

12    benefit claims are excessive and unreasonable and that the VA has violated the rights of

13    plaintiffs' members under (1) the due process clause; and (2) the APA.

14        18. First, and foremost, the question of whether there is undue or unreasonable delay in

15    the adjudication of benefits claims must be made on a case-by-case basis, because the

16    determination of whether delay is unreasonable depends on the facts of each particular claim.

17    <u>See</u> <u>Crosby v. Soc. Sec. Admin.</u>, 796 F.2d 576, 580 (1st Cir. 1986). So, for example, in the case

18    of a simple, single issue disability claim where all necessary medical and military records are

19    readily obtained, it might be reasonable to expect an initial decision within 90-120 days.

20    Alternatively, a complex, multi-issue claim in which the claimant repeatedly submits new

21    evidence as the claim is being reviewed can easily take in excess of a year to adjudicate. The

22    Court is precluded from considering the extent of delay in individual cases by section 511.

23    Alternatively, even if the Court were to entertain a claim that there has been excessive waiting

24    times on a "systemic" basis, plaintiffs' preferred remedy of mandatory timetables is foreclosed

25    by <u>Heckler v. Day</u>, <u>supra</u>.

26        19. Second, the process for adjudicating veterans' benefits claims is controlled and

27    determined by rules. Because any injunction requiring expedited claims processing would

28    inevitably require the amendment or repeal of many of those rules, section 502 deprives this

-36-

1  court of jurisdiction to hear such claims.[34]

2     20.  Finally, veterans have an adequate alternative remedy for undue delay in the

3  adjudication of benefits claims under the VJRA.  Pursuant to the CAVC's authority under 38

4  U.S.C. § 7261(a)(2), a veteran may petition the CAVC for an order to "compel action of the

5  Secretary . . . unreasonably delayed," and the CAVC has required VA to explain the reason for its

6  delay in such circumstances.  See e.g. Lane v. West, 11 Vet. App. 412, 414-15 (1998).

7     21.  TRAC Analysis.[35]  The VBA's rating adjudication process and appeal procedure

8  satisfy the TRAC factors.  The time for a RO to initially adjudicate a rating claim meets the rule

9  of reason.  Congress has not chosen to impose a deadline on this part of the process, nor has it

10 otherwise indicated the speed expected of ROs to adjudicate claims, so the governing statutes

11 provide no content for the rule of reason.

12    22.  VA's current average-days-to-complete a rating claim in a RO is approximately 183

13 days, with a strategic goal of reducing that to 125 days.  The record shows that if just one private

14 record custodian refuses to respond to VBA requests for information, a minimum of a 90-day

15 delay occurs in the processing of the claim.  Perhaps the most important protection is that the

16 record remains open throughout the process, permitting a veteran to bolster his claim or raise an

17 entirely new issue at will.  But this protection comes with a significant cost in time as the VBA is

18 required to develop this new evidence in the midst of its adjudication process.  Lastly, the Court

19 notes that claims normally contain multiple issues.  A claim remains open for purposes of ADC

20 until the final issue is adjudicated, even though a veteran may already be receiving benefits for

21 other issues in the claim.  Given the tremendous due process rights veterans enjoy, in particular,

22 the duty on the VBA to assist him in obtaining that evidence, the Court cannot say that the

23 average time to complete initial adjudication of a rating claim is too long.

---

24    [34]So, for example, rules govern the VA's duty to notify claimants, 38 C.F.R. §
25 3.159(b)(1), the VA's duty to assist claimants, 38 C.F.R. § 3.159(c), the VA's duty to obtain non-federal records, 38 C.F.R. § 3.159(c)(1), the VA's duty to provide medial exams, 38 C.F.R. §
26 3.159(c)(4), the claimant's right to a hearing, 38 C.F.R. § 3.103(c), the period for filing a Notice of Disagreement,38 C.F.R. § 20.302(a); the process of preparing a Supplemental Statement of the
27 Case, 38 C.F.R. § 19.31.  See generally 38 C.F.R. Parts 3, 4, 19 and 20.
28    [35]Defendants incorporate by reference the prior discussion of the TRAC factors, see
   Conclusion ¶ 5.

1     23.   The remaining factors also favor the VA.  First, while delay in adjudicating these

2  benefits may affect the health and welfare of the veterans, VA benefits are not a need-based

3  program.  Moreover, Congress has already acted to address the wait times issue by funding an

4  unprecedented increase in manpower, making judicial intervention at this juncture unnecessary.

5  The record is replete with evidence that the VA has acted to improve timeliness and ensure

6  quality, evidence that belie plaintiffs' suggestion that to the VA has some improper motive

7  behind these delays.  Accordingly, the initial adjudication of a rating claim by a RO is timely

8  under the APA.

9     24.   These consideration apply equally to delays in the appellate process, as does an

10  additional factor.  The record shows that veterans appeal only 11 to 14% of the over 838,000

11  claims filed annually.  Further, only 4% of all claimants actually proceed to the Board, meaning

12  that the vast majority of them resolve their appeals with the VBA.  And only 20% of those that

13  proceed to the Board (including those that have been remanded and returned to the Board)-- or

14  just over 1% of all claims filed annually – are reversed by the Board.  Thus, while the time

15  required to complete an appeal for those that proceed to the Board may be lengthy, in context the

16  overall number affected is small.

17     25.   The VBA's emphasis on initial ratings decisions more than appeals fits squarely

18  within the fourth TRAC prong, demonstrating that a diversion of resources to appeals would

19  deleteriously impact production of initial ratings claims.  And as the record shows that 88% of all

20  claims result in at least a partial grant by the RO, this decision was reasonable, ensuring that the

21  vast majority of claimants receive some benefit even if they later choose to appeal.  Given the

22  small percentage of the overall number of claimants that are adversely affected by any delay on

23  appeal, the emphasis on initial claim production fits within the rule of reason.

24     26.   Due Process Analysis.  The record fails to support the allegation that delays in the

25  ratings claim adjudication process are the result of arbitrary action or inaction.  To the contrary,

26  both Congress and the VA are actively engaged in addressing this issue.  The 2,700 additional

27  employees that Congress authorized just last year may be the most significant evidence of this

28  engagement.  As Mr. Walcoff testified, the positive effects from those new employees are now

1    being seen: the VBA just had its two largest quarters for production in its history.  T Tr 999:20 -

2    1000:5.  Here, as the record is devoid of any basis other than the delay for finding a Due Process

3    violation, the Court declines to find one.  See Wright v. Califano, 587 F.2d 345 (7th Cir. 1978).

4    **C.  Extraordinary Awards Fast Letters**

5    27.  "Fast letters" are written policy guidelines sent out by the Compensation and Pension

6    Service ("C&P Service") of VBA to its Regional Offices, alerting them to new laws, impending

7    changes in the VBA claims manual, or other new policies.  Plaintiffs challenge the legality of

8    Fast Letter 07-19, which requires that proposed benefit decisions that will result in an

9    "extraordinary award," (defined as awards that would result in a retroactive payment of at least

10    eight years or more than $250,000), be reviewed by C&P Service in Washington before they are

11    finalized to ensure that they are correct.

12    28.  At the outset, the Secretary for Veterans Affairs may delegate to employees under his

13    supervision the "authority to act and to render decisions, with respect to all laws administered by

14    the Department."  38 U.S.C. § 512(a).[36]  Second, plaintiffs offered no evidence at trial that any

15    member of either plaintiff organization has been adversely affected in any way by this procedure,

16    or that there is any reasonable prospect that they will be affected.  Third, § 511 deprives the

17    Court of jurisdiction to consider challenges to the legality of this policy since it undeniably is a

18    decision of the Secretary that "affects the provision of benefits" to veterans.  Id.  Fourth, this Fast

19    Letter is merely an internal management directive establishing the process by which claims are

20    adjudicated, (in this case, providing which officials must sign off on such "extraordinary

21    awards"), and therefore, as the letter itself does not result in legal consequences, rights or

22    obligations, it is not final agency action under the APA.  Finally, if this Fast Letter is considered

23    _____

24    [36]See also 38 U.S.C. § 303 (charging the Secretary with "proper execution and administration" of all affecting veterans); 38 U.S.C. § 501(a)(4) (Secretary may establish rules

25    governing the conduct of adjudications).  This delegation has been exercised to give the Under Secretary for Benefits and "supervisory and adjudicative personnel" within VBA the authority

26    "to make findings and decisions . . . as to entitlement of claimants to benefits under all laws administered by the Department of Veterans Affairs . . ." 38 C. F. R. §3.100, which certainly can

27    be construed to encompass the authority to send written guidance to VBA's regional offices. However, the Court need not reach this administrative housekeeping question, since there are

28    several threshold legal bars to considering this claim.

to be a rule, § 502 requires that any challenge to its legality be brought in the Federal Circuit, not this Court.[37]

Dated May 19, 2008                              Respectfully Submitted,

                                                GREGORY G. KATSAS
                                                Acting Assistant Attorney General

                                                JOSEPH P. RUSSONIELLO
                                                United States Attorney

                                                RICHARD LEPLEY
                                                Assistant Branch Director

                                                __/s/ Daniel Bensing__
                                                DANIEL BENSING D.C. Bar # 334268
                                                KYLE R. FREENY California Bar #247857
                                                JAMES J. SCHWARTZ D.C. Bar # 468625
                                                RONALD J. WILTSIE, D.C. Bar # 431562
                                                Attorneys
                                                U.S. Department of Justice, Civil Division
                                                P.O. Box 883
                                                Washington, D.C. 20044
                                                (202) 305-0693 (telephone)

                                                Counsel for Defendants

---

[37]In fact, just such a challenge to Fast Letter 07-19 is currently pending the Federal Circuit. Military Order of the Purple Heart v. Secretary of Veterans Affairs, Dkt. No. 2008-7076 (Fed. Cir.).