**MORRISON | FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

NORTHERN VIRGINIA,
ORANGE COUNTY, DENVER,
SACRAMENTO, WALNUT CREEK

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

June 9, 2008

Writer's Direct Contact
415.268.6411
GErspamer@mofo.com

**By E-filing and Hand Delivery**

The Honorable Samuel Conti
USDC, Northern District
450 Golden Gate Avenue
Courtroom 1, 17th Floor
San Francisco, CA  94102

Re:   *VCS, et al. v. Peake, et al.*, N.D. Cal. Case No. 07-03758-SC

Dear Judge Conti:

Plaintiffs thank the Court for its prompt attention to the important issue raised in their May 28 letter and write briefly to address two key issues in advance of the hearing currently set for June 10: (1) the systemic nature of the e-mail and recent developments relevant thereto; and (2) the issues the e-mail raises with respect to the sufficiency of discovery produced by Defendants prior to trial and Plaintiffs' proposed solution to that problem.

**A.   June 4, 2008 Congressional Hearing: "Systemic Indifference to Invisible Wounds"**

Last week, the Senate Committee on Veterans' Affairs held a hearing to probe the systemic implications of Dr. Perez's e-mail, which was entitled "Systemic Indifference to Invisible Wounds" ("Senate Hearing").[1]  The title alone speaks volumes about the concerns of congressional committee members regarding the systemic implications for the hundreds of thousands of veterans returning from the conflicts in Iraq and Afghanistan with PTSD.  In his opening remarks, Chairman Akaka underscored that the purpose of the hearing went far beyond the activities in one VA Medical Center in Texas but extended to the entire VA system: "I stress, however, that this hearing is not simply about one facility or one clinician. . . .  We must know whether the actions of these VA employees point to a systemic indifference to invisible wounds."  Senator Murray echoed that purpose in stating that the hearing "is going to explore whether a recent e-mail sent by a VA manager directing staff to

---

[1] The Senate requested that the VA's Inspector General investigate the treatment of PTSD as described in the e-mail; a report is expected in the coming months.

sf-2528505

MORRISON | FOERSTER

Judge Samuel Conti
June 9, 2008
Page Two

refrain from diagnosing PTSD in veterans is an isolated case or whether it is representative of greater problems within the VA mental health care system." A true and correct copy of the transcript from the Senate's June 4, 2008 hearing is enclosed herewith for the Court's convenience.

The e-mail evidences systemic deficiencies that the Court heard about in other situations at trial – the absence of necessary controls to ensure that actual operation of VA facilities conforms to the rules, procedures, and programs devised in Washington. Conflicts in the testimony between the VA's own mental health care professionals and other VA officials at the hearing last week illustrates the fundamental disconnect between policies and programs designed in Washington and the on-the-ground VA system practices actually used throughout the country. One exchange was particularly instructive. Dr. Ira Katz, a witness at the preliminary injunction hearing and head of the Office of Mental Health Services in Washington, "respectfully disagreed" with Dr. Perez's testimony before Congress that a diagnosis of "adjustment disorder" would be appropriate over six months after discharge. Dr. Katz openly disagreed with Dr. Perez's practice, because the VA's *own clinical guidelines* provide that adjustment disorder by definition does not last beyond six months after discharge. American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 623 (4th ed. 1994). Although an adjustment-disorder diagnosis would entitle a veteran to medical care, unlike PTSD, it would not entitle the veteran to disability compensation. 38 C.F.R. § 4.130. Despite Dr. Perez's protests that her medical center has "no relationship whatsoever" to the disability-compensation process and is intended to be strictly clinical, the clear implication of her "suggestion" is that diagnosing "compensation seeking veterans" with adjustment disorder as opposed to PTSD would eliminate the cost to the VA of paying veterans compensation. This is yet another example of Washington policies as hollow shells that are not implemented in practice in the VA system and the resulting harm falling squarely on the shoulders of veterans.

At the hearing, Dr. Perez did not take responsibility for her e-mail but rather defended its "intent was to improve the quality of care our veterans received" and its content as a fair expression of VA policy, reiterating that adjustment disorder is a "clinically sound diagnosis and would result in appropriate treatment." In addition to Dr. Perez herself, Dr. Michael Kussman, Dr. Katz, and Bradley Mayes, all top-ranking officials in Washington and all of whom testified during trial or in deposition in this matter, were asked to answer to the Senate Committee for the systemic implications of the e-mail for both veterans' heath care and benefits.[2] On the health-care side, Dr. Kussman disavowed not only any "systemic effort to

---

[2] According to Senator Akaka, the hearing was one step in a broader investigation into the VA's mental health system, including PTSD and suicide-prevention efforts. The House Committee is engaged in a similar investigation and held a hearing in on May 6, 2008 entitled "The Truth About Veterans' Suicides."

sf-2528505                                2

MORRISON | FOERSTER

Judge Samuel Conti
June 9, 2008
Page Three

deny a diagnosis" but also denied "an individual effort to that end" by Dr. Perez. Members of Congress were "struck" by the testimony of Dr. Kussman and other VA officials because "it didn't appear to have any remorse" and merely touted the health-care system as world-class.

Much in the same circle-the-wagons fashion, VA trial witnesses similarly denied the existence of any problems in the system on the willful-blindness theory that the policies that exist in Washington are necessarily followed in the field. In fact, VA's entire defense at trial in this case rested wholesale on its singular view of the VA "system" at issue as the programs and policies as devised by Washington officials rather than the actual practices of VA mental health care providers in the decentralized VA system. VA adduced no evidence to rebut Plaintiffs' showing that VA officials in Central Office responsible for monitoring and enforcement of mental health care policies have no idea what is happening in the field with respect to critical issues like suicide prevention and mental-health screening. Plaintiffs' Findings of Fact 15-18. That narrow view of "systemic" as limited to Central Office in Washington also skewed the scope of documents produced to Plaintiffs and artificially narrowed Defendants' view of discovery relevance. Both issues are addressed in turn below.

B.      **The Operation of the Decentralized VA System in Actual Practice**

There is a fundamental disconnect between the mental health care practice in VA facilities throughout the country and the view from the top in Washington. During the congressional hearing, Senator Tester picked up that issue and cautioned VA officials: "Make sure the people below you are doing what you want them to do. That is critically important, because you can have the best intentions, and if the folks on the ground that are working with the vets aren't doing what needs to be done, you guys end up in front of . . . a [veterans' affairs] committee in Washington, D.C." Senator Tester's comments cut to the heart of the problem in defining the VA "system" as the policies themselves without any regard to whether those policies are followed by VA employees throughout the system. Dr. Perez's e-mail merely exposes the fact – as uncomfortable as that fact may be for VA – that Washington's theories are not the reality for veterans seeking care or benefits in the system.

Dr. Perez is a team leader coordinating the specialized PTSD program at the VAMC serving the veteran population of Central Texas. According to VA's own web site, the Temple, Texas VAMC is a "multi-VISN referral facility for chronically mentally ill patients" operating 191 in-patient psychiatry beds with over 730,000 outpatient visits in a single year. Not only did her instruction to intentionally misdiagnose PTSD as "adjustment disorder" to avoid compensating veterans for their mental health wounds from war potentially affect the veterans in the specialized PTSD care of her network in Central Texas, but more disturbingly, no one in Washington knew about her transgressions until a FOIA request uncovered it and the national media and Congress demanded answers to its troubling implications. Despite public assurances by Secretary Peake and Under Secretary Kussman,

MORRISON | FOERSTER

Judge Samuel Conti
June 9, 2008
Page Four

the VA has no way of knowing whether every other PTSD program coordinator in the country is instructing his or her staff psychologists to give a lesser diagnosis to avoid paying benefits to veterans for their mental health injuries.  As trial testimony of VA officials responsible for monitoring and enforcement made clear, with respect to mental health care, the VHA verifies only two things: how many staff positions have been filled and the length of veteran wait times.  Plaintiffs' Findings of Fact 15-18.  No policy, regulation, directive, or memo issued by Central Office in Washington, including the Mental Health Strategic Plan, the Feeley Memo, or the clinical diagnostic guidelines, has any systemic import if there is no oversight, monitoring, or enforcement.  In the absence of systematic verification of compliance, the policies reflect nothing more than optimistic hopes about how the system should function in theory without constituting any tangible proof of how it actually does function in practice.

Dr. Perez's e-mail also raises significant issues regarding the systemic dysfunction between the health care diagnoses in VHA and disability compensation adjudication in the VBA.  During the congressional hearing, Dr. Perez admitted that during her one-year tenure, she personally knew of at least two instances in which veterans were diagnosed with PTSD by their treating physicians but were not given the same diagnosis by the examiner in the C&P exam for the purpose of establishing service-connection for disability benefits in addition to mental health care beyond the combat period.  Veterans cannot compel testimony from their treating physicians at the Regional Office level in order to establish service-connected PTSD.  When there is a conflict in diagnoses, the tie does not automatically go to the veteran and the C&P exam is routinely given precedence.  Veterans' entitlement to compensation and additional health benefits for PTSD rests solely in the hands of VA mental health care professionals, who have stooped to the conclusion that their medical duty to patients is overridden by the Agency's financial interests.

Dr. Perez's e-mail is not the only instance of medical center practice totally disconnected from Washington policies.  Just today, Plaintiffs obtained interrogatory responses from the VA in a civil matter related to a young veteran, Jeffrey Lucey, who was diagnosed with PTSD and committed suicide after being turned away from a VA Medical Center in Leeds, Massachusetts.[3]  In response to an interrogatory calling for the past or current policies of the Northampton VAMC in admitting or providing psychiatric consultations to patients with PTSD, the VA flatly responded that it "does not have a specific policy addressing this situation."   Such a response is incredible in light of the explicit policy set forth in the Feeley memo purporting to require 24-hour screening for anyone who presents with a mental health issue and a 14-day follow up appointment.  Throughout the trial and even during the recent hearing in Congress regarding Dr. Perez's e-mail, VA officials have denied that there is any

---

[3] Plaintiffs request that the Court take judicial notice of the interrogatory responses.  A true and correct copy of the responses is enclosed herewith.

MORRISON | FOERSTER

Judge Samuel Conti
June 9, 2008
Page Five

divergence in the field from the dictates of Washington. But, at some point, the examples throughout the system become too overwhelming to ignore.

Plaintiffs believe that the PTSD coordinator's e-mail is part and parcel of a larger systemic pattern of intentional misdiagnoses of PTSD by VA medical personnel – by either VHA treating physicians or C&P examining physicians – in order to avoid paying compensation and providing appropriate care. Plaintiffs also believe that the lack of any policy governing PTSD intake procedures, as the Northampton VAMC admitted, is commonplace throughout the system without any verification by officials in Central Office. Plaintiffs were clearly entitled to discovery of documentation showing that the VA's PTSD health care practices contravene Central Office policies.

**C.    Discovery of Further Systemic Evidence**

The shocking aspect is that the VA's attorneys were aware of the document and could easily have produced it. How could this have come to pass? The answer is a little complicated and we appreciate the Court's patience as we try to explain. The short answer is that the VA used claims of burden to obtain textual limitations on Plaintiffs' requests. What was actually happening was the VA was spending its resources to *remove* documents from the production that had suddenly become "non-responsive". Having convinced the Court to adopt their limitations advanced based on a claim of burden, the VA then spent the next six weeks actually withdrawing documents from the relevant production queue that the VA found damaging.

A brief review of the relevant history is instructive. At the time of the March preliminary injunction hearing, the document requests had already been pending for five months. At the conclusion of the preliminary injunction hearing in March, the Court asked the parties to submit their proposals for document discovery with an eye towards completion prior to trial in April. Plaintiffs submitted their proposal, which included documents mentioned during the preliminary injunction hearing regarding the delivery of mental health care as well as additional categories related to the yet-untouched benefits side of the case. In making their counter-submission, Defendants rewrote Plaintiffs' proposed order to significantly narrow the scope of documents responsive to half of the categories (and also wholesale eliminated the other half related to benefits). Defendants confined their search to the "national VA level, or the VISN level, and not documents maintained at every Medical Center due to the *excessive burden* of conducting a search of all local facilities." Docket 171, Defendants' March 11, 2008 Letter, at p. 3 (emphasis added).

That burden argument falls flat, however, when a highly relevant document (and presumably many others like it) is already in the possession of the VA two weeks prior to trial yet nothing is done to bring it to the attention of the parties or the Court. It would have been no burden whatsoever to either mention the document to counsel and/or include it in the

MORRISON | FOERSTER

Judge Samuel Conti
June 9, 2008
Page Six

productions that were on-going for the following ten days prior to trial. Federal Rule of Civil Procedure 26(e) requires supplemental provision of relevant evidence to deal with this very scenario. Any relevance argument could have gone to the weight of the evidence at trial. Instead, the VA maintains that Defendants were under no obligation to come forward to Plaintiffs or the Court on the circular theory that it is not responsive to the document requests that Defendants themselves rewrote on the pretext of burden.[4] Such a position forces one to conclude that the burden argument was merely a smoke screen for the VA to excise damaging yet relevant documents from the scope of production in deliberately rewriting Plaintiffs' discovery order to suit their own purposes rather than accommodate their own resources limitations.

The question is how many more damaging documents exist that were in Defendants' possession but were not produced on the ground that they had successfully rewritten them out of Plaintiffs' requests under the guise of burden. One solution might be to order the VA to produce all relevant documents under the standard in Rule 403 that were removed from the production on grounds other than privilege during the review phase. In the ultimate paradox, Defendants' last-minute production appears to be linked in large part to the re-review of collected documents to remove relevant documents that had suddenly become "non-responsive" due to their successful burden arguments. Indeed, metadata produced by Defendants reveals that e-mails *were* collected and produced from various medical centers, not just Central Office, as well as the VHA FOIA Office.[5] Discovery games are intolerable in the context of a trial, because they waste the parties' and the Court's time and resources by depriving everyone involved of the full picture of relevant evidence. In analogous situations,

---

[4] Unfortunately, this is not the first instance of Defendants' discovery positions serving as a cover for avoiding the production of documents. As the Court may recall, Plaintiffs moved to compel documents being withheld under the Court's March 2008 pre-trial discovery order. The Court held a hearing on April 7, 2008, at which my colleague, Ms. Heather Moser, argued that deponents were testifying based upon their knowledge of STAR Reports and also refusing to testify without having the STAR Reports in front of them at deposition. Defendants prevailed on their argument that the documents were irrelevant and admitted that they specifically rewrote Plaintiffs' order to exclude the STAR Reports. April 7, 2008 RT 44:17-45:3. After successfully withholding the documents, Defendants then attempted to call a trial witness, Edna McDonald, to testify to the subject-matter of the reports, which the Court properly excluded. April 28, 2008 RT 991:14-992:13.

[5] Plaintiffs note that some of the metadata from facility-level e-mails, particularly from suicide prevention coordinators and the suicide center in Canandaigua from Jan Kemp, contain notes stating "DO NOT PRODUCE" and "review required." Thus, ironically, Defendants' burden in substantial part seems to be related to the removal of documents from production that they had excluded on the grounds of search burden.

**MORRISON | FOERSTER**

Judge Samuel Conti
June 9, 2008
Page Seven

district courts have imposed a variety of sanctions and also permitted post-trial discovery to remedy the prejudice. *See, e.g., Qualcomm Inc. v. Broadcom Corp.*, Case No. 05-cv-1958-B (BLM), 2008 U.S. Dist. LEXIS 911 (S.D. Cal. Jan. 7, 2008) (imposing post-trial sanctions for withholding production of relevant documents at trial on theory they were not responsive to discovery requests).

Plaintiffs propose that, pursuant to its broad powers to fashion post-trial relief and appropriate sanctions under Federal Rules of Civil Procedure 59, 60 and 37, the Court should (1) order VA to produce all documents relevant under Rule 403 that had been gathered for production but later removed based on perceived limitations in the Court's order; (2) draw an adverse inference that Dr. Perez's e-mail constitutes the practice throughout the VA system or fashion some other appropriate sanction for the VA's failure to produce the document; and (3) permit Plaintiffs limited discovery on Dr. Perez's e-mail and the system-wide prevalence of the practices condoned in her e-mail.

Enclosed herewith is a proposed order detailing the discovery Plaintiffs believe they require in order to properly investigate the issues raised in Dr. Perez's e-mail, including immediate production of documents collected but not produced, depositions limited to one day total, and six interrogatories to obtain the system-wide figures on PTSD and adjustment disorder. Plaintiffs also request that the Court permit Plaintiffs to submit additional exhibits and testimony and to amend the findings of fact and conclusions of law at the close of the post-trial discovery. Assuming compliance by Defendants, Plaintiffs will be prepared to complete this entire process within 30 calendar days from tomorrow's hearing to avoid delay in the judgment.

Plaintiffs will be prepared to discuss these issues and any other issues the Court would like to address at the hearing tomorrow.

Respectfully submitted,

/s/ Gordon P. Erspamer

Gordon P. Erspamer

Enclosures

cc:   Daniel E. Bensing
      James J. Schwartz
      Kyle R. Freeny

sf-2528505                                                   7