HEARING OF THE SENATE COMMITTEE ON VETERANS AFFAIRS
∎SUBJECT: SYSTEMIC INDIFFERENCE TO INVISIBLE WOUNDS
∎CHAIRED BY: SEN. DANIEL AKAKA (D-HI)
∎WITNESSES: DR. NORMA PEREZ, MENTAL HEALTH INTEGRATION
PSYCHOLOGIST, CENTRAL TEXAS VETERANS HEALTH CARE SYSTEM; DR.
MICHAEL KUSSMAN, UNDERSECRETARY FOR HEALTH, DEPARTMENT OF
VETERANS AFFAIRS; ADMIRAL PATRICK DUNNE, U.S. NAVY (RETIRED),
ACTING UNDERSECRETARY FOR BENEFITS, VETERANS BENEFITS
ADMINISTRATION, DEPARTMENT OF VETERANS AFFAIRS

418 RUSSELL SENATE OFFICE BUILDING, WASHINGTON, D.C.
9:30 A.M. EDT, WEDNESDAY, JUNE 4, 2008

Copyright ©2008 by Federal News Service, Inc., Ste. 500, 1000
Vermont Ave, Washington, DC 20005 USA. Federal News Service is a
private firm not affiliated with the federal government. No
portion of this transcript may be copied, sold or retransmitted
without the written authority of Federal News Service, Inc.
Copyright is not claimed as to any part of the original work
prepared by a United States government officer or employee as a
part of that person's official duties. For information on
subscribing to the FNS Internet Service at www.fednews.com,
please email Carina Nyberg at cnyberg@fednews.com or call 1-202-
216-2706.

SEN. AKAKA: The hearing of the United States Senate Committee of
Veterans Affairs on "Systemic Indifference to Invisible Wounds"
will come to order. (Strikes gavel.)

Before we begin, I want to share with you -- I want to share
with you what happened yesterday, and I just want all of you to
look up over the door and see what's there. And I want to
describe a ceremony that took place yesterday in our newly
renovated hearing room. The room received a traditional Hawaiian
blessing, and I know you there and you also mentioned Dr.
Kussman would have an idea about this.

You may notice that the green lei that's draped over the top of
the room's entrance is called maile, and in Hawaii, that's a
sacred lei that's made of a vine that's very symbolic, because
it's used by the -- what we call the ali'i or the people that
they're in charge. And it connects the things that are
separated. And so the symbolism there is good.

This is a lei that we tied and untied at the entry of the door
during the blessing. And traditionally, after the lei is used in

the ceremony, it remains hung along the door's outline, as you
see it.

When the room was blessed, I was reminded of the Hawaiian
concept of kuleana or responsibility. While many come to this
room with different perspectives, all of us enter with the same
kuleana and that is to honor veterans. And we want to do the
best we can to honor veterans.

It is my hope that we will be mindful of our kuleana to the
veterans of this nation and our nation as a whole. So this
morning, we meet to discuss VA's commitment to PTSD, both in
terms of treatment and compensation.

Recent events at the Temple VA medical center have raised
concerns about the department's dedication to the mental health
needs of our returning service members. I stress, however, that
this hearing is not simply about one facility or one clinician.
This hearing is about -- is a part of the committee's ongoing
oversight of VA activities, including VA mental health care.

Last month, we learned that a VA official sent an e-mail that
appeared to deliberately conceal data on suicides. Now we have
another VA employee who appears to have linked the increase in
veterans seeking compensation for PTSD with a desire to assign a
lesser diagnosis of adjustment disorder, an action that alarmed
many veterans and others.

One question that was raised repeatedly about this e-mail was,
and I quote, "Why would a clinician be so concerned about the
compensation roles?" Unquote. We must know whether the actions
of these VA employees point to a systemic indifference to
invisible wounds. The committee must understand how VA's dealing
with PTSD and other mental health concerns relating to war-zone
service. We must ensure that veterans receive compensation for
conditions related to their military service and we must ensure
they are getting appropriate care.

From the testimony submitted for today's hearing, it appears
that VA takes the position that adjustment disorder is a
rational differential diagnosis to give to a veteran while
clinicians take the time to determine if PTSD is involved. VA
indicates that at Temple, whether a veteran has PTSD or not, the
treatment is the same. This suggests, to me, that the diagnosis
is meaningless, if everyone gets the same treatment. It is my
understanding that the reason a clinician makes a diagnosis is
to inform treatment. To the extent that there are issues or

problems that exist regarding PTSD or other psychological issues related to service, the committee must know what it can do to help ensure that veterans receive accurate diagnoses from VA, proper care and appropriate benefits.

The number of troops suffering from PTSD continues to mount. The numbers are staggering. With so many troops returning from multiple tours with various mental health issues, VA must have the credibility, resources, and commitment to ensure that veterans are properly treated and appropriately compensated.

If anyone here is puzzled about the reason for this hearing, let me answer by using a letter I received yesterday, from the brother of a young man with PTSD who committed suicide last year.

**The brother writes:** For PTSD, the stigma of the label must be removed, starting prior to a veteran's discharge from the armed services. And confidence, in the Veterans Health Administration's ability to adequately treat the condition, must be restored.

This is why we are holding this hearing today. Veterans and their families must be assured, when they turn to VA, that the department is capable of caring for the veteran.

I am working with the inspector general, as his investigation related to Temple progresses. And we expect something formal in the next couple of months. In the meantime, it is imperative that the committee understand what is occurring.

In closing, I note that last night, the Senate passed critical legislation on mental health care, named for yet another young veteran who died tragically after returning home from service. And his name is Justin Bailey.

Senator Burr and I worked to make this bill as focused as possible on PTSD and substance abuse. I look forward to seeing this bill through the president's desk.

I again want to thank the witnesses for being here today and look forward to your testimony. And now I'd like to call on our ranking member, Senator Burr, for his statement.

**SENATOR RICHARD BURR (R-NC):** Aloha, Mr. Chairman. And as I look up and see the Hawaiian decorations, that appeared late yesterday in the ceremony, and had the opportunity to meet your

3

son and to know a little bit about the impact of that ceremony in this beautiful room, where some of the most important work of this Congress is done.

I want to thank you and your family for the personal commitment you have, to make sure that we're blessed in more ways than we can imagine and guided, as I was told last night, by the ceremony and what it will do.

Mr. Chairman, you called this oversight hearing today to address potential mental health issues in the VA. Last month, we learned about the e-mail, that was sent at the Temple, Texas, VA Medical Center, that caught the attention of the media and the attention of this committee.

The e-mail message contained references to, quote, "compensation- seeking veterans" and suggested to five other VA clinicians that they, quote, "refrain from giving a diagnosis of PTSD straight out." We'll have an opportunity to understand that e-mail from its author.

And I think that will be helpful and informative to all of us.

Dr. Kussman's here, Admiral Dunne's here. They'll have an opportunity to explain as well if there's a larger problem within the VA health care system and the benefits system.

Last month, I joined you, Mr. Chairman, in asking the inspector general to look into this matter. We asked the IG to look into whether the e-mail is evidence of a bigger problem with PTSD examinations at the Temple facility and whether any disability compensation claims were affected by those examinations. My preference, to be totally honest, would have been to wait until the inspector general completed his investigation before holding this hearing. I dare say that we don't hold a hearing that mental health is not part of the hearing. But the decision was made and I'm prepared to join you, Mr. Chairman, and other committee members, to address any findings in the IG's report once it's completed. We're moving forward today, quite frankly, with not -- without having all the facts.

The title of today's hearing, "Systemic Indifferences to Invisible Wounds," suggests that some have already reached a conclusion. Based on the title, it appears they're prepared to use this e-mail, and maybe other e-mails, rightly or wrongly, as springboard to launch into attacks on the system of VA care as a whole.

There may be some areas of legitimate criticism. But I do hope that we can avoid impugning the professionalism of the entire cadre of VA health care workers to score any political points. Let's be careful about damaging the confidence veterans have in our VA health care to the point that they stop seeking treatment. We ought to be encouraging veterans to seek mental health care. Treatment is so important to me that I introduced a bill that would pay for their living expenses while participating in an effective program. So let's not destroy the progress we're hoping to make with the use of headline-seeking rhetoric.

If, however, it's the judgment of my colleagues that there is systemic indifference in how VA cares for veterans, then be prepared to give those veterans an option for their care. Let them go wherever they want for their care. It wouldn't make much sense to continue funding a system that was indifferent to their needs. No amount of money can cure indifference.

Mr. Chairman, political headlines will not solve problems inside the VA. The chair will decide whether policy or politics wins and drives this committee. Mr. Chairman, I'll stay engaged regardless of the direction the committee members choose, focused on our veterans, thinking outside the box for solutions to complex health care issues. I'm confident that a promise that we made in this country trumps any political agenda. Mr. Chairman, our troops ignored party affiliations when they chose to serve. I believe that we have a responsibility to display a similar courage in how we approach the policies that fulfill that promise.

I thank the chair. I yield the floor.

**SEN. AKAKA:** (Strikes gavel.) Thank you very much, Senator Burr.

Senator Murray?

**SEN. PATTY MURRAY (D-WA):** Thank you very much, Chairman Akaka and Senator Burr for holding today's hearing to talk about the Department of Veterans Affairs efforts to address the critical mental health care needs of our veterans.

Today's hearing, as we all know, is going to explore whether a recent e-mail sent by a VA manager directing staff to refrain from diagnosing PTSD in veterans is an isolated case or whether it is representative of greater problems within the VA mental health care system.

Now, I know Secretary Peake has strongly condemned this e-mail and said that it was an isolated case by a single practitioner in a single location. And I sincerely hope that this e-mail is the only one of its kind. But I just have to tell this committee, I have reason to be skeptical. It was just a few months ago that we learned about an e-mail that was sent by Dr. Ira Katz, the VA's top mental health official, that started by saying, "Shh" and indicated that the VA had downplayed the number of suicides and suicide attempts by veterans in the past several years.

It wasn't that long ago that Secretary Nicholson sent a letter to Congress saying that the VA had all of the resources it needed, only to tell us just a short time later that indeed, they were $3 billion short. So with all due respect to the witnesses, I have to take the VA's explanations with a grain of salt.

Now, one of the most frustrating things about this latest episode is that it furthers the perception that the VA is shortchanging our veterans. Citing, quote, compensation-seeking veterans, the e-mail in question encourages VA practitioners to avoid diagnosing veterans with PTSD in order to save time or money. After years of trying to get the VA and the administration to be honest about the cost of caring for our veterans, it is very frustrating to read this e-mail and see that it clearly indicates that resources are an issue in getting our veterans both the proper diagnosis and the care they need.

So to me, this e-mail is really a sad reminder that this administration's attempt to play down the cost of war or the cost of taking care of our veterans has begun actually to affect the way that our VA employees view their own work. VA officials should be more focused on providing a lifeline to our veterans than on meeting a bottom line that this administration has put above all else.

And so, today, it is our responsibility to find out what else needs to be done to ensure that our veterans are not being shortchanged due to a lack of resources. And we on this committee know the stakes have never been higher. According to the Rand Corporation, one in five troops who have returned from Iraq and Afghanistan has PTSD or severe depression. Last week, the Pentagon released a report showing that PTSD cases increased by 50 percent in 2007. And just a few days ago, the Army reported that the number of soldiers who committed suicide in 2007 is the highest it has been in decades. It's well past time

that every VA official, particularly those setting policy for their employees, take the psychological wounds of war just as seriously as the physical injuries.

Now, despite my grave concerns about the candor of senior VA officials and the shortcomings of the president's budget, I continue to believe that the VA is the best and most appropriate place for veterans to receive health care. The VA, unlike any other health care organization in this country, is uniquely prepared to care for the distinct wounds of war.

VA staff across this country work their hearts out to get our veterans the care they need and they deserve every day. They have a very hard job. The stigma in our society surrounding mental health care deters a great number of veterans from seeking help.

That is why we need to be doing everything we can to encourage veterans with psychological wounds to go to the VA, to get the care they need and that they have earned.

But time and again, we've seen the VA undermine its own employees and make their jobs harder. And the mail -- e-mail from Dr. Perez is only the latest example, but it is a striking one.

So, Mr. Chairman, it is appropriate that we take a look at this today, to find out the extent of the problem, to make sure that the VA truly, from the top to the very bottom, is seeking these veterans, getting them the help they need, and not just saying we don't have the resources; we can't take care of it. It is our job, as members of Congress, to make sure they have the resources they need. Without the accurate information, we are just incapable of doing that.

So thank you very much for holding this very important hearing, Mr. Chairman.

**SEN. AKAKA:** Thank you very much.

Senator Brown.

**SEN. SHERROD BROWN (D-OH):** Thank you, Mr. Chairman. Senator Byrd, thank you, and Senator Murray, for your comments always.

Dr. Kussman, thank you for your meeting with and talking about mental health issues with the Dayton Development Coalition -- I appreciate that -- some time ago.

When President Bush was inaugurated, he pledged our nation to a goal. He said, "When we see that wounded traveler on the road to Jericho, we will not pass on the other side."

This hearing should be about how we're going to care for those men and women who have traveled to the other side of the world for us and back. We should be working together to openly start filling the gaps, closing the loopholes, improving the benefits and services available to vets. Yet here we are again, hearing testimony from an administration on the defense. Instead of following the example of the Good Samaritan, the Bush administration's been too often passing to the other side of the road.

One news story after another has documented the proposed scheme, as Senator Murray said, to obscure the true numbers of soldiers with post-traumatic stress disorder. Cleveland Plain Dealer writer Elizabeth Sullivan, in reaction to this discovery, wrote, "The VA shouldn't be limiting care and tightening hatches on information leaks. It should be adding to services for our weary, traumatized veterans." She herself was married to a -- for many years -- who is since deceased -- married to a Vietnam veteran. Ms. Sullivan was.

It's shameful the administration would treat injured veterans in such a cavalier manner. It's also incredibly short-sighted. The men and women that serve in our military, as we all know, and we all talk about here, and you all talk about, have proven themselves time and again. They enrich our workforce when they return. They strengthen our communities when they're back stateside. When we ignore a veteran's injuries or deny a veteran care or don't take care of veterans who want to go to school, we're not only shortchanging them; we're shortchanging our economy and our society.

Look a the flip side, what happened after World War II, when we really did take care of veterans in terms of health care and education, the way that we should.

In the last 15 months, I've held some 100 roundtables around my state, gatherings of 15 and 20 people whom I just listen to talk about their concerns, in some 60-plus counties in my state. And

8

I've heard from many veterans many of these same concerns that
we talk about ad nauseam in this committee.

The answer is not to fail -- the VA to fail and then privatize
the VA.

We've seen that in part with Medicare. We've seen it as part of
a political philosophy in town. The answer is to make the VA
work, to fund it as we should and to make it work. There's
simply no reason we can't do that, and I look forward to working
with all of you.

Thank you, Mr. Chairman.

**SEN. AKAKA:** Thank you very much, Senator Brown.

Senator Tester.

**SEN. JON TESTER (D-MT):** Thank you, Chairman Akaka, Ranking
Member Burr. It's a pleasure to be here. Unfortunately, I wish
we were talking about something more pleasant.

It would be the easiest thing in the world for me or my
colleagues to sit up here and talk about how outrageous some of
the e- mails are that have come out of the VA recently. I will
just tell you as a baseline set of information, without honesty,
without honesty of diagnosis, without honesty of care, without
honesty of the realization that there is a problem, a systematic
problem in the VA right now, that it's apparent to me I don't
know that the VA culture will change.

There is a lack of urgency among many of the bureaucrats and a
continued unwillingness to let the needs of our veterans drive
the VA budget. Instead, budgets have been bean counting, seem to
come before the actual needs of our veterans. I think that is
very unfortunate. Even after we refocused -- after we renewed
the focus on the plight of the wounded warriors caused by the
Walter Reed scandal, even after 18 months of what I think is
some great oversight by this committee, even after a much-needed
change in the leadership at the top of the VA, the problem still
exists.

And to be blunt, I am frustrated by the fact that, whether I'm
asking about veteran suicides or construction of new clinics,
the answer from the middle layers of the VA bureaucracy seems to
be the same: We'll deal with it when we can; it's not a big
deal. Well, it is a big deal.

The good news is, when I talk to the secretary himself, I get a much better response. And that is good news. But it should not have to be that we have to work this hard to make the system work. It should not be a matter whether the Congress is trying to get some information about how we're doing to help our veterans or whether an individual veteran is trying to get the benefits that he or she has earned. So we need some answers today.

The witnesses, myself, the other members of this committee are in this business for a reason. That reason is that we all believe that getting benefits and better health care for our veterans is not something we do to feel good about ourselves, it's something we do because -- it's not something we do to spend taxpayers' money. It is something we do because our nation has made a promise to the fighting folks in this country that after they serve our country, our country will serve them.

And the VA is the organization that bears the responsibility for the entire country for a follow-through on that promise. In many cases it's happening and good jobs are being done, but it's not happening in a lot of cases. And I regret to say that in these cases that it did not happen, everyone is falling short of doing their job.

And as a result, our country is falling short of doing its job. And when we fail a single veteran, it's unacceptable.

I too have spent a lot of time, with doctors and nurses and right on down the line to the maintenance staff, in VA facilities in the state of Montana. Almost to a person, out of these hundreds of employees, they understand this. But when it comes to the managers, I'm not sure that they understand it.

So I hope that the witnesses are prepared and able to talk a little bit, about what each of them is doing to make sure that the VA culture is changing from the business as usual. I would very much like to hear your thoughts on this. And I have a number of other questions that we can do during the questioning rounds.

You folks are here for a reason. You're the easiest folks for us to talk to. And you will get the brunt, and that's good. But the truth is, is that; the truth is, is that I've talked to veterans. I've talked to staff. And things need to change.

Now, I don't know if it's because we don't have enough veterans working in the VA -- maybe that's the problem -- or if it's because people don't understand the urgency, the special urgency with what's going on with returning soldiers from Iraq and Afghanistan.

But I will tell you this. It has to change. And I have a tremendous amount of respect for Secretary Peake. I think he is a good man. But things -- he can't do it alone -- things have to change.

And I can give you example after example, where I have talked to people within the VA and have not been told the whole story. I have been told part of the story.

And I will tell you guys the same thing I told the head of the VA in Montana. I'm not here to fight you. I'm here to help you. I'm here to help you make sure that the promises we made, to our veterans, becomes reality. And that's it. That's all I want to do.

So with that, thank you, Mr. Chairman.

**SEN. AKAKA:** Thank you very much, Senator Tester.

Senator Sanders.

**SENATOR BERNIE SANDERS (I-VT):** Thank you, Mr. Chairman. I apologize for being here late.

And thank you, guests, very much for being here.

Thank you for calling this important hearing. Very clearly, I think, there is a reality taking place today that is a new reality. I think generally speaking, we understand, from a historical perspective, that when soldiers have been wounded in a conventional military sense, gunshot wounds or amputation needs, the VA has done an extraordinarily good job.

But I think increasingly what we also understand is that what we called invisible wounds -- maybe it was Gulf War Syndrome initially, that I worked on very hard when I was in the House; maybe it's post- traumatic stress disorder; maybe it's traumatic brain injury; something where somebody has not lost an arm or a leg -- it appears that the VA has not been as effective as it might.

And I think it has something to do with the culture perhaps of
the military where, if you lose an arm or you lose a leg, you
are wounded. But if you come home with PTSD or TBI and you're
walking and you're talking, well, maybe are you really wounded
or maybe you're a little bit wimpy or whatever the case may be.

And I think the thrust of what you are hearing and have been
hearing for a number of months is that the evidence is
overwhelming, that what we are seeing today in terms of PTSD,
what we are seeing in terms of TBI, which is what is called the
signature injury of this war, is that tens and tens and tens of
thousands of ours soldiers are being impacted, and we need a
culture now within the VA that begins to understand and address
that reality.

In my state and in every state in this country, men and women
are coming home who are not getting their lives together. They
are drinking too much. They can't do their jobs. They're getting
fired from their work. They're turning to drugs. Their marriages
are falling apart. And that is absolutely as important as other
types of injuries. And we need a culture in the VA which
appreciates that, which recognizes that.

For whatever reason -- I don't know the reason why -- and we
also understand that issues like TBI are very difficult to
diagnose as being issues separately from PTSD. Often they go
together, and how you pull them apart is something that is not
so easy. And that requires a lot of work. And I think the most
important thing that we need from the VA is an absolute
commitment to understand that these so-called invisible injuries
are wrecking havoc on tens of thousands, not only of soldiers,
but of their families and of their children. And we consider it
as an important an injury as any other. And we need a culture
and an approach that effectively addresses those issues.

I should mention, Mr. Chairman, that in my own state of Vermont,
one of the things that we did was to recognize that no matter
what kind of treatment the VA may have, it's not going to do
anybody any good unless our families and our soldiers get to
that treatment, which speaks to an effective outreach program.

And then when you're dealing with outreach, you understand that
PTSD is a different type of injury. It's not something -- by
definition, it's not an injury where some guy's going to stand
up and say, I'm in pain. I'm drinking too much. I'm on drugs. My
marriage is falling apart. Help me. That's not necessarily what
happens. You've got to figure out a way to connect with those

men and women and bring them into the system. And then you have to figure out a way to create the kind of support systems that you need and to provide the individual treatment. None of which is easy. A lot has been thrown on you. This war, among many other things, has given you hundreds and hundreds of thousands of soldiers from all walks of life who need help.

I come from a rural state. That means a lot of our guys are coming home from the National Guard. They're living in small towns. They don't have the infrastructure of the U.S. Army. How do you address that? We need help on that as well.

But I think, Mr. Chairman, clearly we need a culture in the VA that recognizes that these problems are quite as significant in people's lives as other problems, and want the VA to step up to the plate and address them.

Thank you very much, Mr. Chairman.

**SEN. AKAKA:** Thank you very much, Senator Sanders.

I want to welcome today's panel of witnesses from VA. First, I welcome Dr. Norma Perez, mental health integration specialist at an Austin outpatient clinic and former PTSD clinical team coordinator at the Temple, Texas, VA Medical Center.

Next I welcome Dr. Michael Kussman, undersecretary for Health. He is accompanied by Dr. Ira Katz, deputy chief of -- Patient Care Services officer for Mental Health.

Finally, I welcome Admiral Patrick Dunne, acting undersecretary for Benefits and assistant secretary for Policy and Planning. He is accompanied by Mr. Brad Mayes, director of Compensation and Pension Service.

I thank all of you for being there today. Your full statements will appear in the record of the committee.

Dr. Perez, will you please begin with your statement.

**DR. PEREZ:** Thank you.

Well, good morning, Mr. Chairman and members of the Committee.

**SEN. AKAKA:** Good morning.

13

**DR. PEREZ:** Thank you for inviting me here to discuss the quality of mental health care central Texas veterans are receiving in the Temple PTSD clinic. As the daughter, niece, sister and cousin of Army, Navy and Marine veterans, I have a personal commitment to my work, and I have been blessed with the gift of trust from many East Coast and central Texas veterans. They instill the passion for my work.

I started working for the Central Texas Veterans Health Care System in June of 2007 as a psychologist and program coordinator of the post-traumatic stress disorder clinical team. I claim to -- I came to VA after completing a National Cancer Institute research fellowship at the University of Texas Health Science Center at Houston's School of Public Health. Prior to that, I completed a clinical postdoctoral fellowship at Brown University, I earned my Ph.D. in clinical psychology from the University of Rhode Island, and I completed a clinical internship at the Edith Nourse VA Medical Center in Bedford, Massachusetts.

I realize the committee is interested in learning more about an e-mail I sent to my team on March 20th, so I will provide some context for that message and explain its purpose. My written statement, which I ask to be submitted for the record, discusses the approaches and treatment provided by the Temple PTSD clinical team.

The Central Texas Veterans Health Care System offers specialized mental health care through the Temple PTSD clinical team, or the PCT. Although we are a PTSD clinic, we have been able to offer treatment to any veteran displaying any symptoms of combat stress.

Combat stress is a normal reaction to abnormal events. It can occur immediately following an event or many years later, but in either situation, we stand ready to assist the veteran.

Combat stress can manifest itself in different clinical conditions, including PTSD and adjustment disorder.

We know we can improve the lives of veterans by teaching them coping strategies and other skills to reduce their level of distress and improve their quality of life. And this is exactly what we do in Central Texas.

All of our clinicians are trained to use the guidelines published within the Diagnostic Standards Manual IV for clinical

diagnoses of mental health conditions including PTSD. Individual providers develop a rapport and trust with each patient, and it is through this that the veteran is able to safely convey their experiences and symptoms.

Although PTSD is sometimes recognizable as early as the first few sessions, veterans often need more time to fully disclose their trauma and its impact on their lives. Several veterans expressed to my staff their frustration after receiving a diagnosis of PTSD from a team member during an initial intake, when they had not received that diagnosis during their compensation and pension examination. This situation was made all the more confusing and stressful when a team psychiatrist correctly told them they were displaying symptoms of combat stress, but did not meet criteria for the diagnosis of PTSD.

Because veterans were receiving conflicting messages from the team, I thought it was necessary to provide further guidance. As an extension of ongoing discussions and to address the frustrations of veterans, I sent an e-mail to my staff on March 20th emphasizing careful evaluation of a patient's symptoms to ensure consistent and accurate diagnoses. The Temple PCT fully supports the compensation process and the department's policy of erring in the best interest of the veteran whenever there is any doubt.

In retrospect, I realize I did not adequately convey my message appropriately, but my only intent was to improve the quality of care our veterans received.

I would like to conclude by discussing what a diagnosis of adjustment disorder with rule-out for PTSD means. When a clinician makes a diagnosis, he or she is considering the patient's symptoms and conditions that would explain them. Many conditions look very similar to one another, and sometimes it is important to identify the likely diagnosis while noting in the patient's records to test for possible alternatives.

For example, a patient with chest pains could have indigestion or could be experiencing the early effects of a heart attack. Based on initial information, a clinician would determine the most likely diagnosis -- heartburn -- but note in the record the need to rule out a heart attack and proceed with further assessment. In clinical shorthand, that diagnosis would be "indigestion rule-out heart attack", which would prompt further testing. The diagnostic note actually means "do not forget this

diagnosis" and serves as a reminder for further investigation into multiple possible conditions.

In the context of mental health and my e-mail, I believed it was important to remind the team clinicians of the diagnosis of adjustment disorder, which is a clinically sound diagnosis and would result in appropriate treatment while continuing the assessment process for a possible PTSD diagnosis.

Mr. Chairman, I am happy to report, Central Texas veterans are receiving the care that honors our pledge to care for those who have sacrificed in service to this nation. This concludes my prepared statement. And I am ready to address the committee's questions.

**SEN. AKAKA:** Thank you very much, Dr. Perez.

Dr. Kussman.

**DR. KUSSMAN:** Mahalo, Mr. Chairman and members of the committee. Good morning. Thank you for mentioning earlier my time in Hawaii and my appreciation of the blessing of this room. And I hope the blessing allows all of us together to do what we're here for, is to provide the best service for all our veterans.

Thank you for the opportunity to discuss the VA's mental health services with you today. I realize that you are concerned by an e-mail sent from the program coordinator, of the post-traumatic stress disorder clinical team in Temple, Dr. Perez. The e-mail, as characterized by others, does not reflect the policies or conduct of our health care system.

Let me be very clear. Any suggestion that we would not diagnose a condition, any condition, is unacceptable. And I, as a veteran and a retiree, would not tolerate such a position, for personal and professional reasons. I will further state for the record that not only was there no systemic effort to deny a diagnosis, but there was not even an individual effort to that end.

However the perception remains. So we welcome the opportunity to appear before you today, to explain the VA's commitment to an honest and accurate diagnosis for every veteran, for every diagnosis. That this perception continues is very unfortunate and has unfairly damaged the reputation of the VA's dedicated health care employees.

I was going to mention that with me is Dr. Perez. But obviously that has already taken place. I am grateful to the committee for giving her the opportunity to speak for herself. And I will therefore not say anything further about her e-mail or about the specific situation at Temple.

Delivering world-class mental health care to enrolled veterans is a requirement that the VA and VHA take extremely seriously. VA plans to spend more than $3.5 billion for mental health services in fiscal 2008, and project 3.9 billion in FY 2009.

We are proud of our accomplishments in this area. Many health professionals have recognized the VA's leadership in this area. And I firmly believe no one receives better mental health care in this nation than veterans enrolled with VA for care.

This is particularly true for veterans with post-traumatic stress disorder, an area in which the VA is nationally and internationally recognized, both for its research work and its ability to deliver outstanding care.

Although the quality of VA health care has been found equal to and often superior to that furnished anywhere -- that's care anywhere, as has been mentioned in numerous publications -- the popular perception of the quality of VA care is something less favorable.

It is unfortunate and undeserved. Some continue to believe that health care services furnished by a government system can never be as good as those delivered by the private sector.

In many cases, we have not done enough to educate the public about VA's many achievements and outstanding programs. And we could do more to ensure our own health care employees are informed, about the department's recognized awards and achievements outside their own areas of expertise.

VA and this country have much to be proud of, in terms of the health care provided to veterans by the very skilled and talented cadre of VA clinicians, not to mention our researchers, who continue to improve the clinical care veterans receive.

Improving VA's mental health services has been an active pursuit of the department for many years.

In 2004, we developed a Mental Health Strategic Plan that was both unprecedented and widely acclaimed within the mental health

community. Through that effort, we began to address gaps in the mental health services provided at the local level and to initiate programs at the national level. This plan was intended to serve as a guide for four or five years. During that time, we have continually reassessed our progress and amended the strategic plan based on new information, particularly concerning new evidence-based standards of care and improvements in the delivery of mental health services. We continue to periodically re-assess the plan as appropriate.

As alluded to earlier, the strategic plan was diagnosed -- designed to incorporate evidence-based treatments wherever possible, encourage system redesign activities, and move our system to a recovery-based model as required by the President's New Freedom Commission for Mental Health. For these significant changes to be successful, they must be accompanied by a major educational effort appropriately targeted at our staff and clinicians. I now believe, in retrospect, that we have not done as good a job as we should have to educate veterans and our staff.

As we have initiated new programs that emphasize recovery models for our newest veterans, we have in some places not adequately responded to the needs of those who use and have benefited from our existing programs, such as group therapy sessions for combat-theater Vietnam era veterans. In addition, some of our own providers have not fully understood our new approach, unfortunately compounding the confusion experienced by veterans at those sites. In response, we have developed an aggressive communication and education plan for both clinicians and veterans, which will be launched shortly.

Be assured that despite these inadvertent, but significant, educational and communication lapses, our commitment to our veterans and to improving their health status is unwavering. Their well-being and their continued improvement to full functional status has always been the objective of the strategic plan. We will work even harder to ensure that all understand the needs of different groups of veterans and will keep them apprised of further changes based on newer evidence.

As we have always sought to do, we will do the right thing for every veteran who has entrusted us with his or her care -- one veteran at a time. We will do more to make sure our decision-making process for these clinical policy determinations is open and transparent to veterans. Moreover, we will work with members of this committee, with other mental health professionals and

with veterans themselves to ensure veterans continue to receive
the highest quality care available.

In summary, Mr. Chairman, I am proud of what the VA does in the
area of mental health. More than 200,000 people are fully
committed to helping veterans receive the health care benefits
they have earned through their service and sacrifices. I hope we
can continue to move forward from this episode and help veterans
and their families, Congress and the news media and others to
better understand what the VA has done and is doing to fulfill
our nation's commitment to those who have worn the uniform of
our armed services.

Mahalo nui loa.

**SEN. AKAKA:** Thank you. Mahalo nui loa and thank you very much,
Dr. Kussman, for your statement.

Admiral Dunne.

**ADM. DUNNE:** Good morning, Mr. Chairman, members of the
committee. Thank you for the opportunity to discuss the
important issue of post-traumatic stress disorder.

I am pleased to be accompanied by Mr. Brad Mayes, the Veterans
Benefits Administration's director of the Compensation and
Pension Service.

We all share the goal of preventing and minimizing the impact of
this disability on our veterans and providing those who suffer
from it with just compensation for their service. Today I will
review how VBA processes claims for service connection of PTSD
and the relationship between VBA and the Veterans Health
Administration.

The number of veterans submitting claims for PTSD has grown
dramatically. From fiscal year '99 through May 2008, the number
of veterans receiving disability compensation who are service-
connected for PTSD increased from 120,000 to nearly 329,000;
24,087 of these veterans served in World War II, 11,220 in the
Korean Conflict, 222,191 in the Vietnam era, 11,220 during
peacetime, and 59,196 in the Gulf War era. The Gulf War era
number includes 37,460 OEF and OIF veterans.

Service connection for PTSD requires medical evidence diagnosing
the condition, medical evidence of a link between current
symptoms and an in-service stressor, and credible supporting

evidence that the in- service stressor occurred. VA regulations establish three categories of in-service stressors: first, combat or prisoner of war; second, personal assault; and third, non-combat.

Combat status may be established through the receipt of certain recognized military citations and other supportive evidence. If the evidence establishes that a veteran engaged in combat or was a POW and the stressor relates to that experience, the veteran's lay testimony alone may establish an in-service stressor for purpose of service connecting PTSD. If the stressful event is not linked to combat or POW status, VA requests that the veteran submit information to help substantiate that the incident occurred. Reasonable doubt is always resolved in favor of the veteran.

A VA examination is requested once credible supporting evidence establishes that the claimed in-service stressor occurred. The VHA medical examination for PTSD or an equivalent contract examination essentially serves three purposes. First, it serves to establish whether the veteran has PTSD. Second, it provides an opinion as to the existence of a link between the current symptoms and the in- service stressor. It is important to note that this is a medical determination performed by the examining psychiatrist or psychologist, not by the rating specialist. Third, it serves to provide an assessment of the current level of disability resulting from the veteran's symptoms so that VA can provide a rating for the extent of that disability.

Although a veteran may have received a diagnosis of PTSD from a private mental health provider before submitting a claim to VBA, the VHA examination is still necessary to confirm the diagnosis in accordance with the DSM-IV and to provide the proper diagnostic criteria and level of disability assessment needed for rating purposes.

To ensure that a qualified professional is responsible for the examination, VA requires the initial examination be conducted or supervised by a board-certified psychiatrist or licensed doctorate- level psychologist. Additionally, all potential examiners now must undergo specific training and become certified prior to performing PTSD exams.

Ratings are based on the rating schedule for mental disorders. VBA rating personnel must evaluate the examination report and any other relevant evidence to determine the most appropriate level of disability. The examination report must be carefully

reviewed to match the examiner's description of the veteran's symptoms with the disability percentage most closely representing the severity of those symptoms. This is a complex process that involves an element of judgment. However, when a conflict arises as to what level of evaluation should be assigned, reasonable doubt is resolved in favor of the veteran.

It is critical that our employees receive the essential guidance, materials and tools to meet the increasingly complex demands of their decision-making responsibilities. To accomplish this goal, VBA has developed new training tools and centralized training programs that support more accurate and consistent decision-making. New employees receive comprehensive training through the national, centralized training program called "Challenge." VBA has developed job aids and training sessions to provide employees the skills and tools essential to render fair and timely decisions on PTSD claims.

All Veteran Service Representatives and Rating Veteran Service Representatives are required to receive training on the proper development and analysis of PTSD claims. The training materials include medical and military references and prerecorded video broadcasts pertaining to PTSD development and records research.

Mr. Chairman, this completes my statement. I would be happy to answer any questions.

**SEN. AKAKA:** Thank you very much, Admiral.

Dr. Kussman, I -- you mentioned the word "perception." And for me, this is part of the reason we're having this hearing, and that is to deal with perceptions of our veterans about the Veterans Administration and its service.

We know that the quality of service is good. Accessibility and -- problems that we've always had, but we're trying to correct the perception if there's a wrong perception here.

I share your concern about veterans not seeking treatment because of the public perception that VA may not be sympathetic toward their needs. My question to you is: What are your thoughts on how VA can better assure veterans that they are welcome and will receive needed care? You mentioned some of that in your statement.

As chairman of this committee, I can tell you that even before the story broke about this e-mail, veterans were quite vocal

21

with their concerns about how their mental health care needs are regarded. Indeed, many of the stories about the e-mail expressed the view that it was only the latest example of how VA regards PTSD and that was the perception. So what I'm asking you is your thoughts on how VA can better assure veterans that they're welcome and will receive needed care.

**DR. KUSSMAN:** Thank you, Mr. Chairman, for the question. And obviously, that type of thing is on my mind almost on an hourly basis. We are a large organization: 230,000 people. And I'd be the first person to say we're not perfect in what we do. And when we know about areas where this clearly is not being communicated, we put a great deal of effort into that.

But sometimes, as I alluded to in my written statement, is that a lot of times in our effort to meet the needs of the veterans, sometimes we don't do what they want. And our effort is to be sure that they get the right care and get a firm and appropriate assessment. Sometimes they don't like what the assessment is, and so there's a constant concern about whether they perceive that they didn't get what they want rather than that the appropriate and an honest evaluation was done.

But we have gone to a large degree -- we've hired more than 3,800 mental health people over the last year and half to provide services and expand services. We're trying to put those services as far forward into our CBOCs as well as our clinics, increase the number of vet centers to provide services. So we're doing everything we can to provide services that makes it convenient and easier for the veteran to come in.

As we talked about -- and it was mentioned in opening statements -- patients do not come to say, "I think I have PTSD." They usually come -- and we know this from the 300,000 or so OIF/OEF veterans who have already come to us is that they generally come for some other thing. They may come for a musculoskeletal thing. And as you know, we screen everybody for PTSD and in -- the effort there is to determine whether there's any possibility of a diagnosis of PTSD.

And then we realized also that people are reluctant to go to a mental health clinic because there's a stigma, again, related to that.

That's a societal thing. It may be more so in the group of patients that we take care of.

And I speak from 35 years of experience in that. Perhaps some people think I should have gone to the mental health clinic; I don't know.

**MR. :** (Laughs.)

**DR. KUSSMAN:** But the important point is here -- not to make light of it -- is that what we've done is had an innovative process of putting mental health in the primary care clinic, putting mental health people there, partnering with the primary care people, so as much as possible we can provide mental health services in a more friendly and less stigmatizing environment for patients, because we are concerned that people won't follow up if we send them to a mental health clinic. And that has been eminently successful with our primary care and mental health -- with our mental health people and Dr. Katz.

The other thing that we're doing, as you know, is that waiting for people to come to us is one way you can do that. And we've seen about a third or 37, 35 percent of the total number of people who have served in the theater have come. And so at least we have an opportunity to interact with PTSD or any other thing for that group.

But what about the other 60-plus percent who have not come to us? And so with the secretary's leadership, we are -- have embarked upon a very aggressive campaign of calling all the people that we have contact numbers on, over 500,000, who have not come to us, but remember, already received two letters from the secretary, saying, "We're here for you," and for whatever reason have chosen not to use us. And maybe they have their own health care insurance, or maybe they don't need any health care. That's not the issue.

The issue is to try to get in touch with them, particularly offering them mental health services and other things, because we know people are reluctant to come.

We've been suggesting and we're working now -- you know, we've talked about the 24-hour suicide hotline, and I think you've been briefed on that previously -- to develop a different type of 24-hour hotline, really an extension of the rehabilitation services that Dr. Batres gives at the vet centers. So not only will we have the vet centers themselves that people can go to, but they would be staffed by people hired by Al Batres in the vet centers to be eligible to take calls 24/7, to talk to

people, because, as you know, many of these combat veterans
appreciate talking to someone who's walked in their shoes.

And they can do a -- they've done a great job, as you know, over
25 years, and we would like to extend that into a virtual clinic
that would be open; that people don't even have to go look or
try to get to a vet center or a facility, would have the ability
to call and get counseling. This is not meant to replace any
other 800 number but rather specifically talk about some of the
readjustment issues, PTSD and other things, not suicide.

If suicide came up in the context of this, they would be
referred to the suicide hotline, because you don't want to have
dueling hotlines.

But, so these are some of the things that we're doing to
aggressively assist people. But it's a challenge. As mentioned,
it's -- particularly with mental health, people are reluctant to
come.

And what we're trying to do is make it easy for them to come;
again not to belabor the word but to destigmatize it and make
sure people feel comfortable about what we can do. We can't
impact if they don't come and see us.

**SEN. AKAKA:** Thank you, Dr. Kussman.

Dr. Perez, I do not feel as if this issue has been adequately
addressed. The first line of your e-mail notes that there are,
and I'm quoting, "more and more compensation-seeking veterans,"
unquote.

What exactly did you mean by this? It appears to me and many
others that you were linking diagnosis of PTSD and potential
compensation together, and thereby either intentionally or
unintentionally raising concerns about the cost to VA.

Can you please clarify what you meant by this?

**DR. PEREZ:** Yes, sir.

What I was stating there was the fact that there were those
individuals. It's even more critical to be sensitive, to what
they've already gone through and knowing that they may have had
another evaluation. So we have to really be very, very accurate
in our diagnosis.

24

All of our clinicians strive to give the accurate diagnosis. But when you have somebody who may have already seen somebody, then you want to really make sure that you're going to be consistent and accurate in your diagnosis, so that you don't add to any distress levels.

**SEN. AKAKA:** I have other questions here. I'm going to defer to our ranking member for his questions at this time.

**SEN. BURR:** Thank you, Mr. Chairman.

Dr. Kussman, I had the opportunity, with the opening of a new CBOC in Hickory, North Carolina, to see the changes that you're making relative to mental health. It makes a tremendous amount of sense.

Mr. Chairman, I would ask unanimous consent to enter three letters into the record; two to General Peake and one to Dr. Kussman.

The first one is from the University of Pittsburgh Medical Center, Western Psychiatric Institute & Clinic where, within the body of that letter, it states, I'm writing, on behalf of the president- elect of the American Psychiatric Association, to support the VA in their efforts to care for veterans; a substantial amount of effort has gone into revitalizing the system. So that was to Secretary Peake.

The second one, Mr. Chairman, is from the Association of VA Psychologist Leaders. And I would also read, from the body, we're very appreciative of the enormous effort, by all of you at the VA and especially the Office of Mental Health Services, in supporting the efforts, of those in the field, to provide the best quality mental health care possible to our veterans. That was to Dr. Kussman.

And the last one is, from the American society for suicide prevention, an e-mail that went to Secretary Peake. And I also read, from the body, Dr. Ira Katz is an outstanding leader for this work; he is uniquely qualified to organize the best programs, based on the latest psychiatric research.

I would ask that they all be in the record. Because what we see and we have -- I say this to all our witnesses -- we have an oversight responsibility that cannot be ignored.

And when issues are raised -- whether they're internal or external; these happen to be external -- it's appropriate for this committee to begin to look at: Do we know the full breath of the problem? Is there a problem? If there's not, is there a reasonable explanation? Hopefully at some point in the process we also remember to ask you, are we making progress? Are we positively affecting the lives of more veterans? Are we learning -- as I read from the piece on Dr. Katz -- are we using the latest of what we've learned to incorporate in the delivery of care for patients?

And it's certainly my hope we're doing that, and I have every reason to believe that there's every effort made at every level of the VA to incorporate that into a field that is very difficult, and I think Dr. Perez has alluded to that.

Let me just ask two very pointed questions, because they were raised in opening statements. Dr. Kussman, Senator Murray said that we didn't have enough resources to treat mental health. Do you have the resources needed to provide mental health services to our veterans?

**DR. KUSSMAN:** Mr. Ranking Member, yes. There are -- again, the -- if you talk to any of our mental health people, I believe you'll be told that frequently when we are challenged about providing services in some geographic area, it's not the resources themselves but the ability to buy those resources or provide those resources. And so I believe that there's adequate resources. As I've said, almost $4 billion -- significant amounts targeted directly to PTSD -- 3,800 new employees.

You know, actually, we've been so successful, we've been -- there was an article in a mental health journal that sort of in a backhand way criticized the VA for having scooped up so many mental health people in the country that we were hurting the delivery of care in the civilian community. And I know my friends south of the river at the Pentagon who have been challenged to hire more mental health people are a little frustrated with us because we got ahead of them. And they're having challenges hiring people because, you know, there is a shortage in mental health services -- psychiatrists and PhDs at colleges nationally.

**SEN. BURR:** We see that in North Carolina.

Is there a culture in the VA that ignores or devalues mental health needs?

26

**DR. KUSSMAN:** I don't believe that to be the case. And if I was aware of any kind of culture, I would be at the forefront of trying to change that culture. I think that our people understand the mission that we have and they're committed to doing that.

I will respond to Senator Tester, if I might. Where he talked about the culture, I don't think it was a culture -- I hope he wasn't mentioning the culture of not providing services but responding to needs and things that are related to that.

**SEN. TESTER:** It was the response I'm talking about.

**DR. KUSSMAN:** The response to the needs --

**SEN. BURR:** The response to the needs.

**DR. KUSSMAN:** -- of issues coming up with, whether it was construction or hiring more people or whatever it was. And this is a huge organization. We're well aware of that. The secretary and myself are working very hard to inculcate changes. One of the -- I have four primary things that I'm pushing at. One is patient care. And the other is -- the second one is leadership, and that we're working hard to develop the appropriate leadership and the understanding of everyone in the system to expeditiously look at the problems that we have. If we can't fix something, admit it, be transparent, communicate with the congressional people that are in the VSOs.

We have a good news story to talk about.

And when it gets clouded by the perception or the reality of people not responding, shame on us.

**SEN. BURR:** Dr. Perez, two quick questions and really going to what the chairman raised, and that was in your e-mail -- compensation- seeking veterans, specifically. What relationship does your clinic have with the disability compensation process?

**DR. PEREZ:** No relationship whatsoever.

**SEN. BURR:** Were the veterans looking to your clinic to improve their health through treatment or to provide diagnosis of PTSD that could be used to substantiate their disability claims that drove that phrase?

27

**DR. PEREZ:** No, not at all. Our clinic is just a treatment clinic; that's it. We're pretty clear with all our veterans that this is why we're here, to offer the treatment.

**SEN. BURR:** So given the nature of your treatment facility -- even though I agree with you, this could have been worded differently in your e-mail -- it can't imply that veterans were only there to try to enhance their disability claims because you have no connection to the disability process and you're there not to do anything other than treat for mental health illness.

**DR. PEREZ:** Exactly. It is just a treatment clinic.

**SEN. BURR:** I thank you for that. I thank you, Mr. Chairman.

**SEN. AKAKA:** Thank you very much, Senator Burr.

Senator Murray.

**SEN. PATTY MURRAY (D-WA):** Thank you very much, Mr. Chairman.

Like a lot of my colleagues, I'm very concerned not only with the content of Dr. Perez's March 20th e-mail but also with its potential implications. A lot of our veterans perceive the VA as an obstacle rather than an ally today. And I know that everyone is working in an effort to make that better. And I'm greatly concerned that this incident only kind of adds to that impression. And I think that's part of why we really need to get, you know, good strong answers from all of you.

I do have a lot of questions, but I want to begin by asking Dr. Perez today if her testimony was reviewed by the OMB today before you gave it?

**DR. PEREZ:** Pardon me, I'm not real familiar with the initials.

**SEN. MURRAY:** With the Office of Management and Budget, was your testimony --

**DR. PEREZ:** Oh, no, no, no. The reason I was so grateful to be invited here was that I was given the opportunity to give my entire story.

**SEN. MURRAY:** Good. And so you wrote it yourself.

**DR. PEREZ:** Yes.

**SEN. MURRAY:** It didn't go to any other agency or reviewed by anybody before it came.

**DR. PEREZ:** Yes. Yes.

**SEN. MURRAY:** Great. Okay. Dr. Perez, your e-mail raises a serious question about whether or not veterans are receiving inadequate evaluations for their mental health issues because the VA lacks the staff or the money that they need. Can you tell us how much time you think is needed to properly evaluate a veteran to accurately diagnose PTSD?

**DR. PEREZ:** It really is an individual-case basis because in order to diagnose anyone with PTSD, they have to be at the point where they're ready to share their most traumatic experience, and that takes time. So you -- in order to compassionately do that, it has to be at the veteran's own pace and at their timetable.

**SEN. MURRAY:** So it may take some time to do that.

**DR. PEREZ:** Right. It is very different for --

**SEN. MURRAY:** And how much time did VA staff spend with veterans when they were evaluated for PTSD at Temple VA medical center, where you work?

**DR. PEREZ:** Well, we do our intakes -- they can range usually anywhere from half an hour to an hour.

It kind of depends on the veteran and what time they get there and what materials they've already answered for us. But usually at the intake, our goal really is to kind of gather information that will help us identify what are the most significant symptoms that bring them there that day, and what are the strengths and the limitations they have in treatment, so we can identify a treatment strategy.

**SEN. MURRAY:** So it's a very complex process.

**DR. PEREZ:** It is very complex, yes.

**SEN. MURRAY:** Do you think -- you're out on the ground, do you think that the VA has enough staff to properly evaluate the veterans you're seeing with mental health care issues?

**DR. PEREZ:** Well, I know there in my clinic, we did have an opening that was there. So I think that they are, from what I see, intensely, actively recruiting to try to get those positions filled, specifically in central Texas.

**SEN. MURRAY:** But you are -- right, okay, I understand they're trying to be filled, but do you think you have enough staff to evaluate everybody in the complex procedures that you just talked about a minute ago?

**DR. PEREZ:** Like I said, for those that we have there and the numbers that are coming in at this current time, we do have that staff. But at any given day, you really don't know who's -- the numbers that are going to walk through.

**SEN. MURRAY:** I think why we're all -- at least, I'm confused, is because the actual language of your e-mail is, "We really don't have time to do the extensive testing that should be done to determine PTSD."

**DR. PEREZ:** Right. If you were going to require -- in our clinic, we would accept anybody with even one single combat stress symptom. If we were to require a diagnosis of PTSD in order to admit them into treatment, then when you're going to want to get that answer initially, right off the bat, then you really should, because you don't have the gift of time, and letting them go at their own pace, you have to kind of push the issue and give them more assessments and kind of push them to share their story, maybe before they're ready.

**DR. KUSSMAN:** Could I just add a comment, Senator? Is that okay?

**SEN. MURRAY:** Yeah.

**DR. KUSSMAN:** I think that what Dr. Perez was also talking about is they have a clinic that has no wait times. People can walk in.

**SEN. MURRAY:** I understand --

**DR. KUSSMAN:** No, but let me -- if I could just finish, please.

And so most people who are involved in the treatment of PTSD acknowledge that the best way to evaluate and treat is developing a relationship with a provider over time as this evolves.

30

**SEN. MURRAY:** And my question is, do you have enough staff to do that? Because your e-mail implies that we don't have that enough time to do that kind of extensive testing. I'm asking you because it's our responsibility to make sure we have enough people out there that have the time, that time should not be the factor that stops people from being treated. So your e-mail says we don't have enough time to evaluate everybody. Does that mean you do not have enough people to do that evaluation, or you don't have a --

**DR. PEREZ:** That was more at the initial one hour -- half hour to one hour intake that -- they weren't scheduled for that amount of time in the initial intake.

If we were going to require that, then we would have to have scheduled probably a three-hour window for an intake.

**SEN. MURRAY:** Right. Okay. Well, let me ask Dr. Katz and Dr. Perez a question. In the e-mail that we have, Dr. Perez, you suggest that they consider a diagnosis of adjustment disorder, rule out PTSD. That was meant, I understand, to suggest that the initial diagnosis would be adjustment disorder while the clinician took the time to determine if a diagnosis of PTSD was warranted.

Now here's my question. It's my understanding that the guidelines -- the adjustment disorder guidelines indicate that an adjustment disorder diagnosis should be limited to a period of six months after the event or stressor. Now, I suspect that most of our VA facilities don't see very many veterans within the six months of their having actually had that stressor in -- or left a war zone. So is adjustment disorder the correct diagnosis to give to a veteran who presents with serious behavior or emotional symptoms?

**DR. PEREZ:** Well, we actually are getting quite a few veterans that are -- actually, they haven't even completely discharged from DOD. So we do get some active-duty as their -- as part of the outprocessing, they will sometimes come see this when they're still actually active-duty.

Also, we were doing redeployment counseling because we did have quite a few veterans who were --

**SEN. MURRAY:** Well, in your e-mail you suggest a diagnosis of -- that is -- suggests that it's an adjustment disorder. But from what I am looking at, that should be done within six months. So

it's curious to me that you would suggest that diagnosis when it's obvious that you're out time that -- outside the six-month time frame.

**DR. PEREZ:** Well, that's why it is just a suggestion, because each clinician needs to really look at the criteria of what the veteran is presenting, with what symptoms are they presenting it -- presenting with, and do an assessment based on that, on whatever they're willing to --

**SEN. MURRAY:** Dr. Katz, is that concurrent with what you believe should be done in the field?

DR. IRA KATZ (M.D., deputy chief Patient Care Services officer for Mental Health, Department of Veterans Affairs): Thank you for asking.

About the adjustment disorder diagnosis, my read is actually close to yours, and I would disagree, respectfully, with my colleague about the diagnosis of an adjustment disorder a year after an event, relating it to the event. I would have concerns about it.

There are questions in general about whether diagnosis matters and making the specific diagnosis matters. And the answer is probably yes and no.

One thing that really does matter is making a diagnosis of PTSD versus something else -- PTSD versus depression, for example. The best treatment, behavioral and cognitive, for PTSD is trauma-focused, going back to the event. But if it's a depression, the best treatment is present-focused, dealing with current problem-solving and beliefs and thoughts. So diagnosis matters to help someone plan treatment like that.

In another sense, diagnosis doesn't really matter that much. There are a certain number of symptoms required for PTSD. Many people have sub-clinical PTSD or partial PTSD. And my read is that the best treatment for sub-clinical, sub-syndrome or partial PTSD is the same treatment as PTSD. So if someone doesn't quite make the diagnosis for PTSD, I would think if they're suffering they should get exposure- based treatments just like if they had PTSD.

**SEN. MURRAY:** Well, thank you for your honesty in that, which goes really to my real concern. And our responsibility is that this is a very difficult diagnosis. Our job is to make sure that

we do have enough people on the ground who are capable of doing
that in a timely fashion and that we don't have a VA or a system
anywhere, isolated or not, to say, "Don't make this diagnosis,
because we don't have the resources." It rather should be, "We
need the resources so we can make the proper diagnosis."

And I have a number of other questions, but I know my time is
up. So Mr. Chairman, I will wait for the second round. Thank
you.

**SEN. AKAKA:** Thank you, Senator Murray.

Senator Sanders.

**SEN. SANDERS:** Thank you, Mr. Chairman.

Let me begin with Dr. Katz. Dr. Katz, I am looking at the e-mail
that you exchanged with -- (inaudible word) -- Chaffin (sp). And
in it you respond to Mr. Chaffin (sp) and you say, "Shh! Our
suicide prevention coordinators are identifying about 1,000
suicide attempts per month among the veterans we see in our
medical facilities. Is this something we should carefully
address ourselves in some sort of release before someone
stumbles on it?"

Also, this committee found out from media investigations that
the VA is seeing a thousand suicide attempts per month and the
Army just reported that at least 115 soldiers killed themselves
in 2007. Is this an epidemic? A thousand suicide -- attempted --
suicide attempts, that sounds just to be a very large number.

**DR. KATZ:** The "is it an epidemic" question comes up again and
again. Is a thousand a month too many? Of course it's too many.
Are there too many suicides among veterans? Of course there are
too many suicides among veterans. And we --

**SEN. SANDERS:** That wasn't my question. One suicide attempt -- no
matter any place -- is one too many. But 1,000 a month? It
sounds like an extraordinary number. What is going on where
1,000 guys who were in the military, people who were trained --
tough guys -- are attempting suicide? Can you give me some --

**DR. KATZ:** Yeah. Could I comment on the "Shh!" e-mail first, for
just a minute? I was very excited when I learned of that
finding, and I wrote to a friend on the eighth floor, to Mr.
Chaffin (sp), "What should we do with this new knowledge?

Should we send it out to the field? Or should we use it to improve care first?"

I was writing to someone who gets about 400 e-mails a day. So I wanted to get his attention right away. And I was far too dramatic.

(Cross talk.)

**SEN. SANDERS:** I just want to know the numbers. Go back to this issue. Is it true that 1,000 soldiers a month are attempting suicide? Is that true?

**DR. KATZ:** Well, we still have to validate that number. We expect so.

We know from NIH data that the ratio, of suicide attempts to deaths from suicide, is between --

(Cross talk.)

**SEN. SANDERS:** I'm just asking one simple question, all right? To a layperson, the fact that you have 1,000 active-duty soldiers, 1,000 soldiers --

**DR. KATZ:** 1,000 veterans.

**SEN. SANDERS:** -- 1,000 veterans, I'm sorry, a month, that sounds like a very high number. Is that not the case?

**DR. KATZ:** It's 1,000 attempts. We don't yet know how many multiple attempts there are. It's within the expected range but it's too much.

**SEN. SANDERS:** Okay. What about --

**DR. KATZ:** It does suggest something though, if I may. We know that the group at highest risk for suicide are those who have previously attempted suicide. So this knowledge is an important window into prevention.

**SEN. SANDERS:** What about 115 soldiers, 115 soldiers having killed themselves in 2007, within the Army?

**DR. KATZ:** I've read that in the paper and in the Pentagon report, just as you have. That's very separate from the VA.

**DR. KUSSMAN:** Sir, if I could just add to that.

**SEN. SANDERS:** Yes.

**DR. KUSSMAN:** Okay, sorry. Thank you. The -- obviously aware and, as Dr. Katz just mentioned, that's the Department of Defense, not us.

But as far as my understanding of that number, even though it's gone up, if you look at an age-adjusted population of the group that are in the uniform, that commit suicide, it's a lower rate than it is the civilian community for an age-adjusted population.

That's not to say that it's not going up. But suicide is a great problem in our society, particularly in young people, who tend to be somewhat impulsive.

So I think that the military is well aware of that, and so are we. And the question is, why do they do it? And we're looking at research and everything to try to determine what ideologies would lend somebody to be more susceptible to suicide than others.

**SEN. SANDERS:** 115 soldiers in the Army in 2007 killed themselves. Do you -- again to a layman, this seems like a very high number. Is that not, in your judgment, a very high number?

**DR. KUSSMAN:** I'm saying it's much higher than you would like to see.

(Cross talk.)

**SEN. SANDERS:** Well, that goes without saying.

**DR. KUSSMAN:** Right.

But if you put it in perspective, and I'm not trying to minimize it in any way, shape or form. But it's my understanding that if you look at the same age group, of people who never put on a uniform, the amount of suicide per 100,000 is higher.

**SEN. SANDERS:** If I could ask Mr. Dunne a question, Mr. Dunne, the AP recently reported on VA documents it had obtained, that said that the government expects to be spending $59 billion a year to compensate injured servicemembers over the next 25

years, up from today's 29 billion. The AP story noted that some
at the VA believe that these are conservative estimates.

Overall there are some people who think that the end result of
this war might be as high as some $3 trillion. And one of the
reasons is that there will be a huge amount of money spent, over
the lifetime of soldiers who served, dealing with their wounds,
mental and physical.

Do you concur? What is your estimate in terms of how much we'll
be spending per year to compensate injured service members?

**ADM. DUNNE:** Senator, I don't have numbers with me with that
calculation. I can make a projection and get back to you
afterwards.

**SEN. SANDERS:** Well, I would appreciate it. If the number is what
the AP is talking about, $59 billion a year, I mean, that is for
the next 29 years -- next 25 years, that's just an extraordinary
sum of money, and I would like to know if that is accurate. And
it gets to the issue of what the cost of war is. When we go to
war, it's not just the guns and the tanks of today, it's the
cost for years into the future.

Lastly, if I could, Mr. Dunne, as I understand it, there are
some 400,000 outstanding claims for our veterans. I know that
this committee and the Congress has put a lot more money into
the VA in recent years, not only for health care but to
accelerate the processing of these claims. Are we making any
progress?

**ADM. DUNNE:** Senator, I think we're making progress. We're not
happy with where we are right now and we're striving to do
better. As of the first of this month, we had an inventory of
390,034 claims which we were still working on. We have made
progress on our hiring initiative. We've hired, since January of
2007, 2,650, approximately, of the 3,100 that we intend to hire
by the end of this fiscal year. They take about two years to
become journeyman status so they are most effective handling
claims, but probably within the first year that they are on
board and complete their training, they can begin to have an
impact.

We think that we're starting to see an impact on that, but we're
continuing to look at other initiatives, such as a paperless
environment. This week we've just instituted electronic

signatures for original applications for claims and education and VR&E.

**SEN. SANDERS:** Well, this is an issue that interests me very much. I look forward to talking with you more in the future.

Thank you very much, Mr.Chairman.

**SEN. AKAKA:** Thank you very much, Senator Sanders.

Senator Tester.

**SEN. TESTER:** Thank you, Mr. Chairman.

I want to thank you all for your service. I appreciate your testimony today.

I want to echo the chairman's remarks. This e-mail isn't why I'm here exclusively. You hear a lot of things on the ground that are going on from veterans, and I think this e-mail contributes to that because it reaffirms what you hear on the ground.

I'm going to bring up two cases that reflects back to what you said earlier. This has nothing to do with mental health; it has to do with a clinic that's to be built in Billings, where Secretary Peake and myself thought it was to be done and the people down below had a different idea, and we found out in the paper that it wasn't going to be built until 2009. And that's what I'm talking about. That's what I'm talking about being laid back, we'll get to it when we get to it. That's unacceptable.

The other thing that's unacceptable is when I was also told by a service -- by a veteran that when he talks to me, he was threatened with his disability being reduced. That's unacceptable.

And I got into some -- a bit of trouble through the papers because I said the person who did that, and I didn't know who it was, should be fired on the spot. But that's the way it goes. Senator Murray talks about getting through the door -- getting through door with proper diagnosis.

I have some questions for you, Dr. Perez. How long -- you were at the central Texas PTSD clinic. How long have you been in that position?

**DR. PEREZ:** Since June 10th of 2007.

**SEN. TESTER:** June 10th, 2007. So you're coming on a year?

**DR. PEREZ:** Yes, sir.

**SEN. TESTER:** All right. Have you seen that the PTSD diagnosis has gone up over your tenure there, or is pretty static?

**DR. PEREZ:** It's pretty static.

**SEN. TESTER:** Okay. The diagnosis between adjustment disorder and PTSD, are there different factors involved in that diagnosis?

**DR. PEREZ:** Yes. For PTSD --

**SEN. TESTER:** And they're clear?

**DR. PEREZ:** They're clear.

**SEN. TESTER:** Okay.

Can you tell me -- folks that come in with -- that are diagnosed with adjustment disorder, do they stay at that level, or are they -- is there a percentage that are moved up to PTSD later on or once they're diagnosed with adjustment disorder, they're there for a while? What's the process?

**DR. PEREZ:** No, no. Immediately, they're entered into -- a treatment plan is developed, and they're entered into treatment. And as their provider works for -- works with them, again, at their own pace of disclosure, then that is adjusted by the provider that's working with them.

**SEN. TESTER:** Adjusted to PTSD diagnosis?

**DR. PEREZ:** It depends on whatever their symptoms are.

**SEN. TESTER:** Can you tell me what percentage of veterans that are diagnoses with adjustment disorder are moved to a PTSD category?

**DR. PEREZ:** I don't have that information.

**SEN. TESTER:** Can you get it for me?

**DR. PEREZ:** I can take that for the record. Yes, sir.

**SEN. TESTER:** That would be great.

Do you -- can you tell me what percentage of claims where you make the diagnosis for PTSD and you find out that that diagnosis was a mistake?

DR. PEREZ: I'm not sure I understand the question.

SEN. TESTER: A veteran comes in, a diagnosis is made that they have PTSD. You find out later or you don't think they have PTSD. What percentage of those that you diagnose with PTSD do you feel that the diagnosis was inadequate or the person did not have PTSD?

DR. PEREZ: There's actually been two cases where -- because we don't require any -- we don't require a DD-214, we don't require them to tell us, you know, everything at the initial, so there has been twice where I have been told that --

SEN. TESTER: Yeah. Out of how many cases?

DR. PEREZ: That, I don't know. I --

SEN. TESTER: A hundred?

DR. PEREZ: More than that.

SEN. TESTER: A thousand?

DR. PEREZ: More than -- well, probably close to 1,000.

SEN. TESTER: In your facility.

DR. PEREZ: I'm thinking, just from what I have seen, my own patients that I evaluate.

SEN. TESTER: Then the whole system?

DR. PEREZ: I have no idea of the whole system.

SEN. TESTER: Okay, okay. I want to go to your e-mail, because I think it's quite instructive. And you know what it says because you wrote it.

It says, "Given that we're having more and more compensation-seeking veterans, I'd like to suggest that you refrain from giving the diagnosis of PTSD straight out." So, what that implies to me is that the diagnoses for PTSD that were given,

for you to send something like that out, either they weren't
accurate as diagnoses or you want to deny benefits.

DR. PEREZ: Okay. In no --

SEN. TESTER: Tell me what it says if that doesn't say one of
those two things.

DR. PEREZ: Again, it was really to stress the accuracy of
diagnoses.

SEN. TESTER: But there's only two that have been diagnosed
wrong.

DR. PEREZ: Right. But that was in my personal experience with my
patients. That e-mail was triggered out of two other ones who
had become distressed and had verbalized that distress with a
psychiatrist. And so that e-mail was a result of trying to
remind everybody to be accurate in your diagnoses.

SEN. TESTER: But that's not what it says. It doesn't say you
need to be accurate in your PTSD diagnosis. It says refrain from
giving a diagnosis of PTSD.

DR. PEREZ: Well, again, that e-mail was written specifically to
my clinical staff there, and so they --

SEN. TESTER: There has to be a reason for this, though. What is
the reason that you would send this e-mail out? And I don't mean
to put you on the spot, but --

DR. PEREZ: No, no, I understand. But I mean it was a real
significant issue when you've got two veterans that are coming
to you very distressed, and it led to some --

SEN. TESTER: So what you're saying is those veterans were
diagnosed with adjustment disorder and they really had PTSD?

DR. PEREZ: Well, what I was told from the psychiatrist was that
they were not given a diagnosis -- they were given a diagnosis
of adjustment disorder when they had their compensation and
pension examination. At intake, a clinician gave them a
diagnosis of PTSD. They went for their psychiatric consult, and
that psychiatrist evaluated them and showed, okay, you do have
symptoms of combat stress, but you do not meet criteria for
that. At that time, in both instances, the veterans became very

distressed, and in a case they charged the psychiatrist, and so it became a safety issue.

**SEN. TESTER:** So what you're saying is that -- I'm trying to track you here. But what you're saying is they were diagnosed with PTSD, and then they came in and they backed off that diagnosis?

**DR. PEREZ:** No, no.

**SEN. TESTER:** So you're saying they were diagnosed with adjustment disorder and they went in and they were kept at adjustment disorder?

**DR. PEREZ:** No, no, no. They --

**SEN. TESTER:** Okay. So the only third option left is they came in with adjustment disorder and they were diagnosed with PTSD.

**DR. PEREZ:** Right. And then another team member, a psychiatrist when they went to go have an evaluation to see if they needed any kind of medication, then that second team member stated, "no, no, no, you don't have that. You don't meet criteria. But you do have combat trauma symptoms." It's not unusual for someone to come in and have a different rapport with a different provider, so they may share different information.

**SEN. TESTER:** Well --

**DR. KUSSMAN:** Could I --

**SEN. TESTER:** Go ahead.

**DR. KUSSMAN:** I don't want to belabor it. I apologize. But as Senator Murray mentioned, this is complex stuff sometimes with things. I think what we're doing here is that the individual may have been in the system before and may have submitted a claim for PTSD. That went through the process. And in occasion, they don't get the diagnosis. Most people do, by the statistics, but some don't.

**SEN. TESTER:** Yes.

**DR. KUSSMAN:** The person may then still have symptoms, no question, they're enrolled with us, and then they come to a treatment clinic that Dr. Perez is working in. It's got nothing to do with compensation. But they're still pretty upset that

they didn't, sometimes, get a diagnosis of PTSD when they went through the EDA (sp) process. And so they come in, and again, in the intake, on the cases that I think Dr. Perez is talking about, somebody said, "I think you have PTSD."

They were --

**SEN. TESTER:** What you're -- what you're saying is you've got two docs that have a different opinion of what's going on. Right?

**DR. KUSSMAN:** Right.

**SEN. TESTER:** Okay. I know this is complicated stuff. I know we're on grounds where we've got, what, 30 percent of the folks coming back, there's a claim that there's PTSD involved. I know that this is new ground. I know you're hiring, what, 38,000 new psychiatrists, psychologists -- 3,800. I know that -- I know you're doing this stuff.

But I can tell you what the veterans think because I just talked to a bunch of them last week. They think that they're giving this adjustment disorder diagnosis so that it takes away the government's liability in paying for anything that may be more than that. That's what the veterans think. That's what the people who put their lives on the line for this country think that the VA is doing to them. That's what they think. Perception is reality.

And what I have to say is just -- I'm not a doc. You guys are far more educated than I am, probably. You've got to have definite criteria for PTSD and you've got to have definite criteria for adjustment disorder so that, quite frankly, you can sit down and explain to the person why. That's what's really important.

The other thing is that -- I'm going to go back to the very first statement. Make sure the people below you are doing what you want them to do. That is critically important, because you can have the best intentions, and if the folks on the ground that are working with the vets aren't doing what needs to be done, you guys end up in front of a hearing in front of a VA committee in Washington, D.C.

**SEN. AKAKA:** Thank you very much, Senator Tester.

Dr. Perez, in your testimony, you make two points about the best way to provide a diagnosis for PTSD. One, that a differential

diagnosis is good medicine and two, that trust must be
established between -- before PTSD can be identified. And I
agree with both of these points.

I'm concerned, however, with how you appear to have made these
points in your e-mail to your colleagues, your suggestion to
them. When you were preparing your e-mail, did you believe that
the other clinicians on the PTSD treatment team, some of whom
have many years of experience with PTSD, whether -- they were
not aware of the treatment approach you set forth in your
testimony? For example, did they know about providing a
differential diagnosis, even one that Dr. Katz said was not --
was probably not the best one?

**DR. PEREZ:** Yes, they do know that. They are very familiar with
that, and very -- my thoughts are that they're probably very
accurate in that.

**SEN. AKAKA:** Dr. Katz, you said that adjustment disorder is
probably not a good suggested diagnosis. What are -- are you
going to ensure that your providers understand your position on
this?

**DR. KATZ:** Well, specifically after that 6 month or so period, as
Mary mentioned, I would have concerns about it.

I think the issue comes to how doctors say, I don't know or I
don't know yet. And I think this is the issue that Dr. Perez was
probably addressing. Sometimes after a half-hour or an hour or
an hour-and-a-half with a patient, you don't know enough to make
a diagnosis.

And we have to, I think, allow coding for that, in an
appropriate way, to be able to recognize, for us to still get
credit for the visit but not to commit ourselves prematurely to
the presence or absence of any diagnosis.

**SEN. AKAKA:** Dr. Kussman and Admiral Dunne, do you agree that
there may be confusion, for both veterans and clinicians, when a
particular clinician may act as both care provider and an
evaluator?

Does this suggest that C&P exams -- that's compensation &
pension -- should be conducted by non-VA physicians or, at a
minimum, that no VA physician who provides direct care should be
tasked to conduct the C&P exam?

**DR. KUSSMAN:** Okay. I win.

The -- first of all, Senator, Mr. Chairman, there are two ways that the exam is done, as you know, either through the VHA personnel or under contract with QTC. And the evaluation is very prescribed. There are templates and other guidance that have to be followed.

And we have set standards for that, saying that only psychiatrists and Ph.D. psychologists should do that, although the IOM did not put that level of prescription. But we wanted to be sure that that took place.

If you're asking specifically about the fact that, should a psychologist or psychiatrist who was taking care of somebody, in a clinical setting, be the one that does their comp & pen, I'd have to think about that.

But the fact that somebody is in a clinical setting and does comp & pen exam would not preclude them from doing it, because we have lots of people who maybe Monday and Wednesday, they're in the treatment clinic and maybe Tuesday afternoon, they're doing comp & pen exams.

So I don't think they're mutually exclusive. But if, you know, we want to separate, I think, the clinical treatment from the assessment of how much compensation each person gets so, I think, I would -- and again I don't know if anybody's done it on their own patients. But that would, I think, not be the best way.

Do you have any comments?

**SEN. AKAKA:** Admiral Dunne.

**ADM. DUNNE:** Senator, I would agree that, as people have said this morning, the process is very complex. And what I've learned over the past few months is a review of the template, that's used to conduct that examination, that is a very, very extensive and complex template.

I have confidence in that. I have confidence in the VA doctors, to execute that template and to provide us with a valid, medically correct evaluation of every veteran who comes to see them.

**SEN. AKAKA:** Thank you very much.

Senator Burr.

**SEN. BURR:** Thank you, Mr. Chairman.

Admiral Dunne, your testimony noted that there's been 150 percent increase in the number of veterans receiving disability compensation since 1999.

2004, the inspector general found that veterans' PTSD rating levels, and I quote, "typically increase over time, indicating the veterans' PTSD condition had worsened. Generally once a PTSD rating was assigned, it was increased over time, until the veteran was paid at the 100 percent rate."

Does your information square with the IG's findings, that veterans with PTSD get worse over time?

**ADM. DUNNE:** Senator, I don't have that information. But perhaps Mr. Mayes does.

**BRADLEY MAYES (Department of Veterans Affairs):** Yes, sir.

What we know is that or, I guess, what the IG found was that once veterans were service-connected for PTSD, that it was rare that service connection was stopped or that the evaluations were reduced.

So what we've done is, we've begun to look, look at PTSD. We're looking at evaluations across states. And we are evaluating that as part of our quality assurance program.

So we're taking a look at that. It was also one of the things that the Institute for Defense Analysis also recommended, is that you take a look at any possible variants and, you know, is there any underlying causes for that. So we're taking a look at it.

But that -- I can't -- other than that, I guess the question was, does it square with the IG report? That's what we found. That's what the IG found, and that's what --

**SEN. BURR:** Well, let me go to the clinician, if I can. The 2007 Institute of Medicine report found insufficient evidence to support the effectiveness of most PTSD treatment therapies, with the exception of exposure therapy.

If in fact we see this trend of increasing PTSD claims, a worsening of the disability over time, is that not a suggestion to us that we either need to implement in total exposure therapies, because it's the only one that has the evidence of success; or two, that we need to look out of -- outside of the therapies that we're currently using to try to find something to turn this trend around; or would this committee accept the fact that from a standpoint of mental health treatment, there is no cure, that we're managing a continual progress of getting sicker? Somebody help me with that.

**DR. KATZ:** I like to think about an analogy. And the medical advance that came out of World War II was penicillin. It was known that penicillin existed in a laboratory and could kill bacteria there beforehand, but it was during the war that it was translated into a drug that helps people.

There was information about exposure-based treatments before, but in the past year or year and a half, the VA has trained almost 1,200 people, existing staff members, to deliver cognitive processing therapy for PTSD. That's a huge number, enough to make a public health difference.

We have similar programs under way for prolonged exposure therapy. So we're very seriously working to disseminate these treatments. The --

**SEN. BURR:** And Dr. Katz, is the intent to try to cure, to try to delay any further disability?

**DR. KATZ:** Yeah, I want to respond to that and then talk about medications and research.

PTSD is probably like asthma. We want to treat events. We want to treat exacerbations and deal with symptoms. But once someone has had PTSD, I'm afraid they may be increasingly vulnerable throughout their lives to retraumatization or stress-induced traumatic reactions. So we hope the treatment does both, to deal with the even, to deal with the episode and to decrease the probability that another one would occur with retraumatization.

Going back to other forms of treatment, the Food and Drug Administration views certain antidepressants as safe and effective. So they differ in some ways with the Institute of Medicine. What this calls for is a need for more knowledge, a need for research. And VA has been and continues to be a real leader in research.

**SEN. BURR:** Dr. Kussman keeps us up to date on the progress.

**DR. KUSSMAN:** Yes, sir.

If I could add to it, I think that it's clear that you want to aggressively intervene early in the diagnosis, because it's -- sometimes, the long-term effects of PTSD are not really PTSD itself. It's the second or third level effects with people who will try to treat themselves with substances or get depressed and they frequently are the more severe things longitudinally rather than the PTSD itself. So it's why it's so important to try to get people in early, get them to feel comfortable, so you can prevent or attenuate some of those long-term issues.

What the IOM said, I think, sir, is that when they looked academically, critically at the literature that was available, what they said was the only treatment, the exposure treatment, was the only one that they could say felt unequivocally had effect on the basis of the research that was available. But they didn't say that other therapies like medication and psychotherapy and things were not effective. They just didn't think it was -- there was evidence to show it was as effective as the --

**SEN. BURR:** Yeah, key word, evidence. And let me just summarize by making a statement, and I think this might express why there are so many questions about this from this committee. Since the year 2001, the mental health budget at the Veterans Administration has doubled. Staffing has increased 73 percent over the last three years, and we're not at where we're targeting yet, but we've got an aggressive goal as to how we're going to get there.

Yet people are still asking for an explanation about why our veterans are getting worse versus better as it related to mental health services. I'm not going to take up my colleague's time asking for an answer. I'm not sure that there is an answer, but I think that's the focus of where we need to be. If all agree that the resources are there, that the plan to hire the people and to train the people, which was a very, very important part of the statements that you made, and that we understand to some degree, to quote Dr. Perez, to how we need to peel the onion back before we begin to realize the true problem or the depths of the problem.

At some point, I hope you will share with us what it is we should use to gauge success versus a continuing worsening of the

health of our veterans, an increase in their disability ratings, which is an indication to me that the therapies that we're using aren't working.

And my hope is that that will turn around.

I thank the chair.

**SEN. AKAKA:** Thank you very much, Senator Burr.

Senator Murray.

**SEN. MURRAY:** Thank you very much, Mr. Chairman. I would hope that the gauge of our success is that after a very complex, difficult war, 10, 15, 20 years from now we don't have men and women who served in that war who came home and who were not treated.

And you know, I guess really the bottom line here is we -- post-traumatic stress syndrome is not a new issue from just this war. It has been from every war. And in World War I, World War II, many of our veterans came home and suffered from mental health issues and may or may not have been treated. Certainly one that I know better, the Vietnam war, veterans came home and, because of a culture that wasn't ready to accept them, many of them never tried to get treatment, didn't get treatment. We didn't have the word "PTSD" in our vocabulary at the time. And as a result, decades later those men and women are suffering.

I think what we want is to make sure that in this conflict, that our generation is responsible for, that we don't have veterans 20 years from now who were not given treatment. Hence, Dr. Perez, our deep concern with an e-mail that indicates that because of cost, because of time, because of whatever reason, we're not going to give you a diagnosis. That's the genesis of the concern that many of us have.

It is difficult, but we need to make sure that any veteran seeks care and is not under the perception at any time that they won't get that care, that the VA or this country doesn't have the time for them or the resources to help them. And we have to make every effort to do that and every message from the VA coming out has to be to that; that if you are a veteran and you need care, this country will be there for you, period.

So Dr. Kussman and Secretary Dunne, I want to ask you. The chief of staff at Temple apologized to the veterans and to the

advocates about Dr. Perez's e-mail. Both Secretary Peake and Deputy Secretary Mansfield have repudiated the e-mail. And that was good, needed to be done. The message had to be clear.

I was sort of struck by both of your testimony today that it didn't appear to have any remorse, and I wondered if you could explain that, both of you.

**DR. KUSSMAN:** Senator, I think I said that any perception or (real ?) that we were not approaching the veterans in an appropriate way and gave any perception that we wouldn't make the diagnosis is something that I can't accept. There were some -- as we've discussed, some interpretation of what took place in the e-mail, and I think that we've adequately discussed this here. But I have just as much concern about what -- all the things that you have mentioned.

But I think a lot of it is communication, and we do need to be able to be sure that we are explaining what we are doing and things don't get taken out of context.

**ADM. DUNNE:** Senator, I would agree that the e-mail was poorly worded and it's an unfortunate incident, but it only makes me want to work harder to ensure that veterans understand that we're here for them, whether it be for PTSD compensation or for education or for loans, VR&E. Whatever it is, we're working hard to make sure that they know we're here and we want to hear from them when they need something.

**SEN. MURRAY:** Well, let me just say I'm confused about something. Deputy Secretary Mansfield said that Dr. Perez's suggestion should be disregarded -- that came from Secretary Mansfield -- and that the people working there have been instructed this is not what we're going to do. We're going to follow Secretary Peake's direction, which is to put out the full and accurate word and make sure that we stick with that.

Yet your testimony doesn't, in any way, backpedal from Dr. Perez's suggestion, even though Dr. Katz said that he would not agree with that. Dr. Kussman, Secretary Dunne, can you tell us -- inartfully worded is one thing -- can you tell us what the direction is from the VA in terms of the diagnosis on someone coming in, whether it should be, as was stated in the e-mail, that it should be considered a diagnosis of adjustment disorder or not?

**DR. KUSSMAN:** As we've discussed, I think on any given case, I don't make the diagnosis of adjustment disorder if you think that's inappropriate or that it should be PTSD and don't make any diagnosis that you think is inappropriate for anything other than the true clinical assessment of what you think. It should have nothing to do with time or money or anything else. It should just be an appropriate diagnosis, so if anybody is -- and as I said, I would agree with the secretary and deputy, we would repudiate any suggestion that somebody would make a diagnosis of adjustment disorder in lieu of PTSD if there was any suggestion that that's not an appropriate thing to do.

Now, you've mentioned, Dr. Katz has mentioned that after six months or whatever -- and I think that that's something that has to be determined on a clinical basis -- but it --

**SEN. MURRAY:** Well, would you agree that most vets don't come in and see you within six months of when they were in the field and --

**DR. KUSSMAN:** Most don't. Some do. And it depends on the timing. So if it's beyond the six months, I think that maybe something else -- be it combat stress rule-out PTSD -- I don't know what the appropriate thing is, but the message is, I think, that just like any other diagnosis, is be careful when you make the diagnosis. Do a thorough assessment of people --

**SEN. MURRAY:** Do you agree with Deputy Secretary Mansfield that said Dr. Perez's suggestion should be disregarded?

**DR. KUSSMAN:** If you -- again, did not have the opportunity to discuss exactly what was going on, I would agree that it should be disregarded if it was intended in any way to be that you shouldn't make the diagnosis.

**SEN. MURRAY:** Admiral Dunne?

**ADM. DUNNE:** Senator, I have no disagreement with the deputy secretary. And as I mentioned before, the templates that are used for a claims evaluation examination are very specific. They're very detailed. They would require the doctor to answer a number of questions, many of them to respond to the DSM-IV criteria so that the rating representative could make a valid understanding and evaluation of the disability.

If that template is not filled out correctly or completely, the rating representative is trained to reject that and return it

until it is sufficient medical evidence, so that all the
questions are answered, all the information is available.

**SEN. MURRAY:** Secretary Dunne, I appreciate the complexity of the
answer that you just gave. But to a country that is listening to
a VA, to a soldier that has come home from a very challenging
war, can you please give us, in plain English, what you would
say to someone who is seeking help from a very difficult
diagnosis of mental health?

PAGE 69 06/04/2002 .STX e from a very challenging war, can you
please give us, in plain English, what you would say to someone
who is seeking help from a very difficult diagnosis of mental
health?

PAGE 69 SEN-VET-AFFAIRS-PTSD

**ADM. DUNNE:** Yes, Se 06/04/2002 .STX nator. I would say that if
they were aware and had read about that e-mail, that it did not
reflect the guidance of VA and that they should feel confident
and come see us both for treatment and compensation.

**SEN. MURRAY:** Thank you very much.

Thank you, Mr. Chairman.

**SEN. AKAKA:** Thank you very much, Senator Murray.

Senator Tester.

**SEN. TESTER:** Yeah, thank you, Mr. Chairman.

Dr. Kussman, it was either in your opening remarks or the
questions you'd mentioned stigma surrounding mental health
issues. And it's a point that I appreciate, and it's a good one.
And I appreciate your interest to address it from a societal
standpoint.

It has been a difficult problem in Montana, the perception
issue, the -- around mental illness. But the Guard -- the
National Guard has done a .ETX

x x x disability. If that template is not filled out correctly or completely, the rating representative is trained to reject that and return it until it is sufficient medical evidence, so that all the questions are answered, all the information is available.

**SEN. MURRAY:** Secretary Dunne, I appreciate the complexity of the answer that you just gave. But to a country that is listening to a VA, to a soldier that has come hoP great job in Montana, and I don't anticipate that you've been in contact with them.

And so let me ask this question as kind of a comment. And that is, are you coordinating VA's efforts with the state Guard units around the nation?

**DR. KUSSMAN:** Yes, sir. I haven't personally spoken to anybody in Montana.

**SEN. TESTER:** Right.

**DR. KUSSMAN:** We have an Office of Seamless Transition and DOD-VA coordination. And there are individuals who do nothing else but work in Guard and Reserve issues.

**SEN. TESTER:** Good.

**DR. KUSSMAN:** And we've tried to learn from some of the states that have done a good job --

**SEN. TESTER:** Good.

**DR. KUSSMAN:** -- and try to encourage states that maybe are not as engaged as others to do things.

But you know, my sense is that since this war has been different than any war we've had since World War II, with the use of National Guard and Reserve --

**SEN. TESTER:** Correct.

**DR. KUSSMAN:** -- this has presented us with challenges that we haven't dealt with for 60 years.

**SEN. TESTER:** Yeah.

**DR. KUSSMAN:** And I can just tell you that we're committed to doing everything we can to do that.

**SEN. TESTER:** And I appreciate that.

Going to Senator Murray's question, I think, Dr. Kussman, what I heard you say was spot-on, and that is, if somebody comes in, diagnose him properly. Don't diagnose him on additional workload or anything like that. And I just want to say that, because I appreciate that, because what .ETX

x x x disability. If that template is not filled out correctly
or completely, the rating representative is trained to reject
that and return it until it is sufficient medical evidence, so
that all the questions are answered, all the information is
available.

**SEN. MURRAY:** Secretary Dunne, I appreciate the complexity of the
answer that you just gave. But to a country that is listening to
a VA, to a soldier that has come hoP Admiral Dunne said in a
previous question, that the template for PTSD was solid --
that's good to know. Hopefully the template for adjustment
disorder is solid, or whatever disorder they may have, either
below or above what a PTSD diagnosis would be.

I appreciate Dr. Katz's point about proper treatment depends
upon proper diagnosis, dealing with past events or current
events.

And this question is for both Dr. Kussman and both -- Patrick
Dunne, because you both had a part in why I'm asking this
question. Admiral Dunne had said reasonable doubt goes to the
veteran. And in my previous round of questions, Dr. Kussman said
there was a difference of opinion that really causes this
problem.

One guy diagnoses it. One guy comes in and says -- or gal --
says, no, this isn't correct and there becomes a difference of
opinion. So if the tie goes to the runner, the tie goes to the
veteran -- what doesn't the tie go to the veteran? Why is this
even an issue?

**DR. KUSSMAN:** Yeah, no. First of all, it's rare that that
actually happens because most people will comes to a consensus
of what the individual has. I agree wholeheartedly in the using
the baseball analogy, the tie goes to the runner. Our job is to
provide services -- the full gamut of health care benefits and
not try to find ways of not doing it. And so whenever it's an
appropriate clinical thing, we should err on the side of the
veteran unequivocally.

**SEN. TESTER:** Okay. I think we'll continue, Dr. Katz -- Admiral
Dunne first, and then continue.

**ADM. DUNNE:** Senator, I would agree in that we do the same thing
within our process. Once we get a medical evaluation in and then

have to take it in to the rating table and decide on a percentage disability when the information in the medical exam would cause the ratings specialist to have a concern as to whether it's one disability percentage or another, then it would -- the higher disability would be assigned.

**SEN. TESTER:** So the rating happens after the diagnosis and not before?

**ADM. DUNNE:** Yes, sir. Correct.

**SEN. TESTER:** That's good to know.

Dr. Katz?

**DR. KATZ:** When we're talking about treatment, rather than compensation, the whole issue of the tie going to one side or other doesn't count. The patient needs the most accurate diagnosis to allow the most precise and predictive treatment planning. Sometimes you don't get it right the first time. Someone may be treated for what looks like depression, and during the course of treatment for depression, symptoms of PTSD may emerge and we should then change the treatment.

**SEN. TESTER:** Right. That's why that template that Admiral Dunne talked about is so critical important. If that template is as good as we think it is, it will help your treatment be solid from the get go. Now, I'm not saying mistakes can't be made and there aren't things that -- (audio break). Ultimately, in the end, what we need is, we need diagnosis of a proper problem when that problem exists and not putting folks out. Thank you, Mr. Chairman.

Thank you folks, too.

**SEN. AKAKA:** Thank you very much, Senator Tester. Do you have any more questions?

**SEN. TESTER:** I have more questions that I'll submit to the record.

**SEN. AKAKA:** And in closing, I again thank all of our witnesses for appearing before the committee today. We really appreciate hearing your views on these important issues. Your testimony today will hopefully ensure that we will be able to better serve those who are suffering from -- with invisible wounds.

While it is apparent that VA is trying to do all that it can to help, there is still much room for improvement. Issues of veteran suicide and PTSD are topics that cannot be taken lightly.

We all must be careful about what we say and, of course, how we say it. Now, you are all representatives of VA, both to veterans and to the public as a whole. And when it is discovered that e-mails such as these have been written, it reflects not just on an individual but on the department as a whole.

VA, without question, has a very, very important mission. When charged with such a heavy mission, it is imperative that VA remain the best health care system in the nation for veterans. We must not lose focus on that and that mission. VA is here to serve those who served us.

I look forward to continuing to work with you to improve services and care for veterans and their families.

This hearing is now adjourned.

END.