United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| VETERANS FOR COMMON SENSE and VETERANS UNITED FOR TRUTH, INC., | ) ) ) ) | No. C-07-3758 SC |
| Plaintiffs, | ) ) ) | MEMORANDUM OF |
| v. | ) ) ) | DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| JAMES B. PEAKE, Secretary of Veterans Affairs, UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; JAMES P. TERRY, Chairman, Board of Veterans Appeals; DANIEL L. COOPER, Under Secretary, Veterans Benefits Administration; BRADLEY G. MAYES, Director, Compensation and Pension Service; DR. MICHAEL J. KUSSMAN, Under Secretary, Veterans Health Administration; PRITZ K. NAVARA, Veterans Service Center Manager, Oakland Regional Office, Department of Veterans Affairs, UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

I.    **INTRODUCTION**

     As a preliminary summary to this decision, the Court

concludes: In reviewing each of the items of relief requested by

Plaintiffs, the grievances of Plaintiffs are misdirected.  The

remedies to the problems, deficiencies, delays and inadequacies

complained of are not within the jurisdiction of this Court.
Rather, this authority lies with Congress, the Secretary of the
Department of Veterans Affairs ("VA"), the adjudication system
within the VA, and the Federal Circuit.  Congress has bestowed
district courts with limited jurisdiction.  Congress has
specifically precluded district courts from reviewing veterans'
benefits decisions and has entrusted decisions regarding veterans'
medical care to the discretion of the VA Secretary.  The Court can
find no systemic violations system-wide that would compel district
court intervention.  The broad injunctive relief that Plaintiffs
request is outside the scope of this Court's jurisdiction.  The
statutes and caselaw are quite clear as to the extent of this
Court's authority.  Among them is 38 U.S.C. § 511, which states in
part: "The Secretary shall decide all questions of law and fact
necessary to a decision by the Secretary under a law that affects
the provision of benefits by the Secretary to Veterans or the
dependents or survivors of veterans . . . .  [T]he decision of the
Secretary as to any such question shall be final and conclusive
and may not be reviewed by any other official or by any court . .
. ."

In addition, 38 U.S.C. § 1710(a)(1) provides that the medical
care veterans receive is to be determined by the Secretary, and
under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et
seq., judicial review is prohibited where actions are "committed
to agency discretion by law." 5 U.S.C. § 701(a)(2).  For the
foregoing and following reasons, Plaintiffs' requested relief is
DENIED.  The Court now proceeds with its finding of facts and

United States District Court
For the Northern District of California

1   conclusions of law.

2

3   **II.  BACKGROUND**

4        Veterans for Common Sense and Veterans for Truth

5   ("Plaintiffs") are non-profit organizations devoted to improving

6   the lives of veterans.  Plaintiffs filed the present lawsuit in

7   July 2007, seeking declaratory and injunctive relief against the

8   VA, alleging that the manner in which the VA provides mental

9   health care and the procedures for obtaining veteran disability

10  benefits violate various statutory and constitutional rights.

11  Plaintiffs' Complaint seeks declaratory relief for the following:

12  (1) denial of due process in violation of the Fifth Amendment; (2)

13  denial of access to the courts in violation of the First and Fifth

14  Amendments; (3) violation of 38 U.S.C. § 1710(e)(1)(D) relating to

15  medical care for returning veterans; and (4) violation of Section

16  504 of the Rehabilitation Act.  Compl., Docket No. 1, ¶¶ 258-72.

17  In addition, Plaintiffs' fifth cause of action seeks injunctive

18  relief.  Id. ¶¶ 273-78.

19       On January 10, 2008, this Court issued an Order Granting in

20  Part and Denying in Part Defendants' Motion to Dismiss ("Motion to

21  Dismiss Order").  Docket No. 93.  In that Order, the Court held

22  that Plaintiffs' first, second, and third claims survived

23  Defendants' various challenges, including standing, sovereign

24  immunity, and subject matter jurisdiction.  The Court dismissed

25  Plaintiffs' fourth claim.

26       After Defendants submitted their Motion to Dismiss,

27  Plaintiffs filed a Motion for Preliminary Injunction.  Docket No.

28                                  -3-

*United States District Court*
For the Northern District of California

88.    The Court scheduled a hearing on this motion and from March 3 through March 6, the Court heard testimony and received evidence. At the close of the hearing, in light of the issues raised by Plaintiffs and the importance of addressing Plaintiffs' allegations promptly, the Court continued the matter and set an expedited schedule for discovery and for consideration of Plaintiffs' Request for Permanent Injunction and Declaratory Relief.  A bench trial was then held from April 21 through April 30, 2008.

     After hearing testimony and argument during almost three weeks of trial and reviewing the parties' voluminous submissions, two things have become clear to the Court: the VA may not be meeting all of the needs of the nation's veterans, and the remedies proposed by Plaintiffs are beyond the power of this Court.


**III.  LEGAL FRAMEWORK**

     **A.    Standing**

          An association has standing to bring suit
          on behalf of its members when its members
          would otherwise have standing to sue in
          their own right, the interests at stake
          are germane to the organization's
          purpose, and neither the claim asserted
          nor the relief requested requires the
          participation of individual members in
          the lawsuit.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000).

     For Plaintiffs' members to have standing to sue in their own right, they must satisfy three elements.  Lujan v. Defenders of

-4-

1 | _Wildlife_, 504 U.S. 555, 560-61 (1992).

> First, the plaintiff must have suffered
> an injury in fact - an invasion of a
> legally protected interest which is (a)
> concrete and particularized . . . and (b)
> actual or imminent, not conjectural or
> hypothetical . . . .  Second, there must
> be a causal connection between the injury
> and the conduct complained of - the
> injury has to be fairly traceable to the
> challenged action of the defendant, and
> not the result of the independent action
> of some third party not before the court.
> . . .  Third, it must be likely, as
> opposed to merely speculative, that the
> injury will be redressed by a favorable
> decision.

_Id._ (internal quotation marks, citations, and alterations omitted).  "Since [these elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  _Id._ at 561.  Thus, at the final stage of the proceedings, any disputed facts "must be supported adequately by the evidence adduced at trial."  _Id._ at 561 (internal quotation marks omitted).

**B.    Sovereign Immunity**

"The United States must waive its sovereign immunity before a federal court may adjudicate a claim brought against a federal agency."  _Rattlesnake Coalition v. U. S. Envtl. Prot. Agency_, 509 F.3d 1095, 1103 (9th Cir. 2007) (citing _United States v. Mitchell_, 445 U.S. 535, 538 (1980)).  As discussed in the Conclusions of Law, various of Plaintiffs' challenges fail because of the lack of

-5-

a valid waiver of sovereign immunity.  The Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides such a waiver

in certain circumstances and "permits a citizen suit against an

agency when an individual has suffered 'a legal wrong because of

agency action' or has been 'adversely affected or aggrieved by

agency action within the meaning of a relevant statute.'"  Id.

(quoting 5 U.S.C. § 702).  "This provision contains two separate

requirements."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882

(1990).  "First, the person claiming a right to sue must identify

some 'agency action' that affects him in the specified fashion . .

. ."  Id.  Second, "the party seeking review under § 702 must show

that he has suffered legal wrong because of the challenged agency

action or is adversely affected or aggrieved by that action within

the meaning of the relevant statute."  Id. at 883 (internal

quotation marks omitted).

### 1.  Agency Action

"Agency action" is "the whole or a part of an agency rule,

order, license, sanction, relief, or the equivalent or denial

thereof, or failure to act . . . ."  5 U.S.C. § 551(13).  The APA

defines "agency rule" as "the whole or a part of an agency

statement of general or particular applicability and future effect

designed to implement, interpret, or prescribe law or policy . . .

."  Id. § 551(4).

As an initial matter, Plaintiffs argue that their

constitutional claims are not limited by the requirement that they

challenge an agency action.  In support of their argument, they

rely on Presbyterian Church v. United States, 870 F.2d 518 (9th

-6-

United States District Court
For the Northern District of California

Cir. 1989).  In analyzing whether there was valid waiver of sovereign immunity, the court in <u>Presbyterian Church</u> held that "§ 702's waiver of sovereign immunity is not limited to suits challenging 'agency action.'"  <u>Id.</u> at 525 n.8.

Although <u>Presbyterian Church</u> has not been overruled, its vitality has been called into question.  As this Court noted in its Motion to Dismiss Order, in <u>Gallo Cattle Co. v. Department of Agriculture</u>, 159 F.3d 1194 (9th Cir. 1998), the Ninth Circuit held that "the APA prescribes standards for judicial review of an agency action . . . ."  <u>Id.</u> at 1198.  The tension between <u>Presbyterian Church</u> and <u>Gallo Cattle</u> was recognized in <u>Gros Ventre Tribe v. United States</u>, 469 F.3d 801 (9th Cir. 2006), where the court stated:

> Under <u>The Presbyterian Church</u>, § 702's waiver is not conditioned on the APA's "agency action" requirement.  Therefore, it follows that § 702's waiver cannot then be conditioned on the APA's "final agency action" requirement. . . .  But that is directly contrary to the holding in <u>Gallo Cattle</u> where we stated that "the APA's waiver of sovereign immunity contains several limitations," including § 704's final agency action requirement.

<u>Id.</u> at 809 (citing <u>Gallo Cattle</u>, 159 F.3d at 1198).  Although the court in <u>Gros Ventre</u> declined to resolve the conflict between the two cases, it did note that it "saw no way to distinguish <u>Presbyterian Church</u> from <u>Gallo Cattle</u>."  <u>Id.</u> at 809.  Plaintiffs urge that the court in <u>Gros Ventre</u> "may have been mistaken in suggesting that [these two cases] are not distinguishable."  Pls.' Post-Trial Br., Docket No. 229, at 6.  Plaintiffs argue that because <u>Presbyterian Church</u> dealt with constitutional violations,

United States District Court
For the Northern District of California

1  while <u>Gallo Cattle</u> addressed statutory violations, it should be
2  inferred that constitutional claims are not constrained by the
3  requirement that a plaintiff, for a valid waiver of sovereign
4  immunity under the APA, challenge an agency action.

5       Plaintiffs' argument fails for several reasons.  First and
6  foremost, the Ninth Circuit found this distinction unremarkable
7  and held that the cases were not distinguishable.  <u>Gros Ventre</u>,
8  469 F.3d at 809.  This Court is constrained by that holding.
9  Second, the court in <u>Presbyterian Church</u> did not rely on the fact
10 that the claims before it were constitutional, rather than
11 statutory.  <u>See</u> <u>Presbyterian Church</u>, 870 F.2d at 524-26.  If such
12 a distinction were meaningful, as Plaintiffs suggest, then the
13 court would have so noted.  Instead, in reaching its conclusion
14 about the limits of § 702's waiver, the court relied on the
15 legislative history and on the plain language of the statute
16 itself.  <u>Id.</u>

17      Third, subsequent to <u>Presbyterian Church</u>, the Supreme Court
18 decided <u>National Wildlife Federation</u>.  In <u>National Wildlife</u>
19 <u>Federation</u>, the Court made clear that waiver of sovereign immunity
20 under § 702 is constrained by the provisions contained in § 704.
21 The Court stated: "[T]he person claiming a right to sue [under §
22 702] must identify some 'agency action' that affects him in the
23 specified fashion . . . ."  497 U.S. at 882.  The Ninth Circuit,
24 more recently, reiterated this proposition, holding that when a
25 suit is brought against an agency pursuant to a waiver of
26 sovereign immunity under the APA, the suit must challenge agency
27 action.  <u>Rattlesnake Coalition</u>, 509 F.3d at 1103. Finally, the

28
                                    -8-

United States District Court

For the Northern District of California

1   Court notes that it has already ruled on this issue, stating, in

2   its Motion to Dismiss Order, that "waiver of sovereign immunity

3   under § 702 of the APA is limited by § 704."  Mot. to Dismiss

4   Order at 10.  Nonetheless, as Plaintiffs raised a new argument in

5   their Post-Trial Brief, the above discussion was warranted.  For

6   these reasons, Plaintiffs must challenge an "agency action" to

7   establish a valid waiver of sovereign immunity.

8       In addition, when a claim is brought pursuant to the general

9   review provisions of the APA, rather than under a private right of

10  action or authorization for judicial review under a substantive

11  statute, "the 'agency action' in question must be 'final agency

12  action.'"  Nat'l Wildlife Fed'n, 497 U.S. at 882 (quoting 5 U.S.C.

13  § 704[1]); see also Rattlesnake Coalition, 509 F.3d at 1103; Ecology

14  Ctr. v. U. S. Forest Serv., 192 F.3d 922, 925 (9th Cir. 1999).

15  Neither party argues that the agency action in question is made

16  reviewable by any statute.  Accordingly, the additional

17  limitations of § 704 also apply to the present case, and

18  Plaintiffs must show that the agency action they challenge is not

19  only "final agency action" but also that there is no adequate

20  alternative remedy.  5 U.S.C. § 704; Nat'l Wildlife Fed'n, 497

21  U.S. at 882; Gallo Cattle, 159 F.3d at 1198.

22      Finally, the APA provides that a "reviewing court shall

23  compel agency action unlawfully withheld or unreasonably delayed."

24  5 U.S.C. § 706(1).  "[A] claim under § 706(1) can proceed only

25  _____

26      [1]  Section 704 states, in part, that only "[a]gency action
    made reviewable by statute and final agency action for which there
27  is no other adequate remedy in a court, are subject to judicial
    review."

28                                      -9-

**United States District Court**
For the Northern District of California

where a plaintiff asserts that an agency failed to take a <u>discrete</u> agency action that it is <u>required to take</u>." <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 64 (2004) (emphasis in original).  "Review of an agency's failure to act has been referred to as an exception to the final agency action requirement." <u>Ctr. for Biological Diversity v. Abraham</u>, 218 F. Supp. 2d 1143, 1157 (N.D. Cal. 2002).  "Courts have permitted jurisdiction under the limited exception to the finality doctrine only when there has been a genuine failure to act." <u>Ecology Ctr.</u>, 192 F.3d at 926.  The Ninth Circuit "has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action dressed up as an agency's failure to act." <u>Id.</u> (internal quotation marks omitted).

### a.   Final Agency Action

An agency action is "final" under the APA where two conditions are met: (1) the action "mark[s] the consummation of the agency's decisionmaking process . . . --it must not be of a merely tentative or interlocutory nature," and (2) the action is one "by which rights or obligations have been determined, or from which legal consequences will flow." <u>Bennet v. Spear</u>, 520 U.S. 154, 178 (1997) (internal citations and quotation marks omitted).

### b.   Adequate Alternative Remedy

In addition to final agency action, § 704 also requires that "there is no other adequate remedy in a court" for there to be a valid waiver of sovereign immunity under the APA.  5 U.S.C. § 704.

### 2.   Legal Wrong/Adverse Effect

"[T]he party seeking review under § 702 must [also] show that

-10-

United States District Court
For the Northern District of California

1  he has suffered legal wrong because of the challenged agency

2  action or is adversely affected or aggrieved by that action within

3  the meaning of the relevant statute."  Nat'l Wildlife Fed'n, 497

4  U.S. at 883 (internal quotation marks omitted).  Neither party

5  disputes that this prong of APA waiver of sovereign immunity is

6  satisfied.

7      **C.   Jurisdictional Limitations of the VJRA**

8      The VJRA contains several statutory provisions that preclude

9  review of various challenges to the VA in federal district courts.

10 Although this issue was also dealt with extensively in the Motion

11 to Dismiss Order, it too must be revisited.

12          **1.   § 502**

13     Pursuant to 38 U.S.C. § 502, "VA rulemaking is subject to

14 judicial review only in the Federal Circuit."  Chinnock v.

15 Turnage, 995 F.2d 889, 893 (9th Cir. 1993); see also Preminger v.

16 Principi, 422 F.3d 815, 821 (9th Cir. 2005) (stating "Congress has

17 explicitly provided for judicial review of direct challenges to VA

18 rules and regulations only in the Federal Circuit").  Thus, any

19 challenge by Plaintiffs to VA regulations is not reviewable in

20 this Court.

21          **2.   § 511**

22     38 U.S.C. § 511 states, in part:

23          The Secretary [of Veterans Affairs] shall
            decide all questions of law and fact
24          necessary to a decision by the Secretary
            under a law that affects the provision of
25          benefits by the Secretary to veterans or
            the dependents or survivors of veterans.
26          Subject to subsection (b), the decision
            of the Secretary as to any such question
27          shall be final and conclusive and may not

28                              -11-

1

                    be reviewed by any other official or by
                    any court, whether by an action in the
2                   nature of mandamus or otherwise.

3   38 U.S.C. § 511(a).  As previously held by various courts,

4   including this one in its Motion to Dismiss Order, § 511 does not

5   strip district courts of the ability to hear facial constitutional

6   challenges to the VA benefits system.  See Mot. to Dismiss Order

7   at 20-30; see also Larabee v. Derwinski, 968 F.2d 1497, 1501 (2d

8   Cir. 1992) (stating "district courts continue to have jurisdiction

9   to hear facial challenges of legislation affecting veterans'

10  benefits") (internal quotation marks and emphasis omitted); Broudy

11  v. Mather, 460 F.3d 106, 114 (D.C. Cir. 2006) (stating "district

12  courts have jurisdiction to consider questions arising under laws

13  that affect the provision of benefits as long as the Secretary has

14  not actually decided them in the course of a benefits

15  proceeding"); Beamon v. Brown, 125 F.3d 965, 972-73 (6th Cir.

16  1997) (stating "district court jurisdiction over facial challenges

17  to acts of Congress survived the statutory revisions that

18  established the CVA").

19      Thus, while review of individual benefits decisions is

20  clearly precluded by § 511, facial constitutional challenges are

21  not.  In addition, as this Court held in its Motion to Dismiss

22  Order, where Plaintiffs challenge VA decisions that were made

23  outside the course of a benefits proceeding, § 511 does not

24  necessarily preclude review in this Court.  For reasons discussed

25  below, however, it is unnecessary to determine the precise

26  contours of § 511's preclusive effect.  Suffice it to say, § 511

27  does not provide the extremely broad preclusive effect advocated

28                              -12-

United States District Court
For the Northern District of California

1  by Defendants.

2  **D.    Due Process**

3       **1.    Delay**

4       Under the APA, a district court "shall . . . compel agency

5  action unlawfully withheld or unreasonably delayed."  5 U.S.C. §

6  706(1).  In assessing whether agency action has been unreasonably

7  delayed or withheld, courts look to the so-called <u>TRAC</u> factors.

8  <u>Independence Mining Co. v. Babbitt</u>, 105 F.3d 502, 507 (9th Cir.

9  1997).  These factors are:

> (1) the time agencies take to make
> decisions must be governed by a "rule of
> reason"[;] (2) where Congress has
> provided a timetable or other indication
> of the speed with which it expects the
> agency to proceed in the enabling
> statute, that statutory scheme may supply
> content for this rule of reason [;] (3)
> delays that might be reasonable in the
> sphere of economic regulation are less
> tolerable when human health and welfare
> are at stake [;] (4) the court should
> consider the effect of expediting delayed
> action on agency activities of a higher
> or competing priority[;] (5) the court
> should also take into account the nature
> and extent of the interests prejudiced by
> the delay[;] and (6) the court need not
> "find any impropriety lurking behind
> agency lassitude in order to hold that
> agency action is unreasonably delayed."

21  <u>Id.</u> at 507 n.7 (quoting <u>Telecomms. Research & Action v. F.C.C.</u>,

22  750 F.2d 70, 79-80 (D.C. Cir. 1984)) (modifications in original).

23       **2.    Other Due Process Violations**

24       Plaintiffs also argue that the medical clinical appeals

25  process and the benefits adjudication process violate veterans'

26  Due Process rights under the Fifth Amendment.  "[D]ue process is

27  flexible and calls for such procedural protections as the

28                                    -13-

**United States District Court**
For the Northern District of California

1   particular situation demands." <u>Mathews v. Eldridge</u>, 424 U.S. 319,

2   335 (1976).  In evaluating whether a procedure satisfies Due

3   Process, courts balance (1) the private interest, (2) the risk of

4   erroneous deprivation and the probable value, if any, of extra

5   safeguards, and (3) the government's interest, including the

6   function involved and the fiscal and administrative burdens that

7   the additional or procedural requirement would entail.  <u>Id.</u>

8   "Procedural due process requires adequate notice and an

9   opportunity to be heard." <u>Kirk v. U. S. Immigration and</u>

10  <u>Naturalization Serv.</u>, 927 F.2d 1106, 1107 (9th Cir. 1991).  It

11  does not, however, "always require an adversarial hearing."

12  <u>Hickey v. Morris</u>, 722 F.2d 543, 549 (9th Cir. 1983).

13

14  **IV.  <u>FINDINGS OF FACT</u>**

15       1.  Plaintiffs are two non-profit organizations that

16  represent the interests of veterans. RT 661:10-666:10; 811:20-

17  812:6.[2]  Veterans United for Truth is an advocacy organization

18  with between 1,200 and 1,300 members hailing from 40 states.  <u>Id.</u>

19  661:11-13; 664:20; 665:18-19.  A large percentage of these members

20  are enrolled with the VA, many of them suffer from a service-

21  connected disability, including Post Traumatic Stress Disorder

22  ("PTSD"), and many have sought benefits within the VA.  <u>Id.</u>

23  665:22-666:7; 674:1-4.  Veterans for Common Sense, based in

24  Washington D.C., represents approximately 12,000 members.  <u>Id.</u>

25

26       [2]  "RT" refers to the transcript of record from the trial,
    held April 21-30, 2008.  "PIRT" refers to the transcript of record
27  from the preliminary injunction hearing held March 3-6, 2008.

28                                  -14-

United States District Court
For the Northern District of California

811:20-812:1.  Among these ranks are members who receive services from the VA for mental health issues, including those who have received treatment from the VA for depression and PTSD, and members who have served in Iraq or Afghanistan.  Id. 813:24-814:9. In addition, within the last year, members of Veterans for Common Sense have experienced problems with delays in processing benefits claims and delays in receiving health care.  Id. 813:17-19; 815:4-816:16.  Veterans for Common Sense devotes more than half of its resources to advocating for better veterans' health care and benefits.  Id. 813:12-16.

2.  The mission of the VA is: "To care for him, who has borne the battle and for his widow and for his orphan."  PIRT 245:4-6. Defendants concede that the VA not only has a "broad obligation," but also a "moral imperative [] to provide medical care to the men and women who have served our country."  Defs.' Proposed Findings of Fact and Conclusions of Law ("Defs.' Post-Trial Brief"), Docket No. 230, at 11.

3.  The VA has approximately 230,000 employees and 1,400 sites of care.  RT 778:19-24.  The VA is comprised of three major organizations: the Veterans Health Administration ("VHA"), the Veterans Benefits Administration ("VBA"), and the National Cemetery Administration ("NCA"), only the first two of which are relevant to the present case.

4.  There are approximately 25 million veterans in the United States today.  Ex. 1247.[3]  As of May 2007, between 5 and 8 million

---

[3]  Unless otherwise noted, all exhibits refer to Plaintiffs' Trial Exhibits.

1    of these veterans were enrolled with the VA.   PIRT 254:23; Exs.

2    133, 357.

3        5.  On any given night in the United States, it is estimated

4    that 154,000 veterans are homeless.  RT 503:19-20.

5        **A.   <u>Veterans Health Administration</u>**

6        6.  The VHA, one of the largest health-care systems in the

7    world, is divided into approximately 21 geographical areas called

8    Veteran's Integrated Service Networks ("VISNs").  PIRT 623:16-17;

9    RT 703:1.  Each VISN contains a number of VA hospitals, also known

10   as medical centers, of which there are 153 throughout the country.

11   PIRT 245:17; 246:6; 623:16-17.  Each VISN also has numerous

12   community-based outpatient clinics ("CBOCs"), of which,

13   nationwide, there are approximately 800.  <u>Id.</u> 247:2-7.  CBOCs

14   typically provide, at a minimum, primary health care.  <u>Id.</u> 247:10-

15   11.  Most veterans enrolled in the VA receive their care at CBOCs.

16   Ex. 357; RT 1318:15-17.

17       7.  The VHA also has approximately 200 Readjustment

18   Counseling Centers, known as "Vet Centers."  PIRT 247:24-25.  Vet

19   Centers are small, community-based counseling centers, with

20   average staff sizes of four to six people.  <u>Id.</u> 55:7-9.

21          **1.   Veterans' Mental Health and Suicide Rates**

22       8.  More than 1.6 million men and women have served in Iraq

23   and/or Afghanistan since October 2001.  Answer, Docket No. 110, ¶

24   7; Ex. 1253 at iii.  As of December 31, 2007, 803,757 veterans of

25   Iraq and Afghanistan were eligible for VA health care.  Answer ¶

26   7; Ex. 420 at 5.  Defendants concede that veterans have complained

27   of long wait times for PTSD treatment and difficulties in

28                                  -16-

1    obtaining mental health care in rural areas.   Answer ¶ 10.

2        9.   Approximately one out of every three soldiers returning

3    from Iraq was seen in the VA for a mental health visit within a

4    year of their return.   RT 220:7-11; PIRT 219:3-220:17.   PTSD is a

5    leading diagnosis for the mental health disorders of veterans

6    returning from Iraq.   PIRT 216:17.

7        10.   Dr. Arthur Blank testified for Plaintiffs as an expert

8    in psychiatry, specializing in treatment of veterans with mental

9    health problems, including PTSD.   PIRT 59:23-62:3.   Dr. Blank

10   spent 10 years as a teaching and supervising psychiatrist at the

11   Westhaven VA Medical Center, was a national director of the Vet

12   Centers at the VA headquarters in Washington from 1982-1994, and

13   was the chief psychiatrist on the PTSD team at the Minneapolis VA

14   from 1994-1997.   Id. 54:19-25; 55:1-3; 57:18-23.

15       11.   Dr. Blank testified that PTSD is a "psychological

16   condition that occurs when people are exposed to extreme, life-

17   threatening circumstances, or [when they are in] immediate contact

18   with death and/or gruesomeness, such as [what] occurs in combat,

19   severe vehicular accidents or natural disasters.   It produces a

20   complex of psychological symptoms which may endure over time."

21   PIRT 62:25-63:6.

22       12.   Dr. Gerald Cross, the Deputy Under Secretary for Health

23   in the VA, testified that the high rates of PTSD among Iraq

24   veterans are the result of various factors, including multiple

25   deployments, the inability to identify the enemy, the lack of real

26   safe zones, and the inadvertent killing of innocent civilians.

27   PIRT 216:23-218:2.

28

-17-

**United States District Court**
For the Northern District of California

1    13.   In 2008, Dr. Robert Rosenheck, Director of VA's

2  Northeast Program Evaluation Center ("NEPEC"), issued a report

3  entitled "Recent Trends in VA Treatment of Post-Traumatic Stress

4  Disorder and other Mental Disorders."  Exs. 442, 444.  The report

5  found that during 2003-2005, there was a 232% increase of PTSD

6  diagnosis for veterans born after 1972.  Ex. 442 at 1722.  In

7  addition, while the number of veterans diagnosed with PTSD doubled

8  between 1997 and 2005, "the number of clinic contacts per veteran

9  per year declined steadily and relatively uniformly across the

10  years."  Id. at 1722, 1723.

11    14.   A study released on April 17, 2008, by the RAND

12  Corporation found that 18.5% of U.S. service members who have

13  returned from Iraq and Afghanistan currently have PTSD.  Ex. 1191

14  at 1.  The RAND study also found that approximately half of those

15  who need treatment for PTSD seek it, and of those who actually

16  receive treatment, only slightly more than half get "minimally

17  adequate care."  Id.  The study estimates that 300,000 soldiers

18  now deployed to Iraq and Afghanistan "currently suffer PTSD or

19  major depression."  Ex. 1253 at xxi.

20    15.   Studies indicate that the suicide rate among veterans is

21  significantly higher than that of the general population.  RT

22  274:15-275:19.  One study, the "Katz Suicide Study," dated

23  February 21, 2008, found that suicide rates among veterans are

24  approximately 3.2 times higher than the general population.  Id.;

25  Ex. 1183.

26    16.   Dr. Stephen Rathbun, the interim head of the Department

27  of Epidemiology and Biostatistics at the University of Georgia,

28                                    -18-

**United States District Court**
For the Northern District of California

1    testified as Plaintiffs' expert in biostatistics.  PIRT 303:13-18.

2    Dr. Rathbun analyzed data provided to him by CBS News and

3    concluded that, in 2005, the last year for which suicide data was

4    available, the suicide rate among male veterans aged 20 to 24

5    years old was three or four times the non-veteran rate in that

6    group.  Id. 304:11-17; 307:1; 310:9-311:2.  Internal VA emails

7    state that Dr. Rathbun's methodology was "defensible" and "appears

8    to be correct."  Exs. 1306, 1248.

9        17.  Dr. Ira Katz, Deputy Chief of Patient Care Services

10   Office for Mental Health for the VA, testified that his primary

11   job is to direct mental health services at the VA.  PIRT 736:24-

12   25.  Suicide prevention is an important component of his job.  Id.

13   738:21-24.

14       18.  Dr. Katz, in an internal VA email dated December 15,

15   2007, wrote that "[t]here are about 18 suicides per day among

16   American's 25 million veterans."  Ex. 1247.  The email further

17   states that the "VA's own data demonstrate 4-5 suicides per day

18   among those who receive care from us."  Id.

19       19.  In another internal VA email dated February 13, 2008,

20   Dr. Katz wrote: "Shh!  Our suicide prevention coordinators are

21   identifying about 1,000 suicide attempts per month among the

22   veterans we see in our medical facilities.  Is this something we

23   should (carefully) address ourselves in some sort of release

24   before someone stumbles on it?"  Ex. 1249.

25                **2.   VHA Budget**

26       20.  Paul Kearns, the VHA's Chief Financial Officer,

27   testified that the VHA is not currently facing a budget crisis and

28                                    -19-

**United States District Court**
For the Northern District of California

1    has adequate money to "meet the mission requirements."  PIRT

2    574:13-18.  Dr. Cross agreed with this assessment and testified

3    that the VA has sufficient funding to carry out its mission of

4    ensuring that veterans have the medical care they need.  <u>Id.</u>

5    225:12-23.  Dr. Katz testified that the VHA's current budget

6    provides enough funding to cover a "worst-case scenario" of an

7    influx of veterans returning from Iraq and Afghanistan with mental

8    illness.  <u>Id.</u> 787:17-20.

9         21.  In 2006, VHA spending on mental health care was

10   approximately $2.4 billion.  PIRT 555:17020.  In 2007, this figure

11   rose to $3.2 billion.  <u>Id.</u> 557:8-10.  In 2008, the VHA is on

12   target to spend $3.5 billion on mental health care.  <u>Id.</u> 558:2-3.

13   The estimated budget for 2009 is $3.9 billion.  RT 774:25-775:3.

14        22.  Over the past few years, the VA has hired more than

15   3,800 new mental health staff.  PIRT 739:12-13.  There remain 500-

16   600 unfilled mental health staff positions, out of a total of

17   16,500.  <u>Id.</u> 419:12-22.  In addition, for general health staff,

18   the VA has approximately 1,400 unfilled physician positions out of

19   21,000 and 2,400 unfilled nursing positions out of 40,000.  <u>Id.</u>

20   224:2-7; 231:9-13.

21        23.  Dr. Rosenheck, Director of VA's NEPEC, concluded that

22   for every $100 increase in per capita outpatient mental health

23   spending, there was an associated 6% decrease in the rate of

24   suicide.  Ex. 446 at 118.

25              **3.    Depression, PTSD, and Suicide**

26        24.  Dr. Ronald Maris, an expert witness for Plaintiffs in

27   suicidology, testified that depression and PTSD are two of the

28                                    -20-

United States District Court
For the Northern District of California

leading risk factors for suicide. RT 270:3-10; 273:1-276:24. In general, Dr. Maris was highly critical of the manner in which the VA is treating suicidal or potentially suicidal veterans. <u>Id.</u>

25. Dr. Alan Berman testified as an expert witness for Defendants in suicidology. RT 1272:4-10. Dr. Berman agreed that depression is a leading risk factor for suicide and that PTSD is a "significant risk factor." <u>Id.</u> 1322:25-1323:6. Dr. Berman also agreed that it is important to treat PTSD on a timely basis, and that PTSD, if not properly treated, can lead to depression, and that depression and PTSD, if not properly treated, increase the risk of suicide. <u>Id.</u> 13237-20. Dr. Berman agreed that soldiers returning from Iraq have an elevated rate of suicide. <u>Id.</u> 1324:1-6. Dr. Berman testified that the quality of the VA suicide prevention program is "terrific." <u>Id.</u> 1294:7-10.

26. Dr. Blank testified that there is a strong connection between PTSD and suicide. RT 69:23-70:6. He also testified that depression is one outcome of untreated PTSD and that depression increases the risk of suicide. <u>Id.</u> 70:21-25; 71:1-7. Dr. Blank was critical of the VA's treatment methods for veterans with PTSD. <u>Id.</u> 83:14-22; 83:10-13.

### 4. Mental Health Strategic Plan

27. In July 2004, the VA developed and adopted the Mental Health Strategic Plan ("MHSP"). Ex. 398. The MHSP consists of 265 recommendations and was developed as a five year plan. RT 777:22-24; PIRT 477:24-478:1. It currently is in its fourth year of implementation. <u>Id.</u> Plaintiffs concede that the MHSP is a good plan. RT 705:14-706:7.

United States District Court

For the Northern District of California

28.   In fiscal year 2006, the VHA spent approximately $118 million out of a targeted $200 million on the MHSP.  PIRT 553:1-4. In fiscal year 2007, the VHA spent approximately $325 million on the MHSP and for fiscal year 2008 the VHA is on target to increase this spending to $370 million.  Id. 553:5-554:6.

29.   One of the goals of the MHSP is to "[r]educe suicides among veterans."  Ex. 398 at A-2.  Among the initiatives intended to help reduce veteran suicides are ones to "[d]evelop a national systemic program for suicide prevention" and to "develop[] a plan to educate all staff that interact with veterans, including clerks and telephone operators, about responding to crisis situations involving at-risk veterans."  Id. at A-2.  Other key components of the MHSP are to develop "methods for tracking veterans with risk factors for suicide," and to "[r]equire annual screening for Mental Health and Substance Abuse Disorders."  Id. at A-29.  In addition, the MHSP called for mental health screening for "[e]very returning service man/woman . . . as part of the post-deployment and separation medical examination."  Id. at A-5.

30.   Dr. Katz testified that his office is responsible for "strategic planning about program development."  PITR 737:4-5.  He further testified that he was hired "specifically to oversee the implementation of the 2004, 2005 Mental Health Strategic Plan." Id. 738:5-6.

31.   On May 10, 2007, the VA Office of Inspector General ("OIG") issued a report titled "Implementing VHA's Mental Health Strategic Plan Initiatives for Suicide Prevention" ("May 2007 OIG Report").  Ex. 133.  This report concluded that many components of

**United States District Court**
For the Northern District of California

the MHSP had not been implemented.  Id.  Initiatives such as screening veterans at risk, a suicide prevention database, emerging best practices for treatment, and education programs were all still at the "Pilot Stage" three years after the MHSP was implemented.  Id. at 53.

32.  The May 2007 OIG Report also found 61.8% of VA facilities had not implemented a suicide prevention strategy to target veterans returning from Iraq and Afghanistan.  Ex. 133 at 37.  In addition, 42.7% of VA facilities had not implemented a program to educate first-contact, non-medical personnel about how to respond to crisis situations involving veterans at risk for suicide.  Id. at 46.  70% of VA facilities had not implemented a tracking system for veterans with risk factors for suicide.  Id. at 33.  16.4% of VA facilities had not implemented a system to facilitate referral of veterans with risk factors for suicide. Id. at 30.

### 5.  Feeley Memo

33.  William Feeley has been the Deputy Under Secretary for Health Operations and Management since February 10, 2006.  Ex. 1259 at 1, Feeley Depo. Tr.  Mr. Feeley, in his own words, is "responsible for the 21 [VISN] network directors in implementing policy and procedure that comes in, that gets developed at headquarters."  Id.  Mr. Feeley, as the number three person in the VHA, is tasked with ensuring that the VA Medical Centers and CBOCS comply with the "policies and the rules and regulations of the organization."  Id. 2. He testified that when it comes to compliance in implementing procedures, the "[b]uck stops with me."

-23-

**United States District Court**
For the Northern District of California

1    <u>Id.</u>

2        34.   On June 1, 2007, Mr. Feeley issued a memorandum to all

3    VISN directors regarding "Mental Health Initiatives" ("the Feeley

4    Memo").  Ex. 1259 at 4; Defs.' Ex. 513.  The purpose of the Feeley

5    Memo was to direct the VISN directors to begin implementing the

6    specific initiatives of the mental health plan.  Ex. 1259 at 8;

7    Defs.' Ex. 513.  According to Mr. Feeley, even though the MHSP was

8    developed in 2004, he was unaware of whether the VHA had actually

9    begun to implement the plan prior to June 2007.  Ex. 1259 at 4.

10   Furthermore, Mr. Feeley was unaware of whether the VISN directors

11   were supposed to begin implementing the MHSP prior to his Memo.

12   <u>Id.</u>  Mr. Feeley conceded that he is unaware of "whether there's

13   compliance with the tracking of veterans with risk factors for

14   suicide," but agreed that such tracking, in addition to being part

15   of the MHSP, was "a good suggestion."  <u>Id.</u> at 7-8.

16       35.   Part of the Feeley Memo states that veterans who present

17   to a Medical Center or CBOC for the first time with mental health

18   issues should be evaluated within 24 hours.  Ex. 1259 at 11;

19   Defs.' Ex. 513.  Mr. Feeley conceded that he has no way of knowing

20   whether any of the Medical Centers or CBOCS have implemented this

21   initial 24 hour evaluation directive.  Ex. 1259 at 12.  Mr. Feeley

22   testified that Drs. Zeiss and Katz were going to perform site

23   visits to ensure compliance with this directive.  <u>Id.</u> at 11.

24       36.   Dr. Antoinette Zeiss is the Deputy Chief Consultant for

25   the Office of Mental Health Services.  PIRT 395:11-12.  She has

26   held this position since September of 2005 and she reports to Dr.

27   Katz.  <u>Id.</u> 395:13-16.  Her section's responsibilities include

28                                    -24-

United States District Court
For the Northern District of California

"oversight for mental health programs in VA.  That means working with those above [her section] on policies, working on consultation [with] the field about appropriate implementation of programs, and particularly implementing the Mental Health Strategic Plan." Id. 3961-6.  Since the Feeley Memo was issued in June 2007, Dr. Zeiss testified that as of March 5, 2008, only two site visits to ensure implementation had been conducted.  Id. 457:19-25.  The first of these visits occurred approximately three weeks prior to Dr. Zeiss's testimony.  Id. 457:9-12.  Other than these site visits, Dr. Zeiss has seen no reports that would otherwise indicate whether the Feeley Memo directives were being implemented system-wide.  Id. 456:20-23.

37.   The Feeley Memo also directs that a veteran who seeks an appointment for mental health issues be given a follow-up appointment within 14 days.  RT 443:1-4; PIRT 481:12-17; Defs.' Ex. 513.

38.   The VHA does not have the staff or resources to directly track whether the 24 hour evaluation policy outlined in the Feeley Memo is being implemented systemwide.  RT 446:18-21.

39.   Instead, in order to monitor compliance with the Feeley Memo directives, the VA uses two tangential metrics.  RT 449:1-452:23.  The first metric tracks the number of mental health providers hired at medical facilities within a VISN and the second tracks whether medical centers are complying with the requirement that a veteran who presents with mental health needs be given an appointment within 14 days.  Id. 443:1-23; 446:6-25; 454:10-17.

///

-25-

### 6.   Delays in Mental Health Care

40.   The May 2007 OIG Report found delays in obtaining referrals for depression and PTSD.  Ex. 133 at 31.  Where a primary care provider refers a patient with symptoms of moderate severity for depression, 40% of VA facilities reported same-day evaluation, 24.5% reported a wait time of 2-4 weeks and 4.5% reported a wait time of 4-8 weeks.  Id.  The wait times for PTSD referrals were longer, with only 33.6% reporting same-day evaluation, 26% reporting 2-4 weeks, and 5.5% 4-8 weeks.  Id. at 31-32.  Nonetheless, the majority of veterans of Iraq and Afghanistan are being seen at clinics offering mental health services within 30 days.  PIRT 594:11-595:16; Defs.' Ex. 514.

41.   On September 10, 2007, the VA's OIG issued a report titled, "Audit of the Veterans Health Administration's Outpatient Waiting Times" ("September 2007 OIG Report").  Ex. 169.  This report was prepared at the request of the U.S. Senate Committee on Veterans Affairs.  Id. at i.  The purpose of the report was to follow up on a July 2005 audit that found that the "VHA did not follow established procedures when scheduling medical appointments for veterans seeking outpatient care."  Id.  The July 2005 report made eight recommendations for corrective action, five of which the September 2007 OIG Report found had not been implemented.  Id. at vi.

42.   The September 2007 OIG Report found that "25 percent[] of the appointments we reviewed had waiting times over 30 days when we used the desired date of care that was established and documented by the medical providers in the medical records."  Ex.

-26-

169 at ii.  The report also found that "72 percent[] of the 600 appointments for established patients had unexplained differences between the desired date of care documented in medical records and the desired date of care the schedulers recorded . . . ."  Id. at iii.  In addition, the report concluded that "[o]f the 100 pending consults, 79 (79 percent) were not acted on within the 7-day requirement and were not placed on the electronic waiting list.  Of this number, 50 veterans had been waiting over 30 days without action on the consult request."  Id. at vi.

        43.  The September 2007 OIG Report found that schedulers were not adequately trained.  Ex. 169 at vi.  Of 113 schedulers interviewed, 47% had no training on consults within the last year, and 53% had no training on the electronic waiting list in the last year.  Id.  Furthermore, the report stated the following: "While waiting time inaccuracies and omissions from electronic waiting lists can be caused by a lack of training and data entry errors, we also found that schedulers at some facilities were interpreting the guidance from their managers to reduce waiting times as instruction to never put patients on the electronic waiting list.  This seems to have resulted in some 'gaming' of the scheduling process."  Id.  The report concluded that "VHA's method of calculating the waiting times of new patients understates the actual waiting times," id. at 7, and that even though the "VHA has established detailed procedures for schedulers to use when creating outpatient appointments[, it] has not implemented effective mechanisms to ensure scheduling procedures are followed."  Id. at 9.

-27-

1      44.  As of April 2008, according to VHA's data, there are

2  approximately 85,450 veterans on VHA waiting lists for mental

3  health services.  Ex. 1244.  As of February 1, 2008, there were

4  37,902 veterans having to wait more than 30 days for any type of

5  medical appointment, not just one for mental health issues.

6  Defs.' Ex. 528.  According to the VA, as recently as February

7  2007, there were as many as 182,141 veterans waiting more than 30

8  days for a medical appointment.  Id.

9      45.  Dr. Jeffery Murawsky is the Chief Medical Officer for

10  VISN Number 12, Great Lakes Region.  PIRT 623:12-13.  Dr. Murawsky

11  testified that in his VISN, as of February 15, 2008, there were no

12  Iraq or Afghanistan veterans on the wait list for a mental health

13  appointment.  Id. 635:7-9.  Dr. Murawsky also testified that a

14  veteran is not placed on the wait list until after he or she has

15  had to wait 30 days.  Id. 635:10-19.

16      46.  In February 2005, the U.S. Government Accountability

17  Office ("GAO"), prepared a report for the ranking Democratic

18  Member of the House Committee on Veterans' Affairs.  Ex. 37.  The

19  report was titled, "VA Should Expedite the Implementation of

20  Recommendations Needed to Improve Post-Traumatic Stress Disorder

21  Services."  Id.  Although the report began by noting that the VA

22  "is a world leader in PTSD treatment and offers PTSD services to

23  eligible veterans," id. at 1, it was also critical of the VA's

24  lack of progress in implementing various recommendations,

25  including some dating as far back as 1985.  Id. at 5.  For

26  example, the report found that the VA had not developed referral

27  mechanisms in all CBOCs that do not offer mental health services.

28

United States District Court
For the Northern District of California

-28-

**United States District Court**
For the Northern District of California

1   <u>Id.</u> at 26, 27.  The report summarized: "VA's delay in fully

2   implementing the recommendations raises questions about VA's

3   capacity to identify and treat veterans returning from military

4   combat who may be at risk for developing PTSD, while maintaining

5   PTSD services for veterans currently receiving them."  <u>Id.</u> at 3.

6       47.  Dr. Frances Murphy was the Deputy Under Secretary of

7   Health Policy Coordination within the VA from October 2002 through

8   April 2006.  Ex. 1262 at 1.  Dr. Murphy had helped draft the MHSP.

9   <u>Id.</u> at 4.  In the fall of 2005, Dr. Murphy informed then-Secretary

10  Nicholson that there were "still significant gaps in delivery of

11  substance abuse care, and that in certain areas of the country

12  mental health access was still not meeting VHA standards."  <u>Id.</u> at

13  4.  In a speech on March 29, 2006, Dr. Murphy, while acknowledging

14  that the VA "has achieved benchmark performance in quality,

15  patient satisfaction, patient safety and coordination of

16  healthcare services," also noted that "[i]n some communities, VA

17  clinics do not provide mental health or substance abuse care or

18  waiting lists render that care virtually inaccessible."  Ex. 397

19  at 6, 7.  In February 2006 Dr. Murphy's office was eliminated.

20  Ex. 1262 at 1, 2.

21      48.  Every VA Medical Center now has a Suicide Prevention

22  Coordinator.  RT 1280:21-23.  The Coordinators are charged with

23  the task of overseeing the clinical care and tracking at-risk

24  patients.  <u>Id.</u>  In preparation for their roles as Suicide

25  Prevention Coordinators, the Coordinators, who are all mental

26  health professionals, received only two and one half days of

27  special training, which took place at the University of Rochester

28                                   -29-

**United States District Court**
For the Northern District of California

1  School of Medicine's center for the study of suicide.  Id. 1290:6-

2  11.  As Defendants' expert Dr. Berman testified, the primary role

3  of the Coordinators includes "identifying or making sure that

4  suicidal patients are identified, in tracking, that they are

5  getting the appropriate treatment, in educating and training the

6  staff of the medical center, in promoting suicide awareness and

7  education."  Id. 290:18-23.  As of May 2007, only 30% of the

8  facilities polled had suicide tracking systems.  Ex. 133 at 33.

9      49.  The Suicide Prevention Coordinators are only at the 153

10  VA medical centers, and are not located at any of the roughly 800

11  CBOCs.  RT 1318:10-1319:3.  Most veterans receive their care at

12  CBOCs.  Ex. 357; RT 1318:15-17.

13      50.  CBOCS only provide outpatient services during regular

14  business hours, generally Monday through Friday from 8:00 a.m.

15  until 4:30 or 5:00 p.m.  PIRT 169:22-25.

16      51.  In July 2007, the VA implemented a national Suicide

17  Prevention Hotline.  PIRT 746:12-749:9.  Between July 2007 and

18  January 2008, the Hotline received 26,000 calls, of which 9,000

19  were confirmed to be from veterans and 900 from the families of

20  veterans.  Id. 778:1-9.  In that same time period, the Suicide

21  Prevention Hotline made approximately 2000 referrals of veterans

22  seeking help to the Suicide Prevention Coordinators.  Id. 745:7-

23  14.

24              **7.  Medical Appeals Process**

25      52.  Veterans may appeal clinical medical decisions that

26  affect eligibility determinations.  For example, a veteran may

27  appeal a clinical determination by a nurse or doctor but a veteran

28                              -30-

United States District Court
For the Northern District of California

1    may not appeal the decision of an appointment scheduler.  PIRT

2    713:2-714:13.  If a veteran is told that the next available

3    appointment is two weeks away but the veteran wants something

4    sooner, the veteran cannot appeal this type of administrative

5    scheduling decision.  Id. 712:4-8.  If, however, the veteran is

6    told by a nurse or doctor that it is ok for him to wait those two

7    weeks before his appointment--i.e., if a nurse or doctor makes a

8    clinical decision regarding the veteran's need for access to

9    health care--then the veteran may appeal this decision.  Id.; Id.

10   656:25-657:25.  The veteran appeals this decision by asking to

11   speak with a "Patient Advocate."  Id. 656:25.

12        53.  The Patient Advocate Program is a system that VHA has in

13   place to provide patients with an individual to help them with any

14   issues or problems they might have with VHA.  PIRT 638:16-19.

15        54.  The Patient Advocate, after receiving a complaint from a

16   veteran, is then supposed to log the veteran's complaint into the

17   Patient Advocate database.  PIRT 657:6-10.  If the complaint deals

18   with a clinical decision about the need for treatment, it will be

19   referred up to the chief of staff, who then has seven days to make

20   a decision on how to handle the complaint.  Id. 657:7-15.

21        55.  If the veteran disagrees with the decision by the chief

22   of staff, he or she can then appeal the decision to the VISN

23   director at the network level, who would make the final decision.

24   Id. 659:13-18.  If the veteran disagrees with the VISN director's

25   decision, the veteran can ask the VISN director to request an

26   external review.  Id. 661:14-663:4.  Only the VISN director can

27   request external review, and the veteran, on his or her own, has

28

1  no way of independently securing it. <u>Id.</u>  If the VISN director

2  does request an external review, the veteran does not have the

3  right to know the results of this review. <u>Id.</u> 719:5-10.  If the

4  VISN director refuses to share the results of the external review

5  with the veteran, the only manner in which the veteran might

6  obtain the results would be through a Freedom of Information Act

7  request. <u>Id.</u> 719:10-17.

8              **8.   PTSD and Suicide Screening**

9      56.   When veterans first enroll in the VHA after separating

10  from the service, they are given a mental health screen at their

11  initial primary care visit.  PIRT 518:5-21.  They are screened for

12  PTSD, depression, traumatic brain injury, military sexual trauma,

13  and problem drinking.  <u>Id.</u>

14     57.   In addition, all veterans who present for evaluation of

15  primary mental health and/or addiction disorders are screened for

16  suicide risk. Ex. 365.  This screening consists of the following

17  two questions: (1) "During the past two weeks, have you felt down,

18  depressed, or hopeless?" and (2) During the past two weeks, have

19  you had any thoughts that life was not worth living or any

20  thoughts of harming yourself in any way?" <u>Id.</u>  If the patient

21  answers "yes" to the first question but "no" to the second, no

22  further suicide risk assessment is called for, unless the veteran

23  is being admitted to an inpatient psychiatric unit.  <u>Id.</u>  Thus,

24  unless the veteran admits to having suicidal thoughts within the

25  last two weeks, no further suicide screening is performed, even if

26  the veteran admits to having recently felt depressed or hopeless.

27  <u>Id.</u>

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1      58.   Dr. Maris, Plaintiffs' suicidology expert, was highly

2   critical of this screening mechanism and made a strong argument

3   that it fell below the acceptable standard of care.  RT 288:5-8.

4   Dr. Maris stated that a more comprehensive screening procedure,

5   which would take only an additional 10 or 15 minutes, would be far

6   more accurate in screening suicidal veterans.  Id. 288:12-289:23.

7      59.   Defendants' suicide expert, Dr. Berman, testified that

8   he "was singularly impressed" with what the VA is doing for

9   screening and treating suicidal veterans.  RT 1279:21-25.  Dr.

10  Berman testified that the two screening questions detailed above

11  "are perfectly appropriate."  Id. 1292:2.  He further testified

12  that the level of screening embodied by these two questions "is

13  the standard of care with regard to screening for suicide

14  prevention--suicidal patients."  Id. 1292:10-11.

15      **B.   Veterans Benefits Administration**

16      60.   The Veterans Benefits Administration ("VBA") administers

17  benefit programs for veterans, including service-connected death

18  and disability compensation ("SCDDC") benefits.  RT 885:8-22.

19  Under the Compensation and Pension Service, which includes non-

20  service-connected disabilities, approximately 3.4 million veterans

21  receive benefits.  Id. 887:12-14; 885:20-23.  In fiscal year 2008,

22  VBA will pay out approximately $38 billion in compensation and

23  pension benefits.  Id. 887:20.

24      61.   Service connected injuries frequently interfere with the

25  quality of life and/or preclude employment of a veteran upon

26  return to civilian life, while deaths often deprive a veteran's

27  dependents of their principal or sole means of support.  Compl. ¶

28                                  -33-

United States District Court
For the Northern District of California

93; Answer, ¶ 93.  Many benefits recipients are totally or primarily dependent upon SCDDC for support.  Id.

62.  After deployment to Iraq, soldiers aged 18-24 comprised 50% of the Army and 80% of the Marines.  RT 357:9-19.  82% of the Army personnel deployed have a high school diploma or less.  Id. 358:3-7.  89% of the Marines deployed have a high school diploma or less.  Id.  These figures indicate that many of these soldiers, once they separate and become veterans, may have difficulty navigating complex benefit application procedures unless they are provided with substantial assistance.

### 1.    Adjudication Process for SCDDC Claims

63.  Veterans may file a claim for compensation and pension benefits at any of the 57 VA Regional Offices ("ROs") throughout the country.  RT 887:21-888:8.

64.  A rating claim may seek compensation for more than one injury and each separate injury is considered an "issue" in the claim.  RT 930:11-15.

65.  In fiscal year 2007, the VBA received 838,141 ratings claims.  Defs.' Ex. 542; RT 972:16-22.  Of these, 225,173 were "original" claims, that is, first time requests for benefits by veterans.  Ex. 543.  The remaining 612,968 claims were "reopened" claims--claims from veterans who had previously sought benefits from the VA.  Exs. 542, 543.  Of the original claims that year, 58,532 had 8 or more issues and 166,641 had 7 or fewer issues.  Ex. 543.  Since fiscal year 2005, the number of claims with 8 or more issues has increased by 34%, while the number of claims with 7 or fewer issues has remained mostly constant.  Id.; RT 983:16-

-34-

United States District Court
For the Northern District of California

984:13.

66. Roughly 88% of veterans are granted SCDDC for at least one claimed disability. RT 1042:10-24.

67. Average Days to Complete ("ADC") measures the time required to adjudicate all rating claims over a finite period. RT 900:12-902:8. ADC is computed by taking all rating claims adjudicated during a period, adding the number of days it took to complete each one, and dividing by the total number of claims that were adjudicated. Id. 900:12-18. As of trial, the ADC for fiscal year 2008 was approximately 183 days. Defs.' Ex. 541; RT 936:11-12. Thus, on average, it takes the VBA 183 days to adjudicate a claim filed by a veteran. RT 936:11-15.

68. To establish a claim for SCDDC, a veteran must present evidence of (1) a disability; (2) service in the military that would entitle him or her to benefits; and (3) a nexus between the disability and the service. RT 887:8-11.

69. Veterans pursuing a SCDDC claim for PTSD have the additional burden of proving a "stressor" event during their service. RT 952:22-953:8. Evidence of a stressor is required by 38 C.F.R. § 3.304. A "stressor" is a specific event during the veteran's service that led to the development of PTSD. RT 953:2-8. This additional requirement makes SCDDC claims for PTSD unique from all other types of claims. Id. 952:24-953:1. As Ronald Aument, the Deputy Under Secretary for Benefits until January 3, 2008, testified, PTSD claims, because of the substantial subjectivity involved in their evaluation, are among the most complex claims that the VA is asked to adjudicate. Ex. 1257 at 5.

-35-

1    70.   Section 3.304 also provides that "if the evidence

2    establishes that the veteran engaged in combat . . . and the

3    claimed stressor is related to that combat, in the absence of

4    clear and convincing evidence to the contrary, . . . the veteran's

5    lay testimony alone may establish the occurrence of the claimed

6    in-service stressor."  38 C.F.R. § 3.304(f)(1).

7    71. To file a SCDDC claim, a veteran must complete and submit

8    a 23-page application on VA Form 21-526.   RT 408:12-20; Ex. 1069.

9    Veterans often make mistakes when completing this application and

10   veterans suffering from PTSD have a particularly hard time with

11   this.  RT 39811-13.

12   72.   Pursuant to the Veterans Claims Assistance Act ("VCAA"),

13   38 U.S.C. § 5103, the VA owes veterans the duty to assist them

14   develop all evidence supporting the issues in a claim.

15   73.   Upon receipt of a benefits claim application, a VBA

16   employee known as a Veterans Service Representative ("VSR"), is

17   required under the VCAA to notify the veteran regarding any

18   further evidence the VBA requires to adjudicate the claim.   38

19   U.S.C. § 5103; RT 940:12-17.  This notice, also known as a "duty

20   to notify letter," must also indicate what information the veteran

21   is expected to furnish and what evidence the VBA will seek on his

22   behalf under the VCAA duty to assist.  38 U.S.C. § 5103; RT

23   940:12-17; 38 C.F.R. § 3.159(c).

24   74.   Under the VCAA duty to assist, the VBA must seek all

25   federal government records that may pertain to the claim.   RT

26   940:23-941:4; 38 U.S.C. § 5103A.  Typically, these will include

27   service personnel and medical records, but may also include other

28

-36-

*United States District Court*
For the Northern District of California

1    records such as VA medical records or social security records.  RT

2    942:6-944:8.  The VA must continue to seek these records until the

3    responsible agency attests that they are no longer available.  Id.

4    940:23-941:4.

5        75.  The duty to assist also requires the VBA to undertake

6    reasonable efforts to acquire non-federal records, typically

7    private medical records, identified by the veteran.  RT 941:5-9;

8    944:9-945:2.  The VBA cannot initiate the search for these records

9    without a release executed by the veteran.  Id.

10       76.  The duty to notify letter provides veterans with a 60-

11   day deadline to respond with any releases and with any evidence in

12   the veteran's possession.  RT 941:19-24.  Once the releases are

13   received, the VBA is required to request the private records from

14   their respective custodians.  Id. 944:22-945:4.  The request asks

15   the custodian to provide the records within 60 days.  Id. 945:3-

16   13.  If the records custodian fails to do so, the VBA sends out

17   another request seeking a reply within 30 days.  Id.

18       77.  The duty to assist also includes the duty of "providing

19   a medical examination or obtaining a medical opinion when such an

20   examination or opinion is necessary to make a decision on the

21   claim."  38 U.S.C. § 5103A.  This medical examination is known as

22   a Compensation and Pension Examination ("C&P Exam").  RT 946:22-

23   947:6.  The purpose of the C&P Exam is to confirm that a

24   disability exists and to assess the medical implications of that

25   disability in order to assist the claim adjudicator in determining

26   the percentage the veteran will be considered disabled pursuant to

27   the rating schedule.  Id. 946:25-947:13.  Thus, some veterans who

28
                                    -37-

**United States District Court**
For the Northern District of California

1    have been treated for a disability at a VA medical facility may

2    nonetheless be required to undergo a C&P exam.  For example, a

3    veteran may have actually been diagnosed with and treated for PTSD

4    at a VA medical center, but because of some shortcoming in the

5    medical records or evidence or because of some other deficiency,

6    the veteran would still need to submit to a C&P exam if the VBA

7    determines that one is necessary.  Furthermore, a veteran may be

8    diagnosed as not having, for example, PTSD, during a C&P Exam even

9    after he or she was previously diagnosed as having PTSD by a

10   treating physician at a VA medical center.

11       78.   The VBA arranges and pays for a C&P exam.  RT 951:18-

12   952:20.  The current wait time for a C&P exam is approximately 30-

13   35 days.  Id. 951:14-17.

14       79.   Throughout the claims adjudication process, the

15   evidentiary record remains open.  RT 948:18-949:8.  Thus, at any

16   point, the veteran may supply new evidence.  Id.  The VACC duty to

17   assist applies to this new evidence.  Id. 945:3-13.  In addition,

18   the veteran may, at any time, introduce a new issue into the

19   claim.  Id. 949:9-950:1.  For new issues, the claim development

20   process is reinitiated so that the necessary evidence of this

21   issue may be collected.  Id.  Between 10% and 20% of all claims

22   have a new issue presented during the pendency of the claim.  Id.

23       80.   Once all the evidence has been gathered, a Rating

24   Veterans Service Representative ("RVSR" or "rating specialist")

25   decides whether the disability is service connected and, if it is,

26   assigns a rating to the claim.  RT 895:16-896:5; 956:19-957:9.

27   The rating assigned to a claim is based on a sliding scale of

28

**United States District Court**
For the Northern District of California

1    monthly compensation ranging from $115 per month for a 10% rating

2    to $2471 per month for a 100% rating.  38 U.S.C. § 1114.

3    Approximately 88% of all ratings claims are at least partially

4    granted.  RT 1042:15-24.

5         81.  Although a veteran may be represented throughout the

6    claim adjudication process at the RO, the veteran is statutorily

7    prohibited from compensating a lawyer to represent him at the RO

8    level.  38 U.S.C. § 5904.  Thus, veterans may be represented by

9    attorneys acting pro bono or, more commonly, by Veteran Service

10   Organizations ("VSOs").  RT 932:20-934:21.  VSOs are organizations

11   that work on behalf of veterans.  <u>Id.</u>  The VA in some cases

12   provides VSOs with office space in the ROs, computer systems and

13   access to VA databases.  <u>Id.</u>  VA, however, does not provide

14   training to VSOs regarding how to assist veterans.  <u>Id.</u> 934:4-13.

15   In addition, all of the VSOs combined cannot meet the needs of all

16   the veterans seeking benefits.  <u>Id.</u> 514:19-515:1.

17        82.  Veterans may appeal a rating decision by the RO by

18   filing a Notice of Disagreement ("NOD").  RT 1008:9-24.  The NOD

19   must be filed within one year of the RO's decision.  38 U.S.C. §

20   7105(b)(1).  The NOD is an informal paper stating that the veteran

21   disagrees with some part of the rating decision and wishes to

22   appeal.  RT 1008:9-24.  The veteran may appeal any part of any

23   issue in the rating decision, including the denial of an issue,

24   the percentage of disability assigned, or the effective date.  <u>Id.</u>

25        83.  As noted above, the record remains open throughout the

26   appeals process, thus allowing the veteran to submit additional

27   evidence at any time.  RT 176:9-20.  A veteran who disagrees with

28                                            -39-

the RO decision can file an appeal with the Board of Veterans Appeals ("BVA"), which decides an appeal only after the claimant has been given an opportunity for a hearing. 38 U.S.C. § 7105(a). An adverse decision by the BVA may then be appealed to the CAVC, an Article I court established by Congress with the passage of the VJRA. The CAVC has exclusive jurisdiction to review decisions of the BVA. See 38 U.S.C. § 7252(a). Adverse decisions from the CAVC may then be appealed to the United States Court of Appeals for the Federal Circuit, id. § 7292(a), and then to the Supreme Court. Id. § 7292(c).

84. Upon receiving an NOD, the RO sends the veteran an election letter asking the veteran to choose between two non-exclusive appeals processes: a veteran may elect de novo review with a Decision Review Officer ("DRO") or the veteran may request the RO to issue a Statement of the Case ("SOC"), which provides a more detailed explanation of the rationale underlying the rating decision. RT 1009:2-1014:4; 38 U.S.C. § 7105(d)(1).

85. If the veteran elects de novo review with a DRO, the DRO, who is a senior rating specialist, will review the file and perform any additional development, including, if necessary, meeting with the veteran and any representative the veteran may have procured. RT 896:6-12; 1011:10-20. Because the DRO review occurs post-NOD, a veteran may retain paid counsel at this stage of the proceedings. 38 U.S.C. § 5904. DROs are empowered to reverse the initial rating decision if they determine that it was not warranted. RT 1012:4-6. If the DRO resolves some but not all of the appeal, an SOC will be prepared, and the traditional

-40-

1    appellate path is followed.  Id. 1010:3-14; 1012:12.

2        86.  If the veteran elects to pursue the traditional

3    appellate path, he or she must file a VA Form 9 within 60 days of

4    receiving the SOC, or within a year of receiving the rating

5    decision, whichever is longer.  RT 1010:3-15; 1014:5-10; 38 U.S.C.

6    § 7105(d)(3).  Once the RO receives the veteran's Form 9

7    substantive appeal, the RO must then certify the appeal to the

8    BVA.  38 C.F.R. § 19.35; RT 1017:2-12.  There are no statutory or

9    regulatory time limits imposed on the VA during any step of the

10   adjudication and appeals process for SCDDC.  RT 578:22-580:21.

11   Veterans, conversely, are constrained by various time limits and

12   failure to meet any of these deadlines can result in forfeiture of

13   the appeal.  Id. 1024:17-20.

14                    2.   **VBA Inventory of Claims**

15       87.  The VBA's inventory of pending rating-related claims has

16   increased from 337,742 claims as of January 1, 2005, to 400,450

17   claims as of April 12, 2008.  Ex. 1322.

18       88.  On average, it takes an RO 182 days from the date a

19   claim is filed to issue an initial decision on that claim.  RT

20   936:8-12.  As of April 12, 2008, there were 101,019 rating-related

21   claims pending more than 180 days.  Ex. 1322.  VBA's strategic

22   goal is to process all claims in 125 days.  RT 936:8-15.  PTSD

23   claims take longer to adjudicate than average SCDDC claims.  Id.

24   120:24-121:2; 406:21-407:16; Ex. 1264 at 160:17-21.

25                    3.   **Delays in Appeals Process**

26       89.  Of the more than 830,000 ratings claims filed each year,

27   approximately 11% result in an NOD being filed by the veteran.  RT

28                                   -41-

**United States District Court**
For the Northern District of California

1006:12-24.  Only 4% of the total number of claims filed each year

actually proceed past the NOD to a decision by the BVA.  Id.

90.  On average, as of March 2008, it was taking 261 days for

an RO to mail an SOC to a veteran after receiving an NOD.  Ex.

1320 at VA322-00002598.  It takes a veteran 43 days, on average,

to file a Form 9 substantive appeal after receiving an SOC.  Ex.

1310 at VA322-00002505-06; RT 215:7-216:20.  It takes 573 days, on

average, for an RO to certify an appeal to the BVA after receiving

a Form 9 appeal from a veteran.  Ex. 1310 at VA322-00002505-06; RT

215:7-217:2.  Some veterans have had to wait more than 1,000 days

for an RO to issue a certification of appeal to the BVA.  Ex. 1260

at6-7.  In addition, some veterans have had to wait more than

1,000 days for an RO to even issue an SOC.  Id.  The Director of

the Compensation and Pension Service within the VA, Bradley Mayes,

testified at a deposition that VBA has not "made a concerted

effort to figure out what's causing" these delays.  Id. at 7.

91.  The Deputy Undersecretary for Benefits for the VA,

Michael Walcoff, testified that the significant delays by the ROs

in issuing SOCs and certifications of appeal are attributable, in

part, to the priority VA has focused on adjudicating initial

claims.  RT 1019:1-1020:5; 1129:20-1130:10; 1171:25-1172:18; Ex.

1258 at 12.

92.  On average, it takes the BVA 336 days to issue a

decision on an original appeal, as opposed to a remand, after a

claim is certified to the BVA by an RO.  Ex. 1310 at VA322-

00002505-06.

93.  Although veterans have a right to submit new evidence at

-42-

1  any time during the appeals process, this alone does not account

2  for the extensive delays.  RT 207:25-208:3; 249:9-250:12; 364:9-

3  23; 1019:15-20; 1129:15-1130:10; 1171:25-1172:18.  When a veteran

4  submits new evidence, the VBA issues a supplemental statement of

5  the case ("SSOC").  Id. 208:4-19.  Form 9 substantive appeals

6  without an SSOC have been pending, on average, for 320 days.  Id.

7  237:4-239:16; Ex. 1320 at VA 322-00002598, 2600.

8      94.  As part of the appeal process to the BVA, veterans have

9  the right to a hearing before a BVA judge.  38 C.F.R. § 20.700; RT

10  528:23-25.  At the veteran's option, the hearing may be held at

11  the expense of the veteran in Washington D.C., or by video-

12  conference, or at the closest RO in what is called a Travel Board

13  hearing.  38 C.F.R. § 20.700; RT 529:1-4; 1017:16-1018:2.  The

14  Travel Board hearings typically happen only once or twice a year

15  at each RO.  RT 1018:3-16.  If a veteran requests a hearing, he or

16  she will have to wait, on average, 455 days.  Ex. 1324 at VA322-

17  00002653-54; RT 231:12-18; 581:24-582:2.  Veterans who receive

18  hearings are more likely to prevail on their appeal.  Ex. 1243 at

19  5.

20      95.  For veterans who pursue an appeal to completion, it

21  takes, on average, 1,419 days to receive a BVA decision after

22  filing an NOD.  Ex. 1323 at VA322-00002552; RT 221:22-222:7.  It

23  takes approximately 4.4 years--182 days for an initial RO decision

24  plus 1,419 days for a BVA decision--for a veteran to adjudicate a

25  claim all the way to a BVA decision.  RT 259:22-261:21.  This 4.4

26  years excludes the time between an RO's initial decision and a

27  veteran's NOD filing, which may be as long as one year.  Id.

28                          -43-

261:3-6.

96.    The metric "Appeals Resolution Time" measures the average number of days, nationwide, that it takes to resolve appeals from the date an NOD is filed.  RT 568:20-24.  This metric, unlike the one described in the preceding paragraph, includes claims that are resolved before the BVA issues an opinion.  Id. 568:20-569:3.  If a veteran dies before the BVA adjudicates his appeal, the appeal is considered resolved.  Id. 1174:2-10.

97.    The Appeals Resolution Time increased from 599 days in April 2005, to 671 days by the end of February 2008.  RT 563:14-16; 567:17-19.  During this same time period, VBA's internal goal for Appeals Resolution Time increased from 500 to 700 days.  Id. 563:14-18; 567:13-16.  The Appeals Resolution Time is expected to increase by another 100 days in fiscal year 2008.  Ex. 1264 at 15-16.

98.    If one excludes from the Appeals Resolution Time those claims that are resolved, for whatever reason, before the BVA issues a decision, the Appeals Resolution Time jumps to 1,419 days, or almost four and a half years.  RT 573:21-574:3.  At trial, James Terry, the Chairman of the BVA, was unable to explain this lengthy delay in the resolution of appeals.  Id. 575:21-576:9.

99.    The composition of the BVA is determined, in part, by statute.  38 U.S.C. § 7101.  Section 7101 states that "[t]he Board shall consist of a Chairman, a Vice Chairman, and such number of members as may be found necessary in order to conduct hearings and

-44-

United States District Court
For the Northern District of California

1   dispose of appeals properly before the Board in a timely manner."

2   Id.  The statute further states that "[t]he board shall have

3   sufficient personnel . . . to enable the Board to conduct hearings

4   and consider and dispose of appeals properly before the Board in a

5   timely manner."  Id.

6        100.  In addition to the chairman and vice-chairman, the BVA

7   is currently comprised of 60 judges and their respective staffs.

8   RT 557:19-558:5.  The number of judges employed by the BVA is

9   within the discretion of the VA Secretary.  Id.  The BVA issued

10  40,401 decisions in fiscal year 2007.  Ex. 370 at 2.  95% of these

11  decisions dealt with SCDDC claims.  Id.  The BVA received 39,817

12  appeals in fiscal year 2007 and expects to receive 43,000 appeals

13  in fiscal year 2008.  Id.

14       101.  On average, the BVA affirms an RO's disposition of a

15  veteran's claim only 40% of the time.  RT 1007:10-11.  The BVA, on

16  average, grants a veteran's appeal roughly 20% of the time, and

17  the veteran's appeal is remanded by the BVA to the VBA in the

18  remaining 40% of the cases.  Id. 1007:2-25.

19       102.  Of the cases certified for appeal by the ROs, between

20  19% and 44% were "avoidable remands."  RT 559:9-560:13; 1027:9-16;

21  Ex. 1312.  An avoidable remand is defined as an appeal in which an

22  error is made by the RO before it certifies the appeal to the BVA.

23  Id. 1026:21-1027:4.  Almost half of the avoidable remands that

24  occurred between January 1, 2008, and March 31, 2008, were the

25  result of the VBA employees violating their duty to assist

26  veterans.  Id. 556:2-24; 1166:14-20.

27       103.  A survey of VBA rating specialists at ROs found that

28                              -45-

**United States District Court**
For the Northern District of California

1  70% of them believed that speed in assigning ratings to claims was

2  emphasized over accuracy.  RT 161:23-163:3.

3      104.  When the BVA remands a claim, the claim is sent either

4  to the Appeals Management Center ("AMC"), or returned to an RO.

5  RT 210:10-14.  Once an SCDDC claim is remanded by the BVA, it

6  takes on average 499.1 days for this claim to be granted,

7  withdrawn, or returned to the BVA for a second time.  Ex. 1243 at

8  13.  It takes, on average, 563.9 days for PTSD claims to be

9  granted, withdrawn, or returned to the BVA.  Id.

10     105.  Approximately 75% of the claims that are remanded by

11 the BVA are subsequently appealed to the BVA a second time.  RT

12 544:15-24.  It then takes the BVA an average of 149 days to render

13 a second decision on a claim that had already been remanded once

14 and subsequently re-appealed to the BVA.  Ex. 1310 at VA322-

15 00002505-06; RT 215:7-217:19.  The BVA Chairman Terry testified

16 that "the entire system is hurt by remands."  RT 543:20-25.

17     106.  Between October 1, 2007, and March 31, 2008, alone, at

18 least 1,467 veterans died during the pendency of their appeals.

19 Ex. 1316 at VA322-00002613-24; RT 254:6-255:2.  When an appellant

20 dies, the appeal is extinguished.  RT 1173:24-1174:1.

21     107.  It is beyond doubt that disability benefits are

22 critical to many veterans and any delay in receiving these

23 benefits can result in substantial and severe adverse

24 consequences, including the inability to make mortgage or car

25 payments.  RT 517:25-518:9; PIRT 324:13-325:5.  Although a benefit

26 award is generally retroactive to the date of the claim, the

27 veteran is not entitled to interest.  RT 551:7-14.

28                                  -46-

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    VA Efforts for Reducing Delay

108.    In Spring of 2007, Congress authorized VBA to hire an additional 3,100 employees and provided the necessary additional appropriations.  RT 918:4-21; 999:1-19.  2,700 of these new employees will be hired into the Compensation and Pension line of business.  Id.  At the time of trial, 2,100 of the 2,700 employees had already been hired.  Id.  Prior to this round of hiring, the VBA had a total of 8,000 employees.  Id.

109.    On April 16, 2008, the VBA proposed a new pilot program, in the form of a regulation, for expedited claims adjudication.  Defs.' Ex. 557; 38 C.F.R. Parts 3 and 20.  The two-year program would be limited to four ROs.  Defs.' Ex. 557; 38 C.F.R. Parts 3 and 20.  The program would ask veterans to sign a waiver upon filing a claim whereby several time limits imposed on the veteran would be shortened.  Defs.' Ex. 557; 38 C.F.R. Parts 3 and 20; RT 1169:9-19.  In addition, the program imposes a time limit, albeit one that is unenforceable, on the VBA during the appellate process between a veteran's Form 9 filing and an RO's certification of appeal to the BVA.  RT 1167:10-1168:22.  There are no consequences for the BVA if it exceeds its recommended time limit.  Id. 1024:11-16; 1168:10-14.

110.    According to Deputy Under Secretary for Benefits Walcoff's trial testimony, the VBA is also pursuing two other efforts at reducing delays in the appellate process at ROs.  RT 1020:6-1021:9.  The first is to establish Appeals Resource Centers dedicated solely to appellate work.  Id.  Mr. Walcoff conceded, however, that these centers are not yet in place and he has not

-47-

**United States District Court**
For the Northern District of California

1  seen a plan to create them.  Id. 1162:7-8; 1167:6-8.  The second

2  effort at reducing delays involves emphasizing appellate

3  performance measures in evaluations.  Id. 1020:6-1021:9.

4            **5.  Extraordinary Awards Procedure**

5        111.  The Compensation & Pension Service ("C&P") is an

6  organization within the VA's central office in Washington, D.C.

7  RT 903:13-904:24.  C&P is responsible for setting the policies

8  governing adjudication of SCDDC claims.  Id.  C&P is not empowered

9  to decide claims.  Ex. 1260 at 12.

10       112.  C&P conveys policies and procedures to ROs by

11 publishing manuals.  RT 905:22-25.  C&P issues "Fast Letters" to

12 RO directors when there are changes to a procedure within a

13 manual.  Id. 913:4-25.  ROs are expected to abide by the terms of

14 a Fast Letter.  Id. 913:7-15.  In Fast Letter 07-19, dated August

15 27, 2007, C&P outlined an "extraordinary awards" procedure for ROs

16 to follow when dealing with claims that would result in a

17 retroactive payment of at least eight years or a payment of more

18 than $250,000.  Ex. 375-A at 1-2; RT 1043:2-12.  This procedure is

19 not specified in any statute or regulation.  Ex. 1260 at 11-12.

20 The procedure directs ROs to send the claims folder for all cases

21 meeting the criteria to C&P for a concurring opinion before the

22 benefit award is given to the veteran.  Ex. 375-A at 1-2; RT

23 1043:2-12.  Pursuant to this Fast Letter, C&P only reviews claims

24 where the veteran was awarded retroactive benefit payments for

25 eight years or a payment of more than $250,000.  RT 1044:18-20.

26 C&P does not review denials of such claims.  Id.  Veterans are not

27 notified that their claims are reviewed pursuant to this

28                                 -48-

1    procedure.  Id. 1045:17-23.

2        113.  C&P has reviewed approximately 800 rating decisions,

3    most of which were reviewed because they called for benefits to be

4    retroactively awarded for eight or more years.  RT 1043:20-24.

5    Less than 25 of the 800 rating decisions were reviewed by C&P

6    because the proposed award was greater than $250,000.  Id.  The

7    vast majority of those reviews resulted in a reduction of the

8    proposed benefits.  Ex. 1264 at 18.

9

10   **V.    CONCLUSIONS OF LAW**

11       With the background of the foregoing findings, the Court

12   turns to the conclusions of law and, in particular, addresses the

13   relief sought by Plaintiffs.

14       **A.    Standing**

15       1.  Plaintiffs have demonstrated that their members have

16   suffered injuries in fact.  Defenders of Wildlife, 504 U.S. at

17   560-61.  As testified to at trial, their members have faced

18   significant delays in receiving disability benefits and medical

19   care from the VA.  Furthermore, given the dire consequences many

20   of these veterans face without timely receipt of benefits or

21   prompt treatment for medical conditions, especially depression and

22   PTSD, these injuries are anything but conjectural or hypothetical.

23       2.  Plaintiffs have also demonstrated a causal connection

24   between the injury and the conduct at issue.  Id. As Defendants

25   concede, delays in health care, especially for mental health

26   issues, and delays in receipt of disability benefits, which are

27   often the primary or sole source of income for a veteran, can lead

28                                    -49-

United States District Court
For the Northern District of California

1    to exactly the type of injuries complained of by Plaintiffs.

2        3.   Finally, the relief sought by Plaintiffs would likely

3    result in the amelioration of the injuries.  Id.  Defendants argue

4    that any relief afforded by the Court would be too speculative to

5    redress Plaintiffs' injuries.  If, however, the Court were to

6    order, for example, that the VBA adjudicate a veteran's appeal of

7    a denial of benefits within a certain time period, Plaintiffs'

8    injuries would be redressed.  The issue, as discussed below, is

9    whether this and the other relief sought by Plaintiffs are within

10   the power of the Court to grant.  Nonetheless, for the purpose of

11   standing, the Court finds that Plaintiffs' individual members

12   would have standing to sue.

13       4.   It is clear, and Defendants do not argue otherwise, that

14   the interests at stake are germane to the purposes of both

15   organizations.  Friends of the Earth, 528 U.S. at 181.  Both

16   organizations are comprised primarily of veterans and both

17   organizations are working to decrease the wait times for, and

18   improve the quality of, mental health care and delivery of

19   disability benefits.

20       5.   The participation of Plaintiffs' individual members was

21   not required at any point throughout the duration of the trial.

22   Id.  For all of these reasons, the Court concludes that

23   Plaintiffs, as organizations, have standing to bring suit on

24   behalf of their members.

25       B.   **Waiver of Sovereign Immunity**

26       6.   To fall within the APA's waiver of sovereign immunity

27   under 5 U.S.C. § 702, Plaintiffs must establish that they

28                               -50-

United States District Court
For the Northern District of California

challenge final agency action for which there is no alternate
adequate remedy. <u>Nat'l Wildlife Fed'n</u>, 497 U.S. at 882; 5 U.S.C.
§§ 702, 704. In determining whether Plaintiffs have challenged
final agency action, the Court examines each of Plaintiffs
specific challenges below. In assessing whether there exists an
adequate alternate forum, the Court notes that in the Motion to
Dismiss Order, the Court held that the system established by
Congress for adjudicating veterans' individual benefit claims does
not provide an adequate alternative remedy for the limited purpose
of Plaintiffs' systemic, facial constitutional challenges.
However, as discussed in detail below, even though there may not
be adequate alternative remedy, Plaintiffs' challenges under the
APA fail for other reasons, including failure to challenge a final
agency action, failure to challenge a discrete agency action,
and/or failure to challenge an action that the agency is required
to take. <u>See Nat'l Wildlife Fed'n</u>, 497 U.S. at 882; <u>Norton</u>, 542
U.S. at 64. Nonetheless, in the interest of uniformity, the Court
briefly revisits its discussion on adequate alternative remedy.

7. The Veterans' Judicial Review Act ("VJRA"), Pub. L. No.
100-687, 102 Stat. 4105 (1988), permits veterans to challenge VA
decisions on individual benefits decisions in the CAVC. 38 U.S.C.
§ 7261. Pursuant to statute, the CAVC, an Article I appellate
court, only has jurisdiction to affirm, reverse, or remand
decisions of the BVA on individual claims for benefits. 38 U.S.C.
§ 7252(a). The CAVC's jurisdiction is therefore limited to the
issues raised by each veteran based on the facts in his or her
claim file from his or her particular case. <u>See</u>, <u>e.g.</u>, <u>Clearly v.</u>

-51-

**United States District Court**
For the Northern District of California

1   <u>Brown</u>, 8 Vet. App. 305, 307 (1995) (stating "[i]n order to obtain

2   review by the Court of Veterans Appeals of a final decision of the

3   Board of Veterans' Appeals ["BVA"], a <u>person</u> adversely affected by

4   that <u>action</u> must file a notice of appeal with the Court")

5   (emphasis added).  Accordingly, the CAVC would not have

6   jurisdiction over or the power to provide a remedy for the

7   systemic challenges to the VA health system such as those brought

8   by Plaintiffs.

9        8.  The CAVC itself has recognized its limited remedial

10   power, stating:  "[I]t must be borne in mind that the jurisdiction

11   of this Court is over final decisions of the BVA. . . .  Nowhere

12   has Congress given this Court either the authority or the

13   responsibility to supervise or oversee the ongoing adjudication

14   process which results in a BVA decision." <u>Clearly</u>, 8 Vet. App. at

15   308.  Although the facts in <u>Clearly</u> are clearly distinguishable

16   from those before this Court, many of Plaintiffs' challenges are

17   aimed directly at the processes that the regional offices and the

18   BVA use to reach decisions of individual claims.  These processes,

19   as conceded by the CAVC itself, are outside the purview of its

20   jurisdiction.

21        9.  In <u>Dacoran v. Brown</u>, 4 Vet. App. 115 (1993), the CAVC,

22   then named the Court of Veterans Appeals ("CVA"), again recognized

23   the limitation of its own remedial power.  The court noted that

24   constitutional challenges will be "presented to this Court only in

25   the context of a proper and timely appeal taken from such decision

26   made by the VA Secretary through the BVA."  <u>Id.</u> at 119.

27   Plaintiffs in the present case, for the reasons stated below,

28   -52-

**United States District Court**
For the Northern District of California

1   would be unable to bring a claim before a VA regional office, much

2   less appeal such a claim to the BVA or CAVC.  Regarding its

3   ability to address constitutional issues through the All Writs

4   Act, the court stated:

> Although this Court also has authority to
> reach constitutional issues in
> considering petitions for extraordinary
> writs under 28 U.S.C. § 1651(a), the
> Court may, as noted above, exercise such
> authority only when a claimant has
> demonstrated that he or she has no
> adequate alternative means of obtaining
> the relief sought and is clearly and
> indisputably entitled to such relief.
> See Erspamer [v. Derwinski, 1 Vet. App.
> 3, 7 (1990)].  Where, as here, a claimant
> remains free to challenge the
> constitutionality of a statute in the
> U.S. district court, she has not
> demonstrated that she lacks adequate
> alternative means of obtaining the relief
> sought.

15  Id.  Thus, the very courts that were established by the VJRA

16  recognize not only the jurisdiction of district courts for

17  constitutional claims but, more importantly for this issue,

18  recognize the limited jurisdiction that they themselves possess.

19      10.  Plaintiffs, as organizations seeking to protect the

20  interests of a broad class of veterans, would be unable to bring

21  suit in the VA system.  Organizations do not and cannot submit

22  individual claims for benefits to the regional offices and,

23  therefore, are precluded from ever presenting claims on appeal to

24  the BVA, the CAVC, or the Federal Circuit.  Under the position

25  advocated by Defendants, Plaintiffs would be barred from raising

26  these particular claims in any forum.  Plaintiffs' members would

27  be left to litigate their own individual claims while also

-53-

**United States District Court**
For the Northern District of California

1  attempting to shoehorn into their claims the challenges now

2  asserted.  The statutory framework of the VA benefits system does

3  not provide for this and, as such, the VA benefits system is not

4  an adequate alternate forum for Plaintiffs' systemic and facial

5  constitutional challenges.

6    **C.  Plaintiffs' Proposed Remedies**

7    11.  One issue that has generated some difficulty throughout

8  this litigation has been determining exactly which practices and

9  actions of the VA Plaintiffs challenge.  For example, in their

10  Complaint, Plaintiffs allege that "certain widespread practices

11  and policies of the VA" are illegal.  Compl. ¶ 31.  Among these,

12  Plaintiffs list protracted delays in adjudication and treatment of

13  PTSD, premature denial of PTSD claims, and "[v]arious other

14  illegal practices and procedures as outlined" in other parts of

15  the 68 page Complaint.  Id. ¶ 31a-e.

16    To ensure that the Court addresses the specific relief sought

17  by Plaintiffs, the Court will use Plaintiffs' Proposed Conclusions

18  of Law as well as the Proposed Order submitted with Plaintiffs'

19  Post-Trial Briefing as a template to address Plaintiffs' claims

20  and remedies.

21    **1.  Mental Health Care**

22    12.  Section 1710 states, in part, that the Secretary "shall

23  furnish hospital care and medical services which the Secretary

24  determines to be needed to any veteran for a service-connected

25  disability . . . ."  38 U.S.C. § 1710(a)(1).  It further states,

26  inter alia:

27    [A] veteran who served on active duty in

28    -54-

United States District Court
For the Northern District of California

1

> a theater of combat operations . . .
> after November 11, 1998, is eligible for
> hospital care, medical services and
> nursing home care . . . notwithstanding
> that there is insufficient medical
> evidence to conclude that such condition
> is attributable to such service.

38 U.S.C. § 1710(e)(1)(D).  Section 1710(e)(3)(C)(i) provides a

five-year period for this medical care.  For reasons discussed at

length in the Motion to Dismiss Order, the Court found that this

language created an entitlement to health care for veterans for

five years after separation from active duty.  See Mot. to Dismiss

Order at 35-38.  The Court need not repeat this discussion, as

even with this finding, the remedies proposed by Plaintiffs are

beyond the power of this Court.

13.  Plaintiffs, in their Proposed Order, state the

following:

> Defendants' failure to provide timely and
> effective health care to veterans with
> PTSD, and related or co-occurring
> conditions such as depression or
> traumatic brain injury, and/or veterans
> exhibiting suicidal intentions or
> symptoms, constitutes a statutory
> violation of 38 U.S.C. §§ 1705 and 1710,
> and that failure constitutes agency
> action unreasonably delayed under 5
> U.S.C. § 706(1).

Proposed Order ¶ 5.

14.  Although the provision of care is mandatory, it is

beyond the power of this Court to determine when and how such care

shall be provided.  Were it to do so, the Court would have to

substitute its own definitions of both "timely" and "effective,"

something prohibited by both the APA and by §§ 1705 and 1710

themselves.

-55-

**United States District Court**
For the Northern District of California

**a.    Timely and Effective Mental Health Care**

15.   Section 706(1) of the APA permits federal courts to order agencies to act only where the agency fails to "take a discrete agency action that it is required to take." Norton, 542 U.S. at 64 (emphasis in original).  "Thus, when an agency is compelled by law to act . . ., but the manner of its action is left to the agency's discretion, a court  . . . has no power to specify what the action must be." Id. at 65.  Furthermore, "[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action." Id. at 66.

16.   As became obvious from the parties' own mental health experts, what constitutes "timely" and "effective" health care is an issue that lacks consensus even among those who are experts in the mental health field.  Thus, for example, at trial there was strong disagreement as to what constitutes appropriate or adequate care for diagnosis and treatment of veterans with PTSD, depression, and/or suicidal ideation.  See, e.g., Findings of Fact ¶¶ 58,59, supra.  These disagreements alone, even if the Court had the power to step in, would make it exceedingly difficult to fashion a plan and order the VA to implement a prescribed course of mental health care.

17.   The Court is prohibited from even reaching that issue, however, as "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with . . . congressional directives is not contemplated by the APA." Norton, 542 U.S. at 66.  For these reasons, Plaintiffs' claim that the VA is not providing timely or effective mental health care is plainly

-56-

United States District Court
For the Northern District of California

1    precluded by the APA.  Any order by this Court relating to the

2    sufficiency and timeliness of mental health care would effectively

3    draw this Court into the position of overseeing various aspects of

4    the VA, something the Supreme Court has expressly prohibited.  The

5    Supreme Court has stated:

6                    If courts were empowered to enter general
                     orders compelling compliance with broad
7                    statutory     mandates,     they     would
                     necessarily be empowered, as well, to
8                    determine   whether   compliance   was
                     achieved--which would necessarily mean
9                    that it would ultimately become the task
                     of the supervising court, rather than the
10                   agency, to work out compliance with the
                     broad  statutory  mandate,  injecting  the
11                   judge   into   the   day-to-day   agency
                     management.

12

13   Norton, 542 U.S. at 67.

14        18.  Finally, Plaintiffs' claim that the VA is failing to

15   provide any mental health care is not supported by the evidence

16   presented at trial.  Even had Plaintiffs' made this showing,

17   however, the APA would likely have prevented review in this Court,

18   as the APA does not allow "plaintiffs to evade the finality

19   requirement with complaints about the sufficiency of an agency

20   action dressed up as an agency's failure to act."  Ecology Ctr.,

21   192 F.3d at 926 (internal quotation marks omitted).

22        19.  In addition, § 1710 commits decisions about the

23   provision of medical care to the Secretary's discretion.  38

24   U.S.C. § 1710.  As noted above, the Court would have no manner in

25   which to determine what type of mental health care is required.

26   See Webster v. Doe, 486 U.S. 592, 600 (1988) (stating "under §

27   701(a)(2) [of the APA], even when Congress has not affirmatively

28
                              -57-

**United States District Court**
For the Northern District of California

1  precluded judicial oversight, review is not to be had if the

2  statute is drawn so a court would have no meaningful standard

3  against which to judge the agency's exercise in discretion")

4  (internal quotation marks omitted).  Section 1705 also dictates

5  that the Secretary "ensure that the system will be managed in a

6  manner to ensure that the provision of care to enrollees is timely

7  and acceptable in quality."  38 U.S.C. § 1705.  As such, the

8  design and implementation of a health care enrollment system is

9  delegated to the Secretary of the VA, leaving courts with no

10  meaningful standards against which to judge the agency's exercise

11  in discretion.  Plaintiffs' challenge to the timeliness and

12  effectiveness of the VA's delivery of mental health care is thus

13  also barred by §§ 1705 and 1710.

14            **b.   Delay in Mental Health Care and Due Process**

15        20.   The TRAC factors provide the framework for a court to

16  determine whether agency action has been unreasonably delayed.

17  See Section III.D.1., supra.  Before the Court can even reach the

18  TRAC factors and the issue of unreasonable delays in the provision

19  of mental health care, however, there must be a showing that there

20  are in fact system-wide delays in providing this care.  The

21  evidence presented at trial falls short of this.  For example, the

22  Court received evidence that the majority of veterans of Iraq and

23  Afghanistan are being seen at clinics offering mental health

24  services within 30 days.  Findings of Fact ¶ 40.  Although the

25  evidence clearly did not prove that every veteran always gets

26  immediate mental health care, it by no means follows that there is

27  a system-wide crisis in which health care is not being provided

28                                      -58-

1   within a reasonable time.[4]

2                   **c.  Clinical Appeals Process**

3       21.  Plaintiffs, in their Proposed Order, assert the

4   following:

5           [T]he VA's process for resolving clinical
            disputes about health care treatment
6           violates the Due Process Clause in that
            it does not apply to refusals to provide
7           care . . . .

8   Proposed Order ¶ 6.  As noted in the Findings of Fact, a veteran

9   may appeal a clinical medical decision, but if, for example, a

10  veteran is told to return at a later date solely on the basis that

11  there are no available appointments, he or she has no way of

12  appealing this decision.  If, however, a veteran is told to come

13  back later because a VA employee has indicated that the veteran's

14  health will not be adversely affected by coming at a later time,

15  then the veteran can appeal this clinical diagnosis.

16      22.  "[D]ue process is flexible and calls for such procedural

17  protections as the particular situation demands."  Mathews, 424

18  U.S. at 335.  In evaluating whether a procedure satisfies Due

19  Process, courts balance (1) the private interest, (2) the risk of

20  erroneous deprivation and the likely value, if any, of extra

21  safeguards, and (3) the government's interest, especially the

22  burden any additional safeguards would impose.  Id. at 332.

23      23.  Without question, the private interest of veterans in

24  receiving health care is high.  The risk of erroneous deprivation,

25

26      [4]  Plaintiffs, perhaps realizing this, did not include in
    their Proposed Order any language relating to Due Process
    violations and delays in mental health care.  See Proposed Order ¶¶
27  4-6.

28
                                -59-

**United States District Court**
For the Northern District of California

however, is less so.  The Court heard testimony during the trial
that veterans who present at a VA medical facility with emergency
mental health issues are seen immediately.  This is not to say
that every time a veteran presents with a mental health emergency,
he or she is guaranteed immediate treatment.  Nonetheless,
Plaintiffs did not prove a systemic denial or unreasonable delay
in mental health care.  In addition, a veteran who is told to come
back at a later time because his or her health is such that
immediate treatment is not required may appeal this clinical
decision.  Finally, additional safeguards at this level would
impose burdens on the VA.  See Parham v. J.R., 442 U.S. 584, 605
(1979) (stating that the government "has a genuine interest in
allocating priority to the diagnosis and treatment of patients . .
. rather than to time-consuming procedural minuets").

      24.  Plaintiffs' Proposed Order also states that the clinical
appeals process violates Due Process because "there is no
opportunity for any hearing by a neutral decision-maker, the
process is unduly complicated and lengthy, and there is no
provision for any expedited process that would apply in an
emergency situation such as a threatened suicide."  Proposed Order
¶ 6.  "Procedural due process requires adequate notice and an
opportunity to be heard."  Kirk, 927 F.2d at 1107.

      25.  The process for clinical appeals involves consultation
with the treating physician, access to patient advocates, and the
opportunity to appeal a medical decision to both the facility and
VISN level.  Findings of Fact ¶ 52.  Moreover, due process does
not "always require an adversarial hearing," nor does it require

United States District Court

For the Northern District of California

1   an "independent decision maker come from outside the hospital

2   administration." Hickey, 722 F.2d at 549.  The process afforded

3   veterans seeking to appeal their medical decisions strikes the

4   Court as an appropriate balance between safeguarding the veteran's

5   interest in medical treatment and permitting medical treatment

6   without overly burdensome procedural protections.  In addition,

7   the Court is mindful of the Supreme Court's admonition that "[t]he

8   mode and procedure of medical diagnostic procedures is not the

9   business of judges." Parham, 442 U.S. at 607-08.  For these

10  reasons, the Court cannot conclude that the VA clinical appeals

11  process violates Due Process.

12                    **2.    Mental Health Strategic Plan**

13        26.   Plaintiffs ask the Court to order the VA, within 150

14  days, to fully implement the MHSP.  Proposed Order ¶ 12.

15  Plaintiffs concede that the MHSP is a good plan.  Thus, rather

16  than attacking the MHSP itself, Plaintiffs instead attack the VA's

17  slow progress and/or failure in implementing the MHSP.

18        27.   Such an attack relies on § 706 of the APA, which

19  provides that a "reviewing court shall compel agency action

20  unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(a).

21  "Review of an agency's failure to act has been referred to as an

22  exception to the final agency action requirement." Ctr. for

23  Biological Diversity, 218 F. Supp. 2d at 1157.  "Courts have

24  permitted jurisdiction under the limited exception to the finality

25  doctrine only when there has been a genuine failure to act."

26  Ecology Ctr., 192 F.3d at 926.  The Ninth Circuit "has refused to

27  allow plaintiffs to evade the finality requirement with complaints

28                                  -61-

United States District Court
For the Northern District of California

1  about the sufficiency of an agency action dressed up as an

2  agency's failure to act." Id. (internal quotation marks omitted).

3  Plaintiffs' challenge to the manner and speed with which the MHSP

4  has been implemented is foreclosed by this caselaw.

5       28.  Furthermore, waiver of sovereign immunity under § 706 of

6  the APA requires a challenge to "a discrete agency action that

7  [the agency] is required to take." Norton, 542 U.S. at 64.  The

8  MHSP falls outside of this definition.  The MHSP consists of 265

9  recommendations.  Findings of Fact ¶ 27.  Whether a plan with this

10  many recommendations can be characterized as "discrete agency

11  action" is dubious.  More problematic, however, is the fact that

12  the actions and strategies outlined in the MHSP are

13  recommendations, and, accordingly, are not actions the VA "is

14  required to take."

15       29.  Finally, as Plaintiffs concede, the MHSP was developed

16  as a five year plan and is currently only in the fourth year of

17  implementation.  It would be anomalous for the Court to find that

18  the MHSP were a final agency action or that the VA has failed or

19  delayed to implement the MHSP, when the action is ongoing and is

20  not even expected to conclude until late next year.  For these

21  reasons, Plaintiffs' request that the Court order the VA to

22  implement the MHSP within 150 days is barred by sovereign

23  immunity.

24            **3.  Feeley Memorandum**

25       30.  Plaintiffs' request that the Court order the VA to fully

26  implement the Feeley Memo within 150 days is equally problematic

27  under the APA's requirements for waiver of sovereign immunity.

28  -62-

Although the Feeley Memo, and its call for 24-hour mental health
triage and 14-day follow-up mental health care is much more akin
to a discrete agency action than the MHSP, it nonetheless is not
an action that the VA is required to take.  Instead, the Feeley
Memo contains "initiatives" created by the Secretary that were
designed to "enhance the capacity of mental health services, and
facilitate access to high quality services."  Findings of Fact ¶
34.  "The limitation to required agency action rules out judicial
direction of even discrete agency action that is not demanded by
law."  Norton, 542 U.S. at 65.  Moreover, "[g]eneral deficiencies
in compliance, unlike [a] failure to issue a ruling . . ., lack
the specificity requisite for agency action."  Id. at 66.  For
these reasons, Plaintiffs' request that the Court order the VA to
fully implement and monitor the Feeley Memo initiatives is barred
by sovereign immunity.

### 4.   Delays in Adjudication of SCDDC Benefits

31.   Plaintiffs assert that the delays in adjudicating SCDDC
benefit claims are excessive and unreasonable and therefore
violate the rights of veterans under the APA and the Due Process
Clause.

32.   It takes the VBA, on average, 183 days to adjudicate a
claim filed by a veteran.  Findings of Fact ¶ 67.  Of the more
than 830,000 ratings claims filed each year, approximately 11%
result in an NOD being filed by the veteran.  Id. ¶ 89.  Only 4%
of the total number of claims filed each year actually proceed
past the NOD to a decision by the BVA.  Id.  For veterans who
pursue an appeal to completion, it takes, on average, 1,419 days

*United States District Court* For the Northern District of California

1    to receive a BVA decision after filing an NOD.  Id. ¶ 95.

2    Although these delays in benefits claims adjudications, especially

3    for appeals, are substantial, the existing statutory framework and

4    caselaw prevent this Court from taking remedial action.  This

5    conclusion is reinforced by the fact that only 4% of the total

6    claims each year are appealed and pursued to a decision by the

7    BVA.

8         33.  As noted above, 38 U.S.C. § 511 prevents the Court from

9    reviewing delays in individual veterans' cases.  The issue,

10   however, of whether a veteran's benefit claim adjudication has

11   been substantially delayed will often hinge on specific facts of

12   that veteran's claim.  For example, a veteran who raises seven or

13   eight issues in his or her claim will likely face a more

14   protracted delay than a veteran who raises only one or two issues.

15   Thus, although the determination of whether the delay is

16   unreasonable may depend on the facts of each particular claim,

17   Crosby v. Soc. Sec. Admin., 796 F.2d 576, 580 (1st Cir. 1986), §

18   511 prevents this Court from undertaking such a review.

19        34.  Furthermore, were the Court to implement the injunctive

20   relief requested by Plaintiffs and order that the VA shorten the

21   average wait times, such an order would invariably implicate VA

22   regulations.  For example, 38 C.F.R. § 3.159(b)(1) requires the VA

23   to notify claimants once the VA has received most or all of a

24   claim application; 38 C.F.R. § 3.159(c) requires the VA to assist

25   the veteran in obtaining medical records; 38 C.F.R. § 3.103(c)

26   provides the time limit for filing a Notice of Disagreement; 38

27   C.F.R. § 3.109(a) provides that a veteran's claim is treated as

28                                    -64-

United States District Court
For the Northern District of California

abandoned if evidence is not submitted within one year; and 38
C.F.R. §§ 20.200-20.202 set forth the procedural requirements to
pursue an appeal.  38 U.S.C. § 502 permits litigation of
challenges to VA regulations only in the Federal Circuit.  See
Preminger, 422 F.3d at 821 (stating "Congress has explicitly
provided for judicial review of direct challenges to VA rules and
regulations only in the Federal Circuit").  Plaintiffs argue that
even though various regulations are implicated in the relief they
seek, § 502 does not strip the jurisdiction of this Court because
Plaintiffs do not directly challenge the regulations.  An order
expediting claims adjudications, however, would force the VA to
alter or repeal some of these regulations.  Although the Court
does not suggest that VA regulations alone are responsible for the
substantial delays, an injunction requiring expedited claims
processing would necessarily challenge some of these regulations,
and any such challenge is reviewable only in the Federal Circuit.

35.  Plaintiffs also argue they are entitled to relief under
the APA for the delays in claims adjudications.  In assessing
whether agency action has been unreasonably delayed pursuant to §
706 of the APA, courts look to the TRAC factors.[5]  See III.D.1.,
supra.  Although the delays faced by veterans, especially during
the appeals process, are significant, the TRAC factors militate
against a finding of unreasonableness.  The first and second
factors, dealing with the "rule of reason" and any Congressional

_____

[5]  It is uncontested the adjudication of benefits claims is a
discrete agency action that the VA is required to take.  Norton,
542 U.S. at 64; 5 U.S.C. § 706.

-65-

**United States District Court**
For the Northern District of California

timetable or indication of the speed with which the agency should act, favor neither a finding of reasonableness nor unreasonableness.  Various statutes admonish the VA to adjudicate benefits claims and appeals in a timely manner.  <u>See</u>, <u>e.g.</u>, 38 U.S.C. § 7101 (statutory duty to hire sufficient personnel to process appeals at the BVA in a timely manner); 38 U.S.C. § 5109B (statutory duty to resolve remands in expeditious manner).  These statutes, rather than providing meaningful signposts for what constitutes a reasonable time, however, instead beg the question.  This conclusion is reinforced by the fact that Congress specifically did not include any fixed time limits for the adjudication of veterans benefits claims, an act of which it is perfectly capable and which would definitively and immediately remedy the delays.  <u>Cf.</u> <u>Heckler v. Day</u>, 467 U.S. 104, 117-18 (1984) (stating "[i]n light of Congress' continuing concern that mandatory deadlines would subordinate quality to timeliness, and its recent efforts to ensure the quality of agency determinations, it hardly could have been contemplated that courts should have authority to impose the very deadlines it repeatedly has rejected").[6]

   36.  The third <u>TRAC</u> factor favors a finding of unreasonableness.  Delays affecting human health and welfare are less tolerable than those in the sphere of economic regulation and

---

   [6]  Legislation was introduced, and rejected, during the 102st and 102nd Congresses that would have required the VA to pay interim benefits if disability and dependency claims that were not decided within 180 days.  <u>See</u> Veterans' Claims Administrative Equity Act of 1990, H.R. 5793, 101st Cong. (1990); Veterans' Claims Administrative Equity Act of 1991, H.R. 141, 102nd Cong. (1991).

1    no one can dispute that the health and welfare of veterans is at

2    stake.  For this same reason the fifth factor favors relief, as

3    the nature and extent of the interests prejudiced by the delay

4    could not be any more serious.  The sixth factor, in which a court

5    need not find impropriety in order to find the agency action was

6    unreasonably delayed, also favors relief.  Although the VA's track

7    record, especially in the area of delays, is troubling, the Court

8    has found no impropriety.

9        37.  These factors, however, cannot overcome the fourth

10   factor, which states that "the court should consider the effect of

11   expediting delayed action on agency activities of a higher or

12   competing priority."  Indep. Mining Co., 105 F.3d at 507 n.7.  The

13   Court heard testimony that the current delays in the claims

14   appeals process are, in part, the result of the VA's decision to

15   emphasize initial claim adjudication at the expense of appeals.

16   Findings of Fact ¶ 91.  Clearly this does not fully explain the

17   significant delays.  One of the most common reasons for a claim to

18   be remanded to an RO is the VA's failure to meet its duty to

19   assist veterans.  This is proof that internal, avoidable forces

20   within the VA are also creating these delays.  Nonetheless, given

21   the substantial number of claims and appeals received each year by

22   the VA, and the fact that only 11% of veterans file Notices of

23   Disagreement after their claims are adjudicated at the RO level

24   and only 4% of the total claims are actually pursued to a decision

25   by the BVA, the Court finds that the fourth TRAC factor outweighs

26   the others.  An order by this Court requiring the VA to decrease

27   its appeals times would necessarily impact those seeking initial

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  benefits, as resources would be diverted from the RO level to the

2  appellate level.  As discussed elsewhere in this Order, claims

3  adjudications at the RO level already face delays.  The relief

4  Plaintiffs seek would, in effect, divert resources from the RO

5  level, where 88% of veterans finalize their receipt of benefits,

6  so that the 4% to 11% of veterans who pursue appeals would face

7  lessened delays.  Given that almost 90% of veterans depend solely

8  on the RO adjudication process for their benefits, the Court is

9  wary of granting relief that would jeopardize the already taxed

10 ROs.  For these reasons, the TRAC factors do not favor a finding

11 that the delays in the VA claims adjudication system are

12 unreasonable.  This conclusion is consistent with the Supreme

13 Court's warning to district courts that the "prospect of pervasive

14 oversight by federal courts over the manner and pace of agency

15 compliance with . . . congressional directives is not contemplated

16 by the APA."  Norton, 542 U.S. at 66.

17      38.  Plaintiffs also assert that the "[d]elays and waiting

18 times for applicants and recipients filing SCDDC claims or appeals

19 are so lengthy as to constitute an unconstitutional deprivation of

20 property under the Due Process Clause."  Proposed Order ¶ 7.

21 Recipients of statutorily-entitled compensation have a property

22 interest under the Due Process Clause in the continued receipt of

23 such compensation.  Mathews, 424 U.S. at 332; Goldberg v. Kelly,

24 397 U.S. 254, 261-62 (1970).  More importantly for present

25 purposes, "[t]he Ninth Circuit has long held that applicants have

26 a property interest protectible under the Due Process Clause where

27 the regulations establishing entitlement to the benefits are . . .

-68-

mandatory in nature." <u>Foss v. Nat'l Marine Fisheries Serv.</u>, 161 F.3d 584, 588 (9th Cir. 1998).

39. Claimants who satisfy the statutory criteria for eligibility are entitled as a matter of law to SCDDC benefits. Based on the statutory framework, many veterans have a protected property interest as applicants for and recipients of SCDDC benefits.

40. "[T]here is no talismanic number of years or months, after which due process is automatically violated." <u>Coe v. Thurman</u>, 922 F.2d 528, 531 (9th Cir. 1990). "In determining when due process is no longer due process because past due, the influence of other significant circumstances is not to be ignored." <u>Wright v. Califano</u>, 587 F.2d 345, 354 (7th Cir. 1978). "Delay is a factor but not the only factor." <u>Id.</u> Although the delays in claims adjudication are significant, the Court, in light of many of the factors creating these delays, cannot conclude that the due process rights of veterans are being violated. The court's discussion in <u>Wright</u> of delays in the Social Security Administration context is illuminating. The court stated:

> In view of the reasons for delay, nationwide in scope, not individualized, and the nature of particular benefits, a judicial fiat cannot help the SSA or claimants. Although judicial intervention may be required at some point, the solution must come from the SSA itself with the assistance of Congress. To impose on the SSA the crash review program sought by plaintiffs could be expected to result in a deterioration of the quality of the review, and possibly more injustice to claimants than justice.

<u>Wright</u>, 587 F.2d at 356. The Court finds this reasoning

-69-

applicable to the present case.  <u>See also</u> <u>Fed'l Trade Comm'n v.</u>

<u>Weingarten</u>, 336 F.2d 687, 692 (5th Cir. 1964) (holding that "it

would be the extremely rare case where a Court would be justified

in holding . . . that the passage of time and nothing more

presents an occasion for the peremptory intervention of an outside

Court in the conduct of an agency's adjudicative proceedings").

### 5.  Claims Adjudication Process

41.  Plaintiffs assert that the claims adjudication process

violates the due process rights of veterans, stating:

> Given the adversarial and complicated
> nature of the VA claims processes, the
> unavailability or lack of utilization of
> basic procedural protections, such as a
> right to a pre-decisional hearing and the
> right to discovery, both alone and in
> combination with the inability to retain
> paid counsel at the Regional Office
> level, constitute an independent
> violation of the Due Process Clause.

Proposed Order ¶ 8.

42.  VA regulations state:

> Every claimant has the right to written
> notice of the decision made on his or her
> claim, the right to a hearing, and the
> right of representation.  Proceedings
> before VA are ex parte in nature, and it
> is the obligation of VA to assist a
> claimant in developing the facts
> pertinent to the claim and to render a
> decision which grants every benefit that
> can be supported in law while protecting
> the interests of the Government.

38 C.F.R. § 3.103.  In addition, 38 U.S.C. § 5904(c) prohibits

paid counsel at the RO level.  Once the veteran files a notice of

disagreement with an RO decision, the veteran may then retain paid

counsel.

-70-

**United States District Court**
For the Northern District of California

1    42.   To begin, the Court notes that in the Motion to Dismiss

2    Order, the Court cited a case from the Federal Circuit in support

3    of the proposition that the claims adjudication system, although

4    designed to be non-adversarial, had shifted towards an adversarial

5    system.  <u>See</u> Mot. to Dismiss Order at 32 (stating "[t]he Federal

6    Circuit, which has exclusive appellate jurisdiction under the

7    VJRA, has recognized [a] de-facto shift towards an adversarial

8    system") (citing <u>Bailey v. West</u>, 160 F.3d 1360 (Fed. Cir. 1998)

9    (en banc)).  In <u>Bailey</u>, the court stated:

10               Since the Veterans' Judicial Review Act .
                 . ., it appears the system has changed
11               from  a  nonadversarial,  ex  parte,
                 paternalistic system for adjudicating
12               veterans'  claims,  to  one  in  which
                 veterans . . . must satisfy formal legal
13               requirements, often without the benefit
                 of  legal  counsel,  before  they  are
14               entitled to administrative and judicial
                 review.
15

16   <u>Bailey</u>, 160 F.3d at 1365 (internal citations and quotation marks

17   omitted).  Based on this assessment, this Court permitted

18   Plaintiffs' due process challenge to the VA claims adjudication

19   system to proceed, noting, "[i]f the VA claims adjudication

20   process were truly non-adversarial, then Plaintiffs' due process

21   claim would be on shaky ground."  Mot. to Dismiss Order at 32.

22   43. Four years after <u>Bailey</u>, the Federal Circuit clarified

23   its holding, stating that the "veterans' benefits system remains a

24   non-adversarial system when cases are pending before the Veterans'

25   Administration," while the "Court of Appeals for Veterans Claims'

26   proceedings are not non-adversarial."  <u>Forshey v. Principi</u>, 284

27   F.3d 1335, 1355 (Fed. Cir. 2002) (en banc) (superceded by statute

28                              -71-

1   on other grounds by Pub. L. No. 107-330, § 402(a), 116 Stat. 2820,

2   2832 (2002)).   Thus, according to the Federal Circuit, the process

3   at the RO level remains non-adversarial.

4        44.   Nonetheless, Plaintiffs challenge the absence of trial-

5   like proceedings and assert that the current system violates

6   veterans' due process rights.   "[D]ue process is flexible and

7   calls for such procedural protections as the particular situation

8   demands."   <u>Mathews</u>, 424 U.S. at 335.   In evaluating whether a

9   procedure satisfies Due Process, courts balance (1) the private

10  interest, (2) the risk of erroneous deprivation and the probable

11  value, if any, of extra safeguards, and (3) the government's

12  interest, including the function involved and the fiscal and

13  administrative burdens that the additional or procedural

14  requirement would entail.   <u>Id.</u>   Although "[p]rocedural due process

15  requires adequate notice and an opportunity to be heard,"   <u>Kirk</u>,

16  927 F.2d at 1107, it does not "always require an adversarial

17  hearing."   <u>Hickey</u>, 722 F.2d at 549.   "The role of the judiciary is

18  limited to determining whether the procedures meet the essential

19  standard of fairness under the Due Process Clause and does not

20  extend to imposing procedures that merely displace congressional

21  choices of policy."   <u>Landon v. Plasencia</u>, 459 U.S. 21, 34-35

22  (1982).

23       45.   Under the <u>Mathews</u> factors, the current system for

24  adjudicating veterans' SCDDC claims satisfies due process.   It is

25  without doubt that veterans and their families have a compelling

26  interest in receiving disability benefits and that the

27  consequences of erroneous deprivation can be devastating.   In

28                                    -72-

looking at the totality of SCDDC claims, however, the risk of erroneous deprivation is relatively small. 11% of veterans file Notices of Disagreement upon adjudication of their claims by ROs. Only 4% proceed past the NOD to a decision by the BVA. Thus, while the avoidable remand rates at the VA are extraordinarily high,[7] only 4% of veterans who file benefits claims are affected. Plaintiffs here "confront the constitutional hurdle posed by the principle enunciated in cases such as <u>Mathews</u> to the effect that a process must be judged by the generality of cases to which it applies, and therefore, process which is sufficient for the large majority of a group of claims is by constitutional definition sufficient for all of them." <u>Walters v. Nat'l Ass'n of Radiation Survivors</u>, 473 U.S. 305, 330 (1985).

46. Moreover, although the additional safeguards Plaintiffs seek would likely reduce the number of avoidable remands and erroneous deprivations, the fiscal and administrative burdens of these additional procedural requirements are significant. Plaintiffs seek, in essence, to transform the claims adjudication process at the RO level from an ostensibly non-adversarial proceeding into one in which the full panoply of trial procedures that protects civil litigants is available to veterans. For example, Plaintiffs seek the general right of discovery, including the power to subpoena witnesses and documents, the ability to examine and cross-examine witnesses, the ability to pay an

---

[7] The avoidable remand rate measures remands from the BVA to the ROs where the RO made an error in the initial adjudication of the claim. The current rate is between 19% and 44%. Findings of Fact ¶ 102.

-73-

**United States District Court**
For the Northern District of California

1   attorney, and the right to a hearing.[8]   Implementation and

2   maintenance of such a system would be costly in terms of the

3   resources and manpower that the VA would need to commit to the RO

4   proceedings.

5       47.  The Supreme Court addressed a similar challenge to the

6   VA benefits adjudication process in Walters, 473 U.S. at 307.

7   There, the plaintiffs challenged the statutory fee limitation on

8   attorneys during VA benefits proceedings.  Id. at 307.   The Court,

9   after noting that "the [benefit adjudication] process here is not

10  designed to operate adversarially," id. at 330, held that,

11  "[e]specially in light of the Government interests at stake," the

12  limit on attorneys fees did not violate the Due Process Clause.

13  Id. at 334.  In so doing, the Court noted the high showing

14  necessary to "warrant upsetting Congress' judgment that this is

15  the manner in which it wishes claims for veterans' benefits

16  adjudicated."  Id.  Although it might seem anomalous, as one

17  witness candidly suggested at trial, that criminal defendants and

18  undocumented immigrants are permitted to pay attorneys at their

19  initial proceedings while veterans are prohibited from doing the

20  same, Congress has nonetheless seen fit to establish such a system

21  and this Court, so long as the system does not violate the

22  Constitution, is powerless to alter it.  See also Vt. Yankee

23  Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S.

24  519, (1978) (stating:

25

26      [8]  The Court notes that veterans currently have the right to a
    hearing before an RO.  38 C.F.R. § 3.103(c) ("Upon request, a
    claimant is entitled to a hearing at any time on any issue involved
27  in a claim . . .").

28                              -74-

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

> Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.  This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute. But such circumstances, if they exist, are extremely rare.)

8    48.  For these reasons, the Court finds that the SCDDC

9  benefits adjudication process does not violate the Due Process

10 Clause.

11                **6.    Right of Access the Courts**

12   49.  Plaintiffs assert that the lack of adequate procedural

13 protections for veterans in the SCDDC claims process deprives

14 claimants of meaningful access to the courts and of their right to

15 redress grievances in violation of the First Amendment and the Due

16 Process Clause.  Plaintiffs argue that the cumulative effect of

17 foreclosing the opportunity to subpoena witnesses and records,

18 disallowing payment of counsel, and requiring veterans to rely on

19 non-neutral VBA service representatives denies veterans any

20 meaningful opportunity to litigate their appeals at the CAVC and

21 the Federal Circuit.

22   50.  A forward-looking denial of access claim requires "an

23 arguable underlying claim and present foreclosure of a meaningful

24 opportunity to pursue that claim."  Broudy, 460 F.3d at 121

25 (relying on Lewis v. Casey, 518 U.S. 343, 353 (1996), and

26 Christopher v. Harbury, 536 U.S. 403, 415)).

27   51.  Plaintiffs' claim is foreclosed by Walters, 473 U.S. at

28                                 -75-

1   305, and by this Court's finding that the SCDDC benefits

2   adjudication process does not violate the Due Process Clause.

3        52.   In the present case, as in <u>Walters</u>, "the asserted First

4   Amendment interest is primarily the individual interest in best

5   prosecuting a claim . . . ." <u>Walters</u>, 473 U.S. at 335.  The Court

6   in <u>Walters</u>, however, rejected the notion that there was a

7   meaningful distinction between the plaintiffs' due process claims

8   and their First Amendment claim, stating, "appellees' First

9   Amendment arguments, at base, are really inseparable from their

10  due process claims." <u>Id.</u>  Accordingly, the appellees' "First

11  Amendment claim ha[d] no independent significance" from the due

12  process claims.  <u>Id.</u>  The same analysis is directly applicable to

13  the present action.  For these reasons, Plaintiffs' right of

14  access claim is without merit.

15                 **7.   Extraordinary Awards Procedure**

16       53.   Plaintiffs assert that the informal adoption of the

17  Extraordinary Awards Procedure ("EAP") by C&P, as described in the

18  Findings of Fact ¶¶ 111-13, <u>supra</u>, deprives veterans with claims

19  that would result in a retroactive payment of at least eight years

20  of benefits or a payment of more than $250,000 of their property

21  interest in the receipt of SCDDC benefits under the Due Process

22  Clause.[9]

23       54.   A brief review of the EAP: C&P is an organization within

24  the VA's central office in Washington, D.C., that is responsible

25

26       [9]   A similar challenge to the EAP is now pending in the
    Federal Circuit.  <u>See</u> <u>Military Order of the Purple Heart v. Sec'y</u>

27  <u>of Veterans Affairs</u>, Docket No. 2008-7076 (Fed. Cir.).

28                               -76-

**United States District Court**
For the Northern District of California

for setting the policies governing adjudication of SCDDC claims.

Although C&P is not empowered to decide claims, it does convey

policies and procedures to ROs by publishing manuals.  When there

are changes to a procedure within a manual, C&P issues "Fast

Letters" to RO directors.  In Fast Letter 07-19, dated August 27,

2007, C&P outlined the EAP.  This procedure is not specified in

any statute or regulation.  The procedure directs ROs

to send the claims folders for all cases meeting the criteria[10] to

C&P for a concurring opinion before the benefit award is given to

the veteran.  C&P reviews only the granting of such claims by ROs,

not denials, and veterans are not notified that their claims are

reviewed pursuant to this procedure.  C&P has reviewed

approximately 800 rating decisions and almost all of these reviews

resulted in a reduction of the proposed benefits.[11]

55.  The Secretary of the VA may delegate the "authority to

act and to render decisions, with respect to all laws administered

by the Department, to such officers and employees as the Secretary

may find necessary."  38 U.S.C. § 512(a).  In addition, the

"Secretary has authority to prescribe all rules and regulations

which are necessary or appropriate to carry out the laws

administered by the Department and are consistent with those laws,

including . . . the manner and form of adjudications and awards."

38 U.S.C. § 501(a).  In delegating authority for benefits

---

[10]  Claims that would result in a retroactive payment of at least eight years of benefits or a payment of more than $250,000 are reviewed by C&P.

[11]  These facts are taken from the Findings of Fact, ¶¶ 111-13, <u>supra</u>.

1  adjudication, the following regulation was promulgated:

2          Authority is delegated to the Under
           Secretary for Benefits and to supervisory
3          or adjudicative personnel within the
           jurisdiction of the Veterans Benefits
4          Administration designated by the Under
           Secretary to make findings and decisions
5          under the applicable laws . . . as to
           entitlement of claimants to benefits
6          under all laws administered by the [VA]
           governing the payment of monetary
7          benefits to veterans and their
           dependents, within the jurisdiction of
8          [C&P].

9  38 C.F.R. § 3.100.

10         56. As a threshold matter, Defendants argue that Plaintiffs

11 have failed to demonstrate that any of their members have been

12 affected or will be affected by the EAP. As Defendants concede,

13 however, a veteran whose benefit award is reviewed by C&P is never

14 told of this review process. Thus, for example, a veteran's

15 benefit may initially be set at $275,000 by the RO. Because the

16 award is greater than $250,000, however, the EAP is triggered and,

17 before the veteran is notified of this award, his claim folder is

18 sent to C&P. Hypothetically, C&P might then reduce the award to

19 less than $250,000. The veteran would subsequently be granted the

20 benefit without ever knowing that his award had been reduced by

21 C&P, or even that the benefit award had initially qualified for

22 EAP. As veterans have no way of knowing whether their benefits

23 were affected by the EAP, Plaintiffs have no way of demonstrating

24 that any of their members were adversely affected. For present

25 purposes, the Court is confident that Plaintiffs have standing to

26 pursue this claim, which the Court discusses in the following

27 Conclusion of Law, ¶ 57.

28                                                    -78-

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    57.  Plaintiffs argue that, in essence, the EAP is an extra-

2    judicial process that the VA has added to the benefits

3    adjudication system in an effort to strip veterans of benefits

4    that have already been determined by the RO.  As the above-cited

5    statutory language indicates, Congress provided the Secretary of

6    the VA with wide discretion in determining how benefits are to be

7    determined.  <u>See</u> 38 U.S.C. § 512(a).  Against this backdrop, the

8    Court is forced to conclude that the EAP is an internal management

9    directive that merely establishes the procedures by which a

10   certain class of benefits claims is reviewed.  The EAP is

11   essentially an auditing mechanism implemented by the VA to ensure

12   that these types of awards are accurately adjudicated.  Such a

13   procedure does not offend due process.

14

15   **VI.  POST-TRIAL HEARING**

16       On June 10, 2008, after the close of evidence, the Court held

17   a hearing regarding newly discovered evidence.  Docket Nos. 236,

18   237.  The evidence was an email sent by the PTSD Program

19   Coordinator of the Central Texas Veterans Health Care system, Dr.

20   Norma Perez, to her colleagues.  Plaintiffs apparently were

21   provided the email by a Washington D.C.-based non-profit

22   organization, which had procured the email through a Freedom of

23   Information Act ("FOIA") request.[12]  <u>See</u> Pls.' Letter to Court,

24   Docket No. 231.

25       At the hearing, the Court permitted the email to be entered

26   _____

27       [12]  It is unclear to the Court why this email was not produced
     by Defendants prior to the trial.

28                                   -79-

**United States District Court**
For the Northern District of California

1   into evidence and hereby designates the email Plaintiffs' Trial

2   Exhibit 1347.   In addition, Plaintiffs requested that the Court

3   enter into evidence the transcript from a June 4, 2008, hearing

4   held by the Senate Committee on Veterans Affairs.   This hearing

5   had been convened by the Senate Committee to address the above-

6   described email.   At the Senate hearing, testimony was received

7   from Dr. Norma Perez, Dr. Michael Kussman, Under Secretary for

8   Health, Dr. Katz, Deputy Chief of Patient Care Services Office of

9   Mental Health for the VA, and Admiral Patrick Dunne, Acting Under

10  Secretary for Benefits.   The Court entered the transcript for this

11  hearing into evidence and hereby designates it Plaintiffs' Trial

12  Exhibit 1348.

13       The email at issue contains the subject "Suggestion," and

14  states:

15           Given that we are having more and
             more compensation[-]seeking veterans, I'd
16           like to suggest that you refrain from
             giving a diagnosis of PTSD straight out.
17           Consider a diagnosis of Adjustment
             Disorder, R/O [Rule Out] PTSD.
18           Additionally, we really don't or
             [sic] have time to do the extensive
19           testing that should be done to determine
             PTSD.
20           Also, there have been some incidence
             [sic] where the veteran has a C&P is not
21           given a diagnosis of PTSD, then the
             veteran comes here and we give the
22           diagnosis, and the veteran appeals his
             case based on our assessment.
23           This is just a suggestion for the
             reasons listed above.
24  Ex. 1347.

25       At the hearing, Plaintiffs argued that the email was

26  compelling evidence of the VA's failure and/or refusal to properly

27  diagnose and treat PTSD.   In addition, Plaintiffs argued that

28                                -80-

**United States District Court**
For the Northern District of California

1    without further discovery, it would be impossible to know for sure

2    whether similar directives or "suggestions" were being followed at

3    other medical centers.  According to Plaintiffs, this email could

4    likely lead to further evidence of a systemic denial of PTSD care

5    to veterans.

6        The Court denied Plaintiffs' request to reopen discovery,

7    noting that the evidentiary record was closed except for the

8    limited purpose of admitting the email at issue and the Senate

9    testimony transcript and evaluating the import of their contents.

10       Dr. Perez is one minor supervisor in a bureaucracy of 230,000

11   employees.  At the time of the email, Dr. Perez had less than a

12   year in her position at the VA and the email she sent had limited

13   distribution.  Although the message Dr. Perez's email conveys is

14   troubling, the Court concludes that the email is not enough to

15   alter the fact that Plaintiffs have failed to demonstrate systemic

16   denials of health care and benefits and that, absent proof of

17   systemic problems, the Court is unable to grant the relief

18   requested by Plaintiffs.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28
                                          -81-

**VII.  <u>CONCLUSION</u>**

     The remedies sought by Plaintiffs are beyond the power of this Court and would call for a complete overhaul of the VA system, something clearly outside of this Court's jurisdiction. For the reasons stated above, the Court DENIES Plaintiffs' request for a permanent injunction and GRANTS judgment in favor of Defendants.


     IT IS SO ORDERED.


Dated: June 25, 2008

_____
UNITED STATES DISTRICT JUDGE